1          IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2

3   NORTH CAROLINA STATE CONFERENCE ) CASE NO. 1:13CV658
    OF THE NAACP, et al.,           )
4                                   )
            Plaintiffs,             )
5                                   )
    V.                              )
6                                   )
    PATRICK LLOYD MCCRORY, in his   )
7   Official capacity as Governor   )
    Of North Carolina, et al.,      )
8                                   )
            Defendants.             )
9   _____

10  LEAGUE OF WOMEN VOTERS OF NORTH ) CASE NO. 1:13CV660
    CAROLINA, et al.,               )
11                                  )
            Plaintiffs,             )
12                                  )
    V.                              )
13                                  )
    STATE OF NORTH CAROLINA, et al.,)
14                                  )
            Defendants.             )
15  _____

16  UNITED STATES OF AMERICA,       ) CASE NO. 1:13CV861
                                    )
17          Plaintiff,              )
                                    )
18  V.                              )
                                    )
19  STATE OF NORTH CAROLINA, et al.,) Winston-Salem, North Carolina
                                    ) July 7, 2014
20          Defendants.             ) 9:46 a.m.
    _____

21

22      TRANSCRIPT OF THE **PRELIMINARY INJUNCTION MOTION HEARING**
                      **VOLUME I OF IV**
23        BEFORE THE HONORABLE THOMAS D. SCHROEDER
                UNITED STATES DISTRICT JUDGE
24
        Proceedings recorded by mechanical stenotype reporter.
25      Transcript produced by computer-aided transcription.

APPEARANCES:

For the Plaintiff:
(NAACP)               PENDA D. HAIR, ESQ.
                      ADVANCEMENT PROJECT
                      1220 L Street, NW, Suite 850
                      Washington, DC 20005

                      DANIEL T. DONOVAN, ESQ.
                      BRIDGET K, O'CONNOR, ESQ.
                      KIRKLAND & ELLIS, LLP.
                      655 15th Street, NW, Suite 1200
                      Washington, DC 20005

                      IRVING JOYNER, ESQ.
                      N. C. CENTRAL UNIVERSITY SCHOOL OF LAW
                      P. O. Box 374
                      Cary, North Carolina 27512


(LWV)                 JULIE A. EBENSTEIN, ESQ.
                      DALE E. HO, ESQ.
                      AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                      125 Broad Street, 18th Floor
                      New York, NY 10004-2400

                      CHRISTOPHER A. BROOK, ESQ.
                      AMERICAN CIVIL LIBERTIES UNION OF NC
                      P. O. Box 28004
                      Raleigh, North Carolina 27611-8004

                      ALLISON JEAN RIGGS, ESQ.
                      SOUTHERN COALITION FOR SOCIAL JUSTICE
                      1415 W. Highway 54, Suite 101
                      Durham, North Carolina 27707

(USA)                 CATHERINE MEZA, ESQ.
                      JOHN A. RUSS, IV, ESQ.
                      DAVID G. COOPER, ESQ.
                      U. S. DEPARTMENT OF JUSTICE
                      Civil Rights Division
                      950 Pennsylvania Avenue, NW
                      Washington, DC 20530

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

```
1  APPEARANCES (Continued):

2  (Intervenor
   Plaintiff):          MARC E. ELIAS, ESQ.
3                       PERKINS COIE, LLP.
                        700 13th Street, NW, Suite  600.
4                       Washington, DC 20005

5

6  For the Defendants:

7  (State of NC)        ALEXANDER M. PETERS, ESQ.
                        N.C. DEPARTMENT OF JUSTICE
8                       P.O. Box 629
                        Raleigh, North Carolina 27602.

9

10 (State of NC)        THOMAS A. FARR, ESQ.
                        PHILLIP J. STRACH, ESQ.
11                      OGLETREE DEAKINS NASH SMOAK & STEWART
                        P. O. Box 31608
12                      Raleigh, North Carolina 27622

13 (Governor)           BUTCH BOWERS, ESQ.
                        BOWERS LAW OFFICE, LLC
14                      1419 Pendleton Street
                        Columbia, South Carolina 29201

15

16 (Amici)              H. CHRISTOPHER COATES, ESQ.
                        934 Compass Point
17                      Charleston, South Carolina 29412

18

19 Court Reporter:      BRIANA NESBIT, RPR
                        Official Court Reporter
20                      P.O. Box 20991
                        Winston-Salem, North Carolina 27120
21

22

23

24

25
```

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1                                  INDEX

2

3    **PLAINTIFFS' WITNESSES:**                          **PAGE:**

4

5    CAROLYN Q. COLEMAN

6        Direct Examination by Ms. Hair              53

7
     MELVIN F. MONTFORD
8
         Direct Examination by Ms. Ebenstein         69
9        Cross-Examination by Mr. Peters             82
         Redirect Examination by Ms. Ebenstein       85
10
11   SENATOR DANIEL T. BLUE JR.

12       Direct Examination by Ms. Hair              88
         Cross-Examination by Mr. Strach            121
13
14   GLORIA HILL

15       Direct Examination by Mr. Donovan          138
         Cross-Examination by Mr. Peters            156
16
17   GEORGE N. GILBERT

18       Direct Examination by Ms. Riggs            161
         Cross-Examination by Mr. Peters            196
19
20

21

22

23

24

25

1          P R O C E E D I N G S

2          **THE COURT:**  Good morning, everyone.  We are here on

3     Cases 13CV658, 13CV660, and 13CV861.  There are a number of

4     plaintiffs:  North Carolina State Conference of the NAACP,

5     League of Women Voters, et al., and United States of America,

6     et al. versus State of North Carolina and various defendants.

7          Let me ask, first, if you would, have you all make

8     your appearances.  I know that we have deviated from our normal

9     practice, and the plaintiffs are now on my right side of the

10    courtroom.

11         Ms. Hair, if we can start with you, if you would

12    state your appearance, please.

13         **MS. HAIR:**  Yes.  I'm Penda Hair representing the

14    North Carolina NAACP group of plaintiffs.

15         **MR. DONOVAN:**  Good morning, Your Honor, Daniel

16    Donovan, Kirkland & Ellis, for the NAACP.

17         **MS. RIGGS:**  Allison Riggs, Southern Coalition for

18    Social Justice on behalf of the League of Women Voters

19    plaintiffs.

20         **MS. EBENSTEIN:**  Julie Ebenstein with the ACLU on

21    behalf of the League of Women Voters plaintiffs.

22         **MS. MEZA:**  Catherine Meza representing the United

23    States from the Department of Justice.

24         **MR. RUSS:**  Bert Russ representing the United States

25    for the Department of Justice.

1          **MS. KARLAN:**  Pamela Karlan representing the United

2  States for the Department of Justice.

3          **MR. ELIAS:**  Marc Elias from the law firm of Perkins

4  Coie on behalf of the Duke Intervenor plaintiff.

5          **MR. BECK:**  Gill Beck, United States Attorney's

6  Office.

7          **THE COURT:**  All right.  Let me start then with the

8  defendants.  Mr. Peters.

9          **MR. PETERS:**  Good morning, Your Honor, Alexander

10  Peters with the North Carolina Attorney General's Office on

11  behalf of the State of North Carolina and the State Board of

12  Elections defendants.

13          **MR. BOWERS:**  Good morning, Your Honor.  My name is

14  Butch Bowers.  I'm here on behalf of Governor McCrory.

15          **MR. FARR:**  Good morning, Your Honor.  I'm Tom Farr.

16  I'm with the law firm of Ogletree Deakins in Raleigh, and we

17  are here as co-counsel for the Attorney General.

18          **MR. STRACH:**  Good morning, Your Honor, Phil Strach

19  also with Ogletree Deakins, co-counsel for the Attorney

20  General.

21          **MR. STEVENS:**  Good morning, Your Honor.  I'm Bob

22  Stevens for Governor McCrory.

23          **THE COURT:**  All right.  Anybody else wish to make an

24  appearance who has not done so?

25      (No response.)

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1          All right.  Let me make a few prefatory remarks

2     before we begin.

3          I set these various motions for hearing in all three

4     of these cases.  The cases have not been consolidated, at least

5     as of yet, for trial, but they have been consolidated for

6     discovery; and it seemed logical to me to hold this hearing

7     with all of them at one time.

8          In terms of the format, what's pending before the

9     Court at this time are motions for preliminary injunction under

10    Rule 65 of the Federal Rules of Civil Procedure as to certain

11    parts of what is North Carolina Session Law 381, sometimes also

12    referred to as House Bill 589; and the question is whether to

13    enjoin implementation of any part of the law before a trial on

14    the merits in the case.

15         Also pending before me is the defendants' motions for

16    judgment on the pleadings under Rule 12(c) of the Federal Rules

17    of Civil Procedure seeking dismissal of the claims that have

18    been brought against them.

19         Now, I have set all of these for hearing beginning

20    today because of the compact schedule that this case has.  Do

21    not assume that by setting the hearing and hearing the evidence

22    on the preliminary injunction request that I have necessarily

23    have already decided the Rule 12(c) motion.  I have not.  I

24    have determined only that the most efficient way to proceed is

25    to hear them all at once, and my thought of the format will be

1   there will be opening presentations by the lawyers as to what

2   they intend to show during the preliminary injunction aspect of

3   the hearing.  Then they can present evidence on both sides, and

4   then there will be an extensive period -- or what I assume will

5   be an extensive period of oral argument as to what the Court

6   then should do with that.

7          It is during that session of oral argument that, in

8   my mind, it makes the most sense to also discuss the Rule 12(c)

9   motions because the legal analysis is going to factor into both

10  sets of motions, and so that's why I have combined these.

11         As the parties know, they have filed what I have been

12  told are more than 6,500 pages of materials.  I have not

13  counted the pages, but I have reviewed the record; and my point

14  is to counsel please be very cognizant that you have already

15  filed an extensive record in the case.  The briefing itself may

16  have given a bad name to the term because I allowed the parties

17  to file up to four times the length of the normal brief in some

18  instances, at least double, I should say, but some of the

19  briefs were extensive, and I have read all of those as well.

20         Please focus your presentations on the key evidence

21  that relates to the factors that are before the Court at this

22  point in time.  This is not the trial on the merits.  This is a

23  motion on the plaintiffs' side for preliminary injunction under

24  Rule 65, which requires the parties to focus on the likelihood

25  of success on the merits, the likelihood of suffering

1   irreparable harm, the balance of the equities, and the public

2   interest, which must favor the injunction.

3          I am particularly focused on the fact that between

4   now and the scheduled trial date of July of next year there is

5   no presidential election, but there is the November election

6   and I suppose a primary in May.  So there are elections of

7   different cycles that are different from the presidential

8   cycles.  The parties have relied heavily on the presidential

9   cycles in their evidence, but, again, the request here relates

10  to the time period between now and trial.

11         So having said that, let me make one other request

12  somewhat in the form of a warning.  If counsel were permitted

13  to and did bring in any electronic devices for purposes of

14  their presentation today, please make sure those with ringers

15  are turned off.  This is the only time I will say it; but if

16  any of them go off in the courtroom, I am going to maintain

17  custody of it through the balance of the hearing.  So I don't

18  think you want that to happen.  So please be careful about

19  that.

20         Does anybody wish to be heard about any of the

21  logistics before we then turn to the primary reason that we are

22  here today?

23         Ms Hair, why don't we start with you, ma'am.

24         **MS. HAIR:**  Your Honor, good morning.  Each of the

25  plaintiffs groups will make a brief opening statement.

As you know, my name is Penda Hair, and I represent the North Carolina State Conference of the NAACP and the group of named plaintiffs who have requested that House Bill 589 be preliminarily enjoined.

This is a case about racial discrimination and voting, intentional discrimination against African Americans and Latinos in the State of North Carolina as well as discriminatory results under the Voting Rights Act.

Two recent anniversaries illuminate our aim here this week. We just celebrated the Fourth of July. I was on the Mall in D.C. for the fireworks as the crowd chanted, "USA, USA," and people of all races and backgrounds celebrated a belief that this is a great country, and it felt unshakable at that time. That scene on the Mall reminded me of what we aspire to be: One people, diverse, and where everybody is included.

But I had just come from Mrs. Eaton's kitchen on Thursday in Louisburg, and what I heard in her home reminds me that there is a deep stain of racism in this country's greatness. The information that Mrs. Eaton shared and that will be shared here in this courtroom is difficult to hear. It's painful and it's shameful, but I also found our country's greatness in her kitchen, in a woman who has spent so much of her life, over 70 years, working to make the right to vote available to people of all races. She and others in this

1   courtroom, like Mrs. Mary Perry and Mrs. Carolyn Coleman, are

2   true heroes.  They have devoted their lives to making the

3   aspiration of the Voting Rights Act real, to help remove that

4   stain and allow this country to realize its true greatness.

5           The 50th Anniversary of Freedom Summer is also this

6   summer, a time in civil rights history that causes us to both

7   celebrate and mourn.  Youth of all races went to Mississippi to

8   live with black families and help people register to vote, and

9   it struck me, when I watched the recent PBS documentary, that

10  there is a direct line running from Freedom Summer 1964 to this

11  courtroom today.  This is not about ancient history.

12          Three young men that summer, two white students,

13  James Chaney and Michael Schwerner, and an African American

14  Mississippi resident, Andrew Goodman, died.  They would be 72,

15  74, and 70 years old today if they had not been brutally

16  murdered for nothing more than helping African Americans

17  register to vote.

18          Freedom Summer was followed quickly by Bloody Sunday,

19  brutal beatings of voting rights marchers in Selma, Alabama.

20          Those events and others led to the enactment of the

21  Voting Rights Act of 1965.  It is this act, which was amended

22  in 1982, as well as the U.S. Constitution that brings us here

23  today.  We can never forget that we walk on sacred ground when

24  we are dealing with African American and Latino voting rights.

25          In my opening, I am going to focus on one of the

touchstones of Section 2:  Whether the challenged practices,

quote, interact with social and historical conditions to cause

an inequality in the voting opportunities enjoyed by

minorities.  One of the key inquiries under Section 2 focuses

on laying out those social and historical conditions for

African Americans in North Carolina, and there is no doubt that

there was a long period of time when North Carolina

discriminated against African Americans in voting and in other

areas of life that influenced the ability to vote, such as

education and employment and health.  This is well documented,

and it is judicially recognized.

The state and the private actors within the state as

well as the federal government discriminated explicitly, and

they also discriminated through so-called "neutral" practices

that fell more harshly on African Americans.

We know that this comprehensive oppression lead to

racially discriminatory results for African Americans.  For

example, today 34 percent of African Americans in North

Carolina live in poverty compared to 13 percent of whites.

Almost 16 percent of adult African Americans in North Carolina

have not graduated from high school compared to 10 percent of

whites.  Three times as many African Americans in North

Carolina are unemployed compared to whites.  27 percent of poor

African Americans in North Carolina do not have a vehicle

available to them compared to 9 percent of poor whites.  These

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1  are current numbers.

2           Despite progress since enactment of the Voting Rights

3  Act and other civil rights acts, the long arm of slavery and

4  Jim Crow still reaches into the present.  In terms of voting,

5  African Americans had to struggle in North Carolina.  For years

6  and years, North Carolina had a literacy test and a poll tax.

7  There was violence and intimidation and tricks designed to

8  prevent and discourage African American voting.

9           Those are some of the social and historical

10 conditions.  Let me turn to what it means for those conditions

11 to interact with the voting system to produce racial

12 inequality.

13          About 15 years ago, at the urging of the NAACP and

14 the black community, the General Assembly started trying to

15 increase voter participation in part to remedy the abysmal

16 record of its voting African American voters.  They enacted

17 early voting, weekend voting, same-day registration during

18 early voting, and other measures that allowed African Americans

19 to participate more fully.

20          After these improvements passed and only after these

21 voting practices were implemented, in federal election after

22 federal election, including the midterm elections and not just

23 presidential elections, African American registration and

24 voting increased substantially.  It not only increased, but it

25 increased in African Americans disproportionately using early

1    voting and weekend voting and same-day registration.  These

2    mechanisms worked together to allow African Americans to access

3    the ballot in new ways, and these mechanisms helped African

4    Americans overcome some of the interaction between social and

5    historical conditions and the prior voting system.

6              Why would these mechanisms help overcome that

7    interaction and why would taking them away create

8    disproportionate barriers?  It is common sense that a racial

9    group with less income, less education, less wealth, less

10   access to transportation, more poverty, more medical problems,

11   that moves more often and has been discouraged from voting by

12   both intimidation and exclusion would have a more difficult

13   time in registering and voting.  It is common sense that

14   members of that group would have a more difficult time

15   registering 25 days in advance of the election and traveling to

16   a voting site.  It is also common sense that more members of

17   that group proportionately will be discouraged from voting

18   because of fear of retaliation by employers, by owners of land

19   where they sharecrop, or just by anxiety about a process that

20   is official, still run by a predominantly white-controlled

21   system that requires you to stand in line and be scrutinized,

22   but we are not going to rely just on common sense.

23             As defendants have recognized, the plaintiffs have --

24   even defendants have recognized plaintiffs have submitted

25   substantial evidence in support of the motion for preliminary

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1   injunction.  We submitted documentary files from the State

2   Board of Elections, and we submitted testimony from

3   legislators, election officials, leaders in the African

4   American community, and leading experts in voting, experts that

5   are experienced, well respected, and have been recognized for

6   their work by other courts in voting rights cases.  Much of

7   this evidence is undisputed.

8           As we have already discussed, we will not be

9   presenting all of that evidence here today, but this week we

10  will have voters and voting rights advocates and officials who

11  administer the system and elected representatives testify.

12  These witnesses will bring the interaction to life.  They will,

13  in their own words, draw the connection between history,

14  current social and economic conditions, and African Americans'

15  ability to vote.

16          The witnesses will highlight the important history

17  that they themselves have lived and that their parents and

18  grandparents passed down to them, and these witnesses will show

19  how the long arm of oppression still impacts African Americans

20  who want to vote today.

21          The North Carolina General Assembly saw the increase

22  in African American voting after the enactment of these

23  reforms.  They knew that cutting early voting, repealing

24  same-day registration, and repealing -- making the other

25  changes would have a disproportionate impact on African

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  American voting.  They had been told previously and discovery

2  in this case has uncovered that the sponsors of House Bill 589

3  requested race data from the State Board.  Almost immediately

4  after the Supreme Court decided the *Shelby* case and freed the

5  state from preclearance, they ran this bill through the

6  legislature.  There was no legitimate reason to do this, and

7  you will hear from the legislators about this.

8          Indeed, preventing this type of manipulation of the

9  rules with the impact of negatively affecting African American

10 voting is exactly why we have Section 2, and it is why we have

11 established that there is a likelihood of success under Section

12 2.

13         Only after the provisions were implemented and

14 disproportionately used by African Americans did the General

15 Assembly repeal those very provisions, but we will also prove a

16 likelihood of success that House Bill 589 was enacted with an

17 intent to discriminate against African American voters.  We

18 know that the legislation was held up until after the *Shelby*

19 decision, and the inference is that the proponents knew it

20 would not pass preclearance.  The timing is suggestive of

21 racial intent.

22         Following *Shelby*, the chair of the Rules Committee in

23 the Senate, one of the leading proponents, called Section 5 of

24 the Voting Rights Act a headache that had been removed.  Let me

25 pause just there for a moment.  To call any provision of a law

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

that African Americans and other people had fought for, shed
blood for, beaten for, had crosses burned on their yard for, to
call that a headache, I would say that's direct evidence of
discriminatory intent.  It is such a callous disregard for the
pain and interests and feelings of an entire racial group.

         But there is overwhelming circumstantial evidence on
the timing, the impact, the fact that the legislators asked for
data on racial impact, that they knew what the impact would be,
and that there is simply no legitimate reason for passing this
law other than making it harder to vote.

         Both the intent and the effect of this law is to make
it harder to vote; and because of the history of discrimination
and current economic and social conditions, these ways of
making it harder to vote fall more heavily on African
Americans.

         President Johnson said the denial of the right to
vote based on race is a wrong that no American can justify, and
he said the right to vote for all on equal terms is one which
no American true to our principles can deny upon passage of the
Voting Rights Act.

         We ask this Court to hold the State of North Carolina
to these principles and to maintain the status quo until a full
trial on the merits is held.  We ask the Court to issue a
preliminary injunction that requires the State of North
Carolina to have the same voting practices in the midterm of

1  2014 that were in the midterm of 2010.  Thank you.

2          **THE COURT:**  Is there an election cycle in May?  Is

3  there a primary in May?

4          **MS. HAIR:**  There was a primary in May.

5          **THE COURT:**  No, in 2015?  Will there be one in 2015?

6          **MS. HAIR:**  Yes, I think there will be local elections

7  in 2015.

8          **THE COURT:**  Thank you.

9          **MS. RIGGS:**  May it please the Court, good morning,

10  Your Honor.

11          **THE COURT:**  Good morning.

12          **MS. RIGGS:**  Again, my name is Allison Riggs from the

13  Southern Coalition for Social Justice in Durham.  I'm here with

14  my colleagues from the ACLU on behalf of the League of Women

15  Voters of North Carolina, the North Carolina A. Philip Randolph

16  Institute, Unifour One, Common Cause North Carolina, and

17  several individual plaintiffs, representatives of whom are

18  sitting with us in the courtroom today.

19          Our clients are grassroots civic engagement

20  organizations and individual volunteers who have invested years

21  in fighting to expand access to the polls in North Carolina.

22  They are groups serving the least among us:  North Carolina's

23  most disadvantaged and marginalized citizens.  They have

24  witnessed firsthand the benefits that have flowed to these

25  citizens from the more level playing field that the legislature

created for voters in the last decade.  Melvin Montford, the

executive director of the North Carolina A. Philip Randolph

Institute, will share his firsthand knowledge of that later on

today.

The League of Women Voters plaintiffs are challenging

certain provisions of House Bill 589 -- the cut to early

voting, the repeal of same-day registration, and the

elimination of the counting of out-of-precinct provisional

ballots -- as violating the federal constitution and the Voting

Rights Act.

The evidence that has been presented to this Court in

briefing, a small glimpse of which the Court will see presented

live this week, will make two things abundantly clear.  The

first is that the challenged provisions, acting in concert with

each other and with the rest of House Bill 589, will interact

with social and historical conditions to cause inequality in

voting opportunities for African Americans.  The second thing

that will become abundantly clear is that the loss of these

challenged provisions, which it is undisputed that North

Carolinians have become hugely reliant upon over the last

decade, will make it harder for eligible voters to exercise

their constitutional right to vote.

Weighed against these obvious conclusions, there is

no evidence of valid, nondiscriminatory justifications for

these changes.  When exposed to the barest light of scrutiny,

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  defendants' proffer of justifications completely evaporate.

2        Over the next several days, the Court will hear

3  evidence that will place in context why House Bill 589 will

4  have such a detrimental effect on voters of color and will

5  create significant burdens for all North Carolina voters.

6        Understanding the trajectory of North Carolina's

7  election laws over history and especially in recent years is

8  critical to understanding the effect of House Bill 589.  First,

9  as Ms. Hair mentioned, our state has a long history of racial

10  discrimination in voting and in other areas.  The Voting Rights

11  Act has been an enormously important tool in addressing the

12  lasting effects of racial discrimination and in moving towards

13  a more level playing field, but its work isn't done yet.

14        The Court is going to hear from long-time election

15  administrators Gary Bartlett and George Gilbert, who will

16  explain how the enactment of voter-friendly legislation over

17  the course of their careers opened political participation in

18  North Carolina.  In the late 1980s through the 1990s, North

19  Carolina voters found voting to be very onerous because of

20  incredibly long lines, and that burden was reflected in our

21  state's turnout.

22        Dr. Morgan Kousser documented in his report that in

23  1988 North Carolina ranked 48th in voter turnout in the

24  country, but by 2012, North Carolina ranked 11th with nearly

25  65 percent of the statewide, voting-eligible population turning

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1  out to vote.  The rankings skyrocketed after the 2000

2  implementation of no-excuse, in-person absentee voting, better

3  known as early voting.

4        You will hear testimony that early voting provided

5  cost savings to counties and offered critical relief for

6  Election Day administration.  In the 2012 election, 900,000

7  North Carolinians voted during the now eliminated first 7 days

8  of early voting.  Those voters have to go somewhere or, when

9  faced with the reality of vastly longer lines in the remaining

10 period, some of those voters will just stay home entirely.

11        The League's expert, Dr. Paul Gronke, explained how

12 that is precisely what happened in Florida in 2012.  Dr. Ted

13 Allen's analysis, other expert on the League's part -- his

14 analysis, uncontested on this motion, quantified what the

15 deterrent effect will be on North Carolina voters, but the

16 legal flaws of House Bill 589 don't end there.

17        As Ms. Hair discussed, African Americans in this

18 state have consistently disproportionately availed themselves

19 of the mechanisms in question in this case, disproportionately

20 availed themselves of early voting, of same-day registration,

21 of out-of-precinct voting, and those facts are uncontested in

22 this court.

23        In 2005, the legislature, after making detailed

24 findings on how many voters would be disenfranchised if

25 out-of-precinct provisional ballots were discarded and making

1  findings about how African American voters disproportionately

2  used out-of-precinct provisional ballots, enacted clarifying

3  legislation to ensure that voters who went to the polls on

4  Election Day had their votes counted; and not once, not once

5  were county administrators unable to achieve their mandate to

6  count valid out-of-precinct ballots, and tens of thousands of

7  North Carolinians, whose ballots would have otherwise been

8  tossed aside, got to have their say in important elections.

9          In 2007, the legislature enacted same-day

10 registration.  As you will hear from Dr. Charles Stewart,

11 hundreds of thousands of voters, who otherwise would have been

12 completely denied the right to vote, were able to cast regular

13 ballots and have them counted because of same-day registration;

14 and you will hear about the safeguards built into same-day

15 registration, making it a safe and effective way of registering

16 voters.

17         Same-day registration removed a significant barrier

18 to political participation that regularly impeded voters in

19 this state who experienced housing instability and economic

20 challenges, and the undisputed fact again is that in North

21 Carolina those voters are disproportionately voters of color.

22         Against this backdrop, decades, years and years of

23 equalizing access to the voting booth, the passage of House

24 Bill 589 represented a dramatic departure from years of

25 legislation that made it easier to vote in this state.  When

House Bill 589 was introduced in April of 2013, it was a much narrower bill, proposing only to create a photo ID requirement for voters. House leadership promised a, and I quote, deliberative, responsible, and interactive approach to the legislation; but on June 25, 2013, the rules of the game changed. The United States Supreme Court decision in *Shelby County* came down. North Carolina was no longer subject to federal review of voting changes, and that opened the floodgates. Within days of the end of the legislative session, a dramatically revamped bill was sprung on the public. Members of Senate Rules Committee received the new bill. What was previously a 16-page bill now transformed into a 57-page bill only 16 hours before the Rules Committee met on July 23, 2013.

Within two days of that bill being introduced in committee, the law had been passed by both chambers of the legislature. No public hearings were held on the expanded bill and only a total of 20 minutes of public comment, unadvertised public comment, were allowed in front of the Senate Rules Committee. That is the extent of the legislative process.

The evidence you will hear this week will demonstrate that not only does House Bill 589 represent a huge step backwards in terms of voter access, but it also creates unconstitutional burdens on the right to vote by making it significantly harder for voters to exercise their right to vote through means they have undisputedly become very reliant upon

1  in the last decade.

2          Discovery in this case isn't complete.  We won't go

3  to trial for another year, but there is a major election that

4  will happen.  The November 2014 election is a major election,

5  and that will happen before the Court is presented the full

6  evidentiary record.

7          Given what's at stake in this case, the ability of

8  tens of thousands of North Carolinians to exercise their

9  constitutional right to vote in an unimpeded manner, the

10  balance of equities weigh heavily in favor of granting the

11  injunction.

12          Election administrators can and will do their job,

13  which is to provide eligible voters with access to the ballot.

14  Thus, the League of Women Voters plaintiffs respectfully move

15  this Court to grant its motion for a preliminary injunction and

16  to deny the State's motion for judgment on the pleadings.

17  Thank you.

18          **THE COURT:**  All right.  Thank you.  I noticed you

19  didn't mention the discretion of keeping the polls open.  Is

20  the League moving as to that?

21          **MS. RIGGS:**  We are not, Your Honor.

22          **THE COURT:**  Thank you.

23          **MS. MEZA:**  Good morning, Your Honor, Catherine Meza

24  representing the United States.

25          Before I proceed with a brief opening statement on

behalf of the United States, I would like to introduce the
United States Attorneys from North Carolina that are in the
courtroom today:  Ripley Rand of the Middle District, Anne
Tompkins of the Western District, and Thomas Walker of the
Eastern District.  I would also like to introduce my colleagues
from the U.S. Department of Justice:  Pamela Karlan, Deputy
Assistant Attorney General for the Civil Rights Division; Gill
Beck of the U.S. Attorney's Office; and Bert Russ.  Also in the
courtroom are Jenigh Garrett, David Cooper, and Elizabeth Ryan.

          Your Honor, the United States is seeking an
injunction barring defendants from enforcing three provisions
of North Carolina's House Bill 589, including the law's
reduction of the early voting period, the elimination of
same-day registration, and the prohibition on the counting of
out-of-precinct provisional ballots.

          Based on the evidence already before the Court and
the testimony that you will hear during the course of this
week, the United States will make a clear showing of likely
success on the merits of its claim that these provisions have
both the purpose and the result of denying and abridging the
right to vote of African Americans in violation of Section 2 of
the Voting Rights Act.  As you have heard from the other
plaintiffs, the record includes extensive evidence satisfying
the results prong of the Section 2 inquiry.

          The findings of the United States' expert,

1  Dr. Charles Stewart, which are presented in his declarations

2  and which he will testify about during this hearing, confirm

3  that these provisions disproportionately burden African

4  Americans voters compared to white voters.

5          The record also includes evidence of --

6          **THE COURT:**  Are you saying that the evidence is going

7  to show that the provisions disproportionately burden, or the

8  elimination of the provisions that previously were in effect

9  disproportionately burden?

