```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NORTH CAROLINA STATE CONFERENCE,    )
OF THE NAACP, EMMANUEL BAPTIST      )
CHURCH, NEW OXLEY HILL BAPTIST      )
CHURCH, BETHEL A. BAPTIST CHURCH,   )
COVENANT PRESBYTERIAN CHURCH,       )
CLINTON TABERNACLE AME ZION CHURCH,)
BARBEE'S CHAPEL MISSIONARY BAPTIST )
CHURCH, INC., ROSANELL EATON,       )
ARMENTA EATON, CAROLYN COLEMAN,     )
BAHEEYAH MADANY, JOCELYN FERGUSON-  )
KELLY, FAITH JACKSON, MARY PERRY,   )
and MARIA TERESA UNGER PALMER,      )
                                    )
        Plaintiffs,                 )
                                    )
        v.                          )         1:13CV658
                                    )
PATRICK LLOYD MCCRORY, in his       )
Official capacity as Governor of    )
North Carolina, KIM WESTBROOK       )
STRACH, in her official capacity    )
As Executive Director of the        )
North Carolina State Board of       )
Elections, RHONDA K. AMOROSO,       )
in her official capacity as         )
Secretary of the North Carolina     )
State Board of Elections, JOSHUA    )
D. MALCOLM, in his official         )
Capacity as a member of the North   )
Carolina State Board of Elections, )
PAUL J. FOLEY, in his official      )
Capacity as a member of the North   )
Carolina State Board of Elections   )
and MAJA KRICKER, in her official   )
capacity as a member of the North   )
Carolina State Board of Elections, )
                                    )
        Defendants.                 )
_____)

LEAGUE OF WOMEN VOTERS OF NORTH     )
CAROLINA; A. PHILIP RANDOLPH        )
INSTITUTE; UNIFOUR ONESTOP          )
COLLABOARATIVE; COMMON CAUSE NORTH )
```

CAROLINA; GOLDIE WELLS; KAY          )
BRANDON; OCTAVIA RAINEY; SARA        )
STOHLER; and HUGH STOHLER,           )
                                     )
        Plaintiffs,                  )
                                     )
    and                              )
                                     )
LOUIS M. DUKE; ASGOD BARRANTES;      )
JOSUE E. BERDUO; CHARLES M. GRAY;    )
NANCY J. LUND; BRIAN M. MILLER;      )
BECKY HURLEY MOCK; MARY-WREN         )
RITCHIE, LYNNE M. WALTER, and        )
EBONY N. WEST,                       )
                                     )
        Plaintiff-Intervenors,       )
                                     )
        v.                           )          1:13CV660
                                     )
THE STATE OF NORTH CAROLINA,         )
JOSHUA B. HOWARD, in his official    )
capacity as a member of the State    )
Board of Elections; RHONDA K.        )
AMOROSO, in her official capacity    )
as a member of the State Board of    )
Elections; JOSHUA D. MALCOLM, in     )
his official capacity as a member    )
of the State Board of Elections;     )
PAUL J. FOLEY, in his official       )
capacity as a member of the State    )
Board of Elections; MAJA KRICKER,    )
in her official capacity as a        )
member of the State Board of         )
Elections; and PATRICK L.            )
MCCRORY, in his official capacity    )
as the Governor of the State of      )
North Carolina,                      )
                                     )
        Defendants.                  )
_____ )

UNITED STATES OF AMERICA,            )
                                     )
        Plaintiff,                   )
                                     )
        v.                           )          1:13CV861
                                     )

THE STATE OF NORTH CAROLINA,      )
THE NORTH CAROLINA STATE BOARD    )
OF ELECTIONS; and KIM W. STRACH,  )
in her official capacity as       )
Executive Director of the North   )
Carolina State Board of Elections, )
                                  )
          Defendants.             )
_____ )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

In these related cases, Plaintiffs seek a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 barring Defendants from implementing various provisions of North Carolina Session Law 2013-381 ("SL 2013-381"), an omnibus election-reform law.[1]  (Docs. 96 & 98 in case 1:13CV861; Docs. 108 & 110 in case 1:13CV658; Docs. 112 & 114 in case 1:13CV660.)[2] Defendants move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  (Doc. 94.)  A trial on the merits is currently scheduled for July 2015.  (Doc. 30 at 4.)

Plaintiffs include the United States of America (the

---

[1]  Throughout the proceedings the parties have referred to the challenged law as "House Bill 589," its original designation by the North Carolina General Assembly.  Because it is a duly-enacted law passed by both chambers of the General Assembly and signed by the Governor, the court will refer to the final product as Session Law 2013-381.  Prior to passage, the bill will be referred to as HB 589.

[2] Because of the duplicative nature of the filings in these three cases, for the remainder of this Memorandum Opinion the court will refer only to the record in case 1:13CV861 except where necessary to distinguish the cases.

"United States") in case 1:13CV861, the North Carolina State Conference of the NAACP and several organizations and individual plaintiffs (the "NAACP Plaintiffs") in case 1:13CV658, and the League of Women Voters of North Carolina along with several organizations and individuals (the "League Plaintiffs") in case 1:13CV660.   Additionally, the court allowed a group of young voters and others (the "Intervenors") to intervene in case 1:13CV660.   (Doc. 62 in case 1:13CV660.)   Considered together, Plaintiffs raise claims under the Fourteenth, Fifteenth, and Twenty-Sixth Amendments to the United States Constitution as well as Section 2 of the Voting Rights Act of 1965 ("VRA"), 42 U.S.C. § 1973.   (Doc. 1 in case 1:13CV861; Doc. 52 in case 1:13CV658; Docs. 1 & 63 in case 1:13CV660.)   The United States also moves for the appointment of federal observers to monitor future elections in North Carolina pursuant to Section 3(a) of the VRA, 42 U.S.C. § 1973a(a).   (Doc. 97 at 75-77.)   Finally, Plaintiffs move to exclude and strike the testimony of three of Defendants' expert witnesses.   (Docs. 146, 148, & 150.)

Defendants are the State of North Carolina, Governor Patrick L. McCrory, the State Board of Elections ("SBOE"), and several State officials acting in their official capacities. They contend that Plaintiffs have not stated any claims for which relief can be granted under either the Constitution or the

VRA and, in any event, have not established entitlement to preliminary relief. (Docs. 94, 95 & 126.)

The court held a four-day evidentiary hearing and argument beginning July 7, 2014. The record is extensive. Throughout the proceedings, there was much debate over the policy merits of SL 2013-381 as an election law and the popularity and desirability of various voting mechanisms it affects. It is important to note that, while these have evoked strongly-held views, this is not the forum for resolving that aspect of the parties' dispute; such considerations are matters for legislative bodies to address. The jurisdiction of this court is limited to addressing the legal challenges raised based on the evidence presented to the court.

After careful consideration, the court concludes that Defendants' motion for judgment on the pleadings should be denied in its entirety. Plaintiffs' complaints state plausible claims upon which relief can be granted and should be permitted to proceed in the litigation. However, a preliminary injunction is an extraordinary remedy to be granted in this circuit only upon a "clear showing" of entitlement. After thorough review of the record, the court finds that as to two challenged provisions of SL 2013-381, Plaintiffs have not made a clear showing they are likely to succeed on the merits of the underlying legal claims. As to the remaining provisions, the court finds that

even assuming Plaintiffs are likely to succeed on the merits, they have not demonstrated they are likely to suffer *irreparable* harm - a necessary prerequisite for preliminary relief - before trial in the absence of an injunction. Consequently, the motions for preliminary injunction and the United States' request for federal observers will be denied. This resolution renders the motions to exclude expert testimony moot.

## I.   BACKGROUND

### A.   Legislative History

The North Carolina General Assembly began consideration of a voter identification ("voter ID") requirement in March 2013. On March 12, the House Committee on Elections, chaired by Republican Representative David R. Lewis, held public hearings on voter ID. (See J.A. at 2388-92.)[3] Over 70 citizens from a wide variety of organizations spoke before the committee. (Id.) The next day, the committee met and considered the testimony of five individuals representing a wide variety of organizations, including the Brennan Center for Justice and the Heritage Foundation. (See J.A. at 2393-2416.) One of the speakers was Allison Riggs, counsel of record for the League Plaintiffs in case 1:13CV660, who appeared on behalf of the Southern Coalition

---

[3] Citations to "J.A." refer to the joint appendix submitted by Plaintiffs along with their briefs in support of the motions for preliminary injunction. (Docs. 99 through 111 & Doc. 154, along with their attachments.)

for Social Justice.  (J.A. at 2394.)  On April 3, the committee heard from Ion Sancho, the Supervisor of Elections for Leon County, Florida, who testified about Florida's experience when it reduced early-voting days in advance of the 2012 general election.  (J.A. at 2418, 2420-23.)

The initial version of HB 589 was introduced in the House of Representatives on April 4.  (J.A. at 2101-12.)  The bill dealt almost exclusively with the implementation of a voter ID requirement beginning in 2016 in portions titled the "Voter Information Verification Act."[4]  (J.A. at 2101-06, 2112.)  On April 8, it passed "first reading" and was referred to the Committee on Elections.[5]  (J.A. at 2354.)  The committee subsequently held another public hearing on April 10, whereupon over 70 citizens from across the political spectrum had the opportunity to speak.  (J.A. at 2424-28.)  It further debated the bill and added amendments at a meeting held on April 17. (J.A. at 2432-43.)  The bill was also referred to the Committees on Finance and Appropriations.  (J.A. at 2354, 2444-45.)

---

[4] The remainder dealt with the procedure for obtaining and voting mail-in absentee ballots.  (J.A. at 2106-11.)

[5] House Rule 41(a) states: "Every bill shall receive three readings in the House prior to its passage.  The first reading and reference to standing committee of a House bill shall occur on the next legislative day following its introduction."  H.R. 54, 2013 Gen. Assemb., Reg. Sess. (N.C. 2013), available at http://www.ncleg.net/Sessions/2013/Bills/House/PDF/H54v3.pdf.

HB 589 advanced, as amended, from the various House committees, and was debated on the House floor on April 24, 2013. (J.A. at 2354, 2446-51.) After three amendments were adopted and six others rejected, the bill passed "second reading" on a roll-call vote of 80-36.[6] (J.A. at 2354, 2450.) The bill subsequently passed "third reading" immediately, on a vote of 81-36, and was passed by the House. (J.A. at 2450-51.) Five House Democrats joined all present Republicans in voting for the final voter ID bill (J.A. at 2366, 2573, 2581, 2592), but none of the black members of the House supported it (J.A. at 2655). Representative Rick Glazier, who strongly opposed the bill, testified at the preliminary injunction hearing in this case that he felt that "for a large bill," HB 589 received up to this point "the best process possible" in the House, one he characterized as "excellent." (Doc. 165 at 56-57.)

HB 589 was received in the North Carolina Senate the next day, passed first reading, and was assigned to the Senate Rules Committee. (J.A. at 2354.) The committee took no immediate action on the bill. The parties do not dispute that the Senate believed at this stage that HB 589 would have to be submitted to the United States Department of Justice ("DOJ") for "pre-

---

[6] House Rule 41(b) states: "No bill shall be read more than once on the same day without the concurrence of two-thirds of the members present and voting . . . ." H.R. 54.

clearance" under Section 5 of the VRA, 42 U.S.C. § 1973c(a), because many North Carolina counties were "covered jurisdictions" under that Section. However, at that time the United States Supreme Court was considering a challenge to the DOJ's ability to enforce Section 5. On June 25, the Supreme Court issued its decision in Shelby County v. Holder, 133 S. Ct. 2612 (2013), declaring the formula used to determine the Section 5 covered jurisdictions, 42 U.S.C. § 1973b(b), to be unconstitutional. The next day, Senator Thomas Apodaca, Republican Chairman of the Rules Committee, publicly stated, "So, now we can go with the full bill." (J.A. at 1831.) The contents of the "full bill" were not disclosed at the time. A meeting of the Rules Committee was subsequently scheduled for July 23. (See J.A. at 2452.)

The night before the Rules Committee meeting, the new bill, now 57 pages in length, was posted for the members on the Rules Committee website.[7] (J.A. at 183-84 (declaration of Sen. Josh Stein); Doc. 164 at 111-12 (testimony of Sen. Dan Blue); J.A. at 2129-85.) In addition to the voter ID provisions,[8] HB 589 now

---

[7] A version of HB 589 appears to have been distributed to members of the Rules Committee who were present on July 18, 2013. (Doc. 134-4 at 3.) It is not clear whether this version differed from that posted on the website on July 22.

[8] The voter ID provisions contained significant changes. For example, the list of acceptable identifications no longer included those issued by a state university or community college. (Compare J.A. at 2102-03

included many additional provisions, including the following that are being challenged in this litigation: (1) the reduction of the period for so-called "early voting"[9] from 17 to ten days; (2) the elimination of same-day registration ("SDR"), which permitted voters to register and then vote at the same time during the early-voting period; (3) the prohibition on the counting of provisional ballots cast outside of a voter's correct voting precinct on Election Day ("out-of-precinct" ballots); (4) the expansion of allowable poll observers and voter challenges; (5) the elimination of the discretion of county boards of election ("CBOEs") to keep the polls open an additional hour on Election Day in "extraordinary circumstances"; and (6) the elimination of "pre-registration" of 16- and 17-year-olds who will not be 18 by the next general election.[10] The bill proposed that the voter ID requirement go

(original bill filed in the House on April 4, 2013), with J.A. at 2130 (version approved by the Senate Rules Committee on July 23, 2013).)

[9] Early voting is a term used to describe in-person absentee voting at designated locations before Election Day.

[10] Apart from the voter ID provisions, which were new, the bill largely purported to repeal, amend, or update existing law. Other amendments included: (1) making it illegal to compensate persons collecting voter registrations based on the number of forms submitted (Part 14); (2) reducing the number of signatures required to become a candidate in a party primary (Part 22); (3) deleting obsolete provisions about the 2000 census (Part 27) (4) changing the order of candidates appearing on the ballot (Part 31); (5) eliminating straight-ticket voting (Part 32); (6) moving the date of the North Carolina presidential primary earlier in the year (Part 35); (7) eliminating taxpayer funding for appellate judicial elections (Part 38); (8) allowing funeral homes to

into effect in 2016 but be implemented through a "soft rollout," whereby voters would be advised at the polls in 2014 and 2015 of the law's requirement that they will need a qualifying picture ID to vote beginning in 2016.

At the committee meeting on July 23, Senator Apodaca allowed members of the public in attendance to speak for two minutes.[11]  (See Doc. 134-4 at 45-60.)  Speakers included the League Plaintiffs' counsel, Riggs, as well as Jamie Phillips, who represented the North Carolina State Conference of the NAACP.  (Id. at 45-47, 57-58.)  Although the majority of comments addressed the voter ID requirement, citizens also spoke in opposition to the other challenged provisions, including the elimination of SDR and pre-registration and reduction of early voting.  Several opponents characterized the bill as an effort at voter suppression.  (See, e.g., id. at 45 (Riggs: "voter suppression at its very worst"); id. at 57 (Phillips: "The fewer young people and minorities who vote, the better it seems in your minds.  We get it.  No one is being fooled.").)  After

---

participate in canceling voter registrations of deceased persons (Part 39); and (9) requiring provisional ballots to be marked as such for later identification (Part 52).  The bill also proposed mandating that several matters be referred for further study, including requiring the Joint Legislative Oversight Committee to examine whether to maintain the State's current runoff system in party primaries.  (Part 28.)

[11] There is no indication the two-minute time allotment was a deviation from normal rules.

debate, the bill passed the committee and proceeded to the floor for second reading.  (Id. at 80.)

The following afternoon, on July 24, HB 589 was introduced on the floor of the full Senate.  (Id. at 84.)  During several hours of debate after the bill's second reading, Democratic Senators introduced and discussed several proposed amendments. Most significantly, Senator Josh Stein introduced an amendment to require the CBOEs to offer the same number of aggregate hours of early voting as were offered in the last comparable election (whether presidential or off-year).  (Id. at 125-26.)  This could be accomplished, he proposed, by CBOEs offering more hours at present sites, or by opening more sites.  (Id. at 130-31.) Senator Stein argued that the amendment would reduce, but not eliminate, the impact the reduction of early-voting days would have on all voters, including African-Americans.  (Id. at 111.) Senator Robert Rucho, the Republican sponsor of HB 589, asked the Senate to support Senator Stein's amendment (id. at 126), and it passed by a vote of 47 to 1 (id. at 131).  The Senators also exchanged argument on many of the other challenged provisions, including voter ID, SDR, pre-registration, and the increase in allowable poll observers, as well as several provisions not at issue here (including the elimination of straight-ticket voting and reduction of various campaign-finance restrictions).  (See generally id. at 148-223.)  At the close of

debate on July 24, Senator Apodaca objected to a third reading, effectively mandating that the debate of the bill be carried over into the next day. (Id. at 224.)

On July 25, the Senate began its session with the third reading of amended HB 589. (Id. at 229.) Senator Rucho then offered a bipartisan amendment, which passed 46 to 0; it clarified the aggregate-hours amendment and permitted a county to obtain a waiver from the aggregate-hours requirement upon unanimous approval of both the CBOE and the SBOE. (Id. at 232-33, 236, 241.) Proponents and opponents of the bill debated both its provisions and the merits of various amendments over the next four hours, and the Senate accepted an amendment dealing with electioneering from Senator Dan Blue (Democrat). (Id. at 307-08.) Several Senators characterized the bill as voter suppression of minorities. (E.g., id. at 251-60 (Sen. Stein), 282-93 (Sen. Blue), & 293-99 (Sen. Robinson).) At the close of debate fourteen amendments had been considered, and the Senate voted in favor of HB 589 along party lines, sending the bill back to the House for concurrence, as amended. (Id. at 325.) Senator Martin Nesbitt (Democrat), although opposing the bill strongly, noted that "we've had a good and thorough debate on this bill over two days." (Id. at 315.)

With the end of the legislative session approaching, the House received the Senate's version of HB 589 that night. (J.A.

at 2355.)  At the beginning of a two-hour floor session starting at 7:45 p.m., Representative Henry M. Michaux, Jr. (Democrat) moved that the House form a Committee of the Whole[12] to consider the bill.  (J.A. at 2507-08.)  Representative Tim Moore opposed the motion on the grounds that "it is simply a waste of time" because such a committee "is the same as the full House," which the bill was properly before at the moment.  (J.A. at 2509.) The motion failed by a vote of 41 to 69.  (J.A. at 2510.)

Two amendments offered by opponents (Sen. Blue's amendment of the date for electioneering; Sen. Rucho's and Stein's amendment altering several items, including the types of ID that can be presented for voting, and requiring the same number of hours of early voting) were adopted 109 to 0.  (J.A. at 2511-15.)  The provisions of the new full bill were then reviewed. (J.A. at 2516-31.)  Each member of the House Democratic caucus present – including four of the five members who voted for the House version in April – were granted time to speak in opposition to the bill.  (J.A. at 2571-73, 2580-81, 2581-83, 2592-93; Doc. 165 at 64-65 (testimony of Rep. Glazier).)  Among other things, opponents characterized the measure variously as voter suppression, partisan, and disproportionately affecting

---

[12] A Committee of the Whole is a legislative device where the whole membership of a legislative house sits as a committee and operates under informal rules.  Webster's Third New International Dictionary 458 (1986).

African-Americans, young voters, and the elderly. (E.g., J.A. at 2561 ("[O]ur anger tonight is palpable. Passage of this bill is a political call to arms."); 2563 ("the most pointedly, obviously politically partisan bill I've ever seen"); 2568 ("voter suppression"). On the Republican side, only Representative Lewis, the bill's primary House sponsor, spoke in support of the amended bill. (J.A. at 2620-24.) He pointed out, among other things, that the bill does not bar Sunday voting, does not reduce overall hours of early voting, provides for free photo ID, and, in his opinion, strengthens the requirements for absentee voting. (Id.) Subsequently, the House voted – again along party lines – to concur in the Senate's version of HB 589 at 10:39 p.m. (J.A. at 2369.)

The bill was ratified the next day and presented to Governor McCrory on July 29. (J.A. at 2355.) The governor signed SL 2013-381 into law on August 12, 2013. (Id.)

### B. Procedural History

Almost immediately after SL 2013-381 became law, two of the instant cases were filed in this court. The NAACP Plaintiffs filed a complaint challenging the voter ID requirement, elimination of SDR, reduction of early-voting days, prohibition on counting out-of-precinct provisional ballots, and the expansion of poll observers and ballot challengers under Section 2 of the VRA and the Fourteenth and Fifteenth Amendments. (Doc.

