IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:13CV658 |
| PATRICK LLOYD MCCRORY, in his official capacity as Governor of North Carolina, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |
| LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, *et al.*, | ) ) | |
| Plaintiffs, | ) ) | |
| *and* | ) ) | |
| LOUIS M. DUKE, *et al.*, | ) ) | 1:13CV660 |
| Plaintiffs-Intervenors, | ) ) | |
| v. | ) ) | |
| THE STATE OF NORTH CAROLINA, *et al.*, | ) ) | |
| Defendants. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:13CV861 |
| THE STATE OF NORTH CAROLINA, *et al.*, | ) ) | |
| Defendants. | ) ) | |

## INTRODUCTION

In *Purcell v. Gonzalez*, 549 U.S. 1 (2006), the Supreme Court vacated an order by the Ninth Circuit preliminarily enjoining Arizona's voter identification procedures. In his concurring opinion, Justice Stevens observed:

> Allowing the election to proceed without enjoining the statutory provisions at issue will provide the courts with a better record on which to judge their constitutionality. At least two important factual issues remain largely unresolved: the scope of the disenfranchisement that the novel identification requirement will produce, and the prevalence and character of fraudulent practices that allegedly justify these requirements. Given the importance of the Constitutional issues, the Court wisely takes action that will enhance the likelihood that they will be resolved correctly on the basis of historical facts rather than speculation.

*Purcell*, 549 U.S. at 6 (Stevens, J. concurring).

The factual developments in this case prove the wisdom of Justice Stevens' concurring opinion. Since the last time the parties were before this Court, North Carolina has conducted a general election using all of the challenged practices established by 2013 N.C. Sess. Laws 381 ("SL 2013-381"), other than a photo identification requirement that will not be enforced until January 1, 2016. During the preliminary injunction hearing, plaintiffs' evidence substantially consisted of expert testimony by academics. They opined that the "burdens" imposed by SL 2013-381 would deprive African Americans of an equal opportunity to participate in the political process and to elect representatives of their choice. As suggested by Justice Stevens, the historical facts following the

implementation of SL 2013-381 have exposed plaintiffs' "expert" testimony as unfounded academic speculation.

Notwithstanding the opinions of plaintiffs' experts, African American participation in early voting and Election Day voting during the 2014 elections increased as compared to both the 2010 Primary and General Election. Moreover, the North Carolina General Assembly recently amended the photo ID provisions of Chapter 163, Article 14A of the General Statutes, which were initially enacted by SL 2013-381 and were codified by as N.C. Gen. Stat. §§ 163-166.13 and -166.14, so that voters who are unable to obtain acceptable photo identification in future elections can still cast a ballot by signing a declaration that a reasonable impediment prevented them from obtaining an acceptable photo ID. *See* 2015 N.C. Sess. Laws 103, § 8(d), codified as N.C. Gen. Stat. 163-166.15. This statute is in many ways nearly identical to a South Carolina law that received preclearance under Section 5 of the Voting Rights Act ("VRA") in 2012, *South Carolina v. United States*, 898 F.Supp.2d 30 (D.D.C. 2012), and which was enforced by South Carolina during 2013 municipal elections and the 2014 General Election without any evidence of an adverse effect on African American turnout.[1] Given these facts – not

---

[1] To the extent the "reasonable impediment" provisions added by 2015 N.C. Sess. Laws 103 differ from the South Carolina law, they do so by including specific directives as to what constitutes a "reasonable impediment" and that clearly indicate that "reasonable impediment" is to be interpreted broadly in favor of the voter. 2015 N.C. Sess. Laws 103, §§ 8(d) and 8(e).

3

known by this Court or the Fourth Circuit prior to the 2014 General Election – plaintiffs cannot prove that SL 2013-381 produces any discriminatory effect.[2]

Further, none of the challenged provisions of SL 2013-381 violate the Fourteenth Amendment under *Crawford v. Marion Cnty. Elections Bd.*, 533 U.S. 181 (2008). Closing registration twenty-five days before Election Day and eliminating out-of-precinct voting are practices that have been approved by Congress, represent the majority rule for all of the States, and serve legitimate State interests. North Carolina remains one of the more generous States for voters who wish to engage in early voting. None of these practices constitute severe burdens and are therefore constitutional.

Finally, there is no evidence that any of the other challenged provisions of SL 2013-381 violate federal law, nor is there any evidence that any of the challenged provisions violate the Twenty-Sixth Amendment. Therefore, following trial, defendants will be entitled to judgment on all of plaintiffs' claims.

## I.      HISTORY OF RELEVANT NORTH CAROLINA VOTING PROCEDURES

### A.      One-Stop Absentee Voting ("Early Voting")

Prior to 1973, North Carolina required all voters to cast their ballots on Election Day or to apply for an absentee ballot by mail. Mail-in absentee ballots were allowed only when a voter provided a statutorily acceptable excuse for being absent and unable to vote in person at the proper polling place on Election Day. *See* 1973 N.C. Sess. Laws

---

[2] Indeed, the facts show that the challenged provisions of SL 2013-381, coupled with the provisions of 2015 N.C. Sess. Laws 103, do not even have a retrogressive effect on minority voting rights and that those statutes would be precleared under Section 5, assuming that provision remained in force.

4

536. In 1973, the General Assembly provided an initial "early voting" accommodation to voters by allowing them to apply for excuse-only absentee ballots and to cast their ballots in person at the board of elections office in the county where the voter resided. 1973 N.C. Sess. Laws 536.

Then, as now, under North Carolina law, a voter must have registered to vote at least 25 days before the day of the primary or general election in which the voter wishes to vote. *See* N.C. Gen. Stat. § 163-82.6(c) (2013). In 1977, the General Assembly first described the in-person excuse-only absentee voting authorized in 1973 as "one-stop" absentee voting because a voter could apply for an absentee ballot at the voter's county board of elections office and return the ballot to the county board office on the same day. 1977 N.C. Sess. Laws 469.

In 1999, the General Assembly expanded one-stop absentee voting. 1999 N.C. Sess. Laws 455. Voters were no longer required to provide a statutorily acceptable excuse for in-person absentee voting. The General Assembly also authorized county boards of election to open more than one site for one-stop voting. *Id.* Additional locations could not be opened unless the local county board of elections unanimously agreed to open more than one site. *Id.*[3]

In 2000, the General Assembly added a provision that allowed the North Carolina State Board of Elections ("SBOE") to adopt one-stop locations for individual counties when a county board could not reach a unanimous agreement. 2000 N.C. Sess. Laws

_____

[3] In 2001, the General Assembly removed the excuse requirement for mail-in absentee ballots. 2001 N.C. Sess. Laws 337. Since that time, voters have been able to apply for and receive a mail-in absentee ballot for any reason.

