# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) |
| PATRICK LLOYD MCCRORY, in his official capacity as the Governor of North Carolina, et al., | ) ) ) ) |
| Defendants. | ) ) |

**Case No.: 1:13-CV-658**

|  |  |
|---|---|
| LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) |
| THE STATE OF NORTH CAROLINA, et al., | ) ) |
| Defendants. | ) ) |

**Case No.: 1:13-CV-660**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) ) |
| Plaintiffs, | ) ) |
| v. | ) |
| THE STATE OF NORTH CAROLINA, et al, | ) ) |
| Defendants. | ) ) |

**Case No.: 1:13-CV-861**

## TRIAL BRIEF
### OF *NAACP* AND *LOWV* PLAINTIFFS AND *DUKE* PLAINTIFF-INTERVENORS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ........................................................................................... 1

ARGUMENT .................................................................................................. 4

I.     THE CHALLENGED PROVISIONS UNDULY BURDEN NORTH CAROLINA VOTERS IN VIOLATION OF THE FOURTEENTH AMENDMENT ........................................................................... 4

     A.    The *Anderson-Burdick* Legal Framework ........................................ 5

         1.    The *Anderson-Burdick* sliding-scale inquiry is flexible, and not a binary strict scrutiny vs. rational basis test ............ 6

         2.    The *Anderson-Burdick* inquiry focuses on voters who are actually affected by the restriction, not on voters generally ................................................................................ 9

         3.    The burden's severity is measured by the effect that the restrictions have on voters under the totality of electoral circumstances present in that state ........................ 11

     B.    The Evidence at Trial Will Show that the Challenged Provisions Impose Substantial Burdens on North Carolina Voters ............................................................................. 13

         1.    The repeal of SDR ............................................................... 13

         2.    The prohibition on counting OOP ballots ............................ 14

         3.    The reduction of the early voting period and elimination of CBOE discretion to keep polling locations open an extra hour .............................................. 15

         4.    The elimination of preregistration ....................................... 16

         5.    The combined burdens imposed by H.B. 589 ...................... 17

     C.    The Evidence at Trial Will Show that the State's Proffered Interests Cannot Justify the Substantial Burdens Imposed by H.B. 589 ............................................................................ 17

         1.    The repeal of SDR ............................................................... 18

         2.    Failing to count OOP provisional ballots ............................ 20

         3.    The elimination of a week of early voting and CBOE discretion to keep polling locations open an extra hour ...... 21

4. The repeal of preregistration ................................................ 24

II. THE CHALLENGED PROVISIONS OF H.B. 589 VIOLATE SECTION 2 OF THE VOTING RIGHTS ACT ....................................... 25

A. The Section 2 Legal Framework ..................................................... 26

1. H.B. 589 must be considered holistically ............................ 28

2. Plaintiffs need not prove that their right to vote has been completely denied ......................................................... 29

3. Facially neutral laws are not immune to Section 2 challenge ............................................................................... 30

4. The prior voting regime is "centrally relevant" to the Section 2 analysis ................................................................. 31

5. Other states' practices are irrelevant .................................. 34

B. The Evidence Presented at Trial Will Show that the Challenged Provisions of H.B. 589 Violate Section 2 ................... 35

III. THE CHALLENGED PROVISIONS OF H.B. 589 WERE ENACTED WITH RACIALLY DISCRIMINATORY INTENT IN VIOLATION OF THE FOURTEENTH AND FIFTEENTH AMENDMENTS ........................................................................................... 39

A. The Legal Framework for an Intentional Discrimination Claim Under the Fourteenth and Fifteenth Amendments .............. 39

B. The Evidence Presented at Trial Will Show that the Challenged Provisions of H.B. 589 Were Enacted with Racially Discriminatory Intent ......................................................... 40

IV. THE CHALLENGED PROVISIONS WERE ENACTED WITH DISCRIMINATORY INTENT AGAINST YOUNG VOTERS IN VIOLATION OF THE 26TH AMENDMENT .......................................... 44

A. The Legal Framework for a 26th Amendment Claim ..................... 44

B. The Challenged Provisions Were Intended to Burden the Voting Rights of Young North Carolinians ................................... 48

CONCLUSION ............................................................................................. 54

# TABLE OF AUTHORITIES

**Cases**

*ACLU of N.M. v. Santillanes*, 546 F.3d 1313 (10th Cir. 2008) .......................................... 10

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ............................................................. passim

*Beer v. United States*, 425 U.S. 130 (1976) ........................................................................ 33

*Brooks v. Gant*, No. CIV. 12-5003-KES, 2012 WL 4482984 (D.S.D. Sept. 27, 2012) .... 31

*Burdick v. Takushi*, 504 U.S. 428 (1992) .................................................................... passim

*Busbee v. Smith*, 549 F. Supp. 494 (D.D.C. 1982) ............................................................. 50

*Bush v. Gore*, 531 U.S. 98 (2000) ...................................................................................... 12

*Carrington v. Rash*, 380 U.S. 89 (1965) ............................................................................ 48

*Chisom v. Roemer*, 501 U.S. 380 (1991) ....................................................................... 25, 30

*City of Los Angeles v. Patel*, — S. Ct. —, No. 13-1175,
    2015 WL 2473445 (U.S. June 22, 2015) ........................................................................ 9

*City of Mobile v. Bolden*, 446 U.S. 55 (1980) ................................................................... 39

*Clingman v. Beaver*, 544 U.S. 581 (2005) .......................................................................... 7

*Colo. Project-Common Cause v. Anderson*, 178 Colo. 1 (1972) ...................................... 46

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) ................................... passim

*Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639 (4th Cir. 2002) .................... 43

*Dickson v. Rucho*, 2013 WL 3376658 (N.C. Super Ct. July 8, 2013) ............................... 37

*Florida v. United States*, 885 F. Supp. 2d 299 (D.D.C. 2012) .......................................... 16

*Georgia v. Ashcroft*, 539 U.S. 461 (2003) ........................................................................ 32

*Gray v. Johnson*, 234 F. Supp. 743 (S.D. Miss. 1964) ......................................................... 30

*Harman v. Forssenius*, 380 U.S. 528 (1965) ....................................................................... 30

*Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966) ............................................ 4, 10

*Holder v. Hall*, 512 U.S. 874 (1994) ................................................................................. 30

*James v. Bartlett*, 607 S.E.2d 638 (N.C. 2005) ................................................................. 20

*Jolicoeur v. Mihaly*, 5 Cal. 3d 565 (1971) ......................................................... 45, 46, 48, 54

*Kusper v. Pontikes*, 414 U.S. 51 (1973) ............................................................................... 4

*Lane v. Wison*, 307 U.S. 268 (1939) ........................................................................... 29, 46

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) ................................. 32

*League of Women Voters v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ............... passim

*Marks v. United States*, 430 U.S. 188 (1977) ..................................................................... 10

*Marston v. Lewis*, 410 U.S. 679 (1973) .............................................................................. 12

*McCutcheon v. FEC*, 134 S. Ct. 1434 (2014) ....................................................................... 1

*McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215 (4th Cir. 1995) ............................... 6, 8

*NAACP v. McCrory*, 997 F. Supp. 2d 322 (M.D.N.C. 2014) ............................................. 42

*Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012) ......................... 9, 15

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012) .................................... 6, 8, 12, 20

*Obama for Am. v. Husted*, 888 F. Supp. 2d 897 (S.D. Ohio 2012) ................................... 12

*Ohio State Conference of NAACP v. Husted*, 43 F. Supp. 3d 808 (S.D. Ohio 2014) 11, 12

*Ohio State Conference of NAACP v. Husted*, 768 F.3d 524 (6th Cir. 2014) ............. passim

*Operation Push v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987) ..................................... 31

*Operation Push, Inc. v. Mabus*, 932 F. 2d 400 (5th Cir. 1991)..........................................31

*Orgain v. City of Salisbury*, 305 F. App'x 90 (4th Cir. 2008) ...........................................39

*Pisano v. Strach*, 743 F.3d 927 (4th Cir. 2014)..................................................................12

*Reno v. Bossier Parish School Board*, 520 U.S. 471 (1997).................................40, 41, 50

*Reno v. Bossier Parish School Board*, 528 U.S. 320 (2000)......................................32, 33

*Reynolds v. Sims*, 377 U.S. 533 (1964) ...........................................................................2, 7

*Sanchez v. State of Colo.*, 97 F.3d 1303 (10th Cir.1996) ....................................................34

*Spirit Lake Tribe v. Benson Cnty.*, No. 2:10-cv-095,
2010 WL 4226614 (D.N.D. Oct. 21, 2010) .....................................................................31

*Stewart v. Blackwell*, 444 F.3d 843 (6th Cir. 2006) ...........................................................31

*Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914 (9th Cir. 2003) ...............31

*Symm v. United States*, 439 U.S. 1105 (1979).....................................................................47

*Tex. Dept. of Housing & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, No. 13–1371,
2015 WL 2473449 (U.S. June 25, 2015) ........................................................................26

*Thornburg v. Gingles*, 478 U.S. 30 (1986).................................................................passim

*United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978) .......................................47, 48

*United States v. Virginia*, 518 U.S. 515 (1996).................................................................43

*Veasey v. Perry*, — F. Supp. 3d —, No. 13-CV-00193, 2014 WL 5090258
(S.D. Tex. Oct. 9, 2014) ...............................................................................................7, 9

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). 39, 40, 51, 53

*Walgren v. Board of Selectmen of the Town of Amherst*,
519 F.2d 1364, 1368 (1st Cir. 1975) ........................................................................47, 51

*Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973) .........................................................46

*Washington v. Davis*, 426 U.S. 229, 242 (1976) ........................................................passim

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ............................................................................ 1

*Wood v. Meadows*, 207 F.3d 708 (4th Cir. 2000) ............................................................ 12

*Worden v. Mercer Cnty. Bd. of Elections*, 61 N.J. 325, 345 (1972)............................ 46, 54

**Statutes**

52 U.S.C. § 10301 ......................................................................................................passim

N.C.G.S. § 163-57 ............................................................................................................ 52

N.C.G.S. § 20-4.01 ........................................................................................................... 53

N.C.G.S. § 20-7 ................................................................................................................ 52

**Other Authorities**

117 Cong. Rec. 7534 (1971).............................................................................................. 45

1982 U.S.C.C.A.N. ............................................................................................................ 34

*Black's Law Dictionary* 7 (9th ed. 2009) ........................................................................ 29

Eric S. Fish, *The Twenty-Sixth Amendment Enforcement Power*,
    121 Yale L.J. 1168, 1175 (2012)................................................................................... 44

S. Rep. No. 92-26 (1971)................................................................................... 44, 46, 53

**INTRODUCTION**

"There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1440-41 (2014) (Roberts, C.J., plurality op.). Because voting is the fundamental building block of political power, "[o]ther rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). For that reason, the right to vote enjoys extraordinary protections as a matter of both statutory and constitutional law.

