# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al., <br><br> Plaintiffs, <br><br> v. <br><br> PATRICK LLOYD MCCRORY, in his official capacity as the Governor of North Carolina, *et al.*, <br><br> Defendants. | **UNITED STATES' TRIAL BRIEF** <br><br> Civil Action No. 1:13-cv-658 |
| LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE STATE OF NORTH CAROLINA, *et al.*, <br><br> Defendants. | Civil Action No. 1:13-cv-660 |
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> THE STATE OF NORTH CAROLINA, *et al.*, <br><br> Defendants. | Civil Action No. 1:13-cv-861 |

# TABLE OF CONTENTS

I.   INTRODUCTION AND BACKGROUND .......................................................... - 1 -

    A.   Summary of Provisions Challenged by the United States ....................... - 2 -

    B.   The Adoption of HB 589........................................................................ - 3 -

II.  ARGUMENT.................................................................................................. - 5 -

    A.   Section 2 of the Voting Rights Act Prohibits the Use of Practices Like Those the United States Challenges Here When Those Practices Have Either a Discriminatory Result or a Discriminatory Purpose................... - 5 -

    B.   The United States Will Establish that the Challenged Provisions of House Bill 589 Have a Discriminatory Result .................................................... - 7 -

        1.   Section 2's Totality of the Circumstances Results Test Directs Courts to Consider Both the Impact of a Challenged Practice and Its Interaction with Past and Current Political and Socioeconomic Conditions Within a Defendant Jurisdiction ................................ - 7 -

        2.   The United States Will Present Evidence Showing that the Challenged Provisions of HB 589 Impose a Discriminatory Burden on African Americans ............................................................... - 13 -

            a.  Elimination of Same-Day Registration................................... - 13 -

            b.  Reduction of the Early Voting Period .................................... - 21 -

            c.  Repeal of Out-of-Precinct Provisional Voting ...................... - 29 -

        3.   The Policy Justifications for the Challenged Provisions of HB 589 Are Either Tenuous or Nonexistent............................................ - 32 -

        4.   Political Realities in North Carolina Reinforce the Conclusion That, Under the Totality of the Circumstances, the Challenged Provisions of HB 589 Violate Section 2's Results Test................................ - 35 -

        5.   The Cumulative Discriminatory Effect of the Challenged Provisions in HB 589 Further Reinforces the Conclusion that HB 589 Violates Section 2's Results Test ............................................................ - 37 -

    C.   The United States Will Establish that the Challenged Provisions of House Bill 589 Were Motivated by a Discriminatory Purpose......................... - 40 -

1.     The Evidence Shows that the Impact of the Challenged Provisions Bears More Heavily on African Americans and that HB 589's Supporters Foresaw This ............................................................ - 41 -

2.     The Historical Background and Sequence of Events Leading Up to the Passage of HB 589 Evince Discriminatory Purpose ............. - 44 -

3.     The Evidence Shows that HB 589's Legislative Process Was a Marked Procedural Departure from the Normal Practice ........... - 46 -

4.     The Contemporaneous Statements and Tenuousness Justifications of HB 589's Supporters Reinforce the Conclusion that the Bill Actually Had a Racially Discriminatory Purpose ...................................... - 48 -

III.    CONCLUSION AND REQUEST FOR RELIEF ............................................ - 49 -

# TABLE OF AUTHORITIES

## CASES

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247 (2013)...................... - 7 -

*Brooks v. Gant*, 2012 WL 4482984 (D.S.D. Sept. 27, 2012) ......................................... - 6 -

*Brown v. Dean*, 555 F. Supp. 502 (D.R.I. 1982) ............................................................ - 6 -

*Busbee v. Smith*, 549 F. Supp. 494 (D.D.C. 1982) ....................................................... - 48 -

*Chisom v. Roemer*, 501 U.S. 380 (1991) ...................................................................... - 6 -

*Clingman v. Beaver*, 544 U.S. 581 (2005) .................................................................... - 11 -

*Florida v. United States*, 885 F. Supp. 2d 299 (D.D.C. 2012) ..................................... - 30 -

*Garza v.County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990) .................................... - 40 -

*Gaston County v. United States*, 395 U.S. 285 (1968) .................................................. - 8 -

*Gingles v. Edmisten*, 590 F. Supp. 345 (E.D.N.C. 1984) ............................................. - 36 -

*Gonzalez v. Arizona*, 624 F.3d 1162 (9th Cir. 2010) .................................................... - 7 -

*Harris v. Graddick*, 615 F. Supp. 239 (M.D. Ala. 1985) ............................................. - 6 -

*League of Women Voters v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ..............passim

*Lemon v. Bossier Parish School Board*, 444 F.2d 1400 (5th Cir. 1971)...................... - 44 -

*LULAC v. Perry*, 548 U.S. 399 (2006) ........................................................................ - 40 -

*Major v. Treen*, 574 F. Supp. 325, 352 (E.D. La. 1983) ............................................. - 47 -

*McMillan v. Escambia County*, 748 F.2d 1037 (5th Cir. 1984) ................................... - 42 -

*North Carolina State Conf. of the NAACP v. McCrory*, 997 F. Supp. 2d 322 (M.D.N.C. 2014)....................................................................................... - 10 -, - 13 -, - 15 -, - 31 -

*Ohio Conference of the NAACP v. Husted*, 768 F.3d 524 (6th Cir. 2014)..- 7 -, - 9 -, - 11 -

*Ohio Conference of the NAACP v. Husted*, 43 F. Supp. 3d 808 (S.D. Ohio 2014) ....... - 6 -

*Operation PUSH v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987) ......................- 6 -, - 32 -

*Operation PUSH v. Mabus*, 932 F.2d 400 (5th Cir. 1991)............................................ - 6 -

*Shelby County v. Holder*, 133 S. Ct. 2612 (2013) ........................................................ - 3 -

*Smith v. Town of Clarkton*, 682 F. 2d 1055 (4th Cir. 1982).......................................... - 48 -

*Spirit Lake Tribe v. Benson Cnty.*, 2010 WL 4226614 (D.N.D. Oct. 21, 2010) ............ - 6 -

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)................................................... - 48 -

*Thornburg v. Gingles*, 478 U.S. 30 (1986)..................................- 5 -, - 7 -, - 8 -, - 9 -, - 36 -

*United States v. Brown*, 561 F.3d 420 (4th Cir. 2009) .................................................. - 41 -

*United States v. Charleston Cnty.*, 365 F.3d 341 (4th Cir. 2004) .................................. - 6 -

*Veasey v. Perry*, 2014 WL 5090258 (S.D. Texas Oct. 9, 2014) .... - 6 -, - 32 -, - 40 -, - 46 -

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977)..- 40 -, - 41 -, - 46 -

*Washington v. Davis,* 426 U.S. 229 (1976) ................................................................... - 42 -

## FEDERAL STATUTES

52 U.S.C. § 10301 ........................................................................................................ - 1 -

52 U.S.C. § 10301(a) ..........................................................................................- 5 -, - 11 -

52 U.S.C. § 10301(b)..................................................................................................... - 9 -

52 U.S.C. § 10302 ....................................................................................................... - 39 -

52 U.S.C. § 10302(a) ..................................................................................................... - 2 -

52 U.S.C. § 10302(c)..................................................................................................... - 2 -

52 U.S.C. § 10310(c)(1) ................................................................................................ - 5 -

52 U.S.C. §§ 20504-06 ................................................................................................ - 19 -

**CONGRESSIONAL REPORTS**

S. Rep. No. 97-417, 97th Cong. 2nd Sess. (1982)...................................................... passim

**STATE STATUTES**

N.C.G.S. § 163-54 ...................................................................................................... - 2 -

N.C.G.S. § 163-55(a)........................................................................................... - 2 -, - 17 -

N.C.G.S. § 163-82.6(c)......................................................................................... - 2 -, - 17 -

N.C.G.S. § 163.82.4(e) ............................................................................................. - 17 -

N.C.G.S. § 163-82.19-20........................................................................................... - 19 -

N.C.G.S. §§ 163-82.22-23......................................................................................... - 19 -

N.C.G.S. § 163-227.2(b)............................................................................................. - 3 -

**OTHER AUTHORITIES**

N.C. Reg. 2017 (1)(c) ............................................................................................... - 17 -

# I.  INTRODUCTION AND BACKGROUND[1]

In 2013, despite the lack of any evidence of problems with its existing elections process, the North Carolina General Assembly enacted an omnibus elections bill—House Bill 589 ("HB 589")—that curtailed opportunities for citizens to register, to vote, and to have their ballot counted.

HB589 undercut three key provisions of North Carolina law: a 17-day early voting period; same-day registration during early voting; and the counting of out-of-precinct ballots for all offices for which the voter was entitled to vote.  It cut the early voting period almost in half and eliminated same-day registration and the counting of out-of-precinct ballots altogether.  In addition, HB 589 imposed a draconian voter photo identification requirement—a requirement whose impact is so unjustified that the State itself has responded to this lawsuit by amending the law.

The provisions of HB 589 that the United States has challenged in this lawsuit each fall with special force on North Carolina's black citizens.  These provisions will interact with socio-economic and historical conditions in North Carolina to result in African Americans having less opportunity than other citizens to participate in the political process, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

That unlawful result is no accident.  The General Assembly adopted HB 589 in part for the racially discriminatory purpose of rolling back the gains black citizens had

---

[1] In addition to the evidence cited below, the United States relies on the Statement of Facts in its Memorandum of Law in Support of its Motion for Preliminary Injunction and for the Appointment of Federal Observers (ECF. No. 97, 1:13-cv-861), previously submitted to the Court.

achieved under the State's prior election laws. This intent forms a second basis for holding that HB 589 violates Section 2.[2]

### A.    Summary of Provisions Challenged by the United States

The United States seeks (a) declaratory and permanent injunctive relief against continued enforcement of the following provisions of HB 589 (collectively "the challenged provisions"), (b) the imposition of a preclearance requirement for review of future voting-related changes under Section 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c), and (c) the appointment of federal observers under Section 3(a) of the Voting Rights Act, 52 U.S.C. § 10302(a).

*Same-Day Registration*.  Beginning in 2007, North Carolina allowed a prospective voter to register at an early voting site during the early voting period, and that same day cast a retrievable absentee ballot.  HB 589 eliminated same-day registration.[3]  Now, with a limited exception, neither aspiring registrants nor already-registered voters who have moved into a new county can vote in an upcoming election unless they have registered (or re-registered) at least 25 days before the election.  N.C.G.S. §§ 163-54, 163-82.6(c) (2014).[4]

---

[2] The United States' complaint includes a claim against the voter photo identification provision of HB 589 (Part 2), which, beginning in 2016, will require every in-person voter (on Election Day or during early voting) to present one of seven types of photo identification.  As a result of the state's amendment of that provision earlier this month, resolution of this claim has been deferred.  *See* Order, ECF No. 282, 1:13-cv-861, ¶ 3.

[3] JA vol. V at 2317 (HB 589 § 16.1).

[4] JA vol. IV at 1958 ("Voter Registration in NC," North Carolina State Board of Elections webpage).  A registered voter who moves within North Carolina within 30 days of an election is, however, eligible to vote at his prior polling place, even if it is in another county.  N.C.G.S. § 163-55(a) (2014).

*Early Voting.* North Carolina's prior early voting regime extended over 17 days, including two Sundays. HB 589 eliminates a full week of early voting, including one of those Sundays by beginning on the second Thursday before the election and ending on the last Saturday before the election (three days before Election Day) at 1:00 p.m. *See* N.C.G.S. § 163-227.2(b) (2014).

*Out-of-Precinct Provisional Voting.* Prior to the enactment of HB 589, a voter could cast a provisional ballot at any precinct located in the county in which the voter was registered to vote, and the votes cast on such a ballot were counted for all contests in which the voter would have been eligible to vote if he or she had cast a regular ballot at his or her home precinct. HB 589 repealed that provision: now, provisional ballots will not be counted if they are not cast in the correct precinct—that is, the precinct in which the voter resides.

