# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al., Plaintiffs, v. PATRICK LLOYD MCCRORY, in his official capacity as the Governor of North Carolina, et al., Defendants. | Civil Action No. 1:13-CV-658 |
| LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, et al., Plaintiffs, v. THE STATE OF NORTH CAROLINA, et al., Defendants. | Civil Action No. 1:13-CV-660 |
| UNITED STATES OF AMERICA, Plaintiff, v. THE STATE OF NORTH CAROLINA, et al., Defendants. | Civil Action No. 1:13-CV-861 |

1

## DEFENDANTS' OBJECTIONS TO AND COUNTER- DESIGNATIONS OF PLAINTIFFS' DESIGNATIONS OF DEPOSITION TESTIMONY FOR TRIAL

Defendants, in accordance with Fed. R. Civ. P. 26(a)(3)(B) and the Court's Order of June 26, 2015, submit the following objections and counter-designations of deposition testimony designated by Plaintiffs. The name of each deponent, a summary of the key facts and relevancy of the testimony of each deponent, counter-designated testimony, and objections to the testimony designated for each witness by Plaintiffs, is listed below. A notice of filing with complete copies of the condensed transcripts of the depositions of each witness for which Defendants are providing counter-designations, with Defendants' counter-designations highlighted, is being filed contemporaneously with this document.

## 1. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF LUE ALICE ABERCROMBIE

Ms. Abercrombie has been registered to vote since 2010, but she had never attempted to vote prior to November 2014. On Election Day, Ms. Abercrombie attempted to vote at the wrong precinct under the mistaken belief that she was assigned to that polling place because her fiancé was assigned to that polling place and they live on the same street. Ms. Abercrombie now knows where her correct polling place is located, and she testified that she will be able to vote at her correct precinct in all future elections.

Ms. Abercrombie's testimony confirms that had she performed even minimal due diligence to determine her correct polling place, she would have voted at her assigned polling place and her vote would have counted.

Defendants counter-designate the following portions of Ms. Abercrombie's deposition of June 4, 2015:

Page 9, Lines 1 through 7
Page 10, Line 22 through Page 11, Line 13
Page 17, Lines 5 through 14
Page 18, Lines 11 through 21

## 2. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF VICTORIA BANKS

On Election Day, Ms. Banks attempted to take two residents of the nursing home where she worked, Mr. Skinner and Ms. Jordan, to vote at the Perquimans County Courthouse. After arriving at the courthouse, Ms. Banks learned Mr. Skinner was assigned to vote at a school that Ms. Banks admitted was closer to the nursing home than the courthouse. She also learned that Ms. Jordan was registered to vote in neighboring Chowan County, not Perquimans County. Ms. Banks did not contact any elections board for information about voting prior to the election and made no effort to determine whether either Mr. Skinner or Ms. Jordan were registered to vote in Perquimans County or where they were supposed to vote before driving them to the polls on Election Day. Ms. Banks drove Mr. Skinner to the school where he was assigned to vote where he successfully voted. Ms. Banks decided not to drive Ms. Jordan to Chowan County to vote.

Ms. Banks's testimony does nothing to support Plaintiffs' claims and only underscores the need for the changes in the law that Plaintiffs are challenging. Had Ms. Banks not been required to drive Mr. Skinner to his correct polling place on Election Day because of the elimination of Out-of-Precinct Voting, Mr. Skinner could have been disenfranchised with respect to some elections on his ballot simply because Ms. Banks failed to determine where he was supposed to vote before driving him to the polls.

3

Contrary to Plaintiffs' assertions in their designations, the elimination of Out-of-Precinct voting will not require Ms. Banks to "drive to multiple polling places to ensure that everyone can vote" because all residents registered to vote at the nursing home will be assigned to vote at the same polling place because they will be registered at the same address. Second, Same-Day Registration ("SDR") would not have permitted Ms. Jordan to vote because Ms. Banks took her to vote on Election Day, not during Early Voting, and SDR was never available to voters on Election Day. Further, Ms. Banks testified that Ms. Jordan told her that she intended to return to her home to Chowan County so Ms. Jordan likely could not have properly registered to vote in Perquimans County even if had SDR been available to her. Finally, although Ms. Banks testified that she was not familiar with the process for absentee balloting in November 2014, Ms. Banks testified that she would be willing to explore ways that residents could vote by absentee ballot in future elections which would eliminate the need for her to transport residents to their polling place.

Defendants counter-designate the following portions of Ms. Banks's deposition of April 21, 2015:

Page 32, Line 4 through Page 34, Line 8
Page 43, Lines 5 through 9
Page 45, Line 20 through Page 47, Line 17

## 3. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF SANDRA BEATTY

Ms. Beatty lost her legs and her vision to diabetes. (Page 22, Lines 2 through 6) Ms. Beatty moved to North Carolina in 2011, but as of October 2014, she had not taken

4

any steps to register to vote in North Carolina. (Page 24, Lines 17 through 19) Contrary to the characterization of Ms. Beatty's testimony provided by Plaintiffs in their designations, Ms. Beatty did not testify that she "went to vote during early voting, hoping she might be able to register to vote at that time." Rather, Ms. Beatty went to the polls in October 2014 on the spur of the moment, as reflected in the following testimony:

> Oh, I was – I was shopping with my daughter, Jacqueline, and one of my friends, George. He's also handicapped as well. And he said, "Oh. Let's go" – he said, "Let me go vote." I said, "Okay." I said, "Well, I'll try, too." I mean, why not?

(Page 10, Lines 8 through 13) Furthermore, Ms. Beatty was unaware that North Carolina once had same-day registration, so she could not have gone to the polls hoping to use it. (Page 19, Lines 12 through 19)

Ms. Beatty testified that she was unaware that she could register by mail or that she could vote by mail-in absentee ballot, but she is interested in learning about these options. (Page 26, Lines 8 through 20) She has family members who can help her obtain information about mail-in absentee ballots. (Page 29, Lines 3 through 19) The SEIMS database reflects that Ms. Beatty is currently registered to vote in North Carolina.

Defendants counter-designate the following portions of Ms. Beatty's deposition of May 18, 2015:

> Page 22, Lines 2 through 6
> Page 26, Lines 8 through 20
> Page 29, Lines 3 through 19

**4. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF JOSUE BERDUO**

Josue Berduo is a college student at N.C. State University. Before attending N.C. State University, he attended UNC-Charlotte. He has had no problems voting in any North Carolina election and was not affected by any of the changes made to North Carolina's voting laws by S.L. 2013-381, also known as the Voter Information Verification Act or "VIVA".

When he was in high school, Mr. Berduo assisted other students in registering to vote. Although he is not currently engaged in efforts to register high school students to vote and has no plans to do so in the future, Mr. Berduo admitted that nothing in S.L. 2013-381 would prevent him from continuing to register anyone who will be 18 by the time of the next general election.

Mr. Berduo helped educate students at N.C. State about the changes made to North Carolina's voting laws by S.L. 2013-381 and answered questions that they had. Mr. Berduo testified that there were no questions he was asked that he could not answer. Mr. Berduo also could not identify any particular student who was unable to vote in 2014 as a result of the changes made to North Carolina's voting laws by S.L. 2013-381.

Defendants counter-designate the following portions of Mr. Berduo's deposition of March 20, 2015:

Page 22, Lines 15 through 18
Page 25, Lines 19 through 25
Page 29, Line 24 through Page 31, Line 2
Page 33, Lines 8 though 24

**5.     DEFENDANTS' OBJECTIONS AND COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF CHARLOTTE BOYD-MALETTE**

In their designations, Plaintiffs incorrectly describe Charlotte Boyd-Malette's testimony about a report maintained by Tracy Bucholtz on "non-issuances" as tracking persons who come to DMV and are not issued a registration application "not successfully transmitted to SBOE."   (See Plaintiffs' designations of Charlotte Boyd Malette Deposition, Page 138, Line 17 through Page 139, Line 12.)  A review of all of Ms. Boyd-Malette's testimony shows that the report described by Ms. Boyd-Malette is a report Ms. Bucholtz has been directed to collect regarding persons who come to DMV offices to apply for a free ID and do not give DMV examiners enough information for the persons who are not issued a photo ID and who have not given the DMV examiner enough information for their application to be entered into DMV's SADLS database. (Page 132, Line 1 through Page 140, Line 24.)

Ms. Boyd-Malette describes the report as a report of "voter IDs" that were "not… transmitted to SBOE" but testified that she is not "really familiar" with the process and that Tracy Bucholtz would have more knowledge.

Defendants counter-designate the following portions of Ms. Boyd-Malette's deposition of May 19, 2015:

Page 132, Line 1 through Page 140, Line 24

Defendants object to the introduction into evidence as hearsay any emails or documents from Division of Motor Vehicles ("DMV") customers complaining about alleged examples of registration applications allegedly completed at DMV and allegedly

7

not submitted to the State Board of Elections for purposes of proving the truth of the matter asserted in the complaints. Defendants do not object to the introduction of these complaints for purposes of showing that DMV received complaints or any testimony by Ms. Boyd-Malette concerning any steps taken to investigate any complaint.

## 6. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF CARNELL BROWN

Carnell Brown has lived in Edgecombe County for most of his life.  In 2008 and 2012, Mr. Brown was a resident of Edgecombe County and he successfully voted in Edgecombe County in 2008 and 2012.   Mr. Brown continued to live in Edgecombe County though 2014.  Despite the fact that Mr. Brown was a resident of Edgecombe County in 2014, had been registered to vote in Edgecombe County from at least 2008 through 2014, and had successfully voted in Edgecombe County in both 2008 and 2012, Mr. Brown attempted to vote improperly in Nash County in 2014.  Mr. Brown was not allowed to vote in Nash County in 2014 because he was not a resident of Nash County and therefore was not eligible to vote in Nash County.

The elimination of SDR in 2014 had no impact on Mr. Brown's equal opportunity to vote in 2014 because he could not legally use SDR in 2014 to vote in Nash County because he was not a resident of that county.

Even though Mr. Brown was not allowed to improperly vote in Nash County during early voting, he did not attempt to vote in Edgecombe County during the remaining part of the early voting period or on Election Day.  In the past, he has never

8

had any problems getting to early voting in Edgecombe County. Mr. Brown's brother gives him rides to early voting and when he needs other assistance.

Mr. Brown did not testify that he was told that he could not vote until he was asked a leading question by counsel for the United States who asked Mr. Brown whether a poll worker told Mr. Brown that he had "missed" his "opportunity to vote." (Page 15, Lines 16 through 21). It is not credible that a precinct worker would actually make such a statement given that Mr. Brown attempted to vote during early voting, not on Election Day, and the poll worker told Mr. Brown that the only reason he could not vote was because he was registered in another county. Any poll worker, including one that was incompetent, would have known that Mr. Brown still had an opportunity to vote in the county where he was registered during what remained of early voting or on Election Day.

Defendants counter-designate the following portions of Mr. Brown's deposition of April 24, 2015:

    Page 11, Line 24 through Page 12, Line 3
    Page 12, Lines 9 through 12
    Page 13, Lines 21 through 23
    Page 14, Lines 4 through 12
    Pages 14, Line 23 through Page 15, Line 4
    Page 15, Lines 16 through 21
    Page 29, Lines 6 through 12
    Page 29, Line 16 through Page 30, Line 11
    Page 30, Line 17 through Page 31, Line 2
    Page 31, Lines 9 through 20
    Page 32, Lines 6 through 20
    Page 41, Lines 5 through 13

## 7. DEFENDANTS' OBJECTIONS TO DEPOSITION TESTIMONY OF TRACY BUCHOLTZ

Defendants have no counter-designations of testimony for Tracy Bucholtz.

9

Defendants object to the introduction into evidence as hearsay any emails or documents from Division of Motor Vehicles ("DMV") customers complaining about alleged examples of registration applications allegedly completed at DMV and allegedly not submitted to the State Board of Elections for purposes of proving the truth of the matter asserted in the complaints. Defendants do not object to the introduction of these complaints for purposes of showing that DMV received complaints or any testimony by Ms. Bucholtz concerning any steps taken to investigate any complaint.

## 8. DEFENDANTS' OBJECTIONS TO AND COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF DORIS BURKE

Ms. Burke worked as a volunteer at the Chavis Heights Community Center in Raleigh on Election Day in November 2014. Defendants object to the following characterization by Plaintiffs of Ms. Burke's testimony: "Ms. Burke saw nearly 300 people turned away without voting, almost all of whom were out-of-precinct voters;" and "based on her conversations with many of the people leaving Chavis without voting, Ms. Burke knew that many of the 300 voters who were turned away were not going to vote elsewhere in the November 2014 general election."

With regard to the first objectionable characterization, it is not possible that Ms. Burke "saw" the reasons people were turned away without voting. It appears from Ms. Burke's testimony that she concluded people were being turned away without voting, and the reason they were turned away, either on the basis of what they told her, (Page 35, Line 21 through Page 36, Line 9), or on the basis of what their voter registration cards said, (Page 17, Lines 17 through 23). In either case, Ms. Burke's testimony is based on

hearsay, and is therefore inadmissible. Similarly, the second objectionable characterization is based on hearsay, in that Ms. Burke's "knowledge" about what the voters may or may not have done is admittedly "based on her conversations" with the people leaving the polling place.

Furthermore, even if it were not based on inadmissible hearsay, Ms. Burke's testimony that 300 people were turned away from Chavis because they were in the wrong precinct cannot be deemed credible. Ms. Burke testified that "we counted them," explaining that "we" consisted of "10 or 12 volunteers." (Page 21, Lines 4 through 10) She later testified that she wrote down the number of people who were leaving Heights because they were in the wrong precinct on a piece of paper that she "probably recycled that probably last week or a couple of weeks ago." (Page 30, Lines 5 through 9). When asked how she could be sure the number was 300, she testified:

> Uh, let me see. It seemed like to me there were several – I'm trying to think. I might – uh, the person that counted them, you know, I – we would count them as they would come out and say they weren't able to vote. If – you know, if – if you were working as a team, you would need to know if I would ask them to list what you – you know, write down this number for me. You know, when they'd come out, they'd tell me that they were not able to vote; they were at the wrong – but I didn't ask them for their names.

(Page 30, Lines 12 through 22) In short, it is impossible to tell from Ms. Burke's testimony who kept a count of the people who were in the wrong precinct, and whether such a count, if in fact made, was accurate.

Ms. Burke attributed the long line she observed on Election Day to an insufficient number of election workers at the site. (Page 22, Lines 5 through 10)

11

Defendants counter-designate the following portions of Ms. Burke's deposition of June 12, 2015:

> Page 22, Lines 5 through 16
> Page 30, Lines 5 through 22

Defendants object to the following designations by Plaintiffs on the ground that the testimony provided by Ms. Burke regarding what people at the Chavis polling place told her or what their voter registration cards said consists of hearsay:

> Page 16, Lines 15 through 23
> Page 17, Lines 14 through 23
> Page 19, Lines 4 through 14
> Page 35, Line 21 through Page 36, Line 9

**9. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF MARC BURRIS**

Defendants counter-designate the following portions of Mr. Burris's deposition of March 15, 2015:

> Page 113, Line 25 through Page 114, Line 2
> Page 156, Line 25 through Page 157, Line 12
> Page 159, Line 22 through Page 160, Line 7

**10. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF EMMA CARR**

In their designations, Plaintiffs contend that "Emma Carr provided testimony in her deposition regarding the effect of the elimination of same-day registration during the early voting period." Ms. Carr, however, admitted in her deposition that (1) she had never used same-day registration ("SDR") to register and vote, (2) that the elimination of SDR did not impact her ability to vote in the 2014 General Election, and (3) that she

12

could not identify any specific person who was prevented from voting by the elimination of SDR.

Ms. Carr moved to Cabarrus County from Mecklenburg County on October 18, 2015, 17 days before the November 4, 2015 General Election. Ms. Carr registered to vote in Cabarrus County shortly after she moved but testified that she was told by an unidentified person at the Cabarrus County Board of Elections that she could not vote in Cabarrus County because she had not lived in the county long enough. Ms. Carr further testified that the same person told her that she also could not return to Mecklenburg County to vote. Ms. Carr did not attempt to verify whether the information she was told about not being able to vote in Mecklenburg County was correct and did not vote.

Ms. Carr admitted in her deposition that SDR would not have permitted her to legally vote in 2014 had it been available because she had not lived in Cabarrus County for 30 days before the election as required by N.C.G.S. § 163-55. Ms. Carr testified that she had no concerns about being able to vote in future elections.

Defendants counter-designate the following portions of Ms. Carr's deposition of May 28, 2015:

Page 17, Line 25 through Page 18, Line 16
Page 27, Line 24 through Page 29, Line 21

## 11. DEFENDANTS' OBJECTIONS AND COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF JASON CHISLOM

Mr. Chislom is a sophisticated citizen who graduated from college, owns a small business, served in the Army National Guard, and has moved his residence multiple times over the years between North Carolina, Georgia, and South Carolina. During a period of

time when he lived in Georgia, Mr. Chislom was in simultaneous possession of driver's licenses issued by both Georgia and North Carolina. Moreover, Mr. Chislom was registered to vote in multiple counties in North Carolina while he resided in those counties, and he demonstrated a knowledge of how to ensure he was registered to vote in his county of residence and was in possession of a driver's license with his current address. Nevertheless, upon moving back to Mecklenburg County in 2012, Mr. Chislom did not obtain a new driver's license until October 29, 2014.

In accordance with the NVRA, Mr. Chislom testified that the DMV employee offered him a chance to register to vote in Mecklenburg County when he got his license on October 29, 2014, but he declined under the mistaken belief that he had already registered to vote at a church voter registration drive months prior to that date. That registration drive was conducted by a volunteer organization, not the Board of Elections.

Mr. Chislom never received a voter registration card prior to the 2014 early voting period, and he never contacted the Board of Elections to inquire about the status of his voter registration or his card. Had he done so, Mr. Chislom likely would have determined that he was not registered to vote and he could have registered at the time. Furthermore, if Mr. Chislom had obtained a new driver's license upon moving from Gaston County to Mecklenburg County in 2012 instead of waiting until the eve of the election in October 2014, he would have been lawfully registered to vote pursuant to the NVRA. Finally, Mr. Chislom is currently registered to vote in Mecklenburg County, so he is not disenfranchised.