10          **MS. MEZA:**  Well, in the case of early voting, for

11  instance, there is the reduction in the early voting period;

12  and in the other two, yes, the elimination of same-day

13  registration and the elimination or prohibition on

14  out-of-precinct provisional balloting will disproportionately

15  burden African American voters.

16          **THE COURT:**  I thought I read in the Government's

17  briefing that it accepted the standard that, under Section 2,

18  you look at the opportunity available under the current

19  situation, that is, post-enactment of the legislation, between

20  African Americans and whites.

21          Is that the Government's position?  Is that

22  accurately stated?

23          **MS. MEZA:**  Yes, it is.  My statement regarding the

24  findings of Dr. Charles Stewart, however, is that elimination

25  of the same-day registration as well as the counting of

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

provisional ballots and the reduction of the early voting

period -- his findings show that all of these will

disproportionately burden African American voters.

   **THE COURT:** In other words, his evidence is going to

show that the current situation with 10 days of early voting,

no same-day registration, and no out-of-precinct voting results

in an inequality of opportunity between African Americans and

whites?

   **MS. MEZA:** Yes, Your Honor.

   **THE COURT:** Okay.

   **MS. MEZA:** The record also includes evidence of the

Senate factors most relevant to a voter access case, like this

one, including the state's history of racial discrimination,

the ongoing socioeconomic disparities between minority voters

and white voters, including, as you've heard, poverty,

unemployment, lower educational attainment, and lack of access

to transportation. Another factor is the tenuous nature of the

justifications offered in support of HB589 and the

unresponsiveness of elected officials to the needs of minority

voters, all of which will interact with the challenged

provisions in violation -- to result in a violation of Section

2.

   The evidence also shows that HB589 was enacted with a

discriminatory purpose. As noted, the record includes

undisputed evidence that at the time that HB589 was being

considered, legislators supporting the bill requested and were
aware of data from the State Board of Elections showing that
these changes would impose a disproportionate burden on African
American voters, and, yet, they proceeded to enact the law
anyway.

The sequence of events leading up to the bill show
that HB589 was intended to target the very reforms that had
expanded opportunities for African Americans for over a decade.

The evidence also shows that HB589's passage through
the General Assembly was secured through a series of departures
from the normal legislative process.  Again, the version of the
bill that passed the house was a very short 16-page bill that
was dedicated primarily to voter ID requirements.  Following
the Supreme Court's decision in *Shelby County v. Holder*, it
morphed into a 57-page omnibus bill with numerous additional
provisions, including the changes that the United States is
seeking to have enjoined.  The new version of the bill was
fast-tracked through the General Assembly with virtually no
opportunity for any meaningful debate or consideration.

**THE COURT:**  There is some -- well, let me put it this
way:  The defendants' position is that they followed all of the
rules.  Does the United States challenge that proposition?

Putting aside the question of the inferences that can
be drawn nevertheless, does the United States accept that, at
least for purposes of the rules that were applicable to the

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1   passage of legislation, that HB589 at least dotted all the Is

2   and crossed all the Ts, if you will?

3          MS. MEZA:  Well, we are disputing that there were --

4   we are asserting that there were procedural departures from the

5   legislative process.  Under Section 2, whether or not the rules

6   of the Senate or the House were followed are inconclusive.

7   There were departures from the normal process.

8          THE COURT:  I understand that.  That's why I asked,

9   putting aside what inference can be drawn -- it may be the

10  usual practices to do one thing, and my question was simply

11  limited to determining whether the Department of Justice

12  accepts that the legislation at least followed all of the rules

13  to the extent none was violated.

14          Is that true or is that untrue, or do you know?

15          MS. MEZA:  The rules -- again, we don't dispute that

16  the rules may have been followed, but there are departures from

17  the normal process.

18          THE COURT:  From normal practice?

19          MS. MEZA:  Yes.

20          THE COURT:  I understand that part.  I was just

21  trying to determine whether you are claiming that any rules

22  were violated in the process.  From what I am hearing, you

23  say --

24          MS. MEZA:  Based on what we know at this time, we are

25  not disputing that.

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1          **THE COURT:**  I understand.  Thank you.

2          **MS. MEZA:**  Without an injunction to stop the

3  enforcement of these challenged provisions during the upcoming

4  2014 election, African Americans will suffer irreparable harm.

5  That is because HB589 forecloses an equal opportunity to

6  register, to vote, and to have their ballots counted.

7          Unbalanced, these significant interests outweigh any

8  interests defendants may have in continuing to enforce the

9  provisions of this law.  Accordingly, following the close of

10 this evidence and oral arguments on the pending motions, the

11 United States will request that this Court grant its motion for

12 preliminary injunction and deny defendants' motion for judgment

13 on the pleadings.  We will further ask that the Court grant the

14 United States' interlocutory motion for appointment of Federal

15 Observers under Section 3(a) of the Voting Rights Act.

16          Thank you, Your Honor.

17          **THE COURT:**  Thank you.

18          **MR. ELIAS:**  Good morning, Your Honor, Marc Elias on

19 behalf of the Duke Intervenor plaintiffs.  I am mindful of your

20 time and the extensive record that has been developed, so I

21 will be extremely brief.

22          Over the next few days, you will hear lots of

23 evidence.  You will hear little from us, and there is a reason

24 for that.  The State of North Carolina has simply not engaged

25 in the claims we have brought.  The Duke plaintiffs are young

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

voters who, the undisputed evidence shows, have been
discriminated against by virtue of the changes in the election
law.

        The State of North Carolina has responded in one page
in a reply brief to their 12(c) motion, saying that nothing
more need to be said other than no 18-year-old or young voter
has had their right to vote denied.  This is, of course, not
the standard under the Twenty-Sixth Amendment, but I will be
back in a few days at the end of the evidence where we can
address that.

        What I wanted to explain at the outset is why you
won't be hearing evidence from us other than to elicit
testimony from one of the witnesses that the State intends to
call, and that is because if you look at the uncontested
evidence that is already in the record, if you look at the
expert reports that we have filed, if you look at the testimony
of their witnesses, what you will see is that the State of
North Carolina changed the law in a number of significant ways
with the intent and effect of making it harder for young voters
to vote.

        Young voters are uniquely targeted by this law.
Preregistration is done away with.  Preregistration is done
away with, and the record shows even for 17-year-olds at the
Department of Motor Vehicles, where most people register to
vote -- preregistration is done away with for those

1  17-year-olds who show up to get their driver's licenses who

2  will turn 18 before Election Day.  Now, that's probably an

3  independent violation of NVRA, the Motor Voter law.

4          **THE COURT:**  My understanding was that the defendants

5  say they have corrected whatever that problem was.

6          **MR. ELIAS:**  I think it will be illuminating for the

7  Court to hear from that witness on this question, whether what

8  the State is saying is that that provision is being corrected

9  or has been corrected.

10          But in either event, Your Honor, as you judge the

11  intent, what was the legislature trying to do when it said

12  let's stop the preregistering of 17-years-olds, and the state

13  immediately ran with it and said, enough, no more registering

14  at DMV for 17-year-olds?  What can you glean from intent about

15  what the state was trying to do when the state said you can use

16  a tribal identity card, you can use a North Carolina driver's

17  license, but that UNC ID issued by the same state government,

18  can't use that?

19          What can we glean that the state was trying to do

20  when it passed this law that in provision after provision had a

21  direct impact on the young voters in this state?

22          Like I said, I will save the legal argument for the

23  end.  I will only say that our silence over the next three days

24  during the evidence only reflects the fact that the State

25  itself has been silent in rebutting the evidence that we have

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1 brought forward or offering any evidence of its own.  The

2 entirety of its legal claim can be found on one page of a reply

3 brief after we embarrassed it by saying you've probably waived

4 your argument.  They said, no, no, we didn't waive it, and here

5 it is in our reply belief.

6          So, Your Honor, I will be back at the conclusion of

7 the evidence to make arguments to what the Twenty-Sixth

8 Amendment means, but I think the state has made an interesting

9 decision, an interesting roll of the dice, which is that it

10 believes that its reading of the Twenty-Sixth Amendment is so

11 correct that it doesn't need to worry about the facts.  Yep, we

12 discriminated against young voters.  Yep, we targeted

13 preregistration.  Yep, we targeted young voters through the

14 elimination of college IDs, state-issued college IDs as a form

15 of voter registration.  Yes, it turns out that some of the

16 rhetorical flourishes on the floor talk about how young college

17 students don't pay squat in taxes, and that's a reason to go

18 after them.  They rolled the dice in letting all of that

19 evidence sit.

20          So as this Court judges likelihood of success on the

21 merits, what they've got left is that I'm wrong on what the

22 Twenty-Sixth Amendment means, and they are right.  I know I am

23 right on what the Twenty-Sixth Amendment means, but that's why

24 we are not going to be bringing forward any further evidence

25 because the evidence that is in all those binders up there

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1 right now tip the scale in only one direction.

2        Thank you, Your Honor.

3        **THE COURT:**  Before you leave and since you will have

4 two or three days to think about it, are any of your plaintiffs

5 under 18?

6        **MR. ELIAS:**  No, Your Honor.

7        **THE COURT:**  They have not brought an associational

8 claim.  Is there any question about their right to bring the

9 claims, that is, the standing issue?  I didn't see it addressed

10 by any of the parties.  I just wondered about that.

11        **MR. ELIAS:**  Your Honor, I am happy to address it now.

12 I am happy to address it later.  I promised I would be brief.

13 Let me say only this now, and then perhaps later is a better

14 time to address it more fully.

15        For purposes of the preliminary injunction, what the

16 Court needs to be mindful of, and I think this is well

17 supported in the case law, is that what the legislature did was

18 create a wonderful meal, and they threw all of these

19 ingredients into the meal, and it turns out some of those

20 ingredients are rotten.  The fact is we know that they targeted

21 young people through preregistration elimination.  We know that

22 they targeted young people through the ID.  We know that at

23 least some of the rhetorical flourish in the legislature

24 suggested that they had animus towards young voters.

25        So the question is not just whether those individual

1  provisions can be challenged by these plaintiffs, but whether

2  or not putting those ingredients into the meal taints the whole

3  meal.  My argument, Your Honor, is that for purposes of the

4  preliminary injunction, the fact that they showed animus in

5  those provisions just shows that the entire bill had animus

6  towards my clients.  It is not just those individual

7  provisions, but when you look at the elimination of same-day

8  registration --

9          **THE COURT:**  Who are your clients?

10         **MR. ELIAS:**  Individual voters who are young people

11 who have relied upon same-day registration, who have relied on

12 out-of-precinct voting, who have relied on early voting.

13         **THE COURT:**  I understand that they may have a gripe

14 with those aspects, and as voters, I understand that they may

15 be injured -- they claim to be.

16         My question is how can someone who is already over

17 the age of 18, or at least 18 -- how can they be injured by the

18 elimination of preregistration, and what test does the Court

19 apply to determine whether they can pursue that claim?

20         **MR. ELIAS:**  I will be happy to address the standing

21 issue more fully in argument.  I would say only that the --

22 even if my clients didn't have standing to challenge, for

23 example, preregistration, it is strong evidence of what the

24 legislature intended in the entirety of the bill, that it

25 targeted young voters.  It is strong evidence of what the

1  legislature --

2         **THE COURT:**  Is a -- who is a young voter?

3         **MR. ELIAS:**  Certainly 18 to 25.

4         **THE COURT:**  Is that a protected class?

5         **MR. ELIAS:**  I believe under -- precisely under the

6  Twenty-Sixth Amendment, it is, Your Honor, and that's what

7  we'll have legal argument --

8         **THE COURT:**  But the 18 to 25, they're not having

9  their -- as I understand it, they are not having their right to

10 vote eliminated because they already had it.

11        **MR. ELIAS:**  Correct, Your Honor, but the Twenty-Sixth

12 Amendment doesn't prevent only elimination; it prevents

13 abridgment.

14        **THE COURT:**  But they are not having it abridged if

15 they already have the right to vote by preregistration being

16 eliminated, are they?

17        **MR. ELIAS:**  The elimination of preregistration is

18 evidence of the mental state of mind of the legislature in a

19 bill.

20        **THE COURT:**  I accept that it might be evidentiary as

21 we proceed for the next several hours.  I hesitated to talk

22 about days.

23        **MR. ELIAS:**  I figured I would break the ice.

24        **THE COURT:**  But I am concerned about whether these

25 plaintiffs have any injury; and, therefore, I am concerned

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

about the question of whether they can bring a claim as to the
preregistration because they are not in the group that is going
to be injured.  They already have the right to vote.

Now, can they claim that same-day registration, early
voting, out-of-precinct, maybe that somehow injures them?  I
will leave that for a later argument.  I am now just focused on
the one claim of the elimination of preregistration somehow
injuring your clients; and I have to say I have a big concern
about the test to apply and whether there is an injury, and it
was not addressed as far as I can tell by anybody in the
litigation.

**MR. ELIAS:**  I think it's fair to say that the State
addressed virtually nothing regarding my clients' claims.  With
the Court's indulgence, I am happy to address those at the time
that we get to argument.  I was simply trying to make the
narrow point that even if you later were to come to the
conclusion that my clients did not have standing to challenge
preregistration, the Court could still, as an evidentiary
matter, say, well, what is the fact that the legislature did
that in the same bill -- what does that tell us about what the
legislature was thinking?  What was on its mind when it took
college IDs out of the bill?  What was on its mind when it did
away with preregistration?  What was on its mind when it did
away with college and high school, which also, by the way, are
stated-issued or at least municipal-issued IDs?  What was on

1   its mind when it did those things, and is that evidence when we

2   now look at these other provisions?

3          The same-day registration, the out-of-precinct voting

4   is all in one bill.  As has been described, this was a

5   miraculous bill that came from 17 pages to 55 pages, or I may

6   have the numbers wrong.

7          **THE COURT:**  I think it was 57.

8          **MR. ELIAS:**  What was in its mind as that sprung

9   forward?

10         I would argue that the State has done nothing to

11  contest the facts that we have brought forward; and, therefore,

12  I would be happy to address the legal issues.

13         **THE COURT:**  As you can tell, I would be intensely

14  interested in that one question.

15         **MR. ELIAS:**  I will come with it first on my mind.

16         **THE COURT:**  Thank you very much.

17         **MR. ELIAS:**  Thank you, Your Honor.

18         **THE COURT:**  All right.  Mr. Peters?

19         **MR. PETERS:**  Thank you, Your Honor.  May it please

20  the Court, again I'm Alexander Peters of the North Carolina

21  Attorney General's Office.

22         We recognize, as the Court has already said, this has

23  been thoroughly briefed.  The Court has already been over the

24  standard for preliminary injunction, but there is one thing

25  about the preliminary injunction that I do think bears

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

mentioning other than the standard itself, and that's the

purpose of a preliminary injunction.

        The purpose of a preliminary injunction is to

maintain the status quo, and the plaintiffs have said this

morning that that's what they are asking is the Court maintain

the status quo; but that is not correct because the status quo

is that the provisions of House Bill 589 have already gone into

effect.

        **THE COURT:**  Isn't it -- under the law, though, isn't

the status quo in this kind of context -- when something is

alleged to be unconstitutional, that the status quo would be

the status quo ante, that is, the position before the allegedly

unconstitutional enactment?

        **MR. PETERS:**  I think, as a general rule, it could be,

Your Honor, but I think in this particular instance there are

reasons why that should not be the case.

        I can jump ahead here, but that goes to the balance

of the equities and, particularly, the public interest here

because what we are talking about are -- is an election that

has already started, that started in May -- or actually started

before May when people started filing, a primary that has been

conducted under the new rules, a second primary that is ongoing

as we speak.  As I drove in this morning, I saw people going in

to vote and campaigning at the county building a block and a

half away.

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1          So, here, we are talking about provisions that have

2     already gone into effect.  Elections are being held under those

3     provisions, and what the plaintiffs are asking is that

4     essentially in the middle of the election cycle, we switch and

5     go back to old rules.  I think that clearly is not in the

6     public interest, to change the rules in the middle of an

7     election.

8          **THE COURT:**  Will there be a period of time that will

9     be, if you will, a quiet period where there won't be any actual

10    election until the fall election when it starts with early

11    voting 10 days before the second Tuesday in November?

12         **MR. PETERS:**  If you are talking, Your Honor, about a

13    quiet period in terms of the voter who is not going to the

14    polls until one-stop absentee starts in October, then, yes,

15    there is a quiet period.  There is no quiet period for

16    elections officials, however, because those elections officials

17    now, if they have not already done so, are having to line up

18    their locations for one-stop absentee voting.  They are having

19    to make sure they have the forms and the papers in place that

20    they need, that they have it all lined up.

21         So as far as elections officials are concerned -- and

22    declarations that we have provided the Court say specifically

23    this:  Changing things at this stage of the game could pose a

24    substantial hardship on those elections officials, especially

25    since they rely on the budgets that county commissioners set

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1 for them, which has already been decided for the upcoming

2 fiscal year.

3          So I think it is important to look at the status quo.

4 Even if the general rule is you look at the status quo ante the

5 litigation being filed, that, here, we are talking about --

6 what the plaintiffs are asking is changing the rules in the

7 middle of the election.

8          Briefly, Your Honor, as we laid out in our briefs, we

9 think it is clear that the plaintiffs are not likely to succeed

10 on the merits of their claim.  They make arguments that the

11 provisions we are talking about have been relied on by them and

12 the groups that they represent disproportionately in the past,

13 but they fail at a basic step of logic, and that is to tie that

14 together to the harm they say they will suffer as a result of

15 House Bill 589.

16          They have to show not just that there is a disparate

17 impact on them as minority voters or as young voters, but they

18 have to show that that disparate impact provides -- deprives

19 them of an equal opportunity to participate in the electoral

20 process; and everything they have submitted to the Court in

21 those thousands of pages is speculation as to that second step.

22          **THE COURT:**  Now, that speaks to Section 2.

23          **MR. PETERS:**  Yes, Your Honor.

24          **THE COURT:**  Are you contending that that applies to

25 the equal protection claims as well?

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1          **MR. PETERS:**  No, Your Honor.  I'm sorry.  I was

2    specifically referring to Section 2 there.

3          But a similar kind of analysis applies across the

4    board.  All that they have presented to the Court is reams of

5    evidence that these particular things -- same-day registration,

6    the full 17 days of early voting, preregistration,

7    out-of-precinct provisional ballots -- have been favored, are

8    election choices that the plaintiffs have preferred to use; and

9    their case boils down to we like them, they were taken away,

10   and you can't do that.  That is really what it all boils down

11   to because even all those experts failed to connect the dots as

12   to how House Bill 589 will have the effect they say it will

13   have.

14         I would point out to the Court that there's already

15   been some reference to the expert reports and what the experts

16   say.  I will point out to the Court that the defendants did not

17   have an opportunity to depose plaintiffs' experts until after

18   our response brief was already due.  We think -- we are

19   designating portions of those deposition transcripts for the

20   Court pursuant to the conversation we had last week because we

21   think when you read those transcripts, you will find that their

22   experts failed to connect those dots.  Those experts go so far

23   as to say things like it doesn't matter if those dots get

24   connected; these are their preferences, and taking away their

25   preferences is enough.

NAACP, et al. v. NC -- Preliminary Injunction/Vol. 1

1              The provisions we are talking about, no-excuse,

2    one-stop absentee voting, went into effect in 2000.  It is, of

3    course, still in effect.  What has changed are the number of

4    days and specific rules about whether those days can be on

5    Sunday.  What has also changed is that counties are no longer

6    free to be open some of those 17 days or have some spots in a

7    county open for those 17 days while others are not.  What has

8    changed is that now all the locations in the county must be

9    open for all of the days and for the same number of hours as in

10   the last comparable election unless the State Board of

11   Elections for good cause grants a waiver of that.

12             That's 14 years that we have had the one-stop

13   absentee.  It has not gone away.  It has just changed in form.

14             Out-of-precinct provisional voting went into effect

15   in 2004, 2005, and what plaintiffs failed to note when they

16   talked about the bill that clarified the intent of the General

17   Assembly as to out-of-precinct voting in the context of the

18   state superintendent of public instruction race and a race from

19   Guilford County is that when the General Assembly made

20   findings, their findings were not that African American voters

21   tend to use out-of-precinct provisional ballots more.  Their

22   findings were that the specific ballots in the cases that had

23   gone up to the Supreme Court disproportionately were from

24   African American voters.  That's a different thing.

25             Same-day registration went into effect in 2008.  It

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

has been in effect only for six years for two presidential

elections.  Preregistration only went into effect in 2010.

        **THE COURT:**  Let me back -- same-day registration

passed in 2007?

        **MR. PETERS:**  I believe it was passed in 2007, went

into effect January 1, 2008.

        **THE COURT:**  Thank you.

        **MR. PETERS:**  The 2008 election would have been the

first that it applied to.

        I noted during the opening -- plaintiffs' opening

statements, that as they went through these practices being put

into effect and encouraging the General Assembly to do it, put

these into effect, what they said was that they encouraged --

the plaintiff groups and others like them encouraged the

General Assembly, advocated for these changes because they

thought it would encourage more voter participation.

        What they did not say is because without them they

were denied an equal opportunity to participate in the

electoral process.  What they did not say is that without

same-day registration, without out-of-precinct provisional

balloting, without preregistration, without 17 days of early

voting an obstacle was placed in their ability to participate

in the electoral process.

        They encouraged it because they thought it encouraged

voting.  They advocated for these changes because they thought

it was good policy.  The fact that they prefer them, the fact

that they think same-day registration, out-of-precinct

provisional balloting, these things are good policy does not

mean that they are legally entitled to them.  Even -- once they

have gone into effect, it doesn't mean that they are entitled

for them to stay forever; they are entitled for it not to be

changed.

Under that theory, if the legislature were to try a

pilot program of any electoral change, and the plaintiffs liked

that, but the legislature decided overall it was not a good

system for the state, under their theory, they could say but

you can't take it away from us now because we like this system;

we like the way it works.

They would have the Court replace the requirement

that they have to show that their ability to participate

equally in the electoral process has been burdened by the law

with the requirement that they only need to show that the law

has eliminated the practice they prefer.  That does not equal

an obstacle, and it points up what we have said in our briefs,

that what they are really trying to do is superimpose a Section

5 claim onto a Section 2 case.

They are trying to say, once these things have been

put into place, they can't be taken away if we like them.  They

can't be taken away if there would be any effect.

They also -- when they failed to make their claims,

1  when they failed to connect the dots, they make lots of

2  predictions about how turnout is going to drop, how lines are

3  going to be longer, how people are not going to be able to

4  exercise a franchise because of these provisions that they

5  challenged; but everything they say there is hypothetical.

6  None of that is something that has actually been shown.

7  In fact, the one thing we have that goes to whether

8  or not those predictions are true are the results of the 2014

9  primary where participation among all voters was up, where

10 there was a 39 percent increase in one-stop absentee voting

11 over 2010, where there was, among African Americans, a

12 66 percent increase in the use of early voting compared to 2010

13 and an almost 30 percent increase overall in the election.

14 Now, I know the plaintiffs will say things like,

15 well, that doesn't take into account other factors such as that

16 Mecklenburg County may have had more spots open -- more

17 one-stop absentee voting locations open this year than they did

18 in 2010, and I would say that's exactly right.  It doesn't take

19 into account other information, which is exactly the problem

20 with their claims.

21 **THE COURT:**  How many people voted in the primary?

22 **MR. PETERS:**  Actually, I wrote all this down just in

23 case, Your Honor.  In total -- and that seems to be the one --

24 that seems to be the one number I did not write down was the

25 total overall.  It was 14.4 percent -- 15.8 percent of

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

registered voters in the primary.  The number that I have is

255,075 voted in early voting, but I am afraid the one number I

did not write down is the total voting for the primary.

      **THE COURT:**  Do you have the Election Day number on

that sheet?

      **MR. PETERS:**  That's the one number -- well, those two

numbers I guess I am missing, but I need to get that total.

      **THE COURT:**  And will there be any evidence as to what

the expected turnout is in November of 2014?

      **MR. PETERS:**  At this point, Your Honor, I don't know

that we intend to put on evidence of that point.  As we said

before, we intend for our evidence to primarily be rebuttal for

what the plaintiffs put on.

      We can look back at 2010 and make judgments from

that, but what the plaintiffs do is they say participation went

up in these years, in the 2000s, and this is the same time that

early voting went into effect and that same-day registration

was in effect and out-of-precinct provisional ballot was in

effect; therefore, they must be connected and, therefore,

taking away same-day registration or out-of-precinct

provisional balloting will of necessity decrease turnout.  They

ignore other things that could have been going on and that were

going on, such as presidential elections and the dynamics of

the presidential elections, particularly in 2008 and 2012, the

dynamics of the campaigns that were run in North Carolina when

1  all of sudden, for the first time in years, North Carolina was

2  a battleground state and a state that the major candidates

3  thought was worth fighting over.

4      We think, if nothing else, the 2014 primary shows

5  that the plaintiffs are not likely to suffer irreparable harm

6  if the injunction is not issued because the harm they predicted

7  in the primary did not come to pass.  Now, they will say --

8  they've said, some of their experts and their witnesses, well,

9  you don't really notice it when it's not a presidential

10 primary.  The presidential primary is really where the rubber

11 is going to hit -- or presidential election is really where the

12 rubber is going to hit the road, and you are going to see the

13 long lines, and you are going to see all of these things we are

14 predicting will happen.

15      Well, there is not a presidential election this year.

16 If it's the presidential elections that what we need to be

17 worried about, the Court will have the opportunity for trial or

18 a summary judgment hearing prior to the presidential elections.

19      And one thing I would like to point out, since you

20 brought it up early -- I will double-check this as the week

21 goes along, but my memory is there is no primary in May in 2015

22 for local elections.  The one exception to that that I wanted

23 to make sure I check is if there are any partisan local

24 elections that might have an earlier primary, but many local

25 races are nonpartisan, and most of those races occur in the

1  fall.  Many municipalities in counties will have a setup where

2  essentially what would be considered Election Day is a runoff,

3  and in October, you have what might be considered a primary but

4  may, in fact, become an election.

5          As I said earlier, when we think about the status quo

6  for this case, we have to think about the fact that an election

7  is ongoing.  Gary Bartlett, who they have said they will call

8  as a witness, has testified in his deposition that changes to

9  election laws typically become the norm, and that's the term he

10 used, the norm, within two or three elections.  Once a change

11 has been in place in two or three elections, they become what

12 people expect.  People get used to them.  People know what the

13 rules are.

14         What the plaintiffs are asking is to have voters

15 going, "So what rules are we following this election?  They

16 keep changing."  That is not in the public interest.  That does

17 not tip the equities to the plaintiffs.

18         So for all of these reasons, at the end of this

19 hearing, we will be asking that the Court deny the preliminary

20 injunction, and we will also be asking that the Court grant

21 judgment for the defendants on the pleadings.

22         **THE COURT:**  Thank you, sir.  Mr. Bowers, do you know

23 how long your presentation is?

24         **MR. BOWERS:**  Your Honor, if I go over two minutes,

25 then I've made a serious mistake.  I am very mindful that I am

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1 batting cleanup this morning, and so I will promise you I will

2 be brief.

3       **THE COURT:** Okay. I am not putting any limit on you.

4 I am simply looking at the clock, trying to determine when to

5 take a break.

6       **MR. BOWERS:** I plan on being very, very brief, Your

7 Honor.

8       May it please the Court, again my name is Butch

9 Bowers. I am here on behalf of Governor McCrory, and I really

10 want to only point out a couple of things.

11       We've heard a lot this morning from the plaintiffs

12 about an intent to discriminate. Let me just be clear, at

13 least on behalf of Governor McCrory and certainly the

14 legislature as well, there was no intent to discriminate.

15 There was absolutely no intent to discriminate, and there is no

16 evidence of an intent to discriminate.

17       HB589 is a common-sense, reasonable reform that

18 really puts North Carolina in the mainstream of other states

19 with regard to election laws. For example, most states don't

20 have same-day registration. So North Carolina joined, if my

21 information is correct, 37 other states in not having same-day

22 registration.

23       The reduction of early voting down to 10 days, that

24 still keeps North Carolina somewhere in the middle in terms of

25 states that provide early voting. Many states don't even

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

provide early voting.  My home state of South Carolina -- for

example, we don't have early voting in South Carolina.

So it's really important to put it into context of

what other states around the country are doing, and North

Carolina really is in the mainstream with HB589.

Also -- and Mr. Peters talked extensively about it,

so I won't belabor the point, but we heard a lot this morning

from the plaintiffs about history, you know, history going back

50, 60, 70 years but also recent legislative history.  What we

didn't hear from the plaintiffs was history from two months

ago, and that was the May 2014 primary election.

I do have the numbers for you that you were looking

for, Your Honor.  Just over a million votes were cast total in

the May 2014 primary, 1,028,053, which, as Mr. Peters

indicated, constitutes 15.8 percent of the registered voters.

Again, just to foot stomp it one more time, the key

point here is that the changes brought about by HB589 are not

discriminatory as evidenced by the not conjecture, not

speculation, not expert analyses, but by real-life actual data

that occurred just two months ago.

We compared -- when you compare the African American

turnout from the 2014 primary to the 2010 primary, which was

the last off-year election, you see an increase of -- you see

an increase in both the turnout of African American voters and

also the total share of the electorate.  By any measure, there

1   is no discriminatory effect brought about by HB589.

2          With that, Your Honor, I will just say that at the

3   close of the hearing -- hopefully, it's a few more hours, but

4   if it's another couple of days, at the close of the hearing, we

5   will reappear and ask the Court to deny the plaintiffs' request

6   for the injunctive relief that they seek and also to grant the

7   defendants' 12(c) motion.

8          **THE COURT:**  Anybody else wish to be heard on the

9   defendants' side?

10         **MR. FARR:**  We are pleased with our arguments, Your

11  Honor.  We'll be happy not to say anything more.

12         **THE COURT:**  Okay.  I am going to go ahead -- we

13  normally take a break at 11:00.  I do start at 9:30, and

14  tomorrow I am going to start at 9:00.  So please be ready to go

15  at 9:00.