15

1 in case 1:13CV658 ¶¶ 56-80, 82-119.)  In an amended complaint, the NAACP Plaintiffs also challenge the elimination of pre-registration.  (Doc. 52 ¶¶ 112, 130-32 in case 1:13CV658.)  The League Plaintiffs initiated their case on the same day, challenging the elimination of SDR, prohibition on counting out-of-precinct ballots, elimination of the discretion of CBOEs to extend poll hours one hour on Election Day in "extraordinary circumstances," and the reduction in early-voting days pursuant to both Section 2 and the Fourteenth Amendment.  (Doc. 1 in case 1:13CV660 at 27 (prayer for relief).)  On September 30, 2013, the United States filed its complaint challenging the early voting, SDR, out-of-precinct voting, and voter ID provisions of SL 2013-381 under Section 2.[13]  (Doc. 1 in case 1:13CV861.)  The Magistrate Judge consolidated the three cases for the purposes of scheduling and discovery on December 13, 2013.  (Doc. 30.)

On January 27, 2014, the court permitted a group of young voters and others to intervene as plaintiffs in case 1:13CV660 pursuant to Federal Rule of Civil Procedure 24(b).  (Doc. 62 in case 1:13CV660.)  Intervenors' complaint contends that the elimination of pre-registration, reduction in early voting,

---

[13] The various complaints refer at times to Hispanics in addition to African-Americans and young voters, but the motions for a preliminary injunction do not mention Hispanic voters.  This Memorandum Opinion therefore addresses only the claims with respect to black and young voters.

repeal of SDR, prohibition on counting out-of-precinct ballots, elimination of CBOE discretion to keep the polls open an extra hour on Election Day, and implementation of a voter ID requirement violate the Fourteenth and Twenty-Sixth Amendments. (Doc. 63 in case 1:13CV660.)

Pursuant to the scheduling order (Doc. 91), Plaintiffs filed motions for a preliminary injunction on May 19, 2014.[14] Combined, Plaintiffs seek to preliminarily enjoin SL 2013-381's provisions regarding poll observers, challenges, and hours; its elimination of SDR, out-of-precinct provisional voting, and pre-registration; its cutback of early voting; and its "soft rollout" of the voter ID requirement. The United States seeks to preliminarily enjoin only the early voting, SDR, and out-of-precinct voting sections of the law. (Doc. 97.) On the same day, Defendants filed their motion for judgment on the pleadings, contending that Plaintiffs have failed to state viable legal claims. (Docs. 94 & 95.) The parties responded to the various motions on June 18 (Docs. 126, 129, & 135), and replies were filed on June 30 (Docs. 152, 153, & 155).

---

[14] The parties have also been engaged in various discovery disputes, some of which have yet to be resolved. Most significantly, Plaintiffs are currently seeking various legislative communications that Defendants and the legislators maintain are privileged. (See Doc. 93.) This court has affirmed the Magistrate Judge's rejection of Defendants' contention that the legislative privilege is absolute and returned the matter to the Magistrate Judge for further proceedings, which are ongoing.

Plaintiffs also moved to exclude three of Defendants' experts. (Docs. 146, 148, & 150.)

During a four-day evidentiary hearing on the pending motions beginning July 7, 2014, Plaintiffs presented nine live lay witnesses, two live expert witnesses, and one witness by video deposition, while Defendants rested on the record, which contains many more depositions and extensive expert reports. The court then allowed a full day of legal argument, including argument by counsel representing Judicial Watch, Inc., Allied Educational Foundation, and Christina Gallegos-Merrill, whom the court permitted to appear as *amici curiae*. (Doc. 136.) Post-hearing, the court allowed the parties to file hundreds of pages of deposition designations as well as supplemental briefing on the issue of standing and exclusion of Defendants' experts, bringing the total paper record in these cases to over 11,000 pages. The motions are now ripe for decision.

Ordinarily, the court would address a dismissal motion before turning to motions based on the evidence. However, because the court has determined that Plaintiffs have stated claims on their pleadings and the legal claims must also be analyzed in the context of the evidence presented on the injunction motions, it makes sense to address the motions for preliminary relief first before addressing Defendants' Rule 12(c) motion. Before reaching these topics, though, there is a

threshold issue of Intervenors' standing to challenge SL 2013-381's elimination of pre-registration, to which the court now turns.

## II.  STANDING OF INTERVENORS

Intervenors are the only party challenging the repeal of pre-registration for 16- and 17-year-olds on Twenty-Sixth Amendment grounds.[15]  Because none of them is under the age of 18, their standing to assert that claim is not readily apparent. Although Defendants did not raise the question and no party addressed it in the original briefing, standing is a jurisdictional prerequisite, and the court has an independent obligation to ensure it.  Fed. R. Civ. P. 12(h)(3); Goldsmith v. Mayor & City Council of Baltimore, 845 F.2d 61, 64 (4th Cir. 1988).  At the preliminary injunction hearing, the court directed Intervenors to brief their standing to challenge the elimination of pre-registration.[16]  Intervenors did so (Doc. 159), and Defendants have responded (Doc. 168).

To establish standing, a party must demonstrate three elements: (1) an "injury in fact," (2) a "causal connection

---

[15]  The NAACP Plaintiffs' challenge to the elimination of pre-registration is made under the Fourteenth Amendment and Section 2, claiming an injury to young minority voters, not young voters generally.  (Doc. 52 ¶ 93 in case 1:13CV658.)

[16]  Intervenors' standing to challenge the reduction in early-voting days, the elimination of SDR, and the elimination of out-of-precinct voting is not in dispute because they have alleged that they are personally and directly injured by those provisions.

19

between the injury and the conduct complained of," and (3) a likelihood that the injury would be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). Plaintiffs sufficiently allege a causal connection and a likelihood of redressability; at issue is whether Intervenors have suffered an "actual or imminent" injury from the elimination of pre-registration, creating a particularized "injury in fact." Id. at 560.

First, Intervenors contend that some of them are or will be imminently injured because they can no longer register voters through the pre-registration program following its repeal. (Doc. 159 at 3.) Defendants dispute that harm to an interest in registering voters can create legally cognizable injury and further assert that such harm is not present here because pre-registration – not registration – is at issue. (Doc. 168 at 4.)

Preventing an individual from registering others to vote has been recognized as a legally sufficient injury for the purpose of standing. In Coalition for Sensible and Humane Solutions v. Wamser, 771 F.2d 395 (8th Cir. 1985), an association dedicated to helping minority and low-income citizens register to vote sued the Board of Election Commissioners of St. Louis for refusing to allow their qualified volunteers to serve as deputy registration officials. The Eighth Circuit held that the association had standing to sue on

behalf of its members because the Board of Election Commissioners injured individual association members "by preventing them from registering new voters." Id. at 399.[17] By contrast, in People Organized for Welfare and Employment Rights (P.O.W.E.R.) v. Thompson, 727 F.2d 167 (7th Cir. 1984), an association dedicated to increasing political power of the poor and unemployed sued to compel the State to allow city registrars to conduct voter-registration drives in the waiting rooms of State social services offices. The Seventh Circuit found that the association lacked standing:

> P.O.W.E.R. in bringing this suit alleged only that its goal of improving the lot of the poor and the unemployed required for its fulfillment that the state make it easier for them to register. This might be a persuasive basis for standing if P.O.W.E.R. had been trying to advance its goal by registering new voters itself. Anyone who prevented it from doing that would have injured it, just as the defendants in this case would have injured it if they had prevented it from going into waiting rooms and urging the people waiting there to register. But P.O.W.E.R. was never forbidden to do *that*, and never sought to do the actual registering of voters.

Id. at 170 (emphasis in original) (citations omitted). Read

---

[17] Wamser specifically addressed the association's standing to sue on the basis of injury to its individual members, see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000) (to have standing, an association must prove that its members would have had standing to sue in their own right), rather than organizational injury, see Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982) (an action adverse to an organization's interests that causes a drain on its resources is a legally cognizable injury). Thus, Wamser is applicable to Intervenors' claim, which only involves individuals – not an association or organization.

together, Wamser and P.O.W.E.R. indicate that an individual or association would not have standing to compel Defendants to allow a third party to conduct voter-registration drives but suffers a cognizable injury if they prevent the litigant him- or herself from registering voters.

Here, Intervenors allege and produced evidence that they pre-registered young voters in the past and would continue doing so had SL 2013-381 not eliminated that program. (Doc. 63 ¶ 10 in case 1:13CV660; Doc. 159-3 ¶¶ 5-6.) Although Defendants attempt to draw a distinction between registration and pre-registration, they fail to explain why any difference matters. Rather, pre-registration appears to be the functional equivalent of registration, except that 16- and 17-year-olds' applications wait in a "hopper" to be processed by the State upon eligibility. (Doc. 167 at 184.) Furthermore, harm to an interest in registering voters is not the only civic harm courts have recognized as sufficient for standing. See Lerman v. Bd. of Elections in City of N.Y., 232 F.3d 135, 141-43 (2d Cir. 2000) (finding harm to an individual's interest in witnessing petition signatures legally cognizable). Based on the current allegations and evidence, Intervenors have sufficiently alleged standing to challenge the elimination of pre-registration because they allege that SL 2013-381 directly injures their interest in registering 16- and 17-year-olds.

Ordinarily, the standing inquiry would end here. However, Intervenors have moved to preliminarily enjoin the elimination of pre-registration, and whether they can demonstrate irreparable harm to justify an injunction depends in part on the scope of the harm they properly assert. So, the court must consider Intervenors' alternative bases for standing to the extent they rely on other claims of harm.

Intervenors contend that they will have to expend greater effort and resources to register young, 18-and-older voters because they were not pre-registered as 16- or 17-year-olds. (Doc. 159 at 4-5.) Defendants dispute this as a factual matter, arguing that there is no greater effort required to register an 18-year-old than a 16-year-old. (Doc. 168 at 6-7.) However, there may be reasons why registering 16- and 17-year-olds is more effective and less expensive than registering 18-year-olds, and at this stage in the litigation the court is bound to accept Intervenors' reasonable factual allegations as true. Therefore, to the extent that Intervenors assert it takes greater effort to register young voters who otherwise would have been pre-registered, they have alleged a direct, legally cognizable injury. However, to the extent they seek to ground their injury in loss of resources, relying on authority applicable to organizational plaintiffs and without any allegations or

evidence of financial harm (Doc. 159 at 4-5), that argument fails.

Intervenors also contend that they will have to expend greater effort and resources to get out the vote because SL 2013-381 discourages young voters from voting. (Id. at 5-6.) Intervenors are not a political party or any other kind of organization, however. Intervenors, as individuals, do not have a direct, particularized interest in the outcome of an election like that of the Democratic Party, see Crawford v. Marion Cnty. Election Bd., 472 F.3d 949, 951 (7th Cir. 2007), aff'd by 553 U.S. 181 (2008), or of an association of candidates challenging incumbents, see Common Cause v. Bolger, 512 F. Supp. 26, 30 (D.D.C. 1980). They have no budget from which resources must now be diverted to deal with the effects of SL 2013-381. Even assuming the truth of all Intervenors' factual allegations and evidence, therefore, they do not have standing on this ground.

Next Intervenors assert that SL 2013-381 harms their interest in living in a State that does not discriminate against young voters. (Doc. 159 at 6-7.) Under such a theory, any one of North Carolina's approximately 6.5 million registered voters would have standing to challenge the elimination of pre-registration. That injury is not sufficiently particularized to confer standing, and Intervenors' argument and authority do not indicate otherwise. Cf. Shaw v. Reno, 509 U.S. 630, 650 (1993)

(discussing the merits of the Fourteenth Amendment claim, not standing). Intervenors' attempt to ground standing in their support of a particular Democratic candidate similarly fails. (Doc. 159 at 7-9.)

Finally, Intervenors contend that they are "not require[d]" to "have standing independent from the original [P]laintiffs." (Id. at 9.) While that may be true as to claims that other Plaintiffs actually assert, here, no other Plaintiff has challenged the elimination of pre-registration as to all young voters. The circuits appear to be split on whether the jurisdictional rule requiring a party to have standing to bring a claim can be dispensed with entirely for Intervenors injecting new claims into the litigation. Cf. Shaw v. Hunt, 154 F.3d 161 (4th Cir. 1998) (permissive Intervenors not required to have standing where they adopted plaintiffs' complaint and asserted no new claim); S.E.C. v. U.S. Realty & Improvement Co., 310 U.S. 434, 460 (1940) (intervenor had "a sufficient interest in the maintenance of its statutory authority and the performance of its public duties to entitle it through intervention to prevent [bankruptcy] reorganizations"); King v. Christie, 981 F. Supp. 2d 296, 307 (D.N.J. 2013) (noting circuit split on the question of whether an intervenor must have standing). Intervenors cite no Fourth Circuit case addressing the issue, nor has the court found one. Because Intervenors fail to allege any different

harm should its position be correct, the court need not decide this issue at this stage; and, in light of the lack of Fourth Circuit precedent, the court declines to do so.

For these reasons, therefore, the court finds that Intervenors have alleged sufficient harm to their interest in registering 16- and 17-year-olds to provide standing at this stage, but have not properly asserted any broader harm than that.[18]

## III. PRELIMINARY INJUNCTION MOTIONS

### A. Preliminary Injunction Standard and General Principles

Issuance of a preliminary injunction is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." Centro Tepeyac v. Montgomery Cnty., 722 F.3d 184, 188 (4th Cir. 2013) (en banc) (quoting Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1991)); Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22, 24 (2008). This is true even when the asserted injury is a violation of the Constitution or the VRA. See, e.g., Centro Tepeyac, 722 F.3d at 187 (First Amendment claim); Perry-Bey v. City of Norfolk, 679 F. Supp. 2d 655, 662 (E.D. Va. 2010) (VRA claim).

---

[18] Of course, whether SL 2013-381 actually causes injury to Intervenors remains to be demonstrated at trial.

To demonstrate entitlement to preliminary relief, Plaintiffs must make a "clear showing" that (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm if an injunction does not issue; (3) the balance of the equities tips in their favor; and (4) an injunction is in the public interest. Winter, 555 U.S at 20, 22; Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011). All four requirements must be satisfied in order for relief to be granted. Real Truth About Obama, Inc. v. Federal Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds by 559 U.S. 1089 (2010). It is not enough that a plaintiff show a grave or serious question for litigation; he must make a "clear" demonstration he will "likely" succeed on the merits. Id. at 346-47.

The denial of a constitutional right, such as the right to vote, constitutes irreparable harm. Ross v. Meese, 818 F.2d 1132, 1135 (4th Cir. 1987); United States v. Berks Cnty., 250 F. Supp. 2d 525, 540 (E.D. Pa. 2003). Because a trial on the merits is scheduled in these cases for July 2015, Plaintiffs and Intervenors must therefore make a clear showing that they will be irreparably harmed in connection with the November 2014 general election – the only scheduled election between now and the trial date.

The Supreme Court has long recognized that the right to

27

vote is fundamental and preservative of all other rights in our republic.  See Reynolds v. Sims, 377 U.S. 533, 561–62 (1964) (citing Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886)).  The Constitution's Elections Clause reserves to the States the general power to regulate "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," subject to laws passed by Congress.  U.S. Const. art. I § 4 cl. 1. "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'"  Burdick v. Takushi, 504 U.S. 428, 433 (1992) (quoting Storer v. Brown, 415 U.S. 724, 730 (1974)).  The State's power to regulate elections is subject to limits imposed by the Constitution, including the Fourteenth, Fifteenth, and Twenty-Sixth Amendments, and federal law.

Here, Plaintiffs challenge several provisions of SL 2013-381, individually and cumulatively.  The statute contains a severability provision that would allow the court to enjoin portions without striking it wholesale.[19]  Thus, the court will

---

[19] SL 2013-381 provides:  "[i]f any provision of [SL 2013-381] or its application is held invalid, the invalidity does not affect other provisions or applications of [the law] that can be given effect without the invalid provisions or application, and to this end the

examine the challenged provisions with this in mind.

**B.    SDR**

In 2007, the General Assembly passed legislation permitting SDR at early-voting sites, which the governor signed into law effective October 9, 2007.  The law provided that "an individual who is qualified to register to vote may register in person and then vote at [an early-voting] site in the person's county of residence during the period for [early] voting provided under [Section] 163-227.2."  2007 N.C. Sess. Laws 253, § 1 (codified at N.C. Gen. Stat. § 163-82.6A(a) (2008)).  The law required a prospective voter to complete a voter-registration form and produce a document to prove his or her current name and address. Id. (codified at N.C. Gen. Stat. § 163-82.6A(b) (2008)).  If the person elected to vote immediately, he or she could "vote a retrievable absentee ballot as provided in [Section] 163-227.2 immediately after registering."  Id. (codified at N.C. Gen. Stat. § 163-82.6A(c) (2008)).  Within two business days, both the CBOE and SBOE were required to verify the voter's driver's license or social security number, update the database, proceed to verify the voter's proper address, and count the vote unless it was determined that the voter was not qualified to vote.  Id. (codified at N.C. Gen. Stat. § 163-82.6A(d) (2008)).

---

provisions of [SL 2013-381] are severable."  2013 N.C. Sess. Law 381, § 60.1.

SL 2013-381 repealed the SDR provisions. Now, to be eligible to vote in any primary or general election, a voter must comply with preexisting law that requires that the registration be postmarked at least 25 days before Election Day or, if delivered in person or via fax or scanned document, received by the CBOE at a time established by the board. N.C. Gen. Stat. § 163-82.6(c)(1)-(2).

All Plaintiffs, including Intervenors, move to preliminarily enjoin SL 2013-381's elimination of SDR for the November 2014 election. Plaintiffs rely on four distinct legal theories: (1) racially discriminatory results under Section 2 of the VRA; (2) racially discriminatory intent under Section 2 and the Fourteenth and Fifteenth Amendments; (3) undue burden on the right to vote of all voters under the Fourteenth Amendment; and (4) unlawful denial or abridgment of the right to vote on account of age under the Twenty-Sixth Amendment. Each basis will be addressed in turn.

### 1. Section 2 "results"

Section 2 of the original VRA provided that "[n]o voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973 (1976). In City of Mobile v. Bolden,

446 U.S. 55 (1980), the Supreme Court held that plaintiffs were required to show discriminatory intent in order to prevail on a Section 2 claim.  In response to <u>Bolden</u>, Congress amended the VRA to clarify that Section 2 plaintiffs need only show that a particular voting practice "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  42 U.S.C. § 1973(a); <u>see</u> <u>Thornburg</u> <u>v. Gingles</u>, 478 U.S. 30, 35 (1986) ("Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test,' applied by this Court in <u>White v. Regester</u>, 412 U.S. 755 (1973), and by other federal courts before.")  Consequently, a Section 2 violation may be proven either by showing discriminatory results or discriminatory intent.  <u>See, e.g.,</u> <u>Garza v. Cnty. of Los</u> <u>Angeles</u>, 918 F.2d 763, 766 (9th Cir. 1990); <u>Brown v. Detzner</u>, 895 F. Supp. 2d 1236, 1244 (M.D. Fla. 2012); <u>United States v.</u> <u>Charleston Cnty.</u>, 316 F. Supp. 2d 268, 272 n.3 (D.S.C. 2003). Section 2(b) now provides:

> A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members

31

of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b).

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Gingles, 478 U.S. at 47. The Gingles Court noted that the Senate Judiciary Committee's majority Report that accompanied the amendment provided several factors that may be probative in establishing a Section 2 violation:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

Id. at 36-37 (quoting S. Rep. No. 97-417, pp. 28-29, 97th Cong. 2nd Sess. 28 (1982)).

As other courts have noted, these factors were clearly designed with redistricting and other "vote-dilution" cases in mind. See Brown, 895 F. Supp. at 1245 n.13; Miss. State Chapter, Operation Push v. Allain, 674 F. Supp. 1245, 1263 (N.D. Miss. 1987), aff'd sub nom Miss. State Chapter, Operation Push, Inc. v. Mabus, 932 F.2d 400 (5th Cir. 1991); see also Daniel P. Tokaji, The New Vote Denial: Where Election Reform Meets the Voting Rights Act, 57 S.C. L. Rev. 689, 709 (2006) ("The legislative history of the 1982 amendments, however, provides little guidance on how Section 2 should apply to practices

33

resulting in the disproportionate denial of minority votes."). In contrast, claims challenging voting procedures that disproportionately affect minority voters are referred to as "vote-denial" cases. See, e.g., Brown, 895 F. Supp. 2d at 1244-45 ("Vote denial occurs when a state employs a standard, practice, or procedure that results in the denial of the right to vote on account of race." (quoting Johnson v. Governor of State of Fla., 405 F.3d 1214, 1227 n.26 (11th Cir. 2005) (en banc) (internal quotation marks omitted))).