136.   The General Assembly granted the SBOE authority to establish one-stop locations for a particular county based upon a majority (and not unanimous) vote by the members of the SBOE.  *See id.*   There are three members of every county board of elections.  By law, not more than two members may belong to the same political party.  N.C. Gen. Stat. § 163-30.  Accordingly, two members of each county board typically belong to the same political party as the Governor while the third member generally belongs to the major opposing political party.  Similarly, there are five members of the SBOE and, by law, no more than three members may belong to the same political party.  N.C. Gen. Stat. § 163-19.  As such, three members typically belong to the same political party as the Governor while the other two members typically belong to the opposing political party.  Therefore, prior to 2000, early voting plans required the unanimous, bi-partisan consent of all three county board members.  After the changes made by the General Assembly during the 2000 session, the members of the majority party on the SBOE could unilaterally impose an early voting plan on a county.

In 2001, the General Assembly gave county boards the authority to designate a single one-stop location at a place other than the county board office.  The General Assembly also reduced the number of days available for voters to participate in one-stop voting to 17 days.  2001 N.C. Sess. Laws 319.[4]

---

[4] Prior to the enactment of SL 2013-381, all counties had the authority to open early voting sites for 17 days but some counties decided to open early voting sites for less than 17 days.  County boards were not required by statute to have all early voting sites within their county open for all 17 days.

6

Congress has never enacted legislation that requires states to either establish a process for early voting or that specifies a time frame for early voting.

## B.     Out-of-Precinct Provisional Voting

Under the Help America Vote Act of 2002 ("HAVA"), 42 U.S.C. §§ 15301-15545 (2012), Congress mandated that states must offer provisional ballots to Election Day voters who moved their residence within 30 days of an election but who failed to report their move to their county board of elections. However, Congress also decreed that any such ballot should be counted only under state law. *See* 42 U.S.C. § 15482(a)(4). In 2003, the General Assembly enacted legislation designed to bring North Carolina into compliance with HAVA. 2003 N.C. Sess. Laws 226.

After this change in 2003, two Republican candidates challenged a decision by the SBOE to count ballots cast by certain Election Day voters in Guilford County who voted in precincts where they did not reside. *James v. Bartlett*, 359 N.C. 260, 263, 607 S.E.2d 638, 640 (2005). The Republican candidates alleged that the counting of these ballots (or "out-of-precinct ballots") violated article VI, Section 2 of the North Carolina Constitution. *Id.* at 266, 607 S.E.2d at 642. The North Carolina Supreme Court avoided the state constitutional issue and ruled instead that the 2003 session law required that voters cast their ballots in the precinct in which they resided. *Id.* at 267, 607 S.E.2d at 642 (citing N.C. Gen. Stat. § 163-55 (2003)). The North Carolina Supreme Court ruled that the SBOE had incorrectly counted non-resident out-of-precinct ballots in these elections, remanding the case for further proceedings. *Id.* at 271, 607 S.E.2d at 645.

7

Soon after the decision in *James*, and before further proceedings could take place in the election protests that were the subject of that opinion, the General Assembly enacted a "clarification" of the 2003 session law. This Act was entitled "An Act to Restate and Reconfirm the Intent of the General Assembly with Regard to Provisional Voting in 2004; and to Seek the Recommendations of the State Board of Elections on Future Administration of Out-of-Precinct Provisional Voting." 2005 N.C. Sess. Laws 2. This Act stated that it had been the intent of the General Assembly that an out-of-precinct ballot cast by a voter in the county of his or her residence be counted for any office for which he or she was otherwise eligible to vote. *Id.* The effect of this session law was to legislatively over-rule the decision by the North Carolina Supreme Court in *James* that Election Day voters were required by statute to vote in the precinct where they resided. The Act also provided for retroactive application to the election challenges that had been the subject of the *James* decision.[5]

Congress has not enacted legislation requiring states to count all out-of-precinct ballots. To the contrary, the only legislation enacted by Congress regarding this issue states that out-of-precinct ballots be counted in accordance with state law.

## C. Same-Day Registration

While Congress has not enacted any legislation requiring that states implement one-stop early voting or count out-of-precinct ballots, Congress has decreed that states

---

[5] There is no indication of any further judicial review of the election protests filed in *James* and the North Carolina Supreme Court has never ruled on whether Article VI, Section 2, of the North Carolina Constitution requires that Election Day voters cast their ballots in the precinct where they reside.

8

must allow voters an opportunity to vote provided that they register within 30 days of an election or within any shorter period allowed by state law.  *See* 42 U.S.C. § 1973 gg-6(a)(1) (2012).  Until 2007, North Carolina required that all voters be registered to vote at least 25 days before an election.  *See* N.C. Gen. Stat. § 163-82.6(c).  Federal law does not require that states allow voters who register less than 25 days before an election to be allowed to vote in that election.

In 2007, the General Assembly passed legislation allowing persons to register to vote and to vote at the same time during the period of time provided for one-stop voting.  2007 N.C. Sess. Laws 253.  This process has been described as "same-day registration" ("SDR") and was available to voters only since the time of local elections in 2007 through the 2012 general election.  There is no federal law requiring states to implement SDR for persons who register to vote for the first time during early voting.

### D.    "Pre-Registration" of 16- and 17-Year-Olds

Under the Twenty-Sixth Amendment to the United States Constitution, citizens who are 18 years of age or older have the right to vote.  U.S. Const. Amend. XXVI, § 1.  Before 2010, all North Carolina citizens who turned 18 prior to an election were permitted to register and vote as a matter of state law.  *See* N.C. Gen. Stat. § 163-55(a)(1); N.C. Gen. Stat. § 163-59.  In 2009, the General Assembly enacted legislation that required county boards of election to allow 16- and 17-year-olds to submit papers by which they "pre-registered," even when they would not be 18 years old at the time of the next general election.   2009 N.C. Sess. Laws 541.  This legislation, which became effective on January 1, 2010, also required the SBOE to conduct voter-registration drives

and pre-registration drives at public high schools. Congress has not enacted legislation requiring states to "pre-register" 16- and 17-year-olds, or requiring boards of election to conduct registration drives at public schools.