This case demonstrates the continuing urgency of those protections. The challenged provisions of House Bill 589 ("H.B. 589") threaten to undo fifteen years of progress during which North Carolina adopted numerous election reforms to remedy the state's sad history of racial discrimination in voting and dismal rates of voter participation by voters of all races. The adoption of those reforms—including primarily same-day registration ("SDR"), out-of-precinct ("OOP") voting, 17 days of no-excuse in-person early voting, and preregistration—coincided with a surge in participation in North Carolina elections and a massive diversification of the electorate. In spite of that recent history—indeed, because of it—the North Carolina General Assembly has now eliminated or curtailed these reforms, a move that cannot be reconciled with the constitutional and statutory protections safeguarding the most basic of all civil liberties.

*First*, the challenged provisions unduly burden the fundamental right to vote in violation of the Fourteenth Amendment. Restrictions on voting rights "strike at the heart of representative government" and warrant the closest attention. *Reynolds v. Sims*, 377

1

U.S. 533, 555 (1964). As a constitutional matter, states cannot impose substantial burdens on the right to vote in the absence of actual evidence that the imposition of those burdens is outweighed by an important governmental interest furthered by the challenged restrictions. The evidence presented at trial will show that the challenged provisions make it significantly harder for many North Carolinians to vote and that Defendants are incapable of substantiating the flimsy rationales they have offered for these provisions.

*Second*, the effects of the challenged provisions fall most heavily on minority voters, causing them to have "less opportunity" to participate in the political process, in violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 ("Section 2"). As the Fourth Circuit previously found, the plain facts of this case demonstrate that the practices eliminated or cut back by H.B. 589 "were enacted to increase voter participation, that African American voters disproportionately used those electoral mechanisms, and that House Bill 589 restricted those mechanisms and thus disproportionately impacts African American voters." *League of Women Voters v. North Carolina*, 769 F.3d 224, 246 (4th Cir. 2014). Moreover, it is undisputed that African Americans continue to bear the effects of racial discrimination and subjugation in all aspects of social, economic, and political life in North Carolina, such that they will be most keenly affected by the burdens on voting imposed by the challenge provisions. Thus, when "viewed in the context of relevant social and historical conditions in North Carolina," H.B. 589 is a "textbook example of Section 2 vote denial." *Id*. (quotations and citation omitted).

2

*Third*, the racially disproportionate effects of H.B. 589 were no secret. Those that would be most affected by these new laws were well known to the General Assembly, which enacted the statute (at least in part) to depress minority voter turnout, in violation of the Fourteenth and Fifteenth Amendments' prohibition on intentional racial discrimination in voting. The highly unusual and expedited manner in which H.B. 589 was enacted, the evidence of disparate impact that was before the General Assembly at the time, and the absence of any credible permissible legislative rationale all point towards a finding of discriminatory animus.

*Fourth*, the same dubious legislative history, the unjustified burdens that H.B. 589 places on young voters in particular, the open hostility of members of the General Assembly to youth voting, and actions by the State Board of Elections ("SBOE"), the Division of Motor Vehicles ("DMV"), and county boards of elections ("CBOEs") that deterred voting by young North Carolinians provide compelling evidence that the law was also enacted with the purpose of discriminating against young voters, in violation of the Twenty-Sixth Amendment.

The challenged provisions should be permanently enjoined on the basis of these constitutional and statutory violations. The evidence at trial will include testimony from numerous North Carolina voters who, as a result of the challenged provisions, were prevented from voting during the November 2014 election. Absent relief, thousands of voters in North Carolina will similarly be irreparably harmed by having their right to vote

unconstitutionally abridged, and in many cases denied outright, in the 2016 presidential election.

## ARGUMENT

I. **THE CHALLENGED PROVISIONS UNDULY BURDEN NORTH CAROLINA VOTERS IN VIOLATION OF THE FOURTEENTH AMENDMENT**

The Fourteenth Amendment safeguards the "precious" and "fundamental" right to vote, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966), by prohibiting any encumbrance on the right that is not adequately justified by the state's asserted interests. *See Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992). As set forth in *Anderson* and *Burdick*, courts making this determination must apply a balancing test that weighs the severity of the burden imposed on the exercise of the franchise against the state's proffered justifications.

When evaluated under the *Anderson-Burdick* balancing test, the evidence will show that the challenged provisions of H.B. 589 violate the Fourteenth Amendment because (1) the elimination of modes of participation that were enacted to remedy the state's historically dismal rates of voter participation, and on which hundreds of thousands of North Carolinians now rely, imposes substantial burdens on North Carolina voters, and (2) the state cannot justify these burdens, as it can offer only conclusory, vague, and unsupported justifications that do not withstand scrutiny.

4

### A.  The *Anderson-Burdick* Legal Framework

"[A] State may not choose means that unnecessarily restrict constitutionally protected liberty."  *Anderson*, 460 U.S. at 806 (quoting *Kusper v. Pontikes*, 414 U.S. 51, 59 (1973)).  But challenges to restrictions on the fundamental right to vote "cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions." *Anderson*, 460 U.S. at 789.  Rather, courts must "weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"  *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).  "However slight [a] burden [on voting] may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling opinion) (internal quotation marks omitted).

There are three guiding principles under the *Anderson-Burdick* legal standard governing claims alleging undue burdens on the fundamental right to vote: (1) the state's asserted rationales for instituting a restriction that imposes burdens on voters are subject to a *sliding-scale* of scrutiny, in which the inquiry's "rigorousness" increases with the burdens' severity; (2) in assessing the severity of a burden, the inquiry must focus on *voters who are actually affected* by the voting restriction, and not on all voters generally;

and (3) the severity of a burden is measured not in the abstract, but by its effect on voters within the full electoral circumstances *in the state at issue*.

### 1. The *Anderson-Burdick* sliding-scale inquiry is flexible, and not a binary strict scrutiny vs. rational basis test.

The *Anderson-Burdick* framework is a "flexible" sliding scale, in which "the rigorousness of [the court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens [voting rights]." *Burdick*, 504 U.S. at 434. At the two extremes of this sliding scale, strict scrutiny is applied to severe restrictions on the right to vote, while deferential rational basis review is reserved for regulations that impose merely incidental or no burdens at all. *See Crawford*, 553 U.S. at 190, 202 (controlling opinion); *Ohio State Conference of NAACP v. Husted*, 768 F.3d 524, 538 (6th Cir. 2014) ("*Ohio NAACP II*"), *vacated on other grounds*, No. 14-3877 (6th Cir. Oct. 1, 2014), ECF No. 53-1. The Fourth Circuit has explained that the majority of cases fall in between the two extremes—*i.e.*, they involve significant burdens that are more than incidental but not quite severe—and therefore are "subject to ad hoc balancing." *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995); *see also id.* at 1221 n.6 (expressly rejecting the proposition that "election laws that impose less substantial burdens need pass only rational basis review"). Critically, in order to trigger the *Anderson-Burdick* balancing test, voters need not show that they are prohibited from voting altogether. *See, e.g.*, *Ohio NAACP II*, 768 F.3d at 541 ("[T]he Supreme Court has not required absolute certainty in predicting how many voters would be prevented from voting by laws that impose burdens on the right to vote."); *Obama for*

*Am. v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012) ("*OFA II*") ("Plaintiffs did not need to show that they were legally prohibited from voting, but only that 'burdened voters have few alternate means of access to the ballot.'" (citations and quotation marks omitted)).

The *Anderson-Burdick* balancing test entails a heightened form of scrutiny that probes the "legitimacy and strength" of the state's asserted justifications, taking into account "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789; *see also Burdick*, 504 U.S. at 434. As the Sixth Circuit recently explained in applying the *Anderson-Burdick* standard to a similar case in Ohio, "more piercing scrutiny" than mere rational basis review is required if the elimination of early voting opportunities imposes "significant" burdens. *Ohio NAACP II*, 768 F.3d at 545, 548; *see also Veasey v. Perry*, — F. Supp. 3d —, No. 13-CV-00193, 2014 WL 5090258, at *42 (S.D. Tex. Oct. 9, 2014) (applying *Anderson-Burdick* balancing test to "a substantial, albeit not severe, burden on the[] right to vote," because it "implicates heavier burdens than the rational basis test will accommodate"). Ultimately, because "the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds*, 377 U.S. at 562; *cf. Clingman v. Beaver*, 544 U.S. 581, 603 (2005) (O'Connor, J., concurring in part) ("[A]pplying heightened scrutiny helps to ensure that such limitations are truly justified

7

and that the State's asserted interests are not merely a pretext for exclusionary or anticompetitive restrictions.").

This heightened form of scrutiny entails a three-part analysis. *First*, the state must identify the "precise interests" that the challenged restriction logically furthers. *See Anderson*, 460 U.S. at 789. The mere articulation of a valid state interest is insufficient if the voting restriction is "not logically linked to" it. *See Ohio NAACP II*, 768 F.3d at 547.

*Second*, the state's proffered interests must be sufficiently supported by actual *evidence*. *See, e.g.*, *id.* at 548 (while "scattered historical examples of voter fraud" may be sufficient to justify a restriction under rational basis review, such evidence was insufficient under "more searching review" required for a significant burden); *OFA II*, 697 F.3d at 434 (restriction unconstitutional where state provided "no evidence" to support its "vague" justifications).

*Third*, the court must examine whether the state's proffered interests are important enough to outweigh the burden imposed on the right to vote. As the Fourth Circuit has explained, "a regulation which imposes only moderate burdens could well fail the *Anderson* balancing test when the interests that it serves are minor, notwithstanding that the regulation is rational." *McLaughlin*, 65 F.3d at 1221 n.6. Thus, even a valid state interest supported by evidence will be insufficient if that interest does not outweigh the substantial burdens imposed on voters. *See, e.g.*, *Ohio NAACP II*, 768 F.3d at 549 (state's interest in "uniformity, standing alone, is not an interest important enough to significantly burden Plaintiffs' ability to vote" (internal quotation marks omitted)).

## 2. The *Anderson-Burdick* inquiry focuses on voters who are actually affected by the restriction, not on voters generally.

When assessing the severity of a challenged voting restriction, courts must consider the effects on those voters who are *actually* affected by the restriction. *See, e.g.*, *Crawford*, 553 U.S. at 198 (controlling opinion) (in assessing severity of burdens imposed by voter ID law, holding that relevant burdens "are those imposed on persons who are eligible to vote but do not possess a current photo identification"); *Burdick*, 504 U.S. at 434 (in evaluating state's interests under *Anderson-Burdick*, courts must "tak[e] into consideration 'the extent to which th[e state's] interests make it necessary to burden *the plaintiff's rights*'" (quoting *Anderson*, 460 U.S. at 789) (emphasis added)). This is an individualized inquiry into the precise effects on actually burdened voters, rather than the effects on voters generally. *See, e.g.*, *Crawford*, 553 U.S. at 201 (controlling opinion) (assessing burdens on "indigent voters"); *Ohio NAACP II*, 768 F.3d at 543-44 (evaluating burdens on "African American, lower-income, and homeless voters"); *Veasey*, 2014 WL 5090258, at *42 (evaluating "the burdens imposed upon the subgroup—here, those who do not possess . . . qualified photo ID"); *cf. City of Los Angeles v. Patel*, — S. Ct. —, No. 13-1175, 2015 WL 2473445 (U.S. June 22, 2015) (holding that the facial validity of a statute must be assessed by focusing on cases in which the law applies, not on those in which the law is irrelevant).