### B.      The Adoption of HB 589

HB 589 was hardly routine legislation. As the Court of Appeals emphasized in *League of Women Voters v. North Carolina*, 769 F.3d 224, 242 (4th Cir. 2014) ("*LWV*"), North Carolina "rushed" to enact HB 589 "literally the next day" after the Supreme Court's decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), promulgating a "'full bill' legislative leadership likely knew it could not have gotten past federal preclearance"—that is, a bill that the State could not have shown would have neither a discriminatory purpose nor a discriminatory effect.[5] *LWV*, 769 F.3d at 242.

---

[5] Indeed, the U.S. Department of Justice objected to over 60 proposed voting changes in North Carolina during the period when the state was partially under the obligation to

The United States has previously set out at length in its preliminary injunction briefing the remarkable transformation of the bill once North Carolina was no longer under the obligation to obtain preclearance pursuant to Section 5 of the Voting Rights Act. *See* ECF No. 97, 13-cv-861, at pp. 9-19; *see also LWV*, 769 F.3d at 230-32 . The last-minute version of HB 589 that became law expanded the bill far beyond the discrete voter photo ID bill that had emerged from the North Carolina House three months earlier. A few days before the end of the legislative session, the Senate Rules Committee unveiled a radically expanded bill. Not only did it impose a significantly more restrictive voter photo ID provision, but without any prior notice, it eliminated same-day registration, reduced the early voting period, and repealed the availability of out-of-precinct provisional voting. After only a day's consideration by the Senate Rules Committee, the omnibus bill proceeded to the full Senate on July 24, 2013. The very next day, ignoring extensive evidence offered that the bill's provisions restricted access to voting and would disproportionately impact African-American voters, the Senate passed the omnibus version of HB 589.[6] Every African-American senator voted against it.[7]

That same evening, at about 7:45 pm, Senate leaders rushed the transformed HB 589 to the House. Following less than three hours of debate on an omnibus that which

---

preclear changes in its voting laws pursuant to Section 5 of the Voting Rights Act. JA vol. III at 1259-60, 1367 (Lawson ¶ 16; Leloudis at 29); JA vol. IV at 1963, 1969-75 (McCrary Decl. ¶ 5 & Att. B); Declaration of Steven Lawson, Ph.D., *U.S. v. North Carolina*, Case No. 13-cv-861 (Feb. 12, 2015) ("Lawson Trial Decl.") at ¶ 35.

[6] JA vol. III at 1294-98 (Lawson ¶¶ 59-64); *Id.* at 1214-15 (Kousser at 38-39).

[7] JA vol. V at 2371, 2653-54 (7/25/13 Senate roll call vote).

contained major never-before considered or debated provisions, and despite objections to the bill's suppressive and racially disproportionate effects, the House concurred in the Senate version of HB 589. Every African-American member of the House voted against the bill.[8]

HB 589 was ratified on July 26 and signed into law by Governor McCrory on August 12, 2013.

## II.    ARGUMENT

### A.    Section 2 of the Voting Rights Act Prohibits the Use of Practices Like Those the United States Challenges Here When Those Practices Have Either a Discriminatory Result or a Discriminatory Purpose

Section 2 of the Voting Rights Act prohibits any State or political subdivision from imposing or applying a "voting qualification," "prerequisite to voting," or "standard, practice, or procedure" that "results in a denial or abridgment of the right of any citizen of the United States to vote on account of race[,] color[, or language minority status]."[9] 52 U.S.C. § 10301(a).

"Section 2 'prohibits all forms of voting discrimination' that lessen opportunity for minority voters," *LWV*, 769 F.3d at 238 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 45 n.10 (1986)), including the imposition of barriers on the ability to register to vote, to cast a ballot, or to have that ballot counted on an equal basis with other members of the electorate. *Id.* at 239. Courts have applied Section 2 to restrictive voter photo

---

[8] *Id.* at 2372 (7/25/13 House roll call vote); JA vol. III at 1299-1304 (Lawson ¶¶ 65-71); *Id.* at 1215 (Kousser at 39).

[9] The Voting Rights Act defines "vote" and "voting" to include "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration . . . casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast." 52 U.S.C. § 10310(c)(1).

identification laws, *Veasey v. Perry*, 13-cv-193, 2014 WL 5090258 (S.D. Tex. Oct. 9, 2014); to reductions in the period available for early in-person voting, *Ohio Conference of the NAACP v. Husted*, 43 F. Supp. 3d 808 (S.D. Ohio 2014), *aff'd*, 768 F.3d 524 (6th Cir. 2014); to unequal access to voter registration, *Operation PUSH v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987), *aff'd sub nom. Operation PUSH v. Mabus*, 932 F.2d 400 (5th Cir. 1991); to unequal access to polling places and early voting sites, *Spirit Lake Tribe v. Benson Cnty.*, No. 2:10-cv-095, 2010 WL 4226614 (D.N.D. Oct. 21, 2010); *Brown v. Dean*, 555 F. Supp. 502 (D.R.I. 1982); *Brooks v. Gant*, No. 12-cv-5003-KES, 2012 WL 4482984 (D.S.D. Sept. 27, 2012); and to underrepresentation of minority poll officials, *Harris v. Graddick*, 615 F. Supp. 239 (M.D. Ala. 1985). There is no doubt that state laws governing registration (whether same-day or advance), voting (whether during an early voting period or on Election Day), and the counting of ballots (whether cast in or outside a voter's precinct of residence) must comply with Section 2.

"[Section 2 prohibits] not only voting practices borne of a discriminatory intent, but also voting practices that 'operate, designedly or otherwise,' to deny 'equal access to any phase of the electoral process for minority group members.'" *United States v. Charleston Cnty.*, 365 F.3d 341, 345 (4th Cir. 2004) (quoting S. Rep. No. 97-417, 97th Cong. 2d Sess. 28, 30 (1982) ("Senate Report")). Thus, Plaintiffs may prevail by showing that HB 589 has a discriminatory result, was enacted with discriminatory purpose, or both. *Chisom v. Roemer*, 501 U.S. 380, 404 (1991).

**B.    The United States Will Establish that the Challenged Provisions of House Bill 589 Have a Discriminatory Result**

**1.    Section 2's Totality of the Circumstances Results Test Directs Courts to Consider Both the Impact of a Challenged Practice and Its Interaction with Past and Current Political and Socioeconomic Conditions Within a Defendant Jurisdiction**

As the Court of Appeals emphasized, the appropriate inquiry in assessing a Section 2 results claim "is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.'" *LWV*, 769 F.3d at 238 (quoting *Gingles*, 478 U.S. at 44); *see also* Senate Report at 29.

The Fourth Circuit identified the two elements required to establish a Section 2 violation in this case:  First, the challenged provision "must impose a discriminatory burden," meaning that it "disproportionately impact[s] minority voters." *LWV*, 769 F.3d at 240, 245. Second, that disproportionate impact must "in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Id.* at 240 (quoting *NAACP v. Husted*, 768 F.3d 524, 554 (6th Cir. 2014) and *Gingles*, 478 U.S. at 47) (internal quotation marks omitted).  The causal question is not whether the challenged practice standing alone causes the disproportionality, but rather whether the practice "interacts with social and historical conditions" to produce an "inequality in the opportunities enjoyed by black and white voters." *Gingles*, 478 U.S. at 47; *see also Gonzalez v. Arizona*, 624 F.3d 1162, 1193 (9th Cir. 2010), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct.

2247 (2013).[10]  When assessing both elements, "courts should consider the totality of circumstances." *LWV*, 769 F.3d at 240 (internal quotations marks omitted).

The Senate Report that accompanied the 1982 amendments to Section 2 guides that totality of circumstances inquiry. It identified nine "typical factors" that can inform a court's evaluation (the "Senate Report factors") and "shed light on whether the two elements of a Section 2 claim are met." *LWV*, 769 F.3d at 240; *see also Gingles*, 478 U.S. at 36-37.[11]  No one factor is dispositive and "there is no requirement that any

---

[10] A similar understanding informed the Supreme Court's decision in *Gaston County v. United States*, 395 U.S. 285 (1968), where the Court upheld Congress's suspension of North Carolina's literacy test on the grounds that, given the "substantial evidence" of racial discrimination in Gaston County's school system, even "'[i]mpartial' administration of the literacy test today would serve only to perpetuate these inequities in a different form." *Id.* at 296.

[11] The Senate Report factors include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction[;]

particular number of factors be proved, or that the majority of them point one way or the other." *LWV*, 769 F.3d at 240 (quoting Senate Report at 29).

There are five aspects of the totality of the circumstances test that are especially salient to this case. First, the text of the statute directs courts to assess whether the political processes "*in the State or political subdivision* are not equally open" to minority citizens. 52 U.S.C. § 10301(b) (emphasis added); the Senate Report also repeatedly focuses on "the jurisdiction" or the "political subdivision." Accordingly, the Section 2 inquiry "is peculiarly dependent upon the facts of each case and requires an 'intensely local appraisal of the design and impact' of contested electoral mechanisms." *Gingles*, 478 at 79. Section 2 therefore does not require consideration of, or comparison with, the laws or practices in other states. *See LWV*, 769 F.3d at 243-44; *see also Husted*, 768 F.3d at 559. Put simply, if black voters in North Carolina have less opportunity than white voters in North Carolina to participate in the political process, it does not matter that they have more opportunity than black (or white) voters in Mississippi to do so.

Second, previous changes to voting practices within the jurisdiction whose laws are being challenged "are a critical piece of the totality-of-the-circumstances analysis Section 2 requires." *LWV*, 769 F.3d at 242; *see also Husted*, 768 F.3d at 558. Two Senate Report factors direct a court's attention to this question. The first Senate Report

---

[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]

[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles,* 478 U.S. at 36-37; Senate Report 28-29.

factor, with its reference to "the extent of any history of official discrimination" touching the right of minority citizens "to register, to vote, or otherwise to participate in the democratic process" by necessity encompasses the fact that over the course of history that discrimination may have waxed and waned. And with respect to the final factor, the Senate Report squarely explains how to determine whether the policy justification for the challenged law is "tenuous," that when "the procedure markedly departs from past practices," this fact "bears on the fairness of its impact." Senate Report at 29 n.117. Thus, in this case, North Carolina is a state with a significant history of official voting-related racial discrimination. The State first adopted reforms that ameliorated the ongoing effects of that prior discrimination, but then repealed or truncated the reforms that black voters disproportionately used. At the same time as this rollback, the State adopted a voter photo ID requirement that markedly departed from its prior regime. All of these facts bear directly on whether African Americans currently have less opportunity than other members of the electorate to participate in the political process.

Third, any assessment of the totality of the circumstances involving HB 589 must take into account the undeniable presence of the first Senate Report factor: North Carolina's "unfortunate history of official discrimination in voting and other areas that dates back to the Nation's founding. This experience affects the perceptions and realities of black North Carolinians to this day. Simply put, in light of the historical struggle for African Americans' voting rights, North Carolinians have reason to be wary of changes to voting laws." *North Carolina State Conf. of the NAACP v. McCrory*, 997 F. Supp. 2d 322, 349 (M.D.N.C. 2014) (citations omitted). Accordingly, North Carolina's history of

voting discrimination must be adequately considered. *LWV*, 769 F.3d at 242.[12]

Fourth, in a case challenging a law that burdens the right to register, to cast a ballot, and to have that ballot counted, the question is whether minority voters have been subject to a discriminatory burden at any step in the electoral process. Because Section 2 forbids "abridgement" of the right to vote as well as outright "denial," 52 U.S.C. § 10301(a), a violation can occur even if every voter who faces the discriminatory burden nevertheless manages to cast a ballot and have that ballot counted. *See LWV*, 769 F.3d at 243; *Husted*, 768 F.3d at 552. In short, voter turnout cannot be the measure of whether a Section 2 violation has occurred because "nothing in Section 2 requires a showing that voters cannot register or vote under any circumstance." *LWV*, 769 F.3d at 243.