14

Defendants counter-designate the following portions of Mr. Chislom's deposition of June 11, 2015:

Page 22, Lines 13 through 15
Page 27, Line 6 through Page 28, Line 5
Page 29, Lines 14 through 19
Page 31, Lines 14 through 24
Page 32, Lines 14 through 24
Page 34, Line 10 through 37, Line 25
Page 38, Line 25 through Page 39, Line 22
Page 40, Lines 3 through 25

Defendants object to Mr. Chisolm's testimony from Page 17, Line 18 through Page 17, Line 20 and also his testimony at Page 18, Line 1 through Page 19, Line 4 as it is not relevant and is inadmissible under Rule 402 of the Federal Rules of Civil Procedure.

## 12. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF ERIKA CHURCHILL

Defendants filed designations of deposition testimony for Ms. Churchill on June 30, 2015 and do not have any objections or counter-designations to her testimony.

## 13. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF NADIA COHEN

Nadia Cohen is an eighteen year old resident of Wake County, North Carolina. Ms. Cohen is recent high school graduate. Ms. Cohen joined this lawsuit after being unable to vote in the 2014 elections because she did not register to vote 25 days before Election Day as required by state law. (Page 14, Lines 6 through 19; Page 15, Lines 18 through 24). Ms. Cohen testified that she had not done any investigation into the requirements for registering to vote prior to October 16, 2014, less than a month before

Election Day. (Page 16, Lines 18 through 25; Page 17, Lines 4 through 11). Ms. Cohen conceded that nothing prevented her from registering to vote during her senior year of high school other than her lack of knowledge regarding the registration process. (Page 21, Lines 23 through 25; Page 24, Lines 1 through 11). She testified that she would have complied with the registration deadline if she had known about it. (Page 24, Lines 12 through 15). Ms. Cohen further acknowledged that if she had complied with the stated registration deadline she would have been eligible to vote in the 2014 elections. Ms. Cohen does not know of any other individuals who were unable to vote because they did not register 25 days before the election. (Page 27, Lines 6 through 12)

Despite being "upset" about not being able to vote in the 2014 elections, Ms. Cohen still has not registered to vote as of the date of her deposition. (Page 16, Lines 1 through 5). She has access to a car, the internet, and U.S. Mail, but is not "sure" how she plans on registering before the next election. (Page 13, Lines 24 through 25; Page 17, Lines 17 through 18; Page 31, Lines 12 through 22). Ms. Cohen testified that she would "probably" register to vote before she went off to college. (Page 18, Line 22 through Page 19, Line 2).

Defendants counter-designate the following portions of Ms. Cohen's deposition of June 3, 2015:

> Page 13, Lines 7 through 17
> Page 16, Lines 1 through 5
> Page 16, Lines 18 through 25
> Page 17, Lines 7 through 11
> Page 17, Line 25 through Page 18, Line 9
> Page 18, Line 17 through Page 19, Line 2
> Page 23, Line 23 through Page 24, Line 11

Page 24, Line 12 through 15
Page 27, Line 6 through 12
Page 31, Line 12 through Page 32, Line 9

## 14. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF CAROLYN COLEMAN

Ms. Coleman has never personally had any difficulty voting in North Carolina. (Page 12, Lines 18 through 24) Ms. Coleman testified that the impact of S.L. 2013-381 on her, personally, was her feeling that the new law changed much of what she had spent all of her adult life working to accomplish.[1] (Page 14, Line 12 through Page 15, Line 7) When asked to be specific, Ms. Coleman testified as follows:

> Well, to begin with, in North Carolina we were able to get people out to vote early and they didn't have to stand in long lines on election day, and we've had a number of long lines on election day here in Guilford County, for example. So when you start thinking of the progress that you've made with people being able to vote early and go in and come out on their lunch hour, that was easy. When you start having to do that on election day, it makes a difference.

(Page 18, Line 11 through Page 19, Line 3) However, Ms. Coleman did not present any evidence that early voting in Guilford County, or elsewhere in North Carolina, was no longer available.

Ms. Coleman did not testify about any harm caused by the elimination of same-day registration. With regard to the elimination of out-of-precinct voting, Ms. Coleman testified that she transported people who were in the wrong precinct to the correct precinct. (Page 35, Lines 1 through 22) Ms. Coleman does not know of anyone who

---

[1] Ms. Coleman also testified about the requirement for photo ID, which is not at issue in this trial.

17

wanted to vote in the primary or general election of 2014 and was unable to vote. (Page 41, Lines 10 through 19)

Ms. Coleman waited about an hour to vote in the general election of 2014. She used curbside voting. When asked if she knew the reason for the wait, she stated that she was told by the gentleman handling the curbside voting that the turnout was heavy and he was the only person working the curbside voting. (Page 12, Lines 1 through 11)

Defendants counter-designate the following portions of Ms. Coleman's deposition of April 14, 2015:

Page 12, Lines 1 through 11
Page 12, Lines 18 through 24
Page 14, Line 12 through Page 15, Line 7
Page 18, Line 11 through Page 19, Line 3
Page 35, Lines 1 through 22
Page 41, Lines 10 through 19

## 15. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF HELEN COMPTON

Ms. Compton does not anticipate any problems for herself in voting as a result of the changes in voting law created by S.L. 2013-381, nor does she know anyone whom she believes will be adversely affected by the changes. (Page 7, Lines 19 through 25)

Ms. Compton testified that when pre-registration was available, her registration work in high schools was easier, because she only had to ask whether a student was 16 years old. After pre-registration was eliminated, Ms. Compton had to ascertain whether a student would be 18 years old by the next election, which required her to ask more questions of the student. (Page 14, Line 20 through Page 15, Line 12)

In 2012, when pre-registration was available, students were told that if they were 16 years old, they could pre-register; almost every student that approached Ms. Compton could be pre-registered, because the rules announced for pre-registering were simple. (Page 24, Line 22 through Page 25, Line 2)  In 2014, when pre-registration had been eliminated, Ms. Compton "walk[ed] around with a clipboard that essentially [said], 'Will you be 18 by Election Day' on the back." (Page 21, Lines 15 through 17)  Ms. Compton testified that she had to turn away many students after ascertaining that they did not qualify to register based on their current age, and she told them to come back the next year. (Page 21, Line 11 through Page 22, Line 3)  Because the rules were not as simple, more people approached Ms. Compton in 2014 who were not eligible to register, as compared to 2012; Ms. Compton estimates that she registered fewer than 20% of the students who approached her in 2014. (Page 24, Lines 6 through 21)

Ms. Compton testified to the advantages to registering students while they are still in high school, and she admitted that registering 18 year-olds in high school enjoys all those advantages, although she did not have as many students to register and she speculated that some of the students she could have registered at a younger age with pre-registration might leave school before becoming old enough for her to register them without pre-registration, and further speculated that they might not get themselves registered outside the school setting. (Page 14, Lines 9 through 19; Page 16, Lines 9 through 23)  Ms. Compton is unaware of any information suggesting that students who pre-register are more likely to vote than students who do not pre-register. (Page 29, Line 20 through Page 30, Line 3)

Defendants counter-designate the following portions of Ms. Compton's deposition of June 4, 2015:

Page 7, Lines 19 through 25
Page 14, Line 9 through Page 15, Line 12
Page 16, Lines 9 through 23
Page 21, Line 11 through Page 22, Line 3
Page 24, Line 6 through Page 25, Line 2
Page 29, Line 20 through Page 30, Line 3

## 16. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF KATE COSNER

Ms. Cosner is employed by the North Carolina State Board of Elections ("NCSBE") as the County Liaison, and was formerly the Director of Elections in Allegheny County. Ms. Cosner testified in her deposition that she believed the NCSBE could work with the counties to provide options that would relieve the stress of meeting the cumulative hours-matching requirement during the already stressful period of "election time."

Plaintiffs' contention that "training materials were created … but not disseminated to counties" disingenuously suggests that *no* training materials were provided to the counties. Ms. Cosner testified at length regarding a training webinar conducted by NCSBE, as well as "enhanced" printed training materials that were provided to all 100 counties. Plaintiffs' contention is based upon the attempted creation of a short video which was never completed, and which Ms. Cosner described as a "first run."

Plaintiffs' contention that Ms. Cosner's testimony "establishes" that NCSBE has a "policy" that voters who vote outside of their assigned precinct "out of convenience" will not have their votes counted, that county election workers make the determination of

whether a voter is voting out of precinct "out of convenience," and that some such voters will not be informed that their votes will ultimately not be counted is not supported by Ms. Cosner's actual testimony. She, in fact, testified that the "policy" was simply training on provisional voting procedures. (Page 131, Line 13 through Page 132, Line 1; Page 132, Line 8, through Page 133, Line 1; Page 136, Line 16 through Page 137, Line 1.) She clarified that "out of convenience" was a term used simply to refer to voters who did not fit into any other defined category, such as an unreported move or an administrative error, and for whom there was "no other reason for them to be at that precinct." (Page 136, Lines 4 through 15; Page 139, Lines 10 through 17.) Ms. Cosner testified that the county board of elections, and not "county elections workers," makes the determination of whether an out or precinct provisional ballot should be counted. (Page 137, Lines 19 through 25; Page 138, Lines 1 through 25.) Ms. Cosner did not testify that some voters would not be informed that their votes would ultimately not be counted, but stated that "Some counties choose to tell their voters that their vote will not count, other counties choose not to say that to make – to make the voter aware of the implications. All voters are made aware of the implications. It's just a matter of what words are chosen.…" (Page 137, Lines 9 through 16; Page 135, Lines 16 through 24.) Ms. Cosner did testify that she was unable to state whether voters who vote out of precinct because of a lack of transportation or means will have their votes counted, but not because of any "policy" of the NCSBE as Plaintiffs contend, but because the decision whether a provisional ballot is counted is made by the county board of elections. (Page 141, Line 17 through Page 142, Line 11.)

21

Plaintiffs also designate portions of Ms. Cosner's deposition testimony regarding her response to a NCSBE survey of county elections officials conducted in July 2013, where she expressed concerns about the impact of S.L. 2013-381 on the conduct of elections. However, Ms. Cosner testified that, after conducting an election under the provisions of S.L. 2013-381, none of the concerns she expressed came to pass. (Page 225, Lines 9 through 15.)

Defendants counter-designate the following portions of Ms. Cosner's deposition of March 4, 2015:

Page 81, Line 24 through Page 83, Line 10
Page 95, Line 16 through Page 107, Line 23
Page 115, Lines 9 through 14
Page 128, Line 23 through Page 143, Line 19
Page 168, Line 2 through Page 169, Line 8
Page 222, Line 19 through Page 225, Line 15

## 17. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF TERRILIN CUNNINGHAM

Terrilin Cunningham first registered to vote in North Carolina in at a Division of Motion Vehicles ("DMV") office after moving to Mecklenburg County from Maryland in 2012. When she moved to Cabarrus County in August 2013, she updated her voter registration address at DMV. She had no difficulty registering to vote or updating her registration at DMV.

In the 2012 General Election, Ms. Cunningham successfully voted in Mecklenburg County during Early Voting. Because she was "busy" before the 2014 General Election, she did not attempt vote during Early Voting in Cabarrus County. Instead, on November 4, 2014, the day of the General Election, Ms. Cunningham started her day by going to a

22

doctor's appointment, shopped at Wal-Mart, visited a friend, then headed toward her workplace. On her way to work, Ms. Cunningham attempted to vote at a polling place near where she worked rather than the polling place where she was assigned to vote. Although Ms. Cunningham admitted that she had lived in two other states, Maryland and Pennsylvania, that also required her to vote in an assigned polling place on Election Day, Ms. Cunningham erroneously believed that she could vote at any polling place in North Carolina because she voted at a polling place that was "far away" from where she lived when she voted during early in Mecklenburg County in 2012. Ms. Cunningham testified that when she lived in Maryland and Pennsylvania, where there was no early voting, she was generally able to vote but had to plan ahead to ensure that she could get to her assigned polling place on Election Day. To the extent Ms. Cunningham did not have time to get to her assigned polling place on Election Day in 2014, it was because she chose to do other things before she went to work and attempted to vote.

The day before her deposition, Mr. Cunningham was able to look up her voter information using the State Board of Elections website and determined that her assigned polling place is the Cabarrus Senior Center. She understands that if she votes in person on Election Day in the future, she will need to vote at the Cabarrus Senior Center.

Defendants counter-designate the following portions of Ms. Cunningham's deposition of May 28, 2015:

Page 23, Lines 17 through 20
Page 29, Line 6 though Page 30, Line 15
Page 31, Line 2 through Page 33, Line 16
Page 46, Line 16 through Page 47, Line 1

**18.    DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF VERONICA DEGRAFFENREID**

Defendants do not have any objections or counter-designations for the deposition of Ms. Degraffenreid.

**19.    DEFENDANTS' OBJECTIONS TO PLAINTIFFS' DESIGNATIONS OF DEPOSITION TESTIMONY OF JAY DELANCY**

Defendants object to the relevance of all designations related to Mr. Jay Delancy and on the grounds that Mr. Delancy has no personal knowledge regarding the intent of the General Assembly when it enacted VIVA.

The designations cited by plaintiffs show that Mr. Delancy discussed with Senator Bill Cook concepts regarding tax deductions taken by parents for children registered to vote at an address different from their parents' address. Two bills resulted from these discussions, Senate Bills 666 and 667.  Neither bill was enacted by the General Assembly and the fact that Mr. Delancy had discussions with Senator Cook about two bills that were not enacted has no relevance whatsoever to the intent of the General Assembly when it enacted VIVA.

The designations also show that Mr. Delancy's concern was that college students did not understand the residence requirement for registering to vote and that their actual residence for voting remained at the home of their parents. This is not even evidence of discriminatory intent by Mr. Delancy as all registered voters must genuinely be residents at the address they claim for voter registration.

Plaintiffs' other designation relates to Mr. Delancy's support for the elimination of Same-Day Registration ("SDR"). Mr. Delancy's personal opinions regarding SDR have no relevance whatsoever to the intent of the General Assembly when it enacted VIVA.

## 20. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF ALLISON DETERS

Ms. Deters attempted to register at the DMV in Watauga County during the summer of 2014. She filled out a form and returned it, and she was told that she should expect her voter registration card to arrive in the mail in two weeks. By the time Ms. Deters realized the card had not arrived, it was too close to the election for her to register. (Page 11, Line 14 through Page 12, Line 23)

Ms. Deters did not go the polls in 2014, because she "figured there was no sense doing that." (Page 16, Lines 8 through 12) Ms. Deters did not contact the Watauga Board of Elections or the State Board of Elections to inquire about her options. She does not know what a provisional ballot is or how it might have affected her situation. (Page 20, Lines 4 through 19)

Defendants counter-designate the following portions of Ms. Deter's deposition of May 27, 2015:

Page 11, Line 14 through Page 12, Line 23
Page 16, Lines 8 through 12
Page 20, Lines 4 through 19

## 21. DEFENDANT'S OBJECTIONS AND COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF MICHAEL GARY DICKERSON

Defendants object to Mr. Dickerson's testimony that the implementation of SDR "cut back" on the number of Election Day provisional ballots. Mr. Dickson did state that

Election Day provisional ballots decreased in at least one election after SDR was implemented but there was no testimony by Mr. Dickerson explaining a causal relationship between SDR during early voting and the number of provisional ballots cast on election day or any studies or surveys supporting that opinion. Defendants suggest there is no logical connection between voters who register and vote during early voting and voters who vote on Election Day. Moreover, Mr. Dickerson's testimony is not supported by the facts of the 2014 general election in which the number of provisional ballots cast in 2014 decreased as compared to 2010.

Concerning Mr. Dickerson's testimony on the reasons why persons cast out of precinct ballots, Mr. Dickerson admits that he has never asked an out-of-precinct voter why they voted at the wrong precinct and that some voters in Mecklenburg counted voted in the wrong precinct because they were taken to a wrong precinct by an organization. (Page 46, Lines 3 through 23) His testimony that out of precinct voters voted at the wrong precinct because they did not have time to get to the precinct after work or do not have sufficient time to get to their correct precinct is nothing more than an opinion because, from Mr. Dickerson's perspective, there is no other logical reason for voters to vote in the wrong precinct. Mr. Dickerson has no data to support his opinion. Mr. Dickerson did not check to see if the number of provisional ballots in the 2014 primary decreased as compared to the 2010 primary. (Page 58, Line 10 through Page 60, Line 18)

Defendants counter-designate the following portions of Mr. Dickerson's deposition of July 1, 2014:

Page 46, Lines 3 through 23
Page 58, Line 10 through Page 60, Line 18

## 22. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF CHERISE DILL

Ms. Dill is a former resident of South Carolina and a current resident of North Carolina, where she has resided for almost two years. Even though she is registered to vote in North Carolina, she is also still registered to vote in South Carolina and is still in possession of a South Carolina driver's license, although it is suspended. Ms. Dill does not have a North Carolina driver's license. Ms. Dill testified that she drove to her deposition without a valid driver's license.

By being registered to vote in two different states simultaneously, Ms. Dill has the ability to commit voter fraud by voting twice in different states (and by voting twice in the same election in presidential elections). The chance of her committing voter fraud is not speculative; as Ms. Dill testified, "….if it is this hard to vote in North Carolina, I don't see the point in voting in North Carolina when I can go right back to South Carolina and vote just fine…" (Page 40, Lines 11 through 14).