16         For the lawyers, if you have any trouble getting

17  through security, let the court security officers know and the

18  U.S. Marshals, and they will shuttle you through the front of

19  the line.  I can't start without you all, but I want to stay on

20  schedule.

21         So we are going to take a break until 11:15, and then

22  we'll proceed and go until 12:30 and take a lunch break.

23      (The Court recessed at 11:02 a.m.)

24      (The Court was called back to order at 11:22 a.m.)

25         **THE COURT:**  Mr. Donovan?

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1              **MR. DONOVAN:**  Yes, Your Honor, good morning.  Before

2     we proceed, we wanted to introduce three other lawyers that you

3     may hear from from our side that we did not introduce

4     previously, if I may.  Irving Joyner is with us from the NAACP,

5     Denise Lieberman from the Advancement Project, and Adam Stein

6     from the law firm of Tin Fulton.

7              **THE COURT:**  All right.  Good morning.

8              **MR. DONOVAN:**  Thank you, Your Honor.

9              **THE COURT:**  Ms. Hair?

10             **MS. HAIR:**  May I proceed, Your Honor?

11             **THE COURT:**  Yes, please.

12             **MS. HAIR:**  I will call Carolyn Q. Coleman.

13    **CAROLYN Q. COLEMAN**, PLAINTIFFS' WITNESS, at 9:13 a.m., being

14    first duly sworn, testified as follows:

15                         DIRECT EXAMINATION

16    **BY MS. HAIR**

17    Q    Good morning, Mrs. Coleman.

18    A    Good morning.

19    Q    What is your name for the record?

20    A    Carolyn Quilloin Coleman.

21    Q    Where do you live, Mrs. Coleman?

22    A    I live in Pleasant Garden, North Carolina.

23    Q    And where were you born?

24    A    Savannah, Georgia.

25    Q    When were you born?

1   A    7/9/42.

2   Q    Can you tell the Court about your educational background?

3   A    Well, I have a BS degree from Savannah State University, a

4   major in history and a minor in sociology and one in economics,

5   a master's degree from North Carolina A&T State University with

6   a concentration in adult education.

7   Q    When did you obtain our undergraduate degree?

8   A    1964.

9   Q    And your master's degree?

10  A    1991.

11  Q    What was your first job after graduating from college in

12  1964?

13  A    I went to work for the NAACP in the State of Alabama.  The

14  NAACP had been banned in that state, and after nine years, the

15  Supreme Court ruled that the NAACP could begin functioning

16  again in the state.  So I went in with a coworker who worked

17  with me to reorganize NAACP's youth units.

18  Q    And what were your responsibilities in that position?

19  A    Well, the NAACP's youth unit's primary responsibility is

20  to develop leaders in that organization.  So we taught

21  leadership skills.  We did voter registration.  We did programs

22  on college campuses on various issues, anything that might help

23  a student to become a leader.

24  Q    And did you hold any other positions with the NAACP after

25  that first position?

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  A    I did.  I became a regional youth director for the NAACP.

2  I became the acting director for the State of Alabama.  I

3  became the North Carolina state director and finally the NAACP

4  southern voter education director.

5  Q    I believe one of the positions you mentioned was the

6  regional youth director; is that correct?

7  A    Yes.

8  Q    What were your duties in that position?

9  A    Well, I served a seven-state area, again working with

10 reorganization and organization of youth units across those

11 states, and we worked with them again on developing leadership

12 skills, worked with them primarily in voter registration on

13 college campuses and in the respective communities in which the

14 students lived.

15 Q    And what about your -- what were your responsibilities as

16 acting state director in Alabama?

17 A    I did a number of things, but, as always, my concentration

18 was in voter registration.  Alabama was one of those states

19 where it had been difficult to register African Americans to

20 vote, and so that was primarily our concentration.

21 Q    Now, in each of these positions you just described, how

22 large of a role did voter registration play in the elements of

23 your job?

24 A    Because it was and still is one of the primary programs of

25 the NAACP, it was my primary responsibility.  Whether I was

1  working with young people or with adults, it was my primary

2  responsibility to conduct voter registration campaigns to teach

3  people how to conduct the campaigns and to work with voter

4  turnout and outreach.

5  Q    In these three positions that you held prior to moving to

6  North Carolina, approximately how many years were you working

7  for the NAACP?

8  A    Approximately 20 years.

9  Q    And during those 20 years, are there any events that stick

10 out in your mind with regard to the Civil Rights movement?

11 A    A number of things.  Particularly, when I worked in the

12 State of Alabama, it was the very same year that the Selma,

13 Montgomery, march took place.  I was based in Birmingham and

14 was not involved in the initial beginning of the march, but the

15 last day, we marched the last four to five miles toward the

16 capital of Montgomery, so I was involved in that campaign.

17      Also, I worked in the State of Mississippi.  This was the

18 end of 1965, which was just two years after Medgar Evers, an

19 NAACP state director, was killed as he was leaving and coming

20 from his home following a voter registration rally.

21      During that time also, I worked with Wharlest Jackson, who

22 was president of the Natchez, Mississippi, branch, and

23 Mr. Jackson was leaving his workplace, got in his car that

24 morning, and as he started the car, the bomb went off and, of

25 course, killed Mr. Jackson.  So there was violence throughout

1  that effort, too.

2  Q    Was there ever a time that you worked or were based in

3  Memphis, Tennessee?

4  A    Yes, I was based in Memphis Tennessee in the late 1960s,

5  primarily '68.  Again, there was some violence there.  I had

6  been involved with the sanitation workers who were protesting

7  the fact that two of their workers had been killed on a truck

8  and, of course, there was no insurance for them because there

9  were no benefits for sanitation workers.  They then felt that

10 they had to protest this.  So we joined them in their effort,

11 meaning the NAACP members.

12      When we did, we ratcheted up the campaign to the point of

13 feeling that we needed to do more to get the community

14 involved.  So Dr. King was called in.  That's Dr. Martin Luther

15 King, Jr.  At that time the men felt that they were not being

16 treated as men, and so they wore placards which said "I am a

17 man."

18      So when we called Dr. King in, of course, we were involved

19 in just one march, and I was involved maybe about three rows

20 behind Dr. King and the only march that he participated in

21 there in Memphis just prior to his being killed.

22 Q    And what was the race of most of the sanitation workers

23 that were protesting in Memphis at that time?

24 A    African Americans.

25 Q    And do you know why you were wearing the shirts that said

1  "I am a man"?

2  A    Well, quite often, sanitation workers were looked upon as

3  lower paid and at the lower level of the workforce.  They felt

4  that they had been discriminated against, especially not having

5  the same benefits that other employees had at higher levels of

6  work.  So they felt that they were not treated as men, and they

7  wore this placard saying "I am a man."

8  Q    I just want to go back to the voters that you were helping

9  to register throughout this 20 years that you were working

10  outside of North Carolina.

11      What was the race of most of those voters?

12  A    African American.

13  Q    Let's turn to when you moved to North Carolina.  What year

14  was that?

15  A    1979.

16  Q    And what position did you assume when you came to North

17  Carolina?

18  A    I was state director of the NAACP.

19  Q    What were your responsibilities in that position?

20  A    Well, again, I worked with our branches on conducting

21  voter registration campaigns, voter outreach, and voter turnout

22  campaigns.  In addition to that, I did just about everything

23  that might have fought to eliminate racism and discrimination.

24  That would mean that we protested police brutality.  We

25  protested school segregation in many instances because some of

1  the schools were resegregated.  We protested the fact that

2  quite often a black student and white student may have been

3  involved in a fight in school.  The black student was suspended

4  or expelled.  The white student was given a call to his parents

5  to come and pick him up, and he returned to the school the next

6  day.  So we were involved in just about everything of fighting

7  racism.

8  Q    And where in the state -- I believe you said you conducted

9  voter registration in North Carolina also; is that correct?

10 A    Yes.  And that was primarily -- well, throughout the

11 state, but primarily in the eastern part of the state.

12 Q    Could you describe what the eastern part of the state is

13 like?  What are those counties like over there?

14 A    Well, those are counties that primarily have the larger

15 black populations.  These are people who work in low-level

16 jobs.  Many of them are farmers.  Many of them worked for

17 farmers.  Quite often, the homes were shanties, toilets in the

18 backyard.  There are clotheslines where people hung clothes.

19 They didn't have dryers to dry clothing.  There may have been

20 washtubs with scrub boards where they worked outside washing

21 clothes.  So it is, in fact, one of the poorer sections of the

22 state.

23 Q    Why did you choose to do voter registration in that part

24 of the state?

25 A    Well, first of all, it had the largest black population,

1  and that was the people that I was working with; but in

2  addition to that, these were people that primarily were not

3  registered to vote, and that was because many of them were

4  afraid to register to vote, just didn't think it would make a

5  difference in their lives.  They had not seen African Americans

6  elected to public office, so they didn't see the need to vote.

7  Q    During your time working as a state director of the North

8  Carolina NAACP, do you have an estimate of the number of voters

9  that you assisted to get registered?

10 A    I would have to say thousands.  In every county of the

11 state, particularly in the eastern section of the state --

12 well, I shouldn't say every county because there is some in the

13 western part that I didn't work in; but, particularly, from

14 Forsyth County on east, I did conduct voter registration

15 drafts, and that was, I guess, the primary work that we did.

16 Q    Did there ever come a time when you ran for elected office

17 yourself?

18 A    Yes, I did run.

19 Q    When did you do that?

20 A    1992.

21 Q    What office was that?

22 A    Guilford County Board of County Commissioners.

23 Q    And were you successful?

24 A    Yes, I was.

25 Q    And how long did you hold that office?

1  A    Well, I served for 12 years, and I am up for reelection.

2  Q    You are currently serving and running for reelection?

3  A    Yes.

4  Q    Do you know the racial breakdown of the people who live in

5  your district?

6  A    Yes.  It is 66 percent black, and that has changed most

7  recently because of redistricting.  I had a smaller black

8  population, but now it has grown to 66 percent.

9  Q    And since you became a county commissioner, have you

10  continued to engage in voter registration or other efforts to

11  help people vote?

12  A    Well, voter registration has been my mainstay whether I

13  was working as an elected official, working for the NAACP, or

14  with my sorority, or any of the other groups that I

15  participated in.

16  Q    Are there any particular places in your county where you

17  would go to try to help people to register to vote?

18  A    We worked everywhere people were, whether it was a

19  shopping mall, the grocery store, football games, basketball

20  games, pool halls, barbershops, wherever.

21  Q    What was the race of most of the people that you were

22  focused on registering to vote during that period of time?

23  A    African Americans.

24  Q    And I believe -- are you still involved in the NAACP?

25  A    Yes, I am.  I serve on the national level as a member of

1    the national board of directors.  I am also assistant secretary

2    on the national level.  I am first vice president of the North

3    Carolina State Conference of the NAACP branches, and then I am

4    active as an executive committee member in the Greensboro

5    branch.

6    Q    What is the mission of the NAACP?

7    A    Primarily to eliminate racism and discrimination in every

8    phase of our lives whether it is in political action, housing,

9    education, or any other phase that we might encounter racism.

10   Q    For the record, you are African American?

11   A    Yes, I am.

12   Q    I would like to turn to the reason we are here today.  Are

13   you familiar with the voting law passed by the North Carolina

14   General Assembly known as House Bill 589?

15   A    Yes, I am.

16   Q    I want to talk more specifically about some of the

17   applications of the bill.  Are you familiar with the fact that

18   same-day registration during early voting has been available in

19   North Carolina in the recent past?

20   A    Yes.

21   Q    Do you remember when same-day registration first became

22   available in North Carolina?

23   A    The year 2000 -- I'm sorry.  I am thinking of -- that was

24   2007.

25   Q    And do you know whether the North Carolina NAACP supported

1  passage of the law to allow same-day registration during early

2  voting?

3  A    Not only did we support it, we lobbied to make it happen.

4  Q    And what was the reason that the North Carolina NAACP

5  supported same-day registration?

6  A    Well, we thought that it would certainly increase the

7  number of African Americans registered to vote because what it

8  did was give them an opportunity to not only register but to

9  vote on the same day.

10 Q    And in your experience, what you would it mean to the

11 African American community in North Carolina if same-day

12 registration during early voting were eliminated?

13 A    I think it would be devastating if I were to determine --

14 to say that there was one thing that made a tremendous

15 difference since the passage of the Voting Rights Act, it would

16 be same-day registration.

17 Q    And a tremendous difference to people of what race?

18 A    African Americans in particular.

19 Q    You are familiar with early voting in North Carolina?

20 A    Yes, I am.

21 Q    And do you remember what date early voting first came into

22 being in North Carolina?

23 A    That was 2000.

24 Q    And before the passage of House Bill 589, how did the

25 African American community and your constituents react to

1  having 17 days of early voting?

2  A    Well, I think all of us were just ecstatic about it

3  because for more than 17 years, we'd worked to make this

4  possible, and so we were just jubilant that now we were

5  successful in getting a bill like that passed.

6  Q    And why is having 17 days of early voting particularly

7  important to African Americans in North Carolina?

8  A    I believe there are a number of reasons why it's very

9  important.  First of all, it gives people an opportunity to

10  vote and makes it more accessible to them, but, in addition to

11  that, there are people that have problems with transportation

12  to the polls.  There are people who work two jobs, sometimes

13  three jobs, and so this gives them the opportunity to vote at a

14  time that's more accessible to them.  There are people who have

15  child care problems.  There are people who take care of their

16  elderly parents, and all of these people again need

17  accessibility to the polls and this helps with that.

18  Q    Could you describe what kind of public transportation

19  exists in your county, in Guilford County?

20  A    Well, in Guilford County, we have a bus service.

21  Q    And what about in other areas of the state, if you are

22  familiar?

23  A    Yes.  In some areas, there is no public transportation,

24  particularly in the eastern part of the state.

25  Q    And are you aware whether there has ever been any access

1   to Sunday voting in North Carolina?

2   A    There has been, and in Guilford County, for example, we've

3   had two days of Sunday voting.  Some counties have had one and

4   some have had none.  Sunday voting has been a day that we have

5   been able to get more people out to vote because, quite often,

6   what we did was work with the churches so that after their

7   church services, they transported people to the polls in their

8   vans and buses and even cars of the members.  So there were

9   just hundreds of people who went out from each church to vote.

10  Q    And when you are talking about the people that were being

11  transported in the churches, what was the predominant race of

12  the people that you were talking about?

13  A    African American.

14  Q    And you said -- I believe you said that you had two Sunday

15  voting days in your county previously?

16  A    Yes, Guilford County had two, and, of course, we really

17  publicized this.  It was known as "Souls to the Polls."  So

18  everybody is almost familiar with that if they are a church

19  member in Guilford County.

20  Q    Are you aware of what House Bill 589 does with respect to

21  Sunday voting?

22  A    Yes.

23  Q    What is that?

24  A    Well, what it does is for those of us in Guilford County,

25  it would cut it to one day.  For those people who live in

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1  counties that are more rural, they might have church only twice

2  a month, so it would eliminate the opportunity to vote on

3  Sunday for them because they would not be in church at the time

4  of the voting.  So it would have an impact on them.

5  Q    Have you ever been at the polls observing on Election Day?

6  A    Yes, I was.

7  Q    And have you -- do you have any knowledge of voters who

8  may come to the wrong precinct by accident?

9  A    Yes.

10  Q    Have you ever seen that happen?

11  A    I have seen it happen many times.  People come thinking

12  that this is where they should vote, and they get in and only

13  find that they are at the wrong place.  So I have worked even

14  to transport them to the right poll.

15  Q    And if a voter is in the wrong place, what would they --

16  what would be their options with regard to voting?

17  A    Well, they would be able to cast a ballot, but they would

18  only be able to vote for people at the top of the ticket, that

19  is, the president, vice president, governor, anyone who was

20  running statewide.  If they were voting for -- trying to vote

21  for a person who was voting for -- who was serving in a

22  district, such as I serve in District 7, for example, and if

23  they were in District 5, they wouldn't be able to vote for me

24  at that time.

25  Q    Do you know what that process is called where they could

1   vote that ballot and have it partially counted?

2   A    It is called out-of-precinct provisional ballots.

3   Q    And did you support out-of-precinct voting?

4   A    I did because I believe that what it would do is give that

5   person the opportunity to vote even though they couldn't vote

6   for the entire slate.  Quite often, as they would be sent to a

7   another poll to vote, they'd get discouraged and go home, not

8   vote at all.  So at least they were able to vote for people at

9   the very top of the ticket.

10  Q    And for voters in your county, who find themselves at the

11  wrong precinct, what would the public transportation option be

12  for them to travel to another precinct?

13  A    Well, they would ride the bus, and, of course, the fare on

14  the bus is $1.75 each way.  They could ride the bus.  They

15  could, I guess, call someone to transport them to the other

16  precinct.  Quite often, there were those of us who were working

17  at the polls that would leave and take people to another poll

18  in order to vote, but the thing is that if you don't have

19  transportation, it can be very discouraging, and some people

20  did become very discouraged and just didn't vote at all.

21  Q    And what is the race of the voters that you are referring

22  to who became discouraged?

23  A    African American.

24  Q    Ms. Coleman, when you first learned about House Bill 589

25  and the changes that it made to North Carolina's voting laws,

1  what was your reaction?

2  A    Actually, I was devastated.  I felt like I was living my

3  life all over again.  Everything that I worked for for the last

4  50 years was now almost being lost.  North Carolina had --

5  we've been very successful in North Carolina, and now to have

6  to start doing some of the same things again were just

7  devastating.  So I really felt that we have to continue working

8  to see that this is changed.

9  Q    You spent many, many years working to help people,

10 especially African Americans, register and vote.  Could you

11 just describe why voting is so important for you as an African

12 American?

13 A    Well, first of all, I believe very much in democracy.  If

14 I didn't, I couldn't keep going every day.  I've just

15 encountered so much discrimination and inequities that without

16 the full belief in America's democracy, I just couldn't do it.

17          **MS. HAIR:**  Thank you.  No further questions.

18          **THE COURT:**  Any examination?

19          **MR. PETERS:**  On behalf of the State Board, I have no

20 questions, Your Honor.

21          **MR. BOWERS:**  No questions for the Government.

22          **THE COURT:**  Anyone else from the defendants' side?

23 All right.  Thank you.

24     (At 11:48 a.m., the witness was excused.)

25          **THE COURT:**  You may call your next witness, please.

1  **MELVIN F. MONTFORD**, PLAINTIFFS' WITNESS, at 11:49 a.m., being

2  first duly sworn, testified as follows:

3                         DIRECT EXAMINATION

4  **BY MS. EBENSTEIN**

5  Q    Good morning, Mr. Montford.

6  A    Good morning.

7  Q    Could you state your full name for the record, please.

8  A    Melvin Franklin Montford.

9  Q    Mr. Montford, where were you born?

10 A    Jacksonville, North Carolina.

11 Q    And where do you currently live?

12 A    Apex, North Carolina.

13 Q    Can you tell us a little bit about your early professional

14 career?

15 A    I started out at age 22.  I became president of my local

16 union in Jacksonville.  Years later, I moved up to work for the

17 international as an assistant secretary-treasurer, which means

18 I was responsible for the finances for 50-some local unions

19 across 17 states.

20      After that, I moved up to international vice president,

21 and I held that position until my union merged with the

22 machinist union.  I became a business representative and moved

23 back to North Carolina where I was responsible for three

24 states:  North Carolina, South Carolina, and Virginia.

25 Q    And what organization do you currently work for?

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1  A    North Carolina A. Philip Randolph Institute.

2  Q    What was your first position with A. Philip Randolph

3  Institute, or APRI?

4  A    My first position was just a member.  Then I became an

5  officer for the Raleigh chapter.  Then I became president of

6  the Raleigh chapter.  Then I moved up to the state chapter,

7  which is here in Raleigh.  I became the vice president and

8  president and then I became executive director.

9  Q    And as executive director, is that a paid position?

10 A    No, I don't get a salary.

11 Q    Is that a full-time position?

12 A    It is full-time.

13 Q    Can you tell us about what kind of work APRI does?

14 A    APRI does voter registration, voter education, "Get Out

15 the Vote," and we also do community services like provide food

16 for the hungry, we provide clothing, more or less whatever the

17 community needs.  If somebody calls us, we try to provide it or

18 find somebody who can donate it.

19 Q    When was APRI started?

20 A    The national organization was started in 1965 by A. Philip

21 Randolph and Brian Rustin after the signing of the Voting

22 Rights Act.

23 Q    And how many different states does APRI operate in?

24 A    Right now, 29 states.

25 Q    How many chapters does it have in North Carolina

1  specifically?

2  A     If you count the youth chapters, 13.

3  Q     And when you said you do voter registration, voter

4  education, "Get Out the Vote," what areas of the state do you

5  work in?

6  A     Well, it's a statewide organization, but, right now, we

7  work in 36 counties -- well, actually 43 when you count the

8  primaries and stuff.

9  Q     How do you select which counties to work in?

10  A     What we look at is we look at areas where we have a

11  volunteer base or where we have a chapter, and then we look for

12  opportunities that we can use to increase the percentage of

13  turnout in the African American community that would impact

14  that community.

15  Q     And why is this work so important to you?

16  A     My goodness, I guess I got involved in this when I was in

17  my fight to get 18 years of the right to vote.  I guess I got

18  hooked in it then.  But in time, I have seen a lot of good

19  happen, a lot of bad happen.  I am concerned about taking the

20  power to vote away from people and what that could mean because

21  one of the things that we tell people is that voting, and

22  Lyndon Johnson said it, is the most powerful arsenal that was

23  created by mankind.

24        And we understand that in order to do what we are supposed

25  to do to build, encourage, and increase political activity in

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  the black community that we need to have the right to vote, and

2  we need a strong right to vote.

3  Q    How are others involved in the organization?  Is it also

4  on a volunteer basis?

5  A    Yes, we are a volunteer organization.  We have one staff

6  member that gets paid, but everybody else is volunteer.  We

7  have unemployed that are volunteers.  We have homeless.  We

8  have retirees.  We've got both Republicans and Democrats

9  because we are nonpartisan.  That's one of our principles is

10  that we don't support any political candidate or party.

11  Q    Can you tell us about some of the activities that you and

12  other volunteers take part in?

13  A    Well, I cover the food pantry first.  It is open five days

14  a week, and it is completely run by volunteers.  Our voter

15  registration is volunteer.  We do two types of voter

16  registration.  We actually go to door to door, and we also do

17  what we call a door-to-door canvas, and we also do it at

18  different locations.  Like this weekend, we did it at four

19  locations.  Also tried to raise money for disabled veterans.

20  So we do both those type of registrations.

21  Q    Any other activities along with going door to door to do

22  voter registration?

23  A    To do voter registration?

24  Q    For example, by phone?

25  A    Oh, yes, there is so much.  What we do is we also call --

1  because we have a system called a VAN that we use, we can

2  identify the non-registered voters.  We call those folks and

3  ask them if they want to register to vote.  It helps without

4  going door to door because we actually know that somebody lives

5  there.  So we call people first and ask if they would like to

6  register to vote.

7  Q    Do you undertake these activities prior to elections or

8  year round?

9  A    We do voter registration year round, but during the 25 --

10 or the period just prior to elections, we actually call people

11 and still call people after that and ask them if they -- if

12 they are not registered to vote, that they can do early voting,

13 or we used to do that anyway.  And we also go to door to door

14 during that time period and tell people about the election and

15 let them know that they can still register and vote.

16 Q    Do you provide any other services or assistance to "Get

17 Out the Vote"?

18 A    We provide rides to polls.

19 Q    And do you provide these services during all elections or

20 only presidential elections?

21 A    All elections.

22 Q    Does that include midterm?

23 A    It includes midterm and municipal.

24 Q    Mr. Montford, are you aware of the changes to elections

25 law that were passed last year that we have been calling HB589?

1    A    I am aware of some of them, yes.

2    Q    Are you aware of the changes to early voting?

3    A    Absolutely.

4    Q    Including the decrease of the early voting period from 17

5    days to 10 days?

6    A    Yes, I am.

7    Q    Before these changes, why was the early voting period

8    important to the communities that APRI serves?

9    A    Well, a lot of people that we serve are low-income or

10   middle-income working people and being able to vote early and

11   have it that many weeks out, that much time out -- some of

12   these people work two jobs, some even three, and a number of

13   them work shifts and work 10- and 12-hour shifts.  So being

14   able to vote on a Saturday, that's a day they've actually got

15   some downtime and felt like actually going out and voting when

16   they had their rest, and they would vote on Saturdays and

17   Sundays.

18   Q    So how do you think the loss of weekend hours will affect

19   people who work long shifts or work multiple jobs?

20   A    Well, some of the folks that we talked to said they

21   probably weren't going to vote.

22   Q    And you mentioned that some people prefer to vote on

23   Saturdays.  Are you aware of the change in law that will close

24   the polls by 1:00 p.m. on the Saturday before elections?

25   A    Yes, I am.  Some of the folks that we've talked to say

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  they work shift work.  When they get off, like, on Saturday

2  morning, they normally -- they go to sleep and some of them may

3  even have worked on Fridays and worked 12 hours.  They rest and

4  they sleep in on Saturday mornings.  They might get up around

5  11:00 or 12:00 and some after 1:00; but when they do get up and

6  they spend their family time, that's when they tell us that's

7  one of the things they are not thinking about is going to vote

8  that day because they are trying to spend family time.

9  Q    Mr. Montford, do you have any personal experience working

10 some of these long shifts that end on Saturday morning or

11 Friday night?

12 A    Yes, I have.  I worked for a long time in an industrial

13 plant.  I am familiar with that.  When you get off work, after

14 working in some places where it is 120 degrees, you want to get

15 some downtime and rest before you do anything.

16 Q    You also mentioned that APRI provides transportation for

17 some people.  How will the changes in the early voting period

18 affect APRI's ability to provide transportation?

19 A    Well, it's already hurt us because when we had the 17-day

20 period, like, we could actually call people and make

21 arrangements to go pick them up, but now, with it being so

22 short -- like I said, we use volunteers.  It's hard to find

23 enough volunteers to cover as much territory as we cover.  With

24 the longer period, volunteers working after hours, unemployed,

25 and different folks, it is easier to find people to cover that

1  space than it will be to cover a shorter period because we'll

2  have to have twice as many people.  Another part of that is

3  when we call people, in order to call the same number of people

4  in a shorter period, we'll actually have to put in more phone

5  lines, which we can't afford to do.  We can't afford to put in

6  more phone lines.

7  Q    Can you walk us step by step, from the first phone call

8  until a voter votes, what kind of involvement APRI might have

9  in assisting them?

10  A    We call the person, and we notify them of the election.

11  We ask them different questions like do they need a ride to the

12  polls, do they know anybody that does, do they know where the

13  voting place is located, and recapture all this information in

14  a database that we call the VAN; and then at a specific time,

15  we pull this information off, and we call those folks that said

16  they needed a ride to the polls to make sure that they still

17  want a ride and to set up a schedule for when we can come pick

18  those folks up.

19  Q    Mr. Montford, are you aware of the changes to same-day

20  registration that -- made by HB589?

21  A    Yes, I am.

22  Q    Can you tell us what those changes are?

23  A    Well, a person won't be able to register to vote during

24  that early period, and what that means to us is -- when we go

25  out and do rides to the polls, for example, we might have one

1  household that shows that there is one person that needs a ride

2  to the polls.  When we get there, there might be some children

3  that just turned 18, or there might be some other folks there.

4  So if they are not registered, and we can actually take all of

5  them to the polls, those that are not registered can actually

6  register and vote at the same time.  We are going to lose some

7  voters because of that.

8  Q    So why would you say the same-day registration was so

9  important in the communities that you serve specifically?

10 A    Well, it's going to eliminate the number of people that

11 actually -- that we can even actually register to vote.

12 Q    And how will it affect APRI's operations to no longer be

13 able to use same-day registration or have the communities you

14 serve lose same-day registration?

15 A    Goodness, ask me that again.

16 Q    How will it affect APRI's services to lose same-day

17 registration?

18 A    We won't be able to get as much people out to vote,

19 because our mission is to encourage more political activity on

20 the local, national, and state level; and without that, we

21 won't be able to be as effective.

22 Q    Mr. Montford, are you aware of the change brought about by

23 HB589 to out-of-precinct balloting?

24 A    Yes.

25 Q    And can you tell us what out-of-precinct provisional

1  balloting is?

2  A    That means, to us, if you vote early, if you go to vote

3  and you happen to be in the wrong precinct, that it's not going

4  to count.  It just won't count.

5  Q    Have you in your personal experience with APRI seen voters

6  or spoken to voters who have used out-of-precinct balloting?

7  A    Yes, yes, I have.

8  Q    Under what circumstances?

9  A    Well, it's -- again, when we go to a person's house and

10 they might have somebody else over there that they don't live

11 in that precinct but they want to vote also, with the new rule,

12 they won't be able to.  There are situations where if -- we run

13 the sounds trucks on Election Day.

14 Q    What's that?

15 A    The sound trucks, where we go out in the neighborhood and

16 we have music and we ask people to go out and vote.  Sometimes

17 we'll pick up people that are not really in their precinct.

18 Under the old rules, those people could still vote.  Under the

19 new rules, they won't be able to.

20      We are afraid that if that person -- if we are actually

21 working in Raleigh and that person actually is registered in

22 Cary or Apex, and they might be working in an area that we are

23 in, then we can't take them over there, and they probably won't

24 vote.

25 Q    And in the communities that you work in, do people have

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  another means of getting to the polls?

2  A    Well, some people catch a bus.  Some people try to catch a

3  ride with somebody else, and those fares are expensive, and

4  what we have seen happen is if they take a bus or get a ride

5  with somebody else and they get told that they got to vote

6  somewhere else, they just give up and just say that they are

7  not going to vote.

8  Q    Would the same expense apply to voters who now have to

9  go -- make one trip to register and one trip to vote with the

10 prohibition of same-day registration?

11 A    Yes.

12 Q    What other Election Day activities or poll watching

13 activities does APRI engage in?