Vote-denial claims under Section 2 have thus far been relatively rare, perhaps due in part to the fact that since 1965, many jurisdictions - including many North Carolina counties - were under federal control and barred from enacting any new voting procedure without first obtaining "pre-clearance" under Section 5 of the VRA from the DOJ or the United States District Court for the District of Columbia. 42 U.S.C. § 1973c(a). Under Section 5, the covered jurisdiction was required to show that the new provision would not "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 478 (1997) (quoting Beer v. United States, 425 U.S. 130, 141 (1976)). The Supreme Court's 2013 decision in Shelby County, declaring the formula used to determine the "covered jurisdictions" under Section 5 to

be unconstitutional, relieved several States, counties, and townships of the burden of submitting their voting changes to federal authorities to be pre-cleared.[20] As a result, very few appellate cases have considered vote-denial claims under Section 2.[21] See, e.g., Irby v. Va. State Bd. of Elections, 889 F.2d 1352 (4th Cir. 1989) (holding that black voters could not establish Virginia's choice to appoint, rather than elect, school board members violated Section 2 because there was no evidence the admitted disparity between black and white school

[20] Since Shelby County, at least one other State has had its newly-enacted voting law challenged under Section 2. See Veasey v. Perry, _ F. Supp. 2d _, Civ. A. No. 13-CV-00193, 2014 WL 3002413 (S.D. Tex. July 2, 2014) (denying Texas' motion to dismiss Section 2 and other claims challenging its voter ID law).

[21] This excludes cases challenging felon-disenfranchisement provisions. While these are technically vote-denial claims, the courts of appeal have analyzed them differently because of the Fourteenth Amendment's specific sanction of such laws and the long history of disenfranchisement of felons in many States. See, e.g., Simmons v. Galvin, 575 F.3d 24, 35-36 (1st Cir. 2009) ("When we look at the terms of the original VRA as a whole, the context, and recognized sources of congressional intent, it is clear the original § 2 of the VRA of 1965 was not meant to create a cause of action against a state which disenfranchises its incarcerated felons."); Hayden v. Pataki, 449 F.3d 305, 328 (2d Cir. 2006) (en banc) (applying a clear-statement rule because of the history of felon-disenfranchisement provisions and concluding that "Congress unquestionably did not manifest an 'unmistakably clear' intent to include felon disenfranchisement laws under the VRA"); Johnson, 405 F.3d at 1230 ("Here, the plaintiffs' interpretation [that Section 2 covers felon-disenfranchisement provisions] creates a serious constitutional question by interpreting the Voting Rights Act to conflict with the text of the Fourteenth Amendment."); but see Wesley v. Collins, 791 F.2d 1255 (6th Cir. 1986) (upholding Tennessee's felon-disenfranchisement law, but classifying the challenge as a vote-dilution claim); Farrakhan v. Washington, 338 F.3d 1009 (9th Cir. 2003), reh'g denied by 359 F.3d 1116 (9th Cir. 2004) (concluding that vote-denial claims challenging felon-disenfranchisement laws are cognizable under Section 2, and remanding to the district court to conduct analysis).

board members had been caused by the appointive system); Ortiz
v. City of Philadelphia, 28 F.3d 306, 312-14 (3d Cir. 1994)
(holding that State statute removing voters who did not vote in
the last two federal elections from the registration rolls did
not violate Section 2 because its disparate impact on minorities
was not caused by the statute, but rather "because [individual
voters] do not vote, and do not take the opportunity of voting
in the next election or requesting reinstatement"); Smith v.
Salt River Project Agric. Improvement & Power Dist., 109 F.3d
586, 595-96 (9th Cir. 1997) (holding that a special utility
district's decision to limit the right to vote in the district
to property owners was not a Section 2 violation because, even
though the requirement disproportionately affected minorities,
there was no causal connection between the decision and a
discriminatory result).

These cases indicate that "a bare statistical showing of
disproportionate *impact* on a racial minority does not satisfy
the § 2 'results' inquiry."[22]  Smith, 109 F.3d at 595 (emphasis
in original).  However, few cases attempt to set out the proper

_____

[22] The Sixth Circuit's decision in Stewart v. Blackwell, 444 F.3d 843
(6th Cir. 2006), vacated as moot by 473 F.3d 692 (6th Cir. 2007) (en
banc), is not to the contrary.  There, the court merely clarified that
Section 2 plaintiffs are not required to show an "actual denial" of
the right to vote but could prevail based on a showing of
"discriminatory effect."  Id. at 878.  It did not hold that a bare
showing that a law would have a disparate impact on a minority group
would be sufficient under Section 2.

test in vote-denial cases. Two recent district court cases provide some guidance. In Brown, the Middle District of Florida denied the plaintiffs' motion to preliminarily enjoin a Florida law that reduced the number of days of early voting from between 12 and 14 days to eight days, leaving each county discretion to offer between 48 and 96 hours of early voting (after 96 had been required under the old law). 895 F. Supp. 2d at 1239. After considering evidence that Florida's largest counties (as well as the State's five covered counties under Section 5) would offer the maximum number of hours of early voting,[23] the district court found that the plaintiffs' claim was not likely to succeed on the merits. The court stated the Section 2 inquiry as "whether, based on an objective analysis of the totality of the circumstances, the application of the [statute] will act to exclude African American voters from meaningful access to the polls, on account of race." Id. at 1249–50 (internal quotation marks omitted). Despite accepting the findings of experts that the changes would disproportionately impact black voters, see

_____

[23] The United States District Court for the District of Columbia, sitting as a three-judge court, had previously refused to pre-clear the same law under Section 5 on the ground that it could be retrogressive if the five covered counties chose to offer fewer than the maximum number of hours of early voting permitted by the statute. See Florida v. United States, 885 F. Supp. 2d 299 (D.D.C. 2012). After the five covered counties committed to using the maximum number of hours, the Attorney General pre-cleared the changes. Brown, 895 F. Supp. 2d at 1241–42.

id. at 1251, the court found that "[b]ecause [the new statute] allows early voting during non-working hours, as well as voting during the weekend, including one Sunday, voting times which are important to African American voters, as well as to [get-out-the-vote] efforts, the Court cannot find that [it] denies equal access to the polls."  Id. at 1255.  In doing so, the court emphasized that it was not comparing the old law to the new one, because that retrogression standard applies only in a Section 5 proceeding.[24]

In Frank v. Walker, __ F. Supp. 2d __, 2014 WL 1775432 (E.D. Wis. Apr. 29, 2014), the court permanently enjoined enforcement of Wisconsin's voter ID law.  Drawing from Gingles – although declining to apply the Gingles factors, which the court viewed as applicable only in the vote-dilution context – the court held that Section 2 plaintiffs "must show that the disproportionate impact results from the interaction of the voting practice with the effects of past or present discrimination and is not merely a product of chance."  Id. at *31.  After concluding that black voters disproportionately lacked IDs, the court found that the ID requirement interacted with historical conditions of discrimination in housing,

---

[24] The court underscored the important role the distinction between the Section 2 standard and the Section 5 retrogression standard and their different burdens of proof played in the case.  Id. at 1251 (citing Reno, 528 U.S. at 324).

employment, and other areas to cause an additional barrier to be placed in the path of black voters.  Id. at *32-33.  Thus, the voter ID provision violated Section 2.[25]

The Brown court's formulation accurately captures the Section 2 results inquiry: whether the current electoral law interacts with historical discrimination and social conditions to cause black voters to have unequal access to the polls.[26] Plaintiffs contend that North Carolina's lack of SDR interacts with its history of official discrimination and present conditions to cause a discriminatory result.  Plaintiffs' expert testimony demonstrates that black citizens of North Carolina currently lag behind whites in several key socioeconomic indicators, including education, employment, income, access to transportation, and residential stability.[27]  They also presented

---

[25] On July 31, 2014, the Wisconsin Supreme Court issued a contrary ruling, finding the Wisconsin photo ID law constitutional under Wisconsin law.  Milwaukee Branch of NAACP v. Walker, _ N.W.2d _, 2014 WL 3744073 (Wis. July 31, 2014).  The Wisconsin Supreme Court did not address Section 2, however.

[26] Plaintiffs here concede that the applicable inquiry is whether the current system under SL 2013-381 results an inequality of opportunity of white and black citizens to exercise the franchise.  (Doc. 164 at 26-27.)

[27] Plaintiffs presented the following unchallenged statistics: (1) as of 2011-12, 34% of black North Carolinians live below the federal poverty level, compared to 13% of whites (J.A. at 1104); (2) as of the fourth quarter of 2012, unemployment rates in North Carolina were 17.3% for blacks and 6.7% for whites (id.); (3) 15.7% of black North Carolinians over age 24 lack a high school degree, as compared to 10.1% of whites (J.A. at 1151); (4) 27% of poor black North Carolinians do not have access to a vehicle, compared to 8.8% of poor

unrebutted testimony that black North Carolinians have used SDR at a higher rate than whites in the three federal elections during which SDR was offered.[28]

North Carolina also has an unfortunate history of official discrimination in voting and other areas that dates back to the Nation's founding. See, e.g., Gingles v. Edmisten, 590 F. Supp. 345, 359-61 (E.D.N.C. 1984), aff'd in part and rev'd in part by Thornburg v. Gingles, 478 U.S. 30 (1986); (see also J.A. at 1036-92 (report of Dr. Lorraine C. Minnite).). This experience affects the perceptions and realities of black North Carolinians to this day.[29] Simply put, in light of the historical struggle for African-Americans' voting rights, North Carolinians have reason to be wary of changes to voting laws.

Plaintiffs' historical evidence in these cases focuses largely on racial discrimination that occurred between a quarter of a century to over a century ago. However, as the Supreme Court recently stated, "history did not end in 1965." Shelby

---

whites (J.A. at 1155); and (5) 75.1% of whites in North Carolina live in owned homes as compared to 49.8% of blacks (J.A. at 1158).

[28] In 2012, 13.4% of black voters who voted early used SDR, as compared to 7.2% of white voters; in the 2010 midterm, the figures were 10.2% and 5.4%, respectively; and in 2008, 13.1% and 8.9%. (J.A. at 629.)

[29] For example, Plaintiff Rosanell Eaton, now 94 years old, testified impressively as to how at approximately age 19 (in the 1940s) she was required to recite the Preamble to the Constitution from memory in order register to vote. (Doc. 165 at 39-40.)

Cnty., 133 S. Ct. at 2628. In the period between the enactment of the VRA and 2013, "voting tests were abolished, disparities in voter registration and turnout due to race were erased, and African-Americans attained political office in record numbers." Id. The record reflects such progress in North Carolina, too. Plaintiffs' expert, Dr. Barry C. Burden, indicates that black North Carolinians have reached "parity" with whites in turnout for presidential elections. (J.A. at 1100.) And Dr. Charles Stewart III concludes that "[t]he registration rate of African-Americans has surged in North Carolina since 2000, to the point that the registration rate of African Americans now exceeds that of whites," a development he characterizes as "significant."[30] (J.A. at 800.) Plaintiffs' experts attribute these increases to the candidacy of President Barack Obama as well as to North Carolina's election law changes since 2000. (See J.A. at 1100 (report of Dr. Burden); 1193 (report of Dr. J. Morgan Kousser).)[31] In addition, Dr. Burden notes, blacks in North

---

[30] To put this advance in perspective, by 2012 black registration reached 95.3% and white registration 87.8%. (J.A. at 806.) This compares to the Gingles court's finding that in 1982 the black registration rate was 52.7% and the white registration rate was 66.7%. Gingles, 590 F. Supp. at 360. By 2000, the black registration rate was 81.1% and the white registration rate was 90.2%, and by 2006, 82.3% of voting-age blacks were registered as opposed to 87.4% of whites. (J.A. at 807.)

[31] The largest increases in black turnout occurred in 2008 and 2012, with turnout in the intervening off-year elections falling by nearly half relative to presidential years. (J.A. at 1197.)

Carolina have been elected to political office at levels that now "approach[] parity with their prevalence in the electorate."[32] (J.A. at 1107.) In examining the totality of the circumstances, therefore, the court views all evidence in context, giving it due weight, but also being careful to acknowledge that "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not in itself unlawful." Bolden, 446 U.S. at 74.

Plaintiffs rely on Operation Push. There, the plaintiffs challenged Mississippi's system of maintaining, for some municipalities, a system of "dual registration" that required a person to register in two different locations to be eligible to vote in municipal elections as well as county, state, and federal elections. 674 F. Supp. at 1249-50. It was admitted that the practice was initially enacted in 1890 as part of a plan to disenfranchise black voters, but the court did not address whether it was being maintained for a discriminatory purpose in the 1980s. Id. at 1251-52. The district court nevertheless enjoined the requirement after a searching examination of what it considered to be the relevant Gingles factors: (1) history of discrimination, (2) socioeconomic results of discrimination, (3) the extent that black citizens

---

[32] Of course, the VRA expressly provides that there is no right to proportional representation. 42 U.S.C. § 1973(b).

have been elected to public office, (4) lack of responsiveness among elected officials to the black community, and (5) the tenuousness of the State's interest. Id. at 1263-68.

The present cases are distinguishable in important respects, however. The Mississippi system had led to a large disparity in registration between black and white voters, and the court found that the valid registration rate for whites remained approximately 25 percentage points above that for blacks. Id. at 1254. Thus, the discriminatory results of the lingering dual-registration system were clear – fewer black than white Mississippians were able to register to vote over a long period, magnifying the effect of the system. Also, the dual-registration system had been in effect to varying degrees for almost 100 years, propagating its effects even further, and the court found that the challenged statutes did not advance or relate rationally to any substantial or legitimate governmental interest. Id. at 1260-61. In fact, at the time of the decision Mississippi was the only State maintaining such a dual-registration scheme. Id. at 1252. Finally, Operation Push was decided in 1987, not long after Mississippi had engaged in official disenfranchisement of black would-be voters. Here, voting-age blacks in North Carolina maintain a *higher* current registration rate than whites, black registration rates continued to make significant increases in the seven years

before the adoption of SDR (J.A. at 804, Table 2 (noting an increase of black registered voters from 988,134 to 1,116,818 in the period from 2000 to 2006)), and SDR existed for only three federal election cycles (six years) before it was repealed by SL 2013-381.[33]

Additionally, the high registration rate of black North Carolinians – 95.3%, some 7.5 percentage points above that of whites – suggests strongly that black voters will not have unequal access to the polls. Plaintiffs point to Dr. Stewart's conclusion that SL 2013-381 would have affected 3% of the 2012 African-American registrants if it had then been in effect. (J.A. at 789.) From this, Plaintiffs predict that without SDR, North Carolina will experience a similar reduction in black registrants. But this prediction appears to ignore important considerations.

Particularly, Plaintiffs have not shown that African-American voters in 2012 lacked – or more importantly, that they currently lack - an equal opportunity to easily register to vote otherwise. For example, under current law, every State resident can register to vote by mail. See N.C. Gen. Stat. § 163-82.6(a) ("The county board of elections shall accept any form described

---

[33] Moreover, as noted above, according to Dr. Burden, some of the recent increase in black registration since 2008 is attributable to the candidacy of the first black major-party presidential candidate. (J.A. at 1100.)

in [N.C. Gen. Stat. §] 163-82.3 if the applicant submits the form by mail, facsimile transmission, transmission of a scanned document, or in person."). Thus, those with transportation, economic, or other challenges need not physically appear to register. Cf. Operation Push, 674 F. Supp. at 1250-52 (describing Mississippi law that initially prevented all registration outside of the office of the county registrar). Certain State agencies are also required to offer voter registration services. Such agencies include departments of social services and public health, disability services agencies (vocational rehabilitation offices, departments of services for the blind, for the deaf, and for mental health), the North Carolina Employment Security Commission, and, under certain circumstances, the North Carolina Division of Motor Vehicles ("DMV"), pursuant to N.C. Gen. Stat. §§ 163-82.19 & 163-82.20. (Doc. 126-1 ¶ 10.) In response to questioning at the hearing, no Plaintiff demonstrated how these various other options failed to provide an equal opportunity to any black voter who otherwise wished to use SDR. (See, e.g., Doc. 167 at 135-40 (acknowledging that these other avenues mean that "many people who are of lower socioeconomic status have an opportunity to register to vote elsewhere"). In addition, State law permits any individual, group, or organization - such as the get-out-the-vote ("GOTV") efforts conducted by some Plaintiffs - to

conduct a voter registration drive, without any special training, pursuant to SBOE-published guidelines and with materials the SBOE and CBOEs provide. (Doc. 126-1 ¶ 11.) Finally, under SL 2013-381, a voter who has moved within the county can still update his or her registration during early voting (i.e., after the 25-day registration cut-off). N.C. Gen. Stat. § 163-82.6A(e). That voters *preferred* to use SDR over these methods does not mean that without SDR voters lack equal opportunity.

Furthermore, because Section 2 does not incorporate a "retrogression" standard, the logical conclusion of Plaintiffs' argument would have rendered North Carolina in violation of the VRA before adoption of SDR simply for not having adopted it. Yet, neither the United States nor the private Plaintiffs have ever taken the position that a jurisdiction was in violation of Section 2 simply for failing to offer SDR. Indeed, "[e]xtending Section 2 that far could have dramatic and far-reaching effects," Irby, 889 F.2d at 1358, placing the laws of at least 36 other states which do not offer SDR in jeopardy of being in violation of Section 2.[34] The district court in Brown recognized

---

[34] See Ala. Code. § 17-3-50 (14-day registration deadline); Alaska Stat. Ann. § 15.07.070(c)-(d) (30 days); Ariz. Rev. Stat. Ann. § 16-120 (30 days); Ark. Code Ann. § 7-5-201(a) (30 days); Del. Code tit. 15 § 2036 (24 days); Fla. Stat. § 97.055(1)(a) (29 days); Ga. Code Ann. § 21-2-224(a) (29 days); Haw. Rev. Stat. § 11-24(a) (30 days); 10 Ill. Comp. Stat. 5/4-50 (three days, with some variation among

this inherent difficulty in Plaintiffs' argument in the context

of the early-voting reduction, where the court stated:

> Consider the fact that many states do not engage in
> any form of early voting. Following Plaintiffs'
> theory to its next logical step, it would seem that if
> a state with a higher percentage of registered
> African-American voters than Florida did not implement
> an early voting program a Section 2 violation would
> occur because African-American voters in that state
> would have less of an opportunity to vote than voters
> in Florida. It would also follow that a Section 2
> violation could occur in Florida if a state with a
> lower percentage of African-American voters employed
> an early voting system . . . that lasts three weeks
> instead of the two week system currently used in
> Florida. This simply cannot be the standard for
> establishing a Section 2 violation.

Brown, 895 F. Supp. 2d at 1254 (quoting Jacksonville Coal. for

Voter Protection v. Hood, 351 F. Supp. 2d 1326, 1335-36 (M.D.

Fla. 2004)). Rather, the court clarified, it "must consider

whether the State of Florida, having decided to allow early

---

counties, except for limited SDR in the fall of 2014); Ind. Code. §§
3-7-13-11, 3-7-33-3, 3-7-33-4 (29 days); Kan. Stat. Ann. § 25-2311(3)-
(7) (21 days); Ky. Rev. Stat. Ann. § 116.045(1)-(2) (28 days); La.
Rev. Stat. Ann. § 18:135(1) (30 days); Md. Code Ann., Elec. Law § 3-
302(a) (21 days); Mass. Gen. Laws ch. 51, § 26 (20 days); Mich. Comp.
Laws § 168.497(1) (30 days); Mo. Rev. Stat. § 115.135 (27 days); Neb.
Rev. Stat. §§ 32-311.01(d), 32-302 (11 days if delivered in person by
the applicant, 18 days otherwise); Nev. Rev. Stat. § 293.560(1) (21
days); N.J. Stat. Ann. §§ 19:31-6, 31-7 (21 days); N.M. Stat. Ann. §
1-4-8(A) (28 days); N.Y. Elec. Law §§ 5-210(3), 5-211(11)-(12), 5-
212(6)-(7) (25 days); Ohio Rev. Code Ann. § 3503.19(A) (30 days);
Okla. Stat. tit. 26 § 4-110.1(A) (24 days); Or. Rev. Stat. §
247.012(3)(b) (21 days); 25 Pa. Cons. Stat. § 1326(b) (30 days); R.I.
Gen. Laws § 17.9.1-3(a) (30 days); S.C. Code Ann. § 7-5-150 (30 days);
S.D. Codified Laws § 12-4-5 (15 days); Tenn. Code Ann. § 2-2-109(a)
(30 days); Tex. Elec. Code Ann. § 13.143(a) (30 days); Utah Code Ann.
§ 20A-2-102.5(2) (30 days); Vt. Stat. Ann. tit. 17 § 2144(a) (six
days); Va. Code Ann. § 24.2-416 (22 days); Wash. Rev. Code Ann. §
29A.08.140(1) (eight days if in person, 29 days otherwise); W. Va.
Code § 3-2-6(a) (21 days).

voting, has adopted early voting procedures that provide *equal* access to the polls for all voters in Florida." Id. at 1254-55 (emphasis in original). Similarly here, the court is not concerned with whether the elimination of SDR will "worsen the position of minority voters in comparison to the preexisting voting standard, practice, or procedure," id. at 1251 (internal quotation marks omitted) – a Section 5 inquiry, but whether North Carolina's existing voting scheme (without SDR) interacts with past discrimination and present conditions to cause a discriminatory result.