### E.    SL 2013-381

In 2013, through SL 2013-381 the General Assembly modified or repealed some of the election laws that were enacted by prior General Assemblies from 2000 through 2009. The law reduced the time during which county boards of election may decide to conduct one-stop absentee voting from 17 days to ten days. SL 2013-381, pt. 25; N.C. Gen. Stat. § 163-227.2(b) (2013). It also repealed SDR during one-stop voting. SL 2013-381, pt. 16. This enactment means that unregistered voters will now need to register to vote 25 days before an election.

The legislation repealed out-of-precinct voting by most voters who cast their ballots in a precinct other than the precinct of their residence. SL 2013-381, pt. 49; N.C. Gen. Stat. § 163-55(a). On Election Day, voters now must cast their ballots in the precincts where they reside.

The law also repealed "pre-registration" for 16- and 17-year-olds as well as any mandate that the SBOE conduct voter drives at public high schools. SL 2013-381, pt. 12. Any person who becomes 18 prior to a general election will still be able to register to vote and can vote in the general election and the primary for that general election, as was the case prior to the enactment of pre-registration. 2009 N.C. Sess. Laws 541; N.C. Gen. Stat. § 163-82.4(d); N.C. Gen. Stat. § 163-59.

10

SL 2013-381 also added several new provisions to North Carolina's election laws. Starting in 2016, voters who present themselves to vote during one-stop absentee voting and on Election Day will need to present a photo identification card to poll workers. SL 2013-381, pts. 2 & 6, sec. 6.2(2). As noted above, on June 22, 2015, the photo ID requirement of this provision was amended to allow in-person voters who have been unable to obtain an acceptable photo ID an opportunity to vote by submitting a reasonable impediment declaration. *See* 2015 N.C. Sess. Laws 103.

SL 2013-381 also allows each political party the right to appoint six additional poll observers for each county. These observers may observe election activity in any precinct within the county, but no party may have more than three observers at a single precinct. SL 2013-381, pt. 11; N.C. Gen. Stat. § 163-45(a). Finally, SL 2013-381 removed from county boards any discretion to extend voting hours at a particular precinct within its county and instead places that discretion under the authority of the SBOE. SL 2013-381, pt. 33; N.C. Gen. Stat. § 163-166.01.

## II.   PLAINTIFFS' CLAIMS

There are four different sets of plaintiffs in these actions: (1) The United States of America, acting through the United States Department of Justice ("USDOJ") in *United States v. North Carolina*, No. 1:13-CV-861; (2) a group of organizational and individual plaintiffs in *League of Women Voters v. North Carolina*, No. 1:13-CV-660 ("LWV Plaintiffs"); (3) the North Carolina State Conference of the NAACP, several churches, and several individual plaintiffs in *N.C. State Conferences of the NAACP v. McCrory*,

11

No. 1:13-CV-658 ("NAACP Plaintiffs"), and a group of college students and other individual plaintiffs who have intervened in these actions ("Intervening Plaintiffs").

Plaintiffs' claims may be categorized and summarized as follows:

## A.    Fourteenth Amendment to the United States Constitution–Alleged Unconstitutional Burden on the Right to Vote

The LWV Plaintiffs contend that the following provisions of SL 2013-381 constitute an unconstitutional burden on their right to vote in violation of the Fourteenth Amendment: (1) the elimination of SDR and out-of-precinct provisional voting; and (2) the reduction of the number of days for one-stop absentee voting.  (LWV Plaintiffs' Compl., First Claim for Relief, ¶¶ 75-76).

The Intervening Plaintiffs contend that the following provisions of SL 2013-381 constitute an unconstitutional burden on their right to vote in violation of the Fourteenth Amendment: (1) the requirement that one-stop and Election Day voters present a photo ID in 2016; (2) the elimination of SDR and out-of-precinct voting; (3) the reduction of the number of hours for one-stop absentee voting; (4) the transfer of discretion from county boards of election to the SBOE to determine whether polls should be kept open on Election Day for an additional hour; (5) the elimination of pre-registration for 16- and 17-year-olds; and (6) the alleged targeting of young voters by the Watauga County Board of Elections, the Pasquotank County Board of Elections, the Forsyth County Board of Elections, and the Chairman of the Pasquotank Republican Party.  (Intervening Plaintiffs' Compl., ¶¶ 46-94, Count I, ¶¶ 95-101).

### B.     Alleged Intentional Discrimination Against African Americans in Violation of the Fourteenth and Fifteenth Amendments to the United States Constitution

The NAACP Plaintiffs allege that the following provisions of the SL 2013-381 constitute intentional discrimination against African Americans in violation of the Fourteenth Amendment: (1) the requirement that one-stop and Election Day voters present a photo ID beginning in 2016; (2) the elimination of SDR and out-of-precinct voting on election day and "pre-registration" of 16- and 17-year-olds; (3) the reduction of the number of days for which counties can decide to schedule one-stop absentee voting from 17 days to ten days; and (4) the provision that allows each political party to appoint for each county up to six additional poll observers in each county. (*See* NAACP Plaintiffs' Compl., Count II, ¶¶ 126-37).

The LWV Plaintiffs allege that the following provisions of SL 2013-381 constitute intentional discrimination against African American voters in violation of the Fourteenth Amendment: (1) the reduction of the number of days for one-stop absentee voting; and (2) the elimination of SDR and out-of-precinct voting. (*See* LWV Plaintiffs' Compl., "Second Claim for Relief," ¶¶ 77-82).[6]

### C.     Alleged Violations of Section 2 of the Voting Rights Act

The USDOJ contends that the following provisions of SL 2013-381 violate Section 2 of the Voting Rights Act: (1) the requirement that one-stop and Election Day voters present a photo ID in 2016; (2) the elimination of SDR and out-of-precinct voting;

---

[6] The NAACP Plaintiffs also allege a claim of intentional discrimination under the Fifteenth Amendment.

and (3) the reduction of the number of days for one-stop absentee voting.  (*See* USDOJ Compl., "Cause of Action," ¶¶ 95-100).

The NAACP Plaintiffs contend that the following provisions of SL 2013-381 violate Section 2 of the Voting Rights Act: (1) the requirements that one-stop and Election Day voters present a photo ID in 2016; (2) the elimination of SDR and out-of-precinct voting; (3) the reduction of the number of days for one-stop absentee voting; and (4) the provision that allows each political party to appoint up to six additional poll observers in each county.  (*See* NAACP Plaintiffs' Compl., Count I, ¶¶ 109-25).