Critically, a law may be unconstitutional even if it affects only a relatively modest percentage of total voters. Indeed, in *Anderson*, the Supreme Court struck down a law that affected only those voters who supported a minor candidate for president, comprising

9

about 6% of the electorate. *See* 460 U.S. at 784-86; *see also League of Women Voters*, 769 F.3d at 244 ("even one disenfranchised voter—let alone several thousand—is too many"); *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 593 (6th Cir. 2012) ("*NEOCH*") (law likely unconstitutional even though it affected only *0.248%* of total ballots cast).

The Supreme Court remained true to this approach in *Crawford*. Although the Court upheld Indiana's voter photo ID requirement, it did so largely because the plaintiffs failed to present any evidence of the burdens imposed by the law. *See Crawford*, 553 U.S. at 187 (controlling opinion). Justice Stevens, who wrote the controlling opinion, recognized that in a future case, a voting restriction could be found unjustified and thus unconstitutional based on evidence that it imposes burdens "on a political party, an individual voter, or a discrete class of voters." *Id.* at 191; *see also id.* at 189 (observing that poll taxes, even if it not burdensome for average voter, violate Fourteenth Amendment because of burdens they impose on poor voters (citing *Harper*, 383 U.S. at 666)).[1]

---

[1] While this Court previously observed that, in *Crawford*, Justice Scalia would have foreclosed any challenge to a voting regulation requiring a "voter-by-voter examination of the burdens on voting regulations," 553 U.S. at 204 (Scalia, J., concurring), his is not the controlling opinion. The controlling opinion is the one that provides the narrowest rationale, *see Marks v. United States*, 430 U.S. 188, 193 (1977), and belongs to Justice Stevens. *See Ohio NAACP II*, 768 F.3d at 544; *ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1321 (10th Cir. 2008). Justice Scalia's view that "individual impacts" are "[ir]relevant to determining the severity of the burden," *Crawford*, 553 U.S. at 205 (Scalia, J., concurring), was rejected by a majority of the *Crawford* Court. *See* 553 U.S. at 190-191 (Stevens, J., controlling opinion); *id.* at 211-14 (Souter, J., dissenting); *id.* at 238-39 (Breyer, J., dissenting).

### 3. The burden's severity is measured by the effect that the restrictions have on voters under the totality of electoral circumstances present in that state.

Voting practices such as "[e]arly voting do[] not necessarily play the same role in all jurisdictions." *Ohio NAACP II*, 768 F.3d at 546. Thus, other states' practices cannot be used as a "litmus test" substitute for the fact-specific "hard judgments" that *Anderson-Burdick* demands. *See id.* at 538, 546. Instead, in measuring the "character and magnitude" of the burden imposed, courts must carefully examine how the challenged set of voting restrictions interacts with the particular election laws and voting opportunities in the relevant state to impact voters in that state. *See, e.g.*, *Burdick*, 504 U.S. at 434-39 (analyzing burden imposed by write-in voting ban "in light of the adequate ballot access afforded under Hawaii's election code"); *Ohio NAACP II*, 768 F.3d at 546 (measuring severity of burden of Ohio's early voting cutback by looking at its impact on voters in Ohio's electoral context). This approach has two implications here.

*First*, the relevant inquiry is not whether all voters everywhere have an absolute right to the modes of participation eliminated or reduced by H.B. 589. Rather, the question is whether the state, having previously found it necessary to provide the eliminated voting opportunities to address its historically dismal rates of voter participation, has now imposed an undue burden on North Carolina voters by *repealing* voting opportunities on which those voters have come to rely. *See, e.g.*, *Ohio State Conference of NAACP v. Husted*, 43 F. Supp. 3d 808, 840-41 (S.D. Ohio 2014) ("*Ohio NAACP I*") ("Having decided to enact a broad scheme of [early in-person]/absentee

11

voting, [the state] may not capriciously change or implement that system in a manner that disproportionately burdens the right to vote of certain groups of voters."), *aff'd*, *Ohio NAACP II*, 768 F.3d 524.[2] Thus, "'[t]here is no reason to think [a] decision here compels any conclusion about the early-voting [or other voting] practices in other states.'" *League of Women Voters*, 769 F.3d at 244 (quoting *Ohio NAACP II*, 768 F.3d at 560).

*Second*, where, as here, plaintiffs challenge multiple, simultaneously imposed voting restrictions, the effect of these restrictions must be measured cumulatively, not in isolation. *See, e.g.*, *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014) ("[W]e evaluate the combined effect" of ballot access rules); *Wood v. Meadows*, 207 F.3d 708, 713 (4th Cir. 2000) (considering other statutory provisions when analyzing constitutionality of filing deadline). Individual provisions that may not be unduly burdensome standing alone can create unconstitutional burdens when considered in light of other provisions or the broader electoral context. *See Ohio NAACP I*, 43 F. Supp. 3d at 815 (evaluating "combined effect" of various voting restrictions). The Court must therefore measure the

---

[2] *Marston v. Lewis*, 410 U.S. 679 (1973), is not to the contrary. That case, which upheld Arizona's 50-day voter registration requirement, was not a repeal of a previous, more accessible registration deadline upon which thousands of Arizonans had come to rely. Where, as here, a state has altered its electoral context by instituting certain modes of participation, it vests a right in its voters to participate by those means, the modification or retraction of which, while not foreclosed, must comport with the guarantees of the Fourteenth Amendment. *See Obama for Am. v. Husted*, 888 F. Supp. 2d 897, 910 (S.D. Ohio 2012) ("*OFA I*"), *aff'd*, 697 F.3d 423 (6th Cir. 2012); *cf. Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam) (although there is no stand-alone constitutional right to vote for presidential electors, once a state vests that right in its people, Equal Protection guarantees apply).

severity of H.B. 589's burdens by assessing the impacts of the elimination or curtailment of the challenged provisions cumulatively within the state's broader electoral context.

### B. The Evidence at Trial Will Show that the Challenged Provisions Impose Substantial Burdens on North Carolina Voters

At trial, Plaintiffs will establish that the challenged provisions impose significant and material burdens on voters—and particularly on low-income voters and (as discussed in the following sections) minority and young voters—which, under the *Anderson-Burdick* balancing test, trigger a heightened form of scrutiny that Defendants cannot satisfy.

### 1. The repeal of SDR

"[T]he ability to register and vote on the same day can make the difference between being able to exercise the fundamental right to vote and not being able to do so." *Ohio NAACP II*, 768 F.3d at 539 (citation and internal quotation marks omitted). The evidence will show that the repeal of SDR in North Carolina will impose a substantial burden on North Carolina voters, being especially acute in higher turnout presidential elections, demonstrating, among other things, that: (1) over 90,000 voters relied on SDR in each presidential election in which it was available, far exceeding SDR usage in Ohio, where its repeal was enjoined as unconstitutional, *cf. id.* (enjoining elimination of SDR in OH where over 5,000 voters utilized SDR in 2012); (2) the institution of SDR was followed by an increased registration rate; (3) many voters who relied on SDR would otherwise have been unable to vote because they had not registered in time; (4) North Carolina's voter registration scheme is fraught with error and apathy, making SDR a vital

13

failsafe in ensuring that duly registered voters can cast a ballot; and (5) the repeal of SDR disenfranchised thousands of voters in 2014, including at least some voters who had timely completed all steps to register, but were denied an opportunity to correct DMV or CBOE errors in processing their registrations.

In particular, transient voters, often members of a lower-income class, face difficulties in registering and voting without SDR. *Cf. Ohio NAACP II*, 768 F.3d at 542 ("[V]oting by mail is not actually a viable alternative means of access to the ballot" for low-income voters who are "distrustful of the mail and/or voting by mail," and who have more difficulty navigating "[t]he associated costs and more complex mechanics of voting by mail." (citations and internal quotation marks omitted)).[3] Because the repeal of SDR has resulted and will continue to result in the complete disenfranchisement of thousands of eligible voters, the burden from its repeal under the *Anderson-Burdick* framework is severe.

### 2. The prohibition on counting OOP ballots

Eliminating the right to OOP voting will have a substantial effect on North Carolinians, namely, the disenfranchisement of voters who appear and cast ballots at the wrong precinct but are eligible to vote for the vast majority of elected offices that extend beyond the geography of the precinct. The evidence will show, among other things, that:

---

[3] Unlike in *Crawford*, where the Court considered the severity of the burden of the voter ID law to be mitigated by a provision of the law that permits voters without ID on Election Day to return at a later time with ID and have their ballots counted, *see* 553 U.S. at 199 (controlling opinion), there will be no failsafe for North Carolinians who did not register or update their registrations when moving before the now-earlier registration cutoff.

14

(1) several thousand voters have used OOP voting in both midterm and presidential elections; (2) many voters do not know to what precinct they are assigned and/or do not have sufficient time or transportation to get to their assigned precinct, and thus go to a different polling place on Election Day; (3) some voters are directed to the wrong precinct due to pollworker error, rendering the discarding of their ballots fundamentally unfair, *cf. NEOCH*, 696 F.3d at 597; (4) lower-income voters who lack access to private transportation are unlikely to find transportation to the correct precinct if they happen to go to the wrong precinct; and (5) many North Carolina voters, including witnesses who will testify at trial, were effectively disenfranchised by the repeal of OOP voting in the 2014 elections. Again, because OOP provisional ballots will not be counted at all, the repeal of this provision results in disenfranchisement—a severe burden—on voters who try to avail themselves of this mechanism.

### 3. The reduction of the early voting period and elimination of CBOE discretion to keep polling locations open an extra hour

Plaintiffs will prove that the elimination of one week of early voting will impose a substantial burden on the many North Carolina voters who, for over a decade, have relied on a 17-day early voting period. The evidence will establish, among other things, that: (1) North Carolina voters have relied heavily, and in increasing numbers, on early voting, with 700,000 ballots cast on the specific days eliminated by H.B. 589 in each of the last two presidential elections—a number that exceeds the number of voters affected by early voting cutbacks enjoined in other cases, *see, e.g.*, *Ohio NAACP II*, 768 F.3d at 539 (enjoining elimination of one week of early voting in which approximately 90,000

15

Ohioans had cast ballots in 2012); (2) many of these hundreds of thousands of voters will now find it harder to vote, due to inflexible work schedules and childcare responsibilities or a lack of transportation, *see, e.g.*, *Florida v. United States*, 885 F. Supp. 2d 299, 328-29 (D.D.C. 2012) (reducing early voting period from discretionary range of 12-14 days to 8 days constitutes a "materially increased burden on African-American voters' effective exercise of the electoral franchise," which "would impose a sufficiently material burden to cause some reasonable minority voters not to vote"); (3) in particular, lower-income voters will have substantial difficulties adjusting to the shorter early voting period; (4) reducing the early voting period in the context of a high-turnout presidential election will cause significant congestion at the polls on Election Day, lengthening North Carolina's already-long waiting times to vote and deterring thousands of voters from participating; (5) these problems will be exacerbated by H.B. 589's elimination of CBOE discretion to keep polling locations open an extra hour; and (6) "[w]ith a substantially reduced voting period, third-party groups would not be able to assist minority voters effectively," *Florida*, 885 F. Supp. 2d at 330. The evidence will further establish that the provision of H.B. 589 that purports to require counties to offer the same aggregate number of early voting hours that were offered in 2012 will not alleviate these problems.