Fifth, the Fourth Circuit directed that "a searching practical evaluation" of the "totality of the circumstances" requires an examination of the "sum of [the] parts [of HB 589] and their cumulative effect on minority access to the ballot box." *LWV*, 769 F.3d at 241-42;[13] *see also Clingman v. Beaver*, 544 U.S. 581, 607-08 (2005) (O'Connor, J., concurring in part and concurring in the judgment) ("A panoply of regulations, each apparently defensible when considered alone, may nevertheless have the combined effect of severely restricting participation and competition."). The third Senate Report factor —

---

[12] Plaintiffs' expert, including United States expert Steven Lawson, provide extensive, detailed accounts of North Carolina's long history of voting-related discrimination. *See* JA vol. III at 1254-61, 1269-71 (Lawson ¶¶ 12-17, 26-28); *Id*. at 1100-03 (Burden at 6-9); *Id*. at 1184-89, *Id*. at 1224-25 (Kousser at 48-49); *Id*. at1351-73 (Leloudis at 13-35).

[13] Judge Motz's dissenting opinion also stressed the need to fully consider the cumulative impact of the challenged provisions of HB 589 and include in its examination of the totality of the circumstances an assessment of whether the burden imposed by one provision could reinforce the burden imposed by others. *League of Women Voters v. North Carolina*, 769 F.3d 224, 251-52 (4th Cir. 2014) (Motz, J., dissenting).

which calls upon courts to consider whether there are "voting practices or procedures that may enhance the opportunity for discrimination against the minority group"—relates to this issue. Senate Report at 28-29. Thus, assessing whether any particular provision of HB589 violates Section 2's result standard also requires this Court to examine the challenged provision together with any of the statute's other provisions that may contribute to or enhance the challenged provision's discriminatory impact.

As the Fourth Circuit held based on the record at the time of preliminary injunction hearing, the evidence supported the conclusion that North Carolina's decision to end same-day registration and prohibit the counting out-of-precinct provisional ballots, "when viewed in the context of relevant 'social and historical conditions' in North Carolina" looked "precisely like the textbook example of Section 2 vote denial." *LWV*, 769 F.3d at 246. Plaintiffs had shown at the time of the hearing that "they are likely to succeed with their Section 2 claims" as to these two provisions of HB 589. *Id.* at 247. Since the preliminary injunction hearing one year ago, Plaintiffs have gathered even more evidence, including both lay witness and expert testimony, on how the three challenged provisions of House Bill 589 violate Section 2 of the Voting Rights Act.[14]

---

[14] Because HB 589's voter photo ID requirement does not take effect until 2016, the United States did not seek a preliminary injunction against it during the July 2013 proceeding. In addition, the Fourth Circuit's basis for not ordering a preliminary injunction against the reduction of the early voting period was the close proximity to the November 2014 election. *LWV*, 769 F.3d at 236. It did not address whether the cuts in early voting might ultimately be found to violate Section 2. *Id.* at 237.

**2. The United States Will Present Evidence Showing that the Challenged Provisions of HB 589 Impose a Discriminatory Burden on African Americans**

**a. Elimination of Same-Day Registration**

The pre-HB 589 regime in North Carolina allowed qualified North Carolina citizens who were not already registered, who had recently moved, or whose registrations had somehow not properly been recorded to participate in upcoming elections by using the option of same-day registration during the early voting period. HB 589 imposes a materially more restrictive regime: voters who have not successfully completed the registration process at least 25 days before an upcoming election are categorically barred from participating in that election.

> *i. When it existed, black voters in North Carolina disproportionately relied on same-day registration to provide them with an effective opportunity to register to vote and cast a ballot.*

The Fourth Circuit and this Court have already found that a significantly higher percentage of black voters than white voters took advantage of the opportunity for same-day registration when it was in effect.[15] *See LWV*, 769 F.3d at 233, 241-42; *McCrory*, 997 F. Supp. 2d at 355. This is not surprising, given that same-day registration enabled black citizens to overcome some of the barriers posed by more restrictive registration regimes.[16]

Same-day registration was a particularly important safe harbor in North Carolina

---

[15] JA vol. II at 825, 964-966 (Stewart ¶¶ 106, 108 & Exs. 31, 32). Preliminary Injunction Hearing Transcript ("PI Hrg. Tr.") 7/08/2014 at 203:10-204:8.

[16] *See* JA vol. I at 147, ¶¶ 32-33 (Bartlett Decl.); SBE-P00079431-79432 (04/23/2008 email from V. Degraffenreid to BOE directors attaching Memorandum from G. Bartlett).

because of persistent racial disparities in literacy and educational attainment.[17] Voters with lower literacy face greater burdens completing self-executed voter registration applications because they have an increased risk of making an error that suspends registration.[18] In addition, lower literacy voters are at greater risk of submitting voter registration applications to the wrong county or to the State Board of Elections ("SBOE"), instead of to their county of residence.[19] The burdens imposed by these types of literacy-related registration delays which are disproportionately borne by African Americans, work to keep an otherwise qualified elector off the registration list.[20] Same-day registration contributed in an important way to overcoming these burdens.

> ### ii. HB589's elimination of same-day registration disproportionately impacts black citizens.

With the enactment of HB 589, North Carolina has moved to a system with a 25-day cutoff for registration. The evidence shows that this disproportionately excludes potential African American voters. During the four-year period between the 2008 general

---

[17] *See* Declaration of Charles Stewart, Ph.D., *U.S. v. North Carolina*, Case no. 13-cv-861 (Feb. 18, 2015) ("Stewart Trial Decl.") 58, Fig. 6(a)-(b), App. Q; Declaration of Kathryn Summers, Ph.D., *U.S. v. North Carolina*, Case no. 13-cv-861 (Feb. 12, 2015) ("Summers Decl.") 1, n.1; Declaration of Lynne Vernon-Feagans, Ph.D., *U.S. v. North Carolina*, Case no. 13-cv-861 (Feb. 12, 2015) ("Vernon-Feagans Decl.") ¶ 30, Figs. 5&6; Declaration of Charles T. Clotfelter, Ph.D., *U.S. v. North Carolina*, Case no. 13-cv-861 (Feb. 12, 2015) ("Clotfelter Decl.") ¶¶ 12-15, 18, 22, 35, 41-42, 45-46; 50-51, 54.

[18] *See* Summers Decl. ¶¶ 7, 24-35, 37-38, Fig. 1; Degraffenreid Dep. Tr. at 195:19-196:4; 187:19-188:2.

[19] Summers Decl. ¶¶ 35-38; 43-53, Fig. 1-7; *see also* 23 N.C. Reg. 2017 (2)(a)(1) (requiring county boards to mail misdirected applications to the correct county); *see, e.g.*, Brown Dep. Tr. at 13:21-14:7, 14:23-15:21, 16:6-17:12.

[20] *See* Stewart Trial Decl. 58, Fig. 6(a)-(b), App.. Q; Clotfelter Decl. ¶¶ 41, 45 Tbl. H; Summers Decl. ¶¶ 7, 24-38; 43-53, Fig. 1-7; Degraffenreid Dep. Tr. at 175:7-176:8, 176:18-177:25; 184:7; 185:21; 186:2-8; 186:14-187:3; 187:19-188:16; 195:19-196:4.

election and the 2012 general election, African Americans were disproportionately *less* likely to register during the regular registration period (*i.e.*, before the 25-day deadline) and disproportionately *more* likely to register after the 25-day deadline.[21]  Moreover, in every federal general election from 2002 to 2014 except 2006—both before, during, and after the period from 2007 to 2013 when same day registration was available—African Americans were more likely than whites to register after the 25-day registration deadline.[22]

Thus, as this Court has already acknowledged, the elimination of same-day registration "bear[s] more heavily on African Americans than whites." *McCrory*, 997 F.Supp.2d at 355.

> *iii. HB589's elimination of same-day registration interacts with social and historical conditions in North Carolina to burden black voters.*

This Court has also recognized that "black citizens of North Carolina currently lag behind whites in several key socioeconomic indicators, including education, employment, income, access to transportation, and residential stability." *McCrory*, 997 F. Supp. 2d at

---

[21] JA vol. II at 824-25 (Stewart Decl. ¶¶ 105-106, Tbl. 7). White voters, by contrast, were disproportionately *more* likely to register during the regular registration period and disproportionately *less* likely to register after the 25-day deadline.  *Id.*

[22] JA vol. II at 830-31, 964-65 (Stewart Decl. ¶ 121, Ex. 31); Stewart Trial Decl. App. X. In addition, in 2014, after SDR was eliminated, African Americans continued to submit voter registration forms during the early voting period at a rate 11% greater than whites—1.99% of all black registrations over the two-year election cycle were submitted during this ten-day period, compared to 1.8% of white registrations.  Stewart Trial Decl. ¶ 177. This difference is statistically significant.  *Id.* n. 97.

348; *LWV*, 769 F.3d at 235.[23]  And it has further recognized that these "current socioeconomic disparities" "resul[t]" in part from "North Carolina's history of official discrimination against blacks." 997 F. Supp. 2d at 366.  HB 589's elimination of same-day registration interacts with those disparities—which form the basis of Senate Report factor 5—to place a disproportionate burden on African-American aspiring voters.

First, black voters are disproportionately likely to face repeated obligations to reregister.  The evidence shows that racial inequalities in socioeconomic status increase residential mobility and instability among African Americans in North Carolina[24] and create the probability that African Americans will be subject to the registration deadline more frequently as they move between counties.[25]  Put simply, black citizens—and particularly poor black citizens—move more often than their otherwise comparable white

---

[23] The Court accepted the following unchallenged socio-economic statistics: (1) as of 2011-12, 34% of African-American North Carolinians live below the federal poverty level, compared to 13% of whites ; (2) as of the fourth quarter of 2012, unemployment rates in North Carolina were 17.3% for African Americans and 6.7% for whites; (3) 15.7% of African American North Carolinians over age 24 lack a high school degree, as compared to 10.1% of whites ; (4) 27% of poor African-American North Carolinians do not have access to a vehicle, compared to 8.8% of poor whites; and (5) 75.1% of whites in North Carolina live in owned homes as compared to 49.8% of African Americans. *McCrory*, 997 F. Supp. 2d at 348 n.27.

[24] *See* JA vol. II at 808 (Stewart ¶¶ 71 73, n. 37); JA vol. III at 1157-58 (Duncan at 16-17); Vernon-Feagans Decl. ¶¶ 63-64, Fig. 26 & 27.

[25] *See* N.C.G.S. § 163-82.6(c) (subject to limited exceptions, the registration period closes 25 days before an election); Degraffenreid Dep. Tr. at 161:13-17; *see, e.g.,* Carr Dep. Tr. at 9:14-11:15, 13:3-15:6.  This Court has already accepted unchallenged statistics showing that black North Carolinians are significantly less likely to live in a home they own than are whites (as of 2011-12, 75.1% of whites in North Carolina lived in homes they owned as compared to 49.8% of African Americans).  *McCrory*, 997 F. Supp. 2d at 348 n.27.

counterparts.[26]

Because North Carolina administers voter registration at the county level, when a voter moves between North Carolina counties he or she must submit a new registration application by the voter registration deadline.[27] The already disproportionate burden imposed by the requirement that voters who move within the state must reregister is exacerbated by the interaction of socioeconomic disparities with the post-HB 589 registration process itself. North Carolina's voter registration process requires applicants to provide a variety of information. If information is missing or incomplete, the voter is placed in an "incomplete queue" and, unless the defect is cured, is required to cast a provisional ballot that will not count if the voter does not appear in his or her assigned precinct.[28] N.C.G.S. §§ 163.82.4(e), 163-82.6(e); 163-55(a); 23 N.C. Reg. 2017 (1)(b)-(c). The only uniform method of notifying a voter of the need to supplement his or her application occurs entirely by mail. N.C. Reg. 2017 (1)(c).