Defendants counter-designate the following portions of Ms. Dill's deposition of May 7, 2015:

Page 27, Lines 5 through 8
Page 27, Line 24 through Page 28, Line 3
Page 29, Line 5 through Page 36, Line 18
Page 40, Lines 11 through 15

**23. DEFENDANTS' OBJECTIONS TO AND COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF LOUIS DUKE**

At the time of his deposition, Mr. Duke was a student at Campbell University. Mr. Duke registered to vote and voted for the first time in the 2012 primary election, in Rockingham County, where his parents live and he attended high school. (Page 7, Line 24 through Page 9, Line 6) In advance of the 2012 general election, Mr. Duke attempted to register in Harnett County, where Campbell University is located. (Page 13, Lines 10 through 12) Voter registration forms require both a physical address and a mailing address. Mr. Duke did not receive mail on campus and did not want to list his parents' home address as his mailing address, so he left the mailing address blank. He turned in the form and assumed he was registered. When he attempted to vote during the early voting period, he was told that he was not registered. The Director of Elections of Harnett County showed him an electronic copy of his registration form, which had nothing filled in for a mailing address, and explained that Mr. Duke's registration had been denied because, as a result of the omission of the mailing address, Mr. Duke had failed mail verification. The Director suggested that Mr. Duke use same-day registration, which Mr. Duke did. (Page 22, Line 13 through Page 25, Line 24; Page 73, Lines 14 through 25)

Mr. Duke assumed that without same-day registration, he would have been unable to vote. He does not know whether he could have cast a provisional ballot. (Page 72, Line 25 through Page 73, Line 13)

Mr. Duke does not know of anyone who was unable to register to vote in 2014 or who was unable to vote in 2014. (Page 81, Lines 2 through 11; Page 85, Line 25 through Page 86, Line 12)

Mr. Duke is not personally affected by the elimination of pre-registration, although he is not able to pre-register someone else. (Page 79, Lines 9 through 13) Mr. Duke has not, himself, participated in any pre-registration drives, because there are so few people at college who would benefit from pre-registration. (Page 58, Line 22 through Page 59, Line 8)

There is a precinct election-day polling place on the campus of Campbell University. (Page 49, Lines 9 through 12)

Mr. Duke testified that he uses the terms "students," "young people," and "new voters" interchangeably. Mr. Duke defines a "young person" as someone who is 35 years old or younger. (Page 39, Line 13 through Page 40, Line 12)

Defendants counter-designate the following portions of Mr. Duke's deposition of March 19, 2015:

Page 7, Line 24 through Page 9, Line 6
Page 13, Lines 10 through 12
Page 22, Line 13 through Page 25, Line 24
Page 39, Line 13 through Page 40, Line 12
Page 49, Lines 9 through 12
Page 58, Line 22 through Page 59, Line 8
Page 72, Line 25 through Page 73, Line 25
Page 79, Lines 9 through 13
Page 81, Lines 2 through 11
Page 85, Line 25 through Page 86, Line 12

Defendants object to the following designations by Plaintiffs on the grounds that the testimony provided by Mr. Duke regarding what others said to him and his testimony regarding others' feelings consists of inadmissible hearsay and/or was not based on Mr. Duke's personal knowledge:

>Page 29, Lines 5 through 21
>Page 36, Line 23 through Page 37, Line 1

## 24. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF SHERRY DURANT

Ms. Durant has cerebral palsy, which was caused when her mother's umbilical cord got wrapped around her neck, cutting off oxygen to her brain. (Page 6, Lines 15 through 19) Ms. Durant currently lives in a group home in McLeansville, North Carolina, with two other women. Prior to moving to the group home, she lived in a facility for the physically and mentally disabled in Greensboro, which she moved to at the age of 19. (Page 8, Line 18 through Page 9, Line 18)

Ms. Durant does not know what county McLeansville is in, although she does not dispute that it is in Guilford County. (Page 23, Lines 5 through 15) Ms. Durant testified that she called "the board of elections" to inquire whether she was registered, but she does not know if she called the Guilford County Board of Elections, or the North Carolina State Board of Elections, or some other board of elections. (Page 14, Line 25 through Page 15, Line 16; Page 23, Lines 16 through 19) According to information in the SEIMS database, Ms. Durant is currently registered to vote in Guilford, and she has been registered to vote in Guilford County since 2001. (DX 338.)

Ms. Durant testified that the caregiver managing her group home, Ms. Graves, did not take her to vote during the early voting period. (Page 17, Line 13 through Page 18, Line 2) Ms. Durant also testified that she did not know what Ms. Graves' schedule was in the weeks leading up to the election. (Page 28, Lines 5 through 19) Thus, even if Ms. Durant's speculation that Ms. Graves did not take her to vote because Ms. Graves did not have time is correct, there is no evidence to suggest that Ms. Graves would have taken Ms. Durant to vote, had the early voting period been longer. Ms. Durant has not made any inquiries to see if there are services she could use to get to an early voting site, nor has she attempted to contact either the Guilford County Board of Elections or the North Carolina Board of Elections to see if they can provide resources to help her. (Page 27, Line 12 through Page 28, Line 4)

Defendants counter-designate the following portions of Ms. Durant's deposition of April 28, 2015:

Page 6, Lines 13 through 19
Page 8, Line 18 through Page 9, Line 18
Page 14, Line 25 through Page 15, Line 16
Page 17, Line 13 through Page 18, Line 2
Page 22, Line 12 through Page 23, Line 19
Page 27, Line 12 through Page 28, Line 19

## 25. DEFENDANTS' OBJECTIONS TO AND COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF HAKEEM DYKES

On Election Day in November 2014, Mr. Dykes was a "vote protector" at Chavis Community Park in Wake County.

Plaintiffs designated deposition testimony by Mr. Dykes that he "observed and documented hundreds of voters at Chavis Community Center who were turned away

because they were in the wrong precinct."   This testimony was based entirely on hearsay. (Page 16, Line 18 through Page 17, Line 12; Page 20, Lines 12 through 21)

Even if Mr. Dykes' testimony were not based on inadmissible hearsay, Mr. Dykes does not know whether the people he stated were turned away without voting later voted in their correct precincts, although he testified that volunteers were looking up the correct precincts for people and transportation to other polling sites was made available.  (Page 21, Line 16 through Page 22, Line 2)

Mr. Dykes testified that he turned his tally marks over to Common Cause and does not know what was done with the information.  (Page 28, Lines 1 through 13)

Defendants counter-designate the following portions of Mr. Dykes's deposition of June 5, 2015:

Page 20, Lines 12 through 21
Page 21, Line 16 through Page 22, Line 2
Page 28, Lines 1 through 13

Defendants object to the following designations by Plaintiffs on the ground that the testimony provided by Mr. Dykes regarding what people at the precinct were told by poll officials and what the people told Mr. Dykes consists of hearsay:

Page 15, Lines 10 through 13
Page 16, Line 18 through Page 17, Line 12
Page 20, Lines 22 through 25
Page 21, Lines 3 through 7
Page 22, Lines 10 through 14
Page 24, Line 22 through Page 25, Line 6

**26. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF ALEXANDER EALY**

Sgt. Alexander Ealy serves in the United States Army and is stationed at Fort Bragg, North Carolina. He lives in barracks on base.  Sgt. Ealy does not receive mail at the barracks where he lives but instead receives mail at another building whose address is C-1135 Waal Street.  In his deposition, Sgt. Ealy testified that if he listed C-1135 Waal Street as his address, he will sometimes receive mail but admits that he was told that including his unit number was more important because he was told that his unit number is "how they really find the soldier."  (Page 25, Line 22 through Page 26, Line 2).

When Sgt. Ealy attempted to register to vote in April 2014, he listed the C-1135 Waal Street address as his mailing address.  (Ealy Ex. 1; DX 134.)  When he attempted to vote during Early Voting on October 24, 2014, he had to vote a provisional ballot because his name was not listed on the voter rolls.  When Sgt. Ealy filled out his provisional ballot, he listed the C-1135 Waal Street address as the only address on the form.  (Ealy Ex. 2; DX 135.)

Sgt. Ealy filed out another voter registration form in March 2015 after the Southern Coalition for Social Justice ("SCSJ") contacted him and told him that his provisional ballot had not counted in 2014.  On this voter registration form, Sgt. Ealy wrote "C-1135 Waal Street, 189 CSSB" in the residential address box.  (Ealy Ex. 3; DX 136.)  The day before his deposition, Sgt. Ealy, at the instruction of counsel for SCSJ, called Terri Robertson, Director of the Cumberland County Board of Elections, regarding his registration status.  Ms. Robertson told Sgt. Ealy that the address verification card

33

sent to him by the elections board was being returned as undeliverable. Sgt. Ealy then provided Ms. Robertson with his new complete unit address, 11 QM Company 189 CSSB. Sgt. Ealy is now listed as a registered voter on the N.C. State Board of Elections website.

Sgt. Ealy's testimony does nothing to support Plaintiffs' claims. Sgt. Ealy unfortunately failed the mailed verification process because he did not include his unit number as part of the mailing address he provided on the voter registration form he completed, while he included the unit address on his driver's license, bank records, and tax returns. Sgt. Ealy further admitted being told that the unit address was "how they really find the soldier" and described his failure to include it on his March 2015 voter registration form as a "mistake."

Defendants counter-designate the following portions of Sgt. Ealy's deposition of March 20, 2015:

> Page 23, Line 19 through Page 24, Line 17
> Page 25, Line 9 through Page 28, Line 2
> Page 29, Lines 9 through 18
> Page 32, Line 21 through Page 42, Line 12
> Page 47, Line 13 through Page 53, Line 18
> Page 54, Line 6 through Page 64, Line 3

## 27. DEFENDANTS' OBJECTIONS AND COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF ARMENTA EATON

Ms. Eaton is a plaintiff in the NC NAACP Plaintiff Group and is heavily involved in political activities in her community, most recently serving as chair and first vice chair of the Franklin County Democratic Party during the 2012 and 2014 elections cycles, respectively. Ms. Eaton was also served as a roving poll observer for the Democratic

34

Party for six days during the 2014 general election. She admitted that the ability to serve as a roving poll observer, made possible for the first time by S.L. 2013-381, helped her "move faster" amongst polling sites and observe voting at more sites because, under the old law, "you'd have to be in one poll for four hours and not return."

Although she opposes some of the changes made to North Carolina's voting laws by S.L. 2013-381, despite her extensive political involvement, Defendants' counter-designations show that Ms. Eaton has never personally experienced any problems voting in any North Carolina election, including during the 2014 election cycle after the passage of S.L. 2013-381. While Ms. Eaton also expressed concerns about long lines being a problem for voters who, like her, have physical limitations, she admitted that voters who are physically unable to wait in line to vote have the option to use curbside voting. Despite Ms. Eaton's concern about long lines being a problem in 2014, Ms. Eaton admitted that she did not have to wait in a line to vote in either the 2014 primary or general election and that she estimated the longest line she saw as a poll observer which occurred on Saturday, Nov. 1, the last day of early voting, did not exceed 25 minutes.

Defendants counter-designate the following portions of Ms. Eaton's deposition of March 19, 2015:

      Page 14, Line 19 through Page 15, Line 18
      Page 24, Line 24 through Page 25, Line 18
      Page 30, Line 22 through Page 32, Line 18
      Page 32, Line 14 through Page 34, Line 8
      Page 34, Line 14 through Page 36, Line 24
      Page 92, Lines 13 through 16 and Lines 18 through 19

Defendants object to the following designations by Plaintiffs on the grounds that the testimony provided by Ms. Eaton regarding the preferences of other voters with respect to curbside voting was based upon hearsay, speculative, and not based upon personal knowledge by Ms. Eaton:

> Page 90, Line 5 through Page 90, Line 22
> Page 90, Line 24 through Page 91, Line 19

## 28. DEFENDANTS' OBJECTIONS TO PLAINTIFFS' DESIGNATIONS OF DEPOSITION TESTIMONY OF ROBIN ELLIS

Defendants object to Plaintiffs' mischaracterization of the deposition testimony that Plaintiffs designated for Ms. Ellis.

Plaintiffs state that their designations of Ms. Ellis' deposition highlight her testimony that "the citizenship audit authorized by the North Carolina State Board of Elections in 2014 appeared to cause some poll workers to target Latino individuals based on race." Contrary to this representation, as Plaintiffs' designations show, Ms. Ellis did not testify about any citizenship audit authorized by the North Carolina Board of Elections, although she did testify that the Elections Director for Mitchell County asked Ms. Ellis to watch for a particular voter and challenge him if he appeared. (Page 29, Lines 7 through 20) Ms. Ellis further testified that, as a result of this directive, "every Latino gentleman that came in – when I was giving him his ballot, the chief precinct judge would come look through the ATVs to look at his name and to make sure that this was not the person that I was supposed to challenge." (Page 30, Lines 17 through 21)

Plaintiffs also state that their designations of Ms. Ellis' deposition highlight her testimony that "challenge procedures and processes at the polls caused voter intimidation,

36

embarrassment and confusion." On the contrary, Ms. Ellis testified that she was very uncomfortable (Page 29, Lines 21 through 22; Page 30, Lines 23 through 24), and she stated that she found the process "unprofessional" and that she was embarrassed by it. (Page 32, Lines 7 through 9) Ms. Ellis did not testify regarding any effect the process may have had on voters.

## 29. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF GWENDOLYN FARRINGTON

Ms. Farrington testified that she had to cast a provisional ballot because on Election Day for the general election in 2014 she went to the polling place closest to her place of employment rather than the polling place for the precinct in which she resides. She testified that she did this because she did not have time to pick up her children and then get to the polling place for her precinct before it closed when she got off of work. She had never voted at this polling place before, but it was her belief that she could vote at any polling place as a registered voter. She had used one-stop absentee voting in the past, so she was aware that option was available to her, and that she could go to any one-stop polling place during early voting. She learned that her provisional ballot was not counted when she was contacted by counsel for the United States.

Defendants counter-designate the following portions of Ms. Farrington's deposition of March 19, 2015:

Page 10, Lines 5 through 10
Page 11, Line 17 through Page 12, Line 23

37

**30. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF KELVIN FISHER**

On November 4, 2014, Kelvin Fisher presented to vote at the Chavis Community Center in Raleigh, North Carolina. Although he had never voted there previously, he knew "they had early voting there" and it was close to his home. When he arrived at Chavis, he was told that he needed to vote at a different polling place, Fullerton Magnet Elementary School. Mr. Fisher asked someone in the line waiting to vote (not a polling official) whether the Fullerton Elementary was within walking distance and was told it was not.

Because he did not think it was on the bus line and, in any event, did not have bus fare and did not think he could walk, Mr. Fisher decided to cast a provisional at Chavis even though he had been told by a poll worker that his vote might not count if he voted there. Mr. Fisher admitted that, after he registered to vote at his current address, he had received a voter registration card in the mail listing Fullerton Elementary School as his polling place. Even though Mr. Fisher knew that Chavis Community Center had early voting and was "around the corner" from his house, he did not attempt to vote early before Election Day and did not recall why he did not attempt to vote early.

Mr. Fisher's testimony demonstrates that nothing was done by the State of North Carolina to prevent Mr. Fisher from voting on equal terms with all other voters in his assigned precinct on Election Day.

Defendants counter-designate the following portions of Mr. Fisher's deposition of May 6, 2015:

Page 15, Line 6 through Page 16, Line 9
Page 25, Line 1 through Page 26, Line 9
Page 29, Line 13 through Page 31, Line 10
Page 32, Lines 11 through 22
Page 33, Lines 15 through 24

## 31.  DEFENDANTS'  COUNTER-DESIGNATIONS  OF  DEPOSITION TESTIMONY OF TED FITZGERALD

Mr. Fitzgerald is the Lead Voter Outreach Specialist employed by NCSBE.  In this capacity, he supervises the Voter Outreach Team.  Plaintiffs' designations of Mr. Fitzgerald's deposition testimony appear to be solely for the purpose of establishing the seemingly irrelevant and no longer accurate fact that, at the time of his deposition, all of the members of the Voter Outreach Team were "white."  Defendant's counter-designations provide details of the efforts of Mr. Fitzgerald and his team to educate and inform the public.

Defendants counter-designate the following portions of Mr. Fitzgerald's deposition of March 3, 2015:

Page 24, Line 23 through Page 31, Line 16
Page 34, Line 7 through Page 36, Line 20
Page 37, Line 6 through Page 40, Line 10
Page 42, Line 23 through Page 44, Line 20
Page 45, Line 13 through Page 46, Line 14
Page 51, Line 24 through Page 57, Line 13
Page 57, Line 21 through Page 58, Line 24
Page 72, Line 12 through Page 79, Line 14
Page 81, Line 24 through Page 85, Line 16
Page 87, Line 5 through Page 89, Line 4
Page 93, Line 12 through Page 94, Line 5
Page 99, Line 3 through Page 102, Line 9
Page 105, Line 6 through Page 107, Line 2
Page 126, Line 20 through Page 127, Line 7
Page 137, Line 22 through Page 141, Line 12
Page 142, Line 12 through Page 143, Line 21

Page 145, Line 4 through Page 146, Line 1
Page 149, Line 8 through Page 154, Line 19

## 32. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF LYNNETTE GARTH

Ms. Garth attempted to register to vote at the end of September 2014 when she applied for a North Carolina driver's license at the DMV. However, she never received a voter registration card in the mail and never contacted the Board of Elections to determine the status of her registration before going to vote, even though she had seen her daughter's voter registration documents that had been delivered in the mail. To her knowledge, she was still not registered at the time of her deposition, and she had not checked on the status of her registration with the Board of Elections despite having the means and the ability to do so. When she went to vote and was informed that she was not registered, Ms. Garth did not request a provisional ballot.

Defendants counter-designate the following portions of Ms. Garth's deposition of June 5, 2015:

Page 22, Line 10 through Page 23, Line 12
Page 23, Line 21 through Page 24, Line 9
Page 24, Line 23 through Page 25, Line 8
Page 29, Lines 13 through 24

## 33. DEFENDANTS' OBJECTIONS AND COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF ELIZABETH GIGNAC

Elizabeth Gignac is a white, unaffiliated voter residing in Cumberland County, North Carolina. After moving to North Carolina in 2014, Ms. Gignac testified that she visited a Division of Motor Vehicles ("DMV") office in Fayetteville, North Carolina on or about August 26, 2014 and stated that she answered "yes" when asked if she wanted to

40

register to vote. Although she intended to register to vote, Ms. Gignac testified that she was not offered a voter registration form, did not review any such form, and did not know if she signed anything related to voter registration during her DMV visit.

Following her visit to DMV in August 2014, Ms. Gignac did not receive a voter registration card in the mail as she had when she previously registered to vote in other states. Her failure to receive a voter registration card in the mail led Ms. Gignac to further investigate whether she was registered to vote in October 2014. Ms. Gignac first looked up her voter registration information online but could not find any record of being registered. She then contacted a representative of the Cumberland County Board of Elections who confirmed that there was no record of her registering to vote.