14 A    Well, one of the things that we do is -- with the early

15 voting is because of the system that we use is -- we monitor

16 early voting and look at the areas that a lot of people have

17 early voted, and then on the days before the election, maybe

18 Monday on Election Day, we concentrate on those areas.

19 Q    So you are able to track which communities have already

20 voted using early voting?

21 A    Yes.  It's updated in our computer system every night

22 after they close early voting.  By the next morning, it is

23 there, so we can determine which communities we can be more

24 effective in.

25 Q    And what kind of activities would you undertake in the

1   communities that haven't voted yet or that you think you can be

2   more effective in?

3   A     Well, we send in what we call a flying squad, and I'll

4   have to explain what that means.  That's APRI terminology.  A

5   flying squad is a mixture of people that go to every door, they

6   knock on every door, and they leave people voting material.

7   They remind people that it's Election Day, and they do the same

8   thing with the sound truck.  And, I mean, in Raleigh, in that

9   two days, we normally hit like 12,000 houses during that

10  period.

11  Q     How many people would you say you are able to access

12  through your phone banking calls?

13  A     Well, it depends on the size of the phone banking.  Our

14  benchmark is 120,000 a year.

15  Q     And is that for midterm elections or presidential

16  elections or both?

17  A     Well, actually, the benchmark is for all of that.  We fell

18  short last year during the municipal.  We only got 119,900 and

19  something.  So we missed our goal by a few.

20  Q     How many voters or how many eligible voters are you able

21  to provide with door-to-door information?

22  A     It depends on the election period cycle.  Sometimes we --

23  let me try to count some numbers here because all of this is

24  spinning around.  Sometimes we'll hit 50,000 door to door.

25  Q     And how many voters are you able to transport to the polls

1  during the early voting?

2  A    It depends on the election, 3-, 400.  It depends because

3  sometimes other organizations know that we have a

4  rides-to-the-polls programs, and they will actually send us a

5  list of people that need rides.  So it depends on what happens

6  during that particular election.

7  Q    So could you summarize for us how these three changes in

8  elections laws will affect your all-volunteer organization and

9  the communities that you serve?

10 A    Well, our ultimate goal is to build political power in the

11 black community because people pay attention to who votes, and

12 this is what we believe.  People that make rules and that spend

13 money on projects, whether it's housing or what, those people

14 pay attention to who votes.  They pay attention to which

15 communities vote.  So what we are telling -- what we are saying

16 is for the black community is, in order to empower them to get

17 their fair share from the government and from others, that they

18 need to go out and vote.

19     One of the things that we tell young people is that, like

20 President Johnson said, the vote is more powerful than any

21 handgun that you could ever pick up.  When we actually go to

22 somebody's door and knock on it and convince them to go out and

23 vote, you are exercising more power than you'll ever have on

24 the corner somewhere with a handgun, and that is a long-lasting

25 power.  I don't know how to put it other than that.

1          **MS. EBENSTEIN:**  Thank you very much, Mr. Montford,

2    for your work and your testimony.

3          **THE COURT:**  Any examination from the defense?

4          **MR. PETERS:**  Just a few questions, Your Honor.

5          **THE COURT:**  All right.

6                          CROSS-EXAMINATION

7    **BY MR. PETERS**

8    Q    Mr. Montford, I'm Alexander Peters from the North Carolina

9    Attorney General's Office.  I just want to ask you a few

10   questions about the voter registration effort that you

11   described.  I am wondering if you can tell me a little bit more

12   about it.  I am saying you.  I mean the volunteers with the A.

13   Philip Randolph Institute.

14        When you go door to door on a voter registration drive,

15   exactly what happens when you go?

16   A    We have a script that we try to stick to, but we encourage

17   our volunteers to actually engage the person in a conversation

18   so they can find out what issues they are concerned about.

19   What we find is the person is more likely to vote if we are

20   talking about their particular issues.  So they actually --

21   what they say to them is, hey, the computer lists that we

22   have -- or we've been informed that you are not a registered

23   voter.  Our system is not 100 percent correct.  Sometimes you

24   go to somebody's house, and they are registered.  We get our

25   information from the board of elections and different sources.

1      So we ask that person -- what we say to them is that even

2  though you may say that you are registered, there might be some

3  difficulty.  So we ask them to reregister.  Some will and some

4  won't, but we also ask is there anybody else in the household

5  that they know of that will be of voting age by Election Day

6  and if they would like to register.

7  Q    And do you actually have a registration form with you, or

8  are you just encouraging them to go, say, to the county board

9  of elections to register, or how does that work?

10 A    Every person that works with APRI that does voter

11 registration is expected to have voter registration forms with

12 them at all times.  I've got some in my vehicle here.  They are

13 the '07s, but '08s just came out, and I've got to change over.

14 So they are expected to have voter registration forms with them

15 at all times.

16 Q    So I am correct then that the prospective voter who

17 registers could fill out the form there on the spot when

18 someone comes to the door?

19 A    Yes.

20 Q    And what happens with that form?

21 A    We have what we call quality control, and that person that

22 actually fills out the form is taught to make sure that the

23 information is correct, or that the person has filled out the

24 spots that needs to be filled out.  Then it comes to our

25 office.  We got people that actually look at those and

1  determine that everything is correct; and if it's not correct,

2  then we got to go back to that person, but we look at it and

3  make sure it's all correct and within the legal period.  Then

4  we mail those to the board of elections.  Sometimes we carry

5  them down if we've got enough of them instead of spending the

6  postage.  The board of elections is a few minutes from our

7  office on Hillsborough Street.

8  Q    So I am correct then that your volunteers are the ones who

9  return those forms to the county board of elections rather than

10 the registrant?

11 A    No, they return those forms to us, and we do the quality

12 control in our office.  We have three people.  As a matter of

13 fact, we got a class coming up next week, five hours, of

14 quality control measures with voter registration and changes in

15 the law.

16 Q    So the volunteers return it to your office, and then your

17 office gets it to the appropriate county board of elections?

18 A    Yes.  Unless it's somewhere like Halifax County where we

19 have people trained in that county or New Hanover that do the

20 same thing.

21 Q    Do you follow a similar procedure -- I know you said you

22 also do voter registration drives in places where people might

23 be -- where you can find a lot of people?

24 A    Yes.

25 Q    Do you follow the same procedure there?

1 A    Yes.  The voter registration forms that were collected on

2 Saturday, we have people that are going through those today.

3 Q    And I believe I understood you to say that this is an

4 effort that goes on throughout the year?

5 A    Throughout the year.

6 Q    But do you intensify the efforts when an election is on

7 the horizon upcoming?

8 A    Not really, because we do -- we work elections every year,

9 and we work primaries every year.  We do try to take some

10 downtime after November for a few months to get some rest, but

11 we work elections, I mean, all year.

12        **MR. PETERS:**  Thank you.  I have no further questions.

13        **THE COURT:**  Any redirect?

14                    REDIRECT EXAMINATION

15 **BY MS. EBENSTEIN**

16 Q    Mr. Montford, you said you do registration all year.  Do

17 you find that some of the people who you help register change

18 their address from when you register them until when they go to

19 the polls?

20 A    There are a lot of address changes.  That's one of the

21 things that we find a lot of, particularly in young folks, a

22 lot of address changes.

23 Q    And how do you think that the loss of some of the early

24 voting period will affect those voters who need to change

25 address at the polls?

1  A    It would be devastating.  They won't be able -- a lot of
2  them won't vote.

3         MS. EBENSTEIN:  Thank you very much.  No more
4  questions.

5         THE COURT:  All right.  You may step down, please.

6      (At 12:15 p.m., the witness was excused.)

7         MR. DONOVAN:  Good afternoon, Your Honor, Dan Donovan
8  for the plaintiffs.  Your Honor, at this time we would ask if
9  we could just take our lunch break and then start.  We have our
10 next witness, Senator Dan Blue, who is en route.  He will be
11 here, but if we can adjust, with your indulgence, 15 minutes
12 either way, it would help us.  So that's our request.

13        THE COURT:  You don't have any other witness that you
14 can call for the next 15 minutes?

15        MR. DONOVAN:  Not currently, Your Honor.  We will
16 have multiple in the afternoon.

17        THE COURT:  All right.  We'll stop here.  We'll start
18 15 minutes early then this afternoon at 1:45.

19        MR. DONOVAN:  We appreciate that.

20        THE COURT:  You'll be ready then?

21        MR. DONOVAN:  We have multiple witnesses for the
22 afternoon.

23        THE COURT:  If the lawyers have any trouble getting
24 in, please make sure that you get to the front of the line.

25      (The Court recessed at 12:16 p.m.)

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1          (The Court was called back to order at 1:48 p.m.)

2             THE COURT:  All right.  We are back on the record.  I

3    do want to start right at 12:45 -- or 1:45.  So I know it's

4    hard for some folks to get in and out, but I am going to ask

5    folks to do what they can.

6             I have one issue I want to cover at the beginning

7    that was brought to my attention.  We had a problem with a cell

8    phone here.  Perhaps somebody brought in a phone who didn't

9    sign an attorney card.

10            Ms. Hair, do you know anything about that?

11            MS. HAIR:  Your Honor, I do not know anything about

12   that.

13            MR. DONOVAN:  We'll try to find out, though, Judge.

14            THE COURT:  Does anybody know anything about that?

15   Has anybody brought in a cell phone who is, first of all, not a

16   lawyer?  (No response.)  All right.

17            Has anybody brought in a cell phone who did not sign

18   an attorney acknowledgment form?  (No response.)  All right.

19            The only people who are permitted to bring in phones

20   are counsel who have signed the acknowledgment form, and they

21   are to be used only for purposes of the proceedings; otherwise,

22   turned off.  I want to make sure everybody follows that.

23   Otherwise, I am going to revoke the privilege of bringing in

24   cell phones for everybody.

25            Okay.  Are we ready to proceed at this time?

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

 1                    **MR. DONOVAN:**  We are, Your Honor.

 2                    **THE COURT:**  All right.  Please call your next

 3    witness.

 4                    **MS. HAIR:**  Your Honor, plaintiffs call Senator Dan

 5    Blue.

 6    **SENATOR DANIEL T. BLUE, JR.,** PLAINTIFFS' WITNESS, at 1:50 p.m.,

 7    being first duly sworn, testified as follows:

 8                         DIRECT EXAMINATION

 9    **BY MS. HAIR**

10    Q    Would you state your full name for the record, please.

11    A    Daniel T. Blue, Jr.

12    Q    And what do you do for a living?

13    A    I practice law in Raleigh, and I serve as a member of the

14    North Carolina Senate.

15    Q    And where were you born, Senator Blue?

16    A    I was in born in Lumberton, North Carolina, Robeson

17    County.

18    Q    And could you tell us about your educational background?

19    Where did you attend college?

20    A    I attended public schools in Robeson County.  I attended

21    North Carolina Central University and got a degree in

22    mathematics, and I attended Duke Law School.

23    Q    And prior to becoming a member of the North Carolina

24    General Assembly, did you participate in any civic or political

25    work?

1  A     I did ever since high school in effect, but following --

2  even in college as a student leader, we were constantly

3  involved in stuff relating to civil rights activity, voting,

4  community empowerment, participation.

5       Following law school, I went to work in Raleigh with a

6  firm, and part of the expectation of that firm is the

7  associates would get themselves involved in community

8  activities, political activities.  All of us went to work doing

9  those kinds of things.  I helped organize a group in Raleigh

10  after my first year there as a lawyer that was focused on

11  increasing voter participation, voter involvement, especially

12  among young people and participated with various groups in

13  Raleigh and Wake County and throughout the state in those kinds

14  of activities.

15  Q    And did you ever participate in voter registration efforts

16  with African Americans?

17  A    Oh, sure, multiple times.  Over the course of that history

18  from college on through present date, I worked with people

19  trying to encourage voter registration participation.

20  Q    And were people always willing to register when you

21  attempted to assist them?

22  A    It's been an interesting experience.  Back in the '60s

23  when I was a teenager, and even in college, we ran into a lot

24  of difficulties in encouraging people to vote.  Many people

25  were afraid to vote, whether you are in rural North Carolina or

1    in urban North Carolina.  Many of them had experiences from

2    their past that their parents had passed down, and some of the

3    folk in rural areas were afraid that if they voted they would

4    get kicked off of their farms, and some of the people in the

5    urban areas felt that they would lose their jobs if their boss

6    didn't want them to vote.

7         So it's been a very interesting experience over the last

8    45 years in that regard.

9    Q    And you said that's -- that you had those experiences in

10   the 1960s.  What about in more recent years?  Have you

11   participated in voter registration focused on African

12   Americans?

13   A    I have and, again, continuously.  I started -- as I said,

14   after I got out of law school, a year out of law school, we

15   helped organize groups in Raleigh, Wake County, and across the

16   state that would encourage greater black voter participation

17   because there was such a great disparity, and also you were

18   getting into the point -- just as the Voting Rights Act was

19   beginning to get real muscle in the late '70s, early '80s, you

20   were getting to the point that you really wanted to make sure

21   that there was full registration or as full as possible.

22        So I have been involved in that ever since the mid '70s in

23   a very earnest way, and I still go out and encourage people to

24   vote, and we still run into people who have fears sometimes of

25   participating in the electoral process because of some of the

1  histories.  They think that they may be denied opportunities

2  that they otherwise would be entitled to if they vote, that

3  somebody will make a note of it and they will lose unemployment

4  benefits or various other things of that nature.

5  Q    And the people that you still run into who may be afraid

6  to vote, what race are they predominantly?

7  A    Mostly African American.

8  Q    When were you first elected to the North Carolina General

9  Assembly?

10 A    In 1980.

11 Q    And what branch of the General Assembly were you elected

12 to?

13 A    I was elected to the House of Representatives in November

14 of 1980 and began serving in late November 1980.

15 Q    And how many years did you serve in the House?

16 A    I served in the House from 1980 continuously until the end

17 of 2002, December 31, 2002.  I left the General Assembly in

18 2002 -- or did not run for reelection in 2002.  I ran for the

19 United States Senate unsuccessfully.  So I went to practicing

20 law the way I wanted to practice it full-time, but I went back

21 to the House in 2006 when the gentleman that replaced me died

22 in office.  So I was encouraged to go back.  So I went back to

23 the House in 2006 and served there again until 2009.  So 25

24 years in the house.

25 Q    And when you were in the House of Representatives, did you

1  hold any leadership positions?

2  A    I held several.  I chaired various committees during the

3  time that I was in the House.  I served as an organizer and

4  chairman of the legislative black caucus, which consisted of

5  the minority members of the General Assembly, starting out with

6  four, and when I left the chairmanship, there were nine or ten,

7  I believe.  I served as speaker of the House from 1991 until

8  1995.

9  Q    And you are now a member of the North Carolina Senate?

10 A    I am.

11 Q    When did you first became a member of the Senate?

12 A    I became a member of the Senate in 2009.

13 Q    And have you served in the Senate since that time?

14 A    I have.  I have been continuously elected or reelected

15 since that time.

16 Q    And do you hold any leadership positions in the Senate?

17 A    I serve as the minority leader in the Senate, which is a

18 democratic leader.

19 Q    Do you serve on any committees in the Senate?

20 A    I serve on multiple committees, the typical ones that the

21 leader would serve on; but to chronical them for you:  I serve

22 on the overall Appropriations Committee; I serve on the

23 Appropriations Committee on Transportation, as the name

24 denotes, looking at a different fund; I serve on the Rules

25 Committee, on the Judicial Committee, on the Commerce

1  Committee, and on the Committee on the University of North

2  Carolina Board of Governors.

3  Q    Both with respect to your Senate district and your House

4  district, what county or counties were those districts located

5  in?

6  A    Wake County.  Initially, as a House member, I was elected

7  countywide in Wake County.  I ran in the entire populous of

8  Wake County.  Subsequently, I ran in a more narrowly drawn

9  district in Wake County in the House.  Now I represent a Senate

10 district that's one of five Senate districts based in Wake

11 County.

12 Q    And what is the demographic makeup of the district that

13 you currently serve?

14 A    The district I currently serve has approximately 190,000

15 people.  It is 50 -- 52 percent African American because it

16 went from about 42 in my last election to 52 in this election.

17 It is about 18 to 20 percent Hispanic.  It is 31, 32 percent

18 white, and there is some cross-pollination, depending on how

19 people are identified.

20 Q    Do you meet with your constituents frequently?

21 A    All the time.  That's one of the advantages of being in

22 Wake County.  When I leave the legislative building, I am

23 immediately in my constituents.

24 Q    What are some of the places that you meet with your

25 constituents?

1  A    You will be surprised at the number of people that I run

2  into on Fayetteville Street -- that's the main street in

3  Raleigh -- just up and down the street all day long.  My law

4  office is right there.  Routinely, I just do move around the

5  area of the district to the barbershop, beauty shops,

6  businesses, both large and small.  I visit the churches

7  regularly in the district and constantly activities that are

8  going on, whether they are political groups or civic groups,

9  school groups, all kind of groups.  Again, being in Wake

10 County, I get called on a lot to go talk to groups that might

11 have a constituency in Wake County, although they might be

12 statewide or national.  Probably 12, 15 hours a week, I am

13 basically doing direct constituent contact stuff.

14 Q    Do you recall around 2000 the enactment of a law that

15 provided or made it probable for early voting to take place in

16 North Carolina?

17 A    Sure, I remember that.

18 Q    Did you support that law?

19 A    Yeah, and I have supported, since, again, I was a

20 youngster, laws that expanded the ability for people to

21 participate in this democracy.  I don't recall specific numbers

22 and stuff, but every law that came before the General Assembly

23 since I have been there that reasonably talked about expanding

24 that opportunity, especially expanding that opportunity for

25 minorities and African Americans, I have supported both

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1  financially and by voicing support for it.

2  Q    And why would you think that early voting would be

3  particularly important to African Americans or other

4  minorities?

5  A    I spend a good amount of time, perhaps too much, looking

6  at developments in this state, especially over the last 50

7  years.  This week reminded me of it.  I looked at the 1960s

8  series on CNN or PBS, whatever it is, but I have looked at it

9  and realized that voting is probably the most fundamental

10 right -- is the most fundamental right in this democracy.  So I

11 have been interested in how you enhance the opportunity for

12 people to participate, especially given some of the historical

13 facts about voting by minorities in this state and in this

14 country.

15      And so some time ago, I, along with many other members of

16 the General Assembly, became very, I guess, bothered that the

17 disparity between black voting participation and white voting

18 participation was very wide and still didn't seem to be

19 closing.  So there were multiple ways that you can look at

20 improving block voter participation, and early voting was one

21 of the ways that many of us thought that would increase black

22 voting participation, and it would start closing that gap from

23 very few, less than 4 or 5 percent when I went off to college,

24 to getting a reasonable number participating, again knowing

25 that in the United States the overall participation in voting

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1   is not as great as perhaps it should be.

2   Q    Was there anything about early voting that made you think

3   that African Americans in particular would be able to have more

4   access to the ballot?

5   A    One thing that I learned -- and, again, it's an evolution

6   sort of in that I have been involved in this when you had fixed

7   registrars, you had to go down to the courthouse and register,

8   to the point that you had floating registrars or people outside

9   precincts who could register you.

10      So I came through that whole process, and I knew that when

11  we created -- had floating registrars, we were able to get more

12  people registered to vote, get greater participation.  As this

13  process evolved, it was clearly you were getting a higher black

14  participation in the process.

15      So with early voting, one of the things that I heard

16  repeatedly, whether I was helping organize people in Wake

17  County or trying to encourage people all across the state, and

18  I was speaking all over the state, is that a lot of people were

19  saying when you would try to get them to register, even after

20  you got over some of those initials hurdles relating to fear

21  and things like that -- was just the access, the polling hours,

22  and things of that nature.  Many people worked on Election Day.

23  We don't take a holiday on Election Day, and they couldn't get

24  off work.  They were afraid that there would be some

25  ramification if they tried to get off work.

1      So early voting made it a longer period for people to

2   vote, and I thought it would be something that would certainly,

3   again, enhance black voter participation and involvement, and,

4   in fact, it did because as we moved toward early voting, more

5   people started participating; but, as importantly, even before

6   the more recent early voting legislation, we had excused early

7   voting, and that is you could go down to the polling place and

8   do absentee voting if you had a reason to believe that you

9   weren't going to be in town on Election Day.

10      As a practicing lawyer and as a litigator, I consistently

11   was out of town around Election Day, except I would come back

12   in so that I can let my constituents see me.  Many times I

13   didn't know where I would be.  So I availed myself of that, and

14   I figured it would work to the advantage of average voters if

15   they had no-excuse early voting.

16   Q   Are you aware that at some point in time early voting was

17   extended to weekends and evenings in North Carolina?

18   A   I was aware of it, but, more importantly, very supportive

19   of it.  Again, having listened to these different reasons that

20   people weren't participating, again the fear coupled -- again,

21   it was much more palpable than I might be able to describe it,

22   but the fear associated with the -- not really inconvenience.

23   It's never inconvenient to vote, but the inaccessibility to the

24   voting place on Election Day basically let me know that if you

25   do it on weekends, you would address many of those because the

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  synergy of a joint or corporate effort on weekends when you are

2  doing voting pushes in the local communities -- they figure

3  that their neighbors and everybody else is doing it, so it must

4  be okay.  They are not going to get any punishment for it, but

5  that as well just as the accessibility of the polling -- of the

6  process.

7       People normally aren't working on Sundays.  A great

8  number -- a great percentage of African Americans still go to

9  church on Sunday, and so it was just a natural thing.  You

10 could organize and encourage people to participate at a much

11 higher level if you did it over weekends, on Saturdays and

12 Sundays, when they weren't working.

13 Q    Was there any particular significance to Sunday voting for

14 African Americans?

15 A    Sure.  The hub -- although it might be changing somewhat,

16 but the hub of black culture, I think, is the black church.

17 Most people will concede that.  And so the Sunday voting

18 enabled churches to be much more active in encouraging their

19 members to participate in the voting process.  They were very

20 careful, at least those that I talked to and those that I

21 advised, not to tell people how to vote or even indicate to

22 them who they ought to vote for if it was any kind of partisan

23 election, but emphasizing of the importance of the franchise

24 and the importance of participating.

25      If you've got Sunday voting, churches could use their

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  resources, their vans and buses, to get the members who had

2  been convinced by -- whether it was their minister or somebody

3  in the church designated to encourage greater participation

4  that it's okay to go down to the polling place and vote on

5  Sunday afternoon.  Mind you, it took a real mindset to get

6  African Americans out of the idea that nothing else ought to go

7  on on Sundays other than church.

8       So in order to increase this participation, Sunday voting

9  really enhanced it in ways that no other experience that we had

10 had enhanced it.  Again, I guess it is the comradery associated

11 with having a van load going down.  It's the thought that you

12 don't have to go to work.  You don't have to worry about

13 whether what you are doing is right.

14 Q    Are you aware of whether there was Sunday voting in Wake

15 County prior to the enactment of House Bill 589?

16 A    Wait a minute.  589 is which bill?

17 Q    I'm sorry.  Let me rephrase that.  The bill -- the law

18 that we are looking at in this court proceeding is House Bill

19 589 that made voting changes in North Carolina, enacted last

20 summer?

21 A    And you'll excuse me.  We sometimes get 3,000 bills a

22 session, and I made it a point not to try remember them all.

23      But, sure, there was extensive Sunday voting in Wake

24 County ever since we changed the law to allow Sunday voting,

25 and it has consistently increased over time in African American

1  communities, especially at the beginning of the process, but

2  early voting has become one of the most popular things that we

3  do in this state as far as voting is concerned.  I think in the

4  last election probably half of the people who voted voted

5  early.

6  Q    What will -- what impact will reducing -- taking away one

7  week of early voting have on African Americans in the State of

8  North Carolina?

9  A    I am convinced that it will reduce the participation, and

10 I arrived at that conclusion based on observing how these

11 efforts are organized.

12      There is an expression you might be familiar with that was

13 on a national push with the churches.  They called it "Souls to

14 the Polls."  It takes time to organize that.  When you can do

15 it over a two-weekend period, certainly, it has a greater

16 impact.  People go home and they talk about it, and other folk

17 come to church the next Sunday.  So planning, making it part of

18 what they want to do on that Sunday.

19      So it will have, I think, a negative effect or might be

20 even a chilling effect on some of that participation.

21 Q    Now, do you recall a different law enacted in 2007 that

22 allowed for same-day registration during the early voting

23 period?

24 A    I am familiar with that, too.

25 Q    And do you support that law?

1  A    I do very strongly.

2  Q    Why do you support that law?

3  A    Well, number one, technologically, we've gotten to the

4  point that we can tell whether somebody is registered anywhere

5  in the system.  I mean, you know, computer chips have made a

6  lot of things possible.

7       Once I was satisfied -- in looking at the voting systems

8  from around the country, once I was satisfied that that was the

9  case, it made sense to do same-day registration and, again,

10 consistent with this earlier belief that I expressed, that you

11 would get people all charged up about candidates or about

12 issues, you know, bond issues or some things like that, get

13 them all charged up about it, and then you've got early voting

14 and load them on the vans and everything, too.  You take them

15 to vote.  If they weren't registered somewhere else, if they

16 hadn't gotten involved in the system, that this is a way to get

17 people brought into the democracy, and so you ought to get them

18 registered while they are there.

19      And when I looked at what was happening with a lot of the

20 African American voters, especially on the Sunday voting, there

21 were some who were showing up who couldn't vote, and they

22 didn't understand it.  I supported it because I thought that it

23 would increase our ability to close this gap.

24 Q    So I think you were talking about African American voters

25 at the end of that answer.  Was there any particular

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1  significance to African American voters of the same-day

2  registration during early voting?

3  A    Yeah, I think that if you study the numbers, it will

4  probably show that at least early on there was a

5  disproportionate number of African Americans who were doing

6  same-day registration.

7       The sociologists, I guess, would give you different

8  reasons for that, but it makes sense if you haven't focused in

9  on the advertising, if you haven't focused in on specific

10 campaigns, and you get moved by somebody who is encouraging you

11 to vote, that you can go and vote on the same day that you got

12 registered.  So I found that that had a pretty good way of

13 getting more African Americans involved in the process.

14 Q    I'm going to move on to another voting issue.  Do you

15 recall a law passed in 2009 that created a preregistration

16 system for 16- and 17-year-olds so that when they turned 18

17 they would be automatically registered?

18 A    I remember that.

19 Q    Did you support the preregistration law?

20 A    I support that as well, yes.

21 Q    Why do you support that?

22 A    Well, several reasons.  Number one, back in the late '90s,

23 the beginning of this century, I was very involved in a

24 national group.  I was president of a group called the National

25 Conference of State Legislatures.  It was a group for the 99

1  legislative chambers in the country, and so I served as

2  president of it and was appointing task forces and

3  participating with folk, and we did the Gore versus Bush stuff,

4  in looking at voting systems and ways that we could make them

5  more reliable and predictable.

6      At various meetings during that process, we had

7  presentations on how it is our responsibility on getting young

8  people more involved in the process because the numbers dropped

9  off very precipitously when you got below 28, 25.

10     And so some of the ways that were discussed both

11  nationally, and we discussed them at the state level, is that

12  once you register a kid at 16 or 17, they feel brought in to

13  the democratic process.  They have recently taken their courses

14  in ELP or civics, or whatever it is that they call it now, but

15  they had recently taken that, and they could see some

16  connection between voting and meeting their obligation.

17     And also at the state level, we had been trying to close

18  the gap with black participation and white participation in the

19  process.  If you register everybody who turns 16 or 17, at

20  least there is no gap in registration.  You got 100 percent of

21  folk eligible to register, both black and white and everybody

22  else.  It makes the task of getting them to participate a

23  little bit easier when they do get of voting age.

24  Q    Are you familiar with the concept of an out-of-precinct

25  ballot?

1   A    I am.

2   Q    Are you aware that if a voter ends up casting a

3   provisional ballot in the wrong precinct that it used to be

4   under North Carolina law that that ballot would be partially

5   counted?

6   A    Yes, I am familiar with that.

7   Q    Did you support that law that allowed the counting of

8   out-of-precinct ballots?

9   A    I would have.  I am not sure of voting on it, but I

10  supported it in talking to people and looking at it.  I tell

11  you the other reason for that.  I first ran into that concept

12  in the late '80s and early '90s with presidential votes, when

13  you had to count presidential votes even when somebody was in

14  the wrong place when they voted.  If they could vote in that

15  race, their vote would count.

16       It made sense to me that -- I think the presidency is a

17  very important office, but I also think that county

18  commissioners, city councils, and certainly legislators are

19  pretty important reasons, too.

20  Q    Could you explain what a split precinct is?

21  A    Again, I've got about 30 of them in my district.  The

22  concept is this, that the "one person, one vote" requirement,

23  *Baker v. Carr* requirements for one person, one vote, slowly

24  evolved to the point that there has been almost absolute

25  parity -- there has to be absolute parity in the congressional

1  races.

2       In state legislative races, there is some tolerance,

3  usually plus or minus 5 percent, but we've gotten to the point

4  that we can get down to the person or household.

5       Over time, over the last two recycling periods, we

6  basically used technology to go in and split out precincts to

7  meet the "one person, one vote" requirement, but also for

8  various other reasons, which I won't go into.

9       So what you do is you have voter tabulation districts, we

10  call them VTDs, during the redistricting process.  For the most

11  part in North Carolina, those corresponded to precincts.  The

12  voter tabulation districts basically were the same as the

13  precincts; and because of the way redirecting was done,

14  especially -- the last time it was done to some degree was in

15  2001, 2003, but you can imagine what you can do with computers

16  now that you couldn't do just ten years ago or that you

17  couldn't have done in 2001 that you can do in 2011.

18       So in 2011, because of the lack of real hard criteria for

19  redistricting, you know, set rules that would govern the

20  redistricting process, precincts were split amazingly,

21  especially in majority black districts; and so you find all

22  kinds of contortions in those precincts.  People will vote for

23  multiple House members within the same precinct or multiple

24  senators and, in some cases, even multiple members of Congress

25  all within the same precinct or the same voter tabulation

1  district.