Moreover, in the National Voter Registration Act of 1993 ("NVRA"), Congress explicitly sanctioned a State's power to set a registration cut-off of 30 days before an election. 42 U.S.C. § 1973gg-6(a)(1).[35] As this statute was passed 11 years after the amendment to Section 2, it is difficult to conclude that Congress intended that a State's adoption of a registration cut-off before Election Day would constitute a violation of Section 2. See United States v. Stewart, 311 U.S. 60, 64 (1940) (concluding that "all acts *in pari materia* are to be taken together, as if they were one law," and thus that "[t]he later act can therefore be regarded as a legislative interpretation of

---

[35] In fact, North Carolina has granted voters another five days, setting its cut-off at 25 days before Election Day. N.C. Gen. Stat. § 163-82.6(c)(1)-(2).

the earlier act in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting" (internal citations omitted)); cf. Johnson, 405 F.3d at 1230 (concluding that Section 2 did not prohibit enforcement of felon-disenfranchisement provisions in part because such laws are explicitly sanctioned by the Fourteenth Amendment).

Finally, Plaintiffs argue that Defendants' stated policy underlying elimination of SDR is tenuous, noting that supporters expressed concern for providing "integrity of the voting process" to ensure that votes "be protected and not negated by fraud." (J.A. at 2516-17.) To be sure, a free-standing claim of "electoral integrity does not operate as an all-purpose justification flexible enough to embrace any burden." McLaughlin v. N.C. Bd. of Elections, 65 F.3d 1215, 1228 (4th Cir. 1995) (quoting Republican Party of Ark. v. Faulkner Cnty., 49 F.3d 1289, 1299 (8th Cir. 1995) (internal quotation marks omitted)). But here there is more in the legislative record. During the Senate Rules Committee debate on the challenged SDR provision, Senator Rucho contended:

> There's no way and there's no simple way to validate. What we're trying to do is give the Board of Elections an opportunity to do their job correctly, validate those individuals and be sure that the election is above board.

(Doc. 134-4 at 45.) Later, during the second reading, he added:

> It also allows time for – to verify voters'

> information by repealing same day registration and
> which will ensure accuracy. It's been a challenge for
> the Board of Elections to be able to identify and
> validate everyone that has come there on the basis of
> one-day registration . . . .

(Id. at 87.) Defendants have presented evidence in support of

this interest.

Plaintiff's witness, Gary Bartlett (SBOE Executive Director

from 1993 to 2013), acknowledged at the hearing that under SDR,

CBOEs sometimes lacked sufficient time to verify registrants

under State law.[36] (Doc. 165 at 166.) As a consequence, over a

thousand ballots were counted in recent elections by voters who

were not (or could not be) properly verified.[37] (Doc. 165 at

148-66; J.A. at 3267, 3269-72.) George Gilbert, former director

---

[36] When a voter registered using SDR during early voting, she was
required to present proper identification under the Help America Vote
Act of 2002 ("HAVA"), 42 U.S.C. §§ 15301-15545 ("HAVA ID"), proving
residence within the State. After receiving the registration, the
CBOE sent out a verification card via the United States Postal Service
intended to determine if the voter in fact lived at the address
presented at the early-voting location. (Doc. 164 at 183.) If the
voter's card was twice returned undeliverable, the CBOE canceled the
voter's ballot. (Id. at 202.) However, the CBOEs allow 15 days for
each card to be returned undeliverable, and if the second card has not
yet been returned before the canvass (which occurs seven days after
the election in non-presidential years and ten days after in
presidential years), the voter's vote is counted even though the voter
has not yet been properly verified through the State's procedure.
(Id. at 205-07.)

[37] For example, in the 2012 general election, SBOE records show that
approximately 1,288 ballots were counted despite being cast by voters
who did not complete the verification process. (J.A. at 3271.) In
the May 2012 primary, 205 ballots were counted without ever being
verified (J.A. at 3269), and in the 2010 general election, 153 such
ballots were counted (J.A. at 3267).

of the Guilford County Board of Elections, acknowledged that a voter who registered before the "close of books" 25 days before Election Day will have more time to pass the verification procedure than a voter who registered and voted during early voting. (Doc. 165 at 16.) These concerns were not new; they had been identified by Director Bartlett in a 2009 report to the General Assembly, following the implementation of SDR. (J.A. at 1528-36.) Specifically, the report noted: "county boards found that there was not enough time between the end of [early] voting (and SDRs) and the canvass date to ensure that verification mailings completed the mail verification process." (J.A. at 1533.) In addition, because of the volume of voters, CBOEs had difficulty simultaneously conducting registrations and early voting such that "it was not possible to process the number of voter registration applications received during one-stop voting" within the two-day statutory window. (Id.) Also, "[d]ue to volume issues, [CBOEs] experienced minor in [sic] DMV validations, especially during the last few days of [early] voting."[38] (Id.)

The State has an interest in closing the voter rolls at a reasonable time before Election Day. In Marston v. Lewis, 410

---

[38] Opponents of the bill were apparently unaware of this report. (See, e.g., Doc. 134-4 at 220 ("Same day registration, I don't know of a single problem we've had with that . . . .").)

U.S. 679, 681 (1973), the Supreme Court held that "it is clear that the State has demonstrated that [a] 50-day voter registration cutoff (for election of state and local officials) is necessary to permit preparation of accurate voter lists." In passing the NVRA's authorization in 1993 for States to have a 30-day cut-off for registration, Congress specifically noted its purposes included "to establish procedures that will increase the number of eligible citizens to register to vote," "to protect the integrity of the electoral process," and "to ensure that accurate and current voter registration rolls are maintained." 42 U.S.C. § 1973gg(b)(1), (3) & (4); see also Lucas Cnty. Democratic Party v. Blackwell, 341 F. Supp. 2d 861, 865 (N.D. Ohio 2004) (noting that State law closing registration books 30 days before Election Day "serves and promotes orderly administration of elections" and "enables election officials to verify information, including the driver's license and social security numbers of persons who have registered, thereby avoiding fraud").

Plaintiffs argue that SDR is actually more reliable than traditional registration because CBOEs are less likely to *deny* voters who registered during early voting than those who registered before the 25-day cutoff. But as their own witness, Director Bartlett, demonstrated, this argument ignores the fact that with SDR over a thousand voters have had their votes

counted without being properly *verified* by the CBOEs. Current SBOE Director, Kim Strach, testified that this concern was recently validated when improper and unverified votes cast as a result of SDR tainted the outcome of a municipal election in the town of Pembroke in November 2013 and caused the SBOE to issue an order to conduct an entirely new election. (Doc. 126-1 ¶ 28; Doc. 161-9 at 48.)

Plaintiffs' argument, therefore, fails to rebut Defendants' point. It is sufficient for the State to voice concern that SDR burdened CBOEs and left inadequate time for elections officials to properly verify voters before the canvass and that unverified votes were counted as a result. In fact, the State has more than an *interest* in allowing time for verification – it has a *duty* to ensure that unverified voters do not have their votes counted in an election. Thus, to the extent this <u>Gingles</u> factor applies here, the court finds that the State's asserted justification for the repeal of SDR is not tenuous. Plaintiffs' further contention that these unverified voters nevertheless represent a low level of possible fraud in view of the nearly half a million people who use SDR does not somehow render the State's interest tenuous. <u>Cf.</u> <u>Florida</u>, 885 F. Supp. 2d at 355-56. Whether other – arguably better - policy solutions exist to address the problem is for elected officials, not the courts, to decide.

For all these reasons and considering the complete record, the court finds that Plaintiffs have not shown a likelihood of success on the merits of their claim that current North Carolina law (without SDR) interacts with current conditions and historical discrimination to result in an inequality of opportunity for African-Americans to exercise their right to vote in violation of Section 2 of the VRA. The motion for preliminary injunction on this basis will be denied.[39]

## 2. Racially discriminatory intent under Section 2 and the Fourteenth and Fifteenth Amendments

The showing of intent required to prove a violation of Section 2 is the same as that required to establish a violation of the Fifteenth Amendment and the Fourteenth Amendment's Equal Protection Clause. See Charleston Cnty., 316 F. Supp. 2d at 272

---

[39] Plaintiffs' contention that these cases are analogous to cases like Spirit Lake Tribe v. Benson County, No. 2:10-cv-095, 2010 WL 4226614 (D.N.D. Oct. 21, 2010), is not persuasive. In Spirit Lake Tribe, the district court preliminarily enjoined under Section 2 a county's decision to close seven of eight precincts, including those closest to a Native American reservation. Id. at *1. There, it was apparent that the lack of polling places, combined with social and historical conditions, caused the Native American population to have less opportunity to vote on Election Day than the white population. Id. at *3-4. Here, because of the numerous other methods for registration and the already high African-American registration rate, it has not been shown that a lack of SDR will likely cause similar issues. See also, e.g., Common Cause S. Christian Leadership Conference v. Jones, 213 F. Supp. 2d 1106 (C.D. Cal. 2001) (denying defendants' motion for judgment on the pleadings where plaintiffs alleged punch-card voting used only in minority areas had a discriminatory result); Berks Cnty., 250 F. Supp. 2d at 538-40 (granting preliminary injunction under Section 2 where county failed to provide bilingual poll workers and election officials made discriminatory remarks about Hispanics and did not allow them to use their choice of poll assisters).

n.3 (citing Garza, 918 F.2d at 766); cf. Reno, 520 U.S. at 481 ("Since 1980, a plaintiff bringing a constitutional vote dilution challenge, whether under the Fourteenth or Fifteenth Amendment, has been required to establish that the State or political subdivision acted with a discriminatory purpose."). The analysis to follow, therefore, applies to the Section 2 claim as well as to Plaintiffs' claims under the Fourteenth and Fifteenth Amendments.

In Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265-66 (1976), the Supreme Court held that discriminatory intent is established where a plaintiff proves that racial discrimination was a "motivating factor" in the governing body's decision. See also Reno, 520 U.S. at 488; Brown, 895 F. Supp. 2d at 1245-46. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights, 429 U.S. at 266. The Court instructed that whether the impact of the action "bears more heavily on one race than another" is "an important starting point." Id. (quoting Washington v. Davis, 426 U.S. 229, 242 (1976)). Next, the court should consider "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes." Id. at 267. "The specific sequence of events

leading up to the challenged decision also may shed some light on the decisionmaker's purposes." Id. This includes departures from the normal legislative procedure as well as substantive departures, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." Id. Also relevant are "[t]he legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." Id. at 268. The Supreme Court did not purport to establish a conclusive list of factors in Arlington Heights, and other factors, particularly the nature and weight of the State interest involved, may be specifically relevant to a claim of discriminatory intent. See, e.g., Florida, 885 F. Supp. 2d at 348, 355; Terrazas v. Clements, 581 F. Supp. 1329, 1347 (N.D. Tex. 1984).

### a. Impact of decision

As to the first factor and as discussed above, the enactment of SL 2013-381's elimination of SDR will bear more heavily on African-Americans than whites because the former disproportionately took advantage of SDR. As in Brown, however, the disparate impact is softened by the fact that elimination of SDR will not likely result in an inequality of opportunity to vote for black citizens. Cf. Brown, 895 F. Supp. 2d at 1246

("Because . . . the evidence before the Court does not demonstrate that the changes will deny minorities equal access to the polls, the otherwise disproportionate effect of the amendments does not weigh heavily in favor of finding discriminatory purpose."). Moreover, as noted, Dr. Stewart predicts that elimination of SDR would have affected just 3% of black voters (and 1.5% of whites) in 2012, and he predicts it would have affected only 1.4% of black voters (and 1% of white voters) in 2010.[40] (J.A. at 789-91.) Further, as noted above, North Carolina provides several other ways to register (including amending registration) that, at least on this record, have not been shown to be practically unavailable to African-American residents. Thus, the disproportionate impact of SL 2013-381's elimination of SDR supports a finding of discriminatory intent, but only moderately so.

### b.  Historical background of decision

As for the historical background of the decision, Plaintiffs contend that it "was not lost on the members of the General Assembly" that, prior to SL 2013-381, North Carolina's decade of State action liberalizing election laws "had succeeded in dramatically increasing overall voter turnout in North

---

[40] Although SDR was used disproportionately by black voters, it bears noting that its elimination affects vastly more whites than blacks. During its existence, SDR was used by 360,536 whites compared to 243,396 blacks in federal elections. (J.A. at 629.)

Carolina, and had increased African-American voter participation in particular." (Doc. 98-1 at 61.) Plaintiffs argue that race data was offered by opponents to HB 589 during debate on the bill (id.) and that the "marked upward trend in black voter registration and turnout was well-known and widely discussed by local media sources and in public hearings of the House Elections Committee, as well as documented in SBOE data" (Doc. 97 at 65).

There is evidence that at its initiation – before any indication of how it would be used by any minority group - SDR was a partisan issue insofar as it was passed by a Democratically-controlled General Assembly on a near-party line vote and was signed into law by a Democratic governor. (J.A. at 1209 (report of Dr. Kousser), 2643-44.) When Republicans gained control of the legislature and the governorship in 2013, they moved to repeal SDR. During debate on HB 589, while asserting its disproportionate impact on blacks, some opponents of the bill nevertheless attributed the supporters' motivation to partisanship. (See, e.g., J.A. at 2563 (statement of Representative Hall that the bill was "the most pointedly, obviously politically partisan bill [he had] ever seen"); 1109 (report of Dr. Burden, noting that "[a]ll evidence indicates that SL 2013-381 was enacted primarily for political gain . . .").)

To be sure, a partisan motive does not preclude or excuse the existence of a racial motivation.  While "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern," "racial discrimination is not just another competing consideration."  <u>Arlington Heights</u>, 429 U.S. at 265.  "Protecting incumbency and safeguarding the voting rights of minorities are purposes often at war with each other," and racial animus in this context need not be "based on any dislike, mistrust, hatred or bigotry."  <u>Garza</u>, 918 F.2d at 778 (Kozinski, J., concurring in part and dissenting in part).  But the fact that a bill reverses prior practice does not itself constitute impermissible intent.  This is especially true not only where evidence suggests that the reversal was the result of a partisan split, but more importantly where a new political majority espouses a legitimate reason to change the law.  Here, as previously detailed, <u>see</u> <u>supra</u> Part III.B.1., the reasons the proponents offered for the elimination of SDR were identified at some length in the SBOE's 2009 report to the General Assembly.

Plaintiffs also argue that the sponsors of HB 589 sought data from the SBOE on the potential racial impact of some of its provisions, but the evidence is sparse as to SDR.  Plaintiffs note that on March 5, 2013, the various House sponsors of HB 589 sent an email to the SBOE asking for a "cross matching of the

registered voters in [North Carolina] with the [DMV] to determine a list of voters who have neither a [North Carolina] Driver's License nor a [North Carolina] Identification Card." (J.A. at 1713.) This evidence seems to relate only to the voter ID provisions then under consideration. The legislators additionally stated that they "would need to have that subset broken down into different categories within each county by all possible demographics that [the SBOE] typically captures (party affiliation, ethnicity, age, gender, etc.)." (Id.) The SBOE sent the data in a large spreadsheet the next day. (J.A. at 1714-81.) On March 28, Representative Lewis sent a ten-page letter to Director Bartlett containing nearly 100 numbered inquiries regarding the SBOE's January 2013 conclusion that 612,955 registered voters lacked a qualifying photo ID. (J.A. at 3128-37.) *One* of the inquiries mentioned race, asking the SBOE to "provide the age and racial breakdown for voters who do not have a driver's license number listed." (J.A. at 3131.) On April 11, Director Bartlett sent a 19-page response with an attached spreadsheet that included the requested race data. (J.A. at 3148-66.) That same day, the Speaker's general counsel emailed the SBOE, asking for additional race data regarding people who requested absentee ballots in 2012 (J.A. at 3234), which was provided (J.A. at 3235-46).

As to SDR, Kim Strach emailed some data to Representative Lewis, one of the bill's House sponsors, on July 25, the day of the House concurrence vote. (J.A. at 3265.) This data included the verification rates for SDR in the 2010 and 2012 elections and information about the type of IDs presented by same-day registrants. (J.A. at 3267-84.) It also included spreadsheets that contain race data for individual same-day registrants and whether those registrants were verified. (J.A. at 3278, 3280.) This was the same data that Defendants relied upon during the preliminary injunction hearing to demonstrate that SDR resulted in the counting of over a thousand ballots of voters who were never properly verified. Thus, as to SDR, there is little evidence from which to infer that the General Assembly's course of action was based on research of the racial effect or implications of its repeal.

Plaintiffs also argue that the General Assembly proceeded to pass the bill even after opponents cited the disproportional use of SDR by black North Carolinians. Plaintiffs rely on a declaration from Senator Stein stating that during Senate debate he emphasized that in 2012 nearly 100,000 people registered with SDR, and that 34% were minority. (J.A. at 190.) The Senate transcript reveals that Senator Stein mentioned the first figure but not the minority participation; however, he did refer to SL 2013-381 several times as "disproportionately affect[ing]

minorities."[41]  (See Doc. 134-4 at 253-55, 259.)  He argued that
the State's registration cut-off was instituted historically to
minimize African-American participation and that by eliminating
SDR, "you all are going back to the sorry old history that we
should not embrace."[42]  (Id. at 255.)

While Plaintiffs rely heavily on these facts to establish
improper intent, the United States also argues that the court
should infer improper intent from the General Assembly's failure
to solicit expert opinions about the impact of the changes.
(Doc. 166 at 219.)  Cf. Brown, 895 F. Supp. 2d at 1248 (noting
plaintiffs' urging to infer intent from the Florida
legislature's failure to conduct any study or analysis of the
effect the changes prior to amending the statute).  When the
court asked during the hearing if it would have been better or
worse not to have asked for any race data, the United States
responded that "[i]t would be just an additional factor to
consider."  (Id. at 219-20.)  Consequently, Plaintiffs' effort

---

[41] Although Senator Stein attached a document to his declaration
containing statistics regarding African-American use of SDR in the
2012 general election (J.A. at 198), there is no indication in the
legislative record that this was shared with Senate members during the
debate.  The record refers elsewhere only to three charts – all
related to early voting - that Senator Stein shared during debate.
(J.A. at 198-200.)

[42] Whatever the original purpose of a registration cut-off, the Supreme
Court, as noted, recognized in 1973 that the States have an interest
in closing voter rolls at a reasonable time before Election Day.
Marston, 410 U.S. at 681.

to simultaneously rely on the presence and absence of race information presents a challenge.

Discriminatory purpose "implies more than intent as volition or intent as awareness of consequences." Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979). "It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Id. To infer from the opponents' objections that the General Assembly passed the bill because of the objections is difficult on this record. This is especially true where some of the contemporaneous legislative criticism eschewed any improper intent. (See, e.g., Doc. 134-4 at 204 (statement of Sen. Bryant clarifying that he was not trying to accuse Republicans of being racist, but only stating that the bill would have a racial impact regardless of its purpose).[43] In sum, evidence that legislators knew or may have known that SDR was used disproportionately by African-Americans in the State is contrasted by evidence that SDR was used overwhelmingly by whites and that it was causing a significant number of unverified voters' ballots to be counted. The historical

---

[43] To the extent Plaintiffs point to evidence of race data on HB 589 generally, it is relevant that during the Senate debate, proponents of the bill emphasized that African-American turnout increased in Georgia after the State passed a voter ID law. (Doc. 134-4 at 158-59.)

background of the decision, therefore, presents a conflicting picture.

### c. Sequence of events leading to decision

The next factor is "[t]he specific sequence of events leading up to the challenged decision," including whether the decision was a "[d]eparture[] from the normal procedural sequence" or if "factors usually considered important . . . would strongly favor" a contrary decision. <u>Arlington Heights</u>, 429 U.S. at 267. Plaintiffs describe the procedure used in the passage of SL 2013-381 as "irregular," "highly expedited," and "unorthodox." (Doc. 98-1 at 62.) Particularly, they note that (1) the original version of HB 589 that left the House of Representatives in April concerned only voter ID; (2) the Senate took no action on HB 589 until after the Supreme Court's decision in <u>Shelby County</u>; (3) Senator Apodaca announced the day after <u>Shelby County</u> the intent to go with the "full bill" without disclosing the contents of that bill; (4) the new provisions were inserted into HB 589 in a process known as "gut-and-amend," and the expanded bill was not posted online until the night before the Senate Rules Committee meeting; (5) after the bill passed the Senate, the House received it that same night and concurred in the changes without referring the bill to a Committee of the Whole or any other committee; (6) of the proponents of the bill, only Representative Lewis spoke in favor

of it during the House session, while every Democratic opponent spoke against it; and (7) the bill represented what Plaintiffs characterize as a reversal of course from the previous decade of North Carolina legislation on election laws.  Defendants contend that HB 589 complied with all General Assembly rules and procedures and that several other bills have followed similar procedural paths, particularly the controversial 2003 redistricting legislation passed by the then Democratically-controlled legislature.