The LWV Plaintiffs contend that the following provisions of SL 2013-381 violate Section 2 of the Voting Rights Act: (1) the elimination of SDR and out-of-precinct voting; and (2) the reduction of the number of hours for one-stop absentee voting.  (*See* LWV Plaintiffs' Compl., "Third Claim for Relief," ¶¶ 38-97).

**D.**  **Alleged Violation of the Twenty-Sixth Amendment to the United States Constitution**

The Intervening Plaintiffs contend that all of the provisions challenged by them deprive 18-year-olds of their right to vote under the Twenty-Sixth Amendment to the United States Constitution.  (*See* Intervenor-Plaintiffs' Compl., "Count II," ¶¶ 102-06).

## FORECAST OF EVIDENCE

According to non-binding witness lists exchanged by the parties on June 19, 2015, the Court may hear testimony from possibly more than 100 individual plaintiffs, organizational plaintiffs, and other witnesses who plaintiffs contend have observed or suffered burdens allegedly caused by SL 2013-381.  The evidence will show that none of

14

these plaintiffs or other witnesses has been prevented from voting or denied an equal opportunity to participate in the political process by virtue of SL 2013-381.

Plaintiffs may also offer testimony by as many as sixteen expert witnesses. Despite the increase in African American turnout in both the 2014 primary and the 2014 General Election, some of plaintiffs' experts continue to opine that SL 2013-381 disproportionately burdens African American voters. It is significant to note that none of plaintiffs' experts has ever testified – and they continue to decline to testify – that SL 2013-381 will cause a decline in African American registration or turnout or how SL 2013-381 will otherwise deprive African Americans of an equal opportunity to participate in the political process and to elect representatives of their choice. To the contrary, the evidence will show that African-Americans have proportionality in terms of the number of legislative seats in which they have an equal opportunity to elect their candidates of choice and that the number of elected African American members of the General Assembly and statewide has never been higher. This evidence, combined with evidence showing higher African American turnout rates following the implementation of SL 2013-381, is fatal to plaintiffs' claims that SL 2013-381 causes African Americans to have less opportunity than whites to participate in the political process.

All of plaintiffs' experts have agreed, as they must, that all of SL 2013-381's challenged provisions apply equally to all voters without regard to race. There is no evidence that the State will only require African Americans to register 25 days before the election, allow white voters a larger period of time for early voting, or only require African Americans to vote in their assigned precinct on Election Day. Instead, the

evidence will show that all voters must register 25 days before the election, choose one of the options for voting (including mail-in no excuse absentee, early voting, or Election Day voting), and that all voters who vote on election day must vote in their assigned precinct without regard to race. All in-person voters must obtain one of the acceptable forms of photo ID or choose to vote by way of a reasonable impediment declaration. All voters also retain the option of avoiding the photo ID requirement by voting with a no excuse absentee ballot by mail. The burdens associated with completing any of these tasks are identical for all voters without regard to their race.

Thus, plaintiffs are not challenging actual "burdens" associated with choosing any of the options available for registering or voting but instead argue that African American and other unspecified groups of voters are less able to comply because they are disproportionately less well-off and less educated than other voters, and, as stated by plaintiffs' expert Dr. Charles Stewart at the preliminary injunction hearing in this case, "less sophisticated." Plaintiffs' argument is that minorities are entitled to either the equivalent of election law affirmative action or practices that are favored by political organizations dedicated to maximizing Democratic turnout. While this interpretation of the Voting Rights Act has been rejected by the United States Supreme Court, *see Bartlett v. Strickland*, 556 U.S. 1, 14-16, 20-23 (2009), the historical facts now prove that SL 2013-381 does not render African Americans less able to participate in the political process, regardless of their comparative education or economic situations.

**ARGUMENT**

## I.   LEGAL STANDARDS ON REMAND

### A.   The Preliminary Injunction Ruling by the Fourth Circuit Did Not Establish the Law of the Case.

The Supreme Court has ruled that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).[7] While we have not found a decision by the Supreme Court holding that a ruling on a preliminary injunction binds a trial court on future rulings, some circuit courts have recognized a narrow exception to the general rule. In *Sherley v. Sebelius*, 689 F.3d 776 (D.C. Cir. 2012), the Court held a preliminary injunction can become law of the case if the preliminary injunction "was established in a definitive, fully considered legal decision based on a fully developed factual record and a decision making process that included full briefing and argument without unusual time constraints." *Id.* at 185-86. Even when a circuit court grants a preliminary injunction motion that is fully briefed and argued during normal time constraints, it does not become law of the case where the factual record materially changes following a full trial. *Center for Biological Diversity v. Salazar*, 706 F.3d 1085, 1091 (9th Cir. 2013).

Based upon these principles, and assuming *arguendo* that the Supreme Court would even recognize an exception to the general rule, the facts and circumstances of this case show that nothing in the Fourth Circuit's ruling on the preliminary injunction

---

[7] Under this principle, for example, an appellate court's preliminary injunction opinion is not binding on a future panel of the circuit court. *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1346 (Fed. Cir. 2004).

establishes the law of the case. This Court's decision denying plaintiffs' motion for a preliminary injunction was issued on August 8, 2014. While the United States did not appeal this ruling, the other plaintiffs did so. On September 25, 2014, the Fourth Circuit granted appellants' motion to expedite and proceed on the original record. No doubt, the motion to expedite the appeal was granted because of the time constraints imposed by the upcoming November election. The Fourth Circuit relieved appellants of their normal obligation to serve appellees with an appendix with their opening brief and instead granted appellants' motion to proceed on the original record. Rules 30(a)(3) and 30(f), Fed. R. App. P. The Court also dispensed with the normal briefing schedule under which appellants must file a brief 40 days after the record is filed and appellees have 30 days after they have received and reviewed appellants' brief to file their response. Rule 31(a), Fed. R. App. P. Instead, appellees were required to file their brief at the same time as appellants and the briefing was limited to fifteen pages. The Fourth Circuit entered its ruling on October 1, 2014, less than a week after the oral argument. Clearly, the process ordered by the Fourth Circuit for the appeal did not "include full briefing and argument without unusual time constraints."

The main focus of the Fourth Circuit majority was to maintain what it perceived to be the status quo pending a full trial on the merits. *League of Women Voters v. North Carolina*, 769 F.2d 224, 235-36 (4th Cir. 2014). To the extent the Fourth Circuit majority analyzed the applicable law, its opinion rests solely on its preliminary interpretation of Section 2. The Fourth Circuit majority made no other legal ruling, definitive or otherwise, about any of plaintiffs' other legal theories.