### 4. The elimination of preregistration

Plaintiffs will prove that the repeal of preregistration will impose a severe burden on North Carolina voters as well. The evidence will show that, from 2010 to 2013, over 150,000 young citizens preregistered to vote. The large number of young North

Carolinians who would have used preregistration but for its repeal must now find another way to register to vote. Moreover, the evidence at trial will show that preregistration noticeably increases youth turnout and that its repeal is likely to result in a decrease of up to 50,000 young voters in the 2016 presidential election.

### 5. The combined burdens imposed by H.B. 589

Each challenged provision independently acts as a significant hurdle to political participation warranting heightened scrutiny under the *Anderson-Burdick* framework. Viewed in concert, these provisions impose an even larger burden that Defendants must justify with evidence of correspondingly weighty interests. For example, voters utilizing early voting may cast their ballots without regard to precinct; but the reduction of the early voting period by half will exacerbate problems caused by the ban on OOP voting on Election Day. The trial record will also demonstrate that the new restrictions will interact in ways that cumulatively make it particularly difficult for lower-income and young voters to register and cast a ballot that is counted. Those provisions will prevent organizations from providing adequate assistance to voters, forcing them to scale back their initiatives, including by directing funds away from voter registration, voter education activities, voter assistance, and get-out-the-vote ("GOTV") efforts.

### C. The Evidence at Trial Will Show that the State's Proffered Interests Cannot Justify the Substantial Burdens Imposed by H.B. 589

Because Plaintiffs will establish that the challenged provisions of H.B. 589 impose substantial burdens on North Carolina voters, the Court must apply a heightened form of scrutiny under *Anderson-Burdick*. The evidence at trial will show that the challenged

17

provisions cannot survive that review, and are thus unconstitutional under the Fourteenth Amendment. Indeed, because the justifications offered for the challenged provisions are weak at best, those provisions must be struck down even under a less searching level of scrutiny. *See Crawford*, 553 U.S. at 191 (controlling opinion) ("However slight [a] burden [on voting] may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." (internal quotation marks omitted)).

### 1. The repeal of SDR

Defendants have asserted two interests in repealing SDR: detecting fraud and ensuring that only voters who satisfy the state's U.S. mail postcard verification process have their votes counted at the canvass. Prelim. Inj. Mem. & Order ("PI M & O"), Doc. 182 at 77.[4] These proffered interests, which boil down to the purported fear that a same-day registrant might fraudulently register and cast a vote without enough time to determine whether the registration is legitimate before the ballot is counted, do not justify eviscerating a right upon which a quarter million North Carolinians have relied.

As an initial matter, Defendants will not be able to offer evidence that *any* fraudulent votes were cast and counted as a result of SDR. Although Defendants may point to evidence that a small percentage of SDR ballots cast by voters whose registrations were not verified were counted, it is also true that ballots cast by voters who

---

[4] All cited docket numbers refer to the docket for *League of Women Voters of North Carolina, et al. v. State of North Carolina, et al.*, No. 13-cv-660.

registered by other means are sometimes counted before the mail-verification process has been completed. *Cf. Ohio NAACP II*, 768 F.3d at 547 (holding that "the specific concern Defendants expressed regarding voter fraud—that the vote of an [early SDR] voter would be counted before his or her registration could be verified—was not logically linked to concerns with voting and registering on the same day, but rather has more to do with the registration process and verification of absentee ballots generally" (internal quotation marks omitted)). Plaintiffs, moreover, will present evidence that the inability to verify a voter's registration status through the state's postcard verification process does *not* mean that the voter's ballot is fraudulent, as mail to a voter's registration address can be returned to sender for a host of benign reasons, such as administration or postal worker error or an intervening change in residence caused by graduation or deployment, among other reasons. And, notwithstanding vague claims that SDR contributes to "havoc" and inaccurate voter rolls, the evidence will establish that SDR was easy to implement and manage.

Further demonstrating the hollowness of Defendants' justifications, Plaintiffs will establish that in-person presentation and simultaneous verification of proof of residence, as was required for same-day registrants, reduces the potential for and appearance of fraud when compared to registration by mail because election workers observe the registrant in person and can confirm that person's identity and eligibility on the spot. In other words, the fact that SDR required proof of residence compliant with the Help America Vote Act ("HAVA") was more than sufficient to remedy any concerns over

19

fraudulent voting. Plaintiffs will also present evidence that, in North Carolina, registration applications submitted via SDR were *more likely* to be subsequently verified by mail than voter registration applications submitted via other means.

### 2. Failing to count OOP provisional ballots

Defendants fail to offer any substantiated justification for disenfranchising voters who cast OOP provisional ballots. As this Court has explained, Defendants' primary interest in banning OOP voting is administrative, *i.e.*, OOP voting *could* result in "overwhelming delays, mass confusion, and the potential for fraud." PI M & O, Doc. 182 at 86 (citing *James v. Bartlett*, 607 S.E.2d 638, 644 (N.C. 2005)). But that rationale rings hollow. North Carolina is already *legally obligated* to provide and canvass provisional ballots under HAVA. The state therefore cannot say that permitting OOP voting adds an administrative burden. Thus the state's burden and confusion arguments must be centered on *counting* such ballots, but the state has previously pointed out to this Court that it is "easy" to count OOP ballots.

Defendants also have no evidence that counting OOP ballots has ever caused mass confusion, overwhelming delays, or fraud, or that future elections "will be more onerous than the numerous other elections that have been successfully administered." *OFA II*, 697 F.3d at 433; *see also Ohio NAACP II*, 768 F.3d at 548-49 (cost-saving rationale insufficient without evidence that defendants would "struggle" with costs of maintaining status quo). Rather, testimony from election administrators will show that the state has counted OOP ballots in past elections without difficulty. The evidence will also show

20

that discarding OOP ballots results in marginal administrative savings or efficiencies for the state, because even post-H.B. 589 the state remains legally required to provide OOP voters with provisional ballots and to subsequently review those ballots, regardless of whether they will ultimately be counted.

Defendants have also hypothesized that "candidates and political parties can deliver large groups of voters to vote in precincts to which they are not assigned," thereby "creat[ing] backlogs and lines." Defs.' PI Opp'n, Doc. 138 at 39. As with their other justifications, however, Defendants do not appear to have any evidence to support these conjectures. Nor have Defendants explained why the voters in this hypothetical scenario should be disenfranchised.

### 3. The elimination of a week of early voting and CBOE discretion to keep polling locations open an extra hour

Defendants have suggested four interests that purportedly justify the significant burdens imposed by the elimination of a week of early voting: (1) uniformity, (2) cost savings, (3) election efficiency, and (4) informed voters. These rationales, however, are entirely unsupported by evidence, and do not withstand even casual scrutiny, let alone the searching review required under the *Anderson-Burdick* framework.

*First*, any claim that the elimination of a week of early voting serves an interest in statewide "uniformity" is dubious, given that the law does not require different counties to have the same number of total hours, daily operating hours, or number of early voting locations *as each other*. In fact, the evidence will show that there was a wide variance among counties in those respects in past elections, and H.B. 589 actually locks those

differences among counties into place, by purporting to require each county to maintain the same number of early voting hours it had in previous elections. The result is not uniformity, but a requirement to maintain substantial differences in early voting opportunities from county to county. In addition, the record will establish that many counties received an exemption from matching their prior polling place hours, such that H.B. 589 does not even guarantee uniformity within counties across elections. In any event, Defendants cannot "explain why a uniform [early] voting schedule could not also include" the seven days of early voting that have been eliminated. *Ohio NAACP II*, 768 F.3d at 549. And, as the Sixth Circuit has observed, "uniformity, standing alone, is not an interest important enough to significantly burden Plaintiffs' ability to vote." *Id.*

*Second*, cutting early voting does not provide any cost-savings to the State or County Boards of Elections; in fact the evidence will show that it is quite costly. As for their claim that shortening early voting will "decrease[] the cost of political campaigns," Defs.' PI Opp'n, Doc. 138 at 37, Defendants do not appear to have any evidence to support this novel theory, nor is this notion reflected in H.B. 589's legislative record. Regardless, this proffered interest is far outweighed by the burdens that the reduction in early voting imposes on voters.

*Third*, the assertion by some supporters of H.B. 589 that the reductions in early voting would "streamline" voting in the state is entirely unsupported and makes little sense. As the evidence will show, early voting sites were *already* highly congested even before the reduction in the early voting period, which only exacerbates the problem.

22

*Fourth*, Defendants' conclusory assertion that early voting increases the "likelihood of voters voting with incomplete information about the candidates," Defs.' PI Opp'n, Doc. 138 at 39, likewise will have no evidentiary support. To the contrary, Plaintiffs will offer evidence that early voters are in fact generally among the more informed voters and unlikely to change their minds. In any event, the possibility that an early voter might change his mind after voting applies equally to absentee voting by mail (which Defendants have not sought to curtail), and hardly justifies imposing substantial burdens on the right to cast a ballot in the first place. Indeed, the Supreme Court's "cases reflect a greater faith in the ability of individual voters to inform themselves about campaign issues . . . [, such that a] State's claim that it is enhancing the ability of its citizenry to make wise decisions . . . must be viewed with some skepticism." *Anderson*, 460 U.S. at 797-98.

In addition, the legislative record does not contain, and Defendants have not supplied, any justification whatsoever for the removal from CBOEs of the discretion to keep the polls open for an extra hour in extraordinary circumstances. Absent any justification, this change cannot stand. *See Crawford*, 553 U.S. at 191 (controlling opinion) ("However slight [a] burden [on voting] may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." (internal quotation marks omitted)).

### 4. The repeal of preregistration

Neither of the two rationales for the elimination of preregistration asserted by Defendants, *see* Defs.' PI Opp'n, Doc. 138 at 40, will hold up at trial.

*First*, Defendants claim that preregistration created confusion, but as the trial record will show, concerns about voter confusion weigh firmly *against* the elimination of preregistration. In support of their assertion, Defendants rely solely on the unsupported claim that CBOE staff in one county had received calls from individuals who were confused about preregistration. Yet, SBOE Executive Director Kim Strach testified that she had never heard of any confusion regarding preregistration. Moreover, whereas the preregistration regime instituted the clear rule that a citizen was eligible to preregister when he or she turned 16, the repeal of preregistration means that a 17 year old, to discern whether he or she is eligible to register to vote, must determine whether he or she will be 18 by Election Day—a task that often is not so simple given that municipalities can set their own dates for the general election in odd-numbered years. Indeed, in implementing the repeal of preregistration, the SBOE requested that the DMV not register *any* 17 year olds—a decision that led to more than 2,700 young North Carolinians unlawfully not having been offered the opportunity to register at the DMV— "out of concerns that DMV personnel should not be required to master a complicated set of timeframes and concerns that young people left the DMV believing they had been registered when, as it turned out, they were not in fact eligible to register." June 18, 2014 Decl. of Kimberly Strach, Doc. No. 138-1, ¶ 56 .

*Second*, Defendants assert that preregistration increased administrative costs for the counties. The evidence will establish, however, that aside from the SBOE's holding the preregistration in a queue, there was no difference in terms of administrative actions between a preregistration application and a standard registration application. *See Ohio NAACP II*, 768 F.3d at 548-49 (cost-saving rationale insufficient without evidence that defendants would "struggle" with costs of maintaining status quo).