It is not surprising, given the differences in educational attainment between black and white North Carolinians,[29] that black aspiring voters are more likely than white ones to end up in the incomplete queue and to face greater burdens in curing any defects in

---

[26] Vernon-Feagans Decl. ¶ 63.

[27] *See* JA vol. II at 808 (Stewart ¶ 70); Degraffenreid Dep. Tr. at 34:20-22, 161:13-25, 184:25-185:6; *see also* 23 N.C. Reg. 2017 (2) (a)(1).

[28] *See* Degrafenreid Dep. Tr. at 96:18-97:20; 164:12-23;188:17-24; 189:2-6. 1.

[29] Expert testimony presented by Dr. Charles Clotfelter shows that North Carolina's past discriminatory policies and practices in its provision of educational resources and present educational inequalities have had a direct effect on the achievement and socioeconomic status of African Americans. Clotfelter Decl. ¶¶ 19-21. In addition, this evidence shows that educational discrimination has had indirect intergenerational effects on educational and socio-economic outcomes of African Americans in the state. *Id*. at ¶ 11.

their applications. As of the November 2014 general election, for example, black applicants comprised a much larger proportion of individuals who had difficulty completing the registration process, when compared to their share of registrants, than white applicants.[30] Of voter registration applications that were in the incomplete queue, 35% were submitted by black applicants (10,500 of 30,226), as compared with only 52% by white applicants (15,575 of 30,226).[31] Furthermore, 33% of applicants placed in the incomplete queue because of a failure to check the citizenship box were black (470 of 1,407), as compared to 29% who were white (406 of 1,407), and 59% of those applications with a missing date of birth were submitted by black applicants (949 of 1,607), as compared to 22% by white applicants (358 of 1,607).[32] In sharp contrast to the same-day registration process, where these types of incomplete information could be caught and fixed immediately, the post-HB 589 regime means that the disproportionately black pool of registrants in the incomplete queue will find itself unregistered prior to Election Day.

The United States will demonstrate the extent to which the elimination of same-day registration interacts with social and historical conditions in North Carolina to burden black voters. We will do so not only through having leading experts on elections and on

---

[30] *See* Third Stipulation Regarding Information in the SEIMS Database, *U.S. v. North Carolina*, Case No. 13-cv-861 (June 15, 2015) ("Third Stipulation"); *see, e.g.* Durant Dep. Tr. at 13:14-16:2.

[31] *See* Third Stipulation.

[32] *Id*. Since everyone of course has a date of birth and there is no evidence that black North Carolinians are less likely than other state residents to be U.S. citizens, those disparities have nothing to do with an applicant's underlying eligibility.

the effects of socio-economic disparities address the issue, but also through the testimony of lay witnesses, especially affected black voters. Their testimony will provide this Court with an appreciation of the life experiences behind the data presented by the United States' experts. Testimony in this case will show that the elimination of same-day registration has interacted with affected African-American voters' socioeconomic circumstances—their residential mobility and/or their educational background—to deny or abridge their right to vote in the last election.[33]

> ### iv. The remaining ways citizens can register do not mitigate the disproportionate burdens caused when HB589 eliminated same-day registration.

The remaining methods of registration cannot substitute for same-day registration.[34] First, their availability does not preclude the finding of a Section 2 violation because "nothing in Section 2 requires a showing that voters cannot register or vote under any circumstance," *LWV*, 769 F.3d at 243. Second, the alternative registration methods available have shortcomings for which same-day registration helped to compensate.

Providing the opportunity to register at the DMV cannot substitute for same-day registration when—as in North Carolina—African Americans are less likely to be DMV customers, given that their disproportionately low socioeconomic status makes them less

---

[33] *See, e.g.*, Brown Dep. Tr. at 5-16, 28-29, 32-33; Suggs Dep. Tr. at 5-19, 45-49, 50-51.

[34] In accordance with the requirements of National Voter Registration Act, North Carolina adopted uniform procedures for self-executed mail voter registration applications and created additional registration opportunities at state agencies. 52 U.S.C. §§ 20504-06; N.C.G.S. § 163-82.19-20 (2014); *see also* N.C.G.S. 163-82.22-23 (libraries, high schools, and military offices).

likely to own cars, and the DMV offers voter registration only to individuals who are seeking DMV services.[35]  Similarly, voter registration at North Carolina public assistance and disability services agencies is generally offered only to individuals who apply for services through those agencies.  *See* N.C.G.S. § 163-82.20.  The volume of registration applications accepted by those agencies is relatively small—for example, during the 2012 election cycle, applications from such agencies accounted for less than 4% of all applications received[36]—and has declined in recent years.[37]

Nor can North Carolina's process for submitting a self-executed application provide an adequate substitute for same-day registration.  That process requires successfully navigating hurdles that are disproportionately likely to burden African-American aspirants because of racial disparities in access to the internet, a computer, a printer, reading levels, and web literacy, among other things.[38]  Thus, the effects of cutting back on same-day registration were entirely foreseeable.  Despite the availability of these alternative methods of registration under the NVRA, racial disparities in the number of applications submitted after the close of registration, and suspended

---

[35] Declaration of Gerald R. Webster, Ph.D., *U.S. v. North Carolina*, Case No. 13-cv-861 (Feb. 12, 2015)("Webster Decl.") ¶ 21; Webb Dep. Tr. at 204:25-205:11.

[36] During the 2012 election cycle, only 3.4% of North Carolina's submitted voter registration applications were from public assistance agencies.  Applications from the remaining designated voter registration agencies reported to the EAC were 0.2% or less of submitted voter registration applications.  U.S. Election Assistance Commission, The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 2011–2012, tbl. 2a at 40-41 (June 30, 2013), *available at* http://www.eac.gov/assets/1/Documents/EAC_NVRA%20Report_lowres.pdf.

[37] *See* Degraffenreid Dep. Tr. at 71:20-72:9.

[38] *See* Webster Decl. ¶ 20; Vernon-Feagans Decl. ¶¶ 43-44, Fig. 12&15; *see, e.g.*, Brown Dep. Tr. at 8:16-19; Ward Dep Tr. at 8:5-8.

registration attempts in the incomplete queue, persisted in 2014.[39]

### b. Reduction of the Early Voting Period

*i. Black voters in North Carolina disproportionately rely on early voting to enable them to participate effectively in the political process.*

Black voters in North Carolina have consistently used early voting at higher rates than white voters in every federal general election since 2008. For example, SBOE data show that in the 2014 election, 45% of black voters used early voting, as compared with only 36% of white voters.[40] In 2008 and 2012, the two most recent presidential elections, the disparity was even greater, with 71% of black voters using early voting in each of those elections as compared with only 51% of white voters in 2008 and 52% in 2012.[41] Thus, HB 589's cutback of early voting reduces the availability of a practice on which black voters disproportionately relied.

There are several explanations for African-American voters' especially heavy reliance on early voting, each of which rests on one of the Senate factors. First, North Carolina legislators, civic leaders, get-out-the-vote organizers in the African-American community, and other fact witnesses will testify that this reliance reflects the legacy of racial discrimination in voting in North Carolina. As a class, African Americans in North Carolina have less history and experience voting because the State intentionally barred them from doing it for so long. Many black voters have lingering "concerns that something could go wrong in their attempts to vote," and voting early gives them

---

[39] JA vol. II at 824 (Stewart Decl. Table 7); *see also* Third Stipulation.

[40] Stewart Trial Decl. ¶ 168.

[41] JA vol. II at 975 (Stewart Decl. Ex. 39).

confidence that they will have time to overcome such obstacles.[42]

   Second, African-American voters are especially likely to rely on early voting to overcome the difficulties their relatively depressed socioeconomic status poses to their getting to the polls.  Expert testimony based on Census data shows that in North Carolina, African-American residents have higher poverty rates, lower vehicle access rates, and lower education levels than white residents.  Specifically, 24% of African Americans of voting age in North Carolina have incomes below the poverty level, as compared to just 12% of white North Carolinians of voting age.[43]  Fifteen percent of black households in North Carolina lack access to a vehicle, as compared with only 4% of white households.[44]  Among North Carolina residents 25 and older, only 80% of African Americans have received a high school diploma, as compared with 88% of white residents.[45]  In addition, as a consequence of socioeconomic disparities, blacks disproportionately suffer from physical disabilities and chronic illnesses that also interfere with their ability to participate in the political process.[46]  In sum, low-income families in North Carolina who are disproportionately African American face greater demographic and day-to-day challenges compared to other families.  These challenges create barriers to voting and

---

[42] JA vol. I at 314 (Glazier Decl. ¶ 52); *Id.* at 364 (McKissick Decl. ¶ 41); *see, e.g.*, Brown Dep. Tr. at 12:4-20, 21:25-22:9; Wilson Dep. Tr. at 8:14-9:5.

[43] Webster Decl. ¶ 18 & Tbl. 3.

[44] *Id.* at ¶ 21 & Tbl. 3.

[45] Clotfelter Decl. ¶ 40.

[46] Expert Report of Barry C. Burden, Ph.D., *NAACP v. McCrory*, Case no. 13-cv-658 (Feb. 12, 2015) ("Burden Rpt.") 12-13.

active engagement in civic life.[47]

North Carolina's African-American community has disproportionately relied on early voting, especially on Sundays, as a means of overcoming these various barriers to political participation. Testimony from experts and fact witnesses, including civic leaders in the African-American community and affected black voters, will demonstrate that every day of early voting disproportionately matters more to North Carolina's black voters because those early voting days allow low income voters to overcome barriers to political participation such as inflexible work schedules and transportation difficulties.[48]

There is a social scientific consensus that there is a cost associated with casting a ballot, either in money or in time and attention or both, and that this cost influences whether voters will in fact turn out to vote.[49] A longer early voting period reduces those costs by giving voters more opportunities to get to the polls.

> ii. *HB 589's reduction in the early voting period interacts with social and historical conditions in North Carolina to burden black voters by reducing options and increasing congestion.*

By reducing the number of days on which voters may choose to vote early, HB 589 effectively raises the cost of voting.[50] The ability of voters to meet that increased cost rests on the very socioeconomic factors as to which African Americans in North

---

[47] Vernon-Feagans Decl. ¶ 63.

[48] Vernon-Feagans Decl. ¶¶ 36, 38; Burden Rpt. 10-14; Moss Dep. Tr. at 46-50; Durant Dep. Tr. at 6-11, 16-22.

[49] PI Hrg. Tr. 7/08/2014 at 193:5-25 (Stewart); PI Hrg. Tr. 7/09/2014 at 115:4-21 (Burden).

[50] PI Hrg. Tr. 7/09/2014 at 119:23-120:2 (Burden).

Carolina on average lag behind white residents.[51]

The burdens imposed by HB 589's reduction in the early voting period will have two effects on the disproportionately African-American group who rely on early voting. First, each voter will have a reduced opportunity to vote. An analysis of SBOE data demonstrates that during presidential elections, African-American voters have shown a particular propensity to vote during the first week of early voting—precisely the period that was revoked by HB 589.[52] This is particularly true for the now-eliminated first Sunday of early voting, a day on which in 2012, 43% of voters who cast ballots were African American, and in 2008, 49% were African American.[53] Moreover, HB 589 also prevents counties from offering a full last day of early voting—the Saturday before Election Day—now requiring early voting locations to finish by 1 p.m. instead of providing the option to remain open until 5 p.m. That day was also used disproportionately by African-American voters in the 2008 and 2012 elections.[54] Thus, the disproportionately black groups of voters who used those two opportunities to vote are now forced to find a different—and presumably more costly—time to vote, if they are

---

[51] PI Hrg. Tr. 7/09/2014 at 117:11-118:8, 118:25-119:9 (Burden); *see, e.g*., Cunningham Dep. Tr. at 25:12-26:3, 26:11-27:11; Durant Dep. Tr. at 6:13-7:4, 7:23-8:9, 18:10-12, 19:1-24, 20:17-21:2, 28:8-19; Moss Dep. Tr. at 48:10-51:13.