On October 21, 2014, Ms. Gignac went back to the Fayetteville DMV office and spoke with Representative Evans who told her that her that DMV records indicated that Ms. Gignac had answered "no" when asked whether she wanted to register to vote when she visited the office in August 2014. Ms. Gignac believes this was an error by DMV but admitted that it was an error that could happen to anyone regardless of their race and admitted that she had no reason to believe she had been personally targeted for any reason by anyone at DMV or the board of elections.

During her visit to DMV to investigate the issue with her registration on October 21, 2014, Ms. Gignac registered to vote through DMV and subsequently received a voter registration card in the mail. She has no concerns about being able to vote in future elections in North Carolina.

Defendants counter-designate the following portions of Ms. Gignac's deposition of June 4, 2015:

Page 17, Line 11 through Page 22, Line 6
Page 24, Line 7 through Page 26, Line 6

Defendants object to the following designation of Ms. Gignac's testimony by Plaintiffs on the grounds that it calls for a legal conclusion, is speculative, is irrelevant, and contradicts Ms. Gignac's previous testimony that she did not know whether the early voting period was going on when she discovered that she was not registered to vote and that she registered to vote at DMV October 21, 2014 and did not attempt to cast a provisional ballot or register to vote at any early voting location:

Page 28, Lines 10 through 18

## 34. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF ANNA-PATRICE HARRIS

At the time of her deposition, Ms. Harris was a third-year law student. (Page 30, Lines 16 through 19) Ms. Harris looked up her precinct address and entered it into her iPhone (GPS) without writing down the address. (Page 8, Lines 15 through18; Page 9, Lines 2 through 4; Page 26, Lines 1 through 12) Ms. Harris's precinct turned out to be across the street from another precinct ("the other precinct"). (Page 13, Lines 1 through3) Ms. Harris followed her GPS, and when she saw election-related activity outside the other precinct, she incorrectly assumed that the other precinct was her assigned precinct. (Page 10, Lines 19 through 25) Ms. Harris did not learn that she was in the incorrect precinct until she had waited in line about 20 minutes and reached the check-in desk. (Page 12, Lines 2 through 15) Ms. Harris's testimony was the following:

42

"Initially, they [sic] just told me that I was not in the right voting place.  I was very confused because I honestly believed I was in my correct voting place.  So then they [sic] went back, and then they [sic] told me that no, your correct voting place actually is across the street."  (Page 12, Line 23 through Page 13, Line 3)  After learning that her assigned precinct was across the street from the other precinct, Ms. Harris crossed the street and voted.

Defendants counter-designate the following portions of Ms. Harris's deposition of June 5, 2015:

Page 8, Lines 12 through 18
Page 8, Line 25 through Page 9, Line 4
Page 10, Lines 16 through 25
Page 12, Lines 2 through 15
Page 12, Line 21 through Page 13, Line 3
Page 26, Lines 1 through 12
Page 30, Lines 16 through 19

## 35. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF BISHOP LONNIE GENE HATLEY

Bishop Hatley cannot give even a ballpark figure of how much Barbee's Chapel Missionary Baptist Church spends annually on get-out-the-vote, voting education, or voter outreach activities.  The largest expenditure is in transportation.  (Page 18, Line 19 through Page 19, Line 14)  Other than a greater amount of publicity, Bishop Hatley does not know of any changes made by Barbee's Chapel Missionary Baptist Church in get-out-the-vote, voter registration, or voter education efforts during the 2014 election cycle as a result of S.L. 2013-381.  (Page 25, Line 20 through Page 26, Line 2)  Bishop Hatley

is not aware of anyone who wanted a ride to the polls in the 2014 election and was unable to get a ride. (Page 28, Lines 5 through 8)

Everyone in Bishop Hatley's ministries who is eligible is registered to vote. (Page 30, Lines 12 through 15) Bishop Hatley does not know of anyone who was unable to register in 2014 because of the elimination of same-day registration; or who tried to vote out of precinct during the 2014 election cycle. (Page 40, Lines 10 through 17) Bishop Hatley is not aware of anyone who was unable to vote in 2014 because of the shortened early voting period. (Page 41, Lines 12 through 17) Bishop Hatley is not aware of anyone who was not able to vote in 2014 as a result of S.L. 2013-381. (Page 37, Lines 2 through 11)

Defendants counter-designate the following portions of Bishop Hatley's deposition of April 1, 2015:

Page 18, Line 19 through Page 19, Line 14
Page 25, Line 20 through Page 26, Line 2
Page 28, Lines 5 through 8
Page 30, Lines 12 through 10
Page 37, Lines 2 through 11
Page 40, Lines 10 through 17
Page 41, Lines 12 through 17

## 36. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF REVEREND JIMMIE HAWKINS

Reverend Jimmy Hawkins is pastor at Covenant Presbyterian Church in Durham and a member of the NAACP Plaintiff Group. Covenant became a plaintiff after being asked to join the lawsuit by attorney Irv Joyner. (Page 10, Line 11 through 17.)

44

Both the church and Rev. Hawkins are active in get-out-the-vote, voter registration, and voter engagement activities but there is no "line item" in Covenant's budget for these activities. (Page 12, Line 13 through Page 13, Line 3.) As a result, Rev. Hawkins admitted that it is hard to measure any financial difference in resources expended by the church as a result of S.L. 2013-381. (Page 82, Line 22 through Page 83, Line 17.) Rev. Hawkins admitted that nothing in S.L. 2013-381 prohibits Covenant from continuing to engage in these activities. (Page 64, Line 21 through Page 65, Line 7.) Rev. Hawkins testified that the enthusiasm level in his church for these activities was greater in 2008 and 2012 than in midterm elections such as 2010 and 2014 because President Obama's presence on the ballot "created a lot of excitement." (Page 87, Line 9 through Page 88, Line 5.)

Despite the church's active involvement in get-out-the-vote, voter registration, and voter engagement activities, the church identified only a single person, Rev. Hawkins's brother, Neil Hawkins, who they alleged was unable to vote as a result of any of the changes made by S.L. 2013-381. (NAACP Ex. 16; Page 58, Line 17 through Page 59, Line 1.) Neil Hawkins was unable to vote in 2014 because he moved to Durham County from Vance County in August or September 2014 but did not register to vote in Durham County. In his deposition, Rev. Hawkins admitted that Neil Hawkins's lack of "organizational skills and his follow through, remembering the need to do it" is what caused him to not register to vote in Durham County after he moved. (Page 59, Line 3 through Page 60, Line 20.)

45

Although Rev. Hawkins provided several opinions about the General Assembly's motivation for enacting S.L. 2013-381, in his deposition, he admitted that he has not directly spoken to any of the legislators that sponsored the law about their intent. (Page 17, Line 6 through 8.)

Defendants counter-designate the following portions of Rev. Hawkins's deposition of March 17, 2015:

> Page 10, Lines 11 through 17
> Page 12, Line 13 through Page 13, Line 3
> Page 17, Lines 6 through 8
> Page 59, Line 2 through Page 60, Line 20
> Page 64, Line 8 through 20
> Page 64, Line 21 through Page 65, Line 7
> Page 82, Line 22 through Page 83, Line 17
> Page 87, Line 9 through Page 88, Line 5

## 37. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF JORGEN JENSEN

Jorgen Jensen is a white, registered Democrat residing in Duplin County who is originally from Denmark. (Page 25, Line 17 through Page 26, Line 7.) Mr. Jensen voted in the 2012 general election after he called "somebody at the Democratic Party and asked them where you go to vote." (Page 12, Lines 17 through 24.) Because Mr. Jensen moved from Wayne County (where he was registered and voted in 2012) to Duplin County in 2013 but did not move his voter registration to Duplin County, he was not registered to vote in Duplin County for the 2014 general election.

Because he was not eligible to vote in Duplin County, Mr. Jensen cast a provisional ballot in Wayne County on October 28, 2014 and, the same day, moved his voter registration to Duplin County. (Jensen Exs. 3-4.) Although Mr. Jensen moved to a

different address in Duplin County after he registered to vote in Duplin County in October 2014, he testified that he had the ability to update his registration with his new address by obtaining a registration form from a public library and mailing it in. (Page 29, Line 19 through Page 33, Line 5.) Mr. Jensen admitted that he also could call someone with either the Democratic or Republican Party, just as he had done when he voted in 2012, if he had questions about the process of updating his voter registration. (Page 32, Line 15 through Page 33, Line 5.)

However, even if Mr. Jensen does not update his registration before the next election, he will still be able to update his registration at the polling place because he has moved within Duplin County. Under N.C.G.S. § 163-82.15(d)-(e), a voter with an "unreported move" within their precinct or to another precinct within the county, may update their voter registration and to vote at the same time.

Defendants counter-designate the following portions of Mr. Jensen's deposition of May 18, 2015:

Page 12, Lines 17 through 24
Page 25, Line 17 through Page 26, Line 7
Page 29, Line 19 through Page 33, Line 5

## 38. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF CARLTON AUGUSTUS JORDAN, JR.

Mr. Jordan is a registered voter in Carteret County. On February 27, 2014, Mr. Jordan visited a Division of Motor Vehicles ("DMV") office to update the address on his driver's license because he had moved from Carteret County to Craven County in June 2013. Based upon the fact that he had registered to vote in Onslow County through

47

DMV in the 1990s while updating his driver's license there, Mr. Jordan believed that he would "automatically" be registered to vote in Craven County by updating the address on his driver's license during his visit in February 2014.

When asked to explain why he believed he had registered to vote at DMV in February 2014, Mr. Jordan testified that he paid taxes in Craven County while at DMV and because it was his understanding, based upon his recollection of his experience in Onslow County that "they automatically . . . once you've got your driver's license and you were registered you were registered to vote."

Mr. Jordan testified that he did not recall signing a voter registration form or having any conversations with anyone at the DMV office about registering to vote. No one at DMV told him that he was, in fact, registered to vote or that he would be able to vote in the 2014 election during his visit. Mr. Jordan testified that his experience at DMV was something that "could happen to anybody, I just wasn't expecting it to happen to me."

Mr. Jordan testified that, following his visit to DMV in February 2014, he did not receive a voter registration card in the mail as he had when he successfully registered to vote at the DMV in Onslow County in the 1990s. Although Mr. Jordan testified that he had moved from Craven County to Carteret County in late November or early December of 2014, he had not yet updated his voter registration. Mr. Jordan testified that he planned to do so that day and that he had no concerns about using DMV to update his registration. Public information on the N.C. State Board of Elections website indicates that Mr. Jordan is current registered to vote in Carteret County.

Defendants counter-designate the following portions of Mr. Jordan's deposition of June 2, 2015:

> Page 24, Line 20 through Page 30, Line 6
> Page 32, Line 25 through Page 33, Line 25
> Page 34, Line 7 through Page 35, Line 19

## 39. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF CAROLYN JUSTICE

Defendants filed designations of deposition testimony for Rep. Justice on June 30, 2015 and do not have any objections or counter-designations to her testimony.

## 40. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF PAUL KEARNS

Mr. Kearns's polling place changed between 2012 and 2014, yet Mr. Kearns was unaware of this changed and showed up late in the day to vote on Election Day at his former polling place. Upon learning that his polling place had changed, Mr. Kearns traveled to his new polling place but arrived after the polls had closed.

Despite knowing that he had business that took him to Asheville on Election Day, Mr. Kearns decided not to take advantage of early voting, which he admits he knew was available to him. Had he availed himself of early voting and showed up at the wrong polling place during that period, he would have had ample time to cast a ballot at his new polling place, either later that same day or on Election Day.

More importantly, Mr. Kearns acknowledges that he was denied the right to vote because of the poll worker at his new polling place, not because of the new rules and new laws in place.

49

Defendants counter-designate the following portions of Mr. Kearns's deposition of June 5, 2015:

Page 27, Line 5 through Page 29, Line 16

## 41.  DEFENDANTS' OBJECTIONS TO DEPOSITION TESTIMONY OF KATHLEEN KENNEDY

Ms. Kennedy was a poll observer in Forsyth County during the 2014 general election.  She did not testify that she personally experienced any difficulties or problems in voting attributable to the change in election laws.

Defendants object to the following designations by Plaintiffs on the grounds that the testimony provided by Ms. Kennedy regarding (1) what poll workers told people at the polling site where Ms. Kennedy was a poll observer; (2) the reasons people at the polling site were being sent to the help desk; (3) the conversations people had with the man at the help desk; (4) the reason for the line at the help desk getting long; (5) conversations people in line had among themselves; (6) statements made by people at the polling site waiting to vote; and (7) Ms. Kennedy's opinions about whether people went elsewhere to vote constitutes hearsay, was based on hearsay, was speculative, and/or was not based on Ms. Kennedy's personal knowledge:

Page 13, Line 22 through Page 14, Line 24
Page 15, Lines 9 through 14
Page 18, Lines 6 through 15
Page 19, Lines 2 through 7
Page 19, Lines 12 through 13
Page 20, Line 8 through Page 21, Line 7
Page 21, Line 23 through Page 23, Line 1
Page 24, Lines 17 through 19
Page 25, Lines 1 through 7
Page 25, Line 25 through Page 26, Line 1

50

Page 28, Lines 5 through 8

## 42. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF WILLIAM KITTRELL

Mr. Kittrell registered to vote in Vance County when he was 18 years old.  At the time of his deposition, he was a sophomore at North Carolina A&T State University in Greensboro, North Carolina.  (Page 6, Line 23 through Page 7, Line 20)  Mr. Kittrell attempted to vote in Guilford County in November 2014, but he was told that he could not because he was registered in Vance County, not Guilford County.  Mr. Kittrell believed that once he was registered to vote in North Carolina, he could vote anywhere.  (Page 9, Line 18 through Page 10, Line 21)  Mr. Kittrell was offered a registration form, which he filled out and sent in.  (Page 10, Line 25 through Page 11, Line 4)

Defendants counter-designate the following portions of Mr. Kittrell's deposition of May 4, 2015:

Page 6, Line 23 through Page 7, Line 20
Page 9, Line 18 through Page 10, Line 21
Page 10, Line 25 through Page 11, Line 4

## 43. DEFENDANTS' OBJECTIONS TO DEPOSITION TESTIMONY OF ELIZABETH KUNIHOLM

Ms. Kuniholm was a poll observer on Election Day in November 2014, at a precinct in Durham County.  Ms. Kuniholm has never had any difficulties voting.  She testified that she did not know what caused the line she observed at the East Regional Library precinct.

Defendants object to the following designations by Plaintiffs on the grounds that the testimony provided by Ms. Kuniholm regarding (1) the reasons people came to the

polling site where Ms. Kuniholm was a poll observer; (2) what poll workers told people at the polling site, including Ms. Kuniholm; (3) the reasons people at the polling site were being sent to the help desk; (4) the conversations people had with the person at the help desk; (5) the reason for the line at the help desk getting long; and (6) statements made by people at the polling site waiting to vote; constitutes hearsay, was based on hearsay, was speculative, and/or was not based on Ms. Kuniholm's personal knowledge:

> Page 14, Line 17 through Page 16, Line 3
> Page 17, Lines 5 through 16
> Page 17, Line 22 through Page 18, Line 10
> Page 18, Line 14 through Page 19, Line 17
> Page 20, Lines 3 through 8
> Page 21, Lines 11 through 16
> Page 24, Line 9 through Page 25, Line 8
> Page 25, Line 21 through Page 26, Line 1
> Page 31, Lines 8 through 16
> Page 31, Line 24 through Page 32, Line 2
> Page 34, Line 15 through Page 35, Line 1

**44. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF BRIAN LIVECCHI**

Mr. LiVecchi is employed as Special Counsel to the NCSBE, and was formerly employed as the Deputy General Counsel to the North Carolina Department of Transportation. He had primary responsibility for conducting a study of voter wait times during the 2014 General Election and drafting the report detailing the findings of that study. The study included surveying and interviewing county elections officials in all 100 North Carolina counties, and focused on reported wait times in excess of one hour. Contrary to the contentions of the Plaintiffs, Mr. LiVecchi did not admit that the survey conducted was "not scientific and potentially inaccurate," nor did he testify that he

52

himself would characterize a one-hour wait time as "too long." In fact, his testimony was that the NCSBE sought to examine voter wait times in a "more or less scientific way or at least in a methodical approach to it." (Page 35, Line 10 through Page 36, Line 8.) While he did acknowledge that he had no knowledge of counties employing a mechanism to scientifically track wait times, this does not support Plaintiffs' contention that the study itself was "not scientific and potentially inaccurate" (Page 81, Lines 11 through 21.)

Plaintiffs state that the State Board of Elections "failed to mention" that some counties reported the compacted early voting schedule as a contributing factor to voter wait times, while in fact Mr. LiVecchi testified that the report published by the NCSBE included this reported factor in the attachments to the report containing the data from surveys and interviews. (Page 96, Line 9 through Page 99, Line 17.) Plaintiffs' designations purportedly show that Mr. LiVecchi acknowledged that a difference between a 30 minute and 50 minute wait to vote would be significant to some voters, when in fact Mr. LiVecchi provided clarification that his testimony was only that, generally, there was a difference between a 30 minute and 59 minute wait, and that such a difference could be considered significant by some people in differing contexts. (Page 78, Lines 2 through 24.)

Defendants' counter-designations include Mr. LiVecchi's testimony pertaining to the wait times study and report, as well as the outreach efforts of the NCSBE Voter Outreach Team.

Defendants counter-designate the following portions of Mr. Livecchi's deposition of May 13, 2015:

Page 17, Line 9 through Page 19, Line 4
Page 34, Line 17 through Page 36, Line 8
Page 37, Line 21 through Page 38, Line 6
Page 77, Line 12 through Page 78, Line 24
Page 84, Line 19 through Page 87, Line 4
Page 90, Line 16 through Page 92, Line 15
Page 96, Line 9 through Page 99, Line 22
Page 100, Lines 4 through 15
Page 100, Line 22 through Page102, Line 7
Page 102, Line 23 through Page 103, Line 15
Page 129, Line 9 through Page 139, Line 18
Page 143, Line 22 through Page 156, Line 24
Page 171, Line 11 through Page 173, Line 13
Page 180, Line 22 through Page183, Line 22
Page 192, Line 22 through Page196, Line 25

## 45. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF NANCY LUND

Nancy Lund is a seventy-three year old retiree who holds leadership positions in numerous organizations affiliated with the Democrat Party. (Pages 43-50). Ms. Lund was not looking to become involved in litigation regarding S.L. 2013-381. (Page 87, Line 25; Page 88, Lines 1 through 2). She only joined the lawsuit after receiving a phone call from Perkins Coie, the law firm representing League of Women Voters Plaintiff. (Page 24, Lines 4 through 21). The enactment of S.L. 2013-381 has not affected Ms. Lund's ability to vote in any way. (Page 27, Lines 7 through 10, 14 through 22).