2  Q    Did you say whether more precincts were split in African

3  Americans communities compared to white communities?

4  A    Oh, absolutely.  But one of the things -- for every

5  action, there is an equal and opposite reaction.  Every time

6  you split one of the precincts in an African American

7  community, the district that was next to it ended up having a

8  lot of split precincts, too.  But the reason for the splits in

9  the African American community often was to put more black

10 voters in black districts, and it left the surrounding

11 districts with these jagged edges; but, overall, there will be

12 more splits in the black community disproportionately than

13 otherwise.

14 Q    Was there any relationship between precincts being split

15 and whether voters might end up going to the wrong precinct on

16 Election Day?

17 A    Well, I don't know that it would make them go to the wrong

18 precinct because if they had been going to that precinct, that

19 would be the precinct they would go to.  They may be confused

20 when they get there because they will be voting differently

21 than they thought they were going to vote based on the people

22 that they talked to, how their neighbor was going to vote, and

23 all of those things; but if they had been going to the same

24 precinct, they shouldn't get that confused.

25      Now -- but you got to temper that somewhat with the fact

1  that more than half the voters would have already voted because

2  they voted at the early voting sites; but directly in response

3  to your question, if they had been going there, I don't know

4  that they would then go to a different one.

5  Q    So if the precinct was split, would it be possible that

6  they would be assigned a new location?

7  A    The way it works, or at least the way that I understand

8  it, split precincts is basically the way we describe precincts

9  that have certain -- they can't change the actual precinct

10 until the next redistricting, I think, by state and federal

11 law.

12      So if you've been going to, say, Precinct 30 for the last

13 20 years, the split occurs this way:  You come in and although

14 I may have represented all of Precinct 30, now there may be two

15 other people representing Precinct 30, but the polling place

16 for that precinct would still be the same.  What happens is you

17 can get as many as 18 or 20 different ballots at that precinct;

18 and depending on where you live, you get a different coded

19 ballot, but the precinct itself will not -- if it splits, it

20 stays in the same district, for the most part, once

21 redistricting has concluded.

22 Q    I am going to turn your attention to the part of the new

23 voting law that increases the plausibility of challengers and

24 observers in the polling place.

25      First, let me ask you, in your experience, have you

1 observed any incidents of intimidation or challenges --

2 challengers in the polling places in African American

3 communities?

4 A    Sure.

5 Q    Can you describe those?

6 A    Each election, we have teams of lawyers -- I mean, I have

7 worked with them.  I used to volunteer for it -- whose goal is

8 to make sure that elections are fair, and we send observers to

9 elections all across the world, and we ought to have an

10 assurance that elections in our state and our country are going

11 to be fair.  So we have lawyers and others at polls all the

12 time, and I'd often get calls that somebody was menacing --

13 acting with some menacing behavior at a polling place, and

14 early on, they were more troublesome than later on.

15      You tend to have people questioning voters.  You had

16 people questioning voters outside, you know, the restricted

17 area, more than 50 feet from the voting booth.  You can talk to

18 people from the entrance to the voting place, and so people

19 would be milling about.  You've got a First Amendment right to

20 do that, of course; but if they were strange to the precinct,

21 you get a buzz going on that somebody is here to watch you do

22 this or somebody is here to watch you do that.  You've got that

23 kind of intimidation.  You had people challenging folk as to

24 whether or not your name is the name that you see it is without

25 any basis for it.

1      So over time, I would say that I have seen it multiple

2   times, and I still see it in different forms even -- or I saw

3   it in the 2012 elections in a couple of polling places in my

4   district.

5   Q    What is the impact on African Americans -- first, what is

6   the race of the people that are asking these questions at

7   African Americans precincts?

8   A    Let me say this:  There is a special psychological thing,

9   I think, in the black community about voting, and that's

10  brought about as much because of the history of voting in this

11  state and in this country as it relates to African Americans as

12  anything else; and a good number of people, not me, but a good

13  number of people who are new to the process are distrustful of

14  people who don't look familiar to them at polling places.

15  There is nothing you can do about people showing up at polling

16  places.  You encourage them to do that; but when people that

17  they are not used to start asking questions or it seems like

18  they are paying particular attention to them, they tend to be

19  fearful that there is something ominous at the end of the

20  process.

21      I don't say that generically, but I have seen specific

22  instances of it.  I know what the underlying reason for that is

23  based on, again, conversations with people over a 40-, 45-year

24  period.

25      So when you see somebody in a suit and tie in a precinct

1   that is 98, 99 percent African American and that person happens

2   to be white and they are engaging in conversation with you,

3   some people are intimidated by it.  Maybe they shouldn't be,

4   but that is a form of intimidation that frightens people to

5   some degree, and I tell you that's one of the reasons, I think,

6   it was easier to get people to do early voting, again because

7   you are bringing them there en masse, and there is a comfort in

8   knowing you got six or seven folk that you know real well

9   around you, and, collectively, you are not going to be doing

10  something wrong.

11  Q    What effect do you believe that the new law that will

12  expand the possibility of at-large observers and challengers --

13  what effect do you believe that will have on the African

14  American voting?

15  A    And, again, I think it has that chilling effect, but let

16  me say this:  The concern that I expressed, and I expressed it

17  a decade ago, or even longer than that -- when there were

18  pushes made to bring outsiders into precincts on Election Day,

19  I was concerned that violence might break out in some of these

20  precincts because initially some of the people showing up in

21  African American precincts were -- looked like they played

22  linebacker at Notre Dame.  So, consequently, it encouraged an

23  equal turnout of African Americans who may have played

24  linebacker at NC State.  You started to feel that you were

25  going to get some kind of friction between these groups, and

1  you were creating friction that ought not to exist at a polling

2  place.  That was my initial concern.

3      My greater concern is when you start bringing more people

4  in, and I think the new law -- in fact, I am sure that it

5  allows ten outside observers to come in.  Historically, having

6  observers from the precinct meant that you had people who were

7  familiar with somebody in the precinct.  They may not be

8  familiar to all of the voters, but the people in the election

9  enclosure, the voting enclosure, some of the poll workers,

10 volunteers knew these folk.  So there was a certain sense of

11 comfort with opposite parties, opposite viewpoints, opposite

12 races at polls; but when you start bringing people in from the

13 outside, then I think that you create this sense of distrust,

14 and you create an environment where people feel that it's

15 easier not to participate than it is to risk whatever they may

16 think the risk is in voting in that particular election.

17 Q   I am going to turn now to the process that led to the

18 enactment of House Bill 589, the new voting law that we have

19 been talking about.

20     Do you recall; when was the first time that you were able

21 to review the expanded version of that bill?

22 A   The day that it came before the Rules Committee.  Now, in

23 all fairness, it was posted on our website sometime late the

24 night before.  I am old enough that I disconnect myself from

25 all this digital stuff when I go home.  So I don't pull up the

1  legislative website at 10:00 or 11:00 at night.  So I would

2  have had an opportunity to look at it the night before had I

3  done that.  I didn't do it.  I still don't do it.

4      When I got to the legislative building the following

5  morning, I knew I had a Rules Committee meeting; and the bill

6  was sprung in the Rules Committee.

7  Q   Do you believe that from 10:00 the night before until the

8  next morning is sufficient time for a member of the Senate to

9  review a bill of this nature?

10 A   Well, part of my review of a bill, and it's multifaceted,

11 but part of my review is to see what constituencies may be

12 affected by it and to try to have some reaction or

13 interaction -- reaction from and interaction with the different

14 folk who are affected.

15     So even had I looked at it at 10:00 the night before --

16 and I try to talk things over with the statewide constituency,

17 quite frankly, but even within my district, it would have been

18 virtually impossible to get the kind of feedback from the

19 various groups that had an interest between that time -- and I

20 would have been reluctant to call them at midnight, quite

21 frankly, but between that time and the time that the committee

22 meeting started early the next morning.

23     So, no, I did not have time to advise people across the

24 state that there was this omnibus bill that had all of these

25 provisions in it and what their reactions may have been to the

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  individual parts of the bill as a whole.

2  Q    What happened in the Rules Committee that day when the

3  bill was presented for the first time?

4  A    It passed.  I mean, a lot of the members, especially those

5  of us who had a sense of what was getting ready to happen and

6  how in one bill you were going to basically obliterate what

7  many of us had worked on over a 20- or 30-year period in

8  efforts that would increase black voter participation, we

9  fussed about it, but, as would be predicted, it passed.  It was

10 sent on to the Senate floor.

11 Q    Was this legislative process unusual in any way for a bill

12 of this nature?

13 A    Well, I got to be fair again.  Nothing is unusual in the

14 North Carolina General Assembly, but it was, I think,

15 uncharacteristic to enact a major piece of legislation that

16 comprehensive without giving the public any opportunity to

17 weigh in on it.  We had no hearings even in the committee.

18      Again, you cannot alert people across the state as to what

19 this bill did -- and there were multiple groups that had been

20 working on this kind of legislation for decades and decades.

21 There are multiple experts who can tell you what the effect

22 would be, not just the individual pieces of legislation had

23 they passed individually, but what collectively all of these

24 things would do.

25      And so, no, there was no testimony like that, no time for

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  testimony like that, and that was unusual on something that has

2  this sort of far-reaching impact.

3  Q    And did the Rules Committee have any experts come in to

4  present any information on the proposed bill the day before it

5  passed?

6  A    No.

7  Q    Senator Blue, what do you believe was the intent of the

8  North Carolina legislature in passing House Bill 589?

9  A    I believe the intent was to eliminate these four or five

10 forms of voter participation, forms that enhanced voter

11 participation over the last couple of decades.  I believe that

12 there was firm knowledge that these -- in fact, I know that

13 there was firm knowledge that these methods of increasing

14 access to the ballot place had effected a disproportionate

15 number of African American voters when compared to voters

16 overall.

17      We had studies from our staff that showed that when you

18 looked at these, as well as straight-ticket voting, that you

19 were going to have a negative effect on black participation in

20 the electoral process.  So I have to believe that it was their

21 intent to negatively affect black participation in the

22 electoral process.

23 Q    Do you know of any justification for enacting House Bill

24 589?

25 A    No, because there is no evidence that we were having

1  problems with these other forms of participation -- these
2  enhanced forms of participation.  I have not seen any evidence
3  of any fraud in elections.  In fact, North Carolina's elections
4  historically have been so much cleaner than elections around
5  the country, and that's a historic faith, not just since we
6  enacted these other pieces of legislation.
7      The burden, I think, on the ability of African Americans
8  to participate would have outweighed any argument that may have
9  been waged otherwise, but I heard no serious arguments as to
10 why these ought to be passed.
11     One of the things -- and I'll share this with you.  I
12 constantly had conversations with our director -- supervisor of
13 elections in Wake County.  The precinct that I live in had over
14 6,000 registered voters in 2008.  Because of early voting, they
15 did not have to split that precinct and go out and create three
16 other polling places, two or three others, since 2000.  So I
17 constantly had conversations with her about the benefits of
18 early voting.
19     And I have not heard any problems with the 16-,
20 17-years-old.  We had -- we've been enhancing the experience of
21 even -- of youngsters in elementary school, when they can go
22 vote with their parents, kids vote, again a way to encourage
23 full participation in this representative democracy.
24     So I didn't hear any arguments that I thought were
25 compelling enough to overcome the negative effect that it was

1  going to have on black voter participation.

2  Q    The election director in Wake County that you mentioned

3  talking with, what is her name?

4  A    Cherie Poucher.

5  Q    Did she share any views about any of these provisions with

6  you?

7  A    Cherie and I, we've been friends for a long time.  I think

8  she is one of the best election supervisors in the state, and

9  she's run some of the best elections; but, no, I mean, she was

10 very supportive, at least in the conversations I had with her,

11 of early voting, again because -- the deal was it kept her from

12 having to train people who were going to work at the polls

13 three or four days, and you had to hire people to do it.  Every

14 precinct has to have a judge and a registrar -- a judge and two

15 registrars, and so these are paid positions.  So each time you

16 can go without creating new precincts, then you save money.

17     In my county, it's gone from roughly 70 precincts with

18 that kind of support infrastructure to well over 270 precincts

19 now.  Again, my precinct is characteristic of many others in

20 Wake County.  As long as you got absentee voting, you save

21 money by not having to create new polling places.  More

22 importantly, school is open during a lot of elections, and

23 schools don't necessarily want to make themselves available now

24 because of security issues, and so it's much more difficult in

25 urban areas to get polling places.  This is a process that made

1   it less necessary to get new polling places.

2   Q    Just one quick clarification.  I think you said absentee

3   voting at one point.  Did you mean the in-person absentee

4   voting?

5   A    Yes, early voting.

6   Q    Did you hear from your African American constituents or

7   African American community groups about their reaction to House

8   Bill 589 when it was enacted by the legislature?

9   A    Yeah, I did.  I got mixed reaction, but overwhelmingly

10  they seemed to be that this is an effort to negatively affect

11  our right to vote again.

12       And, mind you, let me say this, too.  One of the first

13  lessons that we learned when I was growing up, even in Robeson

14  County, is to sort of chronical what voting in North Carolina

15  with African Americans has been about from 1831 forward, and,

16  you know, it is sort of ingrained in us.  Nobody is bitter

17  about it, but we're reminded that you've got to be ever

18  vigilant on impediments to voting because they can go grow into

19  the same thing that the 1830s, 1860s, late 1870s and certainly

20  the turn-of-the-century Jim Crow laws grew into.

21       So there is very great concern in our communities about

22  anything that can be viewed as affecting our right to vote and

23  our right to fully participate because of this history of

24  difficulties that have been created for voting.

25       I pointed out to a group that I had spoken to a couple

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1  weeks ago -- a mentor and friend of mine who inspired me was

2  Henry Frye, who was the Chief Justice of the North Carolina

3  Supreme Court and served in the legislature with me for two

4  terms -- for a term and then he came out the second term, but

5  Henry tells a story -- he told it a year ago when I went to his

6  book signing in Greensboro.  Having served in Korea as an air

7  force officer, he came to register to vote and could not

8  register to vote because he couldn't pass a literacy test in

9  North Carolina, although he had college degrees and defended

10 this country and, again, became the first African American in

11 the 20th Century in 1968 to be elected to the General Assembly.

12      So we know the history, and I think that that permeates in

13 our community; and anything that looks like it may open the

14 door to repeat that history is something that causes create

15 concern.  I got a lot of phone calls, a lot of on-street

16 encounters, in-church encounters, and all other kinds of

17 encounters of people saying, you know, this thing ain't going

18 to happen again.  We are simply not going to let folk take away

19 our right to vote.

20      That's how they perceived the early voting and these other

21 things that may have seemed like an inconvenience to a lot of

22 people but had become an important part of the black voting

23 experience.

24 Q    Let's just talk briefly about the election that's coming

25 up this coming November.  That's called a midterm election;

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  correct?

2  A     Okay.

3  Q     Are there any important candidate races that are on

4  schedule to be voted on in the midterm election in North

5  Carolina this coming November?

6  A     Every election is an important election.  It's certainly

7  important to those who are running; but if it's worthy of being

8  put on the ballot so that people can determine who is going to

9  be their proxy in whatever this place might be, whether it is

10 the city hall, whether it is the school board, or the county

11 commissioners -- most of our state constitutional officers are

12 up for election in this off-year election.  Most of the

13 sheriffs, at least, I think all of them -- some of them aren't

14 contested, but the sheriffs are on the ballot.  The district

15 attorneys are on the ballot.  Many of them are not contested,

16 of course, but we've got a very hotly contested race in Wake

17 County.  So it's a very important election in there.  The

18 sheriff's race is contested.  The clerk's race is contested,

19 the core fundamental constitutional races at the state level.

20 There are hotly contested county commissioner races in Wake

21 County, four of them.  We got judicial races that are on the

22 ballot this fall.

23      Everybody seems to focus on the federal race, the

24 congressional races and the U.S. Senate race.  Certainly, those

25 are important, but, you know, most of the power in the country

1   was supposed to have been reserved at the state level, and so I

2   think that these -- and, of course, we've got a bunch of

3   legislative races that are contested.  Mine isn't, thankfully.

4         Yeah, there are some very important races on the ballot in

5   November.

6   Q    What do you expect to be the impact of this new voting law

7   on the November election if it is not barred by this Court?

8   A    I think, and this is anecdotal and based on where I see

9   resistance coming and what some folk are saying now, as you try

10  to convince them with the idea of all the other changes --

11  because they are very aware all of these voting changes now,

12  and most folk think that it was aimed at them.  You look at the

13  numbers, and it seems to have been.

14        I think it will over time decrease the participation of

15  African American voters in the process because I think it again

16  makes room for these doubts that people had to surface again,

17  and in the absence of evidence -- it wouldn't even have to be

18  overwhelming, but in the absence of reasonable evidence that

19  there is some way that you got fraudulent elections or other

20  things that would make you take radical steps to cut back on

21  this progress that's being made, then I think that the changes

22  were not justified; and, again, at the end of the day, they

23  will have a negative effect on the overall turnout among

24  African Americans.

25        **MS. HAIR:**  Thank you, Senator Blue.  I have no

1 further questions, but you should remain for cross-examination.

2          **THE COURT:**  Any questions from the defendants?

3          **MR. STRACH:**  Your Honor, if I may just note just for

4 the record, we are not slowing down the hearing with objections

5 during the direct testimony.  We assumed, given the posture of

6 the case, that the Court can and will weed out improper

7 opinion, hearsay-type testimony.  I just wanted to note that

8 for the Court.

9          **THE COURT:**  All right.  Well, if you feel like you

10 need to preserve anything, I am going to leave it up to you all

11 to do that.  My recollection is that even in preliminary

12 injunction hearings that the Court can consider hearsay

13 evidence in those proceedings, but, in any event, I would be

14 happy to hear from you, particularly at the time of argument,

15 if you feel that there is an argument to be made that something

16 ought not to be considered.

17          **MR. STRACH:**  We will do that.

18                    CROSS-EXAMINATION

19 **BY MR. STRACH**

20 Q    Senator Blue, good afternoon.  Again, my name is Phil

21 Strach.  Good to see you again.

22 A    Good to see you.

23 Q    You submitted a declaration in this case I believe, which

24 has already been submitted to the Court.  So I don't want to

25 rehash everything in your declaration.  I just want to review a

1  few points with you.

2      You are one senator out of 50 in the NC Senate; is that

3  correct?

4  A    That's correct.

5  Q    And you are one legislator out of 170 between the two

6  chambers in the legislature; is that correct?

7  A    That's correct.  171 sometimes if the lieutenant governor

8  is in there.

9  Q    Is it fair to say, Senator Blue, that you do not speak for

10 the legislature when you are speaking on your opinion on

11 matters such as what you've testified to today?

12 A    That's correct.  Even when I was speaker for the House, I

13 couldn't speak on their behalf.

14 Q    That's right.  So one legislator cannot speak for the

15 intent of the legislature or for the legislature at all for

16 that matter; is that correct?

17 A    No, that is correct.  And, no, you can't, and you make a

18 mistake if you ever think you can.

19 Q    Thank you, Senator Blue.  And you noted that you were

20 elected speaker.  I believe it was in 1991?

21 A    Yes.

22 Q    And served for four years?

23 A    Yes.

24 Q    Were you the first African American speaker ever elected

25 to the State House in North Carolina?

1  A    As far as I know, yes.

2  Q    Would it be fair to say -- was that a sign of progress on

3  the race front in your mind when you were elected speaker of

4  the North Carolina House?

5  A    Oh, absolutely.  And let me, if I could, add to that.  I

6  think that North Carolina has made tremendous progress.  That's

7  why I say that you don't spend time being mad about something.

8  You keep moving on.  That's what all of us ought to be working

9  on to enhance that.  I think we've made tremendous progress.

10 Q    Let me focus for a moment on House Bill 589 itself, the

11 process.  You mentioned that the bill was distributed the night

12 before the Rules Committee meeting, and that there was a Rules

13 Committee meeting the next day; is that right?

14 A    Uh-huh.

15 Q    And do you recall members of the public being allowed to

16 speak at that Rules Committee meeting?

17 A    I don't remember any -- at least I don't recall anybody

18 who would have spoken in opposition.  What we typically do at a

19 committee meeting is that the bill will be called up.  The

20 presenter will tell what it is about.  The members will get an

21 opportunity -- the members of the committee will have an

22 opportunity to ask the sponsoring member or professional staff

23 questions about the bill, what it does.  The sponsor of the

24 bill then, if there are external participation, people

25 participating, will then call on his people to explain it --

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

 1  his people or her people to explain it further.  If there is

 2  somebody in opposition in the audience, then you try to give

 3  them an opportunity, but, typically, you know the bill is going

 4  to be on the calendar, and you know what it's about, and both

 5  sides get the opportunity to line up their folk.

 6      If it's a more complex or sophisticated bill, such as the

 7  redistricting effort, you usually ask for a broad array of

 8  comments from different people because you know that it has

 9  pretty serious implications and ramifications.

10  Q    So with respect to the Senate Rules Committee meetings

11  that were held in July of last year on House Bill 589, do you

12  recall, sitting here today, members of the public being allowed

13  to make comments during that meeting?

14  A    I don't recall.  I don't recall any -- I am sure there

15  were people who said it's a little farfetched, but I don't

16  remember any individuals who made the comments.

17  Q    Do you remember Ms. Allison Riggs with the Southern

18  Coalition for Social Justice speaking at that meeting?

19  A    She may have.  She has spoken at several meetings.  She

20  may have spoken at that one.

21  Q    All right.  Do you recall if the proceedings on House Bill

22  589 of the Senate were recorded?

23  A    They should have been.

24  Q    So if the record reflecting what happened at that meeting

25  indicated there was public comments, I assume you would --

1  A      Absolutely, the record would establish who was there and

2  what they said.

3  Q      Do you remember how many days -- or let me ask you this:

4  Is it usual for public comments to be taken in a committee

5  meeting?

6  A      Yeah, let me say it is not unusual.

7         What we do again is once a bill is called, those --

8  understand the way this process works.  Usually, there is

9  somebody who is a watchdog or a bird dog on everything that a

10 committee does.  You got lobbyists whose job it is to see what

11 is coming up.  Usually, they will line up supporters or

12 opponents of a bill.  That's the typical way that we consider

13 stuff.

14        If it's on the calendar -- sometimes, you know, you

15 forecast that it may be on the calendar a week, several weeks

16 down the road.

17        So typically, as I said, the member will explain it, and

18 sometimes the member doesn't fully understand the finer points,

19 and so they will let the professional staff explain it, what

20 the implications are, what some of the pluses and minuses are;

21 and after the staff explanation, the process is usually opened

22 up for members of the committee to ask the sponsoring member

23 about it, about how far a net he may have thrown out to get in

24 different viewpoints, whether he's consulted, in this case

25 probably with the elections board or with the Attorney

1  General's Office and various others, fully understanding the

2  legal implications on certain kinds of actions that we take.

3      And so you get that, and after that, you will call on

4  members in the audience.  The committee meetings are open, and

5  some committee rooms are bigger than this courtroom, and you

6  will have more people than you have present in this courtroom,

7  and they will volunteer to come up and give their viewpoint

8  typically at a committee meeting, but that's different than a

9  public hearing.

10 Q    Sure.  But it is not required in the rules to allow the

11 members of the public to comment?

12 A    No, that's not required.

13 Q    That's in the discretion of the chairman to allow that;

14 correct?

15 A    That is true.  Now, there have been times when the rules

16 would require it.  The rules have -- historically had a

17 provision that any member -- a certain percent of the members

18 on a committee or in the legislature who wanted to request a

19 public hearing could request it, and the public hearing had to

20 be granted, and we typically do the public hearing in the

21 legislative auditorium rather than a committee room.

22 Q    All right.

23 A    No, the rules don't say that you got to have a public

24 hearing on every bill.

25 Q    All right.  And the rules don't require the chairman of

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  the committee to allow members of the public to comment on

2  every bill either?

3  A    That's correct.

4  Q    Do you remember how many days of floor debate in the

5  Senate there were on House Bill 589?

6  A    It would have been over a two-day period.

7  Q    Do you remember why it carried over into the second day?

8  A    The rules require that.  This is the other thing.  Again,

9  there are rules, but then the rules can disappear.  The rules

10 require that each bill be read on three separate occasions in

11 the General Assembly.  When it's introduced, that's the first

12 reading.  The second reading is when it comes back from the

13 committee, unless the body is acting as a committee as a whole.

14 It comes back from the committee is the second reading, and the

15 third reading is when it comes back -- and the rules are

16 basically that a bill will be read on separate days for each of

17 those.

18      And so routinely what we will do on uncontroversial bills

19 and routine bills is suspend the rules, and the presiding

20 officer will say, Senate Bill 589 having passed the second

21 reading will, without objection, be read a third time.  On

22 bills that have controversy, somebody will object and not allow

23 the rules to be suspended.  It is an effective suspension of

24 the rules if nobody objects to the bill being read the third

25 time.

1        On this bill, as I recall, there was an objection to it

2   being the read the third time on the same day that it had

3   gotten a second reading.

4   Q    Do you recall who made that objection?

5   A    It was probably Nesbitt because it was a hot enough issue

6   that I think he had engaged in -- either Nesbitt or -- there

7   were multiple people who hollered.  I don't know who the record

8   showed, but, I mean, many of us hollered, and I think that the

9   record will show that -- I think it may have been Martin

10  Nesbitt recorded as to the one who objected, either him or Josh

11  Stein.  I know that Floyd McKissick was up shouting.  Multiple

12  members objected very strongly to it being read the third time.

13  Q    Thank you.  Do you know whether the record reflects that

14  Senator Apodaca is the one who objected to the --

15  A    He may have, and that's not unusual either.  He may have

16  if, in fact -- and I mentioned Nesbitt because he was the

17  minority leader at the time.  If, in fact, he told him that we

18  were not going to agree to suspend the rules, the Rules

19  Committee chairman, who was Senator Apodaca, will object

20  himself so that you don't -- it doesn't look like it is

21  confrontational.  Apodaca may have done it.

22  Q    Okay.

23  A    Within our group, we'd say that we were going to object to

24  the third reading because there had been a lot of discussion

25  the day before about it.

1  Q    Do you recall whether any amendments were allowed on the

2  floor to the bill by Republicans or Democrats?

3  A    There were a lot of amendments offered.  I don't know

4  which ones were adopted, but there were a multitude of

5  amendments offered.

6  Q    Were they offered by both parties?

7  A    Yes.

8  Q    Do you remember if of the amendments offered by Democrats,

9  who were the minority caucus, were passed?

10  A    I mean, if you'd refresh my recollection, I can tell you

11  whether I remember that.

12  Q    Do you recall having one of your amendments passed?

13  A    Which one was that?

14  Q    You don't recall?

15  A    Again, this is a process with hundreds of bills and even

16  many, many more preliminary things with amendments.  Unlike the

17  federal system, everything sort of stands -- I probably had an

18  amendment because I had several to do.  I am just trying to

19  remember which one specifically passed.

20  Q    We'll let the legislative record stand on that, I suppose.

21  A    But if you tell me, I mean, I would be glad to tell you

22  what I remember about it.  I just don't remember a specific

23  one.

24  Q    Are you familiar, when I use the term "point of order,"

25  with what that means?

1   A    Sure.

2   Q    What does that mean?

3   A    That means the presiding officer is called upon to restore

4   order to the chamber.  Some member is violating the rules or is

5   speaking about something that is not relevant or germane to

6   what is being discussed.

7   Q    Did you raise any points of order in the floor debate in

8   the Senate on HB589?

9   A    I don't know.  We probably did collectively.  I don't

10  remember whether I did.  If I had raised a point of order, it

11  would have been to probably try to read the bill the third time

12  or something like that.  I try not to engage in acts of

13  futility.

14  Q    That's good advice for all of us.  Senator Blue, I looked

15  at your declarations in the court record.  I did not see

16  anything in your declaration where you said that there was an

17  actual violation of the Senate rules during this process.

18       Are you contending at all that any actual rules were

19  violated in the enactment of House Bill 589?

20  A    No hard set rule, no.  You will not see that because,

21  again, the entire process is governed by a suspension of the

22  rules.  I wasn't being flippant when I said earlier we have

23  rules but we don't have rules because, routinely, we will

24  suspend the rules every day.  90 percent of the legislation

25  that passes passes because there is a suspension of the rules

1  when we read it the third time, passes because we let it come

2  from a committee directly on the House floor.

3      The thing that I noticed that's quite different in the

4  Senate with respect to the rules -- when I formulated the rules

5  in the House, and I've tried to do some of this in the Senate,

6  because of historical experiences in the House, we made it more

7  difficult to suspend the rules.  We made it more difficult for

8  the committees to directly report to the House floor because

9  historically there had been abuses of that, and we built into

10  the rules protections against that.  If you had a bill like

11  this which was a committee substitute, the rules that we

12  promulgated in the House said that it could not come on the

13  House floor for two days and the same thing on a bill that came

14  from the opposite chamber, primarily because we didn't know

15  what was in it and what they would stick in it.  Oftentimes, we

16  didn't know whether we had had time to review some of the stuff

17  that they would stick in it.

18      But, again, the rules routinely are suspended to pass

19  bills, to let members talk when they ought not to be talking,

20  but, no, I didn't declare that there was a violation of the

21  rules that I recall.

22  Q    Senator Blue, in fact, since we are talking about sort of

23  the legislative sausage-making process, for the Court's

24  edification, are you familiar with the process that the

25  legislature called gutting, or amending, a bill?

1  A    Sure.

2  Q    What does that mean?

3  A    It means taking a bill that's unrelated -- we have this

4  rule that you have to adhere to.  We adopt rules, and these are

5  joint rules because they are in resolution in the House and

6  Senate.  So we just can't willy-nilly on our own in either

7  chamber change them.

8        In the adjournment resolution, we will have a provision --

9  not only in the adjournment resolution, we will adopt rules at

10 the beginning of a session.  We will say that certain kinds of

11 bills are ineligible after certain times, unless they are bills

12 dealing with appropriations, either spending money, finance,

13 raising money.  The two committees that deal with those can

14 meet anytime.