A reading of the complete legislative record reveals that, although the procedural path of the bill left room for criticism by opponents, any inference of impermissible intent is marginal. As Plaintiffs must concede, the General Assembly complied with all of its rules during the passage of SL 2013-381.  (See Doc. 164 at 28-29 (statement of United States' counsel).)  No one raised a point of order.  Moreover, testimony established that the process known as "gut-and-amend" used to transform the voter ID bill into the omnibus bill that became SL 2013-381 is not uncommon in the General Assembly.  (Id. at 133 (testimony of Senator Dan Blue, an opponent of the bill, acknowledging that gut-and-amend happens "quite a bit" and "too often" in the General Assembly).)  Such a process occurs because the General Assembly must meet a "cut-off" date – known as the "cross-over date" - by which a piece of legislation must be approved by one

House lest it die for the remainder of the session.  (Id. at 131-33.)  Plaintiffs' legislator-witnesses admitted that it is not uncommon for a bill to return to its originating house with significant material not originally part of the bill.  (Id. at 133; Doc. 165 at 85-88 (testimony of Rep. Glazier).)  In this regard, Plaintiffs' *real* contention seems to be that the process for HB 589 was unusual for a bill having the significance they contend it did and the majority's failure to give deference to existing political relationships with those on the other side of the aisle.  (See Doc. 165 at 67 (testimony of Rep. Glazier: "I was shocked by it, not by, in some respects, some of the provisions, but by the -- and, again, my comments on the floor that night made it clear -- by the process"), 69 ("[t]he process this bill got was nothing more than what we give to a golf cart bill"); J.A. 179 ¶ 3 (declaration of Sen. Stein describing the Senate proceedings as "irregular for a bill of this magnitude").)

The fact that the Senate acted after Shelby County favors Plaintiffs, but it does not bear the full significance that they attribute to it.  That decision greatly altered the burden of proof calculus for a legislative body considering changes to voting laws.  It would not have been unreasonable for the North Carolina Senate to conclude that passing the "full bill" before Shelby County was simply not worth the administrative and

financial cost of seeking permission from the United States. Proponents were aware that – as opponents sharply reminded them during debate – they were still obliged to comply with Section 2 and the Constitution. (Doc. 134-4 at 153, 192.)

Plaintiffs' contention that only one legislator spoke in favor of the bill is inaccurate. While it is true that only Representative Lewis spoke in the House before the vote to concur in the Senate's changes, several Republican Senators spoke in favor of the bill both during the Rules Committee meeting and during the two floor sessions. (See generally Doc. 134-4.) Additionally, the initial bill was debated over several committee sessions and a floor session in March and April 2013. (See generally J.A. at 2388-2451.) It is not necessarily nefarious that no Republican in the House other than Representative Lewis rose to speak in favor of the bill when it was late in the evening, the caucus knew it had the votes to pass the bill, and the end of the legislative session was approaching.[44]

Plaintiffs further rely on the fact that the House voted to concur in the Senate's changes without forming a Committee of the Whole or referring the bill to another committee. The

---

[44] Indeed, an opponent of the bill candidly testified at the hearing that had he been the lawyer for the Republicans, he would have similarly advised the strategy to avoid further discussion. (Doc. 165 at 70.)

record establishes that forming a Committee of the Whole is quite rare. As noted, Representative Moore stated that "[i]t would be pointless to do so, because the Committee of the Whole would be the entire House sitting as a Committee and then later simply sitting as the House." (J.A. at 2507-08.) Defendants also adduced evidence during the hearing that previous Democratically-controlled majorities of the General Assembly returned politically-sensitive bills for concurrence as to extensive changes without referring the substitute bill to a committee.[45]

The Senate debated the bill over two separate sessions and a Rules Committee meeting, debated over a dozen amendments and added several (including two by Democrats), and each opponent was given the floor and sufficient time to speak and explain his or her objections. The Senate also granted time to adjourn between debate to allow members to caucus and consider further amendments. (Doc. 134-4 at 123-25.) At the end of the Senate debate, Senator Nesbitt – a strong opponent of the bill – stated "[w]e've had a good and thorough debate on this bill over two

---

[45] Representative Glazier testified that the 2003 redistricting legislation, affecting all voters in the State, returned to the House following significant changes in the Senate. The Democratically-controlled House voted to concur in the Senate's changes without additional committee hearings. (Doc. 165 at 83-86.) He also testified that controversial bills regarding Sharia law and regulatory reform were also returned to the House on a motion to concur. (Id. at 87-89.)

days," and "I think we've reviewed the bill in great detail."
(Id. at 315-16.)  When the bill returned to the House, every
opponent was given time to speak, some were given extensions,
and many did not even use their full allotment of time.  (J.A.
at 2615.)  While the proceedings moved quickly, the court cannot
say that it is uncommon for a controversial bill to be passed
near the end of a legislative session.

As for the remaining procedural argument, Plaintiffs point
to the fact that the bill expanded to 57 pages before the Rules
Committee meeting.  This is a significant difference.  However,
a review of the bill reveals that apart from the original voter
ID provisions, a significant portion of those 57 pages consisted
of existing law.  Moreover, several component parts – including
the reduction of early voting and elimination of SDR – had been
included in other bills introduced in the House and Senate
around the same time as the original HB 589.[46]  As noted, their
inclusion as part of the "gut-and-amend" process was not
unusual.  (Doc. 165 at 88-89.)  As a political matter, it may
have been preferable, even highly so, to put the bill on a
slower track, but the court cannot say that the manner of the

---

[46] See HB 451 (would have reduced early voting to ten days, eliminated
SDR, and eliminated Sunday voting); HB 913 (would have eliminated SDR
and enhanced observers' rights); SB 428 (would have eliminated SDR and
reduced early voting to ten days); and SB 666 (would have eliminated
SDR and reduced early voting to ten days).  (Doc. 134-3 ¶ 23.)

proceedings in the General Assembly raises a strong inference of discriminatory intent.

### d.   Legislative history

Arlington Heights also instructs the court to consider the legislative history of the decision, especially "contemporaneous statements by members of the decisionmaking body, minutes of its meetings, or reports."   429 U.S. at 268.   Much of this has been addressed in the preceding discussion regarding the debate of the bill.   Plaintiffs have not identified any comment, and the court has found none, of a racial nature by any supporter of the bill during the legislative process.[47]   Thus, the fourth Arlington Heights factor weighs in favor of Defendants.

### e.   State interest

Plaintiffs argue that the State invented post-hoc rationales to defend the provisions of SL 2013-381.   To be sure, "in some circumstances it is reasonable to infer discriminatory intent based on evidence of pretext."   Florida, 885 F. Supp. 2d at 355.   As to SDR, however, the principal interest the State

---

[47] Plaintiffs argued at the hearing that the court should draw an adverse inference from the fact that Defendants have asserted legislative privilege and refused to disclose certain communications that Plaintiffs argue might be probative of intent.   This would be inappropriate.   Drawing such an inference would be tantamount to punishing a party for asserting a privilege – especially one that as of yet has not been determined to be unavailable.   It would also be contrary to the court's prior discovery ruling.   (Doc. 93 (finding that the legislative privilege is qualified).)   Because of the assertion of privilege, it is not unusual therefore that Defendants did not call any legislators to testify.

asserts in this litigation – the verification problem described above – had been identified by the SBOE in 2009 and was raised more than once by Senator Rucho.  (J.A. at 1533; Doc. 134-4 at 45, 87.)  The legislative record and the evidence presented at the hearing falls short of demonstrating that Senator Rucho's proffered reason likely was not the General Assembly's actual reason for eliminating SDR.

In the totality of the circumstances, Plaintiffs' evidence that the General Assembly acted at least in part with discriminatory animus certainly raises suspicions and presents substantial questions.  But it is opposed with at least equally compelling evidence that the lawmakers acted rather for a legitimate State interest.  In this circuit, Plaintiffs must demonstrate more than "only a grave or serious *question* for litigation"; they must "clearly demonstrate that [they] will *likely* succeed on the merits."  Real Truth About Obama, 575 F.3d at 347 (emphasis in original).  Where such competing evidence exists, especially where Defendants have presented evidence that the State interest was eliminating a practice that permitted (if not encouraged) a not insignificant number of unverified ballots to be counted, the court cannot say at this preliminary stage that it is likely that racial animus was a motivating factor for the General Assembly's elimination of SDR.  See Charleston Cnty., 316 F. Supp. 2d at 306 (declining to determine that

invidious discrimination was a motivating factor where South Carolina county's decision to institute an at-large voting system "might reasonably be explained in the context of either of the historical explanations advanced by Plaintiffs and Defendants, respectively" and concluding therefore that "the Court will not disparage [the legislature] without more compelling evidence, particularly in light of other reasonable and historical explanations" for the action); Brown, 895 F. Supp. 2d at 1247 (denying preliminary injunction of reduction of early-voting days where Plaintiffs proffered evidence of unusual legislative procedures and a racial statement made by a legislator, while the State possessed a legitimate interest).[48]

---

[48] In Brown, the court did not find discriminatory intent even where (1) a Senator stated on the floor that "he did not want to make it easier to vote, but rather that it should be harder to vote - as it is in Africa," 895 F. Supp. 2d at 1247 (internal quotation marks omitted); (2) members of the public were limited to three minutes of public comment during the Senate Budget Committee Hearing, id. at 1246; (3) proponents used a "strike-all" amendment to introduce changes the day before amendments were taken up by the Senate Rules Committee, "such that there was less time to analyze and prepare comments regarding the proposed changes," id. at 1246-47; (4) amendments were effective immediately, rather than at some post-enactment date, id. at 1246; and (5) there was some evidence that members of the House and Senate had once participated in a meeting where "not letting blacks vote" was discussed, id. at 1248-49. The court found that the Senator's "single statement [was] not enough to suggest that his purpose, whatever it was, represented the purpose of the Florida legislature as a whole. Accordingly, . . . the 'contemporaneous statements' factor [did] not materially weigh in favor of a finding of discriminatory purpose." Id. at 1248 (quoting Florida, 885 F. Supp. 2d at 355). It also concluded that the State's interests in increasing early-voting flexibility and efficiency were legitimate and that the mere fact the legislature did not conduct a study of the effect the changes was insufficient to warrant a finding

Therefore, Plaintiffs' motions for preliminary injunction based on their intent claims under Section 2 and the Fourteenth and Fifteenth Amendments will be denied.

### 3. Anderson-Burdick

The private Plaintiffs have asserted Fourteenth Amendment claims under the line of Supreme Court Equal Protection cases specifically applicable to voting restrictions. In Harper v. Virginia State Board of Elections, 383 U.S. 663 (1966), the Court struck down Virginia's poll tax in State elections as violative of the Equal Protection Clause. In so doing, the majority hinted that because voting is a fundamental right, strict scrutiny applies to all State restrictions on that right. See id. at 670. However, later decisions established that, because "[e]lection laws will invariably impose some burden upon individual voters," they are subjected to strict scrutiny only when they impose a "severe" burden. Burdick, 504 U.S. at 433–34. Two freedom-of-association cases, Burdick and Anderson v. Celebrezze, 460 U.S. 780 (1983), established a balancing test for election laws that do not severely burden First and

---

of discriminatory intent. Id. at 1248. With respect to the procedure, there was scant evidence it had been unusual, as "strike-all" amendments had been used in the past and the legislative process as a whole allowed for extensive public comment. Id. at 1247 (citing Florida, 885 F. Supp. 2d at 382-84). Finally, there was no evidence connecting the alleged meeting to the enactment of the early-voting changes. Id. at 1249. Thus, the court found that the plaintiffs could not make a clear showing of likelihood of success on the merits on their intent claim. Id.

Fourteenth Amendment rights.

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

Burdick, 504 U.S. at 434 (quoting Anderson, 460 U.S. at 789).[49]

In Crawford v. Marion County Election Board, 553 U.S. 181 (2008), the Court extended the Anderson-Burdick balancing test outside the context of the First Amendment and applied it to State election procedures as a whole. In upholding Indiana's voter ID law, the plurality stated that "however slight [a] burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" 553 U.S. at 191 (plurality opinion) (quoting Norman v. Reed, 502 U.S. 279, 288-89 (1992)). Justice Scalia, joined by Justices Thomas and Alito, agreed that the Anderson-Burdick framework applied to the voter ID law. Id. at 204-05 (Scalia, J., concurring in the judgment).

Thus, the court first must determine whether the burden imposed by SL 2013-381's elimination of SDR is severe. If it

---

[49] Burdick upheld Hawaii's prohibition on write-in voting, while Anderson struck down an early-filing deadline for independent candidates.

is, it must be "narrowly drawn to advance a state interest of compelling importance." Burdick, 504 U.S. at 434 (quoting Norman, 502 U.S. at 289). Otherwise, if a law "imposes only 'reasonable, nondiscriminatory restrictions' upon [voters' Fourteenth Amendment rights], 'the State's important regulatory interests are generally sufficient to justify' the restrictions." Id. (quoting Anderson, 460 U.S. at 788). Under this framework, the court must balance North Carolina's precise interests against the burden imposed by the elimination of SDR.

Plaintiffs' claims under this test are not based on race, but on their right to vote generally. (Doc. 167 at 122.) Plaintiffs do not argue that strict scrutiny applies in this case and thus concede that the repeal of SDR does not create a severe burden on the right to vote. In any event, the Court essentially resolved this question in Crawford. The plurality recognized that "[f]or most voters who need them, the inconvenience of making a trip to the [Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." 553 U.S. at 198 (plurality opinion). Even though the plurality recognized that the requirements may create a special burden for some voters, it found that it is unlikely the voter ID law "would pose a

constitutional problem unless it is wholly unjustified." Id. at 199. The burden imposed by the repeal of SDR – that is, the requirement that voters register at least 25 days before Election Day – is even less than the one at issue in Crawford. This is particularly true because voters may register without making a trip anywhere; they simply must mail the proper form to their CBOE along with a copy of a HAVA-compliant ID. See id. at 205 (Scalia, J., concurring in the judgment) ("Ordinary and widespread burdens, such as those requiring 'nominal effort' of everyone, are not severe." (quoting Clingman v. Beaver, 544 U.S. 581, 591 (2005)). Thus, the Anderson-Burdick framework is applicable here.

It is equally clear that, under Crawford, a requirement to register 25 days before Election Day constitutes a "reasonable, nondiscriminatory restriction[]" on the right to vote. Id. at 190 (plurality opinion) (quoting Burdick, 504 U.S. at 434). The law's reasonableness is evidenced by the fact that an overwhelming majority of States have chosen to close their registration books some time before Election Day, and that this choice has been sanctioned both by the Supreme Court, see Marston, 410 U.S. at 681, and by Congress in the NVRA, 42 U.S.C. § 1973gg-6(a)(1). The burden is also nondiscriminatory in the sense that it applies to every voter without regard to race or other classification. See Crawford, 553 U.S. at 205 (Scalia,

J., concurring in the judgment). As such, the Court has recognized that a State's legitimate regulatory interests are generally sufficient to uphold such a restriction. <u>Burdick</u>, 504 U.S. at 434.

Here, the slight burden imposed by the 25-day cut-off is more than justified by the State's important interest in detecting fraud and ensuring that only properly verified voters have their votes counted at the canvass. <u>See</u> <u>supra</u> Part III.B.1-2. While the removal of the SDR option will affect some voters more than others, this is not the standard upon which voting regulations are judged under <u>Anderson</u>-<u>Burdick</u>. As Justice Scalia explained in <u>Crawford</u>, "[t]he Indiana law affects different voters differently, but what petitioners view as the law's several light and heavy burdens are no more than the different impacts of the single burden that the law uniformly imposes on all voters." 553 U.S. at 205 (citations omitted). Supreme Court precedents "refute the view that individual impacts are relevant to determining the severity of the burden it imposes." <u>Id.</u> For example, the write-in ballot prohibition in <u>Burdick</u> was upheld despite the fact that it entirely deprived the plaintiff of his right to vote for his candidate of choice.[50]

_____

[50] The court recognizes that the district court in <u>Frank</u>, in evaluating the burden imposed by Wisconsin's voter ID law, determined that a burden should be assessed based upon its effect on a subgroup of voters. 2014 WL 1775432, at *5. The court concluded that <u>Crawford</u>

See id. at 205-06 (comparing the Burdick majority, which upheld the prohibition after assessing the burden on voters generally, with the dissent, which would have struck down the restriction because of its effect on specific voters). Thus, the court must consider the burden on "voters generally." Id. at 206.

Under this standard, the burden imposed by elimination of SDR is slight – much less severe than the burden created by the voter ID law at issue in Crawford. As Defendants have articulated an important interest directly served by the elimination of SDR – not counting votes of those whose registrations have not been properly verified - the court finds that Plaintiffs have not demonstrated a likelihood of success on the merits on this portion of their Anderson-Burdick claim. Therefore, Plaintiffs' motion to preliminarily enjoin SL 2013-381's elimination of SDR on this basis will be denied.

---

did not constitute binding authority on this question because the plurality "seemed to assume that a law could be invalid based on its effect on a subgroup of voters." Id. at *4. To be sure, no position on this issue received five votes in Crawford. But this conclusion seems to be at odds with Justice Scalia's observation that "Clingman's holding that burdens are not severe if they are ordinary and widespread would be rendered meaningless if a single plaintiff could claim a severe burden." Crawford, 553 U.S. at 206. Such a conclusion also appears inconsistent with the result in Burdick itself, as the plaintiff who sought to vote for a write-in candidate was entirely disenfranchised by the restriction. The Wisconsin Supreme Court also declined to follow the analysis in Frank, concluding that doing so would "stand[] the Anderson/Burdick analysis on its head." Milwaukee Branch of the NAACP, 2014 WL 3744073, at *8 n.9.

## 4. Twenty-Sixth Amendment

Intervenors challenge the elimination of SDR under the Twenty-Sixth Amendment, which provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." Because the elimination of SDR allegedly impacts voters in the 18- to 24-year-old age bracket disproportionally, Intervenors urge the court to apply the Arlington Heights framework to a claim of age discrimination in voting under the Twenty-Sixth Amendment. While it is true that the Twenty-Sixth Amendment was patterned after the Fifteenth, see Walgren v. Howes, 482 F.2d 95, 101 (1st Cir. 1973), no court has ever applied Arlington Heights to a claim of intentional age discrimination in voting. Nor has any court considered the application of the Twenty-Sixth Amendment to the regulation of voting procedure, such as the decision whether to offer SDR. Thus, Intervenors' Twenty-Sixth Amendment arguments present an issue of first impression in the federal courts.

However, it is unnecessary to decide at this stage whether Intervenors are likely to succeed on this novel claim. Unlike the Twenty-Sixth Amendment cases cited to the court, Intervenors do not proceed as a class, but rather as ten individuals. Cf. Walgren v. Bd. of Selectmen of Town of Amherst, 373 F. Supp.

624, 625 (D. Mass. 1974), aff'd by 519 F. 2d 1364 (1st Cir. 1975); Sloane v. Smith, 351 F. Supp. 1299, 1300 (M.D. Pa. 1972); see also, e.g., McCoy v. McLeroy, 348 F. Supp. 1034, 1036 (M.D. Ga. 1972). Consequently, they must present evidence that *they themselves* are entitled to the relief sought. They have presented no evidence that would permit the court to conclude that any of them is likely to suffer any irreparable harm before trial. Indeed, counsel for Intervenors indicated at the hearing that he did not intend to produce any evidence in support of Intervenors' claims because they had been unrebutted by Defendants.[51] (Doc. 164 at 31.) Without evidence of irreparable harm, however, the court cannot grant injunctive relief to a particular plaintiff. Thus, Intervenors' motion for preliminary injunction against SL 2013-381 because it allegedly violates the Twenty-Sixth Amendment will be denied.

## C. Out-of-precinct Provisional Voting

In 2002, Congress passed HAVA, 42 U.S.C. §§ 15301-15545. Under HAVA, states are required to offer provisional ballots to Election Day voters who changed residences within 30 days of an election but failed to report the move to their CBOE. See 42

---

[51] The only evidence Intervenors presented are three declarations attached to their supplemental brief on the issue of standing to raise their challenge to the elimination of pre-registration. (See Docs. 159-1 through 159-3.) These declarations contain no evidence that any Intervenor is likely to suffer irreparable harm absent an injunction requiring the State to continue offering SDR.