18

Under the circumstances described above, it is inappropriate to consider the Fourth Circuit's opinion as law of the case regarding the proper interpretation of Section 2. The Court's opinion, written without the benefit of an appendix or normal briefing, contains several errors of law which do not bind this Court because they did not establish the law of the case and are instead dicta. *Bull HN Information Systems, Inc. v. Hutson*, 229 F.3d 321, 326 n.3 (1st Cir. 2000) ("The law of the case doctrine does not apply to dicta."); *Dedham Water Co., Inc. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 459 (1st Cir. 1992) ("Dictum constitutes neither the law of the case nor the stuff of binding precedent.") For example, the Fourth Circuit majority relied upon a hearsay statement attributed to one Republican legislator. While this statement may be admissible in connection with a preliminary injunction motion, it would not be admissible at trial and not able to be used as prominently as it was used by the Fourth Circuit majority. 769 F.3d at 231; *But see* Fed. R. Evid. 802. The Fourth Circuit majority also appeared to incorrectly rely on statements by members of the General Assembly who opposed SL 2013-381 as evidence of legislative intent. 769 F.2d at 232; *But see United States v. O'Brien,* 391 U.S. 367, 383–84 (1968). Moreover, the Fourth Circuit majority stated that Section 2 is violated if "'any' minority voter is being denied electoral opportunities." This is clearly an incorrect statement of law – one which could have been avoided had there been more time to allow for additional briefing. Section 2 and Section 5 were designed to protect the rights of the minority group, not the rights of an individual voter. *Bartlett*, 556 U.S. at 14-16; *Thornburg v. Gingles*, 478 U.S. 30, 50, 88 (1986); *Holder v.*

19

*Hall*, 512 U.S. 874, 880 (1994); *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 479 (1997) ("*Bossier Parish I*"); *Hall v. Virginia*, 385 F.3d 421, 427-28 (4th Cir. 2004).

The Fourth Circuit majority also in its haste incorrectly stated that Section 2 "'prohibits all forms of discrimination' that *lessen* opportunity for minority voters." *League of Women Voters of North Carolina*, 769 F.3d at 238 (citing *Gingles*, 478 U.S. at 45 n.10 (emphasis added)).  In truth, *Gingles* does not state that Section 2 is violated by a law that "lessens" opportunity for minority voters and any such interpretation is contrary to the language of Section 2.  Instead, a violation of Section 2 is established "based on the totality of circumstances" and occurs only when "members" of a protected class "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  52 U.S.C. § 1973; *Bossier Parish I* at 479.

In finding that plaintiffs were likely to succeed on their Section 2 claims, the Fourth Circuit majority relied on a circuit court decision by the Sixth Circuit and a district court decision by a Wisconsin district court.  769 F.3d at 238 (citing *Ohio State Conference of NAACP v. Husted*, 43 F.Supp.3d 808 (S. D. Ohio 2014), *aff'd,* 768 F.3d 524 (6th Cir. 2014), *stayed* 135 S. Ct. 42 (2014), *vacated,* No. 14-3877 (6th Cir. Oct. 1, 2014) (copy of unreported order vacating judgment located at ECF Doc. No. 53-1)); *Frank v. Walker*, 17 F. Supp. 3d 837 (E.D. Wis. 2014), *rev'd* 768 F.3d 744 (7th Cir. 2014), *cert. denied* 135 S. Ct. 1551 (2015).  The circuit court decision was vacated by the Sixth Circuit.  *Husted*, *supra*.  The district court decision relied upon by the Fourth Circuit was reversed.  *Frank*, *supra*.  Thus, the legal landscape regarding the

20

interpretation of Section 2 has substantially changed since the Fourth Circuit majority issued its opinion.

The facts to be presented at trial are also materially different from the facts available to the trial court or the Fourth Circuit following the preliminary injunction hearing. The results of the 2014 General Election are consistent with the results of the 2014 Primary which the Fourth Circuit discounted apparently because it was not a General Election. But, following the 2014 General Election, African American participation in the electoral process increased despite the implementation of all SL 2013-381 provisions other than photo ID.

Moreover, the Fourth Circuit majority erred in evaluating the record on issues such as SDR. Despite the fact that it did not reject any of the trial court's factual findings, the Fourth Circuit stated that "naked statements of bureaucratic difficulties attributable at least as much to under-resourcing of boards of election" resulted in "a thousand voters that had not yet been properly verified." 769 F.3d at 246. There was simply no evidence in the record to support the conclusion that SDR voters failed to verify because of under-resourcing of county boards of election. Instead, even at the preliminary injunction stage, the evidence showed that because of the length of time that must elapse before a new registrant is denied because they have failed the mail verification process, voters who used SDR were two to three times more likely to fail mail verification after their vote was illegally counted than voters who register 25 or more days before election day. The evidence to be presented at trial will show even more dramatic failure rates by SDR voters.

21

Contrary to an incorrect assumption made by the Fourth Circuit majority, 769 F.3d at 232-33, the evidence at trial will show that illegal ballots cast by SDR voters cannot be retrieved before they are improperly certified as legal votes. The evidence at trial will show that, following the implementation of SL 2013-381, the number of provisional ballots and out-of-precinct ballots decreased substantially in 2014 as compared to 2010. Elimination of out-of-precinct voting had no impact on access to the ballot by the minority group because over 99% of African American and white voters cast an effective ballot despite the elimination of out-of-precinct voting. The evidence will show that an extremely small percentage of voters may have attempted to register during early voting, but the number of persons who could not vote because of "no record of registration" declined in 2014 as compared to 2010. The evidence will also show that overall African American registration rates suffered no impact because of the elimination of SDR.

**B.** **Regardless of the Standard Applicable to Plaintiffs' Claims, None of the Challenged Practices Violate Section 2, and in Fact Would be Precleared under Section 5 if that Provision Remained in Effect.**

A disparate impact alone is not sufficient to state a vote denial claim under Section 2. *Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352, 1353 (4th Cir. 1989); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1228 (11th Cir. 2005) ("Despite its broad language, Section 2 does not prohibit all voting restrictions that may have a racially disproportionate effect."). Indeed, this is clear from the cases involving the actual denial of the right to vote. Despite the disproportionate impact of felony disenfranchisement laws on minorities, they are routinely upheld despite Section 2. *See Simmons v. Galvin*,

575 F.3d 24, 30-42 (1st Cir. 2009); *Johnson*, 405 F.3d at 1227-1232; *Wesley v. Collins*, 791 F.2d 1255, 1260-1262 (6th Cir. 1986).