*      *      *

The flimsiness of Defendants' proffered justifications for each of the challenged provisions of H.B. 589 becomes only more stark when weighed against the cumulative burdens that these provisions impose. Thus, when evaluated under the heightened scrutiny that the *Anderson-Burdick* framework demands, the evidence will establish that the challenged provisions violate the Fourteenth Amendment by imposing unjustified burdens on voters who seek to exercise their right to vote.

## II.   THE CHALLENGED PROVISIONS OF H.B. 589 VIOLATE SECTION 2 OF THE VOTING RIGHTS ACT

"Congress enacted the Voting Rights Act of 1965 for the broad remedial purpose of 'rid[ding] the country of racial discrimination in voting,'" and, accordingly, "the Act should be interpreted in a manner that provides the 'broadest possible scope' in combating racial discrimination." *Chisom v. Roemer*, 501 U.S. 380, 403 (1991). The statute proscribes not only outright intentional discrimination on the basis of race, but any "standard, practice, or procedure" that "*results* in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. §

25

10301(a) (emphasis added); *cf. Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, No. 13–1371, 2015 WL 2473449, at *13 (U.S. June 25, 2015) ("Recognition of disparate impact liability . . . plays a role in uncovering discriminatory intent: It permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment."). A voting practice runs afoul of Section 2's results standard if, under "the totality of the circumstances," racial minorities have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). "The essence of a [Section] 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

The evidence at trial will establish that the challenged provisions violate Section 2 because: (1) the eliminated or curtailed modes of participation were relied on disproportionately by minority voters, and (2) minority voters continue to bear the effects of racial discrimination in North Carolina, suffer from severe socioeconomic disparities, and therefore will have greater difficulty overcoming the burdens on voting imposed by the challenged provisions.

**A. The Section 2 Legal Framework**

As the Fourth Circuit held in this case, a Section 2 claim in this context has two elements. *First*, "the challenged standard, practice, or procedure must impose a

26

discriminatory burden on members of a protected class, meaning that members of the protected class must have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *League of Women Voters*, 769 F.3d at 240 (quotation marks omitted). *Second*, "that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Id.* (quotation marks omitted).

In assessing both elements, courts consider the "totality of the circumstances," 52 U.S.C. § 10301(b), including "certain typical factors pulled directly from the Voting Rights Act's legislative history," *League of Women Voters*, 769 F.3d at 240. As the Fourth Circuit explained, these factors include:

- The history of voting-related discrimination in the pertinent state or political subdivision;

- The extent to which voting in the elections of the pertinent state or political subdivision is racially polarized;

- The extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;

- The exclusion of members of the minority group from candidate slating processes;

- The extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

- The use of even subtle racial appeals in political campaigns;

27

- The extent to which members of the minority group have been elected to public office in the jurisdiction;

- Evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group; and

- The extent to which the policy underlying the state's or the political subdivision's use of the contested practice or structure is tenuous.

*Id.* (citing *Gingles*, 478 U.S. at 44-45). Although "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other," *Gingles*, 478 U.S. at 45, these "typical" factors nonetheless "may shed light on whether the two elements of a Section 2 claim are met." *League of Women Voters*, 769 F.3d at 240.

As set forth below, there are five legal principles that must kept in mind in applying this framework: (1) the challenged provision must be considered holistically; (2) voters need demonstrate only that the challenged measure results in an "abridgement" of minority voting rights, not that their right to vote has been completely denied; (3) facially neutral laws are not immune from Section 2 challenge; (4) the prior voting regime is "centrally relevant" to the Section 2 analysis; and (5) other states' practices are irrelevant.

### 1. H.B. 589 must be considered holistically.

Although each of the challenged provisions of H.B. 589 would be unlawful had it been enacted in isolation, Section 2 requires courts to consider the *entirety* of the challenged enactment. As the Fourth Circuit has explained, it is error to "inspect[] the different parts of House Bill 589 as if they existed in a vacuum." *League of Women Voters*, 769 F.3d at 242. Instead of isolating and analyzing each provision independently,

28

the Court must consider "the sum of" the various provisions of H.B. 589 and the "cumulative effect on minority access to the ballot box." *Id.*

### 2. Plaintiffs need not prove that their right to vote has been completely denied.

At times, Defendants have suggested that Plaintiffs are required to prove that their ability to vote has been entirely "denied" by the challenged provisions of H.B. 589. That is wrong. As the Fourth Circuit has explained: "[N]othing in Section 2 requires a showing that voters cannot register or vote under any circumstance." *League of Women Voters*, 769 F.3d at 243; *see also Ohio NAACP II*, 768 F.3d at 552 ("Section 2 applies to any 'standard, practice, or procedure' that makes it harder for an eligible voter to cast a ballot, not just those that actually prevent individuals from voting."). As a textual matter, Section 2 does not forbid only practices that entirely "deny" the right to vote. Rather, Section 2 also prohibits any measure that results in an "abridgement" of minority voting rights. 52 U.S.C. § 10301(a). As set forth in the statute, a violation of that prohibition is established upon a showing that members of a protected class have "less opportunity," rather than no opportunity, to exercise their right to vote. 52 U.S.C. § 10301(b).

Indeed, the Supreme Court has explained that the prohibition on "abridgement" of the right to vote reaches any "onerous procedural requirements which effectively handicap exercise of the franchise by the colored race," *Lane v. Wison*, 307 U.S. 268, 275 (1939), as well as any "cumbersome procedure[s]" and "material requirement[s]" that

"erect[] a real obstacle to voting," *Harman v. Forssenius*, 380 U.S. 528, 541-42 (1965).[5]

The inclusion of the term "abridgment" thus broadens Section 2 to include voting practices that make voting more difficult for racial minorities. *See Holder v. Hall*, 512 U.S. 874, 922 (1994) (Thomas, J., concurring) (Section 2 "covers all manner of registration requirements, the practices surrounding registration (including the selection of times and places where registration takes place and the selection of registrars), the locations of polling places, the times polls are open, . . . and other similar aspects of the voting process that might be manipulated.").

### 3. Facially neutral laws are not immune to Section 2 challenge.

A voting law also is not immunized from Section 2 review just because it facially treats members of different races equally. Defendants have previously argued that H.B. 589 must be lawful because it "applies equally to all voters regardless of race." Defs.' 12(b) Motion at 34; *see also id.* (arguing that the challenged provisions "apply to all voters equally"). But facially neutral statutes can cause minority voters to have "less opportunity" to vote as compared to whites—and therefore violate Section 2. "If, for example, a county permitted voter registration for only three hours one day a week, and that made it more difficult for African Americans to register than whites, . . . [Section] 2 would . . . be violated," even though the law on its face treated all races equally. *Chisom*, 501 U.S. at 408 (Scalia, J. dissenting). Again, the "essence" of a Section 2 claim is not

---

[5] Abridge is defined as "[t]o reduce or diminish." *Black's Law Dictionary* 7 (9th ed. 2009); *Gray v. Johnson*, 234 F. Supp. 743, 746 (S.D. Miss. 1964) ("When the word is used in connection with . . . the word deny, it means to circumscribe or burden.") (quotation omitted).

whether a specific statute or regulation discriminates on its face, but whether a facially neutral statute "interacts with social and historical conditions to cause an inequity in the opportunities [to vote] enjoyed by black and white voters." *Gingles*, 478 U.S. at 47. As written, therefore, Section 2 is expressly focused on the impact that facially neutral statutes have on minority voting opportunities, in light of existing social and economic conditions.

Thus, courts have found that plaintiffs can state a claim under Section 2 when challenging facially neutral barriers to voting that disproportionately burden minority voters, including: restrictions on registration, *Operation Push v. Allain*, 674 F. Supp. 1245, 1262-68 (N.D. Miss. 1987), *aff'd*, *Operation Push, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991); limits on early voting, *Brooks v. Gant*, No. CIV. 12-5003-KES, 2012 WL 4482984, at *7 (D.S.D. Sept. 27, 2012); closure or relocation of polling places, *Spirit Lake Tribe v. Benson Cnty.*, No. 2:10-cv-095, 2010 WL 4226614, at *3 (D.N.D. Oct. 21, 2010), *Brown v. Dean*, 555 F. Supp. 502, 504-05 (D.R.I. 1982); and the frequent use of old voting technology in predominantly minority communities, *Stewart v. Blackwell*, 444 F.3d 843, 877-79 (6th Cir. 2006); *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (per curiam).

### 4. The prior voting regime is "centrally relevant" to the Section 2 analysis.

North Carolina's previous voting practices are "centrally relevant" and "a critical piece of the totality-of-the-circumstances analysis Section 2 requires." *League of Women Voters*, 769 F.3d at 242. As the Supreme Court has explained, Section 2 requires a

"searching practical evaluation of the 'past and present reality,' with a 'functional view of the political process." *Gingles*, 478 U.S. at 45 (quotations omitted). Conducting such a "searching practical evaluation" necessarily requires an examination of past practices, including whether the new law "eliminates voting opportunities that used to exist under prior law that African Americans disproportionately used." *League of Women Voters*, 769 F.3d at 242 (quotations omitted).

Defendants have previously objected to taking account of preexisting voting practices in North Carolina, arguing that doing so would improperly incorporate a Section 5-style "retrogression" standard into Section 2. But the premise of that argument is wrong: as the Fourth Circuit explained, "[n]either the Supreme Court nor this Court has ever held that, in determining whether an abridgement [of the right to vote in violation of Section 2] has occurred, courts are categorically barred from considering past practices." *Id.* at 241. In *Reno v. Bossier Parish School Board*, the Supreme Court explained that, whereas Section 5 applies "*only* to retrogression," Section 2 challenges "involve *not only* changes but (much more commonly) the status quo itself." 528 U.S. 320, 334 (2000) ("*Bossier Parish II*"). *Bossier Parish II* thus explained that Section 2 (no less than Section 5) prohibits discriminatory changes to voting laws. *See also Georgia v. Ashcroft*, 539 U.S. 461, 478 (2003) (explaining that "some parts of the [Section] 2 analysis may overlap with the [Section] 5 inquiry"). Indeed, the Supreme Court has previously found a Section 2 violation in part based on changes to a state's electoral system. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 439 (2006) (noting that "[t]he *changes*

32

to District 23 undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive") (emphasis added).

Section 2's application to discriminatory changes in voting laws is apparent from the text of the statute itself. The "retrogression" analysis commonly required in Section 5 cases stems from the phrase "abridging the right to vote on account of race or color" in Section 5. *See Bossier Parish II*, 528 U.S. at 333-34. But *almost identical language* appears in Section 2, which prohibits the "abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(b). No less than in Section 5, the term "abridge" as used in Section 2 "necessarily entails a comparison. It makes no sense to suggest that a voting practice 'abridges' the right to vote without some baseline with which to compare the practice." *Bossier Parish II*, 528 U.S. at 334. Because Section 2 forbids "abridgment" of the right to vote, courts must at the very least take account of "changes in voting practices" and evaluate how those changes impact minority voting opportunities.