[52] JA vol. II at 834, 846-47, 848 (Stewart Decl. ¶¶ 131, 160-61, 164 & Figs. 16, 17).

[53] *Id*. at 977 (Stewart Decl. Ex. 41(b)). These numbers are far larger than African Americans' roughly 22% share of the electorate. *Id*. at 952 (Stewart Decl. Ex. 22).

[54] *Id*. at 848, 977 (Stewart Decl. Fig. 17, Ex. 41(a)) (showing among the highest racial disparities of the whole period on the last day).

able to vote at all.[55]

Second, curtailing the early voting period will impose a burden on voters by increasing congestion during the remaining early voting period and on Election Day, with particular harm to African Americans.[56] Increased wait times to vote directly burdens voters and increases the cost of voting,[57] and redistributing voters over a more condensed period will also impose greater stress on the election system, undermining some of the administrative benefits of early voting and further burdening voters by creating a greater likelihood that a vote cast may not be counted.[58]

These changes will fall with particular force on early voting sites that are already congested. In the 2008 and 2012 presidential elections, reported wait times at early voting sites in North Carolina far exceeded national averages,[59] and the same held true during the 2014 midterm election.[60] Lines at early voting locations have raised concerns among election officials. Memoranda were issued by the SBOE to county officials in 2008 and 2012 relating to crowding at early voting sites, including "long lines" in 2008

---

[55] PI Hrg. Tr. 7/09/2014 at 9:20-23 (Stewart); PI Hrg. Tr. 7/09/2014 at 119:23-120:2 (Burden).

[56] PI Hrg. Tr. 7/09/2014 at 9:1-10:3 (Stewart).

[57] PI Hrg. Tr. 7/09/2014 at 10:17-25 (Stewart).

[58] PI Hrg. Tr. 7/09/2014 at 7:15-8:6, 9:1-10:3 (Stewart), 7/08/2014 at 194:1-22, 195:11-22 (Stewart).

[59] JA vol. II at 851-53 (Stewart Decl. ¶¶171-177); PI Hrg. Tr. 7/09/2014 at 12:4-12 (Stewart).

[60] Stewart Trial Decl. ¶¶ 189-94.

and waits "as long as 2 hours" in 2012.[61]  Even in 2014, a midterm election year when

turnout would be much lower than in a presidential election year like 2012, SBOE

Executive Director Kim Strach testified that some counties were expecting certain voters

to experience wait times of more than an hour.[62]  Given the disproportionately lower rates

of access to vehicles and reliable transportation among African Americans, such

increases in wait times are likely to disproportionately burden black voters.  Moreover, in

addition to having less access to motor vehicles, African Americans in North Carolina,

specifically those living in poverty, are more likely than whites to work nonstandard and

extended hours.[63]  Based on her long-term study of families in three non-urban counties

in North Carolina, Dr. Lynne Vernon-Feagans found that African-American working

mothers were twice as likely as non-black working mothers to hold multiple jobs and

work non-standard or extended hours.  Thus, the flexibility of their schedules is limited

and the burdens imposed by such wait times are compounded.[64]

Reducing the early voting period disproportionately burdens African Americans,

and those burdens will be felt in numerous ways, including, for example, voters who are

deterred from attempting to vote; voters who succeed in casting ballots but are

nevertheless confronted with greater burdens in doing so; voters who encounter long lines

that they are not able to wait in and are thus unable to vote; and voters who fail to cast a

---

[61] JA vol. IV at 1525, PX 54 (SBOE 10/30/05 Memo); *Id*. at 1545, PX 62 (SBOE 10/22/12 Memo); *Id*. at 1547, PX 63 (SBOE 10/23/12 Memo).

[62] Strach Dep. Tr. 3/24/15 at 183:15-184:9.

[63] Vernon-Feagans Decl. ¶¶ 36, 38.

[64] *Id*.

valid ballot because of a diminished ability to obtain assistance from poll officials due to crowded polling places, less time available to the voter due to longer wait times, or lessened ability to vote during early voting where officials are better-trained. All of these will contribute to the burdens faced by African-American voters because of the reduction in the number of days of early voting.

> ### iii. HB 589's other modifications to the early voting process do not ameliorate the problems caused by the lost days of early voting.

HB 589's requirement to maintain the same overall number of early voting hours in federal elections does not eliminate the effects of reducing the length of the early voting period. First, counties are permitted to obtain waivers allowing them to reduce their early voting hours below the amount required by the statute. For the 2014 general election, 31 counties obtained such waivers,[65] resulting in a 3.2% drop in the total number of early voting hours available across the State in 2014 as compared to 2010.[66]

Furthermore, the SBOE's procedure for evaluating counties' waiver requests is based on nothing more than the hunches of a single SBOE member, Dr. Maja Kricker. Testimony from George McCue, the SBOE staff member charged with coordinating the handling of waiver requests from the counties, shows that the SBOE's consideration of

---

[65] Of the 33 counties that submitted waiver requests, 17 requests were approved, and 16 were denied with an invitation to counties to submit new requests that met certain conditions. McCue Dep. Ex. 463 at 3-5 (SBOE Mtg. Mins. 07/09/2014). Among the counties whose requests were denied, 14 submitted new requests, which were all approved. McCue Dep. Ex. 466 at 2 (SBOE Mtg. Mins. 08/21/2014); McCue Dep. Ex. 463 at 3-5 (SBOE Mtg. Mins 7/29/14); McCue Dep. Ex. 466 at 2 (SBOE Mtg. Mins. 8/21/14); McCue Dep. Tr. at 131:8-132:10, 135:3-136:15.

[66] Stewart Trial Decl. ¶ 180.

these requests hinged on Dr. Kricker's determinations.[67]  Yet Mr. McCue could not recall

Dr. Kricker explaining to him or to her fellow SBOE members how she arrived at her

criteria, and he was unaware of any SBOE data providing a basis for her decisions.[68]

Furthermore, Dr. Kricker did not even require all county requests to meet the criteria she

invented.[69]

     Second, voting hours are not fungible.  The evidence shows that "early voting is a

middle-of-the-day activity."[70]  But most of North Carolina's counties cannot meet the

hours requirement by adding more midday hours because their early voting sites are

already open at that time.  In 2014, the number of available midday hours dropped

substantially across the State as compared with 2010,[71] and in most counties midday

hours will likely drop in 2016 as compared with 2012.[72]  Notwithstanding the decline in

the number of midday hours available for early voting in 2014, there was a substantial

increase in the number of voters who voted during those hours.[73]  Put simply,

compensating for the elimination of an hour of afternoon voting on a Sunday by adding

an hour of voting late on a weekday evening is an empty gesture.

---

[67] McCue Dep. Tr. at 124:16-126:1, 136:16-140:10; McCue Dep. Ex. 467 at
SBE00125188-191 (7/29/14 Email with Attachment).

[68] McCue Dep. Tr. at 140:22-142:3.

[69] McCue Dep. Ex. 467 at SBE00125191 (7/29/14 Email with Attachment); McCue Dep.
Tr. at 140:11-21.

[70] JA vol. II at 854 (Stewart ¶¶1 80-82).

[71] Stewart Trial Decl. ¶ 182.

[72] JA vol. II at 857 (Stewart ¶ 186).

[73] Stewart Trial Decl. ¶ 188 and Figure 13.

### c. Repeal of Out-of-Precinct Provisional Voting

*i. Black voters in North Carolina disproportionately used out-of-precinct provisional voting to participate effectively in the political process.*

The undisputed record evidence, including data from the 2014 elections, shows that African-American voters are materially more likely to cast a ballot out-of-precinct than are white voters. Thus, HB 589's prohibition on the counting of out-of-precinct provisional ballots results in a higher proportion of black voters than white voters being denied the right to vote.[74]

In his analysis of SBOE data from elections between 2006 and 2012, Dr. Stewart found that African-American voters were twice as likely as white voters to cast out-of-precinct provisional ballots.[75] Likewise, Dr. Lichtman's examination of the racial composition of the electorate that cast partially counted out-of-precinct provisional ballots in the 2008, 2010, and 2012 general elections concluded that African-American voters were overrepresented in that pool, whereas white voters were underrepresented.[76] These conclusions replicate the finding adopted by the General Assembly in 2005 when it passed S.L. 2005-2, which required the counting of otherwise proper out-of-precinct ballots: "[O]f those registered voters who happened to vote provisional ballots outside their resident precincts on the day of the November 2004 General Election, a

---

[74] JA vol. II at 867- 879 (Stewart ¶¶ 214-245); Report of Allan J. Lichtman, Ph.D., *NAACP v. McCrory*, Case no. 13-cv-658 (Feb. 12, 2015) ("Lichtman Trial Rpt.") at 109-114.

[75] JA vol. II at 868 (Stewart ¶ 217).

[76] Lichtman Trial Rpt. at 109-114.

disproportionately high  percentage were African American."[77]

Because of HB 589's elimination of out-of-precinct voting, 1,184 of the 1,643 provisional ballots cast by voters outside of their assigned precinct in 2014 were not counted.[78]  These uncounted out-of-precinct provisional ballots were disproportionately cast by African-American voters.[79]  While the number is small relative to the overall number of ballots cast in the election as a whole, that fact is irrelevant to the question whether the law disproportionately affects minority voters.  *See LWV*, 769 F.3d at 244; *see also Florida v. United States*, 885 F. Supp. 2d 299, 318 (D.D.C. 2012) ("[N]o amount of voter disenfranchisement can be regarded as '*de minimis.*'").  Moreover, the number of uncounted ballots actually cast in the 2014 election likely underestimates the impact of HB 589.  State and county election officials testified that poll workers were instructed to inform a voter who was not in their precinct that his or her provisional ballot would count only if cast in the correct precinct.[80]  The data show that significantly fewer out-of-precinct provisional ballots were cast in 2014 than the total number of these ballots cast in prior recent elections,[81] exactly the result one would expect once voters are deterred from casting a provisional ballot by being told those ballots are unlikely to be counted.

Finally, the 2014 results likely understate the future impact of HB 589 because "fail-safe" mechanisms such as out-of-precinct voting tend to be used more often during

---

[77] S.L. 2005-2; JA vol. III at 1205-06 (Kousser at 29-30); *Id*. at 1263-64 (Lawson ¶ 20).

[78] Stewart Trial Decl. ¶ 195-199, Table 19.

[79] Response Report of Allan J. Lichtman, Ph.D., *NAACP v. McCrory*, Case no. 13-cv-658 (March 24, 2015) ("Lichtman Trial Surrebuttal Rpt.")at 18-19.

[80] Strach Dep. Tr. 4/16/14 at 129:19-130:3; Poucher Dep. Tr. 7/2/14 at 49:2-6.

[81] Stewart Trial Decl. ¶ 203.

presidential elections.[82]

> ii. *HB 589's prohibition on counting out-of-precinct ballots interacts with social and historical conditions in North Carolina to disproportionately burden African-American voters.*

This Court accepted Plaintiffs' experts' determinations that HB 589's prohibition on counting out-of-precinct provisional ballots will disproportionately affect black voters. *McCrory*, 997 F. Supp. 2d at 366; *see also LWV*, 769 F.3d at 245. This Court also accepted evidence that between the years 2006 and 2010, an average 17.1% of blacks in North Carolina moved within the State, as compared to only 10.9% of whites; and that it was "[p]articularly relevant for the purposes of out-of-precinct voting," that 27% of poor blacks in North Carolina lack access to a vehicle, compared to 8.8% of poor whites. *McCrory*, 997 F. Supp. 2d at 366. These facts and others reflecting historical and current socio-economic conditions are precisely the circumstances that interact with the elimination of out-of-precinct voting to deny or abridge African Americans' ability to participate in the political process.[83] For instance, African Americans are almost twice as likely as white voters to have moved to a new precinct within their county, thus increasing the likelihood that they will appear at the incorrect precinct on Election Day.[84] Testimony from affected voters will show that without the option of out-of-precinct provisional ballots, African American voters' ballots were rejected in the November 2014 election, often with the voters completely unaware that their ability to vote in that election had been lost. Because African Americans are disproportionately more likely to

---

[82] Stewart Trial Decl. ¶ 200-203.