Ms. Lund believes that same-day registration "dramatically" increased voter turnout when it was introduced based on articles she read published by Democracy North Carolina. However, Ms. Lund does not know anyone who was unable to vote as a direct result of the elimination of same-day registration. (Page 35, Lines 15 through 24; Page 36, Lines 1 through 10). With regard to early voting, Ms. Lund believes the reduction in

early voting days will decrease turnout because people "run into [issues like] bad weather…sickness…being out of town." (Page 36, Lines 23 through 25; Page 37, Lines 1 through 3). However, neither Ms. Lund, nor anyone she knows, had problems voting early in 2014. (Page 37, Lines 9 through 16). Ms. Lund also does not explain how bad weather, illness, and travel effects one group of citizens' ability to vote unequally compared to the State's voters as a whole.       Ms. Lund's main concern regarding S.L. 2013-381's enactment, is that the law will force Democratic Party volunteers to put forward "more time and effort" in "Get out the Vote" activities, which might cause the volunteers to "burn out." (Page 88, Lines 14 through 25; Page 89, Lines 1 through 14).

Defendants counter-designate the following portions of Ms. Lund's deposition of March 16, 2015:

Page 14, Lines 14 through 23
Page 19, Line 18 through Page 20, Line 8
Page 21, Lines 1 through 3
Page 24, Lines 4 through 21
Page 27, Lines 7 through 10
Page 27, Lines 14 through 22
Page 33, Lines 7 through 18
Page 34, Line 9 through Page 36, Line 10
Page 36, Line 23 through Page 37, Line 16
Page 37, Line 21 through Page 38, Line 12
Page 39, Lines 9 through 12
Page 40, Lines 3 through 21
Page 41, Lines 11 through 13
Page 43, Lines 7 through 21
Page 44, Lines 7 through 13
Page 45, Line 17 through Page 46, Line 7
Page 46, Line 11 through Page 47, Line 4
Page 48, Line 1 through Page 49, Line 25
Page 51, Lines 11 through 19
Page 53, Lines 7 through 25
Page 55, Lines 5 through 10

Page 55, Lines 16 through 22
Page 58, Lines 1 through 21
Page 60, Lines 4 through 11
Page 62, Line 14 through Page 63, Line 17
Page 64, Lines 5 through 19
Page 65, Line 7 through Page 66, Line 6
Page 66, Lines 17 through 21
Page 67, Line 20 through Page 68, Line 12
Page 72, Lines 4 through 12
Page 75, Line 18 through Page 76, Line 2
Page 81, Line 22 through Page 82, Line 2
Page 82, Line 23 through Page 83, Line 3
Page 85 line 16, through Page 86, Line 5
Page 87, Line 1 through Page 88, Line 2
Page 88, Line 14 through Page 89, Line 14
Page 95, Lines 12 through 22

## 46.    DEFENDANTS'    COUNTER-DESIGNATIONS    OF    DEPOSITION TESTIMONY OF QUISHA MALLETTE

At the time of her deposition, Ms. Mallette was a law student at the University of North Carolina, Chapel Hill, in Orange County.  (Page 7, Lines 22 through 25)  Prior to moving to Orange County to attend law school, Ms. Mallette lived in Raleigh and was registered to vote in Wake County.  (Page 9, Lines 18 through 20; Page 12, Lines 24 through 25; Page 13, Lines 1 through 7)  When Ms. Mallette moved to Orange County, she changed her address with the U.S. Postal Service, and she thought she updated her registration then as well.  During the early voting period leading up to the November 2014 election, Ms. Mallette was "doing the research" and learned that her registration had not been updated.  (Page 16, Lines 22 through 25; Page 17, Lines 1 through Page 15; Page 18, Lines 20 through 25)  Ms. Mallette went to an early voting site in Wake County and explained that she was registered in Wake County but had moved to Orange County. She was told her vote in Wake County would probably not count.  She then went to an

56

early voting site in Orange County, but could not vote a regular ballot there because she was not registered in Orange County.  (Page 13, Lines 1 through 24; Page 18, Lines 1 through 19)

Defendants counter-designate the following portions of Ms. Mallette's deposition of May 19, 2015:

Page 7, Lines 22 through 25
Page 9, Lines 18 through 20
Page 12, Lines 24 through 25
Page 13, Lines 1 through 24
Page 15, Lines 2 through 10
Page 16, Lines 22 through 25
Page 17, Lines 1 through 6
Page 17, Lines 15 through 25
Page 18, Lines 1 through 10

## 47. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF JAMES MANLEY

Mr. Manley lives at 4773 Silvertown Road, in Enfield, North Carolina, with his mother.  His mother is assigned to the precinct in Hollister.  (Page 7, Lines 8 through 9; Page 12, Line 23 through Page 13, Line 5)  The address for Mr. Manley recorded in SEIMS, as reflected in NC Public Voter Information, is incorrect, as a result of which, he has been assigned to an incorrect polling place.

Defendants counter-designate the following portions of Mr. Manley's deposition of May 21, 2015:

Page 7, Lines 8 through 9
Page 12, Line 23 through Page 13, Line 5

## 48. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF GEORGE MCCUE

Mr. McCue is employed as Agency Counsel to the NCSBE, and was formerly employed as an Elections Specialist with the NCSBE.

Plaintiffs' designations of Mr. McCue's deposition testimony state that Mr. McCue "testified that the difference between inter-county and intra-county moves is a source of confusion for many North Carolinians, including staff at the State Board of Elections." On the contrary, Mr. McCue's actual testimony was that an explanation of and education about the nuances of voter moves was necessary for newly-hired members of the NCSBE Voter Outreach Team. (Page 85, Line 12 through Page 86, Line 17; Page 87, Lines 1 through 5.) At no point in Mr. McCue's deposition testimony did he testify that "many" North Carolinians suffer from such confusion, but only that he has received calls from voters who were confused, and that the issue has come up "more than once." (Page 87, Line 11 through Page 88, Line 2.) In fact, when directly asked whether, in his experience, the rules governing voters who have moved tend to cause confusion, he testified that "there's potential for that, but it certainly is a wide range. I would say, in general, with the general public, perhaps not as much…." (Page 162, Lines 17 through 22.) Mr. McCue did not testify about "problems and confusion associated with the registration process" at DMV, but instead specifically stated that the example contained in the email about which he was testifying was a "completely very generalized simple example that is not based at all on specific protocols…." (Page 92, Line 6 through Page 93, Line 15.)

58

Defendants counter-designate the following portions of Mr. McCue's deposition of May 12, 2015:

Page 83, Lines 1 through 22
Page 84, Line 14 through Page 86, Line 17
Page 87, Line 1 through Page 94, Line 11
Page 95, Line 16 through Page 99, Line 5
Page 146, Line 23 through Page 148, Line 22
Page 155, Line 16 through Page 159, Line 15
Page 161, Line 10 through Page 163, Line 15

## 49. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF BRYAN MCGOWAN

Mr. McGowan served honorably in the United States Marine Corps for 20 years, and, upon his retirement from the Marines, Mr. McGowan retired to Clay County, North Carolina. Despite residing in Clay County, Mr. McGowan attempted to register to vote in Cherokee County in October 2014 because he was under the mistaken belief that the house he rented was located in Cherokee County. Mr. McGowan could have attempted to register to vote approximately three months prior to that time, but he did not do so. Mr. McGowan is now aware that he resides in Clay County and he knows where the Clay County Board of Elections is located, and he testified that he is now going to try to register to vote in Clay County.

Mr. McGowan had previously been stationed at Camp Lejeune in Onslow County, and he registered to vote in Onslow County approximately seven years ago. As a result, he could have cast an absentee ballot, but he was unaware that he could have done so.

As a retired Marine, Mr. McGowan knows that rules of engagement can change on a daily basis, and it is incumbent on individuals to make sure that they know the

59

applicable rules. Despite his experience with the importance of knowing the rules, Mr. McGowan did not take the time to make himself of the rules regarding voting in North Carolina. Had he performed even minimal due diligence, Mr. McGowan could have made himself aware of the rules and could have cast a ballot in 2014.

Defendants counter-designate the following portions of Mr. McGowan's deposition of May 7, 2015:

> Page 25, Line 23 through Page 27, Line14
> Page 30, Lines 3 through 12
> Page 32, Lines 10 through 25
> Page 33, Line 17 through Page 35, Line21
> Page 36, Line 2 through Page 38, Line 24
> Page 39, Lines 21 through 24
> Page 40, Lines 6 through 20
> Page 41, Line 7 through Page 44, Line 4

## 50. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF JANE MEADOWS

Defendants have no objections or counter-designations for Ms. Meadows.

## 51. DEFENDANTS' OBJECTIONS TO AND COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF REVEREND JOHN MENDEZ

John Mendez is the senior pastor of Emmanuel Baptist Church in Winston-Salem, North Carolina. Pastor Mendez and his church are both members of the NAACP. (Page 10, Lines 3 through 17). Pastor Mendez believes S.L. 2013-381 targets African-Americans, Hispanics, and poor people of any race because "they are not middle class" and socioeconomic factors make it hard for them to "fit [voting] into their schedules." (Page 59, Lines 1 through 3; Page 64, Lines 24 through 25; Page 65, Lines 1 through 14, 24 through 25). However, Pastor Mendez concedes that "difficulties" he contends some

in his congregation have with voting after S.L. 2013-381 are the same "difficulties" that have existed since he started at Emmanuel in 1983. (Page 94, Lines 9 through 25; Page 95, Lines 1 through 9).

Pastor Mendez's church has a "social action committee" that is responsible for "Get Out the Vote" activities. (Page 20, Lines 15 through 25; Page 21, Lines 1 through 6). However, the "social action committee" has been involved with voting rights issues long before the enactment of S.L. 2013-381. (Page 27, Lines 18 through 25; Page 28, Lines 1 through 5). Despite his contentions that voters were "burdened" by S.L. 2013-381, Pastor Mendez could not name any specific individuals who allegedly encountered difficulties. (Page 57, Lines 3 through 11). At his deposition, Pastor Mendez also alleged that the "social action committee" incurred significant financial burden due to increased spending necessitated by S.L. 2013-381's enactment. (Page 84, Lines 22 through 25). Specifically, Pastor Mendez testified that the law's enactment caused the committee's spending to increase from $200.00 in 2012 to $3,000.00 in 2014. (Page 84, Lines 22 through 25). However, a review of church budgets, produced to defendants after Pastor Mendez's deposition, show that the committee spent zero dollars in 2012 and only $315.00 in 2014 after S.L. 2013-381 was enacted. (*See* DX 343). Notwithstanding any "difficulties" allegedly caused by S.L. 2013-381, Pastor Mendez admitted the church's "social action committee" is continuing to be able to register individuals to vote. (Page 61, Lines 17 through 19).

Defendants counter-designate the following portions of Pastor Mendez's deposition of March 24, 2015:

61

Page 10, Lines 3 through 17
Page 12, Lines 8 through 14
Page 12, Lines 22 through 24
Page 16, Lines 7 through 18
Page 20, Line 15 through Page 21, Line 6
Page 21, Lines 20 through 24
Page 22, Line 18 through Page 23, Line 6
Page 24, Lines 3 through 10
Page 27, Line 18 through Page 28, Line 5
Page 29, Line 16, through Page 12
Page 41, Lines 17 through 22
Page 43, Line 3 through Page 44, Line 6
Page 44, Lines 20 through 22
Page 47, Lines 12 through 21
Page 56, Line 7 through Page 57, Line 11
Page 59, Lines 1 through 24
Page 61, Lines 17 through 19
Page 62, Line 17 through Page 61, Line 19
Page 62, Line 25 through Page 63, Line 13
Page 64, Line 24 through Page 65, Line 16
Page 65, Lines 24 through 25
Page 66, Lines 1 through 17
Page 68, Line 12 through Page 69, Line 19
Page 69, Lines 23 through 25
Page 76, Line 25 through Page 78, Line 16
Page 80, Line 18 through Page 82, Line 6
Page 82, Line 19 through Page 84, Line 7
Page 84, Lines 14, through 19
Page 84, Line 22 through Page 85, Line 16
Page 88, Line 15 through Page 89, Line 2
Page 90, Line 5, through Page 92, Line 10
Page 93, Line 10 through Page 94, Line 3
Page 94, Line 9 through Page 95, Line 9
Page 95, Lines 16 through 24
Page 96, Lines 1 through 19

Defendants object to Pastor Mendez's testimony from Page 58, Line 7 through Page 58, Line 13 and from Page 59, Line 18 through Page 59, Line 22 as it is hearsay testimony inadmissible under Rule 802 of the Federal Rules of Evidence.

**52. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF BRIAN MILLER**

Brian Miller is a twenty-one year old college student at North Carolina State University in Raleigh. Currently, Mr. Miller is registered to vote in Wake County where he attends college. During the 2012 election, Mr. Miller's polling place was on N.C. State's campus. (Page 13, Lines 17 through 21). During the 2014, Mr. Miller's polling place was off-campus. (Page 13, Lines 22 through 24). However, Mr. Miller had no difficulties in presenting to his off campus polling place to vote. (Page 18, Lines 10 through 20).

Mr. Miller does not know any individuals who were unable to vote in the 2014 elections due reduction in the number of days of early voting under S.L. 2013-381. (Page 22, Lines 16 through 25). Despite his contention that S.L. 2013-381 "burdens" young voters, Mr. Miller has not experienced any difficulties voting during the three North Carolina elections, including 2014, in which he has been eligible to vote.

Defendants counter-designate the following portions of Mr. Miller's deposition of March 20, 2015:

> Page 10, Line 17 through Page 11, Line 15
> Page 13, Line 8 through Page 14, Line 2
> Page 15, Lines 8 through 15
> Page 18, Lines 10 through 20
> Page 22, Lines 16 through 25
> Page 23, Lines 12 through 21
> Page 24, Lines 7 through 10
> Page 24, Lines 13 through 20

**53. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF BECKY MOCK**

Becky Mock is a resident of Burlington, North Carolina. Currently she is a full-time volunteer for the Women's Resource Center. Ms. Mock does not remember how she got involved with this lawsuit. Ms. Mock has voted during early voting and on Election Day. She does not have a preference regarding when she casts her votes. Ms. Mock has never utilized same-day registration or voted in a precinct other than her assigned precinct.

Ms. Mock contends that VIVA has burdened her right to vote, but has voted without issue in every North Carolina election since S.L. 2013-381 was enacted. Ms. Mock is aware of only a single individual, Mat Windsor, who was possibly affected by S.L. 2013-381 in the 2014 elections. Mr. Windsor's deposition was taken in this matter and his circumstances are discussed in Defendant's counter-designations of the deposition of Joseph Mat Windsor.

The majority of Ms. Mock's concerns regarding the voting law changes come from information she has read on the social media website, Facebook. Ms. Mock testified that she is not aware of any individual, other than Mr. Windsor, who has been, or will be, unable to vote due to the changes enacted by S.L. 2013-381.

Defendants counter-designate the following portions of Ms. Mock's deposition of March 17, 2015:

Page 12, Lines 3 through 16
Page 13, Lines 8 through 15
Page 17, Lines 2 through 3
Page 17, Lines 11 through 14

Page 19, Line 15 through Page 20, Line 14
Page 23, Line 24 through Page 24, Line 13
Page 25, Line 25 through Page 26, Line 9
Page 26, Lines 10 through 16
Page 27, Lines 19 through 22
Page 28, Lines 20 through 22
Page 29, Lines 3 through 10
Page 32, Line 20 through Page 32, Line 25
Page 33, Line 15 through Page 34, Line 1
Page 37, Line 22 through Page 38, Line 8
Page 40, Lines 10 through 18
Page 42, Lines 6 through 21
Page 47, Line 24 through Page 48, Line 7
Page 48, Line 13 through Page 49, Line 8
Page 51, Line 19 through Page 53, Line 23
Page 55, Line 1 through Page 56, Line 1
Page 61, Line 24 through Page 63, Line 2

## 54. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF GREGORY MOSS

Gregory Moss, Sr. is a senior Pastor at St. Paul Baptist church and has held that position since the late 1990's. (Page 13, Line 25 through Page 14, Line 22). He is a member of the NAACP and has been since his 20's, holding various leadership roles in the organization. (Page 15, Line 14 through Page 16, Line 20). Pastor Moss found about this lawsuit through his membership with the NAACP. (Page 21, Lines 11 through 21).

St. Paul participates in voter education and get-out-the-vote activities and also encourages people to register to vote. (Page 26, Line 22 through Page 28, Line 10). St. Paul strategizes and collaborates with the NAACP, among other organizations, on get-out-the -vote, voter education, and voter registration. (Page 36, Line 20 through Page 38, Line 6). St. Paul has held seminars, including voter education seminars, for at least 17 years, but has not held a seminar regarding HB 589. (Page 29, Line 7 through Page 30,

Line 3).  St. Paul has offered rides to the polls during Pastor Moss' entire tenure as senior pastor, and he is not aware of anyone who, in 2014, needed a ride to the polls and did not get one.  (Page 34, Line 8 through Page 36, Line 19).

Despite Pastor Moss' and St. Paul's involvement in get-out-the-vote and voter engagement activities, he is not aware of anyone who ever approached St. Paul for assistance registering to vote or voting who St. Paul has been unable to help.  (Page 44, Lines 3 through 11).  Pastor Moss has not been personally impacted by S.L. 2013-381 nor does he think he will be impacted by the law.  (Page 46, Lines 5 through 12).  Although Pastor Moss believes S.L. 2013-381 will impact working people, college students, and older people, Pastor Moss is not aware of an identifiable person who has been unable to vote due to the law.  (Page 46, Line 14 through Page 47, Line 5).  Although Pastor Moss has heard stories to that effect, it would be secondhand.  (Page 47, Lines 5 through 9).