15       Other bills that may be of substance, you got cut off --

16 those bills are cut off, agency bills and various kinds of

17 bills.

18       The way the legislature has learned to get around that is

19 if you have a requirement that says a certain bill relating to

20 voting has to be introduced by April 1 and have passed one

21 chamber -- and we got this thing called crossover.  There is

22 this panic to get a bill past one chamber before that date

23 because, if it hasn't, it's not eligible for any further

24 action.

25       So what each chamber will do is take a bill that has

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  passed during that crossover period or before that crossover

2  period -- it's a House bill, so it's passed one chamber, or a

3  Senate bill and it's passed one chamber -- gut everything out

4  of it and put something in it totally unrelated to what the

5  bill was originally about as a way to get around that rule, and

6  then it is eligible for consideration again.  So if it didn't

7  meet the crossover deadline, you put it in this gutted bill,

8  and it is an active bill, just like any other bill that crossed

9  the House or the Senate.

10 Q    Okay.  Even though it passed the one house, it is

11 something completely different?

12 A    It's something totally different that the other chamber

13 has not dealt with.  I say totally.  Usually, it is something

14 different just because, if it's something similar, you can just

15 amend the bill that's already over there to deal with the

16 little nuances that it might have created.

17 Q    Is this a process that happens quite a bit?

18 A    Too often, too often, yeah.

19 Q    Particularly, I said -- I imagine this happens at the end

20 of the session when there is a jam-up for time?

21 A    Yeah, and understand that the purpose of these rules is to

22 give the public an opportunity to know what we were doing to

23 build transparency into it because that's whose business we

24 were transacting.

25     If you gut a bill today and put something unrelated in it,

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1   the public doesn't know what to look for when they see that

2   bill.  They don't get the Institute of Government or the School

3   of Government's, you know, analysis every day of what the bill

4   has in it.  That's what it's about, really putting the public

5   on notice of what the General Assembly is considering.

6   Q    Do you remember in the 2013 session, the long session --

7   do you remember a bill that became known as the Sharia law

8   bill?  Do you remember that bill?

9   A    I remember that.

10  Q    Do you recall if that bill was subjected to this

11  gut-and-amend process?

12  A    Honestly, I don't remember.  I was in the committee when

13  it was debated, and I think I may have played a role in some

14  amendments to it or at least in the discussion about it; but I

15  don't remember its posture when it came to us.  It originated

16  in the House, as I recall, but I don't remember all of the

17  details of what we may have done to change it in the Rules

18  Committee.

19  Q    Is it fair to say that that was a controversial bill?

20  A    It was controversial in that most of us concluded that

21  there were some real constitutional infirmities with it, and it

22  was on a controversial subject, let me say that, but not one

23  that generated the kind of groundswell concern that is

24  significant with a number of other bills we looked at would

25  generate.

1  Q    Do you recall the bill -- that bill originated at the

2  House, I believe, came to the Senate and then went back to the

3  House for the final adoption.  Do you recall whether that bill

4  went back on what they call a motion to concur?

5  A    And this is the way the process would have worked.  If one

6  chamber passes a bill and the other chamber changes it at all,

7  whether they made a committee substitute out of it, that is,

8  substitute the whole bill, whether they amend it, whether they

9  change something as minor as an adjective or something in it,

10  as long as it's not -- even if it's purely technical, if the

11  other chamber changes it, it has to go back to the originating

12  chamber, and it goes back on a motion to concur or not concur.

13  So that bill would have done as bills routinely do.

14  Q    Do you recall if the House in that instance simply voted

15  to concur rather than to not concur and form a conference

16  committee?

17  A    I don't remember that specific bill, but that would not be

18  unusual in the sense that a lot of the changes are consensual

19  changes.  For example, if I am the lead sponsor on a bill and a

20  House member wants to make some changes to it, usually they

21  will consult with me -- I mean, if it's nothing that's

22  controversial, consult with me, and they will make the changes;

23  and when it comes back to the Senate for the Senate's affirming

24  what the House has done, it will come back on a motion to

25  concur, and we will have already worked out the details, and

1  generally the chamber will concur.

2  Q    Okay.  So that's not unusual?

3  A    No.

4  Q    Senator Blue, with respect to same-day registration, are

5  you aware of any election administration issues that were

6  caused by same-day registration?

7  A    To be perfectly honesty with you, I never had any great

8  concerns raised to me about same-day registration.

9       And, again, knowing where we are with computers and stuff

10 and how we can pull up somebody's history, and knowing that in

11 some states, the whole registration process is same day or

12 either postcard or various other ways, I am not aware of any

13 groundswell of problems associated with it.  That's not to say

14 that somebody didn't articulate some.  I am not aware of any.

15 Q    Okay.  Senator Blue, is it fair to say that you agree that

16 only eligible individuals should be able to vote?

17 A    Absolutely.

18 Q    And would you also agree with me that how someone is

19 deemed eligible should be the same for everybody regardless of

20 who they are?

21 A    Sure.

22 Q    One quick question with regard to the observers that you

23 talked about.  You participated in a lot of -- as you said,

24 every side lines up all their lawyers and monitors the process.

25 You are aware that there is a set of rules that govern how

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  observers may conduct themselves in the polling place; is that

2  right?

3  A    In the polling place, yes, in the polling place.  And what

4  concerns me greatly about bringing people external to the

5  precinct into it is that quite often the controversy and the

6  intimidation happens outside the polling place, outside the

7  voting enclosure.

8  Q    Okay.  And the observers that we are talking about with

9  House Bill 589 are the observers who are allowed to come into

10 the polling place; is that correct?

11 A    Uh-huh.

12        **MR. STRACH:**  Your Honor, that's all the question we

13 have.

14        **THE COURT:**  On behalf of all the defendants?

15        **MR. BOWERS:**  Yes, Your Honor.

16        **THE COURT:**  Any redirect?

17        **MS. HAIR:**  No, Your Honor, thank you.

18        **THE COURT:**  All right.  Thank you, sir.  You may step

19 down.

20     (At 3:10 p.m., the witness was excused.)

21        **THE COURT:**  Mr. Donovan, do we have another witness

22 we can at least start with?  We are going to go about another

23 ten minutes, and I'm going to take our afternoon break.

24        **MR. DONOVAN:**  Your Honor, at this time the plaintiffs

25 call Gloria Hill.

1  **GLORIA HILL**, PLAINTIFFS' WITNESS, at 3:10 p.m., being first

2  duly sworn, testified as follows:

3                          DIRECT EXAMINATION

4  **BY MR. DONOVAN**

5  Q    Please state your name.

6  A    My name is Gloria Hill.

7  Q    Where do you live, Ms. Hill?

8  A    I live in Hoke County, Raeford, North Carolina.

9  Q    And how long have you lived in Hoke County, North

10 Carolina?

11 A    Approximately 30 years.

12 Q    And have you attended college here in the State of North

13 Carolina?

14 A    I have.

15 Q    Where?

16 A    I attended Durham College and graduated from Fayetteville

17 State University in Fayetteville with a BS in business

18 administration.

19 Q    And what do you do for a living?

20 A    I am an insurance consultant.

21 Q    Let's turn to Hoke County.  Are you involved in community

22 or civic communities in Hoke County?

23 A    I am.

24 Q    Can you list them for us?

25 A    Yes.  I actually serve on the Raeford planning city board,

1  I actually chair a nonprofit organization, Cameron Heights

2  Community Action Project, and I personally sit on the Hoke

3  County Board of Elections.

4  Q    Let's talk about each of those briefly.  What is the

5  Raeford planning board?

6  A    It is a board that oversees the ordinances and zoning of

7  the city and the ETJ area.

8  Q    What is the ETJ area?

9  A    It is the extraterritorial jurisdiction.  It is a mile

10 boundary line right outside the city limits that the city has

11 jurisdiction over for zoning and ordinances.

12 Q    And what is your role with the Raeford planning board?

13 A    As a board member, we review the submitted proposals for

14 zoning, rezoning ordinances for businesses and residences.

15 Q    You also mentioned you are involved with Cameron Heights

16 Community Action Project.  First, what is that group?

17 A    Cameron Heights Community Action Project is an

18 organization that serves as a small hub of Hoke County.  It

19 focuses on revitalization of that particular area in terms of

20 rehabbing homes and making sure that the area is a vital

21 environment for our community.

22 Q    And what is your role with the Cameron Heights Community

23 Action Project?

24 A    As the part of the organization, I presently serve as

25 chair.

1  Q    Before turning to talk about the Hoke County Board of

2  Elections, I believe you said you've been a voting precinct

3  chair in the past?

4  A    I have been.  For approximately 10-plus years, I've served

5  as a precinct chair.

6  Q    And what is a precinct chair?

7  A    A precinct chair actually is a representative of a

8  particular precinct; and as chair, we, of course, chair the

9  meetings, but our main mission is to ensure the fact that

10 information is disseminated properly in our area -- in that

11 particular precinct.  We try to educate, encourage voter

12 registration, and make sure that the voting process is provided

13 for that segmented group of the county.

14 Q    And as part of the precinct chair, do you do education for

15 voters?

16 A    We do quite a bit of education.  As a matter of fact,

17 that's one of our main things, that we educate and provide

18 opportunities for voter registration.  We disseminate

19 information about the candidates as well as the electoral

20 process, and we do that by canvasing or having voter

21 registration drives or working with -- partnering with churches

22 or other organizations that may be or would allow that voter

23 registration and to encourage registration.

24 Q    Let's turn to your work on the Hoke County Board of

25 Elections.  How was it that you first became involved with the

1  Hoke County Board of Elections?

2  A    I was approached by a couple of persons, one being a

3  county official and some other members of the political group,

4  that decided that I probably would be an asset to work with the

5  county board; and so after the process began with the

6  nomination from the chair, Democratic chair, that is, of the

7  county, and the vote being cast by the elected officials, then

8  I assumed that position.

9  Q    And when did you assume a possession on the Hoke County

10 Board of Elections?

11 A    About July, I believe it was, 2009.

12 Q    And for -- you're still a member of the board today?

13 A    Presently, yes.

14 Q    And for a period of time, you served as the chair of that

15 board; is that right?

16 A    I did.

17 Q    And what are your chair -- or the board -- one of the

18 three board members -- what are the responsibilities in Hoke

19 County as a board member of the board of elections?

20 A    We have several points, but one of our main missions is to

21 ensure the electoral process is carried out fairly and

22 equitable throughout the county.  We make sure that our elected

23 officials are well trained, that our staff has a clear

24 understanding of what is needed and asked of them by way of the

25 state regulatories, and we just ensure that that process is

1  smooth and that voting sites are available.

2  Q    And have you visited polling places during early voting as

3  a board member?

4  A    Yes.  We have two voting sites, so we actually visit each

5  periodically during the whole process.

6  Q    But both during early voting and on Election Day?

7  A    Yes.  During early voting, we visit the two sites

8  periodically during that window of time that we have for early

9  voting.  On Election Day, each of our members are assigned at

10 least five.  So we rotate and visit those all during the

11 Election Day.

12 Q    Did you visit polling places during the May 2014 primary

13 that just happened?

14 A    Yes, we did, both the one-stop and the Election Day.

15 Q    As a board member, do you get updates from the executive

16 director and others on voting in Hoke County?

17 A    We do.  We, of course, have our electronic access, but our

18 director does disseminate reports to us throughout the day

19 because we actually meet sometime midday to get updated

20 reports, and we are able to get tracking and information in the

21 voting process as it's flowing properly as well as what is

22 coming from the state.

23 Q    Before we get into other issues, let's talk about Hoke

24 County itself for a minute.  Where is Hoke County located in

25 the State of North Carolina?

         NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1 A    Hoke County is a small area that's located and sandwiched,
2 I would say, between Moore County and Cumberland County.  I
3 guess, geographically speaking, we also border Scotland and
4 Robeson County.  So we sit on the side of Moore County, which
5 is, you know, a high-wealth area, and the other side is
6 Cumberland County, which is primarily bed and home to our
7 military; and so we are kind of in the middle of that.
8 Q    Between those?
9 A    Yes.
10 Q    Is Hoke County -- would you describe it as a rural county,
11 an urban county, or something different?
12 A    It's truly a rural county, it is.  It is a small county,
13 and it is primarily -- historically, it's been mostly farming,
14 and then it progressed to industrial.  That's primarily where
15 it is.  Even with the closing of the plants that are there,
16 that's primarily what it is, but it is considered rural.
17 Q    And what is the largest city in Hoke County?
18 A    We have one municipal and that's Raeford, comprised of
19 about 5,000 residents.
20 Q    Can you explain the demographic makeup of the folks that
21 live in Hoke County?
22 A    Yes.  It's kind of hard to say, but half of the side is
23 like home to primarily the military and that nature group of
24 environment; and the other side is primary what Hoke County is
25 really made of, and that's low-wealth county, deprived for a

1  number of years.  We've been considered to be at the totem pole

2  in terms of literacy.  We have many challenges in terms of

3  resources.  So it presents a challenge in terms of education,

4  and so, yeah, we are considered low wealth.

5  Q    If you can give an estimate for the Court of the breakdown

6  of African American, Latino, and white makeup in the county?

7  A    Well, at one time African American was the predominant,

8  but we are kind of losing that with other influx, and I would

9  say that migration is due to the military, number one, and then

10 we have a large influx of the Latinos that have moved into the

11 area.  There is still a high percentage, but it is not the

12 predominant number.

13 Q    Can you describe the education level overall in Hoke

14 County?

15 A    The educational level in Hoke County is highly challenged,

16 again due to resources.  You know, we even have a case that I

17 spoke about in the court system where we are winning that

18 battle with trying to get more resources, and that's based on

19 the fact that the kids were in this school, and, of course, it

20 wasn't presenting the education that was needed.  So we are

21 challenged with that source.  So it's pretty challenging to be

22 there.

23 Q    Does Hoke County have a fairly large population of either

24 under or uneducated voters?

25 A    There is a large percentage of that.  Unfortunately, like

1  I said, once you've been at the totem pole of literacy, it

2  takes several years of cycle to try to break that.  So

3  sometimes it takes three, four generations.

4       With that being said, unless that cycle is intercepted, it

5  just repeats itself.  So, unfortunately, with no addition of

6  resources, no addition of funds, no additional jobs, it sort of

7  tends to continue to be in that cycle.  So, therefore, it still

8  is considered deprived educationally speaking and economically.

9  Q    And would it be fair to describe Hoke County, as I

10 understand the term, as a low-wealth county?

11 A    That is a real fair assessment.

12 Q    Can you describe what it means to be a low-wealth county?

13 A    Economically speaking, there aren't any -- the jobs have

14 gone -- one of the experiences that we have had is that one of

15 the largest employers, the House of Raeford, has since closed

16 that.  That had about 1,000 employees.  We lost over $1 million

17 of revenue there.  Again, that is an employer with employees

18 but not necessarily any high -- it is not in the educational

19 realm of requirement that the personnels were there doing the

20 job so much so, but we still lost that economically, and then

21 there was a plant, Burlington Industries, that a lot of those

22 jobs were lost oversees.  So it just kind of brought about sort

23 of a demise, if you would, to the economic disparity there

24 that's already existent, and, therefore, it contends to be

25 considered a low wealth.

1    Q    And does Hoke County have a public transportation system

2    open to all its citizens?

3    A    We actually have no viable transportation, and what I mean

4    by that, there is something that our Hoke County senior

5    services provides, small transportation.  It is primarily to

6    the residents of -- the seniors that attend these small senior

7    functions that may need a ride to the doctor's office or they

8    need a ride to the grocery store.  It's not the best source

9    because wherever you go, you have to sit for, like, all day

10   until everyone is finished before you can even come back.  It's

11   not your typical transportation which you would think of as a

12   mode of transportation, and with that being said, we have no

13   other transportation at all.

14   Q    So there is no regularly scheduled bus service?

15   A    None.

16         **MR. DONOVAN:**  Your Honor, I am about to turn to

17   another topic, if you want me to keep going or if you want to

18   take your break now.

19         **THE COURT:**  We'll stop now then.  Thank you.  We are

20   going to take our break.  I am going to take a break for 20

21   minutes.  So please be ready at 20 to 4:00.

22       (The Court recessed at 3:24 p.m.)

23       (The Court was called back to order at 3:47 p.m.)

24         **THE COURT:**  All right.  Mr. Donovan.

25

1  **BY MR. DONOVAN**

2  Q    Ms. Hill, before the break, we talked about your

3  background in the Hoke County Board of Elections and talked

4  about Hoke County.  Now, I want to turn to voting in Hoke

5  County.  Okay?

6  A    Okay.

7  Q    And let's start with out-of-precinct provisional voting.

8  What is that?

9  A    Out-of-precinct provisional voting is the process that

10 allows our voters to vote when they are unable for some reason

11 to get to their precinct, and that can be other various

12 reasons.  One particular comes to mind.  When we have a lot of

13 workers that work out of town -- we have a particular voting

14 precinct that has a large sign on the main highway

15 thoroughfare, and sometimes when you are coming from work, you

16 have every intention to vote, and it may slip your mind at the

17 time.  So when they pass that voting precinct and they see the

18 huge sign that we have that says "Vote Here," they could,

19 depending on the time they get off of work, go in and vote.

20     Now, if they are trying to get there at the ninth hour

21 just before the polls close and that's the most convenient

22 thing that they can do, that's one incident.  Another one would

23 be a newcomer to the area that is trying to find their

24 precinct, and we've had this experience where they have gone to

25 this precinct, and they have been told to go to another; so

Case 1:13-cv-00658-TDS-JEP   Document 177   Filed 07/18/14   Page 147 of 213

1  they travel to two others, and, come to find out, those two

2  were not the correct ones.

3       So rather than become frustrated and give up, it would be

4  just totally convenient if they can just vote there

5  provisionally.  So those are a couple of cases.

6  Q    Based on your experience, have you had individuals, if

7  they are not able to vote out of precinct, who simply do not

8  vote then?

9  A    Exactly, because they became discouraged.  Exactly.

10 Q    And based on your experience in Hoke County, have African

11 Americans voters in Hoke County used out-of-precinct

12 provisional voting?

13 A    Yes, it is used a lot by African Americans, and I have

14 seen that primarily due to the job situation.

15 Q    Explain, please.

16 A    Getting off work at a late hour, having every intention of

17 voting.  I have even seen it to the point where once they get

18 to their regular voting precinct early evening, it's always

19 closed.  It just makes sense for them to vote at the nearest

20 precinct that they can come in contact with.

21 Q    Based on your experience on the Hoke County board, have

22 you had individual voters within Hoke County who have cast

23 provisional ballots during the prior midterm and presidential

24 elections?

25 A    Yes, we have.  We have always had provisional voting for

1 | various reasons at every election, primary and general.

2 | Q    And has Hoke County Board of Elections, and the people

3 | that work for you, ever have any difficulty processing these

4 | provisional ballots that were cast out of precinct?

5 | A    It has been my experience we have not had any problems at

6 | all.  The board has even been able to handle that.  Our process

7 | is that our executive director would actually match up the

8 | voting card with the voter -- the ballot, and then it comes to

9 | the board, and then we approve it.

10 |     I would have to say we typically are able to approve prior

11 | to this time at least 97 percent, I would say, percentile of

12 | all the ones that come through.

13 | Q    So 97 percent of the out-of-precincts you were able to

14 | approve as appropriate ballots?

15 | A    Right, exactly.

16 | Q    Ms. Hill, if this Court would order Hoke County and the

17 | state to have out-of-precinct voting for the 2014 midterm

18 | election, the same as it had for the 2010 midterm election,

19 | would you and Hoke County Board of Elections be able to comply

20 | with that order?

21 | A    We certainly would without any problems at all.

22 | Q    And based on your experience and community activities on

23 | the Hoke County board, do you believe the elimination of

24 | counting provisional ballots cast out of precinct will have a

25 | negative impact on African Americans' access to voting in Hoke

1  County?

2  A    I do believe it will, primarily, again, for that incident

3  that I brought -- just spoke to about getting off of work at

4  late hours and needing to vote, missing every other

5  opportunity, for whatever reason, maybe being out of town.  We

6  have seen that when you look at both of those when they come to

7  our desk, you do see that identification that is largely

8  African Americans.

9  Q    Let's turn now to same-day registration.  What is same-day

10 registration?

11 A    Same-day registration is a provision the state provides to

12 us to allow our voters to come in and register and vote at the

13 same day, same time.

14 Q    So this, if I understand it correctly, is during what we

15 call the early voting period?  If I am not registered, I can

16 come in and register and vote at the same time; right?

17 A    Right, only during early voting.

18 Q    You understand under the new law, HB589, if not enjoined,

19 the counties would no longer be able to permit people to

20 same-day register during early voting and then vote; correct?

21 A    That's correct.

22 Q    And prior to the enactment of HB589, how is same-day

23 registration used by citizens in Hoke County to vote?

24 A    Same-day registration allowed our voters to come in, and

25 like I stated, they would register and vote at the same time.

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1   The reason this is such a huge benefit for our area is

2   because -- well, there are various reasons.  Two come to mind.

3   You have not, for some reason, done the registration.  You have

4   not found where to go do it.  No one has approached you to do

5   it.  You have not attended the voter registration drive.  So

6   when someone approaches you to ask you to come and vote for

7   them, being a candidate of some -- or someone volunteering,

8   that allows you to come in and register and vote at the same

9   time.  Now, that's one incident.

10      Another incident we have found is that, again, speaking to

11  our area that has a higher illiteracy rate, people tend to

12  have -- or ones that are unable to read, they have their own

13  pride and integrity.  They will be intimidated to share with

14  you that they are having trouble being able to understand or

15  knowing how to fill out the form because they are challenged in

16  those abilities, to be able to read and understand.

17      So if someone invites them to come and register and

18  vote -- and then we have what we call a help desk at our

19  one-stop, and when the person came in, we would allow them to

20  ask for assistance.  We made it regularly available to them,

21  and it was always friendly.  So when they came in, if they were

22  challenged and were unable to read, they could easily ask for

23  assistance because we were always there to provide it.  So it

24  broke that intimidation barrier, and it made it easier for them

25  to come in, register and vote, and at the same time not

1  necessarily communicate to you that I am unable to read this.

2  Q    Based on your experience, have African American voters in

3  Hoke County used same-day registration?

4  A    Yes.  We have seen that that has been more predominant in

5  our African American community because of the disparities that

6  exist there, the challenges that are -- that's there, the

7  system that has failed for whatever reason, and the fact that

8  they just didn't get it.

9  Q    And by "more predominant," do you mean in Hoke County

10  you've seen African American voters use same-day registration

11  more than white voters?

12  A    Absolutely.  The data will show that.

13  Q    Based on your experience in Hoke County, have voters,

14  African Americans in particular, come to rely on same-day

15  registration in order to participate and access the ballot?

16  A    Yes, I have actually seen that.  It has played out in our

17  recent primaries.  Even though announcements were made about no

18  longer having same-day registration, we encourage everyone to

19  please get, you know, registered earlier.  We still had in

20  excess of 40 people that came to register and vote that same

21  day.

22        Again, I digress to say I don't really believe it's about

23  not doing the due diligence that they should do beforehand.  I

24  believe it speaks to the fact that they have those challenges,

25  and they know that they can rely on that type of assistance

1  when they come.

2  Q    What happened with those, you mentioned, 40 people that

3  came in to same-day register and vote during the primary?  Can

4  you explain what that was and what happened?

5  A    When they came in, you know, they were told we could

6  register you, but, unfortunately, you will not be able to vote

7  in this primary.  We will be registering you in the next

8  election that you will be eligible to vote in, which would be

9  the general election in November.

10  Q    So those 40 individuals came, they were registered, but

11  because of the elimination in HB589, they weren't able to vote

12  that day; is that right?

13  A    Absolutely.

14  Q    Based on your service as a board member on the Hoke County

15  Board of Elections, do you believe the elimination of same-day

16  registration will reduce the ability of African Americans to

17  vote in Hoke County?

18  A    Yes, because -- and I don't remember the statistic

19  exactly, but, if I can recall, when we were doing the research

20  on that, primarily the 40 individuals were predominantly --

21  that predominant number was African American.

22  Q    Let's turn to early voting, and we already talked about

23  what it is; but in the past, has Hoke County provided an early

24  voting period for voters during elections?

25  A    Yes, in the past we have had two sites to accommodate our

1  17 days.

2  Q    And has Hoke County had what's been discussed by Senator

3  Blue and others as Sunday voting as well?

4  A    Yes, we were able to incorporate Sunday voting for at

5  least two of our elections.

6  Q    And what effect did Sunday voting have specifically on the

7  African American community and voter participation in Hoke

8  County?

9  A    That was huge for Hoke County.  We knew that it would be a

10  large impact, but we didn't know how much until it was actually

11  implemented.  What we found is that after the individuals

12  attended their worship services, afterwards, they could go to

13  the polls.

14     Now, what we saw actually played out was that there were

15  many persons, and I would say more seniors than not, actually

16  utilized the van services that were offered to them to go and

17  vote; and what we were seeing is that if they did not use that,

18  they perhaps would not be able to get that.  They didn't have

19  transportation because, of course, we don't have

20  transportation.  They may not have had someone in their home

21  that would help them get there, or it may be there weren't

22  any -- I don't know what the reasons were, but for some reason,

23  they would not be able to get to the polls.  So by the churches

24  being able to offer this service to them after, it really

25  bridged that gap of not being able to come at all, and it also

NAACP, et al. v. NC – Preliminary Injunction/Vol. 1

1  brought a comfort zone to them that we had not even thought

2  about, that being, not only did you not have someone to bring

3  you to the polls, but perhaps they were challenged in some way,

4  again, literacy and understanding, reading, comprehension, if

5  you will.  So when there is a member of their congregation or

6  someone nearby that understands that, they can comfortably ask

7  questions in a comfortable manner for assistance.

8       Even though we provide it at the polls, it's just that if

9  I can ask someone that I am familiar with the question, then it

10 becomes easier for me, and it breaks that -- again, that

11 barrier of not being able to communicate effectively.

12 Q    Based on your experience and your service on the Hoke

13 County Board of Elections, do you believe the elimination of

14 one week, seven days, permitted of early voting will negatively

15 impact the African American voters in Hoke County?

16 A    I believe that it will.  As a matter of fact, I almost

17 know it will just from the primaries, watching how that played

18 out.

19      Two incidents come to mind again.  One, the last day of

20 our early one-stop voting, we had, I know, turned around

21 approximately 25 persons in a matter of maybe 30 minutes after

22 the polls had closed, and they were primarily African

23 Americans.  They were from different parts of the area, too,

24 and they were unable to come in and vote at that time, and the

25 only other date that is left is the election date.  So we had

1  one individual to say I won't be able to participate in this

2  election because of my hours, or whatever they were faced with

3  on Election Day, because they didn't have early voting at any

4  precinct.  So that vote we know we lost.

5  Q    Ms. Hill, if this Court requires the state to have the

6  same processes for the 2014 midterm election, including

7  same-day registration and early voting, as occurred in the

8  2010-midterm election, can the Hoke County Board of Elections

9  provide those services to voters?

10 A    We certainly can.  We had no problem in 2010.

11            **MR. DONOVAN:**  Thank you, Your Honor.

12            **THE COURT:**  All right.  Any cross?

13            **MR. PETERS:**  Thank you, Your Honor.

14                      CROSS-EXAMINATION

15 **BY MR. PETERS**

16 Q    Ms. Hill, I am Alexander Peters from the North Carolina

17 Attorney General's office.  Good afternoon.

18 A    Good afternoon.

19 Q    I've got just, I think, a few questions for you.  I want

20 to make sure I understood a few things that you said.  I

21 believe you said fairly early on in your testimony that -- and

22 let me back up.  This is the first time you have given

23 testimony in this case; is that correct?

24 A    That is correct.

25 Q    You did not do a declaration or affidavit prior to today?

1  A    I did not.

2  Q    I believe you said that you served for ten or so years as

3  precinct chair?

4  A    Yes, that's correct.

5  Q    And is that a political party position, or was that an

6  elections position like a precinct official that you might meet

7  when you come into the polls?

8  A    That is a precinct official.  The process of how that is

9  carried out:  You attend the meetings, the voters submit your

10  name, and the masses vote on you, and if you get the majority

11  vote, then you earn that right to be the precinct chair.

12  Q    Maybe I wasn't clear.  Is that a precinct chair for the

13  Hoke County Board of Elections, or is that a precinct chair

14  for -- since I believe you said you were involved in Democratic

15  Party politics, is that a precinct chair for the Democratic

16  Party?

17  A    No.  That is the precinct chair for the Hoke County

18  process.  Now, in that, I represent the Democratic because I am

19  a registered Democrat, right, but the precincts are not divided

20  by -- I mean, they are not divided by the

21  Democratic/Republican.

22  Q    Right.  Are the parties in the Hoke County organized at a

23  precinct level?

24  A    Yes.  There is a Hoke County Democratic Party, and there

25  is a Hoke County Republican Party, uh-huh.

1  Q    Do those parties organize themselves at a precinct level,

2  or do you know?

3  A    They do, uh-huh.

4  Q    I guess that's what I am trying to get at.  When you say

5  you are a precinct chair, is it a precinct chair for the

6  Democratic Party of Hoke County, or is it a precinct official

7  who would be sitting in the polling place on Election Day when

8  people come in to vote?

9  A    With that understanding, yes, representative of the

10  Democratic Party.

11  Q    Thank you.

12  A    Thank you.

13  Q    Can you tell me how many registered voters there are in

14  Hoke County?

15  A    Approximately 30,000.

16  Q    And how many precincts are there in Hoke County?

17  A    Fourteen, and there will be fifteen come November.

18  Q    Now, when -- does the Hoke County Board of Elections --

19  and I believe you said you've been serving on the board of

20  elections since 2009?

21  A    That's correct.

22  Q    Does the Hoke County Board of Elections send out voter

23  registration cards to registered voters in Hoke County or, in

24  any other way, notify voters of what precinct they live in and

25  what the polling place for that precinct is?