U.S.C. § 15482(a). However, such provisional ballots are only required to be counted "in accordance with State law." Id. § 15482(a)(4). After HAVA, in 2003 the General Assembly passed Session Law 2003-226 in order to bring North Carolina into compliance with federal law.

Soon after, two plaintiffs challenged the authority of the SBOE to count provisional ballots cast outside the voter's correct precinct – referred to as "out-of-precinct provisional ballots." The North Carolina Supreme Court held that the counting of such ballots violated State law. James v. Bartlett, 607 S.E.2d 638, 642 (N.C. 2005) ("The plain meaning of [N.C. Gen. Stat. § 163-55 (2003)] is that voters must cast ballots on election day in their precincts of residence."). In response, the General Assembly passed Session Law 2005-2, amending Section 163-55 to remove the requirement that voters appear in the proper precinct on Election Day in order to vote. 2005 N.C. Sess. Law 2, § 2 (codified at N.C. Gen. Stat. § 163-55(a) (2006)). The law provided that "[t]he [CBOE] shall count [out-of-precinct provisional ballots] for all ballot items on which it determines that the individual was eligible under State or federal law to vote." Id. § 4 (codified at N.C. Gen. Stat. § 163-166.11(5) (2006)).

Passage of SL 2013-381 reinstated the James court's interpretation of State law by prohibiting the counting of out-

of-precinct provisional ballots. Section 163-55(a) now provides: "Every person born in the United States, and every person who has been naturalized, and who shall have resided in the State of North Carolina and in the precinct in which the person offers to vote for 30 days next preceding an election, shall, if otherwise qualified as prescribed in this Chapter, be qualified to vote in the precinct in which the person resides." Section 163-166.11(5) provides that a "ballot shall not be counted if the voter did not vote in the proper precinct under [section] 163-55, including a central location to be provided by that section." Thus, if a voter appears at the wrong precinct on Election Day, he or she will have to get to the proper precinct before the close of the polls in order to cast a valid vote.

All Plaintiffs move to enjoin the prohibition on counting out-of-precinct provisional ballots. They rely on the same four legal theories, which will be addressed in turn.

### 1. Section 2 results claims

In order to show likelihood of success on the merits of their Section 2 results claims, Plaintiffs must show that the system put in place by SL 2013-381 with respect to out-of-precinct provisional ballots interacts with historical and current conditions to deny black North Carolinians equal access to the polls. As noted above, for purposes of these motions the

court accepts that North Carolina's history of official discrimination against blacks has resulted in current socioeconomic disparities with whites. Particularly relevant for the purposes of out-of-precinct voting are the following: (1) between the years 2006 and 2010, an average of 17.1% of blacks in North Carolina moved within the State, as compared to only 10.9% of whites (J.A. at 1228); and (2) 27% of poor blacks in North Carolina lack access to a vehicle, compared to 8.8% of poor whites (J.A. at 1155). Also, the court accepts the determinations of Plaintiffs' experts that the prohibition on counting out-of-precinct provisional ballots will disproportionally affect black voters. (E.g., J.A. at 728-34 (report of Plaintiffs' expert Dr. Allan J. Lichtman), 868-69, 878 (report of Dr. Stewart).) However, Plaintiffs have nevertheless not shown an inequality of opportunity under the totality of the circumstances and thus a likelihood of success on the merits of this claim.

First, although failure to count out-of-precinct provisional ballots will have a disproportionate effect on black voters, such an effect will be minimal because so few voters cast them. According to Dr. Stewart's calculations, which the court accepts, approximately 3,348 out-of-precinct provisional ballots cast by black voters were counted to some extent in the 2012 general election. (J.A. at 878.) This represents 1.16% of

the votes cast by black voters on Election Day.[52] (Id.) Because 70.5% of black voters voted early in 2012, the total number of blacks utilizing out-of-precinct voting represents 0.342% of the black vote in that election. (J.A. at 616, 878.) Dr. Stewart also estimates that white voters cast 6,037 out-of-precinct provisional ballots that were at least partially counted in that same election, accounting for 0.44% of Election Day votes. (J.A. at 878.) After accounting for the percentage of white voters that voted early, the total share of the overall white vote that voted out-of-precinct was 0.21%.[53] (J.A. at 616, 878.) These numbers suggest that a system prohibiting the counting of out-of-precinct provisional ballots will not result in unequal access to the polls; nearly 99.7% of black voters in 2012 either voted in the correct precinct on Election Day or utilized early voting. Moreover, the existence of early voting without regard to precinct tends to reduce any inequality even further, because those who would vote out-of-precinct have ample opportunity to vote at a location more convenient to them. (See J.A. at 2635

---

[52] Voters may only cast out-of-precinct votes on Election Day because early voters may present themselves at any early-voting site in the county in order to vote.

[53] The numbers were similar during the 2010 general election, when even fewer out-of-precinct ballots were cast. (See J.A. at 731 (noting that a total of 2,635 out-of-precinct provisional ballots were cast in 2010 and that 56.5% of those ballots with available racial information were cast by black voters).)

(noting seven different ways to vote without respect to precinct).)

Here, too, the court is concerned with the potential scope of a determination that North Carolina's failure to partially count out-of-precinct votes violates Section 2. As noted earlier in the context of SDR, the Section 2 results standard is not retrogression, but an assessment of equality of opportunity under the current system. The fact that North Carolina counted out-of-precinct provisional ballots for four federal election cycles before reversing course, while relevant for the purposes of determining disproportionate impact, does not affect the ultimate inquiry under Section 2. Thus, a determination that North Carolina is in violation of Section 2 merely for maintaining a system that does not count out-of-precinct provisional ballots could place in jeopardy the laws of the majority of the States, which have made the decision not to count such ballots.[54] A contrary interpretation would import the

---

[54] See Ala. Code §§ 17-9-10, 17-10-2(b)(2); Ariz. Rev. Stat. Ann. § 16-584; Ark. Code Ann. § 7-5-308(d)(2); 108-00-9 Ark. Code R. § 909;; Del. Code Ann. tit. 15, § 4948(h)(7); Fla. Stat. § 101.048(2)(b); Haw. Code R. § 3-172-140(c)(3); Ind. Code § 3-11.7-5-3(a); 31 Ky. Admin. Regs. 6:020(14); Me. Rev. Stat. tit. 21-A, § 673(A)(1)(A)(3)(c); Mass. Gen. Laws ch. 54, § 76C(d); Minn. Stat. § 201.016 (making voting outside the proper precinct after receiving an initial violation notice a petty misdemeanor); Miss. Code Ann. §§ 23-15-571(3)(a), (d), 23-15-573; Mo. Rev. Stat. § 115.425; Neb. Rev. Stat. § 32-1002(5)(e); Nev. Rev. Stat. § 293.3085(4); N.H. Rev. Stat. Ann. §§ 659:12, 659:27(II), 659:27-a; N.Y. Elec. Law § 8-502; Okla. Stat. tit. 26, § 7-116.1(C); S.C. Code Ann. §§ 7-13-820, 7-13-830; S.D. Codified Laws §

retrogression standard of Section 5 into Section 2 cases, making a plaintiff's case at least partially dependent on whether a State chose to count out-of-precinct provisional ballots at some point.  This cannot be the proper standard under Section 2.

Finally, the State has articulated a legitimate administrative interest in requiring Election Day voters to vote in their proper precinct.  The North Carolina Supreme Court said as much in James, when it noted that "our State's statutory residency requirement provides protection against election fraud and permits election officials to conduct elections in a timely and efficient manner."  James, 607 S.E.2d at 644.  The unanimous court also found that "[i]f voters could simply appear at any precinct to cast their ballot, there would be no way under the present system to conduct elections without overwhelming delays, mass confusion, and the potential for fraud that robs the validity and integrity of our elections process."  Id.

> The advantages of the precinct system are significant and numerous: it caps the number of voters attempting to vote in the same place on election day; it allows each precinct ballot to list all of the votes a citizen may cast for all pertinent federal, state, and local elections, referenda, initiatives, and levies; it allows each precinct ballot to list only those

12-20-5.1; Tenn. Code Ann. § 2-7-112(a)(3)(B)(iii), (v); Tex. Elec. Code Ann. § 63.011(a); Vt. Stat. Ann. tit. 17, § 2555(1)(C); Va. Code Ann. § 24.2-653(B); W. Va. Code § 3-1-41(d); Wis. Stat. §§ 6.92, 6.94; see also State ex rel. Painter v. Brunner, 941 N.E.2d 782, 794 (Ohio 2011) ("Under Ohio law . . . only ballots cast in the correct precinct may be counted as valid." (quoting Sandusky Cnty. Democratic Party v. Blackwell, 387 F.3d 565, 578 (6th Cir. 2004) (per curiam))).

> votes a citizen may cast, making ballots less
> confusing; it makes it easier for election officials
> to monitor votes and prevent election fraud; and it
> generally puts polling places in closer proximity to
> voter residences.

Id. at 644-45 (quoting Sandusky Cnty. Democratic Party, 387 F.3d at 569). The State's proffered justifications are consistent with the observations of the James court and the Sixth Circuit. (See Doc. 126 at 39-40.) Moreover, testimony presented at the hearing confirmed one of the State's concerns; Melvin F. Montford of Plaintiff North Carolina A. Phillip Randolph Institute testified that his organization's GOTV volunteers take prospective voters to the polls without regard to precinct. (Doc. 164 at 78.) Such activity has the potential to burden precincts, create confusion, and lead to mistakes and election fraud. Because the State's interest in the precinct system is significant and legitimate, it cannot be tenuous.[55]

In conclusion, the minimal usage of out-of-precinct ballots, ready availability of other methods of voting – including early voting and mail-in absentee balloting – without regard to precinct, and the State's legitimate interest in the precinct system all counsel against a Section 2 results finding.

---

[55] As Defendants further noted at the hearing and in their brief, to the extent voters who are recruited through GOTV efforts are not directed to their proper precinct for reasons of convenience, out-of-precinct voting has the potential of actually disenfranchising their vote to the extent they cast ballots for candidates not within their proper precinct (because such votes would not be counted). (See Doc. 126 at 40.)

Considering the totality of the circumstances, Plaintiffs have not demonstrated a likelihood of success on their Section 2 results claim with respect to the counting of out-of-precinct provisional ballots. Consequently, their motion for a preliminary injunction on this theory of recovery will be denied.

## 2. Racially discriminatory intent

Plaintiffs' Arlington Heights argument tracks the analogous argument discussed above with respect to SDR, with one major distinction. Plaintiffs contend that the decision to repeal the provisions for counting out-of-precinct provisional ballots was racially motivated because the General Assembly made a finding when it adopted the mechanism in SL 2005-2 that "of those registered voters who happened to vote provisional ballots outside their resident precincts on the day of the November 2004 General Election, a disproportionately high percentage were African-American." (J.A. at 2635.) While it can be assumed that the General Assembly is deemed to be aware of its prior findings, it does not follow that any future decision to reverse course evidences racial motivation. This is especially true given the legitimate interest articulated by both Defendants and the North Carolina Supreme Court. Moreover, the bill to "reconfirm" out-of-precinct voting was opposed by a significant

minority in both Houses in 2005.[56]

The legislative record contains no evidence that race motivated the opponents of SL 2005-2.[57] The record also contains no more evidence for the claim that race motivated out-of-precinct elimination in SL 2013-381 than it did with SDR, which the court has addressed. In fact, out-of-precinct provisional ballots were only occasionally mentioned during the three days of legislative debates on HB 589, while debate focused on other provisions such as voter ID, early voting, SDR, and the elimination of straight-ticket voting (which is not challenged in these cases). Specifically, the legislative record includes an explanation of the out-of-precinct provision in the Rules Committee meeting that states it "basically moves the law back to the way it was in 2005," making it so a voter "cannot vote in a random precinct." (Doc. 134-4 at 16-17.) Opponents did not attack the rationale for repealing out-of-precinct provisional voting in the Senate, and only Representative Glazier mentioned

---

[56] The bill passed the Senate 29-21 and the House 61-54. (J.A. at 2631-32.)

[57] The record indicates that the primary reason for Republican opposition to SL 2005-2 was the General Assembly's decision to apply the law to elections that had already taken place. (J.A. at 1204.) Republicans attempted to pass an amendment that would have applied the law only to future elections, but when that failed, "the bill rapidly passed both houses on party-line votes." (J.A. at 1206.) Thus, the race data in 2005 was, on this record, apparently unrelated to the motive of the opponents.

it in passing in the House. (J.A. at 2556.) Much like the decisions to enact and then repeal SDR, the injection of race data by itself by opponents of the bill cannot create a likelihood of discriminatory intent when a legitimate State interest – here, one expressly recognized by the North Carolina Supreme Court in James - animates the reversal of course. Given the lack of evidence regarding the consideration out-of-precinct voting, the court cannot conclude that the legislative record is indicative of impermissible intent.

Thus, considering the totality of the circumstances, the court concludes that Plaintiffs have not demonstrated a clear showing of likelihood of success on the merits insofar as racial discrimination is alleged to have been a motivating factor in the decision to prohibit the counting of out-of-precinct provisional ballots. Plaintiffs' motion for preliminary injunction on this basis, therefore, will be denied.

### 3. **Anderson-Burdick**

The private Plaintiffs also challenge SL 2013-381's prohibition on counting out-of-precinct provisional ballots under the Anderson-Burdick balancing test. As the court has already concluded with respect to SDR, because the requirement to vote in one's correct precinct applies to each voter equally, the relevant burden under Anderson-Burdick is that which applies to voters generally. Of course, the requirement will *affect*

voters who would have voted out-of-precinct more than it will *affect* those who vote early or who normally vote at their precinct of residence. But this is not the proper standard under Anderson-Burdick. Like the decision not to offer SDR, the current law prohibiting the counting of out-of-precinct provisional ballots "imposes only 'reasonable, nondiscriminatory restrictions,'" and therefore "the State's important regulatory interests are generally sufficient to justify" the law. Burdick, 504 U.S. at 434 (quoting Anderson, 460 U.S. at 788).

The minor nature of the burden imposed is demonstrated by the fact that less than one-half of one percent of voters utilized the option to cast an out-of-precinct provisional ballot in the 2012 general election. Cf. Crawford, 553 U.S. at 188 n.6 (plurality opinion) (noting that the district court found 99% of Indiana residents already possessed an ID meeting the criteria under State law). Additionally, there are other ways to vote, including during the early-voting period and absentee by mail, which do not require the voter to appear at the proper precinct. As the North Carolina Supreme Court stated, "it is but a perfunctory requirement that voters identify their proper precinct and appear within that precinct on election day to cast their ballots." James, 607 S.E.2d at 645. Indeed, it is hard to imagine how the elimination of out-of-precinct voting constitutes an impermissible burden when the

majority of States have decided, apparently lawfully, not to offer it. See supra n.54. Because any slight burden is justified by an important and legitimate State interest, see supra Part III.C.1, Plaintiffs have not demonstrated a likelihood of success on the merits of their Fourteenth Amendment Anderson-Burdick claim. Their motion to enjoin those provisions on that ground, therefore, will be denied.

### 4. Twenty-Sixth Amendment

Intervenors also argue that the prohibition on counting out-of-precinct provisional ballots violates the Twenty-Sixth Amendment because it has the purpose and effect of discriminating in voting based on age. As noted above as to SDR, however, none of the ten Intervenors has presented any evidence that *they* will likely suffer irreparable harm before trial in the absence of an injunction. See supra Part III.B.4. Thus, they have not demonstrated entitlement to preliminary relief, and their motions to preliminarily enjoin the prohibition on counting out-of-precinct provisional ballots will be denied.

### D. Early Voting

"No-excuse" early voting[58] was established for even-year general elections in North Carolina beginning in 2000. 1999 N.C.

---

[58] "No-excuse" refers to the fact that voters need not present any justification in order to vote before Election Day.

Sess. Law 455, § 1 (codified at N.C. Gen. Stat. §§ 163-226(a1), 163-227.2(a1) (2000)). At that point, a registered voter could present herself at the CBOE office in her county of residence "[n]ot earlier than the first business day after the twenty-fifth day before an election . . . and not later than 5:00 p.m. on the Friday prior to that election" to cast her ballot. N.C. Gen. Stat. § 163-227.2(b) (2000). After the 2000 election cycle, the General Assembly expanded no-excuse early voting to all elections. 2001 N.C. Sess. Law 337, § 1. It also amended the early-voting period so that voters could appear at the CBOE office to vote "[n]ot earlier than the third Thursday before an election . . . and not later than 1:00 P.M. on the last Saturday before that election." 2001 N.C. Sess. Law 319, § 5(a) (codified at N.C. Gen. Stat. § 163-227.2(b) (2002)). Under this law, CBOEs were required to remain open for voting until 1:00 p.m. on that final Saturday, but retained the discretion to allow voting until 5:00 p.m. Id. They were also permitted to maintain early-voting hours during the evening or on weekends throughout the early-voting period.[59] Id. §5(b) (codified at N.C. Gen. Stat. § 163-227.2(f) (2002)).

The challenged provision makes two changes to the

---

[59] CBOEs were, and still are, also permitted to open additional early-voting sites other than the CBOE office by unanimous vote of the board members. N.C. Gen. Stat. § 163-227.2(g).

permissible duration of the early-voting period.  First, early voting must now begin "[n]ot earlier than the second Thursday before an election," a reduction of one week of permissible early-voting days.  2013 N.C. Sess. Law 381, Part 25 (codified at N.C. Gen. Stat. § 163-227.2(b)).  As such, SL 2013-381 reduces the number of permissible early-voting days from 17 to ten throughout the State.  Second, it eliminates the discretion of the CBOEs to keep early-voting sites open until 5:00 p.m. on the final Saturday before Election Day, instead mandating that early voting end at 1:00 p.m. everywhere.  Id.

However, the decrease in permissible days is coupled with a required increase in voting hours.  SL 2013-381 requires the CBOEs, before the 2014 elections, to "calculate the cumulative total number of scheduled voting hours at all sites during the 2010 . . . elections" and "ensure that at least the same number of hours offered in 2010 is offered for [early voting] under this section through a combination of hours and numbers of [early-voting] sites during the . . . election."  N.C. Gen. Stat. § 163-227.2(g2)(2).[60]  In other words, counties must generally offer the same number of aggregate hours of early voting this November 2014 as they did in November of 2010.  The

---

[60] CBOEs must make the same calculation with respect to the 2012 elections in 2016, and then must offer the same number of aggregate hours in 2016 as in 2012.  Id. § 163-227.2(g2)(1).

CBOEs can meet this requirement either by opening more early-voting sites or keeping the existing sites open for more hours, including expanding weekend voting. See id. § 163-227.2(f) ("A county board may conduct [early] voting during evenings or on weekends, as long as the hours are part of a plan submitted and approved according to subsection (g) of this section."). SL 2013-381 also requires that each early-voting site within a county maintain the same hours of operation as every other site in that county. Id. § 163-227.2(g).

In the event a county determines that it either cannot meet the aggregate-hours requirement or that additional hours are unnecessary, it may seek a waiver. A CBOE may only decide to seek a waiver "by unanimous vote of the board, with all members present and voting." Id. § 163-227(g3). The waiver request is then transmitted to the SBOE, where it also must be approved by a unanimous vote before a county will be granted a waiver. Id. Absent a waiver, counties must either open more early-voting sites or keep existing sites open longer to satisfy SL 2013-381's aggregate-hours requirement.

All Plaintiffs, including Intervenors, seek to enjoin enforcement of SL 2013-381's early-voting provisions. Plaintiffs' claims are brought under the same four legal theories discussed above. Plaintiffs' principal arguments are the following: (1) the reduction in early-voting days will lead

95

to long lines both during early voting and on Election Day, deterring black and young voters from participating in the election; (2) seven fewer days will make it harder for GOTV operations to target black voters who need transportation to the polls and otherwise would not vote; (3) the aggregate-hours amendment will not compensate for the lost days because counties cannot add more hours during the mid-day times that voters prefer to use, and over 30 counties obtained a waiver from the requirement during the May 2014 primaries; and (4) the seven lost days will result in fewer Sunday voting hours, which are particularly important to black voters and GOTV operations because of "souls to the polls" efforts by churches. Defendants generally contend that the State is not required to have any early voting and that no State action prevents black and young voters from voting on the remaining ten days of early voting, by absentee ballot, or on Election Day.