Plaintiffs cannot demonstrate as a matter of law that the repeal of the former election law choices favored by plaintiffs will result in a disparate impact or unequal opportunities. Nothing in SL 2013-381 erects an actual barrier to voting. The photo ID requirement and the recent reasonable impediment amendment enforces existing North Carolina law—not challenged by plaintiffs—that voters be who they purport to be when presenting themselves to vote. N.C. Gen. Stat. § 163-85(c)(10) (2013). The other challenged provisions simply repeal or scale back conveniences on when and how to voter or register to vote: in no respect do they impose additional qualifications or barriers to vote.

In *Frank,* the Seventh Circuit dismissed plaintiffs' challenge to Wisconsin's photo ID law. The Court refused to find a violation of Section 2 based upon plaintiffs' expert testimony that minorities are disproportionately poor, less educated, and lack photo IDs needed for voting in Wisconsin.[8] The Court noted that, under Section 2, "units of government are responsible for their own discrimination but not for rectifying the effects of other persons' discrimination." 768 F.3d at 753. The Seventh Circuit found that plaintiffs were obligated to prove "that the challenged 'standard, practice, or procedure' [imposes] a discriminatory burden on members of the protected class, meaning that members of the protected class 'have less opportunity than other members of the

---

[8] The Wisconsin statute did not have a reasonable impediment option now available to North Carolina voters under North Carolina's photo ID requirement, as amended.

electorate to participate in due political process and to elect representatives of their choice.'" *Id.* at 754-55. The Seventh Circuit concluded that plaintiffs could not prove a violation of Section 2 "because in Wisconsin everyone has the same opportunity to get a qualifying ID." *Id.* at 755.

Unlike North Carolina, the Seventh Circuit did not have the factual history of turnout rates following the implementation of the challenged Wisconsin statute. Because African American turnout increased after the implementation of SL 2013-381, under the Seventh Circuit's interpretation of Section 2, there is even a stronger basis for dismissing all of plaintiffs' claims. As admitted by plaintiffs' experts, all voters have the same opportunities to vote under the challenged requirements of SL 2013-381. Plaintiffs agree that there is no evidence that these provisions will be selectively enforced because of race. Moreover, the factual history of the 2014 elections show that alleged burdens theorized by plaintiffs' academicians did not prevent African American voters from voting at a higher rate than they did in 2010.

Defendants are also entitled to judgment under the Section 2 standard preliminarily adopted by the Fourth Circuit majority. The Fourth Circuit majority repeatedly criticized this Court because, in the Fourth Circuit majority's opinion, this Court "failed to consider the sum of these parts [all of the provisions of SL 2013-381 challenged by plaintiffs] and their cumulative effect on minorities' access to the ballot box." 769 F.3d at 242. However, even under this test, the 2014 General Election shows that the SL 2013-381 provisions implemented in 2014 had no negative "cumulative effect" on minority access to the ballot box. In fact, a comparison of the 2010 and 2014

24

General Elections shows that African American participation not only increased, it did so at a higher rate than white participation. None of the plaintiffs have cited a case – nor can they – where a law has been found to create a "discriminatory effect," as required to prove a violation of Section 2, where African American participation rates increased at a higher rate than whites after the challenged law was implemented.

This Court is well familiar with the stringent burdens of proof that a state seeking preclearance of an election change was required to meet. But even under Section 5, the fact that a law has an alleged "disparate impact" was not sufficient to find a violation. *Florida v. United States*, 885 F.Supp.2d at 299, 312 (D.D.C. 2012) (three judge court). Even under Section 5, "a change is not retrogressive simply because it deals with a method of voting or registration that minorities use more frequently, or even because it renders that voting method marginally more burdensome." *Id.* For an election change to be retrogressive it "must be sufficiently burdensome that it will likely cause some reasonable voters not to register to vote, not to go to the polls, or not be able to cast an effective ballot once they get to the polls." Based upon African American turnout results, all of the challenged provisions of SL 2013-381 at issue for the July trial would be precleared if Section 5 remained in effect. Plaintiffs cannot point to a single case where a ballot access law has been precleared under Section 5 but found to be in violation of Section 2.

C.    **None of the Policy Decisions Made by the General Assembly in SL 2013-381 Constitute an Unconstitutional Burden on the Right to Vote**

1.    **Reducing the time that a county board may schedule early voting and eliminating SDR, out-of-precinct voting, and pre-**

25

**registration for 16- and 17-year-olds do not impose unconstitutional burdens on voters.**

Voting is fundamentally significant "under our constitutional structure." *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). However, the right to vote in any manner is not "absolute." *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986). Under the Elections Clause, states retain "the power to regulate their own elections." *Sugarman v. Dougall*, 413 U.S. 634, 647 (1983). "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections…" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). There "must be a substantial regulation of elections . . . if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974).

Election laws will always impose some type of burden on a voter. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). Requiring "strict scrutiny" for every election regulation "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. Instead, a "more flexible standard applies." *Id.* at 434. When the right to vote is subjected to "severe" restrictions, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). "But when a state election law provision imposes only 'reasonable, non-discriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788). Under this standard, none of the long-standing election law

26

practices historically followed by the State of North Carolina and reinstated by SL 2013-381 imposes severe restrictions on the right to vote.

There is nothing in the Constitution or any law passed by Congress requiring states to allow "early voting" prior to Election Day or to allow new voters to register and vote at the same time during an early voting period. To the contrary, the Supreme Court has held that states may close registration at a reasonable time before an election. *Marston v. Lewis*, 410 U.S. 679, 681 (1973); *Burns v. Fortson*, 410 U.S. 686 (1973). This is because closing registration before an election serves an important state interest "in accurate voter lists." *Burns*, 410 U.S. at 687 (quoting *Marston*, 410 U.S. at 681).[9] Congress has also recognized the important state interest by legislation that permits a state to close its registration books up to 30 days before an election. *See* 42 U.S.C. § 1973aa—1(d)(2012) ("[E]ach state shall provide by law for the registration or other means of qualification of all duly qualified residents of such State, who apply, not later than thirty days immediately prior to any presidential election, for registration or qualification to vote…"); 42 U.S.C. § 1973gg-6(a)(1) ("In the administration of voter registration for Federal office, each state shall -- (1) ensure that any eligible applicant is registered to vote in an election… (c) . . . not later than the lesser of 30 days, or the period provided by State law, before the date of election…"). Thus, there can be no dispute that, under the Elections Clause and federal law, North Carolina has the legal authority to close registration up to 30 days before an election.