To be sure, the inquiries under Section 5 and Section 2 are not identical. "[Section] 5 prevents nothing but backsliding," whereas Section 2 prohibits "discrimination more generally." *Id.* at 334-35. Under the Section 5 retrogression analysis, the focus is solely on "the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 130, 141 (1976). But under Section 2 the question is whether, "based on the totality of

33

circumstances," the challenged provisions result in minority voters having "less opportunity *than other members of the electorate* to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b) (emphasis added). And clearly, "[t]he fact that a practice or law eliminates voting opportunities that used to exist under prior law that African Americans disproportionately used is . . . relevant to an assessment of whether, under the current system, African Americans have an equal opportunity to participate in the political process as compared to other voters." *League of Women Voters*, 769 F.3d at 241-42 (quoting *Ohio NAACP II*, 768 F.3d at 558); *see also Sanchez v. State of Colo.*, 97 F.3d 1303, 1325 (10th Cir. 1996) ("'If [a challenged] procedure markedly departs from past practices or from practices elsewhere in the jurisdiction, that bears on the fairness of its impact.'") (quoting 1982 U.S.C.C.A.N. at 207 n.117).

### 5. Other states' practices are irrelevant.

Finally, the Fourth Circuit has explained that the practices of *other* states are irrelevant to the analysis under Section 2, which "on its face, is local in nature." *League of Women Voters*, 769 F.3d at 243. Liability under Section 2 is "peculiarly dependent upon the facts of each case." *Gingles*, 478 U.S. at 78-79 (citations and internal quotation marks omitted). Other states' practices have no bearing on whether the enactment of H.B. 589 *by North Carolina* "interacts with social and historical conditions" *in North Carolina* "to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives" *in North Carolina. Id*. at 47; *see also Ohio NAACP*

34

*II*, 768 F.3d at 559 ("The focus is on the internal processes of a single State or political subdivision and the opportunities enjoyed by that particular electorate. The text of Section 2 does not direct courts to compare opportunities across States.").

Thus, given the "intense[] local[ity]" of the analysis required by Section 2, a finding for Plaintiffs in this case would not imperil voting regimes in *other* states. Indeed, the Supreme Court has explained that, under Section 2, the same electoral practice may be permissible in some contexts but not others. *See Gingles*, 478 U.S. at 46 ("[E]lectoral devices, such as at-large elections, may not be considered *per se* violative of § 2," because liability depends on the "totality of the circumstances," which may vary in different jurisdictions."); *see also League of Women Voters*, 769 F.3d at 243 (explaining that a conclusion in this case "as to North Carolina" would not "somehow throw other states' election laws into turmoil").

### B. The Evidence Presented at Trial Will Show that the Challenged Provisions of H.B. 589 Violate Section 2

The challenged provisions of H.B. 589—both individually and collectively—violate Section 2 of the Voting Rights Act. *First*, the Fourth Circuit has already held that "[t]here can be no doubt that certain challenged measures of House Bill 589 disproportionately impact minority voters." *League of Women Voters*, 769 F.3d at 245. At trial, Plaintiffs will present additional evidence that the substantial burdens on voting imposed by the challenged provisions, discussed *supra* in Section I.B, are felt disproportionately and most keenly by African-American and Latino voters. The evidence will demonstrate that, among other things, African-American voters

disproportionately relied on the eliminated or reduced voting opportunities. Plaintiffs will show that African-American voters utilized SDR at approximately double the rate of white voters in three of the last six elections in which it was available, were twice as likely as white voters to cast OOP provisional ballots, and have used early voting at increasingly higher rates than white voters in recent general elections. Plaintiffs will also show that Latino voters are likely to be impacted in the same way as African Americans by the elimination of OOP and the cuts in early voting and that the elimination of SDR and preregistration will strike the Latino community particularly harshly because this community suffers from much lower registration rates and will have much higher percentages of young people coming of age to use preregistration in the coming years. Eliminating those means of participation will clearly result in African Americans and Latinos having "less opportunity" to vote than whites.

*Second*, Plaintiffs will prove that the discriminatory burdens that H.B. 589 imposes on African Americans and Latinos are "caused by or linked to social and historical conditions" in North Carolina. *League of Women Voters*, 769 F.3d at 245 (quotation marks omitted).

With respect to the relevant social and historical conditions in North Carolina, the evidence will demonstrate, among other things, that: (1) North Carolina has a long and substantial history of voting-related discrimination, reflected not just in official discrimination from approximately 1900 to 1970, *see Gingles*, 478 U.S. at 38-39, but also in the many DOJ objections to and private lawsuits challenging discriminatory voting

36

practices in North Carolina under the VRA since 1971; (2) African Americans and Latinos continue to bear the effects of racial discrimination and economic and political subjugation in all aspects of social, economic, and political life in North Carolina, "lag[ing] behind whites in several key socioeconomic indicators, including education, employment, income, access to transportation, and residential stability," *id*. at 246 (quotations omitted), as well as in health and criminal justice; (3) a "pervasive pattern" of racially polarized voting continues to exist in North Carolina, which Defendants have acknowledged, *see Dickson v. Rucho*, 2013 WL 3376658, at *18 (N.C. Super. Ct. July 8, 2013); (4) overt and implicit racial appeals have been used in North Carolina elections since the late 19th century and as recently as 2012; (5) North Carolina elected officials have failed to address the persistent socioeconomic and criminal justice disparities between African-American and white residents of North Carolina and ignored minority concerns related to the racially disparate impacts of the challenged provisions of H.B. 589, demonstrating a lack of responsiveness to the particularized needs of minority voters; and (6) the rationales given by North Carolina for enacting the challenged provisions, as discussed *supra* in Section I.C, are tenuous at best.

As to the connection between these social and historical conditions and the discriminatory burden that H.B. 589 imposes on African Americans and Latinos, Plaintiffs will show, among other things, that: (1) the challenged provisions, as discussed *supra* in Section I.B, impose particular burdens on voters with higher rates of transience and lower rates of income, education, and vehicle ownership; (2) this population of voters

is disproportionately comprised of African Americans and Latinos as a result of the social and historical factors described above, including the effects of past and present discrimination; (3) GOTV efforts, which are critical in African-American communities as a result of these socioeconomic disparities, will be less effective as a result of the challenged provisions; and (4) the disproportionate burden on African Americans imposed by the reduction in the early in-person voting period can be linked to the legacy of racial discrimination in voting and the racialized context of North Carolina politics, which has rendered "voting by mail . . . not actually a viable alternative means of access to the ballot" for African Americans, who take special pride in being able to vote in-person and distrust that their vote will be counted if sent by mail. *See Ohio NAACP II*, 768 F.3d at 542 (internal quotation marks omitted). The evidence will also show that H.B. 589 will encourage increased levels of voter challenge and intimidation, burdening African Americans' and Latinos' ability to participate in the political process. When combined with the history of voting-related racial intimidation in North Carolina—and more recent discriminatory observer and challenger activity—H.B. 589's weakening of protections against intimidation will produce a chilling effect on voters of color. When considered in interaction with North Carolina's history of electoral racial discrimination, unless H.B. 589's provisions on observers and challenges are enjoined, African Americans' and Latinos' ability to participate in the political process will be reduced by increased levels of voter challenge and intimidation at the polls.

## III. THE CHALLENGED PROVISIONS OF H.B. 589 WERE ENACTED WITH RACIALLY DISCRIMINATORY INTENT IN VIOLATION OF THE FOURTEENTH AND FIFTEENTH AMENDMENTS

Plaintiffs also will present overwhelming direct and circumstantial evidence at trial showing that H.B. 589 was enacted with the intent to discriminate against African-American and Latino voters in North Carolina, in violation of the Fourteenth and Fifteenth Amendments. *See, e.g.*, *City of Mobile v. Bolden*, 446 U.S. 55, 62, 66 (1980) (plurality opinion); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

### A. The Legal Framework for an Intentional Discrimination Claim Under the Fourteenth and Fifteenth Amendments

To prove unlawful racial discrimination, Plaintiffs need not show that "the challenged action rested *solely* on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265 (emphasis added). "Rather, Plaintiffs need only establish that racial animus was one of several factors that, taken together, moved [the decision-maker] to act as he did." *Orgain v. City of Salisbury*, 305 F. App'x 90, 98 (4th Cir. 2008). Although it can "rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern," a law nonetheless violates the Constitution "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision." *Arlington Heights*, 429 U.S. at 265-66.

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266; *see also Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[A]n

39

invidious discriminatory purpose may often be inferred from the totality of the relevant facts.").  Whether a law "bears more heavily on one race than another" is "an important starting point" in conducting that analysis.  *Davis*, 426 U.S. at 242; *see also Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997) ("*Bossier Parish I*") (disproportionate impact of legislation "is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions").  But courts should also consider other factors, including "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes."  *Arlington Heights*, 429 U.S. at 267.  Courts should take account of "[t]he specific sequence of events leading up the challenged decision," including any "[d]epartures from the normal procedural sequence" in the General Assembly's consideration of a bill.  *Id*.  In addition, "[t]he legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  *Id.* at 268.

### B. The Evidence Presented at Trial Will Show that the Challenged Provisions of H.B. 589 Were Enacted with Racially Discriminatory Intent

At trial, Plaintiffs will show, based on the direct and circumstantial evidence, that H.B. 589 was enacted—at least in part—to depress voting by minority voters in North Carolina.  *First*, as explained *supra* in Section II.B, the evidence will show that H.B. 589 as a whole and each of the challenged provisions has a disparate racial impact, particularly on African Americans when compared to whites.  The evidence will further establish that the General Assembly was aware of this disparity, including, among other

40

things, that: (1) legislative staff, on behalf of legislators, requested data on demographic usage of SDR and early voting prior to the passage of the dramatically expanded version of H.B. 589; (2) the data provided to the General Assembly—and indeed, the undisputed data central to this case—demonstrates that voters of color disproportionately used these voting mechanisms; and (3) the members of the General Assembly were well aware that African-American voter participation had increased dramatically in North Carolina in recent years, and that the very practices repealed by H.B. 589 meaningfully contributed to that increase. The General Assembly therefore enacted H.B. 589 with full knowledge that the challenged provisions would impose disproportionate burdens on African-American voters—a fact that is highly "probative" of why the General Assembly decided to enact the challenged provisions "in the first place." *Bossier Parish I*, 520 U.S. at 487.

*Second*, the evidence will show that the sequence of events leading to the enactment of H.B. 589 was highly irregular. Shortly after a United States Supreme Court ruling invalidated a key portion of the Voting Rights Act, thus removing North Carolina from the protective purview of federal preclearance, the General Assembly's leadership took note and pursued sweeping changes to North Carolina's elections laws, using as a vehicle a short bill that had been dedicated solely to voter ID, and which had languished for months. This more expansive law was not revealed until hours before it was presented in a Senate Rules Committee meeting that took place just three days before the end of the legislative session, the law bypassed any consideration by a Conference Committee, and it was not substantively debated. For a law that rewrote essentially every

41

section of North Carolina's election code, this was an extremely abnormal process. Significantly, the key inquiry is not whether "the General Assembly complied with all of its rules during the passage of" the law, *NAACP v. McCrory*, 997 F. Supp. 2d 322, 359 (M.D.N.C. 2014), *aff'd in part, rev'd in part sub nom.*, *League of Women Voters*, 769 F.3d 224, but whether, even though there might have been technical "compliance," the process used was out of step with the way in which business is generally conducted in the General Assembly—particularly for matters of this import. On *that* issue, the evidence will clearly show that the manner in which H.B. 589 was enacted was highly unusual for a law of its size and significance.