[83] *See, e.g.*, Washington Dep. Tr. at 6:2-7:11, 14:23-15, 35:2-16, 39:9-40:4.

[84] Lichtman Trial Rpt. at 116.

lack access to a vehicle or other means of reliable transportation, they will disproportionately bear the costs and burdens of traveling, if even possible, to a second voting location if they arrive at the wrong precinct on Election Day.

### 3. The Policy Justifications for the Challenged Provisions of HB 589 Are Either Tenuous or Nonexistent

The primary justifications proponents of HB 589 offered for enacting the challenged provisions were electoral integrity and fraud prevention. Each is highly tenuous and unsupported by the record.[85] Neither can justify the disproportionate impact these provisions will have on the ability of African-American citizens to register, to vote, and to have their ballots counted. *See, e.g.*, *Operation PUSH v. Allain*, 674 F. Supp. 1245, 1260-61 (N.D. Miss. 1987) (finding that the rationale of preventing fraud was not supported by the evidence); *Veasey*, 2014 WL 5090258 at *3 (finding that the only voter fraud addressed by Texas' voter photo ID law "is voter impersonation fraud, which the evidence demonstrates is very rare").

With respect to same-day registration, the SBOE's report regarding implementation of same-day registration in 2008 concluded that the project was a success.[86] In the face of that report, the State can point to nothing to suggest that eliminating same-day registration responded in any way to an existing or emerging

---

[85] JA vol. V at 2479 (7/24/13 N.C. Senate Sess. Tr. at 78:6-12) (statement of Sen. Tillman); JA vol. V at 2460 (7/23/13 N.C. Senate Sess. Tr. at 41:2-11) (statement of Sen. Rucho); *see also* JA vol. III at 1218-20 (Kousser at 42-44); *Id.* at 1045-50 (Minnite at 8-13).

[86] JA vol. IV at 1531 (SBOE Report on Same Day Registration, 03/31/2009, at 3).

problem.[87]  To ensure electoral integrity and prevent fraud, same-day registration in fact included a number of safeguards to verify the identity of registrants and protect against fraud.[88]

The specific justifications offered for the reduction in the early voting period are grounded neither in logic nor in facts.[89]  Reduction to the early voting period did nothing to advance consistency or efficiency across counties, and instead will likely lead to even more congestion.  Further, the requirement that counties offer fewer days of early voting but the same number of hours as in past elections will lead to additional costs, rather than saving money.[90]  The SBOE confirmed as much in memoranda provided to the legislature in 2011 and 2013 reporting data that showed that, in high turnout elections, reducing early voting would likely increase costs.[91]

The defense of HB 589's photo identification requirement as an anti-fraud

---

[87] *See* JA vol. V at 2479 (7/24/13 Tr. at 78:6-12); JA vol. V at 2495 (7/25/13 Tr. at 45:19-23; JA vol. V at 2460 (7/23/13 Tr. at 41:2-11); JA vol. V at 2469 (7/24/13 Tr. at 5:9-14) (same-day registration).

[88] Indeed, when the legislature enacted HB 589 the available evidence showed that same-day registrants had a lower rate of failure during mail verification than registrants who submitted their applications by another method of registration.  *See* JA vol. IV at 1621-26 (02/11/2013 SBOE Report 2012 Elections Mail Verification Analysis of New Voters (Strach Dep. Ex. 41)).

[89] JA vol. V at 2456, 2465 (7/23/13 Tr. at 30:6-9, 30:24-31:3, 75:10-15); JA vol. V at 2468-69, 2472 (7/24/13 Tr. at 4:11-5:3, 4:20-22, 5:3-9, 11:5-13); JA vol. V at 2499-2500 (7/25/13 Tr. at 55:22-56:3) (early voting).

[90] JA vol. I at 141-43 (Bartlett Decl. ¶¶ 15-20); *Id*. at 221-222 (Gilbert Decl. ¶ 11-13); *Id*. at 441 (Sancho Decl. ¶ 18); *Id*. at 432 (Sawyer Decl. ¶ 11); PI Hrg. Tr. 7/08/2014 at 169-73 (Gilbert testimony); *Id*. at 123-24 (Bartlett testimony).

[91] JA vol. IV at 1541-43 (5/18/11 SBOE Memo); *Id*. at 1677, 1701-02 (3/11/13 SBOE Memo).

measure was similarly tenuous.[92]  In-person voter impersonation fraud is the only type of

fraud prevented by the requirement,[93] yet Defendants have never identified even a single

individual who has been arrested, much less charged and convicted, for committing this

type of crime in North Carolina.[94]

In a 2013 memorandum prepared by the SBOE for the General Assembly, the

SBOE concluded that in-person voter impersonation fraud is exceedingly rare.[95]  The

Board also noted that in-person voter impersonation fraud is the type of case it refers

least frequently to criminal prosecutors.[96]  Of the approximately 21 million votes cast

from 2000 through 2012, the SBOE identified just two such referrals—one in 2004 and

another in 2012.[97]  SBOE's data on voter fraud, when considered together with the

testimony of SBOE employees involved in investigating voter fraud crimes, demonstrates

that voter fraud of any kind is virtually non-existent in North Carolina,[98] further evincing

---

[92] JA vol. III at 1315-17 (Lawson ¶ 87-89).

[93] JA vol. III at 1050-54 (Minnite at 13-17).

[94] Defendants' Response to U.S.'s Fourth Set of Interrogatories, Request No.22; Defendants' Response to U.S.'s First Set of Requests for Production, Request No. 20, 21; Defendants' Response to League of Women Voters' First Set of Interrogatories to Defendants, Interrogatory No. 11; Defendants' Response to League of Women Voters' First Set of Requests for Production, Request No. 14; and Defendants' Response to the NAACP's Second Set of Interrogatories, Interrogatory No. 12, 13; Tutor Dep. Tr. at 64:25-67:19; Strach Dep. Tr. 3/24/2015 at 263:3-263:7.

[95] JA vol III at 1215-16 (Kousser at 39-40); JA vol. IV at 1699 (3/11/13 SBOE Memo).

[96] JA vol. IV at 1699 (3/11/13 SBOE Memo); *see also* JA vol. I at 150 (Bartlett Decl. ¶ 43).

[97] JA vol. IV at 1699 (3/11/13 SBOE Memo.

[98] JA vol. III at 1045-49 (Minnite at 8-12); JA vol. IV at 1699 (3/11/13 SBOE Memo)). While resolution of  the voter photo ID claim has been deferred, a consideration of the

the tenuousness of the rationales offered for HB 589.

Finally, regarding the repeal of out-of-precinct voting, no rationale at all was ever given by any supporter of HB 589 during the Rules Committee debate or during the debate on the Senate floor.[99]  Instead, all available evidence demonstrates that out-of-precinct provisional voting "ensure[d] that all citizens have a chance to vote" and was "appreciated" by both voters and county officials alike.[100]

### 4. Political Realities in North Carolina Reinforce the Conclusion That, Under the Totality of the Circumstances, the Challenged Provisions of HB 589 Violate Section 2's Results Test

Several of the Senate Report factors focus on the current political process within the defendant jurisdiction.  In this case, each of these factors is present, and they help to explain the General Assembly's adoption of a law that has such a disproportionate impact on black voters.  First, Defendants have conceded that voting in North Carolina's elections is racially polarized (Senate Factor Two).  "Defendants admit that past court decisions in the area of voting rights speak for themselves and that racially polarized voting continues to exist in North Carolina."[101]  In addition, in other recent litigation, the State has acknowledged that the pattern is "pervasive."[102]

Perhaps not surprisingly, both responding to and exacerbating that polarization,

---

tenuousness of the justification offered for HB 589 while the bill was being considered are relevant to both the discriminatory results and intent analysis.

[99] JA vol. I at 191 (Stein Decl. ¶ 30).

[100] JA vol. VI at 3062 (Written Comments C. Poucher).

[101] Answer to United States' Complaint, *U.S. v. North Carolina*, Case no. 13-cv-861 (Feb. 02/2013); JA vol. III at 1267-68, 1270-71 (Lawson ¶¶ 24, 28).

[102] *Dickson v. Rucho*, 2013 WL 3376658 at *18 (N.C. Super. Ct. July 8, 2013); *see also* JA vol. III at 1103 (Burden at 9); *Id*. at 1225-26 (Kousser at 49-50).

political campaigns in North Carolina have been characterized by overt and subtle racial appeals (Senate Factor Six). As described by Dr. Steven Lawson and other Plaintiffs' experts, both overt and subtle racial appeals have characterized elections in North Carolina from the late nineteenth century through the present.[103] While the campaigns of former Senator Jesse Helms provide a particularly stark illustration of explicit appeals,[104] overt racial appeals continued to occur during both the 2008 and 2012 presidential races.[105]

When voting is racially polarized, as it is in North Carolina, elected officials whose political success does not depend on minority voters' support can ignore the minority's "distinctive group interests that are capable of aid or amelioration by government." *Gingles v. Edmisten*, 590 F. Supp. 345, 355 (E.D.N.C. 1984) (three-judge court), *aff'd in part, rev'd in part sub nom. Thornburg v. Gingles*, 478 U.S. 30 (1986). That nonresponsiveness—Senate Report factor 8—was particularly evident in the run up to HB 589. The bill gutted precisely those provisions of North Carolina's electoral system—extended early voting, same-day registration, and the acceptance of out-of-precinct ballots—that had made a major dent in ameliorating the State's history of depressed political participation among African Americans. The objections of representatives from majority-black districts were almost entirely ignored in the rush to

---

[103] JA vol. III at 1361-63 (Leloudis at 23-25); *Id*. at 1184 (Kousser at 9); Lawson Trial Decl. ¶¶ 3-31.

[104] *Id*. ¶¶ 17-27; JA vol. III at 1189-92, 1229 (Kousser at 13-16, 53); JA vol. I at 68-85 (NAACP Decl. ¶¶ 36-37, 39).

[105] Lawson Trial Decl. ¶¶ 28-31.

enact HB 589, and every African-American representative in either chamber voted against the bill. While the implementation of early voting and same-day registration were effective in reversing the persistent disparities in registration and participation, it is precisely these practices that HB 589 targeted.[106]

### 5. The Cumulative Discriminatory Effect of the Challenged Provisions in HB 589 Further Reinforces the Conclusion that HB 589 Violates Section 2's Results Test

As set forth above, HB 589's challenged provisions interact individually with economic, historical, and ongoing social conditions in North Carolina to result in a denial or abridgement of equal opportunities for African-American voters to participate in the political process. Collectively, the elimination of same-day registration, the reduction of the early voting period, and prohibition on out-of-precinct provisional voting exacerbate the burdens imposed by individual provisions. The challenged provisions represent a series of hurdles that eligible voters now face and must overcome in order to cast a ballot, and even if a voter overcomes one hurdle, she may falter at the next. Because the challenged methods of voting were disproportionately and significantly relied on more by African-American voters, these obstacles will weigh more heavily on them and are compounded by socio-economic conditions that will make overcoming these obstacles more challenging.[107]

For example, low-income aspiring black voters who face logistical hurdles arriving at the polls and must rely, if possible, on obtaining a ride from a friend or

---

[106] JA vol. III at 1307-12 (Lawson ¶¶ 78-83).