Defendants counter-designate the following portions of Pastor Moss' deposition of June 3, 2015:

Page 21, Lines 11 through 21
Page 29, Line 22 through Page 30, Line 3
Page 32, Lines 17 through 22
Page 35, Line 17 through Page 36, Line 4
Page 49, Lines 15 through 21
Page 53, Line 17 through Page 54, Line 1
Page 57, Line 9 through Page 59, Line 1
Page 60, Line 22 through Page 61, Line 4

## 55.  DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF BRIAN NEESBY

Defendants have no objections or counter-designations from the deposition of Mr. Neesby.

**56.  DEFENDANTS' OBJECTIONS TO AND COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF MARIA PALMER**

Maria Palmer is a member of the Executive Committee of the Orange County Democratic Party. (Page 25, Lines 5 through ; Page 76, Lines 1 through 5). She became a plaintiff in the NAACP Plaintiff Group at the request of a lawyer for the Advancement Project, Katelyn Swain. (Page 81, Lines 15 through 25; Page 82, Lines 1 through 8). Ms. Palmer has not personally experienced any problems voting since S.L. 2013-381was enacted. (Page 20, Lines 2 through 7).  Ms. Palmer could only testify about two specific people who she believed were unable to vote in the 2014 election because of S.L. 2013-381. (Page 20, Lines 12 through 25). Ms. Palmer did not know if one of the individuals, "William," had been able to vote after being taken to his correct precinct. (Page 40, Lines 22 through 25; Page 41, Lines 1 through 6; Page 41, Lines 8 through 10, 19 through 21; Page 42, Lines 17 through 19; Page 45, Lines 3 through 4). Ms. Palmer also admitted that the other individual, her son, would have been able to vote if she had informed him of the 25-day deadline for registration. (Page 20, Lines 16 through 24).

Other than these two individuals, Ms. Palmer was unable to recall the specific names, or the number, of individuals she alleges were unable to vote due to the changes in North Carolina's election laws made by S.L. 2013-381. (Page 34, Lines 4 through 11; Page 35, Lines 20 through 25; Page 37, Lines 20 through 22; Page 52, Lines 23 through 25; Page 53, Lines 1 through 3). While Ms. Palmer alleged that voter turnout decreased in the 2014 election as compared to the 2012 election as a result of S.L. 2013-381, she conceded that the lower turnout could be due to the fact that 2012 was a presidential

election where, historically, there is higher voter participation. (Page 85, Lines 20 through 25; Page 86, Lines 1 through 9, 14 through 16).

Defendants counter-designate the following portions of Ms. Palmer's deposition of March 20, 2015:

Page 20, Lines 2 through 7
Page 20, Lines 16 through 18
Page 20, Lines 22, through 24
Page 26, Lines 7 through 22
Page 27, Lines 12 through 25
Page 34, Lines 4 through 11
Page 35, Lines 20 through 25
Page 36, Lines 9 through 13
Page 37, Lines 20 through 22
Page 41, Lines 8 through 10
Page 41, Lines 19 through 21
Page 42, Line 17 through Page 43, Line 3
Page 45, Lines 3 through 4
Page 45, Line 24 through Page 46, Line 2
Page 47, Line 22 through Page 48, Line 5
Page 51, Line 24 through Page 52, Line 5
Page 52, Line 23 through Page 53, Line 3
Page 57, Lines 8 through 20
Page 57, Line 24 through Page 58, Line 25
Page 61, Lines 6 through 18
Page 81, Line 15 through Page 82, Line 8
Page 85, Line 20 through Page 86, Line 9
Page 86. Lines 14 through 16
Page 86, Lines 19 through 25
Page 92, Line 1 through Page 93, Line 9
Page 94, Lines 8 through 23

Defendants object to Ms. Palmer's testimony from Page 37, Line 22 to Page 38, Line 8 as speculative under Rule 602 of the Federal Rule of Evidence. Ms. Palmer lacks personal knowledge regarding what students, who allegedly encountered problems while voting, discussed with their peers and her testimony regarding this should be excluded.

Additionally, Ms. Palmer's testimony regarding the alleged correlation between these hypothetical conversations and her perception of lower voter participation in the 2014 election is also impermissible opinion testimony by a lay witness and should be excluded under both Rules 602 and 701 of the Federal Rules of Evidence.

## 57.  DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF YOLANDA PAYLOR

Prior to Election Day 2014, Ms. Paylor attempted to register to vote in Buncombe County by completing a registration form and giving it to an employee at the Mountain Area Health Education Center who was registering 18 year olds to vote. Ms. Paylor relied on this volunteer to deliver her registration application to the Buncombe County Board of Elections, even though he was not employed by or affiliated with the Board. Mr. Paylor never received any confirmation from the Board that she had been successfully registered to vote, even though she had experience with registering to vote through a volunteer in Orange County in 2012 and received confirmation of her registration from the Orange County Board of Elections at that time. Ms. Paylor never independently verified that she had been registered vote prior to attempting to vote. Ms. Paylor is currently registered to vote in Buncombe County and is eligible to cast a ballot in future elections.

Defendants counter-designate the following portions of Ms. Paylor's deposition of May 7, 2015:

Page 16, Lines 13 through 14
Page 21, Line 16 through Page 23, Line 19
Page 25, Line 1 through Page 28, Line 13
Page 29, Lines 3 through 14

Page 36, Lines 4 through 15
Page 45, Line 5 through Page 46, Line 10

**58.  DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF MARY PERRY**

Mary Perry is 85 years old and served as the President of the Wake County NAACP for 41 years.  Ms. Perry has not been personally affected by the any of the changes made to North Carolina's voter laws by S.L. 2013-381.  Ms. Perry said she "maybe" was personally impacted by a "long line" that she attributed to the law, however, she testified that she waited "about 10 minutes" to vote in 2014 and "about ten" minutes to vote in 2012 before S.L. 2013-381 became law.  (Page 11, Lines 13 through 25; Page 14, Lines 3 through 5; Page 26, Lines 8 through 14; Page 48, Line 23 through Page 49, Line 6). Ms. Perry later testified that the lines she experienced both years were "not so long."  (Page 48, Line 23 through Page 49, Line 6.)

Ms. Perry could not recall the specific number, or names, of anyone who she believes were unable to vote in 2014 as the result of S.L. 2013-381. (Page 14, Lines 22 through 25; Page 15, Lines 1 through 8). Ms. Perry further admitted that she did not know the specific reasons why any of the unnamed individuals she cited in her testimony were allegedly unable to vote. (Page 16, Lines 4 through 7).  Although Ms. Perry expressed concern about being able to stand in line to vote in the future due to physical limitations, she testified that she felt comfortable asking for assistance if she needed it. (Page 48, Line 19 through Page 50, Line 3).

Defendants counter-designate the following portions of Ms. Perry's deposition of March 12, 2015:

70

Page 11, Lines 13 through 25
Page 13, Lines 21 through 23
Page 14, Lines 3 through 5
Page 14, Lines 13 through 15
Page 14, Line 22 through Page 15, Line 8
Page 16, Lines 4 through 7
Page 25, Lines 7 through 14
Page 26, Lines 8 through 14
Page 39, Lines 4 through 5
Page 41, Lines 11 through 24
Page 48, Line 19 through Page 50, Line 3

Defendants object to Ms. Perry's testimony from Page 48, Line 4 through Page 48, Line 9 as impermissible hearsay under Rule 802 of the Federal Rules of Evidence.

## 59. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF TAWANDA PITT

Ms. Pitt's testimony demonstrates that factors unrelated to S.L. 2013-381, such as computer failures, contributed to lines some voters experienced during the 2014 general election.  In her deposition, Ms. Pitt testified that "my son and I stood in line for like the first time 35, 40 – 40 minutes, at the most" starting around 3:30 p.m. on November 4, 2014, Election Day.  (Page 17, Lines 4 through 6; Page 19, Lines 11 through 13.)  Ms. Pitt returned to her polling site around 6 p.m.  (Page 22, Lines 19 through 25.)  After waiting 30 minutes, Ms. Pitt testified that she decided to get out of line because a computer that she had heard contributed to the line she was waiting in had not arrived and she could not find out when it would arrive and because she had to go home to cook supper for her son and help him with his homework.   (Page 22, Line 19 through Page 23, Line 11; Page 25, Lines 5 through 13.)

71

Ms. Pitt testified that she was told by both a poll worker and by counsel for the Southern Coalition for Social Justice, who she spoke with on Election Day about the wait at her polling site, that computers at the site were down and that poll officials were waiting for another computer to arrive. (Page 17, Line 22 through Page 20, Line 17.)

Ms. Pitt testified that her polling site normally has "four or five computers" set up but "only had two that day." (Page 19, Lines 16 through 21.) Although Ms. Pitt testified that she thought "cutting the days for early voting didn't help" the line, she testified that "having two computers didn't help either" and that she thought "both of them played a part." (Page 29, Lines 15 through 19.) Ms. Pitt admitted that she could not say how much either factor influenced the length of the line she experienced. (Page 19, Lines 20 through 22.) Ms. Pitt admitted that she had not attempted to vote during Early Voting and did not know whether there were in any lines during Early Voting in Wilson County. (Page 25, Lines 14 through 21.)

Defendants counter-designate the following portions of Ms. Pitt's deposition of June 1, 2015:

Page 17, Lines 4 through 6
Page 17, Line 22 through Page 20, Line 17
Page 22, Line 19 through Page 23, Line 11
Page 25, Lines 5 through 21

## 60. DEFENDANTS' OBJECTIONS TO AND COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF MARCIA PLEASANT

Ms. Pleasant moved within Durham County in July 2013. She updated her address with the Durham County Board of Elections. (Page 11, Lines 11 through 16; Page 12, Lines 21 through 25) Nevertheless, when she arrived at her polling place to

vote in November 2014, her name was not in the poll book. Ms. Pleasant was offered a provisional ballot, which she cast and later learned was counted. Following the election, Ms. Pleasant obtained her new voter registration card in the mail. (Page 19, Line 7 through Page 21, Line 2)

Ms. Pleasant testified that she had to wait a long time in line at her polling place. She arrived at her polling place just before the polls closed. She recalls that a poll worker distributed tickets to people who were line before the polls closed. (Page 23, Lines 2 through 14) Ms. Pleasant did not testify that she saw people leaving the line before voting, as represented by Plaintiffs. Rather, Ms. Pleasant was asked, "Did you see anyone leave the line?" to which Ms. Pleasant responded, "Yes, I did." (Page 23, Lines 22 through 24) This testimony is consistent with Ms. Pleasant having seen one person leave the line; furthermore, there is no testimony regarding the reason for anyone having left the line.

Ms. Pleasant believes the long line was caused by the cramped space and disorganization in her polling area and too few voting stands. (Page 27, Lines 9 through 13; Page 30, Lines 17 through 22)

Defendants counter-designate the following portions of Ms. Pleasant's deposition of June 5, 2015:

Page 11, Lines 11 through 16
Page 12, Lines 21 through 25
Page 19, Line 7 through Page 21, Line 2
Page 23, Lines 2 through 14
Page 23, Lines 22 through 24
Page 27, Lines 9 through 13
Page 30, Lines 17 through 22

Defendants object to the following designation made by Plaintiffs on the ground that the testimony provided by Ms. Pleasant regarding statements made by people waiting in line to vote constitutes hearsay:

Page 29, Lines 3 through 5

## 61. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF CHERIE POUCHER

Plaintiffs' designation that VIVA reduced the number of "hours" from 17 to 10 is incorrect. VIVA reduced the number of days for early voting. Plaintiffs incorrectly state that Poucher testified that the administrative burden is not alleviated by the elimination of out of precinct voting. Elimination of out of precinct voting eliminates the research and administrative burden of county boards of election to the extent that, prior to VIVA, they were required to research each out of precinct ballot to determine which office on the ballot voted by the out of precinct voter was an office for which the out of precinct voter was eligible to vote and were then responsible for hand counting each provisional out of precinct ballot. These administrative burdens no longer exist under VIVA. (Poucher 7/2/14 Page 43, Line 22 through Page 46, Line 22, Page 80, Line 9 through Page 81, Line 4)

Plaintiffs examined Ms. Poucher on a paper she prepared (Exhibit 207) in 2005 on "provisional ballots" which was not produced prior to Ms. Poucher's deposition. (Poucher 7/2/14 Page 53, Line 15 through Page 54, Line 23). Ms. Poucher did not remember writing the document (*Id.* at Page 55, Line 18 through Page 56, Line 6). The paper written in 2005 makes references to "provisional voting" not "out of precinct

74

ballots" (*Id.* at Page 56, Line 7 through Page 57, Line 6). At the time the 2005 document was prepared, out of precinct ballots were illegal in North Carolina because of a decision by the NC Supreme Court. Exhibit 207 states that the General Assembly had just introduced a bill to clarify the General Assembly's intent regarding out of precinct ballots had just been introduced "because of the Supreme Court ruling." (*Id.* at Page 81, Line 5 through Page 83, Line 23). At the time Ms. Poucher or WCBOE prepared Exhibit 207, the statute "clarifying" legislative intent that out of precinct ballots should be counted had not been enacted. *(Id.* at Page 83, Line 24 through Page 84, Line 2). Thus at the time of the preparation of Exhibit 207, out of precinct ballots were illegal under North Carolina law.

Regarding plaintiffs' designations concerning the elimination of same day registration and the impact on "voters who believed they were registered but whose registrations were not received," this was in response to a hypothetical question and not a specific example of a voter who matched the hypothetical. (*Id.* at Page 28, Line 19 through Page 30, Line 8) This designation ignores the facts that the number of provisional ballots cast for no record of registration declined in 2014 as compared to 2010.

Ms. Poucher testified that electronic poll books were responsible for the decline in provisional ballots, not the implementation of SDR. (*Id.* at Page 57, Line 7 through Page 59, Line 2) In fact, the evidence will show that the number of provisional ballots cast in 2014 declined as compared to 2010.

Ms. Poucher testified that prior to VIVA there was no way for a poll worker to know when a person presenting to vote was impersonating another voter (4/21/15 Poucher Dep. Page 150, Line 24 through Page 151, Line 11)

WCBOE received phone calls from 16 and 17 years olds who were confused about preregistration because they had not received voter cards from WCBOE after the completed preregistration (7/12/14 Poucher Dep. Page 17, Line 19 through Page 18, Line 13).

Defendants counter-designate the following portions of Ms. Poucher's depositions of July 2, 2014

> Page 17, Line 19 through Page 18, Line 13
> Page 43, Line 22 through Page 46, Line 22
> Page 53, Line 15 through Page 54, Line 23
> Page 55, Line 18 through Page 56, Line 6
> Page 56, Line 7 through Page 57, Line 6
> Page 57, Line 7 through Page 59, Line 2
> Page 80, Line 9 through Page 81, Line 4
> Page 81, Line 5 through Page 83, Line 23
> Page 83, Line 24 through Page 84, Line 2

and April 21, 2015:

> Page 28, Line 15 through Page 29, Line 25
> Page 150, Line 24 through Page 151, Line 11

## 62. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF CANDI RHINEHART

Despite having zero experience as an elections investigator (or any kind of investigations, for that matter), Ms. Rhinehart was nevertheless hired as an investigator for the State Board of Elections (SBOE) in 2004 through the help of the chairman of the Board at that time. Ms. Rhinehart has never worked in the polls and never checked in

76

voters, so she has no idea of what is required to determine if a voter is eligible to vote. Ms. Rhinehart received no training and attended no classes or seminars on investigating election fraud or any other election-related matters. She primarily served in an administrative assistant capacity at the SBOE, and even though she worked there for 8 years, Ms. Rhinehart testified that she does not "keep up with election stuff at all." (Page 31, Lines 17 through 18).

Ms. Rhinehart testified that her supervisor, Mr. Tutor, "was very thorough," even though in one instance he was notified of an allegation of voter fraud on one day after business hours and closed out the matter on the following day before business hours started. In determining whether election fraud had occurred, Ms. Rhinehart relied on whatever her supervisor told her. Despite these severe limitations, Plaintiffs nevertheless rely on her testimony for the proposition that the cases that she and her supervisor closed out did not merit further investigation.

Defendants counter-designate the following portions of Ms. Rhinehart's deposition of April 30, 2015:

> Page 18, Line 7 through Page 19, Line 20
> Page 25, Line 10 through Page 26, Line 18
> Page 28, Line 14 through Page 30, Line 19
> Page 31, Line 17 through Page 32, Line 2
> Page 32, Line 23 through Page 33, Line 2
> Page 35, Line 21 through Page 36, Line 4
> Page 38, Line 19 through Page 40, Line 22
> Page 41, Line 18 through Page 48, Line 2
> Page 54, Line 21 through Page 59, Line 4

## 63. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF DEAN ROBERTS

On examination by the United States Attorney, Mr. Roberts admitted that he has never seen anything in his career consistent with the kind of non-delivery rate experienced with the Metro Productions mailings. He stated that the mailing list might not accurately reflect the actual addresses of the persons mailed. While Mr. Roberts is not a "mail design piece expert" he did not know if the Metro Productions mailing met ideal dimensions. (Page 103, Line 13 through Page 104, Line 6). On examination by the United States attorney Mr. Roberts compared the voter card typically mailed by SBOE to new registrants to the Metro mailing and noted that the SBOE mailing was printed as official election mail and the Metro mailing was not so printed (Page 104, Line 22 through Page 105, Line 7). On re-direct, Mr. Roberts admits that Chuck Underwood received the list of removed voters who were mailed from the SBOE (Page 108, Lines 10 through 23). He agrees that Mr. Underwood testified in his affidavit that the card mailed by Metro is identical in dimensions to voter card mailed by SBOE and that he has no way of disputing that. (Page 109, Line 10 through Page 110, Line 8). Mr. Roberts had never before looked at a report similar to Mr. Underwood's affidavit explaining the number of cards returned by the Postal Service. (Page 111, Line 23 through Page 113, Line 4). He admits that the card mailed by Metro should have been returned by the Postal Service if the person to whom the card is addressed no longer resides at that address (Page 115, Lines 1 through 11).