1  A    Initially, once you are registered, there is a card that
2  is sent out.  We are challenged with that.  I can't explain
3  why.  I don't know if it's due to the mail, due to people
4  relocating, or what that explanation would entail, but we get
5  several complaints about we didn't receive it, we didn't have
6  information; and the strange thing is we have more than you
7  would probably guess as to how many people really don't know
8  what precinct they are to vote in despite the fact that perhaps
9  a voter card was mailed out.
10 Q    Does the Hoke County Board of Elections have other ways in
11 attempts to notify voters of what precinct they are in and what
12 the polling place for that precinct is?
13 A    Actually, we don't.  That's left up to the party.  Our
14 mandate is what the state provides for us to do, and we are to
15 send out a voter registration card to you once you are
16 registered.  Unless we get that card back, then we make two
17 more follow-up attempts to get the card to you, and the same
18 thing is done if your name is purged from the voter list.
19 Outside of that fact, there is no other defined attempt that we
20 would have.
21 Q    All right.  Now, let me ask you.  When you talk about if
22 that card is returned, you send another card, are you talking
23 about the mail verification process when someone registers to
24 vote?
25 A    Well, when you register to vote and we send that card to

1  the address that's on there, it can come back for whatever

2  reason.  I can't explain why.  I don't know, but it will come

3  back occasionally; and, like I said, we'll make two other

4  additional attempts to get that card to you.  That goes for

5  both, as you mentioned, the mail verification or the purged

6  list; but when that happens, we have no other recourse, I guess

7  is what I am saying to you, to get that disseminated to them.

8  Q    With that mail verification process, the purpose of that

9  is to see if a registered -- if the person who is registered to

10 vote is at the address that they gave when they registered; is

11 that correct?

12 A    That is correct.

13 Q    Have you done any analysis in Hoke County of the rate of

14 return for those cards coming back for same-day registration?

15 A    We have actually addressed that at our board.  I don't

16 have those numbers in front of me to give you accurate

17 information, but we have addressed that because they were

18 coming back at an alarming rate.

19      Now, you have to understand that there is a certain

20 portion of our area that is high transit, not to mention that

21 if you have more renters, that that's transit sometimes, too.

22 We've got the renters -- high area of renters because we have

23 several, you know, apartments there, and then you also have the

24 military.  So when you have a high transit area, there is a

25 certain expectation to know that there will be a certain small

1 ratio that will always come back.

2 Q    Did you discuss the testimony you are giving here today

3 with the other two board members of the Hoke County Board of

4 Elections?

5 A    I did not.

6 Q    Just so it's clear on the record, you are not purporting

7 to speak for the board; you are speaking for yourself?

8 A    Absolutely.

9          **MR. PETERS:**  Thank you.  I have no further questions.

10         **MR. DONOVAN:**  Nothing further, Your Honor.

11         **THE COURT:**  You may step down.

12      (At 4:10 p.m., the witness was excused.)

13         **MS. RIGGS:**  Your Honor, plaintiffs call George

14 Gilbert.

15 **GEORGE N. GILBERT**, PLAINTIFFS' WITNESS, at 4:11 p.m., being

16 first duly affirmed, testified as follows:

17                    DIRECT EXAMINATION

18 **BY MS. RIGGS**

19 Q    Good afternoon, sir.  Can you please state your full name

20 for the record.

21 A    George Nixon Gilbert.

22 Q    Mr. Gilbert, where do you live?

23 A    I live at 4018 High Point Road in Greensboro, North

24 Carolina.

25 Q    What do you do for a living, sir?

1  A    I am now retired.  I retired in February of 2013.  Prior

2  to that, I was the director of elections for Guilford County

3  for 25 years.

4  Q    So what year did you start in that role?

5  A    1988.

6  Q    Can you tell us a little bit about your educational

7  background?

8  A    I have a bachelor's degree in economics from the

9  University of Florida, a master's degree in economics from

10  Florida State University.

11  Q    What kinds of employment did you engage in after you

12  graduated with your master's degree?

13  A    Initially, I was doing economic research for the State of

14  Florida.  Then moved to the Congressional Research Service in

15  Washington where I was doing economic agricultural research.

16  Q    For whom were you doing that?

17  A    For the Congressional Research Service.  After that, I

18  worked for the United States Senate -- or two United States

19  senators on their staff as legislative assistants.

20  Q    How did you receive that work?

21  A    Well, my boss at the Congressional Research Service

22  recommended me to one of the senator's chief of staff, and they

23  hired me.

24  Q    Can you describe for me some of your duties as director of

25  the Guilford County Board of Elections?

1  A     Well, the director of elections is responsible for

2  overseeing and being sure that all voter registration is

3  properly conducted within the county, preparation for all of

4  the elections, that is, providing for all of the supplies,

5  lining up all of the precinct officials, all of the polling

6  places, making sure that the voting systems are properly

7  inspected, properly set up, and that the equipment is delivered

8  to the polling place on time.

9      Basically, for all the elections that are conducted in the

10 county, we are responsible for making sure all of the things

11 happen that are necessary in order for those elections to be

12 conducted properly.

13 Q     How big of a staff did you direct?

14 A     The staff, when I began in 1988, was a staff of 12.  When

15 I left the office last year, it was a staff of 17 full-time

16 people.

17 Q     Did you have any responsibilities for staffing and

18 training?

19 A     Oh, yes.  I actually personally conducted the training of

20 poll workers prior to each election.  There is a statutory

21 instructional meeting that must be conducted prior to each

22 election, and I was responsible for executing that

23 instructional meeting.

24 Q     Did you have any responsibilities with budgeting?

25 A     All the budgeting for the department, yes, was my

1    responsibility as well.

2    Q    Mr. Gilbert, while you were director of the Guilford

3    County Board of Elections, did you have any involvement with

4    national election groups?

5    A    Yes, I was very active in the Election Center, or the

6    National Association of Election Officials, from about 2000

7    through 2012; and for the last five or six years of that

8    period, I served as the co-chair of the legislative committee

9    for the national association.

10   Q    Can you tell us a little bit more about the Election

11   Center's National Association for Election Officials?

12   A    The Election Center and the National Association of

13   Election Officials is an organization -- basically, it's a

14   professional association, that election administrators across

15   the country join the Election Center, and we meet periodically.

16   We always have an annual meeting, but then we have additional

17   training sessions.

18        The primary focus of the national -- of the Election

19   Center is continuing education for election officials, and it

20   was a prime sponsor of a certified elections registration

21   administrator program.  So I participated in that and went

22   through and obtained my national certification as an elections

23   registration administrator.

24        And we also communicated -- in my role as chair of the

25   legislative committee, we communicated extensively with the

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  members of Congress, particularly through the House and Senate

2  committees that were responsible for election legislation, and

3  we consulted extensively with them.

4  Q    What were you asked to do when you were consulting with

5  Congress?

6  A    Well, primarily, we were asked to inform them on what the

7  impact of their proposed legislation would be.  The Election

8  Center and the national association never -- very, very rarely

9  took a position for or against election legislation.  It was a

10  very diverse group, represented, you know, both parties

11  extensively, and we just did not get into the partisan issues.

12  However, we did try to inform the committee staffs and the

13  members of what the effects of their proposed legislation would

14  be and proposed alternatives to what they were suggesting in

15  their draft legislation.

16      So we worked extensively with those staffs prior to the

17  introduction of legislation frequently to try and draft a

18  legislation that would work most effectively for as many

19  jurisdictions as we could envision.

20  Q    Mr. Gilbert, did you ever testify in front of the U.S.

21  Senate or the U.S. House of Representatives?

22  A    Both cases, yes.  I was asked to testify on legislation in

23  probably three or four cases over those years.

24  Q    What kinds of advice or information did you present when

25  you were testifying?

1   A    Well, the same kind of advice that I would -- that we gave

2   to the committee staffs.  What would be the impact of the

3   legislation?  How could it be improved if we felt that it could

4   be improved in ways that it would still accomplish the

5   objectives that they were trying to accomplish?

6        In one particular hearing, they were doing a review of --

7   kind of a follow-up hearing on the 2008 election I believe, and

8   they were basically asking us to report on what worked well,

9   what didn't work well, where should we be looking for the

10  future.

11  Q    Okay.  I want to turn now to Guilford County.  Can you

12  tell the Court about the size of Guilford County approximately?

13  A    Guilford County is just under half a million population

14  with about 350,000 registered voters.

15  Q    How many precincts are in Guilford County?

16  A    A little over 160.

17  Q    How many early voting sites during the last election?

18  A    We had 20 early voting sites during the 2012 election.

19  Q    During your tenure as director of the county board of

20  elections, did you have the opportunity to coordinate with

21  election directors from other counties?

22  A    Oh, yes.  We communicated with each other quite

23  extensively, and in our case, it was -- you know, most

24  extensively with, say, Wake and Mecklenburg Counties since they

25  were the other two large counties in the state.  Forsyth County

1  as well.  We discussed issues and procedures and things like

2  that on a regular basis.

3       I would get calls a lot of times from some of the smaller

4  counties, you know, inquiring as to how we did things, how do

5  we make this happen.  You know, I talked to other county

6  directors quite a bit during the years.

7  Q    What were some of the topics that you would consult with

8  other urban county directors about?

9  A    Well, I think probably the biggest thing is how do you get

10 polling place officials?  How do you get your polling officials

11 trained properly?  Early voting sites, what kind of facilities

12 are we using for early voting sites.  What kinds of setup are

13 we using.  What are our hours going to be.  Why are you using

14 it that way?

15      We would on a -- specifically, when there was a election

16 pending, you know, pretty far ahead of time, we would probably

17 discuss, you know, how are you going to approach this, what are

18 you expecting, what do you anticipate to be problematic, and

19 those kinds of issues.

20 Q    What kinds of issues would the smaller counties reach out

21 to you about?

22 A    Very much the same thing.  How are you going to implement

23 this new procedure?  How are you going to implement this new

24 rule?  Did you experience, you know, this kind of problem when

25 you were conducting your last election?  So a wide variety of

1  issues come up throughout any election.

2  Q    What was your understanding of why the smaller county

3  election directors were reaching out to you particularly?

4  A    Well, I had been around longer -- particularly by 2005, I

5  had been around longer than most of the directors, although

6  there were quite a few that had been around longer than me, but

7  we also talked to each other.  We respected each other.  We

8  knew that each of us had good ideas and different experiences,

9  and we were kind of a team that tried to share information with

10 each other and help each other out.

11 Q    Mr. Gilbert, are you familiar with House Bill 589?

12 A    Yes, I am.

13 Q    And are you familiar with the provisions -- well, the

14 first provision I will talk to you about that reduces the early

15 voting period by seven days?

16 A    Right.

17 Q    Are you familiar with the provision that repeals same-day

18 registration?

19 A    Yes, I am.

20 Q    Are you familiar with the provision that eliminates the

21 counting of out-of-precinct ballots?

22 A    Yes, I am.

23 Q    Did any member of the General Assembly contact you during

24 the legislative process to seek your advice or opinion on the

25 effects of House Bill 589 or any part of it?

          NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1   A    No, they did not.

2   Q    All right.  So I want to talk about early voting with you

3   first.  How did Guilford County go about implementing early

4   voting when it first started in 2000?

5   A    Well, in 2000, we only had five early voting sites, and,

6   obviously, we were experimenting with no history and no

7   experience.  The turnout in that year we thought was absolutely

8   overwhelming because we had two-hour voting lines at a lot of

9   our early voting sites throughout the entire early voting

10  period.  So it became apparent pretty quickly that this was

11  something that we were going to have to expand, that this was a

12  preferred method of voting for a lot of people.

13       At that time we only had about 15 to 17 percent of the

14  total turnout accounted for by early voting.  That eventually

15  grew to 65 percent in 2012.

16  Q    Were you aware of any increasing voter interests in early

17  voting over that period?

18  A    Oh, every year.  2004, we pretty much doubled our

19  capacity, and our turnout in early voting more than doubled.

20  In 2008, we doubled it again almost.  We went to about 16, 18

21  sites, but we only opened half the sites for the first week

22  because we knew that that first week was slower than the last

23  week.  So we opened half the sites for that week and then all

24  the sites for the second week.  We did that in 2004 and in

25  2008.

1       We still had long lines at early voting, and when you have

2   long lines at early voting, and we weren't having as long of

3   lines on Election Day, that still sent us the message that we

4   needed to continue to increase our capacity.  That was the way

5   that people wanted to vote.

6   Q    Did you anticipate -- what kinds of anticipated cost

7   issues did you see with early voting in the early years?

8   A    Well, initially, we thought that the primary impact was

9   going to be on additional people, that we had to hire people

10  for three weeks to conduct early voting and then we had to hire

11  people for Election Day.

12      Well, as we moved into the shift of people from Election

13  Day to early voting, what I found was that I could conduct

14  early voting with far fewer voting machines than on Election

15  Day because I could put a thousand votes on a voting machine

16  over a period of three weeks, but only 150 votes on that same

17  machine on Election Day.

18      So at that point it really became a major economic issue

19  for the county, is that we could have conducted the entire

20  election through the early voting process with 400 voting

21  machines; whereas, if I had to conduct the entire election

22  process on Election Day, I would have needed over 2,000 voting

23  machines.  At one point in there, I calculated that we had

24  probably saved 2- to $3 million in voting machine equipment

25  costs as a result of early voting.  So the cost of the people

1  that we used in early voting was far overshadowed by the

2  savings in voting equipment.

3  Q    Just for the Court's knowledge, how much does a voting

4  machine cost?

5  A    Our machines cost about $3,500 apiece when we were

6  purchasing them.

7  Q    Are there still -- do you know how many counties still use

8  electronic voting machines?

9  A    I think probably 25 to 28 counties in the state use them.

10  More than that actually use them during early voting.  As many

11  as 35 to 40 when I left were using them during early voting.

12  Q    I want to go back to your example from the 2008 election

13  when you said that you didn't have all of the early voting

14  sites opened in the first week.

15  A    Right.

16  Q    Did that change in 2012?

17  A    Yes, it did.

18  Q    How so?

19  A    We opened all the sites on the first day and kept them

20  open throughout the entire 17 days.

21  Q    What was the result you saw from that?

22  A    Well, it went a lot more smoothly, particularly the first

23  couple of days.  The first couple of days of early voting are

24  extremely busy, and if we -- when we didn't have all the sites

25  open, we had long voting lines those first two or three days,

1    that Thursday, Friday, Saturday.  The second week it would slow

2    down some, but we would just reduce the number of people that

3    we had working so that we didn't waste resources.

4         But in 2012, we opened all of those sites.  During those

5    first two weeks -- or that first week, or 10 days, we were able

6    to adjust the number of workers that we had so that we --

7    everybody was busy but not overwhelmed and just try to gauge

8    each day.  We can predict pretty much each day, once you get

9    started, what the demand is going to be the next day and adjust

10   our resources that way.  It really worked out extremely well to

11   have all those sites available throughout that period.

12   Q    During the course of your career, at least as long as --

13   during the period that one-stop voting was available, were you

14   actively engaged in trying to anticipate the demand for early

15   voting?

16   A    Well, yes, you are always actively engaged in trying to

17   anticipate the demand for whatever type of voting is taking

18   place.  You know, you have early voting.  You have absentee by

19   mail.  You have to know how many staff you're going to have to

20   effectively administer that, and then you've got Election Day.

21        So the process involves a tremendous amount of analysis of

22   historical data and projection of what's turnout going to be,

23   you know, and how are we going to meet that turnout.

24   Q    When was the first time you felt like that you satisfied

25   demands for early voting?

1  A    2012.

2  Q    Why is that?

3  A    We were busy but not overwhelmed.  People did not have to

4  wait in long voting lines.  I don't think that -- the vast

5  majority of the time, the lines were under a half an hour,

6  which was, by the way, the standard that the Guilford County

7  Board of Elections established 20 years ago as being a target,

8  but we always wanted voting lines to be less than 30 minutes in

9  all cases, and we didn't really achieve that in Guilford County

10 during early voting until 2012.

11 Q    That 30-minute standard you just said, what elections did

12 that apply to?

13 A    All elections.  It was -- obviously, it was primarily

14 related to the biggest elections.  The general elections were

15 the times when you were going to have voting lines.  You don't

16 have voting lines in primary and municipal elections and things

17 like that.

18 Q    In the way you are using the time definition, does that

19 cover wait lines?

20 A    Well, it is the time that people get in line until the

21 time they get to the table to check in to vote.  At that point,

22 they are ready to step into the machine and start voting.

23 Q    Mr. Gilbert, when you were director of the board of

24 elections, would you have the occasion to visit polling places

25 during early voting and on Election Day?

1  A    In both cases, yes, and I did so every election.

2  Q    Did you ever witness long lines?

3  A    Oh, yes, I certainly did on both early voting and on

4  Election Day.

5  Q    What happens when voters are kept waiting in long lines?

6  A    When voters are kept waiting in long lines on Election

7  Day, they get mad.  I spoke with and confronted -- was

8  confronted by a lot of very angry voters.  We found

9  interestingly that when voters waited in line during early

10 voting, they still thanked us for offering early voting, and I

11 could only conclude that it was because they had the

12 opportunity to vote on the day that they chose and not the day

13 that we told them they had to.

14 Q    When voters would get angry, what would that mean for poll

15 workers?

16 A    Well, when people get angry at you, how do you respond?

17 You know, you don't think as clearly.  It is an upsetting

18 thing.  It is always much nicer to be able to deal with someone

19 in a civil way, but some voters, and many voters obviously, are

20 civil even when they are unhappy; but there is a lot more that

21 aren't when they are waiting in a long line.

22 Q    Did you ever observe what would happen to poll workers

23 with regards to mistakes when lines got really long?

24 A    When the lines got really long, people get in a hurry and

25 they get flustered, and they don't think through things, and

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  they don't have time to consult with one of the other officials

2  because the other officials aren't available either.  So, yeah,

3  you end up with more mistakes.  These are primarily

4  administrative irregularities and things like that that are

5  always present in every election, but, certainly, they tend to

6  magnify, or you give the person the wrong answer.  I think when

7  the polling places were very busy, people that were at the

8  wrong precinct would get sent to another wrong precinct.  Just

9  those kinds of mistakes multiply when things are very crowded.

10  Q    When lines were long, did you ever observe voters leaving?

11  A    That's hard to say because people are coming and going.

12  Certainly the anecdotal evidence is that people believe -- and,

13  obviously, some people have to leave when they have

14  appointments, or they only have a certain amount of time.  So

15  one has to presume that that happens.  Certainly, the election

16  in which we had the longest lines was 1988 because we had too

17  few voting machines in the county altogether, and we had lines

18  three and four hours long in some places.  That was the lowest

19  turnout election that I conducted in 25 years, general

20  election.

21  Q    What is the significance of weekend voting for voters in

22  Guilford County?

23  A    I think a couple of things.  There are people that have a

24  difficult time voting Monday through Friday, so weekends give

25  them the opportunity.  As they say, when people can vote on the

1  day that they choose, when it is convenient for them, they are

2  more likely to go and do so at some point during that weekend.

3  Q    Before no-excuse weekend voting was offered to Guilford

4  County voters, did you notice any effects on the lack of

5  weekend voting on any classes of voters?

6  A    Well, we always had weekend voting during early voting

7  because we always had early voting on Saturday.  So I never did

8  any analysis that would show that there was a change.

9  Q    I'm sorry.  I meant to say before early voting started.

10  A    Before early voting started?

11  Q    Yes.

12  A    Well, yeah, I mean, there was no -- I mean, you either

13  voted on Election Day or you voted by mail; and, certainly, as

14  early voting progressed, that period from 2000 to 2012 showed,

15  you know, fairly significant increases in turnout, particularly

16  in 2008 and 2012.

17  Q    Prior to the introduction of early voting, could you

18  identify what neighborhoods the longest lines were in?

19  A    Primarily, late in the evening, in working-class

20  neighborhoods.  The people that had to work from early morning

21  until afternoon didn't have the option of taking off and just

22  leaving the office or whatever.  So those working-class

23  neighborhoods in late afternoon, 5:00 to 7:30 or 8:00, or

24  whatever it was, would have significant long lines.  In some of

25  the other neighborhoods, you would have lines, particularly

1  early in the morning.  People just wanted to go vote early.

2  You can't do anything about a line before 6:30 because you

3  can't open the doors until then, but that was probably the

4  biggest problem lines, and at university campuses.  Kids in

5  university can't get out of bed before 5:00.

6          **THE COURT:**  In the evening?

7          **THE WITNESS:**  In the evening.  They all wanted to go

8  vote at 5:00 to 7:00, something like that.

9  **BY MS. RIGGS**

10 Q    How would you describe the activity levels during both

11 weekends of early voting prior to House Bill 589 in Guilford

12 County?

13 A    Well, we always had good, you know, fairly steady turnout

14 during those early voting periods.  They were very much like

15 the other days of the week.  They weren't exceptionally busy

16 nor were they slack.  I came to look at them eventually as just

17 another day of week that we are voting, and the number of

18 voters that we had per hour at the various sites was very

19 comparable to what it was in the days preceding and immediately

20 following each of those weekends.

21 Q    Did you see long lines in working-class neighborhoods

22 after the introduction of early voting?

23 A    They certainly diminished and literally by 2012, and there

24 was very little -- there were very few long lines in 2008 and

25 2012.

1  Q    I want to talk a little bit more about the cost savings of

2  early voting.  How did you determine how much cost the county

3  saved with early voting?

4  A    Well, I always had to calculate how many voting machines I

5  needed for an election.  To do that, you project, you know,

6  what your turnout is going to be in early voting.  What is your

7  turnout going to be on Election Day?  I knew how many voters

8  could vote on a voting machine within one day's time.

9       Over the years, we tested and counted and came up with

10 statistics on how long it took each voter to vote.  It would

11 range anywhere from six to eight or nine minutes per voter.  At

12 some locations, it was eight or nine.  In some, it was six.  So

13 you use a number like seven minutes per voter, and how many

14 seven minutes are in thirteen hours on Election Day?  How many

15 seven minutes are in ten hours at how many sites?

16      So that's very much a matter of statistical analysis of

17 calculating how many people can vote within this time frame on

18 X number of machines.  So I knew how many machines I needed to

19 accommodate the projected number of voters.  You always try to

20 give yourself a margin of error on the topside there, but we

21 were able to estimate fairly accurately what our needs were.

22 Q    Did the county see any savings when it came to training

23 poll workers?

24 A    Well, whenever you don't have to hold a new election

25 because poll workers messed up, you've saved money.  I think

1  that's the main thing with respect to training poll workers is

2  that you want to make sure that you've got a qualified group of

3  people.  They are the ones that conduct the election.  I didn't

4  conduct an election.  In 25 years, I never conducted an

5  election; my poll workers did, and providing them with the

6  knowledge and the training and the resources that they need was

7  my job.

8  Q    How would you compare the experience and expertise of poll

9  workers on Election Day with that of poll workers during early

10 voting?

11 A    Well, during early voting, we had a lot more training

12 opportunities, and also they had on-the-job training.  If they

13 would be working throughout -- you know, multiple days, they

14 would gain experience each of those days.  So by the time --

15 and many of them also worked Election Day.  By the time they

16 got into the busiest part of early voting and to Election Day,

17 they were very knowledgeable about the process and what they

18 were doing.  Probably on Election Day -- about a third of our

19 poll workers on Election Day had worked in early voting and

20 two-thirds of them had not; but we also had a precinct official

21 certification program, which was 16 hours of course work and a

22 final exam, and we had over 700 or 800 precinct officials in

23 Guilford County who had gone through that certification

24 program.

25     So, you know, we had a relatively small number of really

1  truly unexperienced and untrained poll workers who only got a

2  minimal amount of training.

3  Q     In the last five to ten years, Mr. Gilbert, what happened

4  to African American turnout in Guilford County?

5  A     Well, it went up I think significantly, particularly in

6  '08 and -- from '8 to '12.

7  Q     Did the location of one-stop sites in your mind affect

8  that turnout?

9  A     No.  We had locations -- we had one-stop sites located --

10 you know, fairly evenly distributed to all segments of the

11 population in Guilford County.  That was always a major part of

12 the discussion when the board of elections came up with its

13 early voting plan.  We would sit down and put it on GIS mapping

14 systems.  We would show them where all the registered voters

15 were.  We would show them what the proposed sites we had were,

16 and they made sure, in order to get a unanimous vote on that

17 board, that we had an equitable distribution of those early

18 voting sites throughout the county.

19 Q     How did voter registration numbers figure into the

20 location of a one-stop site?

21 A     Well, you would try to have -- you know, we would do a

22 circle, say, of a 2- to 3-mile radius around a proposed site

23 and determine -- you know, when you put it on a geographic

24 information system, a computer map, you can see immediately how

25 many registered voters there are within, say, 2 miles of that

1  site; and we did that so that, you know, we'd get a good equal

2  distribution of those sites around the county.

3  Q    In Guilford County, were one-stop sites concentrated in

4  black neighborhoods?

5  A    No, they were not.

6  Q    Did you ever have a board member object to early voting

7  sites because they were concentrated in black neighborhoods?

8  A    No, we did not.  That issue was discussed, but it was

9  remedied before we submitted our final plan in every case.

10  Q    Okay.  Mr. Gilbert, what does more early voting mean for

11  Election Day?

12  A    It means less crowding on Election Day and probably a

13  smoother election for both precinct officials and voters.

14  Q    Will it have an effect on expenditures?

15  A    It costs more to do both, but with the savings -- when we

16  got to the point where we had 65 percent of our voters voting

17  in early voting, as I said, we saved several million dollars in

18  voting equipment costs.  If voters are moved back to Election

19  Day, significant cost increases could incur.

20  Q    What will those cost increases come from?

21  A    The biggest cost increase would be in terms of the voting

22  equipment itself.

23  Q    Will there need to be more sites?

24  A    But you would have to have -- well, I don't know that I

25  would need more sites.  Eventually, if you got more people

1   voting -- I did an analysis back in the early '90s as to what

2   factors in the election led to the longest voting lines, and

3   one always presumed that it was the number of voters per hour

4   trying to vote.  Well, it didn't turn out to be that way.  It

5   turned out that the -- the variable that had the highest

6   correlation with long voting lines was the size of the polling

7   place.  Larger polling places had longer lines for some reason.

8   People actually voted slower in those larger polling places.

9       So one of the first things that I did was divide

10  precincts, create smaller precincts, which turns out were more

11  manageable for the precinct officials.  When people don't have

12  a lot of training and experience, they can manage a smaller

13  facility easier than they can a larger one.  That was my

14  conclusion.

15  Q   As the Guilford County population has grown over the last

16  couple of decades, did you notice any trends with the number of

17  precincts you needed to open after the introduction of early

18  voting?

19  A   Well, we were not -- we always had to increase the number

20  of precincts, and we had to split 10 to 15 precincts prior to

21  most general elections up through 2004, 2008.

22  Q   Have you ever had to split more precincts without early

23  voting?

24  A   Oh, absolutely.  We would have over 200 precincts now if

25  we had too many voters switch back from early voting to

1  Election Day.  That would be, obviously, more machines, more

2  personnel, more of everything on Election Day.

3  Q    Okay.  Now, I want to switch to same-day registration,

4  Mr. Gilbert.  Very briefly, can you just explain to the Court

5  how same-day registration works?

6  A    Yes.  If a voter comes to an early voting site, typically

7  what happens is that they give their name and their address,

8  and the poll worker looks up and finds that they don't find

9  them on the registration.  We have a live computer registration

10 file at every early voting site.  If they don't find that

11 voter's name, then they would ask the voter if they would

12 like -- they say, yes, we don't find you registered, but you

13 can register and vote today.  So then they would go and they

14 would fill out a registration application.  That data was then

15 entered in the computer right there at the early voting site,

16 which is then transmitted back to the central office.  The

17 voter is allowed to cast their ballot.  Of course, as a

18 no-excuse absentee ballot, it is identifiable and retrievable

19 just like all other absentee ballots are.

20     That night, all those forms come in.  We double-check the

21 forms against the data that was entered into the computer to

22 make sure it was entered accurately, and then the next day the

23 verification notices go out in the mail.  The law requires that

24 those verification notices be mailed within 48 hours.  We found

25 that once we figured out what we were doing that we were

1  certainly able to do that without any problem.

2       So those verifications notices go out to the voters just

3  like they do to all other voters after they register to vote.

4  If the notices came back undeliverable from the same-day

5  registrants, we would actually cancel the ballot that the voter

6  had cast.  So if they were unverified, those ballots were

7  canceled.

8  Q    So let me ask first:  Did you have administrative troubles

9  with administering same-day registration in 2012?

10 A    No.  We actually found that same-day registration was a

11 big help to us.  It substantially reduced provisional voting.

12 We didn't have any provisional voting during early voting

13 anymore because everyone could register and vote, and it was

14 administratively a more efficient process than was handling

15 that many provisional votes.

16 Q    Did you ever complain to any member of the legislature

17 that you were having trouble administering same-day

18 registration.

19 A    No, I did not.

20 Q    Were you -- what were your thoughts on the ability for the

21 verification process to be complete in time with same-day

22 registration?

23 A    It required us to do things in a timely manner and to do

24 it quickly.  We had to change our way of operating in order to

25 accomplish that, but we were successful in doing so.  The last

1    day of early voting is a Saturday prior to the election.  The
2    canvas is 10 days following the election.  So you had -- if the
3    last verification notices went out on Monday, you had at least
4    10 days for that mail to go out and come back, and some notices
5    did, and then we would immediately get out a second notice if
6    something came out.  So, yes, we had voters whose notices came
7    back undeliverable twice.
8    Q    Were those registrations canceled or denied?
9    A    The registrations were denied and the ballots were
10   canceled.
11   Q    Did you ever perform a study to check the verification
12   rates of same-day registrations compared to regular
13   registrations?
14   A    Yeah, after 2012, I did.
15   Q    Why did you do that?
16   A    Well, there was a story going around that there was a
17   higher rate of return mail on same-day registrations than there
18   was for regular registrations, and so I said, well, let's see
19   what Guilford County's experience was; and I found in Guilford
20   County that the rate of return of the verification notices for
21   same-day registrations was about half what it was for the other
22   regular registrations, which didn't surprise me at all.
23        The people that are doing same-day registrations are
24   required to show ID when they register.  They have to show
25   something with their current name and current address on it.