Even assuming, without deciding,[61] that Plaintiffs can show a likelihood of success on the merits on any of their early-

---

[61] It is noteworthy that the United States conceded at the hearing it has never previously taken the position that a State was in violation of Section 2 for failing to have any, much less a particular number of, days of early voting. (Doc. 166 at 192.) It also conceded that it has previously pre-cleared states for significant reductions in early-voting periods. (Id. at 223; see also Florida, 885 F. Supp. 2d at 332 n.39 (noting that Georgia was pre-cleared for a reduction of their early-voting period from 45 to 21 days).) Additionally, Plaintiffs have cited no decision from any court finding a State in

voting claims, they have not made the necessary clear showing of irreparable harm during the November 2014 general election to warrant the entry of a preliminary injunction. First, Plaintiffs' arguments regarding long lines are not supported factually with respect to the upcoming election. Neither party has proffered any evidence of expected turnout in the fall, but it is undisputed that turnout will be significantly lower than it was during the presidential elections of 2008 and 2012.[62] For example, in the November 2008 presidential election, 706,445 voters utilized the first seven days of early voting. (J.A. at 1543.) In the 2010 midterm, however, just 208,051 voters – 29.4% of the 2008 total – used those days. (Id.)

There is also no evidence in the record that it is likely that counties will not be able to handle the turnout this fall with the remaining ten days.[63] Indeed, Senator Stein's amendment

violation of Section 2 for failing to maintain a particular number of early-voting days.

[62] The record reflects that the 2010 midterm (which hosted a contested U.S. Senate race between the incumbent Senator and the Democratic challenger) is the most recent comparable contest to this fall's election. Although there was some speculation at the hearing that turnout in November 2014 may exceed that in 2010 because of the contested U.S. Senate race, no party contends that turnout will approach presidential-year levels. See J.A. at 790 n.4 (expert report of Dr. Stewart) (noting that turnout for 2006 and 2010 averaged 46.9% less than that of 2008 and 2012).

[63] An "important part" of Plaintiffs' argument on longer lines is an Internet poll of 334 North Carolina voters discussed in Dr. Stewart's report. (Doc. 166 at 186-87; J.A. at 852.) However, methodological challenges aside, the data in that study relate to the 2008 and 2012

to require the same number of aggregate hours for comparable elections, which was adopted, was designed to ameliorate the effect of any lost days on everyone, including African-Americans. (Doc. 134-4 at 111.) Moreover, in 2010, the racial disparity in early-voting usage that was observed in 2008 and 2012 all but disappeared; the statistics show blacks used early voting at a rate nearly comparable with that of whites during that midterm election.[64] The same is true of young voters, who used early voting at a lower rate than blacks or whites as a whole in 2010.[65]

Furthermore, Plaintiffs' generalized arguments with respect to Sunday voting lack force in the context of the preliminary injunction standard. Only seven of North Carolina's 100 counties offered any Sunday voting in the 2010 general election,

general elections, which have much higher turnout as presidential elections. Thus, the study's conclusions have limited persuasiveness for the 2014 election cycle. Indeed, Plaintiffs' expert Dr. Theodore Allen testified that he did not include any midterm election data in his report concluding that waiting times would increase on Election Day due to the elimination of seven days of early voting. (Doc. 163-9 at 78-79.)

[64] In 2010, 36% of all black voters that cast ballots utilized early voting, as compared to 33.1% of white voters. (J.A. at 616.) By comparison, in the presidential elections of 2008 and 2012, over 70% of black voters used early voting compared to just over 50% of white voters. (Id.) In addition, 80.2% of the voters using the first week of early voting in 2010 were white. (J.A. at 1543.)

[65] In the 2010 general election, 28.2% of young voters (ages 18-24) voted early. (J.A. at 1444.) In the 2012 and 2008 general election, this age cohort voted early at approximately the same rate as white voters as a whole; 53.1% in 2012 and 49.4% in 2008. (Id.)

i.e., before SL 2013-381 was enacted.[66]  (Doc. 126-4 at 45-90.)
Even among those seven, none offered any voting hours during the
first Sunday of the early-voting period – October 17, 2010.[67]
Thus, Plaintiffs' claims that the number of Sunday voting days
has been "cut in half" by SL 2013-381 are unsubstantiated, at
least for the purposes of a preliminary injunction sought for
the November 2014 cycle.[68]  The seven counties offering Sunday
voting may still offer it on the second Sunday before Election

---

[66] The seven counties offering Sunday voting were Mecklenburg
(Charlotte), Wake (Raleigh), Guilford (Greensboro), Forsyth (Winston-
Salem), Durham (Durham), Pitt (Greenville), and Vance (Henderson).
(Doc. 126-4 at 57-58, 61-62, 71-73, 78, 86-87.)   The first five of
these are among the six most populous counties in North Carolina.

[67] Durham County offered Sunday voting at the CBOE office from 12:00
p.m. to 3:00 p.m. on the second available Sunday – October 24 – and
two additional sites without Sunday voting.  (Id. at 57.)   Forsyth
County offered Sunday voting at the CBOE office from 1:00 p.m. to 5:00
p.m. on October 24 and maintained seven other sites not offering any
Sunday voting.  (Id. at 58.)   Guilford County offered nine Sunday
voting sites opened between 12:00 p.m. and 4:00 p.m. on October 24 and
two sites without Sunday voting.  (Id. at 61-62.)   Mecklenburg County
– the State's most populous county – offered 16 sites open from 1:00
p.m. to 4:00 p.m. on October 24.  (Id. at 71-73.)   Pitt County offered
one site open from 1:00 p.m. to 5:00 p.m. on October 24 in addition to
three sites not offering Sunday voting.  (Id. at 78.)   Vance County
provided two sites open from 1:00 p.m. to 5:00 p.m. on October 24.
(Id. at 86.)   Finally, Wake County offered nine sites open from 1:00
p.m. until 5:00 p.m. on that second Sunday.  (Id. at 86-87.)

[68] The court notes that Gloria Hill of the Hoke County Board of
Elections testified that in some cases black voters in her county
would not be able to get to the polls without Sunday voting.  (Doc.
164 at 154-55.)   But Hoke County did not maintain any Sunday voting
hours in the 2010 general election.  (Doc. 126-4 at 64.)   It offered
only two sites with an aggregate total of 11 weekend hours, all on the
Saturday before Election Day.  (Id.)

Day – October 26, 2014 – under SL 2013-381.[69]  It will not be possible for many counties to comply with the aggregate-hours requirement of N.C. Gen. Stat. § 163-227.2(g2) if they were to cut existing Sunday hours or voting sites.  Plaintiffs' request asks the court to assume that some counties will obtain waivers for the general election as they did for the primary elections, but there is no indication they will and such speculation would be inconsistent with the Supreme Court's direction that a preliminary injunction should not be granted "based on only a possibility of irreparable harm."  Winter, 555 U.S. at 22.  Because Plaintiffs have the burden to make a clear showing of that irreparable harm is *likely*, the court must assume that counties will comply with the law until it is shown that they will not.[70]  Plaintiffs have not shown that any fewer Sunday

---

[69] For example, Durham County will have four early-voting sites this November (as opposed to three in 2010), and all four will feature Sunday voting from 2:00 p.m. through 6:00 p.m.  See N.C. State Bd. of Elections, N.C. One-Stop Voting Site Results – November 4, 2014 Election, http://www.ncsbe.gov/webapps/os_sites/OSVotingSiteList.aspx?County=DURDUR&Election=11/04/2014 (last visited Aug. 5, 2014).  This represents an increase of 13 aggregate Sunday voting hours.  One of the new Sunday voting sites is located on the campus of North Carolina Central University, a historically black university.  Id.  Wake County will offer Sunday voting at eight sites between the hours of 1:00 p.m. and 5:00 p.m., a decrease of just four aggregate hours throughout the county.  See N.C. State Bd. of Elections, N.C. One-Stop Voting Site Results – November 4, 2014 Election, http://www.ncsbe.gov/webapps/os_sites/OSVotingSiteList.aspx?County=WAKE&Election=11/04/2014 (last visited Aug. 5, 2014).

[70] In fact, Michael Dickerson, chair of the Mecklenburg County Board of Elections, testified that his county would be able to meet the aggregate-hours requirement by opening up more early-voting sites.

hours will be offered this year than in the 2010 general election.[71]

_____

(Doc. 160-2 at 7-10.)  He stated that he expected the Mecklenburg CBOE would open five additional sites as compared to November 2010.  (Id. at 10.)

[71] Plaintiffs also contend that SL 2013-381's removal of one possible Saturday for early voting and mandate that early-voting sites on the final Saturday before Election Day close at 1:00 p.m. will cause them harm.  But the reality of what counties actually offered in 2010 belies this contention.  Only eight of the State's 100 counties exercised their discretion to keep a voting site open after 1:00 p.m. on the final Saturday of early voting in 2010.  (Doc. 126-4 at 45-90.) None of these counties was among the State's most populous; Harnett County, the State's 24th most populous county, is the largest that made the choice to remain open past 1:00 p.m. in 2010.  (Id. at 62.) Only three of the eight counties to stay open past 1:00 p.m. had at least one site open until 5:00 p.m. on the last Saturday.  (Id. at 51, 65-66, 69.)  In 2010, Harnett County had three sites open on the final Saturday from 8:00 a.m. through 3:00 p.m., and in 2014 it will have four sites open from 6:30 a.m. through 1:00 p.m., accounting for an increase of five aggregate final Saturday hours.  See N.C. State Bd. of Elections, N.C. One-Stop Voting Site Results – November 4, 2014 Election  http://www.ncsbe.gov/webapps/os_sites/OSVotingSiteList.aspx? County=HARNETT&Election=11/04/2014 (last visited Aug. 5, 2014).  This surely cannot constitute irreparable harm.

In addition, only 14 counties offered any voting on the first Saturday available in 2010.  (Id. at 45-90.)  Once again, the largest counties (Mecklenburg, Guilford, Forsyth, Wake, Durham, and Cumberland) offered no hours of early voting on the first Saturday. (Id.)  The counties that chose to offer voting on the first Saturday in 2010 will have two additional Saturdays in 2014 as well as one Sunday (on which none of them previously offered voting) to make up the required hours.  Voters will have no fewer than two Saturdays of early voting in counties that previously offered three Saturdays.  In most counties, including the six largest, the weekend voting situation will remain unchanged from 2010.  Indeed, counties may actually be compelled to add *more* weekend hours to comply with the aggregate-hours requirement.  For example, Chatham County will now offer four sites with 33 aggregate hours of voting on the second Saturday before Election Day, as opposed to three sites and 15 aggregate hours in 2010.  See N.C. State Bd. of Elections, N.C. One-Stop Voting Site Results – November 4, 2014 Election, http://www.ncsbe.gov/web apps/os_sites/OSVotingSiteList.aspx?County=CHATHAM&Election=11/04/2014 (last visited Aug. 5, 2014).  This falls far short of the showing necessary to demonstrate irreparable harm.

Plaintiffs' witnesses opined that the loss of one week of early voting will hamper GOTV efforts and thus depress black turnout. (Doc. 164 at 74-76 (testimony of Melvin F. Montford); Doc. 165 at 95-97 (testimony of Rev. Jimmy Hawkins).) But no witness testified that he or she will not be able adjust operations readily to fit the new early-voting period. Cf. Brown, 895 F. Supp. 2d at 1253-54 (citing Florida, 885 F. Supp. 2d at 336) (finding that, despite testimony suggesting a two-week period was essential to GOTV efforts, groups would be able to adjust to a new distribution of hours over fewer days). In fact, one witness testified that even 17 days was not sufficient for his efforts and that a whole month of early voting would be preferable. (Doc. 165 at 100.) This suggests that although GOTV operators would prefer more days of early voting, they will be able to adjust to a reduced schedule of days with more voting sites and hours. This is especially true for the purposes of irreparable harm in the lower-turnout 2014 midterm election.[72]

Finally, Plaintiffs argue that historically black voters disproportionately used the first week of early voting under the old law and that SL 2013-381 "takes that away." This is a

---

[72] The court also acknowledges that data from the May 2014 primary suggest that black turnout increased more than did white turnout when compared with the May 2010 primary. (See Doc. 126-1 ¶¶ 61-67.) Although this tends to weigh against a finding of irreparable harm, it is of limited significance because of the many noted differences between primaries and general elections.

reformulation of the same argument. The evidence shows that black voters utilized the initial days of early voting more than white voters. To say that they will no longer use the first seven days of the new ten-day period is speculative and insufficient to show irreparable harm.

On this record, Plaintiffs have failed to carry their burden to make a clear showing that they are likely to be irreparably harmed by the reduction of seven possible days of early voting.[73] Thus, even assuming Plaintiffs will succeed at trial on the merits of their claims as to the early-voting changes of SL 2013-381, they have not met this important prerequisite for entry of a pretrial injunction, and their motion will be denied.

**E.   Voter ID "Soft Rollout"**

SL 2013-381 institutes for the first time in North Carolina a requirement that a voter "present photo identification bearing any reasonable resemblance to that voter to a local election

---

[73] In assessing likelihood of success on the merits, the Brown court recognized the ameliorative effect of the increased hours significantly lessened the burden on voters. See Brown, 895 F. Supp. 2d at 1252. The court also noted that the new Florida law would actually increase weekend hours, creating a further ameliorative effect. Id. at 1253. The same analysis applies here in the context of irreparable harm for the 2014 midterm election. As discussed above, see supra nn.67, 69-71, SL 2013-381 will likely result in either no change or an increase in the total number of weekend voting hours for voters in most counties in 2014.

official at the voting place before voting."[74]   N.C. Gen. Stat. § 163-166.13(a).   The new law provides three exceptions: for voters who are permitted to vote curbside under Section 163-166.9, those who have a religious objection to being photographed, and those who have been the victim of a natural disaster occurring within 60 days of Election Day.   Id. § 163-166.13(a)(1)-(3).   Any voter who does not comply with the ID requirement will be permitted to vote a provisional ballot, which will be counted if the voter appears at her CBOE before noon on the day prior to the convening of the election canvass and presents a form of photo ID bearing a reasonable resemblance to herself.   Id. § 163-182.1A(b)(1).   The voter may also choose to execute a declaration of religious objection at that time. Id. § 163-182.1A(b)(2).

If a local election official determines that a voter's photo identification "does not bear any reasonable resemblance

---

[74] Acceptable forms of photo identification include (1) a North Carolina driver's license; (2) a special identification card for nonoperators; (3) a United States passport; (4) a United States military identification card; (5) a Veterans Identification Card issued by the United States Department of Veterans Affairs; (6) a tribal enrollment card issued by a federally recognized tribe; (7) a tribal enrollment card issued by a tribe recognized by North Carolina, so long as it is signed by an elected official of the tribe and the requirements for obtaining it are equivalent to the requirements for obtaining a special identification card from the DMV; and (8) a driver's license or nonoperator's identification card issued by another State or the District of Columbia so long as the voter registered to vote within 90 days of Election Day.   Id. § 163-166.13(e)(1)-(8).

to that voter," she must "notify the judges of election of the determination." Id. § 163-166.14(a). The judges of election then must review the photo identification and determine if it bears any reasonable resemblance to the voter. Id. § 163-166.14(b). The judges may take into account additional evidence proffered by the voter and must construe all evidence in the light most favorable to the voter. Id. Unless the judges unanimously determine that the voter's photo identification bears no reasonable resemblance to him or her, the voter will be allowed to vote. Id. § 163-166.14(c). If the judges unanimously agree that the identification is invalid, the voter will be permitted to vote a provisional ballot. Id. § 166-166.14(d).

SL 2013-381 requires the State to provide a special photo identification card free of charge to any registered voter who executes a declaration "stating the registered voter is registered and does not have other photo identification acceptable under [the photo ID requirement]." Id. § 20-37.7(d)(5). The State must also provide a free photo identification card to anyone appearing before the DMV for the purpose of registering to vote who declares that she does not have an acceptable photo ID. Id. § 20-37.7(d)(6). In addition, the State may not charge the usual ten dollar fee to obtain a copy of one's birth certificate or marriage license if the

registered voter declares she needs such document in order to obtain acceptable photo ID.  Id. § 130A-93.1(c).

SL 2013-381's voter ID requirement does not take immediate effect.  Instead, Section 6.2 of the law provides that the requirement to present valid photo ID "becomes effective January 1, 2016, and applies to primaries and elections conducted on or after that date."  2013 N.C. Sess. Law 381, § 6.2(2).  Before the 2016 elections, the law provides for a "soft rollout" of the voter ID requirement, such that,

> [a]t each primary and election between May 1, 2014, and January 1, 2016, each voter presenting in person shall be notified that photo identification will be needed to vote beginning in 2016 and be asked if that voter has one of the forms of photo identification appropriate for voting.  If that voter indicates he or she does not have one or more of the types of photo identification appropriate for voting, that voter shall be asked to sign an acknowledgment of the photo identification requirement and be given a list of types of photo identification appropriate for voting and information on how to obtain those types of photo identification.

Id. § 6.2(6).[75]

_____

[75] The "soft rollout" appears to be patterned after a bipartisan report drafted by former President Jimmy Carter and former Secretary of State James A. Baker, III.  See Crawford, 553 U.S. at 193-94 (citing Comm'n on Federal Election Reform, Building Confidence in U.S. Elections (2005)).  That report recommended that States adopt a photo ID requirement for voting if it is "'phased in' over two federal election cycles, to ease the transition."  Id. at 238 (Breyer, J., dissenting).  In fact, Justice Breyer based his objection to the Indiana voter ID law in part on the fact that Indiana failed to follow this recommendation.  Id.  He also objected to what he saw as Indiana's failure to abide by the Carter-Baker report's other condition - that IDs "be easily available and issued free of charge."  Id. at 238-39.  As noted infra, SL 2013-381 purports to alleviate the cost of

106

The private Plaintiffs move to enjoin the "soft rollout" on the ground that it will create confusion and long lines at polling places and increase the costs associated with voting, and because the State has not engaged in any public education campaigns or properly trained poll workers to handle the rollout. While Plaintiffs urge they are likely to succeed on the merits of their claims that the voter ID requirement violates Section 2 and the Constitution, the court need not reach that issue at this time.[76] Plaintiffs have not made a clear showing that SL 2013-381's notice provisions for the implementation of the requirement, which does not become effective until 2016, will cause irreparable harm in the upcoming November 2014 general election.

Plaintiffs rely on the declarations of a husband and wife in Pitt County who state they were improperly advised they

---

obtaining an ID for those who need to obtain one. <u>Compare</u> N.C. Gen. Stat. § 130A-93.1(c) (waiving the usual ten dollar fee for obtaining a birth certificate or marriage license if a voter declares she needs such a document in order to vote), <u>with</u> <u>Crawford</u>, 553 U.S. at 239 (noting that those needing a birth certificate in Indiana would still have to pay the State's usual 12 dollar fee, and the indigency exception required voters to travel to the county clerk's office after each election to sign an affidavit).

[76] Defendants argue that the requirement serves important State interests and is constitutional, citing <u>Crawford</u>. <u>See</u> <u>Crawford</u>, 553 U.S. at 194-200 (plurality opinion) (noting that a properly-drafted voter ID law advances the important State interests of preventing election fraud and maintaining confidence in elections).

needed a photo ID in order to vote in the May 2014 primary (but were able to vote).[77] (J.A. at 2821-27.) Plaintiffs argue the State's failure to allocate funds to educate poll workers on the nature of the soft rollout suggests that voters are likely to be denied the right to vote due to confusion created by the effective date of the new law. But this limited evidence fails to show a likelihood that poll workers will misinterpret the clear requirements of State law that voters are not to be turned away for failure to present an ID this fall. As the Supreme Court clarified in Winter, a plaintiff seeking preliminary relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction." 555 U.S. at 22 (emphasis in original).[78] Arguments concerning longer lines are speculative; there is no showing that the "soft rollout" will cause confusion or undue lines during the November 2014 election. Indeed, the

---

[77] Plaintiffs also cite the experience of a resident of Hoke County who, while unable to register during early voting in May 2014 because SDR had been eliminated, also sought to update her address but says she was not permitted to do so because she did not have a driver's license bearing an address in the county. (J.A. at 2828-30.) Her problem, however, had nothing to do with voter ID; rather, she simply failed to have a HAVA-compliant ID in order to register.

[78] Cf. Reed v. Chambersburg Area Sch. Dist. Found., No. 1:13-cv-00644, 2014 WL 1028405, at *16 (M.D. Pa. Mar. 17, 2014) (finding that plaintiff pointed only to speculative harm and demonstrated "no clear factual basis to conclude that further disparaging remarks are imminent"); Oneida Nation of N.Y. v. Cuomo, 645 F.3d 154, 173 n.20 (2d Cir. 2011) (finding that plaintiffs' concern over one scenario that might arise upon implementation of tax law was insufficient to support preliminary injunction).

"soft rollout" occurred in the May 2014 primary, and Plaintiffs present no evidence it caused any delays. Moreover, in light of the Supreme Court's acknowledgement of the merits of adequate notice for such a requirement, see Crawford, 553 U.S. at 238 (Breyer, J., dissenting), and until the provision is declared invalid or repealed, the State has an interest in attempting to fulfill the statutory purpose of educating the electorate about it.