---

[9] In its decision, the Fourth Circuit majority never explained why the state interest recognized in *Burns* and *Marston* did not justify North Carolina's decision to eliminate SDR.

27

These same principles apply to early voting. No Supreme Court decision and no act of Congress requires *any* type of early voting. Early voting is an accommodation to voters, not a constitutional or fundamental right. North Carolina would act within its constitutional authority to eliminate all forms of "early voting" and require voters to cast excuse-only absentee ballots or vote only on Election Day, subject to Congressional mandates for overseas and military voters. *See* The Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. §§ 1973ff – 1973ff-7. Instead, North Carolina has elected to continue its early voting accommodation to voters through no-excuse absentee voting by mail and no-excuse, in-person, one-stop voting for a ten-day period.

Plaintiffs contend that reducing the number of days county boards can schedule early voting from 17 days to ten days places an unconstitutional burden on voters. This argument is not supported by the facts since African American participation in early voting increased in 2014 as compared to 2010. More African Americans participated in early voting during a ten-day period in 2014 as compared to the 17-day period in 2010.[10] Regardless, plaintiffs can offer no guidelines on what would constitute a legally sufficient number of days for "early voting" versus an illegal reduction. While 45 days of early voting – or even the 60 days North Carolina allows for no-excuse absentee voting by mail – might be *preferable* to only 17 days, plaintiffs cannot claim that North Carolina *must* expand the days for early voting over and above 17 days. The amount of time a state decides to provide voters for an early-voting accommodation is a policy decision left to

---

[10] Plaintiffs' and their experts' focus on the number of days for early voting is simplistic and myopic. For example at least some of the states with more days have only one early voting center per county and far fewer total early voting hours than North Carolina.

state legislatures under the Elections Clause. Under SL 2013-381, "any burden on voters' freedom of choice and association is borne only by those who fail" to apply for and cast a no-excuse, mail-in absentee ballot or who fail to appear and vote during the ten-day period of one-stop voting that now may be scheduled by each county board of elections. *Burdick*, 504 U.S. at 436-37. In short, under SL 2013-381, voters still retain many options that allow them to vote at times other than on Election Day under the laws that apply to all voters equally regardless of race or any other personal characteristic.

These same principles also apply to the requirement that voters cast their ballots in the precinct where the voter resides. Congress has agreed that voters who cast out-of-precinct ballots shall have their votes counted in accordance with state law. 42 U.S.C. § 15482(a)(4). Prior to 2005, North Carolina's General Statutes precluded voters from voting in a precinct where they have never resided. *See James*, 359 N.C. at 267, 607 S.E.2d at 642. This requirement did not violate federal law when it was in effect. Requiring voters to cast their ballots in the precinct where they reside promotes sound election administration and avoids disputes over the offices for which an out-of-precinct voter is eligible to vote. Requiring Election Day voters to vote in their assigned precinct also means that fewer voters will be disenfranchised because only when voters vote in their assigned precinct are they assured of having the opportunity to vote for all of the legislative or local races for which they are eligible to vote.[11]

---

[11] This restriction does not apply to voters on Election Day who have not reported a change of their residence outside of the 30 day period prior to a general election. These voters will continue to be allowed to vote using a provisional ballot.

29

Furthermore, as with early voting, plaintiffs again fail to explain any limiting principles on the "right" to vote out-of-precinct. For example, logically extending plaintiffs' legal theory, why shouldn't a resident of Guilford County be allowed to vote in Wake County on Election Day and at least have his or her ballot counted for all statewide offices since the voter would be eligible to vote in those contests? If there is no rational reason for requiring voters to vote in the precinct of their residence, there can be no rational reason for making voters vote in the county of their residence. Clearly, such an argument would be just as baseless as plaintiffs' contentions that the Fourteenth Amendment bars a state from requiring Election Day voters to vote in the precinct of their residence.

Just like the number of days established for early voting and the provisions allowing for SDR during early voting, the decision by the 2007 General Assembly to allow voters within a county to vote in a precinct other than the one in which they resided was an accommodation to voters, albeit one with a substantial administrative burden on election officials; it was not required by the United States Constitution. Requiring all Election Day voters to vote in the precinct of their residence, a rule authorized by Congress and followed by a majority of the states, does not create a "severe burden" on the right to vote.

Finally, these same principles apply to pre-registration of 16- and 17-year-olds. This, too, was an accommodation provided by the General Assembly. While opinions may differ as to whether it has any merit as public policy, it is not required by either the Fourteenth Amendment or the Twenty-Sixth Amendment, so long as the State retains

30

voting regulations that allow new voters to register and vote in time for any general election that is held after they turn 18 years old. Nothing in SL 2013-381 can be construed as denying voters who will be 18 years of age at the time of the next General Election from registering to vote and from voting in that election.[12]

### 2. None of SL 2013-381's provisions violate the Twenty-Sixth Amendment.

The Twenty-Sixth Amendment to the United States Constitution states very simply:

> Section 1.     The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age.

> Section 2.     The Congress shall have the power to enforce this article by appropriate legislation.

U.S. Const., Amend. XXVI. While plaintiffs cite to numerous allegations in the Intervening Plaintiffs' Complaint by which they purport to allege violations of the Twenty-Sixth Amendment, they ignore one basic fact: Despite their allegations, nothing in SL 2013-381 can reasonably be construed as denying citizens who are at least 18 years of age, or who will be 18 years of age at the time of the next election, from registering to vote and from voting in that election. As a matter of law, the clear language of SL 2013-381 establishes that the law does not deprive any 18-year-old citizen of the right to vote.

---

[12] The claim by the Intervening Plaintiffs that a state violates the Fourteenth Amendment by granting the SBOE the sole authority to extend voting hours in a particular county is frivolous. The same is true of plaintiffs' claims regarding SL 2013-381 allowing each political party to appoint additional poll observers. We are aware of no legal authority supporting these claims, nor are we aware of any evidence produced by plaintiffs so far upon which any such claim could be legitimately based.