*Third*, a review of the legislative record confirms that the state's rationales for enacting the challenged provisions of H.B. 589 are either entirely tenuous, *see supra* Section I.C, or post hoc. On SDR, the General Assembly received evidence that hundreds of thousands of voters relied on SDR to register and vote and that SDR *assisted* with the effective administration of elections. Moreover, as explained *supra* in Section I.C.1, any concern that SDR results in the counting of fraudulently cast ballots is strained, at best. With respect to OOP voting, the record will show that the General Assembly failed to query any CBOE officials prior to the enactment of H.B. 589 on the alleged burdens borne by the counties from the counting OOP provisional ballots. As for the reduction in early voting, the justifications proffered fall completely flat and, in some cases, are not actually reflected in the legislative record.

42

In this case, the legislative leaders who designed and sponsored H.B. 589 have declined to testify about their motives, rationales, or their internal decisionmaking processes and have successfully resisted discovery on those issues by asserting legislative privilege. Although the Defendants have asserted legislative privilege to prevent discovery, the fact that Defendants refused to disclose their motives or put their credibility on the line by testifying under oath about their intent further undermines the credibility of the flimsy rationales for this legislation included in the legislative record or put forward post hoc by Defendants' attorneys and experts. Moreover, the weight of all evidence on legislative intent more than weighs in favor of plaintiffs despite the denial to plaintiffs of any opportunity to seek discovery of the legislative files.

Nor can the state rely on post-hoc rationales to support H.B. 589. Such after-the-fact reasoning tells the Court nothing about the General Assembly's intent in passing the challenged provisions. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) (legislature's reasons for enacting laws that impinge on fundamental rights "must be genuine, not hypothesized or invented *post hoc* in response to litigation"). Indeed, Defendants' need to resort to post-hoc rationalizations only confirms the conclusion to which the facts above lead: the General Assembly's true motivations were unlawful. *Cf. Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002) ("The fact that an employer has offered inconsistent post-hoc explanations for its employment decisions is probative of pretext.").

43

# IV. THE CHALLENGED PROVISIONS WERE ENACTED WITH DISCRIMINATORY INTENT AGAINST YOUNG VOTERS IN VIOLATION OF THE 26TH AMENDMENT

In 2000, North Carolina ranked 43rd in the nation for young voter registration and 31st for young voter turnout. Over the course of the next decade, North Carolina enacted a number of measures, including an expanded early voting period, OOP voting, SDR, and preregistration, that made the franchise more accessible to young voters. And young North Carolinians took advantage of these reforms. From 2010-2013, over 150,000 young people preregistered to vote. Moreover, over 50,000 young voters used SDR in the 2012 presidential election alone. In part because of North Carolina's measures expanding access to the franchise, by 2012 North Carolina's young citizens were registered and voted at some of the highest rates in the nation: youth registration rates had risen to 8th in the country, while young voter turnout had climbed to 10th.

In 2013, the General Assembly took action to reverse this trend with the enactment of H.B. 589. Indeed, the evidence at trial will show that the challenged provisions of H.B. 589 are likely to have a strong negative effect on registration and turnout among young voters in North Carolina. Because that impact on young voters is not an accidental result but rather one of the purposes of the challenged provisions, those provisions violate the 26th Amendment.

## A. The Legal Framework for a 26th Amendment Claim

Under the 26th Amendment, "[t]he right of citizens of the United States, who are eighteen years of age or older, shall not be denied or abridged by . . . any State on

44

account of age." The language of that amendment "embodies the language and formulation of the 19th amendment, which enfranchised women, and that of the 15th amendment, which forbade racial discrimination at the polls." S. Rep. No. 92-26 at 2 (1971); *see also* Note, Eric S. Fish, *The Twenty-Sixth Amendment Enforcement Power*, 121 Yale L.J. 1168, 1175 (2012). The framers of the 26th Amendment used those other amendments as models because, beyond simply granting the right to vote to all citizens between the ages of 18 and 21, they sought to ensure "that citizens who are 18 years of age or older shall not be discriminated against on account of age" in the voting context. 117 Cong. Rec. 7534 (1971) (statement of Rep. Richard Poff). The text of the 26th Amendment serves that broad anti-discriminatory purpose by proscribing not only the *denial* but also the *abridgement* of the right to vote. *See supra* p. 30 n.5; *Jolicoeur v. Mihaly*, 5 Cal. 3d 565, 571 (1971) ("The word 'abridge' means diminish, curtail, deprive, cut off, reduce.").

The 26th Amendment's broad scope reflects the historical context in which it was enacted. As the California Supreme Court explained the year the amendment was ratified, "America's youth entreated, pleaded for, demanded a voice in the governance of this nation. . . . And in the land of Vietnam they lie as proof that death accords youth no protected status." *Jolicoeur*, 5 Cal. 3d at 575. The amendment's backers argued "that the frustration of politically unemancipated young persons, which had manifested itself in serious mass disturbances, occurring for the most part on college campuses, would be alleviated and energies channeled constructively through the exercise of the right to

vote." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973) (footnote omitted).

Accordingly, "[t]he goal was not merely to empower voting by our youths but was

affirmatively to encourage their voting, through the elimination of unnecessary burdens

and barriers, so that their vigor and idealism could be brought within rather than remain

outside lawfully constituted institutions." *Worden v. Mercer Cnty. Bd. of Elections*, 61

N.J. 325, 345 (1972); *accord Jolicoeur*, 5 Cal. 3d at 575 (the Senate Report for SJR 7,

later enacted as the 26th Amendment, "indicates that Congress . . . disapproved of . . .

treatment . . . that it [feared] would give youth 'less of a sense of participation in the

election system' and 'might well serve to dissuade them from participating in the

election,' a result inconsistent with the goal of encouraging 'greater political participation

on the part of the young'") (quoting S. Rep. 92-26, 1971 U.S.C.C.A.N. 362).

Consistent with its broad language and history, courts interpreting the 26th

Amendment have explained that it guards against both blatant and subtle forms of

discrimination. *See Jolicoeur*, 5 Cal. 3d at 571 ("The [26th] Amendment . . . 'nullifies

sophisticated as well as simple-minded modes of discrimination. It hits onerous

procedural requirements which effectively handicap exercise of the franchise . . .

although the abstract right to vote may remain unrestricted[.]'") (quoting *Lane*, 307 U.S.

at 275 (15th Amendment case)); *see also Colo. Project-Common Cause v. Anderson*, 178

Colo. 1, 8 (1972) (holding based on "[h]istory and reason" that the 26th Amendment's

"prohibition against denying the right to vote to anyone eighteen years or older by reason

of age applies to the entire process involving the exercise of ballots and its

46

concomitants"). Thus, while the First Circuit concluded in *Walgren v. Board of Selectmen of the Town of Amherst*, 519 F.2d 1364, 1368 (1st Cir. 1975), that there was no violation of the 26th Amendment where the Town of Amherst had decided to hold an election when its college population was on break, the court explained that the town had tried to move the election to a time when school was in session but was unable to do so due to the short time period the town had to make a decision and that "the finding that defendants acted in good faith in a crisis atmosphere [wa]s significant." The First Circuit added that it "would not wish the end result of this . . . litigation to be construed as authority for setting critical election dates during college recesses in communities having a very large if not majority proportion of students who are also eligible voters in the 18-20 year age group, without a showing of some substantial justification," and that "[w]ere [it] to adjudicate this as a restriction for all time, . . . [it] might well come to a different conclusion." *Id.* at 1367-68.

The Supreme Court has considered the scope of the 26th Amendment on only one occasion. In *Symm v. United States*, 439 U.S. 1105 (1979), the Court summarily affirmed a district court's conclusion, in line with the cases discussed above, that a voter-registration practice that made it more difficult for students than for other voters to register was unconstitutional. That district court decision, *United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978), relied on the history of the 26th Amendment and Supreme Court precedent holding that:

> "Fencing out" from the franchise a sector of the population because of the way they may vote is constitutionally impermissible. "The exercise of

rights so vital to the maintenance of democratic institutions," cannot constitutionally be obliterated because of a fear of the political views of a particular group of bona fide residents.

*Id.* at 1260 (quoting *Carrington v. Rash*, 380 U.S. 89, 94 (1965)) (internal citations omitted). The *Texas* decision also quoted extensively from the California Supreme Court's opinion in *Jolicoeur*, which found that a registrar's refusal to register unmarried minors at addresses other than their parents' addresses "violate[d] the letter and spirit of the 26th Amendment," as it would "clearly frustrate youthful willingness to accomplish change at the local level through the political system"; "give any group of voters less incentive 'in devising responsible programs' in the town in which they live"; and guarantee the franchise to "[o]nly the most dedicated partisan." *Jolicoeur*, 5 Cal. 3d at 575; *see also Texas*, 445 F. Supp. at 1256-57.

### B. The Challenged Provisions Were Intended to Burden the Voting Rights of Young North Carolinians

The evidence in the record and that will be presented at trial demonstrates that, with H.B. 589, the State of North Carolina has done precisely what the 26th Amendment forbids: intentionally burden the ability of young people in particular to register and to vote. *First*, H.B. 589 targeted young voters on its face. It repealed the highly successful preregistration program, as well as mandatory voter-registration drives in high schools. H.B. 589 also permitted military IDs, veterans' IDs, and certain types of tribal enrollment cards, *but not college IDs*, to be used for voting—even though public college IDs would have been permissible forms of voter ID under the version of H.B. 589 originally passed

48

by the House.[6]  Notably, with its recent modification of the voter ID law, the General Assembly has permitted voters reasonably impeded from obtaining an ID to vote without any form of ID, yet it still will not permit voters to establish their identity with a college ID.

*Second*, the challenged provisions disproportionately burden young voters—often starkly.  Young voters were far more likely than older voter to use SDR in North Carolina, particularly for the purpose of registering to vote for the first time, and research has shown that SDR is especially beneficial for young citizens.  Likewise, young voters were disproportionate users of OOP voting when it existed, and they were 3.85 times more likely than older voters to cast rejected OOP provisional ballots in the 2014 general election.  Young voters are also less likely than older voters to possess a form of ID that could have been used for voting under H.B. 589's voter ID provision, strongly indicating that young voters would have been disproportionately burdened by that provision.  Further, there is reason to conclude that young voters will be disproportionately burdened by H.B. 589's reduction in early voting and elimination of the discretion that CBOEs had to extend by an hour the close of polling locations.

The Supreme Court has explained that the disproportionate impact of an action "is often probative of why the action was taken in the first place since people usually intend

---

[6] The voter ID requirement enacted as part of H.B. 589 remains highly relevant here, notwithstanding the recent modification of that requirement.  Discriminatory purpose may be inferred from the totality of the facts, *see Davis*, 426 U.S. at 242, and the General Assembly's intent in enacting the voter ID requirement is clearly probative of its intent in passing other provisions in H.B. 589.

49

the natural consequences of their actions." *Bossier Parish I*, 520 U.S. at 487; *see also Davis*, 426 U.S. at 242 (if true, fact "that the law bears more heavily on one race than another" is relevant to determination whether there was "invidious discriminatory purpose"). In this case, *several* provisions disparately impact or directly target young voters; and measures seen as unfavorable to young voters have a cumulative negative effect on them. The disproportionate impact here therefore provides a particularly strong basis for inferring that H.B. 589 was enacted with the intent, at least in part, to discriminate against young voters.