[107] PI Hrg. Tr. 7/8/2014 at 195:4-22 (Stewart).

relative to make one voting-related trip, have greater security with a longer early voting period (ensuring they make it to the polls), the option of same-day registration (to correct any problems with registration that otherwise might require multiple trips to resolve or even losing the right to vote in a particular election all together), and the option of casting out-of-precinct provisional ballots on Election Day (in case their ride delivers them to a precinct other than their home precinct). Reductions in early voting and the elimination of same-day registration and out-of-precinct provisional ballots increase the likelihood that these voters will need to make multiple trips in a compressed time frame. Prior to HB 589, such repeated trips were unnecessary because same-day registration and out-of-precinct provisional ballots were a fallback, and the voters had more days of early voting in which to obtain transportation to the polls. Now, however, the requirement to comply with more restrictive registration provisions and a shortened early voting period, as well as the need to get transportation to the correct precinct on Election Day since an out-of-precinct ballot will not be counted, pose significant burdens to these voters.

Similarly, the full early voting period and same-day registration reduced the likelihood that voters on Election Day would be forced to resort to out-of-precinct provisional ballots because the voters had more opportunities to cast a ballot before Election Day and to address any problems with their voter registration during the early voting period (for example, if they had moved from one county to another and needed to register in their new county). With early voting cut back and same-day registration eliminated, however, the fallback of casting an out-of-precinct ballot becomes more important.

Finally, although the impact of the amended voter photo ID law remains unclear at this point, the SBE's own data show that hundreds of thousands of voters do not have DMV-issued photo ID, and they will need to complete reasonable impediment forms and cast provisional ballots under the new law. The added time needed to complete these forms and provisional ballots could contribute to longer lines, and the complexity of the new procedures adds new a challenge for election officials, particularly those working at Election Day precincts who tend to lack the experience and training of officials at early voting sites.[108] Both of these effects are likely to exacerbate problems caused by reducing the availability of early voting, which is likely to lead to longer lines at early voting sites[109] and more voters casting ballots on Election Day[110] without the administrative benefits that come with early voting sites.

Cutting early voting, eliminating same-day registration, and rejecting completely out-of-precinct provisional ballots work together to eliminate safeguards that African-

---

[108] *See* JA vol. II at 837 (Stewart ¶ 139); PI Hrg. Tr. 7/9/2014 at 7:17-8:2 (Stewart describing greater reliability of staff at early voting sites). Defendants have previously argued that the procedures for voters to complete same-day registration also could contribute to lines during early voting. However, the solution to long lines cannot be to prevent eligible citizens from voting (*i.e.*, reducing the number of citizens who are permitted to vote). Instead, Defendants have an obligation to make sure that enough resources are devoted so that citizens have an opportunity to exercise their right to vote. The Fourth Circuit has explicitly recognized "the problem of sacrificing voter enfranchisement at the altar of bureaucratic (in)efficiency and (under-)resourcing. After all, Section 2 does not prescribe a balancing test under which the State can pit its desire for administrative ease against its minority citizens' right to vote." *See LWV*, 769 F.3d at 244. Furthermore, in light of the fact that many voters who would otherwise use same-day registration now cast provisional ballots, it is not clear whether eliminating same-day registration shortens voter wait times. *See* Strach Dep. Tr. 3/24/2015 at 185:10-187:1.

[109] JA vol. II at 867 (Stewart ¶ 213).

[110] PI Hrg. Tr. 7/9/2014 at 9:15-19 (Stewart).

American voters relied upon to register to vote, to cast their ballots, and to have those ballots counted.

### C. The United States Will Establish that the Challenged Provisions of House Bill 589 Were Motivated by a Discriminatory Purpose

Section 2 of the Voting Rights Act forbids adopting a voting law or practice for a racially discriminatory purpose.[111]  *See*, *e.g.*, *Garza v. Cnty. of L.A.*, 918 F.2d 763, 766 (9th Cir. 1990), *cert. denied*, 498 U.S. 1028 (1991); *Veasey*, 2014WL5090258 at *52; Senate Report at 27.  To prevail on a claim of racially discriminatory purpose, a Section 2 plaintiff must show that such a purpose was one of the motivating factors underlying the enactment; the evidence need not show "that the challenged action rested solely on racially discriminatory purposes" or that the discriminatory purpose "was the 'dominant' or 'primary' one."  *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977).  Moreover, establishing proof of discriminatory purpose does not require proof of invidious racial animus, but rather simply an intent to disadvantage minority citizens, for whatever reason. *Garza*, 918 F.2d at 778 & n.1 (Kozinski, J., concurring and dissenting in part); *see also LULAC v. Perry*, 548 U.S. 399 (2006).

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may

---

[111] This Court must determine whether HB 589 was enacted with a discriminatory purpose, notwithstanding any potential holding that HB 589 violates the Section 2 results test.  The prayers for relief in this matter include a request that a preclearance requirement be ordered under Section 3(c) of the Voting Rights Act and a final judgment authorizing federal observers be entered under Section 3(a) of the Act, which require a finding of discriminatory purpose.  52 U.S.C. § 10302.  This Court may authorize federal observers as part of a temporary or interlocutory order without the necessity of such a finding.  *Id.* § 10302(a).

be available." *Arlington Heights*, 429 U.S. at 266. In *Arlington Heights*, the Supreme

Court identified factors to consider when conducting that inquiry, including (1) whether

the impact of the decision bears more heavily on one racial group than another; (2) the

historical background preceding the passage of the challenged law; (3) the sequence of

events leading up to passage of the bill; (4) whether passage of the bill departed, either

procedurally or substantively, from the normal practice; and (5) the legislative history,

including contemporaneous statements and viewpoints held by the decision makers. *Id.* at

266-68; *see also* Senate Report at 27 n.108. The Senate Report "expressly incorporates

the considerations in *Arlington Heights* for purposes of analyzing a Section 2 intent

standard claim." At the same time, the Senate Report factors "supply a source of

circumstantial evidence regarding discriminatory intent." *United States v. Brown*, 561

F.3d 420, 433 (5th Cir. 2009).

The evidence here shows that HB 589 was motivated, at least in part, by an intent

to reduce the opportunity of African Americans to participate in the political process.

## 1. The Evidence Shows that the Impact of the Challenged Provisions Bears More Heavily on African Americans and that HB 589's Supporters Foresaw This

Both individually and cumulatively, all three of the challenged provisions bear

more heavily on African Americans. As recounted above, African-American voters were

more likely than their white counterparts to rely on early voting, particularly during the

periods eliminated by HB 589, and to use the same-day registration and out-of-precinct

provisional voting options HB 589 eliminates.[112] HB 589's elimination or restriction of

---

[112] *See supra* Section II.B.2.

these practices will thus disproportionately impact black voters.

Proponents of HB 589 were well aware of the entirely foreseeable disproportionate impact of the challenged provisions and the voter photo ID provision that made up the ratified version of the bill. Accordingly, the Court can draw "the normal inferences to be drawn from the foreseeability of defendant's action." *See McMillan v. Escambia County*, 748 F.2d 1037, 1047 (5th Cir. 1984) (quoting Senate Report at 27 n.108); *see also Washington v. Davis*, 426 U.S. 229, 253 (Stevens, J., concurring) ("[N]ormally the actor is presumed to have intended the natural consequences of his deeds.").

Before HB 589 was even introduced and while the bill was under consideration in the General Assembly, various sponsors of the bill requested from the SBOE a matching analysis of North Carolina registered voters and DMV records to compile a list of voters who did not possess DMV-issued identification.[113] Tellingly, these legislators also requested a racial breakdown of the results, as well as race data on voters who requested absentee ballots in 2012.[114] In every voter identification matching analysis conducted by the SBOE prior to passing HB 589, African Americans were disproportionately

---

[113] Churchill Dep. Ex. 521 (3/27/2013 Email from G. Bartlett to R. Starling, et. al); JA vol. IV at 1627 (March 2013 Emails from HB 589 Sponsors).

[114] JA vol. IV at 1627 (March 2013 emails re legislator request from SBOE); JA Vol. IV at 1782 (March 13, 2013 email re SBOE-DMV supplemental analysis); *Id.* at 1786 (April 2013 spreadsheet); JA vol. VI at 3127-3137 (3/28/2013 Letter from Rep. Lewis to SBOE); JA vol. VI at 3166 (4/11/2013 Letter from SBOE to Rep. Lewis); JA vol. V at 2492 (7/24/2013 Sen. Tr. at 33:12-35:16); JA vol. IV at 1611 (SBOE-DMV ID Analysis Jan. 2013); *Id.* at 1669 (Email re SBOE-DMV ID Analysis Jan. 2013 (Strach Dep. Ex. 47)); JA vol III at 1181 (Kousser at 5); LEG 22577 (4/11/2013 Email from R. Starling to M. Burris).

overrepresented among voters who lacked a form of DMV-issued ID.[115] For example,

the SBOE's April 17, 2013 report comparing the voter registration lists with the DMV's

customer list found 318,643 registered voters without a DMV match and, of this number,

107,681—about a third—were African American.[116] This report also included racial

breakdown data provided at the request of staff of supporters of HB 589.[117] Supporters of

HB 589 and their staff were well aware of these results and, in fact, were intimately

involved in formulating the last iteration of the analysis conducted prior to HB 589's

passage in April 2013.[118]

     In addition, both before and during consideration of the omnibus, post-*Shelby*

version of HB 589, legislators were presented with evidence showing that African

Americans disproportionately used the other challenged provisions, including same-day

---

[115] JA vol. IV at 1611 (SBOE-DMV ID Analysis Jan. 2013); *Id*. at 1669-1709 (Mar. 5, 2013 SBOE-DMV supplemental analysis); *Id*. at 1782 (Mar. 6, 2013 Supplemental Tables to SBOE-DMV supplemental analysis); *Id*. at 1821 (Apr. 17, 2013 SBOE-DMV ID analysis).

[116] JA vol. IV at 1821 (Apr. 17, 2013 SBOE-DMV ID analysis)

[117] JA vol. IV at 1786 (April 2013 spreadsheet); *Id*. at 3231 (4/16/2013 email from M. Burris to R. Starling); LEG 22577 (4/11/2013 email from R. Starling to M. Burris); LEG 23254 (4/15/2013 email from M. Burris to R. Starling).

[118] Ex. 192 JA vol. VI 314866 (4/11/2013 Letter from SBOE to Rep. Lewis); *Id*. at 3120-24 (3/13/2013 email from R. Starling to J. McLean); *Id*. at 3125-26 (3/18/2013 SBOE email); *Id*. at 3138-41 (4/14/2013 email from R. Starling to M. Burris); *Id*. at 3142-47 (4/11/2013 email from R. Starling to T. Farr); *Id*. at 3231-46 (4/16/2013 email from M. Burris to R. Starling); *Id*. at 3247-48 (staffer noting that the analysis in the April SBOE report "hit the nail on the head"); LEG 23254 (4/15/2013 email from M. Burris to R. Starling); LEG 22566 (4/12/2013 email from M. Burris to G. Bartlett); Degraffenreid Dep. Tr. at 297:14-298:18; 299:10-300:8; Burris Dep. Tr. at 115:4-23, 116:15-25, 120:19-25; Strach 30b6 4-16-2014  239:25-241:4  ("It's my understanding it was done— there were some legislators that were involved in this analysis as well as the request.").

registration and early voting.[119]  Faced with this information regarding the racially

disparate effect of these provisions on African Americans, the supporters of HB 589 not

only proceeded with the newly added provisions, but they further tightened the already

restrictive voter identification portions of the omnibus bill.[120]

### 2. The Historical Background and Sequence of Events Leading Up to the Passage of HB 589 Evince Discriminatory Purpose

The historical background to HB 589 reflects two eras in North Carolina's history.

For most of its history, North Carolina intentionally suppressed black political

participation.[121]  During the decade immediately preceding HB 589, by contrast, the State

finally addressed that history, with a series of reforms—most notably the expansion of

early voting, implementation of same-day registration, and the validation of out-of-

precinct ballots—that produced rates of black voter registration and turnout that reached a

fragile parity with those of white voters during presidential elections.[122]  *Cf. Lemon v.*

*Bossier Parish School Board*, 444 F.2d 1400, 1401 (5th Cir. 1971) (explaining that, in the

context of whether a previously segregated school system has reached unitary status, that

a single semester was not long enough because "[o]ne swallow does not make a spring").