78

Defendants counter-designate the following portions of Mr. Roberts's deposition of May 14, 2015:

> Page 103, Line 13 through Page 104, Line 6
> Page 104, Line 22 through Page 105, Line 7
> Page 108, Lines 10 through 23
> Page 109, Line 10 through Page 110, Line 8
> Page 111, Line 15 through Page 113, Line 4
> Page 115, Lines 1 through 11

## 64.  DEFENDANTS' OBJECTIONS TO AND COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF SUSAN SCHAFFER

Susan Schaffer served as a poll observer for advocacy group Democracy North Carolina at a polling site at Precinct 54, the Durham Public Library South Regional Branch in Durham County for less than six hours on Election Day, November 4, 2014. Democracy North Carolina was attempting to measure the impact of provisions of S.L. 2013-381 in the 2014 general election.  Ms. Schaffer's testimony and the information included in the poll observer report discussed in her deposition are based upon things she observed while outside of the polling place.  Ms. Schaffer admitted that she did not hear any conversations that occurred between any voter and any poll official.

All of Ms. Schaffer's deposition testimony, including her testimony about why voters were allegedly "not allowed to vote" and the amount of time they allegedly waited to vote, is instead based upon hearsay statements allegedly made by individuals who Ms. Schaffer testified shared information with her (or a partner she was working with who has not testified in these cases) about their voting experiences outside the polling site. Though Ms. Schaffer testified that most of the voters who were allegedly unable to vote because they were at the wrong precinct were African-American, Ms. Schaffer admitted

that the "majority" of voters appearing to vote at that precinct were also African-American. Ms. Schaffer did not keep track of the race or ethnicity of the individual voters listed in her poll report. She also admitted that she did not know how many of the voters listed on her report as not voting later voted at another polling place.

Defendants counter-designate the following portions of Ms. Schaffer's deposition of May 8, 2015:

> Page 14, Line 22 through Page 15, Line 13
> Page 16, Lines 14 through 20
> Page 26, Lines 21 through 23
> Page 33, Line 24 through Page 34, Line 7
> Page 40, Line 23 through Page 43, Line 7
> Page 45, Lines 4 through 17
> Page 47, Line 16 through Page 48, Line 15
> Page 58, Lines 1 through 12
> Page 60, Line 21 through Page 63, Line 21

Defendants object to the following designations of Ms. Schaffer's deposition testimony by Plaintiffs on the grounds that it is based upon inadmissible hearsay:

> Page 17, Lines 9 through 13
> Page 58, Line 13 through Page 59, Line 10

Defendants object to the following designations of Ms. Schaffer's deposition testimony by Plaintiffs on the grounds that it is based upon inadmissible hearsay and that Ms. Shaffer lacks personal knowledge of the matters about what voters included in her poll observer report were told by precinct officials:

> Page 20, Line 9 through Page 23

Defendants object to the following designations of Ms. Schaffer's deposition testimony by Plaintiffs on the grounds that it is based upon inadmissible hearsay, that Ms.

Shaffer lacks personal knowledge of the matters about what voters included in her poll observer report were told or asked by precinct officials, and because Ms. Schaffer admits her testimony is based upon speculation about whether voters were offered a provisional ballot:

Page 24, Line 1 through Page 25, Line 15

## 65. DEFENDANTS' OBJECTIONS TO DEPOSITION TESTIMONY OF APRIL SIDBURY

Defendants object to Plaintiffs' statement in their designation of deposition testimony of April Sidbury that Ms. Sidbury "was disenfranchised in the November 2014 general election because SDR had been repealed," on the ground that this is argument, not testimonial evidence.

## 66. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF GARY SIMS

Mr. Sims is the Deputy Director of the Wake County Board of Elections. Plaintiffs' state that their designations of Mr. Sims' deposition testimony include testimony that changes wrought by H.B. 589 contributed to long waiting times for voters, seemingly attributed to his testimony that voters took longer to mark their ballots in 2014 than in 2010, and that this was a result of the elimination of "straight-ticket voting." However, Mr. Sims testified that the length and content of the ballot was "very different" in 2014, including a "very wordy bond referendum," and a judicial election with 19 candidates. He testified that "there were many factors on that ballot" when asked directly whether he attributed the difference to the loss of straight party voting. (Page 71, Line 23 through Page 72, Line 13.)

Plaintiffs also contend that Sims' testimony is that Wake County officials are aware that qualified voters whose registration applications were not transmitted by DMV to the county board of elections were disenfranchised because of that error, when in fact his testimony was that a provisional ballot cast by such a voter would count if proof was available that the voter attempted to register at DMV prior to the registration deadline, *even if* "a DMV transaction doesn't make it through the system, such as if we don't receive the paper copy of the record or if for some reason we don't receive the data." (Page 48, Lines 8 through 18; Page 148, Lines 1 through 23.)

Plaintiffs also contend that Mr. Sims' testified that elimination of out-of-precinct voting resulted in disenfranchisement of voters whose polling places had changed, when in fact his testimony indicates that voters whose assigned polling places are relocated are sent a new voter registration card with a mailing notifying them of their new polling place, the changes are posted on the Wake County Board of Elections website, and signs would be posted directing voters to the new location. (Page 221, Line 13 through Page 223, Line 25.) Moreover, were voters in such a situation permitted to vote at a precinct other than the one to which they were assigned, they would likely have been disenfranchised as to local election contests.

Defendants' counter-designations serve to further highlight Mr. Sims' testimony that provisional ballots cast by voters claiming to have registered at DMV will be counted if there is a record of the attempted registration, that any potential issues with DMV registrations affect only a small proportion of voters who have registered at DMV.

Page 20, Lines 12 through 24

Page 71, Line 23 through Page 72, Line 20
Page 73, Lines 8 through 8
Page 80, Line 5 through Page 84, Line 7
Page 106, Line 2 through Page 108, Line 11
Page 129, Line 17 through Page 132, Line 14
Page 134, Line 14 through Page 137, Line 6
Page 140, Line 17 through Page 159, Line 21
Page 160, Line 2 through Page 177, Line 22
Page 181, Line 17 through Page 191, Line 18
Page 200, Line 8 through Page 201, Line 18
Page 213, Line 7 through Page 217, Line 3
Page 217, Line 4 through Page 218, Line 13
Page 221, Line 13 through Page 223, Line 25
Page 226, Line 19 through Page 227, Line 2

## 67. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF BRANDI RENA SMITH

Ms. Smith is a white, registered Republican residing in Carteret County. In October 2012, Ms. Smith pled guilty to ten felonies under a North Carolina statute, N.C.G.S. § 90-96, that allows individuals charged with certain controlled substance offenses to plead guilty to charges against them but later have those charges dismissed upon successful completion of probation. Following her guilty plea to these felonies, Ms. Smith was removed from the voter rolls. After successfully completing the terms of her probation in April 2014, all felony charges against Ms. Smith were dismissed. In May 2015, the same month as her deposition and with assistance from an attorney for the Southern Coalition for Social Justice, Ms. Smith obtained a Certificate of Relief with respect to misdemeanor charges that were not dismissed as part of her plea agreement under N.C.G.S. § 90-96.

After her felony charges were dismissed in April 2014, Ms. Smith did not check her voter registration status or re-register to vote because she did not believe her guilty

83

plea would affect her ability to vote. When Ms. Smith presented to vote at her precinct on Election Day, November 4, 2014, she had to cast a provisional ballot because she was no longer registered to vote. Because Ms. Smith did not attempt to vote during the early voting period in 2014, even if Same-Day Registration had been available in 2014, it would not have allowed Ms. Smith to register and vote because she attempted to vote only on Election Day and not during the early voting period.

Defendants counter-designate the following portions of Ms. Smith's deposition of May 26, 2015:

Page 32, Line 12 through Page 33, Line 5
Page 35, Line 25 through Page 36, Line 2
Page 38, Line 15 through Page 39, Line 12
Page 53, Lines 7 through 22

## 68. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF KIMBERLY STRACH

Defendants do not have any objections or counter-designations to the deposition testimony of Ms. Strach.

## 69. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF GERRICK SUGGS

Plaintiffs' description of the testimony by Gerrick Suggs is not supported by his actual testimony. Mr. Suggs testified that he heard something on the radio about early voting starting and that he then did internet research and discovered that some of the rules had changed that would affect him. (Page 13, Line 12 through Page 14, Line 14). Counsel for the United States did not ask Mr. Suggs to explain his testimony about rules being changed but Mr. Suggs admitted on cross examination that he understood that he

84

could not vote until he was registered. (Page 48, Lines 16 through 25). On cross examination, Mr. Suggs explained that he is not registered to vote in Craven County and that when he did his internet research he discovered, before he went to cast a provisional ballot, that he could no longer register to vote during early voting. (Page 27, Line 15 through Page 28, Line 24). Mr. Suggs therefore admitted that he knew before he voted in 2014 that he could no longer register during early voting and that he also understood that he could not vote unless he was registered.

The rest of Mr. Suggs testimony shows how same-day registration is subject to abuse by college students who may not be residents in the counties where they attend school. The pages counter-designated by defendants show that Mr. Suggs moved back and forth between his parents' home in Craven County and Raleigh, North Carolina between 1999 and 2014, sometimes voting at his assigned polling place on Election Day and sometimes voting during early voting. Mr. Suggs registered during a period of time other than early voting and during early voting. But Mr. Suggs never changed the address on his driver's license which, throughout this period, indicated that his residence was at his parents' home in Craven County. When Mr. Suggs registered in Raleigh, he typically completed the registration form to show that his parents' home was his mailing address and not the alleged residence he gave for several different locations in Raleigh. Mr. Suggs admitted that he did not understand the residency requirement for voting when he registered to vote in Raleigh while maintaining his driver's license and mailing addresses in Craven County.

Mr. Suggs also testified that he has been able to meet deadlines for school and other matters and that he will now be able to meet any deadline for registering to vote in the future.

Defendants counter-designate the following portions of Mr. Suggs's deposition of March 20, 2015:

Page 5, Lines 13 through 14
Page 5, Lines 21 through 22
Page 6, Lines 5 through 11
Page 6, Line 21 through Page 7, Line 11
Page 13, Line 12 through Page 14, Line 14
Page 19, Line 12 through Page 20, Line13
Page 21, line 11 through Page 223 Line 5
Page 23, Lines 14 through 21
Page 24, Line 7 through Page 25, Line 3
Page 25, Line 10 through Page 27, Line 6
Page 27, Line 15 through Page 30, Line 3
Page 30, Line 10 through Page 31, Line 11
Page 31, Line 16 through Page 32, Line 3
Page 32, Line 6 through Page 33, Line 11
Page 34, Lines 3 through 5
Page 34, Lines 11 through 24
Page 35, Lines 2 through 25
Page 36, Lines 3 through 18
Page 36, Line 24 through Page 37, Line 12
Page 38, Line 2 through Page 39, Line 17
Page 42, Line 5 through Page 44, Line 12
Page 48, Line 16 through Page 49, Line 2
Page 50, Lines 11 through 16
Page 50, Line 22 through Page 51, Line 9

## 70.  DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF KELLY THOMAS

Plaintiffs' designations of Commissioner Thomas' deposition testimony appear to be limited to the authentication of a document which contains statements regarding DMV's involvement with outreach on college campuses pertaining to voter ID. To the

86

extent Plaintiffs' intent is to demonstrate that DMV was not engaged in such outreach, Defendants' counter-designations serve to highlight Commissioner Thomas' testimony to the contrary.

Defendants counter-designate the following portions of Commissioner Thomas' deposition of March 3, 2015:

Page 248, Line 24 through Page 252, Line 6

**71. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF MARSHALL TUTOR**

Marshall Tutor is an elections investigator employed by the NCSBE. Defendant's counter-designations of Mr. Tutor's testimony establish that, prior to S.L. 2013-381, the "surest way" that an individual attempting to commit in-person voter impersonation fraud could be caught "does not even apply at this day and time to many, many counties and precincts," and relies almost exclusively on poll workers personally knowing the voters assigned to the precincts at which they are working. (Page 41, Line 16 through Page 43, Line 16.) Additionally, Tutor testifies that this is "unfortunate," as poll workers are "rushed" and "don't take as much time to scrutinize as they should and it will always be like that." (Page 43, Lines 16 through 20; Page 54, Line 1 through Page 55, Line 14.) After testifying that the responsibility for identifying voter impersonation fraud fell primarily to poll workers, Tutor further testified that, in many cases, poll-workers would know less than 5% of the voters presenting to vote, (Page 160, Line 7 through Page 161, Line 5), and that if an individual presenting to vote provided the correct name and address, it would be "almost impossible for the poll worker to know whether that

87

individual was impersonating someone else." (Page 161, Lines 6 through 24.) When asked directly whether he agreed that, absent photo ID, it is almost impossible for a poll worker to identify someone impersonating another voter, Tutor testified "It is…. So in answer to your question, it's not going to happen." (Page 163, Line 25 through Page 164, Line 12.)

> Page 30, Line 4 through Page 35, Line 19
> Page 36, Line 25 through Page 38, Line 14
> Page 41, Line 16 through Page 51, Line 9
> Page 52, Line 4 through Page 56, Line 23
> Page 68, Line 3 through Page 69, Line 22
> Page 74, Line 18 through Page 75, Line 20
> Page 116, Line 15 through Page 117, Line 7
> Page 129, Line 17 through Page 130, Line 2
> Page 134, Line 13 through Page 148, Line 12
> Page 152, Line 20 through Page 156, Line 7
> Page 157, Line 12 through Page 165, Line 11
> Page 165, Line 24 through Page 167, Line 16
> Page 170, Line 22 through Page 172, Line 7
> Page 172, Line 20 through Page 174, Line 19
> Page 175, Lines 2 through 11

## 72. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF LYNNE VERNON-FEAGANS

Dr. Vernon-Feagans studied the family life habits of a sample of participants in three non-urban counties out of 100 total North Carolina counties. Dr. Vernon-Feagan's study was not related to voting, or to these voting rights cases, and Dr. Vernon-Feagans has no experience in or studying elections. Dr. Vernon-Feagans did not attempt to draw any conclusions, causal or otherwise, regarding the impact of her study participants' family life on their ability to vote. In short, she "did not attempt to measure the extent to which barriers in these participants' lives would affect their ability to vote."

88

Defendants counter-designate the following portions of Dr. Vernon-Feagan's deposition of April 14, 2015:

Page 31, Line 20 through Page 32, Line 25
Page 55, Line 10 through Page 58, Line 4
Page 58, Lines 7 through 19
Page 59, Lines 2 through 9
Page 59, Line 16 through Page 61, Line 2
Page 61, Line 12 through Page 62, Line 16
Page 63, Line 10 through Page 66, Line 6
Page 66, Line 14 through Page 67, Line 6
Page 68, Line 16 through Page 69, Line 13
Page 69, Line 25 through Page 71, Line 15

## 73. DEFENDANTS' OBJECTIONS TO AND COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF LYNNE WALTER

Defendants object to Plaintiffs' mischaracterizations of the deposition testimony that Plaintiffs designated for Ms. Walter. Ms. Walter did not testify that the reduction of early voting days "makes it more difficult for her to vote," as Plaintiffs stated in their designations. Ms. Walter voted on Election Day both in the primary and in the general election of 2014, the only elections that have taken place with the reduced early voting period. (Page 26, Line 17 through Page 27, Line 8) Ms. Walter testified that she has concerns that a shorter early voting period could affect her in the future. (Page 37, Lines 4 through 13)

Plaintiffs also stated in their designations that it took Ms. Walter "longer than usual to vote" in the 2014 general election. In fact, Ms. Walter testified that it "took *a little bit* longer in November of 2014 to vote than usual." (Page 47, Lines 5 through 6) (emphasis added) Ms. Walter does not remember how long it took her to vote from the

89

time she arrived at her polling station to the time that she left.  (Page 47, Lines 16 through 19)

Ms. Walter does not know of anyone who was not able to vote in 2014 because of the change in election law.  (Page 36, Lines 1 through 6)

Defendants counter-designate the following portions of Ms. Walter's deposition of March 19, 2015:

> Page 26, Line 17 through Page 27, Line 8
> Page 36, Lines 1 through 6
> Page 37, Lines 4 through 13
> Page 46, Line 25 through Page 47, Line 8
> Page 47, Lines 16 through 19

## 74.  DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF BESSIE WARD

Ms. Ward presented to vote in 2014 and was not allowed to vote because the Carteret County Board of Elections and N.C. State Board of Elections SEIMS data base had no record that she had ever before registered to vote.  Ms. Ward did register to vote in 2014 and is currently registered to vote in Carteret County.  Defendants will present evidence at trial showing that the State's SEIMS data base has no record that Ms. Ward was ever registered before 2014.

Ms. Ward is 82 years old. Her testimony regarding her voting history is inconsistent and not credible.  On direct examination she testified that "over the years," she has voted many times.  (Page 9, Lines 9 through 15).  She has lived at the same address all of her life.  (Page 16, Lines 2 through 6).

On cross examination, she admitted that she did not recall the first time she voted or when she registered. She contended that she registered more than 20 years ago. She stated that she has never voted in a precinct and that she has always voted early. She stated that she had voted before 2000. (Page 19, Lines 17 through 19).

When advised that early voting did not exist before 2000, Ms. Ward then changed her testimony on how many time she had voted and when she first voted. Contrary to her testimony on direct that she had voted many times over the years and that she had registered over 20 years ago, Ms. Ward testified that 2008 was the first time she had ever voted.

Defendants counter-designate the following portions of Ms. Ward's deposition of May 8, 2015:

Page 9, Lines 9 through 15
Page 16, Lines 2 through 6
Page 17, Line 19 through Page 18, Line 20
Page 19, Line 6 through Page 20, Line 14

## 75. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF TIMOTHY WASHINGTON

Timothy Washington lives at an address that is 1.3 miles from his assigned precinct (Wages Building) and 0.6 miles from the precinct at which he voted on Election Day (the public library). (Page 42, Line 23 through Page 44, Line 19).

Prior to voting in 2014, Mr. Washington made no attempt to determine the location of his correct precinct. He cannot recall who told him that he could go to the public library to vote. (Page 48, Line 1 through 13). When Mr. Washington voted in 2014 at the public library, he was told that he was in the wrong precinct and that he

needed to go to his assigned precinct at the Wages building. (Page 11, Lines 13 through 23, Page 37, Lines 3 through 20). The 2014 General Election was the first time Mr. Washington attempted to vote. (Page 37, Line 21 through Page 38, Line 9).