1   Now, clearly within a matter of -- even a matter of two weeks,

2   people can move, you know, and some of that happens; but the

3   fact is that the rate of return on those should be and in our

4   case was substantially lower than the rate of return on regular

5   registration verification notices.

6   Q    Were you aware that the State Board of Elections had

7   performed some kind of comparative analysis on verification

8   rates between same-day registration and regular registration?

9   A    No, I had not consulted with them or talked to them about

10  that issue until after I did my study, and I shared it with

11  them.

12  Q    Was your study based on theirs?

13  A    No, it wasn't.

14  Q    When did you pull the data to conduct this comparison?

15  A    It was probably December or January of 2012, '13.  So it

16  was six weeks to two months after the election.

17  Q    What were your observations on the qualitative benefits of

18  same-day registration for voters in Guilford County?

19  A    It enabled 5,000 voters per election to vote that would

20  not have been able to do so otherwise in two presidential

21  elections.  You've got a lot of people who just don't know

22  whether they are registered or not, or they think they are

23  registered.  It enables those people to cast a ballot that's

24  counted as opposed to, you know, telling them they can't vote

25  or as opposed to casting a provisional ballot, which may or may

1  not be counted, depending on whether, in fact, they did

2  register early.

3  Q    Were there any benefits that you saw to same-day

4  registration on interactions between voters and poll workers?

5  A    As I said earlier, it's always nicer to tell people yes

6  than it is to say no.  You know, when people come in to a

7  polling place and you tell them you can't vote, they are ready

8  to fight.  When you say, well, we don't find you registered,

9  but you can register today and vote, obviously, it created a

10 much more positive atmosphere.

11      Probably the biggest thing that I've experienced about

12 that was that creates an atmosphere in which the voters'

13 confidence in the integrity of the election is much higher.

14 When voters encounter problems at the polls, when they are told

15 that they can't vote, when they have long lines, they

16 automatically assume, first, that there is some sort of

17 conspiracy to prevent them personally from voting.  When you

18 eliminate those problems and those barriers, they go away from

19 that process saying, hey, we got a good election process here,

20 and we trust it.

21 Q    Mr. Gilbert, do you remember any numbers about -- any of

22 the data specific to how African American voters in Guilford

23 County use same-day registration?

24 A    I do know that in 2008, and I think it was pretty

25 comparable in 2012, roughly 45 percent of our same-day

1 registration was African American and about 28 percent of our

2 voter registration was African American.  So, yeah, it was

3 heavily used by the African American community.

4 Q    What about college students?  How did same-day

5 registration affect college students?

6 A    Well, in light of the fact that college students always do

7 things at the last second and the last minute and never think

8 about it ahead of time, yeah, they are obviously good

9 candidates for same-day registration.

10 Q    Do you have a daughter in college right now?

11 A    I have a daughter in college right now.

12 Q    What is your experience with --

13 A    I've had a daughter in college for six years.

14 Q    What is your experience with how college students move

15 around?

16 A    Well, they move very frequently, and I'm sure that my

17 daughter has had our home address on her driver's license the

18 whole time because she would never change her address every

19 time she's moved.  I mean, I've painted a lot of apartments in

20 Raleigh over the years, so, yeah -- and, you know, from our own

21 experience, those of who went to college, yeah, we move a lot

22 in college, and they still do.

23 Q    Are there a lot of universities in Guilford County?

24 A    Quite a few.  We've got UNCG.  We've got A&T.  We've got

25 Bennett College.  We've got High Point University.  We've got

1 Guilford College.  We've got GTCC.  So it is a major college

2 town.

3 Q    Are some of those that you just listed historically black

4 colleges?

5 A    North Carolina A&T and Bennett College both.

6 Q    I want to switch now to out-of-precinct voting.  Can you

7 tell me about how you accomplished out-of-precinct provisional

8 ballots in Guilford County?

9 A    Well, you identified those that are out of precinct and

10 you identify, you know, which districts the voters actually

11 lived in, and then you don't count them -- the votes for

12 districts that they didn't live in.  We didn't have a big -- we

13 didn't have a high number of out-of-precinct ballots.  Some

14 counties' procedures substantially increased their own number

15 of out-of-precinct ballots.  We were very conscientious about

16 encouraging -- when people came to the wrong polling place, we

17 would identify what their correct polling place was.  We would

18 explain to them that, you know, they needed to go to their new

19 polling place or to the correct polling place where they could

20 vote a full ballot; otherwise, they would have to vote a

21 provisional ballot and only part of it would be counted.

22      In Guilford County, we were successful in convincing most

23 people to go to the correct precinct to vote.  I think a lot of

24 that was just the procedural aspect and the voter education

25 that we did on that issue.  So we didn't have an overwhelming

1  number of out-of-precinct ballots.  Mainly, it was people that

2  just couldn't go to their new polling place, people that we had

3  sent to the wrong place once or twice already, or people that

4  came to the polls late.  We have always offered a provisional

5  ballot like that to people that came to the polls.  If they

6  came to their old polling place at 7:25 and told us they moved,

7  we would have them vote a provisional ballot rather than try to

8  send them to the new polling place, knowing that they couldn't

9  get there in time.

10 Q    Were you ever unable to count -- to process

11 out-of-precinct provisional ballots before the end of canvas?

12 A    No, and we never had to delay the canvas in order to do

13 that obviously.

14 Q    Thank you.  Real quickly, I want to talk about voter

15 education.  By my calculations, you were in office during some

16 major election law changes.  How would you describe the process

17 by which voters learn about new election laws?

18 A    Voters learn about new election laws from the time they

19 walk in the door of the polling place to the time they vote,

20 and they don't pay much attention to it outside of that.

21 They -- we focused our voter education on that voter from the

22 time they walk into the door until they finish voting on their

23 machine.

24 Q    How would you describe the difference in time it took for

25 voters to become educated to new laws if you compare laws that

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  made voting easier to laws that made voting harder?

2  A    Well, whenever you make a change, there is an adjustment,

3  and certainly people adjust very rapidly to things that make it

4  easier for them, and they adjust with substantial resistance to

5  things that make it hard for them.  If you are making changes

6  in election procedures, it's a lot easier for the voters to

7  adjust to things that make the process easier and simpler for

8  them.

9  Q    How does the scope of changes affect the time it takes

10 voters to adjust?

11 A    You know, I mean --

12 Q    Do you want me to rephrase that?

13 A    Yeah, try another one.

14 Q    Are smaller changes easier to adjust to than are larger

15 changes?

16 A    Voters can adjust to changes of all sizes as long as it

17 makes it easier for them.  That, quite honestly, is the crux of

18 the matter.  If the process is simplified and made easier, then

19 the voter can make the adjustment quickly.  I mean, the voters

20 will make the adjustment.  The precinct officials are the ones

21 that I had to worry more about than the voters, but if I have

22 my precinct officials prepared and trained properly to do the

23 voter education -- that was the challenge, you know.

24 Q    And then, finally, I wanted to talk to you about voter

25 fraud and confidence in elections.  What has been your

1  experience with information about voter fraud in Guilford

2  County?

3  A    I have not experienced any instance that we could verify

4  as voter fraud in 25 years.  The closest thing that I would say

5  to that is that when we would have people would had, say, voted

6  twice in an election.  They either voted absentee by mail or

7  they voted early and then were allowed to vote on Election Day

8  typically either to due to timing or to a poll worker error.

9  Most of those cases were elderly people, and they voted by mail

10 and then their son or daughter had come and picked them up to

11 vote on Election Day.  They didn't know it was the same

12 election.

13      In cases like that -- now, we did have a handful of cases,

14 maybe a dozen cases over the years, in which we didn't think

15 that was a valid excuse for this person to have voted twice,

16 and those were referred to the district attorney, but in no

17 case were both ballots counted.

18 Q    Why is that?

19 A    Because on the absentee side, they either voted absentee

20 by mail or they voted absentee, one-stop early voting, and

21 those ballots were canceled.  If we found that someone had

22 voted on Election Day and had voted early, then the early vote

23 was identifiable and retrievable, and those ballots were

24 canceled.

25 Q    When you referred cases to the district attorney, do you

1  know what the outcomes were?

2  A    The district attorney didn't pursue them primarily because

3  they hadn't actually had two ballots counted.  The process of

4  prosecuting people like that is sort of self-defeating because

5  we were able to cancel those ballots, and they didn't

6  actually -- they may have tried to commit fraud, but they

7  didn't get away with it.

8  Q    What in your mind is the best way of preventing voter

9  fraud?  Or should I say what role do poll workers play in

10 preventing voter fraud?

11 A    Well, the best way to prevent voter fraud is -- I think

12 North Carolina's election process is quite good at the way it's

13 structured.  It's structured with bipartisan participation,

14 effective bipartisan participation at all levels of conducting

15 the voter registration and the election.  You've got bipartisan

16 boards of elections.  You've got bipartisan precinct officials

17 at the polling place, both early voting and on Election Day.

18 We always made sure we had bipartisan teams processing absentee

19 ballots by mail, and we had a group of people -- and I think I

20 have found this to be true nationwide, that the vast majority

21 of election officials are extremely dedicated to the integrity

22 of the election process.

23 Q    When you say the way the North Carolina conducts

24 elections, do you mean prior to House Bill 589?

25 A    I have not conducted an election under House Bill 589, so

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1  I can't speak to that.

2  Q    Okay.  What is your experience with the -- what is your

3  experience with what the challenged provisions in this

4  litigation did for the integrity of elections?

5  A    Well, we never had a challenge filed in 25 years in

6  Guilford County at the polls on Election Day except by our

7  precinct officials themselves who had personal knowledge that

8  someone had moved out of the precinct long before, and they

9  kept coming back to vote there; and there were several

10 occasions on which those precinct officials filed challenges

11 against those voters to stop that practice of them voting out

12 of the proper districts.

13      But no challenges -- the challenge procedure as it

14 stands -- Election Day challenge procedure has never been used

15 really, and the only -- I certainly can't see it being

16 legitimately used in the future, particularly -- if you have

17 people outside the precinct serving as observers with the

18 potential of filing challenges, they are certainly less likely

19 to have any personal knowledge of a voter than people who are

20 residents of that precinct.  So, you know, I don't think that

21 it will -- it serves any purpose or any valid purpose.

22 Q    What is your impression of the level of confidence that

23 voters in Guilford County had in the election systems?

24 A    Very high.  It was certainly -- it was very high and, you

25 know, I mean, I didn't take any surveys, but we got good press

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1   when we did get a little press and didn't get any rebuttals

2   that I can think of -- at least after 1988.  We got very bad

3   press in 1988.

4   Q    Mr. Gilbert, thank you so much for your time.

5   A    One more issue.  You asked me --

6           **THE COURT:**  Wait a minute.  If she has a question,

7   then you can answer the question.  You are not here just to

8   give opinions.

9           **THE WITNESS:**  Oh, okay, it was actually follow up.

10  She had asked me about the -- you know, what contributed to the

11  integrity of the election.

12          **THE COURT:**  Do you want to add to that answer?

13          **THE WITNESS:**  Yes.

14          **THE COURT:**  All right.

15          **THE WITNESS:**  Yes, I would like to add to that

16  answer.  What I found is, and I have alluded to this earlier

17  somewhat in my testimony, when people go away from the polls

18  and they are told they can't vote or they got long lines and

19  whatnot, they tend to doubt the integrity of the election.

20          Well, the same thing is true in terms of just general

21  participation in the election; and if you are worried about

22  voter fraud as a threat to the integrity of the election, you

23  also need to worry about voter participation.  The more people

24  who are enabled to vote in the election, the higher the

25  integrity of that election.

1          **MS. RIGGS:**  Thank you very much for your time,

2    Mr. Gilbert.  Sit there for a few more minutes.

3          **THE COURT:**  All right.  Any cross-examination?  We

4    are going to go until 5:30.

5          **MR. PETERS:**  Yes, Your Honor, thank you.

6                         CROSS-EXAMINATION

7    **BY MR. PETERS**

8    Q    Mr. Gilbert, good afternoon.

9    A    Good afternoon.

10   Q    My name is Alexander Peters.  I am with the North Carolina

11   Attorney General's Office.  I do have a few questions I would

12   like to ask you.

13        I believe you said you retired in February of 2013?

14   A    That's correct.

15   Q    What communication or involvement have you had with the

16   Guilford County Board of Elections since that time?

17   A    Very little.  I stop by and visit with them occasionally.

18   I think this past winter I visited with my predecessor,

19   Charlie, and we discussed things that were going on.

20   Q    Well, specifically, have you had any conversations with

21   people who are at the Guilford County Board of Elections about

22   the implementation of House Bill 589?

23   A    Not subsequent to their actual implementation, which was

24   May.  Back in the winter, what are you planning on doing?  But

25   subsequent to the actual implementation of it in the spring,

1    no, I have not.

2    Q    Did you have any involvement or communication with people

3    at the Guilford County Board of Elections about planning for

4    the May primary?

5    A    No.

6    Q    And I believe you said in your testimony that you have not

7    implemented House Bill 589 since it came into effect after you

8    retired; is that correct?

9    A    That's correct.

10   Q    So would it be a fair characterization of your testimony

11   to say that you do not have experience with how House Bill 589

12   was actually implemented in Guilford County other than as a

13   voter going to the polls?

14   A    Correct.

15   Q    Now, let me ask:  How is the budget for the Guilford

16   County Board of Elections set up?

17   A    The budget is proposed by the director of elections or the

18   board of elections and then modified and/or approved by the

19   board of county commissioners.

20   Q    When does that happen typically?

21   A    Typically, it happens in the winter -- well, for a budget

22   that is going to take place -- take effect July 1, we would

23   submit that budget probably in December of the preceding year.

24   Q    So would I be understanding correctly that Guilford

25   County's fiscal year runs from July 1 to June 30 --

1  A    Correct.

2  Q    -- just like the state's does?  And so would I be

3  understanding correctly that the board of elections would be

4  making recommendations in the winter, they would be considered

5  in the winter, spring, and at some point in the spring a new

6  budget for the following fiscal year to take effect July 1

7  would be adopted?

8  A    That's correct.

9  Q    So would I be correct then that the budget that the

10 Guilford County Board of Elections has to operate with for the

11 upcoming general election has been set by the board of county

12 commissioners for the fiscal year that began last week?

13 A    The initial budget has been set, but it's never set in

14 stone.

15 Q    So what do you mean by that?

16 A    I mean you can always go back and get a supplement

17 appropriation.  I've had to on a number of -- when changes in

18 law took place after I had submitted budgets, which happened

19 frequently with respect to early voting, you know, we had to go

20 back to the board of commissioners and say, okay, now we've got

21 to expand this.  They are flexible in that regard.

22 Q    But does doing that have an effect on the rest of the

23 county's budget?

24 A    Minimal.  My total budget in 25 years never exceeded

25 one-half of one percent of the county budget.

1  Q    I believe you testified that in 2004 and 2008 all of

2  Guilford County's early voting sites or one-stop absentee sites

3  were not open for the full 17 days.  Did I understand that

4  correctly?

5  A    That is correct.

6  Q    It was not until 2012 that you actually -- all of the

7  early voting sites were open for the complete amount of time?

8  A    That's correct.

9  Q    Do you have an understanding whether it might have been

10  common in other counties as well that the early voting -- all

11  early voting sites were not open for the entire time allowed,

12  the 17 days?

13  A    I think there were several other counties.  I think

14  most -- well, most of the counties are small and only had early

15  voting in their central office.  So it was open.  Whereas, the

16  larger counties -- there really were only half a dozen of us

17  that were large enough to have extensive number of early voting

18  sites.

19  Q    When you say most of the counties are small and only had

20  their central office open, are you saying that over 50 of the

21  counties only had the one location open for one-stop voting?

22  A    That would be my guess, yeah, and most of the others, if

23  they only had two or three sites, they probably had them open

24  the whole time.

25  Q    Do you know that, or are you speculating?

1  A    I am speculating on that.

2  Q    You made a declaration earlier in this case; is that

3  correct?

4  A    That's correct.

5  Q    And do you recall saying in that declaration that "the

6  elimination of the first week of early voting in North Carolina

7  has no effect on the standardization of the process of early

8  voting as a whole" because "prior to the changes implemented by

9  House Bill 589, the early voting period started on the same day

10 in every county and ended on the same day in every county"?  Do

11 you recall saying that in your declaration?

12 A    Yes, I do.

13 Q    But as you've just testified, just because the early

14 voting period started on the same day in every county, that

15 doesn't mean that every county opened their sites on that day;

16 isn't that correct?

17 A    Every county had at least one site open on the first day.

18 Q    But they did not necessarily open -- if they had multiple

19 sites, they did not necessarily open all of them?

20 A    That's correct.

21 Q    And do you understand that House Bill 589 did more with

22 regard to early voting than just shortened the period from 17

23 days to 10 days?

24 A    Well, I know that it still required you to provide the

25 same number of hours of early voting.

1  Q    Do you know whether or not House Bill 589 also required

2  all locations in the county be open all days of early voting?

3  A    I think I remember reading that, and I thought it was a

4  bad idea.

5  Q    But would you agree that that is -- also standardizes

6  more?

7  A    Yeah, I think you are using the words "standardize" and

8  "uniformity" as synonymous.

9  Q    Explain to me then in your declaration what you meant by

10 standardization.

11 A    Standardization means that we had the service available

12 throughout the same periods in all counties, had the service

13 available to countywide voters throughout all counties for the

14 same days throughout that period.  That's what I meant by that.

15 Q    You described in your testimony earlier that when you were

16 looking at one-stop sites, you looked at where your population

17 was and kind of drew a circle, I think is how you described it,

18 to see if you could bring the voters in so that everyone was

19 within a reasonable distance of a one-stop site.  Did I

20 understand that correctly?

21 A    Yes.

22 Q    So even if the service is available at a few one-stop

23 sites in the county, that doesn't necessarily mean it is

24 equally available to everyone, does it, because it may be much

25 farther away from some people than others?

1  A    I got complaints from voters on Election Day that the

2  polling place was on the far side of the precinct.

3  Q    So the answer to the question would be that farther for

4  some --

5  A    There is no such thing as uniformity among voters in that

6  regard.  When you get to that level, it doesn't exist.

7  Q    Now, let me ask for a moment about mail verification of

8  registration, and you described earlier the process and I

9  believe you described it in the context of same-day

10  registration.  The voter comes in, they register, and within 48

11  hours the verification card is sent out; is that correct?

12  A    That's correct.

13  Q    Now, I think I understood you to say, and I want to make

14  sure that I was -- didn't misunderstand you, that if that mail

15  verification card came back undeliverable, you canceled the

16  ballot that had been cast?

17  A    If the second verification card came back undeliverable,

18  we canceled the ballot that had been cast.

19  Q    That's what I wanted to make sure.

20  A    Right.

21  Q    I'm sure that was clear.  So you mailed out two -- if the

22  first mail verification card came back undeliverable, then what

23  happened?

24  A    You sent a second one.

25  Q    You sent a second one.  How long did you need to wait for

1  that first mail verification card to come back?

2  A    That depended on the Postal Service.

3  Q    Well, was there a time that you were supposed to wait

4  before assuming that it had been delivered?

5  A    Well, until the canvas at that point.

6  Q    So --

7  A    If it came back prior to the canvas, you know, then --

8  because the canvas was the effective date on which it had some

9  relevance.

10 Q    Do you recall whether there was a time period that you

11 were supposed to allow for that card to come back?

12 A    I think the state had some target of like if it doesn't

13 come back within 10 or 15 days or something like that, but,

14 effectively, it was, you know, the canvas.

15 Q    But do you recall that the state criteria was 15 days?

16 A    Okay.  That's programmed into their computer, and it

17 automatically makes the voter active and verified after 15

18 days.

19 Q    Right.

20 A    So -- but even if that voter were active and verified and

21 that card came back prior to the canvas and we sent another one

22 and it came back again, that ballot -- that vote -- that

23 registration would be denied, and the ballot would have been

24 canceled.

25 Q    That could only happen if both of those cards came back

1   before the canvas?

2   A     Which did happen, yes.

3   Q     But did it always happen?

4   A     Always?  It didn't always happen with any registration.

5   We'd receive second verification notices back from voters who

6   registered 25 days prior to the election -- we'd receive them

7   in December.

8   Q     So it can take longer?

9   A     It can take longer, and there is a provision of statute

10  that addresses that.

11  Q     And I believe in your declaration you said -- excuse me

12  one minute -- that you generally had no problem getting this

13  verification process finished with same-day registration by the

14  end of canvas; is that correct?

15  A     Well, we finished everything that we had to do; that is,

16  we had sent all of the notices out and we had processed those

17  that came back undeliverable and sent out others and processed

18  any that came back and canceled the ballots of the voters who

19  had two notices returned undeliverable.

20  Q     I am just trying to make sure I've got the math right

21  here.  Prior to House Bill 589, the earliest that one-stop

22  absentee voting could occur was how long before the election?

23  A     Prior to same-day registration.

24  Q     The earliest -- what was -- do you recall what was the

25  first day -- what could be the first day of one-stop absentee

1  voting?

2  A    Thursday following the close of the books, which was the

3  25th day prior to election.

4  Q    The close of books is the 25th -- is the 25th day before

5  the election?

6  A    Right.

7  Q    And the Thursday following that?

8  A    That's correct.

9  Q    So would that be correct that that means it could be

10 anywhere from 24 days prior to the election until --

11 A    -- three days.

12 Q    Having to do the math off the cuff here, I guess if the

13 books closed on the Friday a week before, that would be 7 days.

14 So would that be -- 15 days before the election would be too

15 close, wouldn't it?

16 A    Too close for what?

17 Q    Well, if you had 15 days of one-stop voting, but the

18 one-stop voting closes the Saturday before the election?

19 A    Well, it just means that the computer would not have

20 changed the status of that voter; but once that voter has cast

21 their ballot and it has been counted, under statute, they are a

22 valid voter.

23 Q    Right.  What I am trying to get at is the canvas, I

24 believe you say in your declaration, in a presidential election

25 occurs 10 days after the election; is that correct?

NAACP, et al. v. NC - Preliminary Injunction/Vol. 1

1    A    Correct.

2    Q    And in other elections, it is 7 days?

3    A    Correct.

4    Q    So between the close of books -- we'll use that day.

5    Between the close of books and the canvas --

6    A    Thirty-five days.

7    Q    -- a maximum of 35 days if it's a presidential election?

8    A    Correct.

9    Q    And 32 days if it's not?

10   A    Right.

11   Q    If a person comes in and does same-day registration on the

12   first day of early voting, that is -- I believe it would be 17

13   or 18 days prior to the election, if I put my math --

14   A    Probably 19 or 20, but that's okay.  Close enough.

15   Q    You have to send out the mail verification card within two

16   days; is that correct?

17   A    Correct.

18   Q    So that puts us to 17 or 18 days before the election?

19   A    Right.

20   Q    You allow 15 days for a card to come back, and let's say

21   that card comes back on the 15th day.  Then that puts the card

22   coming back just days before the election, doesn't it?

23   A    Correct.

24   Q    And so you mail out the second verification card, and

25   let's say that one doesn't come back for 15 days.  That's after

1 the canvas, isn't it?

2 A    Well, yes, cards come back after the canvas for both

3 same-day registration and others.

4 Q    But in that case it is too late to pull out the card,

5 isn't it?

6 A    That's correct.  As I said, the statute provides for that.

7 It basically says if the voter has cast the ballot and

8 subsequently a second verification notice comes back

9 undeliverable, that that ballot shall be counted and that that

10 voter shall be put into the confirmation process.

11 Q    Correct.

12 A    So the statute validates the ballot and then tells us what

13 to do with that voter's registration.

14 Q    Right.  But even though the statute says that, the board

15 of elections has not been able to verify that voter's address,

16 has it, in that instance?

17 A    Well, in that instance, if a second verification notice

18 comes back undeliverable, we have not verified anyone's

19 address; and if it doesn't come back, I'm not sure we have

20 either, but it depends on what the Postal Service did with it.

21 Q    I believe you said Guilford County uses voting machines?

22 A    Yes, the electronic voting machines.

23 Q    Would that be direct record?

24 A    Yes.

25 Q    And that's basically a touchscreen?

1  A    It is.  Now it is, yes.

2  Q    Where you touch on the screen what you are voting for?

3  A    Correct.

4  Q    And I believe you said about 25 counties use that

5  particular equipment?

6  A    I think 25 counties use it both in early voting and on

7  Election Day and some additional counties that use it only in

8  early voting.

9  Q    Do you know what the equipment is that other counties use?

10 A    The same as ours.

11 Q    No, the counties that do not use direct record equipment?

12 A    They use optical scan ballots.

13 Q    What is that?

14 A    It is a piece of paper that you mark with a pencil or pen

15 and fill in the little circle to indicate your choice.

16 Q    Kind of like the SAT?

17 A    Yeah, and it's read on an optical reader.

18 Q    And do you know whether there is a trend in North Carolina

19 toward using more direct record equipment or away from using

20 direct record equipment?

21 A    Well, there hasn't been any real major change since 2006

22 when the counties sort of locked themselves into which system

23 they were going to use.  I think there have been a handful of

24 counties that have switched to paper, but at this point there

25 hasn't been any significant movement from what happened in 2006

1  to my knowledge.

2            MR. PETERS:  Give me just one second, Your Honor.

3  That's all the questions I have.

4            THE COURT:  Mr. Farr, do you know how much longer you

5  have?

6            MR. FARR:  I will try to make it five or ten minutes,

7  Your Honor, at most.  Is that all right?

8            THE COURT:  Well, I think what we may do is stop here

9  tonight, and then you can pick up in the morning.

10            MR. FARR:  All right.  Thank you, Your Honor.

11            THE COURT:  I hate to ask you to come back again.

12            THE WITNESS:  I'm not far away.

13            MS. RIGGS:  Your Honor, I was just hoping we could

14  excuse the witness so he didn't have to drive back.

15            THE COURT:  He is going to finish his testimony.

16  That's what he is here for.

17            THE WITNESS:  I can do that.

18            THE COURT:  Thank you, sir.  Before you leave --

19  nobody get up.  Talk to me a little bit about scheduling.  We

20  are going to start tomorrow at 9:00.  I don't know if we are

21  going to have this many people here tomorrow or not.  Let me

22  speak with Ms. Solomon just a moment.

23       (Off-the-record discussion.)

24            THE COURT:  So what we'll do tomorrow is open the

25  courtroom as early as 8:15 if people want to get in and get

1  through security and all that.  Come earlier if you want to be

2  here when things start.  If you are one of the counsel, be here

3  by 9:00.  If you are stuck in line, let them know that, and

4  they'll get you processed through the line.

5          If you are not a lawyer and you have a cell phone,

6  you are in violation of the court rules.  Do not bring any

7  electronic device in this courtroom unless you are a lawyer and

8  you've also signed the form that agrees to be bound by the

9  Court's rules for those, which include the Court being able to

10 police that kind of activity.

11         We'll go tomorrow then until 5:30 in the evening.

12 Let me ask if I can, Mr. Donovan, if you have some sense of

13 where we are in the presentation of evidence?

14         **MR. DONOVAN:**  I wanted to update, Your Honor.  So the

15 good news is we are ahead of the schedule that we discussed.

16 So I think we will go with -- including Ms. Strach and

17 Ms Thornton, who the defendants are going to call, I think we

18 will be done with testimony on Wednesday possibly by lunch.  I

19 think by Wednesday I am confident it will all be in so that we

20 can do argument on Thursday, maybe earlier.  After today, that

21 is kind of where we are at.  I think we are well within the

22 schedule we discussed.

23         **THE COURT:**  Okay.  If that changes, let me know.  I

24 appreciate --

25         **MR. DONOVAN:**  Every day I will update you.

1          **THE COURT:**  Does anybody have any issue you want to

2   bring to my attention at this time?

3          **MR. STRACH:**  Your Honor, the only question I have is

4   may we leave stuff in the courtroom?

5          **THE COURT:**  You may.  The only people -- it will be

6   locked, but the cleaning people will be in here.  I wouldn't

7   leave anything valuable just for your own benefit.  We do not

8   insure those things, at least I don't think we do.  I think

9   that should take care of all issues.

10         I have some motions to strike some of the experts.

11  Plaintiffs have filed motions to strike some of the defendants'

12  experts.  Normally, there would be an opportunity in due course

13  to respond to that in writing.

14         Have you all talked about what you are inclined to do

15  about that?  Do you want to respond in writing?  Do you want to

16  be heard during the argument?  What would be your preference?

17         **MR. PETERS:**  Your Honor, we'll do obviously whatever

18  the Court would prefer.  Given that -- despite the fact that

19  the hearing was coming up, the plaintiffs did not ask that

20  those motions be expedited in any way.  We have been planning

21  to respond in writing and have been planning to do so under the

22  general parameters of the rule.  Obviously, we will handle it

23  however the Court would like us to.

24         **THE COURT:**  You certainly have an opportunity to do

25  that in writing.  The problem will be that it won't be done in

1  the course of this proceeding.  So I think what I'll do is take

2  a look at the schedule, see if I need to somehow tweak the

3  dates, and then let you know about that.  If, for some reason,

4  I need to get you back here to talk about that aspect, then

5  we'll do that.  I'm trying not to bring folks in unnecessarily

6  on separate occasions for this.

7          All right.  Anything else anybody needs to raise?

8  Okay.  You all have a good evening.  We are going to start

9  promptly 9:00.

10      (COURT RECESSED AT 5:32 P.M.)

11

12                  END OF VOLUME I OF IV

13

14                      * * * * * *

15

16

17

18

19

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT

2    MIDDLE DISTRICT OF NORTH CAROLINA

3    CERTIFICATE OF REPORTER

4

5

6            I,  Briana L. Nesbit, Official Court Reporter,

7    certify that the foregoing transcript is a true and correct

8    transcript of the proceedings in the above-entitled matter.

9

10           Dated this 17th day of July 2014.

11

12

13                           _____
                             Briana L. Nesbit, RPR
14                           Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25