In conclusion, the private Plaintiffs have not shown that they are likely to suffer irreparable harm if the "soft rollout" is not enjoined before the November 2014 election. Therefore, the motions to enjoin the soft rollout will be denied.

### F.    Elimination of Pre-registration

SL 2013-381 ends the practice of "pre-registering" 16- and 17-year-olds who would not be 18 before the next general election, which had begun in 2009. 2013 N.C. Sess. Law 381, § 12.1. Prior to enactment, N.C. Gen. Stat. § 163-82.1(d) provided "[a] person who is at least 16 years of age but will not be 18 years of age by the date of the next election and who is otherwise qualified to register may preregister to vote and shall be automatically registered upon reaching the age of eligibility following verification of the person's qualifications and address in accordance with [Section] 163-82.7." 2009 N.C. Sess. Laws 541, § 7(a). After the passage of

SL 2013-381, voter registration application forms in North Carolina now ask only one question regarding the applicant's age: "Will you be 18 years of age on or before election day?" N.C. Gen. Stat. § 163-82.4(d)(2)(a). Thus, those who are 17 but will be 18 before Election Day still may register to vote in that election under SL 2013-381.

The NAACP Plaintiffs and Intervenors move to enjoin SL 2013-381's elimination of pre-registration of 16- and 17-year-olds. As discussed above, Intervenors claim injury not because the repeal of pre-registration will infringe *their* right to vote (as they are all over 18 years of age) or any *16- or 17-year-olds'* right to vote, but because the statute will make it harder for Intervenors to conduct voter-registration drives targeting young people. (See, e.g., Doc. 63 in case 1:13CV660 ¶ 88.) The difficulty posed to Intervenors on the present motions is demonstrating that, even assuming they could succeed on the merits, they will be irreparably harmed before trial absent an injunction. The NAACP Plaintiffs, however, appear to assert direct claims on behalf of their 16- or 17-year-old members. (Doc. 52 in case 1:13CV658 ¶ 93.)

To be sure, assuming the direct right of 16- or 17-year-olds to vote is at issue in these cases, an injunction would not protect any young person's right to vote during the November 2014 general election. No present 16-year-old would be eligible

to vote this fall, and any 17-year-old who will be 18 by Election Day has been able to register for some time even under SL 2013-381. Although Plaintiffs have presented evidence that the DMV refused to register people who were under 18 for some time after the passage of SL 2013-381 (Plaintiffs' Hearing Exhs. 220-23), SBOE Director Strach testified that this problem has been corrected and the DMV is now sending all voter registration applications for 17-year-olds directly to the SBOE. (Doc. 161-9 at 93-95, 99.) While individuals who turned 17 between September 1 and November 4 of 2013 would have suffered some harm in the sense that they "lost" two months of possible registration time, and individuals who were turned away by the DMV undoubtedly suffered harm at that time, a preliminary injunction at this time would do nothing for either of these groups.

It is also clear that SL 2013-381's elimination of pre-registration will not irreparably harm Plaintiffs' or Intervenors' ability to engage in pre-registration efforts for 16- and 17-year-olds. "'[I]rreparable harm, as the name suggests, is harm that cannot be undone.' In other words, easily reversed harm cannot be considered irreparable." Kobach v. U.S. Election Assistance Comm'n, No. 13-cv-4095, 2014 WL 1806703, at *2 (D. Kan. May 7, 2014) (footnote omitted) (quoting Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp., 320 F.3d 1081,

1105 (10th Cir. 2003)).  For those 16- and 17-year-olds who are not eligible to vote in the upcoming November 2014 general election, an injunction would be ineffective.  Plaintiffs and Intervenors will have an opportunity to register them after trial, should they be successful.  For those 17-year-olds who are eligible to vote this fall, Plaintiffs and Intervenors can assist them in registering under current law.  Indeed, under current law Plaintiffs may continue to conduct registration activities in high schools and other locations, targeting those who will be 18 years-old before the next general election.  SL 2013-381 does not even prohibit them from collecting registration forms and forwarding them to the boards of elections at the appropriate time.  The law only provides that the State will not process for registration anyone who will not be 18 years old before the next general election.

Thus, because the NAACP Plaintiffs and Intervenors have failed to demonstrate how they will suffer irreparable harm absent an injunction, their motion to enjoin the elimination of pre-registration pending trial will be denied.

## G.  Increased Poll Observers/Poll Challenges and Elimination of Discretion to Keep the Polls Open

North Carolina law permits the chair of each political party in every county to "designate two observers to attend each voting place at each primary and election."  N.C. Gen. Stat.

§ 163-45(a).  SL 2013-381 allows the chair of each county party to "designate 10 additional at-large observers who are residents of that county who may attend any voting place in that county." 2013 N.C. Sess. Law 381, § 11.1 (codified at N.C. Gen. Stat. § 163-45(a)).  "Not more than two observers from the same political party shall be permitted in the voting enclosure at any time, except that in addition one of the at-large observers from each party may also be in the voting enclosure."  Id.  The list of at-large observers must be "provided by the county director of elections to the chief judge [for each affected precinct]."  Id. (codified at § 163-45(b)).  In conjunction with the addition of at-large observers, the law now permits any registered voter in the county, rather than in the precinct, to exercise the right to challenge a ballot on Election Day.  Id. § 20.2 (codified at N.C. Gen. Stat. § 163-87)).  During early voting, any resident of the State may now file a challenge.  Id. § 20.1 (codified at N.C. Gen. Stat. § 163-84)).

Under North Carolina law, the polls on Election Day are to remain open from 6:30 a.m. until 7:30 p.m.  N.C. Gen. Stat. § 163-166.01.  Beginning in 2001, each CBOE had the power to "direct that the polls remain open until 8:30 p.m." in "extraordinary circumstances."  2001 N.C. Sess. Laws 460, § 3 (codified at N.C. Gen. Stat. § 163-166 (2002)).  SL 2013-381 eliminates the discretion of the CBOEs by deleting the

"extraordinary circumstances" clause.  2013 N.C. Sess. Law 381, § 33.1.  The law now provides:

> If the polls are delayed in opening for more than 15 minutes, or are interrupted for more than 15 minutes after opening, the [SBOE] may extend the closing time by an equal number of minutes.  As authorized by law, the [SBOE] shall be available either in person or by teleconference on the day of election to approve any such extension.

N.C. Gen. Stat. § 163-166.01.  The law thus vests discretion in the SBOE to the exclusion of the CBOEs and conditions the exercise of discretion on a delay of 15 minutes or longer.

The private Plaintiffs move to preliminarily enjoin these two provisions from going into effect during the November 2014 general election.  With respect to the discretion to keep the polls open, Plaintiffs bring claims of racially discriminatory intent, undue burden under the Anderson-Burdick framework, and intent to discriminate against young voters in violation of the Twenty-Sixth Amendment.  As to the poll observers and challenges, Plaintiffs bring all claims except a Twenty-Sixth Amendment challenge.  The court need not determine at this stage whether Plaintiffs are likely to succeed on the merits on these claims because Plaintiffs have failed to demonstrate that they will suffer irreparable harm this November if these provisions are not enjoined.  Therefore, the motions for a preliminary injunction as to these provisions will be denied.

As noted, African-American voters in North Carolina and elsewhere have good reason to be concerned about intimidation and other threats to their voting rights. Any intimidation is unlawful and cannot be tolerated, and courts must be vigilant to ensure that such conduct is rooted out where it may appear. Several witnesses testified to recalling personal experiences in their lifetimes when intimidation based on race occurred, or worse, was condoned.

However, Plaintiffs' legitimate concerns do not support a conclusion that the potential for additional poll observers and challengers renders any intimidation likely under the facts presented to the court. The law provides that "[a]n observer shall do no electioneering at the voting place, and shall in no manner impede the voting process or interfere or communicate with or observe any voter in casting a ballot," unless the chief judge of elections permits the observer to make observations and take notes. N.C. Gen. Stat. § 163-45(c). Plaintiffs have provided no basis to suggest that poll observers or any challenger(s) will abuse their statutory power.[79] With respect

---

[79] Senator Blue testified that a concern was that black voters may be intimidated by the presence of a white observer who does not look familiar to them and that bringing in people from outside the precinct may create an intimidating environment. (Doc. 164 at 109-11.) But as he stated, individuals have a First Amendment right to stand outside the polling place in this manner, and SL 2013-381 does not address this. (Id. at 108.) Moreover, the intimidation he was most concerned with, he said, occurs outside the polling place, not inside the

to the discretion to keep the polls open, it is unclear how the elimination of the "extraordinary circumstances" clause will cause irreparable harm. This is especially true because the SBOE retains the ability to make up significant losses in time by ordering the polls to remain open in the event of a delay.[80] N.C. Gen. Stat. § 163-166.01.

On these provisions, Plaintiffs fall short of the showing necessary to establish irreparable harm. Therefore, the motion to preliminarily enjoin the poll observers and discretion provisions will be denied.

## IV. MOTION FOR JUDGMENT ON THE PLEADINGS

### A. Standard of Review

Defendants move for judgment on the pleadings on all claims pursuant to Federal Rule of Civil Procedure 12(c). The standard of review governing motions for judgment on the pleadings is the same as that employed on motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014). "[A] complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v.

restricted area where observers from both parties would be present under SL 2013-381. (Id. at 136-37.)

[80] Director Bartlett testified that any concern he had about the removal of discretion from the CBOEs would be addressed as long as the SBOE could keep the polls open in the event of a delay. (Doc. 160-3 at 151.)

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "A Rule 12(c) motion tests only the sufficiency of the complaint and does not resolve the merits of the plaintiff's claims or any disputes of fact." *Drager*, 741 F.3d at 474 (citing *Butler v. United States*, 702 F.3d 749, 752 (4th Cir. 2012)). It is important to emphasize that the fact-based discussion necessitated by the voluminous preliminary injunction record is not at issue in consideration of Defendants' Rule 12(c) motion.

## B. Analysis

### 1. Voter ID

With respect to the voter ID provision, Defendants contend that *Crawford* is controlling precedent and requires dismissal of the private Plaintiffs' *Anderson-Burdick* claims. But *Crawford* turned on the specific facts relevant in the context of Indiana's voter ID law and recognized that the determination of whether such a law satisfies the Constitution is factually intensive. *See* *Crawford*, 553 U.S. at 191-203 (plurality opinion). Plaintiffs here have alleged that approximately 5% of the voting-age population of North Carolina lacks valid ID, that it would be a significant burden for many voters to obtain such

ID, and that the State has minimal evidence of voter fraud. (Doc. 1 in case 1:13CV861 ¶¶ 49-50, 76; Doc. 52 in case 1:13CV658 ¶¶ 71-72, 81, 83.)  Such allegations are sufficient to make a claim under Anderson-Burdick at least plausible.  See Veasey, 2014 WL 3002413, at *14-18; Frank, 2014 WL 1775432, at *3-18.

Plaintiffs have also alleged that blacks disproportionally lack IDs and that their socioeconomic conditions interact with the ID requirement to create an inequality of opportunity to vote.  (See, e.g., Doc. 1 in case 1:13CV861 ¶¶ 14-17, 74-75.) Such facts state a plausible Section 2 results claim that depends on the facts adduced at trial.  Finally, Plaintiffs have plausibly alleged that the General Assembly was motivated by discriminatory intent when it passed SL 2013-381, and the voter ID provision particularly.  (See, e.g., id. ¶¶ 81-89, 92.) Thus, they have stated claims under both Section 2 and the Fourteenth and Fifteenth Amendments.

As to the Twenty-Sixth Amendment claim, the court will exercise its discretion under Federal Rule of Civil Procedure 12(i) to defer a ruling until trial.  See Design Res., Inc. v. Leather Indus. of Am., 900 F. Supp. 2d 612, 621 (M.D.N.C. 2012). Not only would it assist the court to have a more developed factual record, but, as recognized above, Intervenors raise a novel claim.  The court need not decide the proper framework to

apply at this early stage, especially considering that if the other Plaintiffs are ultimately successful, such a claim will not have to be adjudicated.  Thus, rather than to wrestle with a matter of first impression, the court will defer any ruling on Intervenors' Twenty-Sixth Amendment voter ID claim to trial.

## 2.  SDR, out-of-precinct, and early voting

Plaintiffs have also pleaded plausible claims with respect to SDR, out-of-precinct voting, and early voting.  Although the court determined that Section 2, Fourteenth and Fifteenth Amendment challenges to the SDR and out-of-precinct provisions were unlikely to succeed on the merits, the inquiry here is a lesser standard.  Plaintiffs have *pleaded* adequate factual matter to make these claims plausible.  (See, e.g., Doc. 1 in case 1:13CV861 ¶¶ 14-22, 27-34, 37-38, 41-42, 69-73.)  Section 2 results claims require a fact-sensitive inquiry in order to determine whether the challenged provisions interact with current and historical conditions to produce an inequality of opportunity for black voters.  While the court concludes that Plaintiffs have not demonstrated a likelihood of success on the merits on this record, their claims are not barred as matter of law.  Cf. Salas v. Sw. Texas Jr. Coll. Dist., 964 F.2d 1542, 1551 (5th Cir. 1992) (holding that no *per se* rule prevents a protected class constituting a majority of registered voters in a jurisdiction from bringing a vote dilution claim under Section

2).  Plaintiffs have also sufficiently alleged discriminatory intent under the Arlington Heights standard (e.g., Doc. 1 in case 1:13CV861 ¶¶ 81-89, 92), although the court is not persuaded that the preliminary injunction record establishes a likelihood of success on the merits with respect to SDR and out-of-precinct voting.  Similar to Section 2, Anderson-Burdick claims are fact intensive and the private Plaintiffs have sufficiently alleged an impermissible burden on the right to vote of voters generally.  For the same reasons stated above, the court will defer any ruling on Intervenors' Twenty-Sixth Amendment claims under Rule 12(i).

### 3.  Other provisions

With respect to the other provisions, it is clear to the court that the private Plaintiffs' and Intervenors' claims "can be adjudicated more accurately after the parties have developed the factual record."  Design Res., 900 F. Supp. 2d at 621 (quoting Flue-Cured Tobacco Co-op Stabilization Corp. v. EPA, 857 F. Supp. 1137, 1145 (M.D.N.C. 1994)).  Very little of the parties' arguments and evidence have been devoted toward certain challenged provisions, such as the increased numbers of poll observers and eligible challengers and the elimination of CBOE discretion to keep the polls open for an additional hour.  The court would benefit from additional factual development in these areas and is reluctant to rule on the face of the complaint,

especially when challenges to so many provisions are already proceeding. Although more arguments were directed toward the elimination of pre-registration, the court would also benefit from further development of the record and argument in this area.

Therefore, the court finds that Plaintiffs have stated plausible claims under Section 2 and the Fourteenth and Fifteenth Amendments (both discriminatory intent and <u>Anderson-Burdick</u>) regarding voter ID, SDR, out-of-precinct voting, and early voting. The remainder of the claims by Plaintiffs and Intervenors will be deferred under Rule 12(i). Defendants' Rule 12(c) motion will therefore be denied in its entirety.[81]

## V. UNITED STATES' REQUEST FOR FEDERAL OBSERVERS

The United States also seeks the appointment of federal observers "to monitor future elections in North Carolina, including the November 2014 general election," pursuant to Section 3 of the VRA. (Doc. 97 at 76.) Section 3(a) authorizes the court to appoint such monitors if it determines that doing so is "necessary to enforce [the] voting guarantees" of the VRA

---

[81] Defendants' brief in support of its Rule 12(c) motion indicates that certain claims were made in Intervenors' complaint against several CBOEs that are not defendants in these cases, as well as the Chairman of the Pasquotank County Republican Party. (Doc. 95 at 13.) However, these factual allegations are not additional *claims* made by Intervenors, but merely factual allegations Intervenors contend support their claims against the named Defendants. Thus, because there are no claims to dismiss, the motion is denied on this basis as well.

and the Fourteenth and Fifteenth Amendments. 42 U.S.C. § 1973a(a). According to the United States, the adoption of SL 2013-381 "creates needless obstacles to minority voters' ability to cast a ballot," and thus federal observers from the Government's Office of Personnel Management will "provide a safeguard against additional violations of the Voting Rights Act," "provide reassurance to minority voters," and provide a "calming effect" in light of the law's provisions that "expand[] the ability of partisan groups to send monitors to the polls and to challenge voters." (Doc. 97 at 76.)

The United States' request is premised on its only claim in the case - violation of the Section 2 of the VRA. As noted above, however, the United States demonstrated neither irreparable harm nor, where addressed, a likelihood of success on its claims. The United States has also not demonstrated that any of the changes implemented by SL 2013-381 will render federal observers necessary for the November general election. For example, neither the elimination (or return, if it had been ordered) of SDR, nor the reduction of seven days of early voting, nor the prohibition on counting out-of-precinct provisional ballots has been shown likely to create the kind of problem at the polls that observers can monitor to ensure compliance. Cf. Berks Cnty., 250 F. Supp. 2d at 543 (appointing federal examiner to oversee defendant's compliance with court

order requiring Spanish ballots).  Similarly, and as explained previously, to conclude that potential poll monitors or challengers under SL 2013-381 will somehow act unlawfully would be speculative.  Indeed, the State's experience during the May 2014 primary, where black turnout *increased* without serious incident, suggests otherwise.[82]

Consequently, the United States' request for federal observers prior to trial will be denied.  Coleman v. Bd. of Educ., 990 F. Supp. 221, 233 (S.D.N.Y. 1997) (declining to appoint federal observers because showing was insufficient).

## VI.  CONCLUSION

For the reasons stated, the court finds that Plaintiffs have stated plausible claims that should not be dismissed at this stage.  Defendants' motion for judgment on the pleadings will therefore be denied.  However, based on a careful review of the extensive record submitted by the parties and the applicable law, the court finds that at this stage of the proceedings Plaintiffs and Intervenors have failed to demonstrate a

---

[82] Although not argued by the United States, the court notes the isolated experience of a husband and wife in Pitt County who were asked for a photo ID (and were able to vote) and a resident of Hoke County who tried unsuccessfully to register during early voting but did not have a driver's license bearing an address in the county. (J.A. at 2821-30.)  These fail to rise to a showing of necessity.  See 42 U.S.C. § 1973a(a) (providing that the court need not authorize the appointment of observers if any incidents of denial or abridgement were few in number, corrected promptly and effectively, lack a continuing effect, and lack a reasonable probability of recurrence).

likelihood of success on their claims that SL 2013-381's changes as to same-day registration and out-of-precinct provisional voting were implemented with intent to deny or abridge the right to vote of African-American North Carolinians or otherwise violate Section 2 of the VRA or the Constitution. Further, even if the court assumes, without deciding, that Plaintiffs and Intervenors can demonstrate a likelihood of success on their legal challenges to the remaining provisions of SL 2013-381, they have not made a clear showing that they will nevertheless suffer *irreparable* harm if the court does not enjoin the law before a trial on the merits can be held. The only election slated before trial is the November 2014 general election. As to SL 2013-381's reduction of early-voting days from 17 to ten, the parties acknowledge, and history demonstrates, that turnout for the fall election will likely be significantly lower than that in presidential years. The evidence presented, in light of the law's requirements for counties to provide the same number of aggregate voting hours as in the comparable previous election under prior law, fails to demonstrate that it is likely the State will have inadequate polling resources available to accommodate all voters for this election. The court expresses no view as to the effect of the reduction in early voting on other elections. As to the voter ID provisions, Plaintiffs only challenged the "soft rollout," which the court does not find

will likely cause irreparable harm, and not the photo ID requirement, as to which the court also expresses no view. In the absence of the clear showing for preliminary relief required by the law, it is inappropriate for a federal court to enjoin a State law passed by duly-elected representatives.

IT IS THEREFORE ORDERED that Defendants' motions for judgment on the pleadings (Doc. 94 in case 1:13CV861, Doc. 106 in case 1:13CV658, and Doc. 110 in case 1:13CV660) are DENIED.

IT IS FURTHER ORDERED that Plaintiffs' and Intervenors' motions for a preliminary injunction (Docs. 96 & 98 in case 1:13CV861; Docs. 108 & 110 in case 1:13CV658; and Docs. 112 & 114 in case 1:13CV660) are DENIED.

IT IS FURTHER ORDERED that Plaintiffs' motions to strike Defendants' experts (Docs. 146, 148, & 150 in case 1:13CV861; Docs. 156, 158, & 160 in case 1:13CV658; and Docs. 157, 159, & 161 in case 1:13CV660) are DENIED AS MOOT.

/s/   Thomas D. Schroeder
United States District Judge

August 8, 2014