Moreover, no one, including the plaintiffs, has argued that the election practices in place prior to the enactment of SDR, out-of-precinct voting, 17-day early voting, and pre-registration violated the Twenty-Sixth Amendment. In fact, a majority of the states did not have these practices. The enactment of SL 2013-381 simply returned North Carolina to practices that formerly existed, represent the majority rule in states, and have never been considered to violate the Twenty-Sixth Amendment.[13] The claims under the Twenty-Sixth Amendment are baseless. *See Gaunt v. Brown*, 341 F.Supp. 1187 (S.D. Ohio 1972) (three-judge court) (holding that statute preventing 17-year-old plaintiff who would be 18-years-old at the time of the general election from voting in primary election did not deny plaintiff due process or equal protection and finding that the Twenty-Sixth Amendment "simply bans age qualifications *above* 18") (emphasis added), *aff'd* 409 U.S. 809 (1972).

## CONCLUSION

For the foregoing reasons, defendants will be entitled to judgment on all of plaintiffs' claims following trial.

---

[13] Similarly, plaintiffs' constitutional claims are without merit. In order to prove a violation of the Fourteenth or Fifteenth Amendment, plaintiffs must show that SL 2013-381 was intentionally adopted or maintained by state officials for a discriminatory purpose and that it has a discriminatory effect. *City of Mobile v. Bolden*, 446 U.S. 55 (1980). In 1982, Congress amended Section 2 in response to *Bolden* to make clear that a violation of that statute could be proved by showing discriminatory effect alone. *Gingles*, 478 U.S. at 35. Like plaintiffs' claims under Section 2, plaintiffs' constitutional claims fail because they cannot prove that application of SL 2013-381 has caused or will cause a discriminatory effect. Moreover, plaintiffs continue to be unable to meet the heavy burden for establishing discriminatory purpose stated in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

32

This the 29th day of June, 2015.

ROY COOPER
ATTORNEY GENERAL OF NORTH CAROLINA

/s/ Alexander McC. Peters
Alexander McC. Peters
Senior Deputy Attorney General
N.C. State Bar No. 13654
apeters@ncdoj.gov

/s/ Katherine A. Murphy
Katherine A. Murphy
Special Deputy Attorney General
N.C. State Bar No. 26572
kmurphy@ncdodoj.gov

N.C. Department of Justice
P.O. Box 629
Raleigh, NC  27602
Telephone: (919) 716-6900
Facsimile: (919) 716-6763
*Counsel for Defendants North Carolina and State Board of Election Defendants.*

OGLETREE, DEAKINS, NASH SMOAK & STEWART, P.C.

/s/ Thomas A. Farr
Thomas A. Farr
N.C. State Bar No. 10871
Phillip J. Strach
N.C. State Bar No. 29456
thomas.farr@ogletreedeakins.com
phil.strach@ogletreedeakins.com
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Telephone:  (919) 787-9700
Facsimile:  (919) 783-9412
*Co-counsel for Defendants North Carolina and State Board of Election Defendants.*

33

BOWERS LAW OFFICE LLC

By: /s/ Karl S. Bowers, Jr.
Karl S. Bowers, Jr.*
Federal Bar #7716
P.O. Box 50549
Columbia, SC 29250
Telephone: (803) 260-4124
E-mail: butch@butchbowers.com
*appearing pursuant to Local Rule 83.1(d)
*Counsel for Governor Patrick L. McCrory*

By: /s/ Robert C. Stephens
Robert C. Stephens (State Bar #4150)
General Counsel
Office of the Governor of North Carolina
20301 Mail Service Center
Raleigh, North Carolina 27699
Telephone: (919) 814-2027
Facsimile: (919) 733-2120
E-mail: bob.stephens@nc.gov
*Counsel for Governor Patrick L. McCrory*

## CERTIFICATE OF SERVICE

I, Thomas A. Farr, hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will provide electronic notification of the same to the following:

**Counsel for United States of America:**

T. Christian Herren, Jr.
John A. Russ IV
Catherine Meza
David G. Cooper
Spencer R. Fisher
Elizabeth M. Ryan
Jenigh Garrett
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
Room 7254-NWB
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Gill P. Beck
Special Assistant United States Attorney
Office of the United States Attorney
United States Courthouse
100 Otis Street
Asheville, NC 28801

**Counsel for NCAAP Plaintiffs:**

Penda D. Hair
Edward A. Hailes, Jr.
Denise D. Liberman
Donita Judge
Caitlin Swain
ADVANCEMENT PROJECT
Suite 850
1220 L Street, N.W.
Washington, DC 20005
phair@advancementproject.com

Irving Joyner
P.O. Box 374
Cary, NC 27512
ijoyner@nccu.edu

Adam Stein
TIN FULTON WALKER & OWEN
312 West Franklin Street
Chapel Hill, NC 27516
astein@tinfulton.com

Thomas D. Yannucci
Daniel T. Donovan
Susan M. Davies
K. Winn Allen
Uzoma Nkwonta
Kim Knudson
Anne Dechter
Bridget O'Connor
Jodi Wu
Kim Rancour
KIRKLAND & ELLIS LLP
655 Fifteenth St., N.W.
Washington, DC 20005
tyannucci@kirkland.com

*Counsel for League of Women Voter Plaintiffs:*

Anita S. Earls
Allison J. Riggs
Clare R. Barnett
Southern Coalition for Social Justice
1415 Hwy. 54, Suite 101
Durham, NC 27707
anita@southerncoalition.org

Laughlin McDonald
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, NE
Atlanta, GA 30303
lmcdonald@aclu.org

Dale Ho
Julie A. Ebenstein
ACLU Voting Rights Project
125 Broad Street
New York, NY 10004
dale.ho@aclu.org

Christopher Brook
ACLU of North Carolina Legal Foundation
PO Box 28004
Raleigh, NC 27611-8004
cbrook@acluofnc.org

*Counsel for the Intervening Plaintiffs*:

John M. Davaney
jdevaney@perkinscoie.com
Marc E. Elias
melias@perkinscoie.com
Kevin J. Hamilton
khamilton@perkinscoie.com
Elisabeth Frost
efrost@perkinscoie.com
PERKINS COIE, LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960

Edwin M. Speas, Jr.
espeas@poynerspruill.com
John W. O'Hale
johale@poynerspruill.com
Caroline P. Mackie
cmackie@poynerspruill.com
POYNER SPRUILL, LLP
301 Fayetteville St., Suite 1900
Raleigh, NC 27601

This the 29th day of June, 2015.

OGLETREE, DEAKINS, NASH SMOAK & STEWART, P.C.

/s/ Thomas A. Farr
Thomas A. Farr

21656913.1

21656913.1