*Third*, the rationales for the challenged provisions are either nonexistent or weak. *Cf. Busbee v. Smith*, 549 F. Supp. 494, 517 (D.D.C. 1982) ("The absence of a legitimate, non-racial reason for a voting change is probative of discriminatory purpose, particularly if the factors usually considered by the decision makers strongly favor a decision contrary to the one reached.") (quotations omitted). Defendants have not even attempted to provide a rationale for the elimination of mandatory high school voter-registration drives or the refusal to accept college IDs as a form of voter ID. And the General Assembly provided no explanation for the elimination of OOP voting or the removal of discretion from CBOEs to extend polling times by an hour.

There was at least some basis provided for the elimination of preregistration: a senator's son was purportedly confused about whether preregistration permitted him to vote before he turned 18. But the effect of the elimination of preregistration (in addition to the unlawful failure to offer voter registration to over 2700 eligible 17 year olds) was

50

to create confusion, not to reduce it. *See supra* p. 24. And tellingly, only one state has ever repealed preregistration: North Carolina.

As set forth above, the rationales provided for the reduction in early voting days, the elimination of SDR, and the voter ID law were similarly strained. Thus, the rationales provided for the challenged provisions—to the extent the General Assembly provided any rationale at all—do not withstand even mild scrutiny, much less provide a substantial justification for those provisions. *See Walgren*, 519 F.2d at 1367-68.[7]

*Fourth*, there is direct evidence that members of the General Assembly that enacted H.B. 589 were openly hostile to young voters. Two bills introduced in 2013— Senate Bill ("S.B.") 666, which Defendants have identified as a precursor to H.B. 589, and S.B. 667, which six senators sponsored—would have prevented a parent from claiming a tax exemption for a child registered to vote at an address other than the parent's address. Shortly after these bills were introduced, moreover, Senator Bill Cook, a primary sponsor of both bills, said that college students "don't pay squat in taxes" and "skew the results of elections in local areas." Prel. Inj. Record Ex. ("PX") 79 at 1. Representative John Blust claimed to "have for years heard complaints that college students ought to vote in their home towns." PX 91. And Jay DeLancy, who, as the evidence will show, played a leading role in the development of S.B. 666 and S.B. 667,

---

[7] The extraordinary process through which H.B. 589 was enacted provides further evidence that the General Assembly enacted that law in order to suppress the youth vote. *See Arlington Heights*, 429 U.S. at 267 ("[d]epartures from the normal procedural sequence" can provide evidence of discriminatory intent).

wrote, "If other states pick up this legislation, it will shift the landscape of college town voting all across the nation. . . ." PX 76 at 1. In addition, in April 2013, in response to the statement from Representative Paul Luebke that "[t]here's no logical reason why a Duke ID isn't as good as an NCCU one, and I think you're just trying to keep people from voting," Representative Jeffrey Collins joked, "Well, I've just been convinced from what Representative Luebke told us that we are discriminating in this bill. We apparently are discriminating against rich Caucasians from New Jersey." *Trans. of the Proceedings of the N.C. House Finance Comm.* (Apr. 18, 2013) at SBE00001668-69.

*Fifth*, actions of the SBOE, the DMV, and CBOEs following the enactment of H.B. 589 provide further evidence of the State of North Carolina's hostility to youth voting. As noted, in implementing the repeal of preregistration, the SBOE directed the DMV unlawfully not to register 17 year olds, irrespective of whether those 17 year olds were eligible to vote. While the SBOE and the DMV reversed course after that issue was brought to light in this litigation, over 2700 17 year olds were improperly not offered the opportunity to register to vote at the DMV while this policy was in effect. In addition, the evidence will show that DMV's policy is to instruct college students with out-of-state driver's licenses who obtain no-fee voter IDs that they have to obtain a North Carolina driver's license within 60 days—even though there is no such requirement under North Carolina law, which establishes different standards for when an individual may vote in

52

North Carolina and when he or she must obtain a North Carolina driver's license.[8]

Moreover, certain counties decided not to provide an early voting location on or near a college campus in 2014, even though early voting had been provided on or near that campus in 2012.

Taken together, these and other facts in the record and that will be presented at trial establish that H.B. 589 was intended, at least in part, to suppress the youth vote. *Cf. Arlington Heights*, 429 U.S. at 265 ("*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes."). *See generally Davis*, 426 U.S. at 242 ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts."). There can be no serious question that the challenged provisions are directly at odds with the goal of the 26th Amendment "not merely to empower voting by our youths but . . . affirmatively to encourage their voting, through the elimination of unnecessary burdens and barriers, so that their vigor and idealism could be brought within rather than remain outside lawfully constituted

---

[8] *Compare* N.C.G.S. § 163-57(11) ("So long as a student intends to make the student's home in the community where the student is physically present for the purpose of attending school while the student is attending school and has no intent to return to the student's former home after graduation, the student may claim the college community as the student's domicile. The student need not also intend to stay in the college community beyond graduation in order to establish domicile there."), *with* N.C.G.S. § 20-7(a) (except for a person holding a commercial driver's license issued by another jurisdiction, a "new resident of North Carolina who has a drivers license issued by another jurisdiction must obtain a license from the [DMV] within 60 days after becoming a resident"), *and* N.C.G.S. § 20-4.01(34) ("Any person who resides within this State *for other than a temporary or transitory purpose* for more than six months shall be presumed to be a resident of this State . . . .") (emphasis added).

institutions," *Worden*, 61 N.J. at 345, and Congress's "disapprov[al] of . . . treatment . . . that it [feared] . . . would give youth 'less of a sense of participation in the election system' and 'might well serve to dissuade them from participating in the election,'" *Jolicoeur*, 5 Cal. 3d at 575 (quoting S. Rep. 92-26, 1971 U.S.C.C.A.N. 362). The challenged provisions violate the 26th Amendment.

## CONCLUSION

The trial record in this case will establish that the challenged provisions of H.B. 589 violate Section 2 of the VRA and the Constitution, causing thousands of North Carolinians to be denied their right to vote. The challenged provisions should therefore be permanently enjoined, beginning with the municipal elections scheduled for the fall of 2015.

Dated:  June 29, 2015                          Respectfully submitted,

                                    By:    */s/ Adam Stein*
                                    _____
Penda D. Hair                              Adam Stein (N.C. State Bar # 4145)
Edward A. Hailes, Jr.                      Of Counsel
Denise D. Lieberman                        TIN FULTON WALKER & OWEN, PLLC
Donita Judge                               312 West Franklin Street
Caitlin Swain                              Chapel Hill, NC 27516
ADVANCEMENT PROJECT                        Phone: (919) 240-7089
Suite 850                                  astein@tinfulton.com
1220 L Street, N.W.
Washington, DC 20005                       */s/ Daniel T. Donovan*
Phone: (202) 728-9557                      Daniel T. Donovan
phair@advancementproject.com               Susan M. Davies
                                           Bridget K. O'Connor
Irving Joyner (N.C. State Bar #            K. Winn Allen
7830)                                      Jodi Wu
P.O. Box 374                               KIRKLAND & ELLIS LLP
Cary, NC 27512                             655 Fifteenth St., N.W.
Phone: (919)319-353                        Washington, DC 20005
ijoyner@nccu.edu                           Phone: (202) 879-5000
                                           tyannucci@kirkland.com

*Attorneys for Plaintiffs in North Carolina Conference of NAACP, et al. v. McCrory, et al.*

Dated:  June 29, 2015                                    Respectfully submitted,

                                        By:     /s/ Allison J. Riggs

Laughlin McDonald*                              Anita S. Earls (State Bar # 15597)
ACLU Voting Rights Project                      Allison J. Riggs (State Bar # 40028)
2700 International Tower                         Southern Coalition for Social Justice
229 Peachtree Street, NE                         1415 Highway 54, Suite 101
Atlanta, GA 30303                               Durham, NC 27707
(404) 500-1235                                  Telephone: 919-323-3380 ext. 115
lmcdonald@aclu.org                              Facsimile: 919-323-3942
* appearing pursuant to Local Rule              E-mail: allisonriggs@southerncoalition.org
83.1(d)


                                                /s/ Dale Ho
Christopher Brook (State Bar                     Dale Ho*
#33838) ACLU of North Carolina                  Julie A. Ebenstein*
Legal Foundation                                Sophia L. Lakin*
P.O. Box 28004                                  ACLU Voting Rights Project
Raleigh, NC 27611-8004                          125 Broad Street
Telephone: 919-834-3466                         New York, NY 10004
Facsimile: 866-511-1344                         (212) 549-2693
E-mail: cbrook@acluofnc.org                     dale.ho@aclu.org
                                                *appearing pursuant to Local Rule 83.1(d)


Attorneys for Plaintiffs in League of Women Voters of North Carolina, et al. v. North
Carolina, et al.

Dated: June 29, 2015                                    Respectfully submitted,


/s/ *Marc E. Elias*                                     /s/ *Edwin M. Speas, Jr.*
Marc E. Elias                                           Edwin M. Speas, Jr.
PERKINS COIE LLP                                        POYNER SPRUILL LLP
D.C. Bar No. 442007                                     N.C. State Bar No. 4112
MElias@perkinscoie.com                                  espeas@poynerspruill.com
John M. Devaney                                         John W. O'Hale
D.C. Bar No. 375465                                     N.C. State Bar No. 35895
JDevaney@perkinscoie.com                                johale@poynerspruill.com
Bruce V. Spiva                                          Caroline P. Mackie
D.C. Bar No. 443754                                     N.C. State Bar No. 41512
BSpiva@perkinscoie.com                                  cmackie@poynerspruill.com
Elisabeth C. Frost                                      P.O. Box 1801 (27602-1801)
D.C. Bar No. 1007632                                    301 Fayetteville St., Suite 1900
EFrost@perkinscoie.com                                  Raleigh, NC 27601
Joseph P. Wenzinger                                     Telephone: (919) 783-6400
Illinois Bar No. 6307600                                Facsimile:  (919) 783-1075
JWenzinger@perkinscoie.com
Amanda R. Callais                                       *Local Rule 83.1(d) Counsel for*
ACallais@perkinscoie.com                                *Duke Plaintiff-Intervenors*
D.C. Bar No. 1021944
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone:  (202) 654-6200
Facsimile:  (202) 654-6211


Joshua L. Kaul
Wisconsin Bar No. 1067529
JKaul@perkinscoie.com
1 East Main Street, Suite 201
Madison, WI  53703
Telephone: (608) 294-4007
Facsimile: (608) 663-7499


*Counsel for Duke Plaintiff-Intervenors*

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2015, I served the foregoing **TRIAL BRIEF OF**

*NAACP* **AND** *LOWV* **PLAINTIFFS AND** *DUKE* **PLAINTIFF-INTERVENORS**

using the CM/ECF system, by filing a copy thereof in case numbers 1:13-cv-658 and

1:13-cv-660, which will send a Notice of Electronic Filing to all parties with an e-mail

address of record, who have appeared and consent to electronic service in all above-

captioned actions.


/s/ *Edwin M. Speas, Jr.*
Edwin M. Speas, Jr.