HB 589 either curtailed or repealed precisely those provisions of North Carolina law that

---

[119] JA vol. I at 188-190, 193-200 (Stein Decl. ¶¶ 24-28, Ex. A); JA vol. V at 2492-2494 (7/25/13 N.C. Senate Sess. Tr. at 33:12-35:16); Lichtman Trial Rpt. at 116-128.

[120] *See supra* Section I.B.

[121] JA vol. III at 1254-61 (Lawson ¶¶ 12-17); *Id*. at 1184-92, 1224-25 (Kousser at 8-6, 48-49); *Id*. at 1351-57 (Leloudis at 13-19).

[122] JA vol. III at 1251-53, 1261-65 (Lawson ¶¶ 10, 18-21); *Id*. at 1193-94, 1197)(Kousser at 17-18 & Tbl. 2); JA vol. II at 800-01, 807 (Stewart ¶¶ 51-53, Table 3); Stewart Trial Decl. App. U.

operated to remedy the State's prior, concededly intentionally discriminatory regime. It marked a direct reaction to the dramatic growth in the participation of African Americans in North Carolina's elections.[123]

Of particular salience, the final form of HB 589 self-consciously took advantage of the Supreme Court's decision in *Shelby County v. Holder*. Prior to *Shelby*, HB 589's legislative proponents acknowledged that any legislation would have to satisfy Section 5's preclearance requirement, which precluded passing a bill that would have either a racially discriminatory purpose or a racially discriminatory effect.[124] Thus, the bill under ostensible consideration during the pre-*Shelby* period was a comparatively modest voter ID requirement. Indeed, the pre-*Shelby* version of HB 589 was subjected to a process that supporters themselves lauded as transparent and involving extensive vetting, study, and analysis. As discussed, consistent with the constraints imposed by preclearance, various sponsors of the voter photo ID-focused version of the bill requested that the SBOE compile a list of voters who did not possess DMV-issued identification and also requested a racial breakdown of the results. Despite these efforts supporters did not expeditiously move the bill along the legislative process so that it could undergo

---

[123] JA vol. III at 1261-63; 1271-75, 1290-93 (Lawson ¶¶ 18-21, 29-33, 54-56); *Id*. at 1181, 1193 (Kousser at 5, 17).

[124] On March 15, 2013, Representative Warren commented to a constituent that supporters of photo identification for voting had to craft their bill "in order to gain preclearance past Section 5 of the Voting Rights Act." LEG00005103 (3/15/2013 email from H. Warren to J. Rhodes). Similarly, in June 2013, Senator Apodaca stated that the North Carolina Senate did not want "the legal headaches of having to go through pre-clearance [under the Voting Rights Act] if it wasn't necessary and having to determine which portions of the proposal would be subject to federal scrutiny." JA vol. IV at 1831 (6/25/2013 Article); JA vol. III at 1290-91 (Lawson ¶ 54).

preclearance review.[125]  Instead, for a period of almost three months the bill lay dormant.

But things changed dramatically once the Supreme Court relieved North Carolina of the affirmative obligation to prove that its proposal had neither a racially discriminatory purpose nor a racially discriminatory effect.  Indeed, just one day after the *Shelby* decision, Chairman of the North Carolina Senate Rules Committee Tom Apodaca, stated that the Senate intended to proceed with a "full bill"[126]—a bill whose dramatically expanded contours had never before been made public and indeed were not made public until three days before final passage.   Within a month of the decision in *Shelby*, the legislative majority exploited the removal of Section 5's preclearance requirement by transforming HB 589 into an omnibus package of changes that knowingly and deliberately targeted voting opportunities from which African-American voters were disproportionately likely to benefit.[127]

### 3.  The Evidence Shows that HB 589's Legislative Process Was a Marked Procedural Departure from the Normal Practice

The passage of HB 589 was characterized by multiple "[d]epartures from the normal procedural sequence." *Arlington Heights*, 429 U.S. at 267; *see Veasey,* 2014 WL 5090258 at *53.[128]

First, the process by which the post-*Shelby* version of HB 589 sped through the

---

[125] Lichtman Trial Rpt. at 31-32.

[126] *Id*.; JA vol. IV at 1831 (6/25/2013 Article); JA vol. III at 1290-91 (Lawson ¶ 54); *Id*. at 1214-15 (Kousser at 38-39 & n.109); JA vol. I at 357, 361 (McKissick Decl. ¶¶ 17, 29).

[127] Lichtman Trial Rpt.. ¶ 158; Lawson Trial Decl. at ¶ 64; JA vol. III at 1291, 1315 (Lawson ¶¶ 54, 88).

[128] Lawson Trial Decl. at ¶ 45-72.

General Assembly allowed neither the House nor the Senate sufficient time or opportunity to assess on the record the likely impact of the bill.[129] Although bills related to some of the challenged provisions had previously been introduced in the General Assembly, none had received debate, expert testimony, or public input.[130] Moreover, the changes included in HB 589 were not simply amendments or ministerial alterations to existing law, but were dramatic overhauls to the election code involving the complete elimination of practices hundreds of thousands of voters were using.[131]

Next, the House adopted the Senate's radically altered version of HB 589 through a concurrence vote rather than referring the bill to conference committee, another atypical procedure.[132] Normally, when the Senate made major changes to a House bill, the bill would either be referred to the House committee from which it originated (which would recommend concurrence or non-concurrence on the bill to the full House), or be referred to a conference committee made up of House and Senate members (if the entire House voted not to concur).[133]

The General Assembly routinely appointed conference committees when House

---

[129] JA vol. I at 183-84, 377-78, 165, 357-58 (Stein Decl. ¶ 15; Kinnaird Decl. ¶ 21; H.M. Michaux Decl. ¶ 20; McKissick Decl. ¶¶ 19-20). As one Senator put it, "This was a process designed to short-circuit the typical deliberative process." JA vol. I at 378-79, 356, 360, 304, 101 (Kinnaird Decl. ¶ 24; McKissick Decl. ¶¶ 13, 27; Glazier Decl. ¶ 18; Phillips Decl. ¶ 15).

[130] Lawson Trial Decl. at ¶¶ 73-89.

[131] *Id.*

[132] *Id.* at ¶ 45.

[133] JA vol. I at 306-07 (Glazier Decl. ¶ 29); *Id.* at 359 (McKissick Decl. ¶ 25); *Major v. Treen*, 574 F. Supp. 325, 352 (E.D. La. 1983) (noting that bypass of "routine mechanism of the conference committee" supported finding a Section 2 violation).

and Senate versions of bills differed substantially.[134]  In fact, the General Assembly had

customarily followed this procedure even in situations in which versions of bills differed

far less than those of HB 589.[135]  With respect to the post-*Shelby* version of HB 589,

however, the General Assembly relied on procedural mechanisms to pass the bill rather

than negotiation and compromise through the conventional conference committee process

it had used in the past.

> **4. The Contemporaneous Statements and Tenuous Justifications of HB 589's Supporters Reinforce the Conclusion that the Bill Actually Had a Racially Discriminatory Purpose**

Evidence regarding the intent of particular legislators can be relevant to the

purpose inquiry, particularly where a legislator played a key role in the enactment of the

challenged practice.  *See, e.g.*, *Busbee v. Smith*, 549 F. Supp. 494, 500 (D.D.C. 1982)

(three-judge court), *aff'd mem.*, 459 U.S. 1166 (1983).  At the same time, high-minded

public statements by legislative proponents cannot necessarily be taken at face value

because it is unlikely that proponents motivated by a discriminatory purpose would

announce that purpose publicly.  *See, e.g.*, *Smith v. Town of Clarkton*, 682 F.2d 1055,

1064 (4th Cir. 1982).  The Supreme Court has explained that a court's "disbelief of the

reasons put forward" by proponents "(particularly if disbelief is accompanied by a

suspicion of mendacity)" can support a finding of discriminatory purpose. *St. Mary's

Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

Most notably, supporters' contemporaneous statements discussing Section 5

---

[134] Lawson Trial Decl. at ¶¶ 45, 48-49, 52, 56, 60 64, 67-72.

[135] *Id.*

indicated a desire to circumvent the Voting Rights Act's protections against discriminatory purpose and effect.[136]  Accordingly, after the preclearance requirement was removed, the pre-*Shelby* version of HB 589 was significantly altered to knowingly and deliberately target African-American voters.

Also, as discussed, HB 589's proponents proffered highly tenuous rationales during the legislative process, which were contradicted by the facts available to them and the data supplied by the SBOE.[137]  In *Arlington Heights*, the Supreme Court explained that when "factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," a factfinder can infer a discriminatory purpose. 429 U.S. at 267.  The General Assembly's decision to fly in the face of the available evidence thus supports finding an impermissible purpose.  The tenuousness of the proffered justifications for HB 589 provides additional evidence that a racially discriminatory purpose that the legislators were compelled to hide was a motivating factor in the passage of HB 589, and thus supports the conclusion that the challenged provisions violate Section 2.

## III.  CONCLUSION AND REQUEST FOR RELIEF

The challenged provisions of HB 589 will both individually and collectively result

---

[136] *See supra* n. 124; *see also* LEG00004879 (6/17/2013 email from Senator Thom Goolsby to constituent indicating that he favored an even more restrictive voter photo identification law than the provision included in the pre-*Shelby* version of HB 589 and opining that "many of the soft policies are a result of squeamishness about the mandatory federal review.").  *See also* Lichtman Trial Rpt. at 33, 158; JA vol. III at 1311-12 (Lawson ¶¶ 82-83).

[137] JA vol. I at 146, 140-41 (Bartlett Decl. ¶¶ 31, 12-13); *Id*. at 184, 191 (Stein Decl. ¶¶ 16, 31); *see also supra* Section II.B.4.

in black citizens in North Carolina having less opportunity than other citizens to participate in the political process and elect representatives of their choice. They were, in fact, adopted in part for that very purpose. Thus, HB 589 violates both the results and purpose prongs of Section 2 of the Voting Rights Act.

For the reasons set forth above, the United States requests that this Court enter judgment in favor of Plaintiffs by (a) declaring that the challenged provisions of HB 589 (including parts 16, 25, and 49) violate Section 2; (b) permanently enjoining the challenged provisions of HB 589; (c) authorizing the appointment of Federal observers, pursuant to Section 3(a) of the Voting Rights Act; (d) retaining jurisdiction and subjecting North Carolina to a preclearance requirement pursuant to Section 3(c) of the Voting Rights Act; and (e) granting other such relief that may be just and proper.

Dated: June 29, 2015

Respectfully submitted,

/s/ Gill P. Beck                                By:    /s/ Catherine Meza

Gill P. Beck (State Bar # 13175)                       T. Christian Herren, Jr.
Special Assistant United States                        John A. Russ IV
Attorney                                               Catherine Meza
OFFICE OF THE UNITED                                   David G. Cooper
STATES ATTORNEY                                        Spencer R. Fisher
United States Courthouse                               Jenigh J. Garrett
100 Otis Street                                        Elizabeth Ryan
Asheville, NC 28801                                    Avner Shapiro
Telephone: (828) 259-0645                              Ernest A. McFarland
E-mail: gill.beck@usdoj.gov                            Attorneys, Voting Section
                                                       Civil Rights Division
                                                       U.S. DEPARTMENT OF JUSTICE
                                                       950 Pennsylvania Avenue, N.W.
                                                       Washington, D.C. 20530
                                                       Telephone: (800) 253-3931
                                                       E-mail: catherine.meza@usdoj.gov

*Attorneys for Plaintiff in United States v. North Carolina, et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2015, I electronically filed the foregoing **United States' Pre-Trial Brief**, using the CM/ECF system in case numbers 1:13- cv-658, 1:13- cv-660, and 1:13-cv-861, which will send notification of such filing to all counsel of record.


  _/s/ Catherine Meza_____
CATHERINE MEZA
U.S. Department of Justice
Civil Rights Division - Voting Section
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Phone:    (800) 253-3931
Email:     catherine.meza@usdoj.gov