Mr. Washington testified that he was able to get a ride to the DMV office to obtain a photo ID. (Page 16, Line 2 through 10; Page 32, Line 13 through Page 33, Line 14). Though Mr. Washington testified that public transportation was not available to take him to his assigned precinct at the Wages building, (Page 13, Lines 11 through 13), evidence to be presented at trial will show that this testimony is not correct. Additionally, defendants were unable to identify any testimony from Mr. Washington's deposition to support plaintiffs' contention in their designations that that Mr. Washington "called all the people he knew, but they were busy" and unable to give him a ride on Election Day.

Defendants counter-designate the following portions of Mr. Washington's deposition of April 20, 2015:

Page 11, Lines 13 through 23
Page 12, Lines 9 through 11
Page 12, Lines 22 through 24
Page 16, Line 2 through 10
Page 18, Lines 7 through 21
Page 26, Lines 12 through 25
Page 28, Line 14 through Page 29, Line 10
Page 29, Line 13 through Page 30, Line 6
Page 31, Lines 9 through Page 33, Line 16
Page 33, Line 25 through Page 34, Line 18
Page 37, Lines 3 through 17
Page 37, Line 21 through Page 38, Line 9
Pages 39, Line 10 through Page 40, Line 11
Page 40, Lines 17 through 21
Page 48, Lines 1 through 13

**76. DEFENDANTS'   COUNTER-DESIGNATIONS   OF   DEPOSITION TESTIMONY OF YVONNE WASHINGTON**

Ms. Washington has voted in the past when she resided at prior addresses.  She has always voted on Election Day and has been able to travel to her assigned precinct or polling place. When she moved to her current address, she did not attempt to determine the location of the polling place for her new address.

Ms. Washington receives free bus passes from social services.  She will be able to vote in future elections at her assigned precinct (the Wages Building) if the bus can take her there.  She attends church and she believes that someone at her church would take her to her polling place to vote on Election Day if she asked.  She has hitchhiked in the past to cast her vote at her precinct on Election Day.

She has been to the Wages Building on two prior occasions to find information on Meals on Wheels and was taken there by friends who gave her a car ride.

Defendants   counter-designate   the   following   portions   of   Ms.   Washington's deposition of April 20, 2015:

> Page 11, Lines 10 through 15
> Page 12, Lines 6 through 18
> Pages 13, Lines 18 through Page 14, Line 5
> Pages 20, Line 9 through Page 21, Line 14
> Page 21, Lines 22 through 25
> Page 23, Lines 9 through 25
> Page 24, Lines 14 through 16
> Page 25, Line 25 through Page 26, Line 7
> Page 27, Lines 7 – 12
> Pages 27, Line 25 through Page 28, Line 9
> Pages 29, Line 7 through Page 30, Line 12
> Page 31, Lines 14 through 21
> Pages 38, Line 22 through Page 39, Line 2

**77. DEFENDANTS' OBJECTIONS TO DEPOSITION TESTIMONY OF MARIANNE WEANT**

Defendants object to Plaintiffs' statement in their designation of deposition testimony of Marianne Weant that, "Had SDR not been repealed, Ms. Weant would have cast a ballot that would have counted," on the ground that this is argument, not testimonial evidence.

**78. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF BARBARA WEBB**

Ms. Webb explains that when a customer applies for DMV services information related to his request for a DMV card and his registration application is entered electronically into the SADLS data base and the electronic information on voter registration is transmitted to SBOE. This electronic information stays in the SADLS system and is not destroyed. The DMV examiner also prints a registration application for the customer's signature and this "hard" copy of the registration application is scanned and forwarded to SBOE. The "hard copy" of the registration application is kept by DMV offices for 30 days after it is scanned and sent to SBOE and it is then destroyed. The electronic application is not destroyed. During her career as director of field services Ms. Webb was aware of only two problems with registration information not being conveyed to SBOE. (Page 122, Line 24 through Page 126, Line 11; Page 201, Line 11 through Page 203, Line 13)

Ms. Webb did not testify as suggested by plaintiffs that college students without an out of state driver's license are told to surrender their IDs at the time they apply for a NC DL or no-fee ID card. The DMV process is explained by Exhibit 221 (Page 115,

Lines 4 through 16; Page 231, Line 16 through Page 233, Line 7, Ex. 221 p. 11) and was explained by Ms. Webb. Residents who drive cars in NC are required by NC law to possess a NC driver's license. At the time a college student or anyone else applies for a no fee ID, they are informed that if they have an out of state driver's license they must obtain a NC driver's license within sixty days. (Page 200, Line 7 through Page 203, Line 13; Page 206, Line 25 through Page 212, Line 4). Persons with an out of state driver's license are not required to surrender that license at the time they are issued a no fee ID. Residents of NC who do not drive are not required to have a NC driver's license. (Exhibit 221).

It is true that for a period of time, and because of issues related to programing, DMV did not offer voter registration to anyone under 18. As plaintiffs well know this was changed in 2014 so that 17 year olds could be offered registration and would be registered if they meet the other qualifications for voting and will be 18 before the next general election. (Page 212, Line 12 through Page 224, Line 14)

Defendants counter-designate the following portions of Ms. Webb's deposition of January 23, 2015:

> Page 115, Lines 4 through 16
> Page 122, Line 24 through Page 126, Line 11
> Page 200, Line 7 through Page 203, Line 13
> Page 206, Line 25 through Page 212, Line 4
> Page 231, Line 16 through Page 233, Line 7

Defendants object to the introduction into evidence as hearsay any emails or documents from Division of Motor Vehicles ("DMV") customers complaining about alleged examples of registration applications allegedly completed at DMV and allegedly

95

not submitted to the State Board of Elections for purposes of proving the truth of the matter asserted in the complaints. Defendants do not object to the introduction into evidence of these complaints for purposes of showing that DMV received complaints or any testimony by Ms. Webb concerning any steps taken to investigate any complaint.

## 79. DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF EBONY WEST

Ebony West is a twenty year old college student at East Carolina University in Greenville, North Carolina. (Page 9, Lines 15 through 17). Ms. West originally registered to vote in 2012 while in high school, but has reregistered, without complication, every time she has moved during her first three years of college. (Page 17, Lines 9 through 24). In 2013, Ms. West reregistered using same-day registration because it was "easier," not because anything prevented her, as a college student, from registering earlier. (Page 24, Lines 8 through 23).   After her latest move in August 2014, Ms. West reregistered by completing a voter registration form and did not experience any problems attributable to S.L. 2013-381. (Page 18, Lines 3 through 6; Page 18, Line 24 through Page 19, Line 1). She also did not have any problems voting early in the 2014 primary or general elections. (Page 20, Lines 3 through 25; Page 21, Lines 1 through 11).

Despite extensive political involvement on campus and around North Carolina, Ms. West has not heard of anyone who was unable to vote in 2014 because of the elimination of same-day registration. (Page 50, Lines 24 through 25; Page 51, Lines 1 through 4). Likewise, she has not heard of anyone who was unable to vote in 2014 because of the shortening of the early voting period. (Page 51, Lines 5 through 12).

Finally, Ms. West, and the political organizations she works for, developed voter education literature that educates the public about the new voting laws enacted by S.L. 2013-381. (Page 57, Lines 3 through 15) Ms. West believes that this literature is an efficient way to inform the public about the new voting requirements. (Page 60, Lines 1 through 4).

Defendants counter-designate the following portions of Ms. West's deposition of March 20, 2015:

Page 14, Line 13 through Page 14, Line 25
Page 15, Line 4 through Page 15, Line 6
Page 18, Line 3 through Page 18, Line 6
Page 18, Line 24 through Page 19, Line 1
Page 20, Line 3 through Page 21, Line 7
Page 22, Line 23 through Page 24, Line 4
Page 24, Line 8 through Page 25, Line 3
Page 50, Line 24 through Page 51, Line 18
Page 53, Line 20 through Page 54, Line 24
Page 57, Line 3 through Page 57, Line 15
Page 59, Line 15 through Page 60, Line 4
Page 65, Line 16 through Page 65, Line 20
Page 66, Line 18 through Page 66, Line 23
Page 69, Line 11 through Page 70, Line 3
Page 70, Line 15 through Page 70, Line 19

## 80. DEFENDANTS' OBJECTIONS TO AND COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF STEPHANIE WILLIAMS

Ms. Williams had three different residences in Mecklenburg County since 2012, and she does not recall if she was offered the opportunity to register vote at the SMV when she obtained her Mecklenburg County drivers' license. She acknowledges that it is possible the DMV did offer her the opportunity to register to vote when she moved to Mecklenburg County in 2012, and that it is possible the DMV mailed her voter

97

registration card to one of her previous residences and she never got it. Ms. Williams did not otherwise attempt to register to vote until September 2014 at a voter registration drive at her church, so she had ample opportunity to register to vote prior to Election Day but never did so.

Defendants counter-designate the following portions of Ms. Williams's deposition of June 11, 2015:

> Page 15, Line 22 through 23
> Page 16, Lines 22 through 25
> Page 20, Lines 5 through 6
> Page 26, Line 25 through Page 27, Line 6
> Page 27, Line 25 through Page 28, Line 16
> Page 28, Line 24 through Page 30, Line 1
> Page 33, Line 5 through Page 35, Line 15
> Page 43, Line 18 through Page 44, Line 2
> Page 46, Line 16 through Page 47, Line 16
> Page 49, Line 19 through Page 51, Line 16
> Page 53, Line 5 through Page 56, Line 10
> Page 62, Lines 11 through 20
> Page 64, Lines 12 through 22
> Page 65, Line 12 through Page 66, Line 12

Defendants object to Ms. Williams' testimony from Page 15, Line 12 through Page 15, Line 24, her testimony from Page 16, Line 20 through Page 17, Line 9, and her testimony from Page 18, Line 11 through Page 18, Line 14, as it is hearsay testimony inadmissible under Rule 802 of the Federal Rules of Evidence.

Defendants also object to Ms. Williams' testimony from Page 20, Line 3 through Page 21, Line 3 as the testimony is not relevant under Rules 402 and 403 of the Federal Rules of Evidence

**81.     DEFENDANTS' COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY OF MALCOLM WILSON**

Mr. Wilson is a painter who resides in Greenville, North Carolina. Mr. Wilson voted a provisional ballot in the 2014 election that was not counted because he voted out-of-precinct. (Page 10, Lines 14 through 25; Page 11, Lines 1 through 18).  Mr. Wilson admitted that he had voted at his correct precinct, a church "four to six blocks" from his residence, in previous elections. (Page 19, Lines 10 through 24; Page 20, Line 23 through Page 21, Line 1; Page 21, Lines 9 through 12). On the same day Mr. Wilson cast his vote in 2014, his wife informed him that he had voted in the wrong precinct. (Page 27, Lines 13 through 18)  Mr. Wilson did not ask anyone at either precinct whether there was something he could do to fix his mistake. (Page 27, Lines 9 through 23; Page 28, Lines 6 through 11). The 2014 election was the first time Mr. Wilson had not voted in his assigned precinct. (Page 30, Lines 4 through 7). Despite this experience, Mr. Wilson's confidence in North Carolina's electoral process has not diminished. (Page 15, Lines 10 through 13).

Defendants counter-designate the following portions of Mr. Wilson's deposition of May 5, 2015:

Page 15, Lines 10 through 13
Page 19, Lines 10 through 24
Page 20, Line 23 through Page 21, Line 1
Page 21, Line 9 through Page 22, Line 4
Page 23, Line 24 through Page 24, Line 4
Page 27, Line 9 through Page 28, Line 18
Page 29, Lines 13 through 19
Page 30, Lines 4 through 7

**82. DEFENDANTS' OBJECTIONS TO DEPOSITION TESTIMONY OF JOSEPH WINDSOR**

Defendants object to Plaintiffs' statement in their designation of deposition testimony of Joseph Windsor that, "Had SDR been an option, Mr. Windsor would been [sic] able to cast a ballot that counted," on the ground this is argument, not testimonial evidence.

**83. DEFENDANTS' OBJECTIONS TO OF DEPOSITION TESTIMONY OF COURTNEY WOODARD**

Defendants object to Plaintiffs' mischaracterization of Ms. Woodard's testimony regarding her efforts at registering to vote. Specifically, Ms. Woodard did not testify that she registered to vote in Vance County through a social service agency, nor did she testify that she received mailings for election contests in Vance County; rather, she attempted to register to vote in Franklin County through a social service agency, and she received mailings for election contests in Franklin County.

As Plaintiffs' designations show, Ms. Woodard testified that she first registered in Vance County when she was 18 years old. (Page 10, Lines 14 through 21) She moved to Louisburg, in Franklin County, in 2011 and lived there for about two years. (Page 11, Lines 10 through 16; Page 12, Lines 4 through 12) Ms. Woodard received unemployment insurance while living in Franklin County and had several opportunities to register to vote when she went to social services, but she chose not to. When she attempted to vote in Franklin County in 2012, she was told that she was not registered in Franklin County, so she went to Henderson, in Vance County, to vote, even though she was no longer a resident of Vance County. When she was at social services back in

Franklin County following the 2012 election, Ms. Woodard testified she filled out the voter registration section of the paperwork, on several occasions. (Page 12, Line 13 through Page 13, Line 14; Page 19, Line 18 through Page 21, Line 24) Ms. Woodard testified that she thought it was odd that she was not registered in Franklin County because she received advertisements to vote for people, and her boyfriend, who lived in Franklin County all his life, did not get these advertisements. (Page 21, Line 25 through Page 22, Line 17)

This the 8th day of July, 2015.

ROY COOPER
ATTORNEY GENERAL OF NORTH
CAROLINA

/s/ Alexander McC. Peters
Alexander McC. Peters
Senior Deputy Attorney General
N.C. State Bar No. 13654
apeters@ncdoj.gov

/s/ Katherine A. Murphy
Katherine A. Murphy
Special Deputy Attorney General
N.C. State Bar No. 26572
kmurphy@ncdodoj.gov

N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602
Telephone: (919) 716-6900
Facsimile: (919) 716-6763
*Counsel for Defendants North Carolina and State Board of Election Defendants.*

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

/s/ Thomas A. Farr
Thomas A. Farr
N.C. State Bar No. 10871
Phillip J. Strach
N.C. State Bar No. 29456
thomas.farr@ogletreedeakins.com
phil.strach@ogletreedeakins.com
4208 Six Forks Road, Suite 1100
Raleigh, North Carolina 27609
Telephone: (919) 787-9700
Facsimile: (919) 783-9412
*Co-counsel for Defendants North Carolina and State Board of Election Defendants.*

102

BOWERS LAW OFFICE LLC

By: /s/ Karl S. Bowers, Jr.
Karl S. Bowers, Jr.*
Federal Bar #7716
P.O. Box 50549
Columbia, SC 29250
Telephone: (803) 260-4124
E-mail: butch@butchbowers.com
*appearing pursuant to Local Rule 83.1(d)
*Counsel for Governor Patrick L. McCrory*

By: /s/ Robert C. Stephens
Robert C. Stephens (State Bar #4150)
General Counsel
Office of the Governor of North Carolina
20301 Mail Service Center
Raleigh, North Carolina 27699
Telephone: (919) 814-2027
Facsimile: (919) 733-2120
E-mail: bob.stephens@nc.gov
*Counsel for Governor Patrick L. McCrory*

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas A. Farr, hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will provide electronic notification of the same to the following:

***Counsel for United States of America*:**

T. Christian Herren, Jr.
John A. Russ IV
Catherine Meza
David G. Cooper
Spencer R. Fisher
Elizabeth M. Ryan
Jenigh Garrett
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
Room 7254-NWB
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Gill P. Beck
Special Assistant United States Attorney
Office of the United States Attorney
United States Courthouse
100 Otis Street
Asheville, NC 28801

***Counsel for NCAAP Plaintiffs:***

Penda D. Hair
Edward A. Hailes, Jr.
Denise D. Liberman
Donita Judge
Caitlin Swain
ADVANCEMENT PROJECT
Suite 850
1220 L Street, N.W.
Washington, DC 20005
phair@advancementproject.com

Irving Joyner
P.O. Box 374
Cary, NC 27512
ijoyner@nccu.edu

Adam Stein
TIN FULTON WALKER & OWEN
312 West Franklin Street
Chapel Hill, NC 27516
astein@tinfulton.com

Thomas D. Yannucci
Daniel T. Donovan
Susan M. Davies
K. Winn Allen
Uzoma Nkwonta
Kim Knudson
Anne Dechter
Bridget O'Connor
Jodi Wu
Kim Rancour
KIRKLAND & ELLIS LLP
655 Fifteenth St., N.W.
Washington, DC 20005
tyannucci@kirkland.com

104

***Counsel for League of Women Voter
Plaintiffs:***

Anita S. Earls
Allison J. Riggs
Clare R. Barnett
Southern Coalition for Social Justice
1415 Hwy. 54, Suite 101
Durham, NC 27707
anita@southerncoalition.org

Dale Ho
Julie A. Ebenstein
ACLU Voting Rights Project
125 Broad Street
New York, NY 10004
dale.ho@aclu.org

Laughlin McDonald
ACLU Voting Rights Project
2700 International Tower
229 Peachtree Street, NE
Atlanta, GA 30303
lmcdonald@aclu.org

Christopher Brook
ACLU of North Carolina Legal Foundation
PO Box 28004
Raleigh, NC 27611-8004
cbrook@acluofnc.org

***Counsel for the Intervening Plaintiffs:***

John M. Davaney
jdevaney@perkinscoie.com
Marc E. Elias
melias@perkinscoie.com
Kevin J. Hamilton
khamilton@perkinscoie.com
Elisabeth Frost
efrost@perkinscoie.com
PERKINS COIE, LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960

Edwin M. Speas, Jr.
espeas@poynerspruill.com
John W. O'Hale
johale@poynerspruill.com
Caroline P. Mackie
cmackie@poynerspruill.com
POYNER SPRUILL, LLP
301 Fayetteville St., Suite 1900
Raleigh, NC 27601

This the 8th day of July, 2015.

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

/s/ Thomas A. Farr
Thomas A. Farr

21704464.1

106