```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3  NORTH CAROLINA STATE CONFERENCE ) CASE NO. 1:13CV658
    OF THE NAACP, et al.,           )
 4                                  )
            Plaintiffs,             )
 5                                  )
    V.                              )
 6                                  )
    PATRICK LLOYD MCCRORY, in his   )
 7  Official capacity as Governor   )
    Of North Carolina, et al.,      )
 8                                  )
            Defendants.             )
 9  _____)

10  LEAGUE OF WOMEN VOTERS OF NORTH ) CASE NO. 1:13CV660
    CAROLINA, et al.,               )
11                                  )
            Plaintiffs,             )
12                                  )
    V.                              )
13                                  )
    STATE OF NORTH CAROLINA, et al.,)
14                                  )
            Defendants.             )
15  _____)

16  UNITED STATES OF AMERICA,       ) CASE NO. 1:13CV861
                                    )
17          Plaintiff,              )
                                    )
18  V.                              )
                                    )
19  STATE OF NORTH CAROLINA, et al.,) Winston-Salem, North Carolina
                                    ) July 14, 2015
20          Defendants.             ) 9:02 a.m.
    _____)
21

22            TRANSCRIPT OF THE **TRIAL/DAY TWO**
          BEFORE THE HONORABLE THOMAS D. SCHROEDER
23              UNITED STATES DISTRICT JUDGE

24
          Proceedings recorded by mechanical stenotype reporter.
25       Transcript produced by computer-aided transcription.
```

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

APPEARANCES:

For the Plaintiff:
(NAACP)                PENDA D. HAIR, ESQ.
                       DONITA JUDGE, ESQ.
                       DENISE D. LIEBERMAN, ESQ.
                       ADVANCEMENT PROJECT
                       1220 L Street, NW, Suite 850
                       Washington, DC 20005

                       DANIEL T. DONOVAN, ESQ.
                       BRIDGET K, O'CONNOR, ESQ.
                       MICHAEL A. GLICK, ESQ.
                       CHRISTOPHER J. MANER, ESQ.
                       JODI WU, ESQ.
                       KIRKLAND & ELLIS, LLP.
                       655 15th Street, NW, Suite 1200
                       Washington, DC 20005

                       IRVING JOYNER, ESQ.
                       N. C. CENTRAL UNIVERSITY SCHOOL OF LAW
                       P. O. Box 374
                       Cary, North Carolina 27512


(LWV)                  ALLISON JEAN RIGGS, ESQ.
                       ANITA S. EARLS, ESQ.
                       GEORGE E. EPPSTEINER, ESQ.
                       SOUTHERN COALITION FOR SOCIAL JUSTICE
                       1415 W. Highway 54, Suite 101
                       Durham, North Carolina 27707

                       JULIE A. EBENSTEIN, ESQ.
                       DALE E. HO, ESQ.
                       AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                       125 Broad Street, 18th Floor
                       New York, NY 10004-2400

                       CHRISTOPHER A. BROOK, ESQ.
                       AMERICAN CIVIL LIBERTIES UNION OF NC
                       P. O. Box 28004.
                       Raleigh, North Carolina 27611-8004

APPEARANCES (Continued):

(USA)                     CATHERINE MEZA, ESQ.
                          JOHN A. RUSS, IV, ESQ.
                          DAVID G. COOPER, ESQ.
                          AVNER M. SHAPIRO, ESQ.
                          SPENCER R. FISHER, ESQ.
                          ELIZABETH M. RYAN, ESQ.
                          JENIGH J. GARRETT, ESQ.
                          U. S. DEPARTMENT OF JUSTICE
                          Civil Rights Division
                          950 Pennsylvania Avenue, NW
                          Washington, DC 20530

                          GILL P. BECK, ESQ.
                          U. S. ATTORNEY'S OFFICE
                          100 Otis Street
                          Asheville, North Carolina 28801


(Intervenor
Plaintiff):               JOSHUA L. KAUL, ESQ.
                          PERKINS COIE, LLP
                          1 E. Main Street, Suite 201
                          Madison, Wisconsin 53703

                          BRUCE V. SPIVA, ESQ.
                          AMANDA R. CALLAIS, ESQ.
                          PERKINS COIE, LLP.
                          700 13th Street, NW, Suite  600
                          Washington, DC 20005


                          JOHN W. O'HALE, ESQ.
                          POYNER SPRUILL, LLP
                          P. O Box 1801
                          Raleigh, North Carolina 27602-1801


For the Defendants:

(State of NC)             ALEXANDER M. PETERS, ESQ.
                          KATHERINE A. MURPHY, ESQ.
                          N.C. DEPARTMENT OF JUSTICE
                          P.O. Box 629
                          Raleigh, North Carolina 27602

```
 1  APPEARANCES (Continued):

 2  (State of NC)        THOMAS A. FARR, ESQ.
                         PHILLIP J. STRACH, ESQ.
 3                       MICHAEL D. MCKNIGHT, ESQ.
                         OGLETREE DEAKINS NASH SMOAK & STEWART
 4                       P. O. Box 31608
                         Raleigh, North Carolina 27622
 5
    (Governor)           BUTCH BOWERS, ESQ.
 6                       BOWERS LAW OFFICE, LLC
                         1419 Pendleton Street
 7                       Columbia, South Carolina 29201

 8

 9

10  Court Reporter:      BRIANA NESBIT, RPR
                         Official Court Reporter
11                       P.O. Box 20991
                         Winston-Salem, North Carolina 27120
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

```
 1                          INDEX

 2

 3   PLAINTIFFS' WITNESSES:                        PAGE:

 4

 5   WILLIAM A. KITTRELL

 6       Direct Examination by Mr. Eppsteiner        35
         Cross-Examination by Ms. Murphy            41
 7

 8   DR. J. MORGAN KOUSSER, PH.D.

 9       Direct Examination by Ms. Riggs            42
         Cross-Examination by Mr. Bowers            76
10       Cross-Examination by Mr. Farr              84
         Redirect Examination by Ms. Riggs          96
11       Recross-Examination by Mr. Farr            97

12   ISABEL NAJERA

13       Direct Examination by Mr. Brook           104
         Cross-Examination by Mr. McKnight         112
14

15   CHARLES T. CLOTFELTER, PH.D.

16       Direct Examination by Ms. Meza            125
         Cross-Examination by Mr. Strach           141
17       Redirect Examination by Ms. Meza          159

18   TERRILIN C. CUNNINGHAM

19       Direct Examination by Mr. Shapiro         163
         Cross-Examination by Mr. McKnight         181
20       Redirect Examination by Mr. McKnight      184
         Recross-Examination by Mr. McKnight       185
21

22

23

24

25
```

EXHIBITS

| Exhibits: | | Identified | Received |
|---|---|---|---|
| P-46 | Dr. J. Morgan Kousser's expert report | 48 | 62 |
| P-418 | 7/24/13 Email exchange/Nancy Evans and Rep. Harry Warren | 69 | 71 |
| P-678 | 6/10/2015 SEIMS data of deposed affected voters | 116 | 119 |
| P-679 | Transcript of Designated portions from video deposition of Ms. Yvonne Washington | | 121 |
| P-680 | Transcript of Designated portions from video deposition of Mr. Carnell Brown | | 121 |
| P-681 | Transcript of designated portions from video deposition of Dr. Lynne Vernon-Feagans | 123 | |
| P-240 | Dr. Lynne Vernon-Feagans' expert declaration | 123 | |
| P-252 | Dr. Lynne Vernon-Feagans' expert surrebuttal declaration | 123 | |
| P-509 | Family Life Project graph/access to vehicle | 123 | |
| P-510 | Family Life Project graph/access to technology | 123 | |
| P-511 | Family Life Project graph/literacy level | 123 | |
| P-512 | Family Life Project Graph/residential instability factors | 123 | |
| P-513 | Family Life Project graph/hardship experiences since 2008 | 123 | |
| P-237 | Dr. Charles Clotfelter's expert declaration, 2/12/15 | 128 | 129 |
| P-249 | Dr. Charles Clotfelter's expert surrebuttal declaration, 3/24/15 | 128 | 129 |
| P-309 | Photograph of Terrilin Cunningham | 178 | 179 |

                    P R O C E E D I N G S

1   **THE COURT:**  Good morning, everyone.  I think
2   yesterday we finished with the video deposition.  Are we ready
3   to proceed with a new witness?

4   **MR. DONOVAN:**  We are, Your Honor.

5   **MR. FARR:**  Your Honor, could we talk about some
6   preliminary matters about evidentiary issues that you raised
7   yesterday, or would you like to defer that?

8   **THE COURT:**  Have you reached some resolution on some
9   of those?

10   **MR. FARR:**  No.  I was going to talk about your
11   issue -- you said you wanted some more cases on the hearsay
12   issue.  I also wanted to alert to the Court to some other
13   issues that are going to come up today with some of the
14   experts.  I can defer any of those issues until later,
15   Your Honor, if you would like.

16   **THE COURT:**  That's all right.  Go ahead and give me a
17   heads-up.

18   **MR. FARR:**  Your Honor, I think you asked for some
19   cases on -- you were not happy with the briefing that the
20   parties did on hearsay issues involving State employees, I
21   think, is one of the questions that you had.

22   **THE COURT:**  I wouldn't say I wasn't happy.  I just
23   was not yet satisfied on the answer to that.

24   **MR. FARR:**  Well, we took that as being not happy,

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1  Your Honor, and that was a concern to us.  So I would like to

2  hand up a case, a Middle District case, it is called *Tabor v.*

3  *Thomas Built Buses*.  The citation is 2010 WL 148431, Middle

4  District, January 12, 2010.  May I approach, Your Honor?

5           **THE COURT:**  Yes, please.

6           **MR. FARR:**  Your Honor, if you -- you certainly can

7  take -- I am sure you will read this whole case.  If you will

8  turn to page 4, one of the holdings by the Court in this case

9  is that in order to overcome a hearsay objection, you have to

10 first identify the identity of the person who allegedly made

11 the statement.  If you can't -- if the witness cannot state the

12 name of the person who allegedly made the statement, then the

13 statement is hearsay and it cannot possibly be an admission.

14 So that's the first point, Your Honor.

15          The second case we want to hand up -- we are still

16 looking for more authority on this, Your Honor, but I recall

17 you said you had questions about at what stage or what level a

18 supervisory authority or employment --

19          **THE COURT:**  And does it matter.  Right.  Does it

20 matter that there has to be a certain level that somebody can

21 bind an entity by what they said?

22          **MR. FARR:**  We are still looking for that.  We did

23 find one case, Your Honor.  It's an unpublished decision by the

24 Fourth Circuit, 229 F.3d 1142.  The case is *Hassman v. Caldera*.

25 May I approach, Your Honor?

1          **THE COURT:**  Yes, please.

2          **MR. FARR:**  I think, Your Honor, what this decision

3  says is for a statement to be an admission, there has to be

4  some evidence that the statement was made within the scope of

5  the authority of the person making the statement.

6          **THE COURT:**  All right.

7          **MR. FARR:**  So we are still looking for some other

8  cases, Your Honor, on what the parameters would be for

9  supervisors in a state agency.  If we find any other cases, we

10  will certainly get them to you.

11          A heads-up, Your Honor, today we are going to have

12  testimony by -- and we appreciate the Plaintiffs have been

13  trying to give us a schedule of who is coming to testify.  We

14  want to thank them for that.  One of their witnesses who may

15  testify today is Dr. Morgan Kousser.

16          We have two issues with Dr. Kousser.  First of all,

17  much of his report is based upon newspaper articles.  We would

18  object to the newspaper articles coming into evidence for the

19  truth of the matter asserted in the newspaper articles.

20          He may testify that experts reasonably rely on

21  newspaper articles in forming an opinion.  Whether it's

22  reasonable to rely upon newspaper articles is something that

23  the Court can decide, but we do object to those articles coming

24  in for the truth of the matter asserted.

25          Also, Your Honor, if you go back to our motion in

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1    limine, it's Docket Number 288 that was filed in the 861 case,

2    we object to any of these experts giving testimony on the

3    ultimate legal conclusion as to whether North Carolina engaged

4    in intentional discrimination.

5         They can give testimony about facts that they

6    think -- or matters that they believe relate to the Court's

7    finding on that issue, but we do object to them giving

8    testimony on the ultimate legal conclusion.

9         And those would be our concerns on evidentiary issues

10   today, Your Honor.

11        **THE COURT:**  All right.

12        **MR. FARR:**  Thank you.

13        **MR. DONOVAN:**  Good morning, Your Honor.

14        **THE COURT:**  Good morning.

15        **MR. DONOVAN:**  Two issues.  First, we also are having

16   good folks research the issue on the party admissions.  I do

17   want to give you a framework first.  We will give you cases

18   probably later today.

19        The starting point obviously is a party admission,

20   that is, is it within the scope.  We have case law that provide

21   party admissions can be applied to the Government.  That's

22   settled.  So then the issue -- and our research to date shows

23   that -- the question is is it within the scope.

24        **THE COURT:**  Let me back up a minute.  The State of

25   North Carolina is a Defendant.  Does that mean any and all

         NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1    agencies of the State now are a party for that purpose?

2              **MR. DONOVAN:**  I think it does, but we haven't

3    finished that research.  Also the State Board is as well.

4              **THE COURT:**  I understand that.

5              **MR. DONOVAN:**  You get that.  So then I think the

6    question is is the DMV or legislators.  I think the answer is

7    yes, but we haven't finished that yet.

8              But as you think through this issue, you get then to

9    is it within the scope, which I think Mr. Farr gave you a case.

10   We wouldn't disagree with you about that.  Don Wright is the

11   general counsel.  You admitted that.  He is the general counsel

12   of the SBOE.

13             Then with each -- I think you have to take each

14   statement on its own.  A poll worker in this state, that's the

15   way elections are run.  So if you can establish that it was a

16   poll worker, they have been trained, they were acting within

17   the scope, I think it is admissible.

18             I think the one issue that was mixed up is either --

19   the question was is it binding.  I think we have to separate

20   binding from an interrogatory response where the entity is

21   bound versus admission into evidence and you still give it the

22   weight that you assign it, because, obviously, if we establish

23   that people are told in different counties, any individual one,

24   you may say, has limited weight; but if we start establishing

25   multiple places, I think it has weight.  So I think you need to

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1    separate binding to a corporation that are bound with just

2    admission.

3           We are going to get you cases on that.

4           **THE COURT:**  Okay.

5           **MR. DONOVAN:**  Ms. Riggs is going to address -- that's

6    her witness, Mr. Kousser.  I have that with Mr. Lichtman, so I

7    may follow up.

8           But one point that we think we've missed is that a

9    lot of these newspaper articles are already in evidence.  So

10   what you have at issue is a limited scope.  They are in because

11   of the preliminary injunction and our stipulation.  So what's

12   before you is a very limited amount.  And, in fact, as Your

13   Honor well knows, you cited one of those statements in your

14   opinion, as did the Fourth Circuit.

15          So the area of dispute --

16          **THE COURT:**  Just to be clear, the rule on preliminary

17   injunction is that I can consider hearsay, of course, and for

18   that reason, I may have cited it; but if it's been stipulated

19   to, then that's a different situation.

20          **MR. DONOVAN:**  That's my point.  I understand it can

21   be.  It has been stipulated to, the entire evidentiary record.

22   So most of these issues that the State is now complaining

23   about, the ship has sailed.  It's in evidence; and once it's in

24   evidence, it can be used for any and all purposes.

25          There is a subset, I believe, that were not admitted

1   by stipulation.  So those would still be at issue from a

2   substantive evidence point.  We will address those as those

3   arise.

4           I will leave to Ms. Riggs and maybe follow up on kind

5   of can an expert rely on them as their methodology.

6           **THE COURT:**  Let me ask real quick:  What about the

7   stipulated issue?

8           **MR. FARR:**  No, Your Honor, we do not agree with that.

9   We do not stipulate to the introduction into evidence of the

10  newspaper articles from the preliminary injunction hearing.

11          Also, Your Honor, I want to say that county employees

12  do not work for the State.  Poll workers are not State

13  employees.  They are employees of the counties.  The counties

14  are not Defendants here.  There is a hundred counties in North

15  Carolina.  It would be substantially prejudicial for the

16  defense in this case to be held liable for statements by poll

17  workers from counties, and, particularly, Your Honor, very few,

18  if any, of the statements attributed to poll workers by any of

19  these witnesses identified the name of the poll worker, and so

20  we go back to the first case I handed up to you.  For the

21  admission, we have to know who the person was who made the

22  statement.

23          Also, Your Honor, there has to be evidence, in

24  addition to the fact that the statement was made, that the

25  statement was being made within the scope of the person's

NAACP, et al. v. NC, et al. — Trial Day 2 — 7/14/15

1   authority.  There has to be additional evidence showing that it

2   was within the scope of the person's authority.  I think that

3   case I handed up to you says that.

4           **THE COURT:**  I understand that.  What did you

5   stipulate to in terms of the preliminary injunction record?

6           **MR. STRACH:**  Your Honor, the stipulation is that --

7   the one I have in my notebook is Docket -- ECF 259 in the 861

8   case.

9           **THE COURT:**  Okay.  Give me a second to catch up with

10  you.  I have 275 in the 658 case.  Is that the same thing?

11          **MR. STRACH:**  Joint stipulations regarding preliminary

12  injunction record.

13          **THE COURT:**  Yes.  It was entered on June 12th.

14          **MR. STRACH:**  Yes, Your Honor.

15          **THE COURT:**  And it has five numbered paragraphs.

16          **MR. STRACH:**  That's right.  The paragraph that I

17  believe would be relevant here would be paragraph 2,

18  documentary exhibits.  It just says that, "The parties agree

19  that the exhibits identified in Exhibit A shall be incorporated

20  into the trial record as trial exhibits."

21          We certainly did not intend to, and we don't think we

22  were agreeing to their admissibility at trial.  We were just

23  saying that they could be used as trial exhibits.

24          **THE COURT:**  What does it mean to be incorporated into

25  the trial record?

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

          **MR. STRACH:**  I think it just means that they can be
used as an exhibit.  Certainly, we didn't say that we were
waiving any objections to admissibility.  One could argue, at
best, that language is ambiguous, but we certainly weren't
stipulating to the admissibility of those exhibits.

          In fact, Your Honor, when we submitted our objections
to their exhibit list, we noted objections even to those
exhibits in the PI, preliminary injunction, record that they
are now claiming we stipulated to their admissibility.  So we
made it very clear when we submitted our objections that we
were not agreeing to those documents being admitted --
admissible.

          **THE COURT:**  What would the point of paragraph 2 have
been?  Why did you need to stipulate that those were
incorporated as trial exhibits if they were exhibits -- if they
are just exhibits and not part of the record?

          **MR. STRACH:**  Your Honor, like I said, that can be
argued that's ambiguous language, but we would just simply say
that to the extent there is a stipulation that should reflect
the parties' agreement, we certainly were not agreeing that
documents would be admissible and that we were waiving any
objections to them.

          **THE COURT:**  Okay.  All right.  I understand.

          Mr. Donovan?

          **MR. DONOVAN:**  Sure.  Thank you.  Your Honor, the

1  reason you do a stipulation for evidence to come in is for

2  evidence to come into the trial record.  We actually discussed

3  this on a conference call with Your Honor, not in detail, but

4  Rule 65 expressly envisions that preliminary injunction

5  evidence can -- can come into evidence.  This stipulation

6  actually is quite specific, and it's not ambiguous, drafted by

7  the many lawyers who negotiated in this room.

8         The documentary exhibits, the agreement was that all

9  the exhibits -- both sides had some picayune objections each

10 side raised.  We all agreed that it all comes in.

11        What's the proof is look at three, Your Honor.  We

12 did say that authenticity and hearsay regarding expert reports

13 is reserved.  We didn't say that up above.  That's because all

14 the documentary exhibits come in.  Expert reports, which

15 everyone recognized may have really more hearsay than

16 authenticity, is reserved.  There were charts that are attached

17 to this, a series of emails, and this issue is kind of coming

18 up, Your Honor, as the State, both on this and deposition

19 designations, are kind of -- I know we are all in trial, but

20 when we make these agreements and we prepare our cases and we

21 prepared to present it efficiently to you, those decisions have

22 to mean something.  So I respectfully submit that the --

23        **THE COURT:**  You said authenticity and hearsay is

24 reserved.  It's waived.

25        **MR. DONOVAN:**  I'm sorry, waived.  I'm sorry, yes.

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1          But there was kind of provided the expert needs to

2     show up.  That's a little different than documentary.  You see

3     we also agreed that all the fact witness declaration that Your

4     Honor has, that's in.  That's substantive evidence, recognizing

5     it wouldn't normally be that way, and then we said deposition

6     designations are not coming in.  We kind of negotiated those

7     one by one, which we've done.

8          So this kind of was kind of exhaustive, it took a

9     long time, but it sets the record for Your Honor, recognizing

10    that you heard a lot of testimony from last time.

11         So we'd submit that the stipulation is here.  Your

12    Honor recognized that in your order, setting kind of what we

13    had to do pretrial, recognizing we were stipulating, not the

14    details, just referring to the stipulation.  And, frankly, we

15    relied on that to present our case sufficiently and with the

16    witnesses we are here to present.

17         **THE COURT:**  Okay.  Did you want to be heard,

18    Ms. Riggs?  Anything in addition to that?

19         **MS. RIGGS:**  So I do want to be heard on the motion in

20    limine with regard to Dr. Kousser, but not on the stipulation

21    issue.

22         **THE COURT:**  Mr. Strach?

23         **MR. STRACH:**  I was just going to point out, Your

24    Honor, what paragraph 3 shows is that when we were waiving

25    objections to admissibility or, et cetera, we were very clear

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1  about it.  That's what we were –– that was our impression of
2  what we were doing.  When we were waiving something, we were
3  very clear about it in here.  So I think that shows we were not
4  waiving anything in paragraph 2.

5          **THE COURT:**  Okay.  All right.  As to your witness?

6          **MS. RIGGS:**  Yes, Your Honor, good morning.

7          **THE COURT:**  Good morning.

8          **MS. RIGGS:**  First, with respect to Defendants' motion
9  in limine on intent evidence, expert testimony on intent isn't
10 objectionable just because it embraces an ultimate issue that
11 this Court has to decide.  That's the text of Rule 704.

12         **THE COURT:**  I don't know that there is any objection
13 to any expert giving testimony as to facts which they contend
14 indicate intent.  So is there any objection to that?

15         **MR. FARR:**  No, Your Honor.

16         **THE COURT:**  Okay.  So you can assume all of that is
17 coming in, as long as there is proper foundation, and I agree
18 with that.  I think the question is, are you going to be asking
19 your witnesses did the State of North Carolina intentionally
20 discriminate based on whatever race or ethnicity.  And you can
21 ask that question, or you can ask something else like is there
22 evidence of intent.  If so, what did you find.  And then lay it
23 out.

24         **MS. RIGGS:**  Our experts have been studying this
25 subject for years and have looked at other situations where

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1  there is --

2           **THE COURT:**  I understand.  Are you going to try to

3  ask them the ultimate question:  Did North Carolina racially

4  discriminate?

5           **MS. RIGGS:**  The experts have opinions on that based

6  on the synthesis of all the broad circumstantial evidence.  I

7  don't think that them opining on that is even problematic in

8  the Fourth Circuit, because the Fourth Circuit has allowed

9  experts to testify on ultimate facts.

10          So, for example, in *U.S. v. Perkins*, in the Fourth

11  Circuit in 2006, the Court held an expert testimony on the

12  reasonableness of a police officer's use of force was

13  admissible, even though that was the decision ultimately.  It

14  was a reasonably objective determination.

15          **THE COURT:**  What did the expert say?

16          **MS. RIGGS:**  The expert opined that the police

17  officer's use of force was reasonable.  That was the expert's

18  testimony, and that was admitted, not because that then proved

19  the decision -- the ultimate question that the Court had to

20  answer, but that is what the expert -- it was within the scope

21  of what the expert's normal course of study was, and it wasn't

22  replacing the Court's independent judgment.  But here, with

23  historians who have been studying North Carolina history and

24  legislative process across the country for decades --

25          **THE COURT:**  I understand.  Are you going to be asking

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1  your experts questions like, in your opinion, did the State of

2  North Carolina discriminate based on race, or are you going to

3  ask questions more along the lines of did you examine the

4  evidence, did you find evidence that you think is supportive of

5  the determination that they may have discriminated?

6          **MS. RIGGS:**  Yes.

7          **THE COURT:**  Is it the latter as opposed to the

8  former?

9          **MS. RIGGS:**  It is closer to the latter.  Applying the

10  rubric of factors that you've identified that are relevant,

11  what was your conclusion.

12          **THE COURT:**  Okay.  I will take it, depending on what

13  the question is.

14          **MS. RIGGS:**  Okay.

15          **THE COURT:**  You recognize, of course, the decision's

16  for the Court to make?

17          **MS. RIGGS:**  Absolutely.

18          **THE COURT:**  So the important information is the

19  factual information.

20          **MS. RIGGS:**  Absolutely.  With regard to the other

21  motion in limine aspect, which is newspaper articles,

22  Dr. Kousser reviewed a variety of sources, which he'll describe

23  in detail.  I don't want to waste your time.  Newspaper

24  articles were just one source.

25          Under Rule 803, newspaper articles aren't hearsay if

NAACP, et al. v. NC, et al. — Trial Day 2 — 7/14/15

1  they are offered as evidence of intent, motive or state of

2  mind, which a lot of the cases, that's what the newspaper

3  articles were reviewed as.

4          But under Rule 807, I think that's even more

5  applicable.  Rule 807 permits out-of-court statements to be

6  admitted when there is strong indicia of reliability, and

7  Dr. Kousser will explain why these newspaper articles are

8  reliable.

9          **THE COURT:**  Let me stop you for a minute.  Typically,

10  when experts and historians rely on newspaper articles, they do

11  that to then form an opinion as what the public may have known

12  in a period of time.  So, frequently, newspaper articles are,

13  even though hearsay, permitted because they are not being

14  entered for the truth of what they say, they are being entered

15  to indicate what people would have known who read the

16  newspaper.

17          So if the newspaper says on January 1 that using a

18  certain pharmaceutical now will cause a certain disease, that

19  article can come in, not to prove that using the pharmaceutical

20  can cause the disease, but it can come in to show that people

21  may have been aware of that fact because they read the article.

22  Do you follow me?

23          **MS. RIGGS:**  Yes.

24          **THE COURT:**  To the extent that the experts rely on

25  newspaper articles for that kind of analysis, I understand.

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1 The concern I have is -- putting the stipulation aside, I have

2 to decide that issue -- if experts are relying on statements of

3 state legislators who are quoted in the paper and they are

4 relying on that for proof of intent, that decision seems to let

5 into the back door something that through the front door I

6 would have some concern about, and, that is, having a newspaper

7 article that quoted a legislator come into evidence all by

8 itself. That would be hearsay, and it would be offered to

9 prove the truth of the matter in the article, and, that is,

10 that that's what the legislator said and that was the

11 legislator's intent. So intent seems to be aligned with the

12 truth of the statement.

13 So my concern is if that can't come in through the

14 front door absent a stipulation, then having an expert rely on

15 it basically lets it right through the back door, and I am

16 concerned about that. So that's my concern.

17 As a practical matter, is that the problem we are

18 going to be looking at? And, if so, how many of those

19 instances are we talking about?

20 **MS. RIGGS:** So we are not moving through Dr. Kousser

21 the independent newspaper articles into evidence today. So, to

22 some extent, this isn't being teed up right now. And

23 Dr. Kousser certainly is reading them, basing his opinion on

24 them, the first category you discussed that you didn't have a

25 problem with.

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1          With regard to the second category, the Defendants
2    have not made available any legislators to talk about their
3    intent.

4          **THE COURT:**  I understand.  They have a legislative
5    privilege, and they are entitled to rely on that.

6          **MS. RIGGS:**  Right.  So --

7          **THE COURT:**  You can criticize them for that, but
8    that's their privilege.

9          **MS. RIGGS:**  Yes, Your Honor.  I'm sorry.  I
10   understand, but I still think that the residual rule under 807
11   is applicable here because we will provide evidence through
12   witnesses and experts that -- and exhibits, emails from
13   legislators, that these statements in the public -- there is a
14   high indicia of reliability.  It seems in these emails,
15   everyone is acknowledging -- for example, Senator Apodaca said,
16   "Now we are going with the full bill."  There are legislative
17   emails talking about "what is that full bill then?"

18         I mean, so this is indicia of reliability.  It is
19   also very probative of the material facts in this case, the
20   larger ultimate issue of intent, but also some of the factors,
21   the *Arlington Heights* factors, so process, background, that
22   kind of stuff.  So these are facts -- material facts that you
23   need for your ultimate conclusion.

24         These statements are better than evidence otherwise
25   available.  We don't have the legislators available to speak,

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1  and so each of these statement -- so each of those is present

2  for these statements by legislators in the newspapers.

3          **THE COURT:**  All right.  How many statements are we

4  talking about as a practical matter that fit that category, the

5  "now we can go with the full bill" kind of statement?

6          **MR. DONOVAN:**  I would say a dozen, Your Honor.

7          Let me address two issues, Judge.  One is we have

8  Dr. Lichtman, who is also -- we are not going to overlap.

9          Two things.  First, the newspaper articles.  Those

10  are statements by legislators.  They are in a newspaper.  So I

11  understand you say that's hearsay.  Here is the issue.

12          **THE COURT:**  It is actually probably double hearsay.

13          **MR. DONOVAN:**  It probably is, but it is actually

14  curable, and we did that.  One is -- what we tried to do is

15  we -- those are obviously not protected by legislative

16  privilege.  So we talked to the State and suggested

17  stipulations.  The State refuses to do that.  Okay.  Fine.  We

18  said we are going to subpoena them.  They are not privileged by

19  those statements.

20          Mr. Strach emailed Mr. Kaul and said that the State

21  will seek sanctions if you subpoena them.  So, actually, Your

22  Honor, I would ask for a ruling.  We have to resolve this

23  because we are going to subpoena those legislators.

24          **THE COURT:**  Why didn't you all -- the case has been

25  pending for two years, and I have been working with the

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  magistrate judge and handled a couple of appeals.  I thought

2  you all would have litigated that; and if there was a problem,

3  taken it to the magistrate judge for a ruling.

4         **MR. DONOVAN:**  Our view is a lot of this is in through

5  the stipulation; but if it's not, I want the Court to know we

6  intend to subpoena those legislators.  We think it is a waste

7  of their time.  The State should tell us if they didn't.  The

8  State has access to them.  They've talked to them before.

9         But I do want to raise for Your Honor that is an

10 issue, and I understand your back boor-front door concern.  We

11 want to resolve that because I don't want you to think our

12 experts are just relying on newspaper articles; but it is one

13 piece of their analysis, and we think it is substantive

14 evidence.  So that's kind of point number one on the newspaper

15 articles.  We will try to work with the State today, but I

16 think we may tee that up for you because we may need to

17 subpoena these legislators.

18        **THE COURT:**  I encourage you to work it out, if you

19 can.  I have to say, this case has been pending for quite a

20 while and consumed a fair amount of time from the judges of the

21 court in the pretrial stage; and there was quite a few

22 amendments to the pretrial order, and the parties asked for

23 extensions and all sorts of things, and that would have been

24 the appropriate time to have gone head to head, if there was a

25 fight about it, and resolved it at that time.  I wanted to try

1  the case with whatever evidence you all have marshaled.

2      **MR. DONOVAN:**  We're not asking for a delay or

3  anything.  We think a lot of it is in through the stipulation.

4  So that's easy for us.  I am just kind of letting Your Honor

5  know -- and Mr. Peters has said he will accept those subpoenas.

6  So we may be serving those today.

7      I think on the other issue that Ms. Riggs -- that is,

8  the experts considering it, is this kind of tracks the

9  *Arlington Heights* factors.  Newspapers and these statements are

10  just one piece.  There is not a statistical analysis --

11      **THE COURT:**  Do you have any case where a Court has

12  permitted reliance -- I read -- or reviewed the cases you had

13  in your materials, but I am looking for a case where the Court

14  says that a statement like this from a legislator that's quoted

15  in a paper can be introduced directly in the case.  I think the

16  answer to that is likely to be no because it is hearsay.  It is

17  a double hearsay unless you bring the reporter in.

18      Then the next question is, do you have any case where

19  an expert can rely upon that?  I would be interested to see

20  those because it has to be the type of material upon which an

21  expert would normally rely, and it may be that an expert might

22  normally rely on reading newspapers.  I don't know how that

23  trumps the standard that I have to apply for admission of that

24  as substantive evidence, which is, in effect, how it has to

25  come in in the courtroom.  So that is my concern.

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1          MR. DONOVAN:  I understand.  We will look at those,

2    but I do think as you think -- and you will hear both of them

3    and their methodology, and it has been accepted just last year

4    in the Texas photo ID case.

5          THE COURT:  What was accepted?

6          MR. DONOVAN:  Testimony on intent.

7          THE COURT:  I don't have any difficulty --

8          MR. DONOVAN:  It was a similar analysis is my point.

9    It is not just the intent, is that you will hear from both

10   Dr. Kousser and Dr. Lichtman, this is what they do for a

11   living.  They're both professors.  You kind of walk through --

12   because, obviously, this is different.  What they are

13   presenting is circumstantial evidence of intent, which the

14   State says in most cases you have to look for, and that's

15   what's presented.  Obviously, with circumstantial evidence, it

16   is a buildup of different categories, not just one piece of

17   evidence.  This is kind of one leg of the analysis, but, yes,

18   it has been accepted.

19          THE COURT:  You say "it."

20          MR. DONOVAN:  This method --

21          THE COURT:  I want to be careful what we are talking

22   about.

23          MR. DONOVAN:  This understand.  This methodology.

24   I'm now moving away from newspaper articles.

25          THE COURT:  The methodology I understand.  At least

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1 preliminarily I don't have any problem with that.  I think the

2 expert can testify as to -- with the proper foundation, as to

3 the facts that the expert thinks support elements of a claim.

4          **MR. DONOVAN:**  Sure.

5          **THE COURT:**  All right.  I am concerned about the

6 expert saying that I am relying on newspaper articles because

7 in the article, legislator was quoted as saying X, Y or Z; and

8 I think that's evidence of intent because I have no idea of

9 knowing if the statement was quoted in full or whether it was

10 quoted accurately, whether it was taken out of context, whether

11 there is more to it and that only the first half of it was

12 quoted for whatever reason.  And those are the reasons why

13 I'm -- I think the hearsay rule applies.

14          **MR. DONOVAN:**  We understand that, and we'll take that

15 into consideration.

16          **THE COURT:**  I give you fair warning.  I am concerned

17 about those statements.  Unless it's been stipulated to that

18 they are in the record, then that part I do have some concern

19 about that.  So be careful about that.  I am going to look at

20 the stipulation.

21          **MR. DONOVAN:**  That would be helpful.

22          **THE COURT:**  I acknowledge that at the preliminary

23 injunction stage, hearsay comes in, and I am not sure what the

24 parties meant when they signed this.  I understand the

25 argument.  So I will take a look at that.

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1          **MR. DONOVAN:**  Thank you, Your Honor.

2          **MR. FISHER:**  Your Honor, Spencer Fisher representing

3    the United States.  And if I could, I just want to make two

4    points very briefly on what's being discussed because the

5    United States also plans on presenting an expert to speak about

6    legislative intent.

7          We believe that the testimony offered by the

8    Plaintiffs in this case easily satisfies the standard for

9    admissibility, and I just wanted to point to the United States'

10   filing, and it's ECF Number 323 in the 658 case.

11         We attached the order from *Perez v. Texas* in that

12   case.  In that order -- and this goes to the first issue that

13   Your Honor discussed, is the inferences that can be drawn from

14   the intent expert's testimony.  The judge stated that the

15   expert's testimony about legislative intent necessarily

16   includes any inferences or deductions that the expert may draw

17   from the information that he reviewed and analyzed.

18         So the question of to what extent the expert can

19   testify to, what Your Honor just described as the ultimate

20   question of whether the legislature discriminated based on

21   race, we would say that the intent expert can draw the

22   inferences and conclusions upon -- based upon his review, his

23   expert review of the record.

24         **THE COURT:**  Are you going to ask the ultimate

25   question of your expert, or are you, rather, going to ask

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  whether this is evidence that supports the conclusion that it

2  was based on race?

3      **MR. FISHER:**  Well, Your Honor, I think we plan on

4  asking whether there is evidence that supports that conclusion.

5  We plan on also asking the expert what he, using his expert

6  analysis, was able to infer or deduce from that evidence, and

7  that very may well get us closer to the ultimate question.

8      **THE COURT:**  I will just -- I understand the argument,

9  and I did read the case.  I am going to take it on a

10 case-by-case basis and question-by-question basis.  I guess the

11 question might be that it is a little bit of mixed fact/legal

12 question, and fact questions are for the experts to testify to.

13 The legal questions are ones I have to decide.  This one seems

14 to straddle that.

15      At the end of the day, I think everybody realizes

16 that, as a practical matter, whether or not somebody gives such

17 an opinion, we don't have a jury here, so I know how to weigh

18 that with the appropriate standards, and so it may not have the

19 same concern that you would with a jury.  They might give it

20 extra weight simply because they hear it from an expert.

21      **MR. FISHER:**  Understood, Your Honor.

22      **THE COURT:**  I acknowledge that.  So I will approach

23 it question by question; and if the objection is raised, I will

24 take it; and, if not, we'll just keep going.

25      **MR. FISHER:**  And if I could just take one more moment

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1  to just point to another page of that filing that I just

2  mentioned, page 8.  We have cited -- I'm counting -- four

3  different cases where social scientists, such as the

4  Plaintiffs' experts, in this matter have relied on newspaper

5  articles.

6          **THE COURT:**  The question I have again is, for what

7  reason?  I tried cases where I put on experts who used

8  newspaper articles.  I am familiar with the issue, but it was

9  usually for a purpose to show what might have been known or to

10  provide some context.  It is usually not for the truth of the

11  matter asserted in the article.

12          **MR. FISHER:**  Okay.  I think in this case, Your Honor,

13  you know, and we've made the argument as well in that filing,

14  that this evidence could also be offered to show -- and I think

15  you mentioned the effect on the public at the time, but to

16  show, for instance, what other legislators thought about the

17  process at the time, what they understood was going on with the

18  bill at the time, for actions that they might take or may not

19  take as a result of those statements that were put out there

20  and not for the truth of the matter stated.

21          Also, Your Honor mentioned kind of the timing of

22  this.  The Defendants, up until this point, have not impugned

23  the credibility of these news sources.  They haven't indicated

24  that any legislators were misquoted in any of these news

25  sources.  We would also proffer that the reliability of these

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  news sources, you know, weighs heavily --

2         **THE COURT:**  How would they contest that without

3  waiving the legislative privilege?

4         **MR. FISHER:**  That also has been mentioned by

5  Ms. Riggs, the fact that, you know, they had the legislative

6  privilege puts us in a different position --

7         **THE COURT:**  That only makes it more difficult for the

8  Plaintiffs.  I acknowledge that, but it's a privilege, and

9  sometimes I see a fact of a privilege; but I don't know how the

10  Defendants would try to attack or clarify a statement without

11  having a witness then made available to attack or clarify the

12  statement, in which case they then waive privilege.  So I am a

13  little concerned about an invitation to bring the legislator in

14  in order to clarify something if you think there is a problem

15  with it because they do have a privilege they can stand on.

16         It's not absolute, as I've held, but they do have a

17  privilege they can stand on.

18         **MR. FISHER:**  I just want to make one more point, and

19  this case goes back to the case -- Your Honor has asked for

20  authority.  In the *Bolden* case that we cited, *City of Mobile v.*

21  *Bolden*, the expert did rely on newspapers to give his opinion

22  on the intent behind at-large elections that were held in

23  Mobile.  So we would direct the Court to that opinion, if you

24  feel that the --

25         **THE COURT:**  What was it in the newspaper that the

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1  expert relied on in that case?  What precisely was it?

2          **MR. FISHER:**  We'll have to take a look at it.

3          **THE COURT:**  I don't dispute that they can rely on

4  newspapers.  I've said that.  The question I have is, for what

5  purpose?  And that's the key issue.  So if it's for the truth

6  of some statement in there, then that I would be interested in

7  seeing.  If it's for some other purpose, then I wouldn't be

8  surprised that that happened because I'm inclined to think that

9  that's appropriate.

10          **MR. FISHER:**  We would be happy to provide additional

11  information on that.

12          Just in closing, we do feel that the sources -- these

13  sources are vital to the intent portion of this case, and that

14  the experts relying on that to come to their opinions is vital

15  as well, and they will come up here and tell you why these are

16  reliable and why they use them in their normal course of

17  business in what they do.

18          **THE COURT:**  We'll take it question by question and

19  see where we go.

20          **MR. DONOVAN:**  Your Honor, going back to the

21  stipulation point I was pointing out, if you look at your

22  order, which is Docket Number 271, just by reference, you

23  directed the parties in paragraph 2 that the parties shall file

24  two things, A, a stipulation listing all exhibits,

25  declarations, deposition designations from the PI hearing they

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1   agree will become part of the trial order, and you said we
2   should identify which ones we object to.
3           So, therefore, I think that led to that stipulation,
4   if you're trying to interpret what the parties meant when they
5   said the exhibits come into the record, Your Honor.  Thank you.
6           **MR. FARR:**  Your Honor, may I respond to that briefly?
7           **THE COURT:**  Briefly, yes.
8           **MR. FARR:**  Your Honor, the stipulation number 2
9   says -- and this is Document 861 -- excuse me, Document 259 in
10  Case 861.  It says that the exhibits can be part of the trial
11  record, but as you just indicated, newspaper articles can be
12  exhibits for matters other than purposes of the story being
13  admitted for the truth of the matter asserted in the newspaper
14  article.
15          And, secondly, the order you just mentioned indicated
16  that the parties could object to exhibits, which we did object
17  to the exhibits when we filed our objections to their exhibit
18  list.  So the stipulation requires that there be a meeting of
19  the mind of the parties; and as the Plaintiffs have known for a
20  long time, based upon motions we've filed and other things that
21  have come up, the Defendants have never, ever intended or done
22  anything to waive their objections to newspaper articles coming
23  in for purposes of proving the truth of the matter asserted
24  therein.  That intent was reflected by the objections we filed
25  to their exhibits when we filed the objections pursuant to the

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1 Court's order.

2      **THE COURT:** Okay. I understand. The only other

3 preliminary matter I want to raise, and I am just going to put

4 this out as a question and maybe we can get some evidence in,

5 is there were several witnesses who have been asked, as a

6 result of some of the things that happened to them, how it made

7 them feel; and it is not readily apparent to me what element

8 that goes to, how they feel about something.

9      The issue, I thought, was burden and intent of the

10 legislature. So at some point I am going to be interested in

11 your view as to what that's relevant to and how I should

12 consider that, if at all.

13      At least one of the witnesses then talked about

14 burden and so, in that context, I understand the answer; but

15 the question was a little unclear to me as to how that relates

16 to the case. So, at some point, if you can set me straight on

17 that, that would be helpful.

18      Why don't we proceed then. Call your next witness.

19      **MR. EPPSTEINER:** Good morning, Your Honor, George

20 Eppsteiner for the League of Women Voters Plaintiffs. The

21 Plaintiffs call William Kittrell.

22 **WILLIAM A. KITTRELL**, PLAINTIFFS' WITNESS, at 9:44 a.m., being

23 first duly sworn, testified as follows:

24                DIRECT EXAMINATION

25

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1   BY MR. EPPSTEINER

2   Q    Good morning.

3   A    Good morning.

4   Q    Can you please introduce yourself to the Court.

5   A    My name is William Kittrell.

6   Q    And, Mr. Kittrell, what is your middle name?

7   A    Alexander.

8   Q    How old are you, Mr. Kittrell?

9   A    I'm 20 years old.

10  Q    Where were you born?

11  A    I was born in Greensboro, North Carolina.

12  Q    In what city do you currently reside?

13  A    Greensboro, North Carolina.

14  Q    Is that in Guilford County, North Carolina?

15  A    Yes, sir.

16  Q    Have you lived in other counties in North Carolina?

17  A    I resided in Henderson, North Carolina, Vance County, for

18  a few years.

19  Q    And when you say "a few years," from what time period --

20  from what year to what year was that?

21  A    About mid 2010 to 2013.

22  Q    And when you lived in Henderson, I think you said in Vance

23  County, was that during a particular time of schooling for you?

24  A    I was finishing my sophomore year through my senior year.

25  Q    When you say sophomore year to senior year, is that of

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1  high school?

2  A    High school, yes.

3  Q    So other than the about two years of high school that you

4  were in Vance County, and other than living in Greensboro, have

5  you lived in any other places?

6  A    No.

7  Q    Did you graduate from high school?

8  A    Yes.

9  Q    Have you ever registered to vote?

10  A    I did.

11  Q    Where did you register to vote?

12  A    Vance County.

13  Q    And when was that?

14  A    When I was 18, when I got my license.

15  Q    So would that would have been -- you said you are 20 now.

16  Would that have been sometime in 2013?

17  A    Yes.

18  Q    Do you currently attend college?

19  A    Yes.

20  Q    Where?

21  A    North Carolina A&T State University.

22  Q    Is that located in Greensboro, North Carolina?

23  A    Yes, sir.

24  Q    Guilford County?

25  A    Yes, sir.

1  Q    And during the summertimes, do you stay in Greensboro in

2  Guilford County?

3  A    Yes.

4  Q    Do you intend to remain in Greensboro after graduation?

5  A    Yes.

6  Q    Do you have relatives in Greensboro?

7  A    I do.

8  Q    What relatives do you have in Greensboro?

9  A    My mother's parents reside in Greensboro.

10 Q    And your mother as well?

11 A    Yes.

12 Q    What are you currently studying in college?

13 A    Secondary English education.

14 Q    And what would you like to do for employment after

15 graduation from college?

16 A    Hopefully have a teaching job.

17 Q    When you say "teaching job," for a particular age group?

18 A    Between 6th grade and 12th grade.

19 Q    Why do you want to be a teacher?

20 A    Growing up, I always had a knack for teaching.  I always

21 had the patience for kids, and I hope one day to make a

22 difference in some kid's life.

23 Q    Let's talk about the November 2014 election.

24 Mr. Kittrell, did you attempt to vote in this election?

25 A    I did.

1  Q    Was this during the early voting period?

2  A    Yes.

3  Q    Do you recall what day of the early voting period?

4  A    I believe it was the first Saturday of early voting.

5  Q    Were you able to vote?

6  A    No.

7  Q    What happened that first Saturday of early voting?

8  A    I went to go early voting at the local recreation center

9  up the street from my house.  After waiting in line for about

10 30 to 45 minutes, I got to the desk, and they asked for my

11 name, and I wasn't in the system for Guilford County.

12 Q    And when you said you went to the local rec center, do you

13 recall the name of the center where you tried to vote?

14 A    I believe it was the Brown Center.

15 Q    And the Brown Center is in Guilford County, North

16 Carolina?

17 A    Yes.

18 Q    And at the time that you went to early voting, was this

19 sometime in October of 2014?

20 A    Yes.

21 Q    And how long had you been living in Guilford County at the

22 time you voted?

23 A    For a few -- well, for about a year.

24 Q    So you waited in line, and did you approach a registration

25 table?

1   A    I did.

2   Q    Okay.  And why exactly did they say you couldn't vote?

3   A    They said that I wasn't registered in Guilford County to

4   vote.

5   Q    How long did your total voting experience take you?  I

6   believe I you said you waited in line for 30 to 45 minutes; is

7   that right?

8   A    Yes.

9   Q    So the entire experience of voting, how long did that take

10  you?

11  A    About an hour and 15 minutes.

12  Q    Why did you believe you could vote on that Saturday?

13  A    Because I figured since I was a resident of North Carolina

14  and I had registered to vote in North Carolina, that I would be

15  able to vote in any county that I was in.

16  Q    When you say any county that you are in, do you mean the

17  county in which you live?

18  A    Guilford County, yes.

19  Q    When you went to vote in 2014 at the Brown Center, did

20  they offer you a provisional ballot?

21  A    No.

22  Q    Why did you want to vote in the November 2014 election?

23  A    Because I've waited to vote basically all my life, and I

24  figured that it was the perfect time and I thought that my

25  vote -- it would actually count for once.

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  Q    Is voting important to you?

2  A    Yes.

3  Q    Why is it important to you?

4  A    Because I feel that it is my duty to have a voice in

5  decisions made.

6  Q    And after you weren't able to vote that day, how did it

7  make you feel about your right to vote?

8  A    I was disappointed, frustrated.

9  Q    Why were you disappointed and frustrated?

10  A    Because it's -- my mother has always told me about voting,

11  that I should always vote, and the fact that I couldn't simply

12  because I wasn't registered in a certain county, it was really

13  frustrating to me.

14  Q    Thank you, Mr. Kittrell.

15         **MR. EPPSTEINER:**  I don't have any other questions at

16  this time.

17         **THE COURT:**  Any cross?

18         **MS. MURPHY:**  Thank you, Your Honor.

19                        CROSS-EXAMINATION

20  **BY MS. MURPHY**

21  Q    Good morning, Mr. Kittrell.  I believe you testified you

22  lived in Guilford County for about a year prior to your attempt

23  to vote in 2014; is that correct?

24  A    Yes.

25  Q    And during that time, is it correct that you did not make

1 any attempt to register in Guilford County?

2 A    No.

3         **THE COURT:**  I'm sorry?

4 **BY MS. MURPHY**

5 Q    Is it correct or incorrect?  Did you make any attempt to

6 register to vote in Guilford County during that year prior to

7 the election of 2014?

8 A    No, I did not.

9         **MS. MURPHY:**  I have no further questions.  Thank you

10 very much, Mr. Kittrell.

11         **THE COURT:**  Anything further?

12         **MR. EPPSTEINER:**  No questions, Your Honor.

13         **THE COURT:**  You may step down, sir.

14         **MS. RIGGS:**  Your Honor, the League of Women Voters

15 Plaintiffs call Dr. Morgan Kousser.

16 **J. MORGAN KOUSSER, PH.D.,** PLAINTIFFS' WITNESS, at 9:53 a.m.,

17 being first duly sworn, testified as follows:

18                         DIRECT EXAMINATION

19 **BY MS. RIGGS**

20 Q    Professor Kousser, can you introduce yourself to the

21 Court, please.

22 A    I'm Morgan Kousser.  I teach at Caltech.  I live in

23 Pasadena, California.  I am happy to see rain.

24 Q    Please push the microphone a little bit closer down.  What

25 is your current position at Caltech?

1   A    I'm the William R. Kenan, Jr. professor of history and

2   social science at Caltech.

3   Q    And how long have you been teaching at Caltech?

4   A    For about 45 years.

5   Q    Can you briefly tell the Court about your training,

6   background?

7   A    I was an undergraduate at Princeton, majored in history.

8   I then went to Yale to study with C. Vann Woodward, did

9   history, political science.  I have taught at Caltech for that

10  period of time, also taught at Harvard, Oxford, Claremont,

11  graduate school, Hong Kong last fall.

12  Q    What is the emphasis of your study and teaching at Caltech

13  and the other institutions that you've taught at?

14  A    Well, I have published extensively on southern history and

15  politics, on voting rights, on education, history of

16  discrimination in education.  I have taught a course for nearly

17  45 years on the U.S. Supreme Court, taught it in Hong Kong last

18  fall, an interesting experience.

19  Q    Dr. Kousser, have you had the opportunity to study

20  political history in North Carolina prior to your involvement

21  in this case?

22  A    Yes.  My senior thesis at Princeton was called "Tennessee

23  Politics and the Negro, 1948 to 1964."  And it had a little

24  section at the end on North Carolina, so that long.  There is a

25  large part of a chapter of my dissertation for the book called

1  *The Shaping of Southern Politics*, which concerns the

2  disenfranchisement of the blacks and poor whites.  Part of the

3  chapter -- a large of part of a chapter is on North Carolina.

4      I did an article on educational discrimination by race in

5  North Carolina in the late 19th and early 20th Centuries after

6  that.  I testified in the remand case of *Shaw v. Reno*,

7  eventually called *Shaw v. Hunt*.  And there is a -- the report

8  there was incorporated as a long chapter in my book *Colorblind*

9  *Injustice*.  So I've done a lot on North Carolina in the past.

10 Q    Speaking of that, Dr. Kousser, what kind of expert work

11 have you done in the past relating to the testimony -- related

12 to what you were asked to do in this case?

13 A    Well, I have been testifying since 1979 in voting rights

14 cases.  The first one that I testified was to -- went up to the

15 Supreme Court as *Hunter v. Underwood*.  It was on the criminal

16 disenfranchisement provision of the 1901 Alabama Constitution,

17 and the question was whether that was adopted with a racially

18 discriminatory intent.  I concluded that it was.

19      The only very direct, what is referred to as "smoking gun"

20 evidence in that case came from a newspaper article.  The

21 legislators, in this case a member of the constitutional

22 convention, were a little less discreet about their racial

23 intentions in 1901 than legislators are today.  And the person

24 who framed the criminal disenfranchisement provision told a

25 newspaper reporter -- was quoted in the newspaper as saying

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 44 of 193

1  that the wife-beating provision of the criminal

2  disenfranchisement provision alone would disenfranchise, I

3  think, 60 percent of the black males in Alabama.  So that was

4  my first case.

5      I also testified in the *Bolden* case that's been referred

6  to, *City of Mobile v. Bolden*, in the remand case, which

7  concerned the intent of the framers of what turned out to be an

8  1874 law setting up an at-large election system in Mobile.

9  Newspapers were a major source there.  There were other

10  sources, but there weren't any legislative hearings.  There

11  wasn't a transcript of legislative debates.

12      Newspapers were very important for the background of the

13  events that took place, and I testified that I thought that the

14  at-large system had been adopted with racially discriminatory

15  purpose.

16  Q    Dr. Kousser, beyond *Bolden* and *Underwood*, have you

17  testified in other cases on legislative intent?

18  A    I have.  One of the most important ones was *Garza v.*

19  *Los Angeles Board of Supervisors*.  There the question was

20  whether a series of redistrictings were done with racially

21  discriminatory intent.  I wrote a very long paper, almost as

22  long as the paper that I wrote in this case.  It used a variety

23  of resources.  The legislative privilege was not so strictly

24  enforced as in this case.

25      I read 65 depositions of legislators, people who did the

1 redistricting, aides to legislators, et cetera, et cetera, and

2 also newspapers, all sorts of other documents that were

3 available.

4      And the largely circumstantial case led me to the

5 conclusion that the series of racial redistrictings, which made

6 the most Hispanic supervisorial district in LA increasingly

7 non-Hispanic white in each redirecting, were adopted with a

8 racially discriminatory intent.

9      The District Court judge in that case, the first third of

10 his opinion is on intent, and it largely tracked my report.

11 Q    In addition to your expert work, have you published on the

12 topic of legislative intent and racially discriminatory intent

13 specifically?

14 A    I have.  When I finished the *Garza* report and the District

15 Court opinion came out, I thought perhaps I should publish it,

16 publish my report.  So I talked to a friend and colleague who

17 happened to be dean at the University of Southern Carolina Law

18 School and said, what's the best thing to do to get this into a

19 law review?  And he said, well, law students would like to see

20 cases cited.

21      And so I spent a very long time thinking about cases,

22 reading cases on legislative intent and going through them,

23 trying to make sense of them, trying to play out the rationales

24 that the judges and historians and political scientists have

25 used to try to determine intent so that I could make some sort

Case 1:13-cv-00658-TDS-JEP  Document 348  Filed 08/12/15  Page 46 of 193

1  of systematic framework to use, to analyze intent so that it

2  wouldn't have to be something that was just ad hoc each time.

3  And I published in the law review a long article called "How to

4  Determine Intent: Lessons from LA."

5  Q    In the course of your studies, have you had the

6  opportunity to analyze evidence relating to the intent of

7  legislation in other contexts beside voting or redistricting

8  legislation?

9  A    Yes, I've done it with regard -- I did the Texas voter ID

10 case, the first of the Section 5 cases, and did an intent

11 analysis in Washington.  Sorry about my voice.

12 Q    Did you need some more water?

13 A    Eventually, yes.

14        **MS. RIGGS:**  Your Honor, the League of Women Voters

15 Plaintiffs tender Dr. Morgan Kousser as an expert in political

16 history, southern history and voting rights.

17        **THE COURT:**  Any objection?

18        **MR. BOWERS:**  No objections from the Defendants, Your

19 Honor, to his qualifications as an expert.  However, I will

20 note for the record that we will be, as my colleague Mr. Farr

21 said, objecting to any reliance on statements of legislators

22 found in newspaper articles for purposes of determining intent.

23        **THE COURT:**  All right.  He may give his opinions.

24 **BY MS. RIGGS**

25 Q    Dr. Kousser, what were you asked to do in this case?

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  A    I was asked to analyze as many documents as I -- that were

2  provided to me or that I could find which were relevant to two

3  questions.  One was essentially a Section 2 question, whether

4  there was a racially discriminatory effect or a likely racially

5  discriminatory effect of the passage of H.B. 589, and the

6  second, whether it had been adopted with a racially

7  discriminatory intent.

8  Q    That first point, are those -- is that evidence known as

9  the Senate Factors evidence?

10 A    Yes.

11 Q    Did you produce a report in this case, Dr. Kousser?

12 A    I did.

13         **MS. RIGGS:**  Your Honor, may I approach?

14         **THE COURT:**  Yes.

15         **MS. RIGGS:**  I am handing the Court what has been

16 marked as Plaintiffs' Exhibit 46, which is Dr. Kousser's report

17 in this case.

18 **BY MS. RIGGS**

19 Q    Dr. Kousser, you have a copy; am I right?

20 A    Yes.

21 Q    Is this the report that you created at the request of

22 counsel?

23 A    Yes.

24 Q    In this report, you examined a series of factors that you

25 said were relevant to the question of whether House Bill 589

1  was adopted with discriminatory intent.  Can you explain to the

2  Court how you identified these factors?

3  A    Well, as I said, this came out of *Garza* very directly, and

4  I tried to identify as many factors as I could.  I started with

5  the *Arlington Heights* case, which has more of a discussion of

6  intent than any other case, but *Arlington Heights*, like many

7  Supreme Court opinions, states things but does not fully

8  elaborate them.  Often for the elaboration of the reasons why

9  this counts, you have to look at lower Court opinions and also

10 practices.

11    I also examined what I had done in the past, even -- when

12 I did my Ph.D. dissertation and first book, I examined the

13 question of whether disenfranchisement had been adopted with a

14 racially discriminatory intent.  The actions of southern

15 states, the 11 southern states that managed to secede from the

16 Union in 1861, when they adopted disenfranchisement rules,

17 laws, constitutional provisions, the poll tax, literacy tests,

18 understanding clauses, grandfather clauses, et cetera, whether

19 that was adopted with racially discriminatory intent.

20    So I had been studying these things for quite a long time,

21 and I used my knowledge and anything that I could find out that

22 historians had said or political scientists had said about what

23 sort of evidence counts as intent and what the rationales for

24 counting that as intent are, and I tried to set them out

25 systematically in a series of factors.

1    My first pass came up with nine factors.  When I got to

2 the -- putting it into the book form, *Colorblind Injustice*, I

3 came up with ten factors, but they are essentially coming out

4 of the *Arlington Heights* factors more than anything else.

5 Q    Why is the use of this ten-factor rubric helpful in a

6 legislative intent case?

7 A    Well, it is helpful to organize the evidence.  You can --

8 you don't have to come at it sort of hit or miss, and you

9 can't -- you thought through it before.  I think the most

10 important is with this model, as with lots of kind of models in

11 social science, it gives you a chance to be wrong.  It gives

12 you a chance to disprove, and so at various points, sometimes

13 in cases, for example, in the Texas voter ID case, I looked at

14 the adoption of particular laws or provisions, which I

15 concluded, after looking at the same sorts of factors, were not

16 adopted with racially discriminatory intent.  So that it is

17 possible under this analysis to disprove that things were

18 adopted with a racially discriminatory intent.

19    It is a framework, a systematic framework, and it allows

20 you to analyze things systematically.

21 Q    So to be clear, using this framework, you've looked at

22 laws and concluded they were not motivated by discriminatory

23 intent?

24 A    Yes.

25 Q    Can you describe, given all of the intent cases that you

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  studied and have been involved with, what types of -- what is

2  the scope of evidence that you look at in doing your work?

3  A    It is much like the scope of evidence that I publish in

4  academic journals.  I look at all sorts of things.  I look at

5  hearings.  I look at transcripts of debates.  I look at

6  newspapers.  I look at reports that were in the public domain

7  at the time.  I look at statistics in *The Shaping of Southern*

8  *Politics*.  I analyzed election returns.  I did what's called

9  ecological regression, which is the same technique that's been

10  used in voting rights cases to determine racially polarized

11  voting.  I've displayed things in graphs, on maps.  I look at

12  every type of evidence that's possibly available.  Depositions

13  I mentioned before.

14  Q    Is the evidence relating to legislative intent in the

15  cases you've worked on voluminous?

16  A    It is quite voluminous.  The *Garza* analysis took me 18

17  months, and as I said, I had 65 depositions and read enumerable

18  newspapers.

19  Q    When you said amongst the types of evidence that you

20  review, reports in the public domain, does that include reports

21  from state agencies?

22  A    Yes.

23  Q    What else might that include?

24  A    Anything that informed the debate at the time,

25  particularly think tank reports or reports from -- well, one of

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  the things that I haven't mentioned that I should have

2  mentioned, sorry, is scholarly articles and books, which I

3  certainly took into account, and sometimes they are important

4  in particular debates, and I would certainly take those into

5  account.

6  Q    Dr. Kousser, you said you reviewed newspaper articles as a

7  piece of your analysis.  Can you explain to the Court why you

8  find newspapers to be a useful source of information?

9  A    Newspapers are useful for lots of reasons.  One of them is

10 to set the context, what was generally going on at the time,

11 what were people generally thinking at the time, what had gone

12 before, what did people do, what other sorts of things did

13 people do, what did they say about other things that they had

14 done.

15     A good example taken not from a case, but from my book,

16 *The Shaping Southern Politics*, is the analysis of a law in

17 Tennessee called the Dortch Law passed in 1890.  It was a

18 secret ballot act.  It applied to four counties in Tennessee,

19 and one might think that a secret ballot act was simply passed

20 to make sure that voters could vote without telling anybody

21 else how they voted, but in Tennessee, it was used to

22 disenfranchise, particularly people who were less literate, and

23 that was particularly in 1890 African-Americans.

24     I learned from newspapers a great deal about the sponsor

25 of the act, Mr. Dortch.  In particular, that in the election

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 52 of 193

1  where he was elected in Fayette County, Tennessee, the election

2  was quite violent.  They kept African-Americans away from the

3  polls for the first time since the Fifteenth Amendment had been

4  passed, and he led that effort to keep them away from the

5  polls.

6       He then went to the legislature with the stated purpose of

7  disenfranchising as many blacks as possible.  There was no

8  other way to learn that than to look at the newspapers, and

9  that was very informative to me about Mr. Dortch, his purposes

10  and the ultimate purposes of the passage of the secret ballot

11  law.

12  Q    In the course of your work, have you found that newspaper

13  articles are a reliable source for your analysis?

14  A    They are often reliable.  They should always be viewed as

15  every other piece of evidence, skeptically.  You have to ask --

16  you have to try to find other evidence that corroborates them,

17  if that's available.

18       An example from this particular case is that there was an

19  effort after the 2011 voter ID bill was vetoed to pass local

20  voter ID laws in the legislature.  A newspaper said, well, the

21  Attorney General issued an opinion that said that those kinds

22  of laws were not according to the -- not legal according to the

23  North Carolina State Constitution.

24       I then found the Attorney General's opinion.  So that

25  corroborated what was in the newspaper, but it was a newspaper

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1 article that alerted me to the existence of that opinion.

2 Q    Have you a chance to assess generally the credibility of

3 statements in newspaper articles attributed to individuals or

4 legislators?

5 A    In general, I think a lot of them are credible.  I was

6 trying to think while the -- while you and the other lawyers

7 were talking about this, whether there had been any statements

8 here in this particular case where someone said, I did it

9 because, I did X because, and that that was very important in

10 my analysis, and I couldn't think of any.  There may be some

11 there that I couldn't remember, but there were certainly no

12 articles that I can recall that I relied upon from newspapers

13 that simply said that.

14      Let me say also that with regard to newspapers and other

15 evidence, if there were -- suppose that it were possible to ask

16 every legislator why they voted for such and such a bill.  In

17 the *Garza* case, there were lots of attempts to do that.  Why

18 did you draw the lines in this manner?  And the conventional

19 answer again and again and again in all the depositions was "I

20 don't know" or "I don't remember."

21      In the context of a legal case or if people are

22 anticipating a legal case, if you ask legislators why they did

23 something, the people who were for it will say something

24 predictable, the people who were against it will say something

25 predictable, and it won't be very meaningful.  You don't expect

1  to see somebody say, oh, I did this because I don't like

2  African-Americans, or I did this simply because

3  African-Americans are going to be discriminated against because

4  of this.  Those are not credible.

5      So if you compare them with contemporary newspapers making

6  statements usually before the case is filed, the newspaper

7  evidence is expected to be more credible.  Though one should

8  look at it skeptically than the evidence that would come about

9  by asking people directly, did you do this because X.

10 Q    Do political historians conventionally rely on newspapers

11 in the way you have?

12 A    Yes.

13 Q    Now that we have discussed your methodology, I want to

14 move on specifically to your findings in your report, and there

15 are a couple of times that I will refer to a page number in

16 your report, so just have it handy.

17     First, Dr. Kousser, you didn't start your analysis in

18 2013.  So my question is, why did you look at changes in

19 election laws earlier in the 1990s and 2000s?

20 A    If the question is why did someone vote for or why did the

21 legislature adopt something -- some particular law, some

22 particular rule, the commonsensical thing to look at,

23 commonsensical starting place, commonsensical baseline, and the

24 one that political scientists or historians would look at is

25 what did it replace.  What is the status quo?

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1      So in order to try to provide evidence which would be

2  useful to the judge in making his decision about why this was

3  adopted, I had to start with what went before, what was the

4  legislature reacting to, and so I looked at the laws that it

5  repealed.

6  Q    Can you turn with me to page 20 of Exhibit 46.

7  Dr. Kousser, when you get there, can you explain to the Court

8  when you started looking at the laws that existed before House

9  Bill 589, what did you find?

10 A    Well, North Carolina, as previous studies have shown, had

11 a long history of racial discrimination in voting laws.  In the

12 1990s, this turned around.  It turned around almost completely.

13 Instead of trying to make it more difficult for

14 African-Americans to -- and people of color in general to vote,

15 the legislature made it easier, and the proof of that, the

16 proof that the laws had that effect is in the numbers.

17      There was a dramatic increase in turnout in North Carolina

18 elections, and if you look at Table 1, there was a 45 percent

19 rise in turnout in 1988 in the Presidential election.  Table 1

20 looks at only Presidential elections.  North Carolina was 48th

21 in the country in turnout.  By 2012, it was 11th in the

22 country.  That had jumped, the turnout had increased quite

23 substantially even by 2004.

24      So it wasn't simply something that happened because you

25 had an African-American candidate running for President.  It

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 56 of 193

1  happened even with John Kerry running for the Democratic -- as

2  the Democratic nominee in 2004.  So a very dramatic increase

3  from 48th in the country to 11th in the country in turnout.

4  Q    In studying that time period, what laws were passed that,

5  in your opinion, played a role in changing that?

6  A    Well, there was a series of laws.  There was a law

7  allowing no-excuse absentee ballots for -- that did not have to

8  be mailed in, so-called early voting, for a period of time,

9  eventually 17 days.  That made it much easier to vote, and it

10 particularly made it much easier to vote for people who might

11 have difficulty getting off of their work or difficulty that

12 they had picking up their kids after school, all of those sort

13 of things.  They could vote at a time that was easier for them.

14 They could vote over a long period of time.  Particularly, they

15 could vote on two Sundays before the election.

16         **MR. FARR:**  Your Honor, I would just like to make an

17 objection to that question to the extent that the question

18 asked him to give an opinion as to what caused an increase in

19 turnout.  There has been no testimony that he's analyzed what

20 caused an increase in turnout.  To the extent he is going to

21 testify about election laws that had been passed during this

22 period of time where turnout has increased, we have no

23 objection.

24         **MS. RIGGS:**  I'm fine with him testifying to that

25 extent.

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1          **THE COURT:**  All right.  Sustained.

2          **THE WITNESS:**  There was another law allowing votes to

3  be counted even if they were cast in the wrong precinct.  The

4  votes that were not precinct specific could be counted.  There

5  was a law allowing what has been called in this case I think

6  same-day registration during the early voting period.  They

7  could change their residency or they could register for the

8  first time during that period.  There was also, finally, a law

9  allowing 16- and 17-year-olds to preregister to vote so that

10  they would be able to do so when they were 18.

11  **BY MS. RIGGS**

12  Q    And are the rest of the relevant laws in your report?

13  A    Yes.

14  Q    Can you turn with me to Table 2 now.

15  A    I have it.

16  Q    When all of these new laws and voting practices are being

17  put into place in the '90s and 2000s, what phenomenon did you

18  notice happening with African-American turnout?

19  A    African-American turnout rose quite substantially, more

20  substantially than white turnout, and it rose, as we see, if we

21  look at -- if we compare 1996 and 2004, the rise is 45 percent

22  in African-American turnout.  It is not 45 percentage points,

23  but it is 45 percent if the denominator is 36.9.  So even

24  before 2008, the rise is very substantial.

25          Note also that the rise is particularly substantial in

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  Presidential elections in African-American turnout, and the

2  trend is best looked at in Presidential elections and not in

3  the off-year elections, the Congressional elections.  As you

4  can see when you look at the table, the rise in turnout in

5  off-year elections is not quite so much.  So you don't expect

6  as much of an effect of whatever changes had taken place in the

7  off-year elections.

8  Q    Dr. Kousser --

9        **MR. FARR:**  Your Honor, I object to that question

10 because he is again testifying to the effect of the changes in

11 the election law on the turnouts, and he has not given any

12 testimony that he's studied how the changes in the election

13 laws affected the turnout.

14       **MS. RIGGS:**  Your Honor, he is testifying that there

15 was a change in law accompanying a dramatic change in

16 participation and turnout.  He's a voting rights expert.  He's

17 reviewed voting laws across the country.  I think he is

18 entitled to, as a historian and political scientist, opine on

19 whether there is a relationship between the two.

20       **THE COURT:**  I am going to sustain the objection for

21 lack of foundation as to cause, but the numbers speak for

22 themselves, and I will examine the numbers for what they are.

23 **BY MS. RIGGS**

24 Q    Dr. Kousser, in the course of your study, have you had the

25 opportunity in the past to study the relationship between

1  turnout and election laws?

2  A    I have, the basis more than anything else for *The Shaping*

3  *of Southern Politics*.  What I did there is people previous to

4  my study had not had the statistical competence to estimate

5  turnout by race.  Ecological regression gave me the ability to

6  estimate turnout by race, and the basis for that book, more

7  than anything else, was sequence of estimates of turnout by

8  race and looking at the laws that had been passed and other

9  events that took place around the same time.

10       In particular, lots of historians previously had thought

11  that violence and/or ballot box stuffing had totally

12  disenfranchised African-Americans long before the laws that

13  were passed took place.  I could show by looking at the

14  sequence of estimates of turnout that that wasn't the case.  My

15  inference, from looking at the sequence of election laws and

16  comparing them with the sequence of estimated turnout by race,

17  was that the laws caused the decline in turnout.  So it is

18  directly analogous to what I did here.

19  Q    So going back, though, to your findings in this case, why

20  was the change in turnout relevant to your analysis on what

21  might have motivated the legislature?

22  A    There was a very large increase in African-American

23  turnout, African-American political participation.  It changed

24  politics in North Carolina.  North Carolina moved from a state

25  that had not been really severely contested in Presidential

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 60 of 193

1  elections for a while to one of the most contested states.

2       It allowed for the election of candidates on the state

3  level who were favorable to African-Americans and whom

4  African-Americans supported.  So it changed politics

5  considerably, and that change then feeds into the narrative of

6  why the 2013 H.B. 589 needed to be adopted.

7  Q   I want to talk now about some of the specific factors you

8  looked at.

9       **MS. RIGGS:**  Before I do that, League of Women Voters

10 Plaintiffs would like to move into evidence Plaintiffs'

11 Exhibit 46.

12      **THE COURT:**  Any objection?

13      **MR. BOWERS:**  No objection, Your Honor, with the

14 exception to the hearsay objections that we've already noted

15 for the Court.

16      **MS. RIGGS:**  To clarify, that's in regard to

17 newspapers, not the content of the report being hearsay?

18      **MR. BOWERS:**  That's correct.

19      **THE COURT:**  Okay.

20      **MR. FARR:**  Also, Your Honor, any testimony here about

21 the ultimate legal conclusion, we object to.

22      **THE COURT:**  I have no idea what's in it.  It's 70

23 pages long.

24      **MS. RIGGS:**  We are not going to have time to go

25 through everything.  So I want to get it moved it into

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1  evidence, and we'll hit some highlights.

2           **THE COURT:**  And I will read it later?

3           **MS. RIGGS:**  Otherwise, we might be here a very long

4  time.

5           **THE COURT:**  All right.  I will admit it without

6  objection, except as to anything dealing with newspaper

7  articles, I will reserve as to the truth of the contents of the

8  newspaper articles.  What was the other basis?

9           **MR. FARR:**  Just, Your Honor, if --

10          **THE COURT:**  The cause issue?

11          **MR. FARR:**  Yes, sir.  If he's testified that the

12  intent of the legislature was to discriminate, we would object

13  to that coming into evidence for the reasons we've stated.

14          **MS. RIGGS:**  Well, that's different than cause.

15          **THE COURT:**  Does he say that in here?

16          **MS. RIGGS:**  As a historian, he is opining on what the

17  evidence in totality and in context means.  The fact that he is

18  offering --

19          **THE COURT:**  Where does he say that?

20          **MS. RIGGS:**  Throughout.  I mean, Your Honor, his

21  abstract of findings is a summary; but just because Dr. Kousser

22  is, as an historian and political scientist, reviewing all of

23  the evidence and placing it in context, concluding that there

24  was a discriminatory intent, doesn't supplant your decision on

25  that front.

1          But he is a historian.  He's studying what motivates

2  the passage of election laws.  His analysis wouldn't be very

3  useful if he just threw up facts on a piece of paper and then

4  made no analysis of those facts.  So he provides an analysis of

5  what the facts mean.

6          **THE COURT:**  Okay.  I don't know how I can possibly

7  parse through this right now and make that determination.

8          **MR. FARR:**  Your Honor, we're perfectly fine for you

9  to reserve your ruling on that objection.

10         **THE COURT:**  I am going to do that.

11  **BY MS. RIGGS**

12  Q    In your report, Dr. Kousser, did you go through the facts

13  applicable to each of the intent factors you've identified

14  before?

15  A    I did.

16  Q    Can we talk first -- one of the factors that you

17  identified as relevant to determining the legislative intent is

18  the historical context.  Can you explain that?  Is that what

19  we've talked about so far?

20  A    Yes.

21  Q    What about -- another factor that you discussed is models

22  of human behavior.  Can you explain that?

23  A    Yes.  When anybody is analyzing an action in daily life or

24  in grandiose ways, you have some sense of how human beings act,

25  and it's inevitable that this sort of thing informs your

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1    analysis.  What I tried to do is to make as conscious as

2    possible the -- some assumptions and generalizations with which

3    one approaches evidence.

4         We don't have a lot of historical or social scientific

5    laws in the same sense that physics has laws.  We don't have a

6    first law of thermodynamics, but we have generalizations that

7    we can make about how human beings react to particular

8    situations, and that informs what we think in analyzing

9    analogous situations.

10        In this case, it was informative to me to start with what

11   I did in *The Shaping of Southern Politics* in the section about

12   North Carolina and analyze what happened in North Carolina in

13   the 1890s.  North Carolina was a very competitive state, very

14   competitive for the South in the post-Reconstruction Era.

15        In no election was there a landslide majority statewide

16   from 1872 through 1900, but in the 1890s, largely because of

17   the worldwide Depression, a coalition between Republicans and

18   Populists took over the state.  The Republican Party, then the

19   core constituency -- the Republican Party in North Carolina in

20   the 1890s was African-American, and when a Republican governor

21   was elected in 1896 after a landslide Republican Populist

22   legislature was elected in 1894, they passed a series of

23   election laws.  The election laws made it easier to vote, and

24   there was an increase in turnout.

25        African-Americans got elected to the legislature.  They

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 64 of 193

1  got elected to local office.  This was threatening to the

2  people who believed in white supremacy.  In 1898, they reversed

3  this with what was called the White Supremacy Campaign.  It was

4  violent.  They stuffed ballot boxes.

5      In 1900, they passed a constitutional amendment to

6  disenfranchise as many blacks as possible.  Again, this was

7  quite violent, and the ballot box stuffing was quite

8  overwhelming.

9      If you analyze the election returns, as I did, and

10 estimate how blacks voted in the 1900 election, you come to the

11 conclusion that virtually every black who voted voted to

12 disenfranchise all blacks in the future.  That was not

13 credible, but the election returns, as recorded, seemed to show

14 that.

15      So there was a political movement which was based in the

16 African-American community.  It was triumphant.  It changed

17 North Carolina politics.  That political movement was reversed

18 with the changes of election laws.  I found that not merely

19 interesting as a historical grace note, but informative as to

20 how people operated in a similar situation that took place a

21 hundred years later.

22 Q    Did you look at the behavior of the legislature in the

23 modern context in light of those historical behavioral

24 patterns?

25 A    Yes, I did.

Case 1:13-cv-00658-TDS-JEP  Document 348  Filed 08/12/15  Page 65 of 193

1  Q    What -- did you also look at whether the text of the law

2  could provide any evidence of discriminatory intent?

3  A    Yes, I did.  And, in particular, I looked at two things.

4  One is a comparison of the law, the voter ID part of the law,

5  with voter ID laws in other states, Texas, Georgia, Indiana,

6  and what I called in the report the first version of H.B. 589

7  and the second version of H.B. 589.  And the conclusion there

8  was that the law that was finally passed was more restrictive

9  of the suffrage than the Texas law, than the Indiana law, than

10  the Georgia law, and than the law that was first proposed and

11  debated and discussed and passed by the House.

12       So if you look at the text of the law, you can see that

13  this was a very restrictive law and that the legislature,

14  having been given the opportunity to adopt less restrictive

15  laws, adopted the most restrictive law that it could.

16       The second thing that I looked at was amendments that were

17  proposed and rejected; and the one that's perhaps most

18  interesting, in light of more recent events, is the rejection

19  of what might be called the South Carolina law or provision.

20  There was an amendment proposed by, I think, Representative

21  Glazer, and it was rejected in the House at the time.  They

22  could have adopted a bill which was quite similar to what they

23  finally adopted in 2015, but they rejected it, and they

24  rejected the vast majority of the major amendments that were

25  offered by opponents of that law.

1      And, of course, they rejected all efforts to eliminate the

2  other provisions of the law which came into the bill after the

3  *Shelby County* decision came down.

4          **THE COURT:**  Ms. Riggs, if this is a good time to take

5  a break, maybe we'll take our morning --

6          **MS. RIGGS:**  I have less than ten minutes, but we can

7  take a break.

8          **THE COURT:**  Let's do that.  We'll take a 20-minute

9  break then, and then we'll come back.

10      (The Court recessed at 10:43 a.m.)

11      (The Court was called back to order at 11:07 a.m.)

12  **BY MS. RIGGS**

13  Q    Dr. Kousser, we were talking about factors relevant to

14  whether or not a law may have been motivated by discriminatory

15  intent.  Did you analyze whether the State policies and

16  institutional rules followed during the House Bill 589

17  legislative procedure gave any indication of the intent behind

18  the law?

19  A    I did.

20  Q    And what did you find?

21  A    Well, the -- there are legislative rules and then there

22  are legislative normals.  And so far as I know, no legislative

23  rules were infringed upon by the passage of H.B. 589, but there

24  are certainly legislative norms that were set out in a way that

25  previous legislature, for example, had dealt with an objection

1  in the passage -- to the passage of an election law.

2       The legislature had been considering one of the laws of

3  the early 2000s and there was -- one of the State officials

4  said, oh, there was terrible fraud and I have evidence of dead

5  people voting, et cetera, et cetera, et cetera, and you must

6  take this into account.  And the legislature was scheduled to

7  start debating the issue something like 45 minutes later, and

8  they -- he asked that the legislature not consider it at that

9  point but hold legislative hearings on it.  They did so and

10 they held legislative hearings and only considered the bill

11 finally two weeks later after the concerns about fraud had

12 largely been dissipated.

13      In the consideration in 2013 about the voter ID bill, at

14 the beginning of the legislative session, Speaker Tillis and

15 Mr. Lewis, the chairman of the House Elections Committee, held

16 a press conference and went through and said --

17           **MR. FARR:**  Objection, Your Honor.

18           **MS. RIGGS:**  Your Honor, this is, you know, part of

19 the materials that he has been relying on for his expert

20 opinion, but it is also part of the PI stipulation, the

21 public -- the transcript of the press event that Speaker Tillis

22 and Representative Lewis had announcing the legislative process

23 for the earlier version of House Bill 589.

24           **THE COURT:**  All right.  I am going to allow him to

25 testify.  I am just going to reserve on what weight I am going

Case 1:13-cv-00658-TDS-JEP  Document 348  Filed 08/12/15  Page 68 of 193

1  to give it.

2          **MR. FARR:**  Can we just have a standing objection to

3  the newspaper article so as not to disrupt --

4          **THE COURT:**  One of the concerns I have is -- I

5  flipped through his report over the break, and there are all

6  sorts of footnotes and references to newspaper articles, some

7  without quotations, and I have no idea to what extent there is

8  an objection and to which one of those.  And so it would help

9  me to know exactly what parts are being objected to and what

10 aren't.  So I am going to ask you to object, at least for now,

11 to what you have objections to.

12         **THE WITNESS:**  In this particular example, I saw the

13 video of them saying what they did, and they said that this was

14 going to be a fair and open process, they were going to have

15 hearings, the opponents were going to be allowed to speak, to

16 offer amendments and so on; and they did so.

17         There were legislative hearings.  There was a full

18 and relatively open debate, and I took that to be a legislative

19 norm that they thought was important enough to announce, which

20 was important for the passage of H.B. 589 in the House.  That

21 seemed to be the mode or procedure that they wanted to adopt.

22 And then after *Shelby County*, everything changed.

23         **MS. MURPHY:**  Your Honor, may I hand up an exhibit?

24         **THE COURT:**  Yes.

25         **MS. RIGGS:**  This is Plaintiffs' Exhibit 418.  And may

1  I hand a copy to the witness?

2          **THE COURT:**  Yes.

3  **BY MS. RIGGS**

4  Q    In the course of your work on this case, did you have the

5  opportunity to review emails produced by the legislature

6  relating to the passage of House Bill 589?

7  A    Yes.

8  Q    Is this one of those emails?

9  A    Yes.

10 Q    And does this email -- is it an email from Harry Warren to

11 Nancy Evans on July 24 stating, "Please remember, however, the

12 bill has not yet come to the House for concurrence.  I am sure

13 some changes will be made in a conference committee on that and

14 several other aspects of the bill."

15      Did I read that correctly?

16 A    Yes.

17 Q    What -- how did reading this email affect your findings

18 with regard to the abrogation of norms in this case?

19 A    It was one more piece of evidence that norms were

20 abrogated.  This is what he said typically happened.  I am sure

21 changes will be made in a conference committee because changes

22 are often made in conference committees, and he was assuring

23 Ms. Evans that the same sorts of procedures would be followed

24 as usually were followed, and he expected to see changes.

25 Q    Were there changes in conference committee with House

1  Bill 589?

2  A     No.

3         **MS. RIGGS:**  Your Honor, Plaintiffs move for admission

4  of Plaintiffs' Exhibit 418.

5         **THE COURT:**  Any objection?

6         **MR. BOWERS:**  No objection.

7         **THE COURT:**  Admitted.

8  **BY MS. RIGGS**

9  Q     Finally, Dr. Kousser, can you explain how the anticipated

10  outcome of House Bill 589 ought to be factored into an analysis

11  of the intent behind it?

12  A     Yes.  If you are trying to analyze why people did

13  something, if there is some sort of public record that

14  indicates what a reasonable person in that circumstance would

15  anticipate would be the effects of the action, then that is

16  relevant to an analysis of why they took that action; and there

17  was an extensive public record in this case as to the

18  anticipated effects of the passage of various provisions of

19  H.B. 589.

20  Q     Was that evidence in transcripts of committee debates?

21  A     It was in transcripts of committee debates.  It was things

22  that were said on the floor.  It was State Board of Elections

23  reports.  It was reports from a group called Democracy North

24  Carolina, which were discussed in the press, which were

25  discussed on the floor, and in committee meetings.  There were

1  lots of sources of this, not only in newspapers, but newspapers

2  as well.

3  Q    So the disparate impacts of the provisions of H.B. 589

4  were publicly known and discussed prior to passage of the bill?

5          **MR. BOWERS:**  Objection.

6  **BY MS. RIGGS**

7  Q    Based on your review of all the evidence?

8          **THE COURT:**  I will sustain as to the form of the

9  question.  Rephrase the question.

10         **MS. RIGGS:**  Absolutely, Your Honor.

11 **BY MS. RIGGS**

12 Q    Was -- what was the state of public discussion about the

13 disparate impact of the provisions of House Bill 589?

14         **MR. BOWERS:**  Objection.

15         **THE COURT:**  Overruled.

16         **THE WITNESS:**  A good example is the disparate impact

17 expected from the voter ID portion of 589 as originally passed

18 in 2013.  There was a matching study by the State Board of

19 Elections which found that something on the order of 320,000

20 people who were on the current registration rolls had no North

21 Carolina driver's license or identification card with a photo

22 on it, and there was a racial breakdown which showed that

23 blacks were disproportionately likely not to be matched on

24 voter registration rolls and DMV rolls.

25         There were also studies about the use of same-day

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  registration, which showed that blacks were more likely to use

2  same-day registration than whites, and I think I've got some

3  figures on that in the table in my report.  And they were more

4  likely to use out-of-precinct voting than whites.

5          So these were widely discussed.  They were discussed

6  in hearings.  They were discussed on the floor.  They were

7  discussed in newspapers.  They were discussed in publicly

8  available reports.

9  **BY MS. RIGGS**

10  Q    Did you look to see if there was evidence in the

11  legislative record -- in all of the evidence that you reviewed

12  to see if any justification proffered by the State -- strike

13  that.  Let me start over.

14      Did you examine the record to see if any alternative

15  hypothesis other than racial discrimination could have

16  motivated the challenged provisions of House Bill 589?

17  A    Yes, I did.  If I could explain just for a minute.  I

18  spent a long time trying to think about questions of

19  objectivity in expert witnessing and published a couple of

20  articles on that in the 1980s and 1990s.  One with, if the

21  Court will excuse me, the provocative title "Are Expert

22  Witnesses Whores?"

23      I am conscious enough of this so that I try in this, as in

24  all of my scholarly work, to put my thesis at risk, to use a

25  phrase that a friend once used who is an economic historian.

1  So in order to put my thesis at risk, I have to look at the

2  evidence.  I have to give all of the sources for the evidence

3  so that anybody who is reading it, a report or a scholarly

4  paper, can figure out exactly why I came to the conclusion that

5  I did and what the evidence for that conclusion is, and I have

6  to test alternative hypotheses.

7      I have done so in every case that I've testified in.  If

8  you look at *Colorblind Injustice*, there are five chapters that

9  come out of case testimony.  In all of those, I looked at

10 alternative hypotheses and tried to weigh the evidence for them

11 versus the evidence of racially discriminatory intent, and I

12 did so in this case.

13 Q   Based on your review of the evidence, does voter fraud

14 hold up as an alternative hypothesis for -- addressing voter

15 fraud, does that hold up as an alternative hypothesis for

16 explaining the bill?

17 A    It does not.  There was a lot of talk about voter fraud,

18 but the objective evidence that was presented most clearly is

19 from a State Board of Elections study, which showed that from

20 2000 through 2013 -- 2012, I believe, there were only two cases

21 prosecuted for in-person voting fraud, which would have been

22 affected by the voter ID bill.

23     There were something on the order of 21 million votes

24 cast.  That makes it seem very unlikely that real proven voter

25 fraud was a reason for the adoption of the bill.  There is

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1  plenty of other evidence, which I detail in the report, but as

2  one piece of evidence, that seems to me telling.

3  Q    Based on your review of the evidence, what about the

4  alternative explanation that the bill was motivated by an

5  attempt to increase confidence in elections?

6  A    Well, this was discussed most prominently by

7  Speaker Tillis at the beginning of the legislative session,

8  beginning of the discussion of voter ID, but it was actually

9  surprising to me that there was so little testimony about this.

10 If you look at the hearings and you look at the debates and

11 even if you look at the discussions in the newspapers, there

12 was very little testimony about this, very little evidence of

13 it.

14      Nobody got up and said, I didn't vote because I lost

15 confidence in elections, because I thought there was fraud, and

16 here are X number of other people who didn't vote.  In fact,

17 voter turnout was at a record high, very little evidence that

18 this could possibly have been a legitimate explanation.  So I

19 rejected that.

20 Q    Dr. Kousser, after reviewing all of this evidence we've

21 discussed and applying the analytical methodology you developed

22 and described for the Court here today, what did you conclude

23 was the intent behind the legislation?

24           **MR. BOWERS:**  Objection, Your Honor.

25           **MS. RIGGS:**  Your Honor, Dr. Kousser has --

1      **THE COURT:**  I don't need to hear an argument.  I've

2  heard the argument multiple times at this point.  I am going to

3  allow him to give his opinion.  Whether I am going to rely on

4  it, I will reserve for a later day.  Overruled.

5      **THE WITNESS:**  I concluded that the purpose of --

6  predominant purpose of H.B. 589 was racially discriminatory.

7          **MS. RIGGS:**  No further questions.

8          **THE COURT:**  All right.  Any cross?

9          **MR. BOWERS:**  Yes, Your Honor.

10                      CROSS-EXAMINATION

11  **BY MR. BOWERS**

12  Q    Dr. Kousser, good morning.

13  A    Good morning.

14  Q    Ms. Riggs asked you some questions about newspaper

15  articles.  Do you recall that?

16  A    Yes.

17  Q    And do you recall when Mr. Farr and I took your deposition

18  about a year or so ago?

19  A    Yes.

20  Q    And at that deposition, you testified that you relied

21  heavily on newspaper reports in your analysis, did you not?

22  A    Yes, certainly.

23  Q    Okay.  So you don't dispute that you relied heavily on

24  newspaper reports for your report -- your expert report?

25  A    I relied on newspaper reports for parts of it.  I relied

1  on lots of other sources; but, yes, I relied on newspaper

2  reports.

3  Q    And isn't it true, Dr. Kousser, that you did not

4  independently verify any of the facts that were reported in

5  those news articles?

6           **MS. RIGGS:**  Objection, mischaracterizes earlier

7  testimony.  He explained he did verify.

8           **THE COURT:**  Overruled.

9           **THE WITNESS:**  I gave one example, but there are other

10  examples.  I mean, the newspapers would report what's in the

11  State Board of Election reports; and I looked at the State

12  Board of Elections reports, and it said the same thing that the

13  newspapers said.

14           To the extent that anything could be verified or

15  cross-verified by looking at other newspapers or looking at

16  hearings or looking at things that were said on the floor that

17  were reported in the debates, I looked at all of the sources

18  that I possibly could and cross-questioned them.

19  **BY MR. BOWERS**

20  Q    To you, that constitutes independent verification?

21  A    Certainly it is independent verification to look at what's

22  in the newspapers and then to see what's in the hearings.  If

23  they quoted -- if the newspapers quoted people in the hearings

24  correctly, that seems to me independent verification.

25  Q    Dr. Kousser, just a few moments ago you testified

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 77 of 193

1  regarding objectivity of expert witnesses.  Do you recall that?

2  A    Yes.

3  Q    It's fair to say, is it not, that you were and are an

4  advocate for the practices that were eliminated by H.B. 589;

5  correct?

6  A    I would be in favor of having same-day registration in

7  California.  I would be in favor of out-of-precinct voting, and

8  we have early voting in the same way.  These practices make it

9  possible for more people to vote, and I would be in favor of

10 those.  That does not affect what I decided in my analysis

11 here.  If all I had been doing was saying, hooray for things

12 that I was in favor of, then I wouldn't have written a

13 60-odd-page report and put all the footnotes in.

14      I tried to make very clear why I came to the conclusions

15 that I do, and those conclusions are separate from whatever I

16 am in favor of in the way of election returns or election

17 rules.

18 Q    Ms. Riggs also asked you about voter fraud.  Do you recall

19 that?

20 A    Yes.

21 Q    It's true, Dr. Kousser, that you don't know the procedures

22 that are available, if any, to a poll worker in North Carolina

23 to determine if a person who checks in to vote is impersonating

24 another voter, do you?

25 A    I think we went over this in deposition.

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 78 of 193

1  Q    We did.

2  A    And I am not completely aware of all the procedures that

3  would be taken into account; that's correct.

4  Q    Okay.  And you've never yourself investigated voter fraud,

5  have you?

6  A    That's actually not true.  I have come to inferences about

7  voting fraud.  For example, in North Carolina in 1900, when the

8  amendments providing for a literacy test and poll tax were

9  adopted in the referendum, I looked -- I tried to estimate the

10  proportions of blacks and whites who voted for that amendment,

11  and it seemed to me entirely implausible that 100 percent of

12  the blacks that had voted would have voted in favor of

13  disenfranchising themselves.

14      The same thing was true in Alabama in the 1901 referenda,

15  the referendum on calling a constitutional convention and

16  another referendum on passing that constitutional convention.

17  I looked at the election returns.  They were entirely

18  implausible, and I came to the conclusion that there was

19  considerable voter fraud.

20      I did the same thing with regard to some reconstruction

21  elections in other -- in other cases.  So, yes, I looked at

22  that sort of thing in the past.

23  Q    Dr. Kousser, I am not referring to -- and maybe my

24  question was inartful, so let me try again.  I'm not referring

25  to historical analyses.  I'm asking you:  Have you ever

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  participated in an active investigation of voter fraud?

2  A    I'm sorry, why does an historical analysis not qualify

3  under that?

4  Q    Because I'm asking about then existing allegations and

5  investigating those.  Have you been a part of any team doing

6  that?

7  A    For current --

8  Q    Yes, sir.

9  A    -- voting fraud?  No, I have not.

10  Q    Thank you.  Do you know how many investigators have been

11  hired in the past by the State Board of Elections in North

12  Carolina to investigate fraud?

13  A    No.

14  Q    Do you know what the past budgets are for the State Board

15  of Elections to investigate fraud that the General Assembly has

16  allocated?

17  A    No.

18  Q    Dr. Kousser, I want to turn to your expert report that's

19  already been admitted.  Do you still have that in front of you?

20  A    I do.

21  Q    That's Exhibit Number 46, for the record.

22       First, let's look at Table Number 2 that you went over

23  with Ms. Riggs on page 21.  Do you see that?

24  A    Yes.

25  Q    And I am focused specifically on the turnout increased

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  numbers among African-Americans voters in 2008, 2010, and '12.

2  Do you see that?

3  A    Yes.

4  Q    And there is a significant dropoff in 2010 between '8 and

5  '12; correct?

6  A    Yes.

7  Q    I don't want to mischaracterize it, but I think you

8  testified one of the reasons for that is because of

9  Presidential elections, correct, and greater turnout generally

10 in Presidential elections?

11 A    Yes.

12 Q    Okay.  Is it also true that the significant Get Out the

13 Vote efforts of the Obama campaign also had an impact on

14 increased African-American registration in '08 and '12?

15 A    Yes.  I think we discussed this in the deposition, and I

16 made the point that campaigns, particularly national campaigns,

17 choose where to spend their limited resources on the basis of

18 opportunities, and that the changes in laws in North Carolina,

19 which had made it easier for African-Americans in particular to

20 vote and which coincided with the increase in black turnout,

21 attracted the Obama campaign in 2008 to spend more resources to

22 Get Out the Vote.

23      And I opined that if the laws were reversed and black

24 turnout could not be expected to be as high in future

25 Presidential elections, that Democrats and probably Republicans

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  would allocate fewer resources to North Carolina and probably

2  the Presidential turnout would not have that extra boost.

3      It is the connection between election laws and behavior

4  that results in changes in political participation, and we

5  discussed that at some length, I think.

6  Q    Dr. Kousser, turn to page 20 and Table 1, please, sir.

7  And in the first -- the first three lines, 1998, '92, and '96,

8  do you see that?

9  A    Yes.

10  Q    Tell me, Dr. Kousser, do you know which party was in

11  control of the North Carolina legislature in the '90s?

12  A    Throughout most of the '90s, it was the Democrats, but I

13  think that there was some times that the Republicans controlled

14  at least one house.  That may be incorrect.

15  Q    In your expert opinion, is it possible that changes from

16  the '90s to the -- this decade in legislative approach could be

17  attributable to many factors, including policy differences?

18  A    There were certainly policy differences, certainly.

19  Q    Okay.  Dr. Kousser, when Ms. Riggs was asking you

20  questions about the legislative process in 2013 as compared to

21  2011, do you know how much time was left in the legislative

22  session in 2013 when the current version of H.B. 589 was

23  introduced?

24  A    It was less than a week.

25  Q    Okay.  Wouldn't less than a week time in a legislative

1  session have a significant impact on the availability of time

2  to conduct hearings or other legislative efforts?

3  A    Yes, but the bill didn't have to be introduced then.  It

4  could -- provisions of the bill had been introduced without

5  hearings early in the session.  I detail this in my report.

6  They could have held legislative hearings on same-day

7  registration.  They could have held legislative hearings on

8  out-of-precinct voting.  They could have held them on early

9  voting previous to that point.

10        They had plenty of time to consider these provisions

11  during the legislative session.  They didn't have to put it all

12  together at the very end.

13  Q    Dr. Kousser, in looking -- in doing your intent analysis,

14  isn't it true that you haven't found any one legislator who

15  was -- who demonstrated discriminatory intent, did you?  As we

16  sit here today, you can't point to one legislator that had

17  discriminatory intent?

18  A    I tried to look at the whole legislature and to determine,

19  as objectively as possible, what the intent of the legislation

20  was.  I did not find any smoking guns.  Nobody said, I want to

21  pass this because I want fewer African-Americans to vote.  I

22  don't expect, in a contemporary legislature, to find that sort

23  of statement.  So I was looking at the legislature as a whole.

24  Q    Dr. Kousser, back last summer, didn't you agree with me

25  and Mr. Farr that Congress has not violated Section 2 or the

1   Equal Protection Clause by enacting legislation that gives

2   states the right to close their registration books 30 days

3   prior to Election Day?

4   A    Yes.

5   Q    Isn't it also true that your theory is based on a

6   retrogression standard?

7         **MS. RIGGS:**  Objection, misstating his testimony and

8   his report.

9         **THE COURT:**  Overruled.

10        **THE WITNESS:**  It is not based on a retrogression

11  standard.  It is based upon a comparison between the status quo

12  and what was adopted; and when you are looking at intent,

13  that's the commonsensical standard.  You could call that a

14  retrogression standard if you wanted to, but you always have to

15  ask, when you are trying to figure out why something was

16  passed, what the baseline is, and the natural baseline for

17  determining what -- why a law was changed is the previous law.

18        If the question was, is a particular practice

19  demanded by the Constitution, that's a different question and

20  that's not a question that I addressed.

21        **MR. BOWERS:**  Dr. Kousser, thank you for your time.  I

22  think my colleague Mr. Farr may have some on behalf of the

23  State.

24        **THE COURT:**  Mr. Farr?

25

BY MR. FARR

Q    I don't know if I should say good morning or good
afternoon, Dr. Kousser.  Thank you for coming today, and it is
good to see you again.

     I wanted to start off by asking:  In your deposition last
year, did you not testify that you thought that black turnout
would drop off if the provisions of H.B. 589 were enacted?

A    Yes.

Q    Okay.  And do you know if that happened in the 2014
election?

A    I think that it did not happen just from things that I
heard about in this particular case.  But as I pointed out when
I discussed the table, the major rise in black turnout
coincident with the earlier laws took place in Presidential
elections, and we wouldn't expect nearly so much of an effect
in off-year elections.

Q    Right.  I think if we pulled your deposition out, I think
you said that you expected it would drop off in Presidential
years at a higher rate, but that it would still drop off some
in off years; is that correct?

A    Yes.  I think that what I underestimated was the sort of
backlash effect on the part of particularly African-American
organizations, and I certainly didn't anticipate that a senate
race which had more money spent in it than any other senate
race in the history of the country would took place.  I just

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 85 of 193

1  had no idea that that senate race would attract so much in the

2  way of funds.  So ...

3  Q    Dr. Kousser, we took your deposition in April, I think --

4  or June of 2014.  At that point in time, did you not testify

5  that you had given a contribution to Kay Hagan for the 2014

6  election?

7  A    Yes.

8  Q    And did we not agree in that deposition that we expected

9  that the 2014 Senate election in North Carolina would be

10  competitive?

11  A    We did.  I didn't think it would attract so much money.

12  Q    Okay.  And at the time you gave your deposition, you had

13  not done any sort of cross-state analysis to determine the

14  effect of turnout on practices like early voting or same-day

15  registration or out-of-precinct voting?

16  A    That's correct.

17  Q    All right.  Now, I wanted to clarify a few things.  In the

18  *Garza* case in which you testified, did you say you relied upon

19  65 depositions?

20  A    Among other things, yes.

21  Q    Did that include depositions of the -- I don't know if

22  they were city councilmen or commissioners.  What were they?

23  A    They were members of the county board of supervisors.

24  Q    So the people who actually passed the law had their

25  depositions taken, and that was part of the evidence that you

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  relied upon in *Garza*?

2  A    I think one of the supervisors had his deposition taken,

3  but it was uninformative.

4  Q    Okay.  But you had that deposition?

5  A    Yes.  The depositions that were much more informative were

6  the people who actually did the redistricting.

7  Q    Who were the other 65 people that got deposed?

8  A    They were legislative aides.  There was a redistricting

9  committee that was appointed, which was -- it turned out --

10 basically, a shell committee.  It had a certain number of

11 minority members, et cetera, but the committee really didn't do

12 anything.  It was a couple of members who did things, and I

13 concluded, after all of the material that I read, that they

14 were sort of queued by legislative aides to the supervisors.

15 The supervisors -- the legislative aides would say, we want a

16 line here rather than there, and people would do it.

17      But it's the people who actually did the redistricting

18 that were most important in the deposition evidence.  One of

19 the depositions was 750 pages long.

20 Q    Okay.  You didn't have evidence like this to review in

21 this case, did you?

22 A    Just the emails.

23 Q    Okay.  All right.  Now, Dr. Kousser, I think you told me

24 that at your deposition you've never worked as a poll worker or

25 an elections board member.

1  A    That's correct.

2  Q    So have you ever had any experience in counting

3  provisional ballots?

4  A    No.

5  Q    Do you know the process that's followed to count an

6  out-of-precinct provisional ballot in North Carolina?

7  A    No.

8  Q    Do you know -- when I say "verification of a voter

9  registration application," would you understand what I was

10 talking about?

11 A    In general, yes.

12 Q    Do you know how voter registration applications are

13 verified in North Carolina?

14 A    No.

15 Q    Do you know how long it takes a voter registration

16 application to be verified in North Carolina?

17 A    No.  I know some things that they do.  They try to

18 verify -- if there is a Social Security number or the last four

19 digits of the Social Security number or driver's license

20 number, they look at that, and they send a postcard or a letter

21 to the voter.  I know that they do that.

22 Q    But you don't how long the process takes for a

23 registration application to be verified?

24 A    No.

25 Q    Are you aware of the fact that if a registration

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  application is unverified, that registration is denied?

2  A    I think that is the case.

3  Q    And would you also be aware of the fact that if the

4  registration is denied, that voter would not be able to vote?

5  A    I believe it to be the case, but I don't know

6  specifically.

7  Q    Okay.  And did you ever study how long it took -- you are

8  aware of the fact that North Carolina closes their registration

9  books 25 days before the election?

10  A    Yes.

11  Q    Did you ever compare the verification rates for people who

12  register 25 days before the election versus those who register

13  during same-day registration?

14  A    I have not seen figures on that.

15  Q    Did you ever look to see if -- what the percentage was of

16  same-day registration voters who failed to mail their

17  application after their ballot had been counted?

18  A    I have not specifically looked at that.

19  Q    You haven't looked at the percentage of what I will call

20  normal registrants, people who registered 25 days before the

21  election -- you haven't studied or looked at how often those

22  individuals fail mail verification after their ballot is

23  counted?

24  A    I have not specifically looked at that.

25  Q    I wanted to talk to you about Senator Tillis, who at the

1  time of your report I think was Speaker Tillis.

2  A    Yes.

3  Q    And Representative Lewis.

4  A    Yes.

5  Q    And you saw a press conference, you say on video, where

6  they made some comments?

7  A    Yes.

8  Q    And you said that the process that they followed was a

9  fair process.  You tell me how you described it.  I don't want

10 to put words in your mouth.

11 A    Well, it was certainly a more extensive process, and it

12 was relatively fair compared to what happened in 589

13 eventually.

14 Q    Okay.  But they were members of the North Carolina House?

15 A    Yes.

16 Q    Did you ever see any press conferences or things on TV

17 about statements by Senator Berger, who was the President Pro

18 Tem of the House, explaining how he was going to conduct the

19 process on the Senate side?

20 A    I can't remember looking at -- there may have been

21 descriptions in hearings or other reports, but I don't remember

22 seeing anything on video.

23 Q    All right.  And do you know whether or not the rules in

24 the Senate and the House may be different?

25 A    I'm sure they are different.  They are different in every

1  legislature like that.

2  Q    Now, you talked about this email.  I think it was in

3  Exhibit 418.  Do you still have that with you?

4  A    I do.

5  Q    Where there was a reference by Representative Warren about

6  the conference committee?

7  A    Yes.

8  Q    Did you study anything about other conference committees

9  and how they operated in North Carolina during the 2013

10 legislative session?

11 A    I read some descriptions, but I did not make any extensive

12 study.

13 Q    Right.  Do you know whether or not the Congress committees

14 always make amendments, or do they sometimes just pass the bill

15 as it's been presented from one house or the other?

16 A    I am sure they sometimes just pass the bills.

17 Q    In studying the North Carolina photo ID bill, were you

18 aware that there was a rollout period for that bill that --

19 when it was enacted in the summer of 2013, and it was not

20 intended to come into effect until January of 2016?

21 A    It did not come fully into effect until that point, yes.

22 Q    The photo ID requirement would not come into effect until

23 2016; right?

24 A    Fully.  There was a sort of mock photo ID.  People would

25 be told in 2014 that if they could show their photo -- asked if

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  they could show their photo ID, but it wouldn't be required to

2  vote.

3  Q    So no one was required by North Carolina to offer a photo

4  ID to vote in elections that had been held up to this point in

5  time?

6  A    That's correct.

7  Q    All right.  Now, did you -- I am going to refer to the

8  period of time from when the bill was enacted to when voters

9  will be required to have a photo ID as a rollout period.  Will

10  you accept that?

11  A    Okay.

12  Q    Did you ever check to see any other states and the types

13  of rollout periods they had for their photo ID requirements?

14  A    I looked at other states, and they were required quickly.

15  They didn't have an intervening election before they were

16  required to go into effect.

17  Q    Okay.  So North Carolina had, as far as you know, the

18  longest rollout period of any state that has enacted a photo ID

19  bill?

20  A    As far as I know.  I have not looked in detail at Alabama,

21  Mississippi, Arkansas, Wisconsin, et cetera.

22  Q    Do you recall that the photo ID statute required the State

23  to engage in an educational campaign to advise voters of the

24  photo ID requirement that would come into place in 2016?

25  A    I was aware of that.  I was also aware of the cutdown of

1  the publicity campaign which had been promised in the first

2  version of 589.  The last version of 589, that was drastically

3  reduced, but I was aware that there was to be a campaign of

4  public information.

5  Q    Well, the final version of the bill had almost a

6  two-and-a-half-year rollout period; correct?

7  A    That's correct.

8  Q    And it also required an educational campaign for voters?

9  A    Yes.

10 Q    Did you ever compare the education campaign that North

11 Carolina required its State Board of Elections to engage in to

12 any other educational campaign by any other state that adopted

13 a photo ID bill?

14 A    I am aware of what was available in Georgia.  I am aware

15 of what was available in Texas.  Those seemed basically to me

16 to be comparable.

17 Q    Can you recall any specifics to explain why they were

18 comparable?

19 A    There was a good deal of money spent.  Certainly in

20 Indiana, there was a good deal of money spent to try to inform

21 voters of exactly what they needed, and that became an issue in

22 the *Crawford* case, I think.

23 Q    But the time period of the educational campaign in North

24 Carolina was longer than any of the other states?

25 A    Absolutely.

1  Q    Now, in your deposition, Dr. Kousser, we went over a

2  summary of the legislative history for H.B. 589.  Do you

3  remember that?

4  A    Yes.

5  Q    And do you remember admitting that, as far as you were

6  aware, that no Democratic member of the General Assembly ever

7  made a point of order arguing that the rules had been violated?

8              **THE COURT REPORTER:**  I'm sorry.

9              **MR. FARR:**  I'll start again.

10             **THE COURT REPORTER:**  Thank you.

11             **MR. FARR:**  I have only lived here for 30 years, so

12 I've still got a little bit of Ohio in me.  I apologize.

13 **BY MR. FARR**

14 Q    Do you remember admitting during your deposition that

15 during the legislative process that not a single Democratic

16 member made a point of order arguing that the rules of either

17 the House or the Senate had been violated?

18 A    Yes.

19 Q    Do you recall that you had admitted that the Senate held a

20 committee hearing where members of the public were entitled to

21 speak?

22 A    Yes.

23 Q    Do you remember admitting that under the Senate rules,

24 there was no requirement that the Senate allow members of the

25 public to speak?

1  A     Yes.

2  Q     Do you recall admitting that there were several amendments

3  offered by Democratic members that were ultimately incorporated

4  into the final version of 589?

5  A     Yes.  Except for one, I think they were pretty minor

6  amendments.

7  Q     Do you remember an amendment by Senator Stein where the

8  majority accepted a proposal that the number of hours for early

9  voting be maintained at their prior levels?

10 A     That was the exception I was referring to.

11 Q     Do you think that was a minor exception?

12 A     I said except for that.  That -- it is an interesting

13 exception.  It's, as I understand it, something that required

14 county by county, each county to have the same number of hours

15 that they had had previously, and it allowed for -- under

16 agreement from the local board of elections, it allowed

17 exceptions in each county so that a large number of counties

18 didn't have to maintain the same number of hours.  My

19 understanding is that that was not in the original amendment,

20 but that that was what passed.

21 Q     Did you study the actual hours of early voting that were

22 held in 2013 to determine if there had been a significant

23 cutback as compared to 2010?

24 A     No.

25 Q     Did you study how many early voting locations there were

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1 | in North Carolina in 2014 as compared to 2010?

2 | A    No.

3 | Q    Did you study how many evening hours were available to

4 | voters in 2014 as compared to 2010 for early voting?

5 | A    No.

6 | Q    Did you study how many weekend hours were available for

7 | early voters in North Carolina in 2014 as compared to 2010?

8 | A    No.

9 | Q    Getting back to your deposition, Dr. Kousser, do you

10 | recall that you did not dispute that the redistricting plan

11 | that was enacted in 2003 was enacted without any public

12 | hearings?  Do you remember that?

13 | A    I didn't dispute it, but I didn't study it.  So I accepted

14 | your characterization of it.

15 | Q    You didn't look at how the 2003 redistricting bill was

16 | handled; is that right?

17 | A    That is correct.

18 |         **MR. FARR:**  I think that's all, Your Honor.  Thank

19 | you.

20 |         Thank you, Dr. Kousser.

21 |         **THE WITNESS:**  Thank you, Mr. Farr.

22 |         **THE COURT:**  Any redirect?

23 |         **MS. RIGGS:**  Very briefly, Your Honor.

24 |                    REDIRECT EXAMINATION

25 | **BY MS. RIGGS**

1   Q    Mr. Farr asked you questions about what it takes to count

2   out-of-precinct provisional ballots, what it takes for poll

3   workers to do that.  Do you recall that question?

4   A    Yes.

5   Q    Was there debate during the legislative committee meetings

6   or on the floor justifying the repeal of out-of-precinct

7   provisional voting on that basis?

8   A    I don't know of any.

9   Q    And you reviewed all of those transcripts?

10  A    Yes.

11  Q    And I am looking at your report, page 44.  Was the

12  contemporaneous evidence at the time that the confirmation

13  by-mail rate of same-day registration and earlier registration

14  was approximately equal?

15  A    Yes.

16          **MS. RIGGS:**  No further questions.

17          **MR. FARR:**  Would you mind if I just look at page 44

18  for a second?  I may have no further questions.

19          **THE COURT:**  That will be fine.  Hold on just a

20  minute.

21          **MR. FARR:**  I do have one question -- or a couple of

22  questions, Your Honor.

23          **THE COURT:**  All right.

24                    RECROSS-EXAMINATION

25  **BY MR. FARR**

1  Q    This is redirect on Exhibit 46, Dr. Kousser.  Ms. Riggs

2  referred you to on page 44, footnote 132, and that's a

3  newspaper article from *The News & Observer* dated July 1, 2001.

4  A    Yes.

5  Q    And that's the source you are relying upon to make the

6  testimony that you gave Ms. Riggs?

7  A    Yes.

8  Q    And that footnote doesn't say anything about the

9  percentage by which same-day registrants failed mail

10 verification after they voted, does it?

11 A    No.

12          **MR. FARR:**  Thank you.

13          **THE COURT:**  Hold on just one minute, please, sir.  I

14 have a few questions for you.

15          Over the time that same-day registration and early

16 voting and out-of-precinct were in effect, which is roughly

17 2000 through 2013, do you know approximately how many people by

18 race used those procedures, dividing it into African-American

19 versus everyone else?

20          **THE WITNESS:**  I believe that's in the report.  I am

21 not sure exactly where, but I believe that the early voting --

22 the figures on early voting by race and the figures on same-day

23 registration by race are in the report.  So I did know that.

24          **THE COURT:**  As I understand the evidence, it's the

25 proportionality of use that was disproportionately

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

 1  African-American as to those procedures.  Is that accurate?

 2         **THE WITNESS:**  That's correct.

 3      **THE COURT:**  Were there, nevertheless, hundreds of

 4  thousands, if not millions, of nonAfrican-Americans who used

 5  those procedures over that period of time?

 6         **THE WITNESS:**  Yes.

 7      **THE COURT:**  How do you take that into account when

 8  you examine factors for racial intent; that is, that the repeal

 9  of these procedures affected large numbers of

10  nonAfrican-Americans?

11         **THE WITNESS:**  Well, to give you an example, I

12  recalled the proportions of early voting.  I think in 2012, it

13  was roughly 70 percent of African-Americans used early voting

14  and roughly 50 percent of whites.  And the question is

15  disproportionality.  To use -- if you will excuse me and go

16  back to being an historian of the 19th Century.  After the

17  passage of the Fifteenth Amendment, states could no longer say

18  blacks couldn't vote.  So they had to choose some quality of

19  blacks that disproportionately affected blacks, and so one of

20  them was wealth or income, another was illiteracy, property

21  holding, or the grandfather clause, the classic one, they asked

22  has your grandfather fought in a war.

23         Blacks were disenfranchised in lots of southern

24  states because they chose a characteristic which blacks

25  disproportionately had.  They were disproportionately

        NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1  illiterate.  They were disproportionately poor.  And they made

2  that a qualification.  On the face of it, it's not a racial

3  qualification.  It is just a qualification for property or

4  illiteracy.

5          The same is true here.  The North Carolina

6  legislature chose a qualification or a rule which was

7  disproportionately used by blacks, and they repealed that rule.

8  They changed that rule.

9          Just as I concluded that there was a racially

10 discriminatory intent in the adoption of a poll tax or a

11 literacy test because blacks were disproportionately poor and

12 illiterate, I conclude that there was a racially discriminatory

13 intent in the adoption and the repeal of early voting because

14 blacks disproportionately used that.

15         **THE COURT:**  In many of the prior cases that you

16 referred to, there is the institution of some type of

17 restriction that makes it harder for someone of color to

18 vote --

19         **THE WITNESS:**  Yes.

20         **THE COURT:**  -- whether it is a poll tax or a literacy

21 test or something along those lines.  In this case, as to those

22 three items that I mentioned, the early voting, same-day

23 registration, out-of-precinct ballots, some could argue those

24 don't quit fit the normal model of a restriction; they were an

25 additional mechanism allowing people to vote, making it easier

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1   to vote.  At least that argument has been made, okay.

2           So are there any other cases you've found in your

3   research over your career where there is some elimination of a

4   voting mechanism like the three I mentioned in this case that

5   might not fit the classic restriction category?

6           **THE WITNESS:**  Well, consider the sort of classic

7   Section 2 case where -- or things that brought about the

8   original passage of Section 5.  The first time that Section 5

9   was validated by the Supreme Court in regard to an election

10  structure was in Allen in 1969.  And in Allen, after blacks

11  started voting in Mississippi -- four of the five cases were

12  from Mississippi, one of the cases from Virginia -- the

13  legislature changed the election structure to -- from a

14  single-member district system, or an elective system, to an

15  at-large system, or an appointive system.  Both those made it

16  more difficult for blacks to elect candidates of their choice;

17  in fact, in the appointive choice, to elect candidates at all.

18          And the conclusion was that those were racially

19  discriminatory, and most of the voting law since 1969 has been

20  based on such changes in electoral procedures or there have

21  been attempts to make it easier to -- or to require the use of

22  single-member districts.  I think that's analogous to the sorts

23  of changes that took place in North Carolina.

24          **THE COURT:**  All right.  Does anybody have any

25  questions in light of my questions?

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 101 of 193

1          **MS. RIGGS:**  Just one, Your Honor.

2  **BY MS. RIGGS**

3  Q    Dr. Kousser, are you aware of situations in Florida where

4  the use of punch ballot machines were found to have a racially

5  disparate effect on voters of color?

6  A    Yes.

7  Q    And can you explain how that might be analogous to the

8  current situation in response to what Judge Schroeder asked?

9  A    Well, in those cases, there were -- the punch cards were

10 used disproportionately in counties where blacks were more

11 concentrated, and there were more errors in punch cards than

12 there were in the direct recording of vote and other ways of

13 voting, and Courts have taken that into account in assessing

14 whether that was racially discriminatory.

15 Q    And the use of a punch card machine isn't a restriction,

16 per se?

17 A    No.

18         **MR. FARR:**  Your Honor, I have a few questions.

19         **THE COURT:**  All right, Mr. Farr.

20 **BY MR. FARR**

21 Q    Dr. Kousser, in response to the judge, you talked about

22 how states went from single-member districts to multi-member

23 districts, which essentially submerged the black voters in

24 multi-member districts so they could not elect a candidate of

25 choice; is that correct?

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  A    Yes.

2  Q    That was an action that the states took, and there was

3  nothing the black voter could do to really get around that,

4  could they?

5  A    That's correct.

6  Q    Punch cards, if the State gives you a punch card to vote

7  on, that's what you got to vote on; right?

8  A    That's correct.

9  Q    All right.  H.B. 589, is there anything that the State has

10  done here to stop African-Americans from registering to vote 25

11  days before the election?

12  A    No.

13  Q    Is there anything that the State has done here to stop

14  African-Americans from voting during the ten days of early

15  voting?

16  A    No.

17  Q    Is there anything the State has done here to stop voters

18  from going to the right precinct?

19  A    No.

20          **MR. FARR:**  That's all, Your Honor.

21          **THE WITNESS:**  Just as -- if I may expand a bit?  Just

22  as blacks could have gotten enough money to pay a poll tax.

23  They could, after a period of years, have become literate.

24  They could gain property.  Over a period of time, they could

25  have done all of those things.

1          MR. FARR:  No questions, Your Honor.

2          THE COURT:  All right.  You may step down, sir.

3          MR. BROOK:  Christopher Brook for League of Women

4    Voters Plaintiffs.  Plaintiffs call Isabel Najera to the stand.

5    ISABEL NAJERA, PLAINTIFFS' WITNESS, at 12:10 p.m., being first

6    duly sworn, testified as follows:

7                         DIRECT EXAMINATION

8    BY MR. BROOK

9    Q    Could you please introduce yourself to the Court.

10   A    My name is Isabel Najera.

11   Q    And how old are you, Ms. Najera?

12   A    Forty-four.

13   Q    And where do you live?

14   A    I live in Salemburg, North Carolina.

15   Q    Could you spell that for the court reporter?

16   A    S-A-L-E-M-B-U-R-G.

17   Q    And what is your street address in Salemburg?

18   A    314 Bubba Gump Lane, Salemburg.

19          THE COURT REPORTER:  I am having trouble

20   understanding her.

21   BY MR. BROOK

22   Q    Is that located in Sampson County, North Carolina,

23   Ms. Najera?

24   A    Yes.  I think she have it wrong.  B-U-B-B-A --

25   Q    Is that what you're stuck on?

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 104 of 193

1   A    -- G-U-M-P.

2          **THE COURT:**  She doesn't need to read over her.  Don't

3   worry about what's on her screen.  It's in a certain code.  You

4   just answer the questions just as clearly as you can.

5          **THE WITNESS:**  I am going to try to do my best.

6   **BY MR. BROOK**

7   Q    Where were you born?

8   A    Durango, Mexico.

9   Q    How long have you lived in the United States?

10  A    Twenty-one years.

11  Q    Where have you lived in North Carolina?

12  A    I lived in Autryville, North Carolina and now I live in

13  Salemburg.

14         **THE COURT:**  What was the first name?

15         **THE WITNESS:**  Autryville.

16         **MR. BROOK:**  Would it be helpful for her to spell

17  that, Your Honor?

18         **THE COURT:**  No, I think we can go forward.  I am

19  going to let you lead, though.

20  **BY MR. BROOK**

21  Q    Are you a citizen of the United States?

22  A    Yes.

23  Q    When did you become a citizen?

24  A    I become a citizen on July 30 of last year.

25  Q    So you became a citizen July of last year?

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 105 of 193

1  A    Yes.

2  Q    July of 2014.  And prior to becoming a citizen, what was

3  your immigration status?

4  A    Permanent resident.  I was a permanent resident.

5  Q    How long had you been a permanent resident?

6  A    Since January 1994.

7  Q    And can you tell me a little bit about your work history

8  since you've lived in North Carolina.

9  A    I was a farm worker and then I started working on Head

10 Start, migrant and Head Start.

11 Q    First, you were a migrant worker; is that correct?

12 A    Yes.

13 Q    And then you worked with Head Start; is that right?

14 A    Yes.

15 Q    Can you tell me what you did with Head Start?

16 A    I was a senior aide first, and then I was a teacher

17 assistant, and then I began to be a teacher.  You want me to

18 describe what I do?

19 Q    Absolutely.  Please do.

20 A    I work with two years to three, and we help them to be

21 independent, like eating by themselves, talk, to sharing toys,

22 take turns.

23 Q    So you were with Head Start working with very young

24 children, toddlers, on eating, socializing, interacting with

25 one another; is that correct?

```
 1  A    Yes, sir.

 2  Q    How long did you work with Head Start?

 3  A    Twenty-one years.

 4  Q    So more than two decades with Head Start?

 5  A    Yes.

 6  Q    Can you tell me about your education history since you

 7  have lived in North Carolina?

 8  A    Well, I got my GED.  Then I get my -- I start to getting

 9  my associate's degree and I get -- I finished last year on May,

10  my associate's degree in early childhood.

11  Q    So you got your associate's degree in early childhood in

12  2014; is that correct?

13  A    Yes.

14  Q    Why did you pursue your associate's degree in early

15  childhood?

16  A    Because I work with children.

17  Q    So you're pursuing the associate's degree related to your

18  work with Head Start; is that right?

19  A    Yes.

20  Q    When did you first register to vote, ma'am?

21  A    October the 7th, 2014.

22  Q    So October of last year is when you first registered to

23  vote?

24  A    Yes.

25  Q    How did you come to register to vote?
```

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1   A    I went to get my driver's license, my CDL.

2   Q    Let me stop you right there.  Your CDL.  What is a CDL?

3   A    Commercial driver's license.

4   Q    Why were you pursuing a commercial driver's license?

5   A    Because where I work, sometimes they need a bus driver

6   to -- for -- to take the childrens for field trips, to doctor's

7   appointments for the family.

8   Q    So you pursued your commercial driver's license as part of

9   your responsibilities with Head Start; correct?

10  A    Correct.

11  Q    Go on about how that relates to you registering to vote.

12  A    Well, when I went to get my driver's license, the lady

13  asked me if I want to register to vote, and I say yes.  Then

14  she give me a piece of paper to sign and she asked me what

15  party I wanted to be, and I answer I don't know because it is

16  going to be my first time to vote.  And she said she was going

17  to put me unaffiliate.

18           MR. MCKNIGHT:  Your Honor, we just object to hearsay

19  to the extent that she is testifying about what she was told at

20  DMV to the extent that it goes to anything other than actions

21  that she later took.

22           THE COURT:  All right.  Sustained for now.

23           MR. BROOK:  Again, this is not being offered for the

24  truth of the matter asserted, but simply her understanding of

25  the interaction.

1  **BY MR. BROOK**

2  Q    What DMV did you go to?

3  A    Clinton, North Carolina.

4  Q    So you went to the DMV in Clinton, North Carolina, to get

5  your commercial driver's license?

6  A    Yes.

7  Q    While there, they asked you about registering to vote;

8  correct?

9  A    Yes.

10 Q    And when did you go to the Clinton DMV and register to

11 vote?

12 A    It was October 7.

13 Q    Of what year?

14 A    2014.

15 Q    So just before -- it was October of 2014, last year?

16 A    Yes.

17 Q    So just before the election of last year?

18 A    Yes.

19 Q    Did you believe as a result of registering in October --

20 on October 7, 2014 that you would be able to vote in

21 November 2014?

22 A    Yes, she told me I was registered on time to vote last

23 year.

24 Q    Who told you that?

25 A    The lady.

1  Q    The lady at DMV?

2  A    Yes.

3  Q    Okay.  Did you want to vote in the November 2014 election?

4  A    Yes.

5  Q    Why did you want to vote in that election?

6  A    It was one of my rights after I become a citizen.

7  Q    And did you attempt to vote in the November 2014 election?

8  A    I went on October 29 to vote.

9  Q    And so that was during the early voting period; correct?

10 A    Yes.

11 Q    Where did you go on October 29, 2014, to vote?

12 A    I went to Lakewood High School in Salemburg.

13 Q    So you went to Lakewood High School in Salemburg in an

14 effort to vote on October 29; correct?

15 A    Yes.

16 Q    Can you tell me about what happened when you went to

17 Lakewood High School on that date to vote?

18 A    Well, I was ready to vote.  I was in line.  When they

19 asked my name, I tell them my name, and they say I wasn't on

20 the list.  And they sent me to a different line with another

21 person, and he say he was going to make phone calls to make

22 sure I was on the list.  And he asked me if I was sure I

23 registered to vote, and I said yes.  I stayed around two hours

24 over there, and they never find my name on the list.  And he

25 offered me a provisional ballot.

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1   Q    Let me make sure -- I want to go through piece by piece

2   and make sure I fully understand what happened here.  So you

3   show up at Lakewood High School, and you're in one line; is

4   that correct?

5   A    Yes.

6   Q    You tell someone when you get to the front of that line

7   your name; correct?

8   A    Yes.

9   Q    And they cannot find your name on the voting roll at that

10  point; is that accurate?

11  A    Yes.

12  Q    At that point, they move you over to another line?

13  A    They send me to another line.

14  Q    And at this point, did they -- they can't find your name

15  again when you are in this second line; is that right?

16  A    Correct.

17  Q    And the person who -- who are you speaking with?  Do you

18  know who you were speaking with?

19  A    It was another man.  I don't know his name.

20  Q    So was it someone associated with Lakewood High School

21  polling place?

22  A    Yes.

23  Q    And did he go away at some point to make a phone call?

24  A    No, it was beside me.

25  Q    He did it right in front of you?

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 111 of 193

1   A    Yes.

2   Q    He could not determine that you were on the voting rolls

3   based on that phone call is your understanding; correct?

4   A    Yes, he say my name is nowhere.

5   Q    And this entire process, being shuffled between lines and

6   talking to various people at Lakewood High School, took around

7   two hours?

8   A    Correct.

9   Q    You ultimately cast a provisional ballot; correct?

10  A    Yes.

11  Q    Do you know if that provisional ballot ended up counting

12  in the November 2014 election?

13  A    No.

14          MR. BROOK:   Thank you very much for your time.

15          THE COURT:   No, you don't know or, no, it wasn't

16  counted?

17          THE WITNESS:   It wasn't counted.

18          THE COURT:   Any cross?

19                  CROSS-EXAMINATION

20  BY MR. MCKNIGHT

21  Q    Good afternoon again, Ms. Najera.   My name is Michael

22  McKnight.   We met last month at your deposition in Clinton.

23      When you went to the DMV office, you said that was

24  October 7, 2014; is that right?

25  A    Yes.

1  Q    Did you fill out a voter registration form when you went

2  to the DMV office?

3  A    Yes.

4  Q    Did you sign that voter registration form?

5  A    Yes.

6  Q    And can you describe for me what that form that you say

7  you signed looked like?

8  A    It was a short paper.

9  Q    Do you remember anything that it might have had on it?

10 A    I really was -- something about -- it was my information,

11 but it was unaffiliate I remember.

12 Q    And you say it was unaffiliate.  What do you mean by that?

13 A    When she asked me what party I want to be, that is when I

14 tell her I wasn't sure because it was going to be my first time

15 to vote.

16 Q    And, now, was unaffiliated something that was marked on

17 the piece of paper that you say you signed, or is that part of

18 a discussion that you had with the person at DMV?

19 A    It was on the paper that I signed.

20 Q    And with respect to this piece of paper you say you

21 signed, what happened to it after you signed -- I guess let me

22 ask a better question than that.

23      After you signed that piece of paper, what did you do with

24 it?

25 A    I gave it to her.

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 113 of 193

1  Q    Okay.  And do you know the name of the person who assisted

2  you with that piece of paper at the DMV in October of 2007

3  (sic)?

4  A    I do not know her name.  I think it was an

5  African-American lady.

6  Q    So she was African-American?

7  A    Yes.

8  Q    Do you remember when we talked about this incident in your

9  deposition, I asked you the question:  "Did you think that the

10 fact that you were Hispanic had anything to do with the issue

11 you had in registering to vote?"  And do you remember what your

12 response to me to that question was?

13 A    I say I don't want to think it's because I'm Hispanic, I

14 don't think.

15 Q    So you don't think the fact that you are Hispanic had

16 anything to do with this issue you had in registering to vote

17 at DMV?

18 A    No.

19 Q    Okay.  And you are married, aren't you, Ms. Najera?

20 A    Yes.

21 Q    And is your husband also Hispanic?

22 A    Yes.

23 Q    And is he registered to vote?

24 A    Yes.

25 Q    And is he also registered to vote in Sampson County?

1  A    Yes.

2  Q    Has he been registered to vote a long time in Sampson

3  County?

4  A    From 2000.

5  Q    You think around 2000?  Ms. Najera, are you registered to

6  vote now as a result of casting a provisional ballot in October

7  of 2014?

8  A    Yes.

9  Q    So you will be able to vote in future elections?

10  A    Yes.

11        MR. MCKNIGHT:  I don't think we have any other

12  questions at this time.

13        THE COURT:  Any more redirect?

14        MR. BROOK:  No, Your Honor.

15        THE COURT:  Ma'am, you may step down.  Thank you.

16        MR. DONOVAN:  All the witnesses are about an hour.

17  Do you want to take a break?

18        THE COURT:  We'll take a break.  What's on the

19  afternoon schedule?

20        MR. DONOVAN:  It will be additional experts.  It is

21  going to be some Department of Justice experts, more on the

22  kind of social economic standards and evidence of that.

23        THE COURT:  Who is that?

24        MR. DONOVAN:  For Your Honor, there is three

25  probably.  It's Vernon-Feagans, which is going to be by video.

1  Then Summers and Clotfelter.  So you may want -- I am sure we

2  can get you the hard copy.

3          **THE COURT:**  I was just concerned whether I am going

4  to have any other evidentiary issues with respect to any --

5          **MR. DONOVAN:**  I don't think there is any motions in

6  limine related to these three.

7          **THE COURT:**  That's good news.

8          **MS. RIGGS:**  With regard -- this is the stipulation

9  that's already been filed with regard to provisional ballots

10 and whether they counted or not.  It's Plaintiffs' Exhibit 678.

11 May I hand it up, Your Honor?

12         **THE COURT:**  Yes.  How many other witnesses are there

13 that have as an issue reliance on a newspaper article or some

14 out-of-court statement allegedly attributable to a legislator

15 or some other person that you think is important?

16         **MR. DONOVAN:**  I will check over lunch, Your Honor,

17 but I think it's really Dr. Lichtman, who is our expert,

18 although I am not even sure he is covering that.  He has other

19 evidence that he is going to cover.  The Department of Justice

20 has an expert.  I'm not sure how much -- why don't we confer.

21         **THE COURT:**  If you would.  We can argue about a lot

22 of things; but if it's not going to be an issue or if we can

23 narrow down what the points of contention are, that's always an

24 easier way to do it.

25         **MR. DONOVAN:**  Obviously, it's on your plate, but I

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  think that stipulation issue would really narrow whether or not

2  we have to deal with other issues.

3       **THE COURT:**  I haven't made a decision, but I am a

4  little concerned about making a decision that the Defendants

5  are bound in a way that they are saying now they didn't think

6  they were bound.  I had thought the plan was to get people to

7  agree to what's already in the record, which would mean it is

8  already in the record.

9       **MR. DONOVAN:**  I understand that, although I would ask

10  that you also consider we relied on that stipulation in not

11  subpoenaing --

12       **THE COURT:**  I understand that.

13       **MR. DONOVAN:**  So it goes both ways.

14       **THE COURT:**  That then raises a prejudice issue, but

15  in terms of -- stipulations have to be knowingly entered into,

16  particularly among lawyers who are professionals, I have a

17  little bit of concern of having lawyers, who are officers of

18  the court, tell me that's not what I thought we were agreeing

19  to and then saying, no, I'm sorry, you are bound to that.  So I

20  have some hesitation to holding them to that, although that is

21  what I had hoped you all had been working out for reasons that

22  would affect just this kind of thing.

23       So if I have some hesitation with that, the issue

24  will become where does that leave you all.  It was signed on

25  the 12th of June.  So I don't know where you were with

1  discovery at that point.  Maybe the only issue is whether you

2  could have brought people into the courtroom for trial.

3         So maybe you all can figure out what's really at

4  stake over lunch or today, whether this is an argument that, in

5  the abstract, is contentious, but in reality, when you get to

6  the granular level, it's really only about a few things; and

7  maybe you can reach some agreement or at least narrow it.

8  Otherwise, if you then are going to argue prejudice, I will

9  consider that and whether then you can bring in people and what

10 we'll do.

11        **MR. DONOVAN:**  I think the other issues on our

12 collective plate on evidentiary -- there were some

13 late-produced reports by the State filed basically in June,

14 well after the close of discovery -- I am happy to argue

15 that -- that we think should be excluded.

16        **THE COURT:**  There were late reports produced by the

17 State arguably.  Then there is a late report, arguably,

18 produced by Dr. Lichtman.

19        **MR. DONOVAN:**  Agreed.  That's why -- but if it's all

20 out, then we know -- I think some of that -- maybe not this

21 afternoon, but by tomorrow, maybe not directly, but indirectly,

22 we are going to start wading into those issues.

23        **THE COURT:**  All right.  Well, I am interested in

24 getting as much of the truth out in this case.  If there are

25 facts from the election results, then I think those ought to be

1  known.  If there is a claim of surprise because it came too

2  late, then I will consider that.

3          On the other hand, if there is a late analysis

4  because it just couldn't have been done earlier, then I

5  guess -- I want to lay it all out and get all the facts out.

6          So see what you all can do, and if you still have a

7  dispute, I will make the decision, and I don't have any

8  hesitation in doing that; but the point here, as much as

9  possible, is to get it out there for the public to see and the

10  residents of North Carolina to see so we can know what the

11  truth is.

12          **MR. DONOVAN:**  Thank you.

13          **THE COURT:**  All right.  2:00.

14          **MS. RIGGS:**  Your Honor, the exhibit I handed up, the

15  League of Women Voters formally moves that into evidence.

16          **THE COURT:**  So now I need to look at it?

17          **MS. RIGGS:**  Otherwise, it would get lost.  It's

18  Plaintiffs' Exhibit 678.

19          **THE COURT:**  It is a stipulation among the parties?

20          **MR. FARR:**  No objections, Your Honor.

21          **THE COURT:**  Admitted.  With that, enjoy your lunch.

22  We'll see you all at 2:00.

23      (The Court recessed at 12:32 p.m.    )

24      (The Court was called back to order at 2:01 p.m.)

25          **THE COURT:**  Mr. Russ?

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1            **MR. RUSS:**  Your Honor, I had one administrative

2  matter before we turn to the next witness, Dr. Lynne

3  Vernon-Feagans.

4            Yesterday, we played video deposition testimony of

5  Ms. Yvonne Washington and Mr. Carnell Brown.  I understand that

6  when the video is playing, there isn't a transcription made of

7  the video.  So we have complete transcripts of everything that

8  was played in the video yesterday, both our portion and

9  Defendants' portions; and with your consent, we would move

10  these exhibits into evidence.  Ms. Yvonne Washington's video

11  transcript would be Plaintiffs' Exhibit  679, and the

12  transcript for Mr. Carnell Brown would be Plaintiffs' Exhibit

13  680.  If I could approach?

14            **THE COURT:**  Let me ask a procedural question.  Now,

15  you've designated a larger portion of their testimony?

16            **MR. RUSS:**  Yes.

17            **THE COURT:**  And so what you are doing now is going to

18  have an exhibit with what's played in court, but then you will

19  have the separate designation filed, which will have some

20  duplication and overlap?

21            **MR. RUSS:**  I can clarify on that, Your Honor, in

22  light of your instructions yesterday.  Speaking just for the

23  United States, for our affected voters, the video transcript is

24  all you need to read.  The other designations you will not need

25  from the United States' perspective.

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1           Ms. Vernon-Feagans is an expert who's testifying by

2    video by agreement with the Defendants.  In that case, when

3    we -- we will rely on the video portions that we are playing

4    for you.  There are some things in the written designations,

5    foundation for certain documents, that we are not going to play

6    in the video; but in terms of what the United States is going

7    to rely on in findings of fact, we are only going to cite to

8    the video portions that we played for you.

9           **THE COURT:**  Okay.  Anybody have any objection to

10   that?

11          **MR. FARR:**  Your Honor, we have no objections.  We

12   haven't seen the transcripts from the videos yesterday, but I

13   am sure that Mr. Russ has included everything.  We have no

14   objection whatsoever to that coming in.

15          I don't think from our standpoint -- as to these two

16   witnesses, we ask that everything we designated with our

17   written document be played.  So I think our filed designations

18   should be the same as whatever this transcript is.  I'll let

19   Mr. Strach make any comments about the -- that's all we have

20   for right now, Your Honor.

21          **THE COURT:**  Okay.  I will admit both of these then,

22   679 and 680.  So they are admitted.

23          My concern remains my being able to know what it is

24   you claim I should be reading in the record, and so I really

25   don't want anything that's referred to now but read it later,

1  Judge.  Document 360 to, you know, Exhibit F, we want to move

2  it that in, but read it later, and then I don't keep a good

3  record of what's in and what's not in.

4          So I just need to make sure we keep a good record of

5  everything without duplication, for my benefit and for any

6  other Court that takes a look at this later.

7          **MR. RUSS:**  Yes, Your Honor.

8          **MS. O'CONNOR:**  Bridget O'Connor on behalf of the

9  NAACP Plaintiffs.  On that last point, if Your Honor would find

10 it helpful, we wanted to offer that after we've been through

11 the videos, we could provide you with the same highlighted

12 deposition excerpts that we had already put on file but

13 indicate in the margin perhaps the portions that have been

14 played in video, so that way you could -- if you were going

15 back to them, you could potentially skip over the video

16 portions which you've heard to the extent that they are broader

17 than the portions that are played in court.

18         **THE COURT:**  That would be helpful, if you can do

19 that.  Anything that's going to make it easier, because if

20 something is admitted and the deposition is relied upon but it

21 is not played in court, I will read it, and I'd rather not read

22 it twice.

23         **MS. O'CONNOR:**  We will plan for that.

24         **MS. GARRETT:**  Good afternoon, Your Honor.  The United

25 States will play now the video deposition of Dr. Lynne

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  Vernon-Feagans in sequence.  Dr. Vernon-Feagans is an expert in

2  the data and experiences of poor African-Americans in nonurban

3  North Carolina.

4          With your permission, I would like to deliver the

5  script that was just discussed for the videos played yesterday

6  for the Vernon-Feagans video, and that would be Plaintiffs'

7  Exhibit -- it's previously marked Plaintiffs' Exhibit 681, as

8  well as the exhibits for the Vernon-Feagans designation.

9          **THE COURT:**  All right.  Thank you.

10          **MS. GARRETT:**  Your Honor, I just wanted to clarify

11  something as we go through the deposition so you can

12  cross-reference what you have in your binder in front of you.

13  Deposition Exhibit 1 will be referenced in the video, and it is

14  Plaintiffs' Exhibit 240.  Deposition Exhibit 2, as referenced

15  in the video, is Plaintiffs' Exhibit 252.  Deposition Exhibit 3

16  is Plaintiffs' Exhibit 509 at pages 28 and 29 of Plaintiffs'

17  Exhibit 240.  Deposition Exhibit 4 is Plaintiffs' Exhibit 510

18  at pages 30 and 31 of Plaintiffs' Exhibit 240.  And Deposition

19  Exhibit 5 is Plaintiffs' Exhibit 511, also within Plaintiffs'

20  Exhibit 240.  Deposition Exhibit 6 is Plaintiffs' Exhibit  512.

21  And Deposition Exhibit 7 is Plaintiffs' Exhibit 513.

22          So throughout the video, she'll be referencing her

23  deposition exhibits, but those deposition exhibits are

24  cross-referenced with Plaintiffs' exhibits.

25          For the script in front of you, the portion of the

1   United States' direct that is counter-designated by Defendants

2   is page 13, and it is page 31, line 20, to page 32, line 25, of

3   the deposition.  We highlighted it in yellow for your

4   reference.

5           And, finally, the full deposition designations and

6   counter-designations for Dr. Vernon-Feagans have been provided

7   to the Court in matter Number 861 at ECF Number 293, 307, and

8   308.

9           **THE COURT:**  Okay.  So you are playing a portion of

10  the deposition today; is that right?

11          **MS. GARRETT:**  We are playing a portion of the

12  designated deposition.

13          **THE COURT:**  But the rest of the designations, are

14  they being moved into evidence as well?

15          **MS. GARRETT:**  After we play, we are going to ask for

16  the full designated portions of the deposition to be moved in.

17  And, Your Honor, just so I can tell you right now, it is a very

18  small additional portion.

19          **THE COURT:**  All right.

20          **MS. GARRETT:**  Okay.  So we can play the video.  Thank

21  you.

22      (Designated portions from the video deposition of

23      Dr. Lynne Vernon-Feagans was played.)

24          **MS. GARRETT:**  Your Honor, we think we might be having

25  a problem with the tape right now.  If we could pause this

1  particular witness at this time and continue with another

2  witness and pick up right there at 37, line 1.

3          **THE COURT:**  Is this on a disk or a tape?  What's the

4  format?

5          **MS. GARRETT:**  It is on a -- it is a series of clips

6  in the computer program.  If you would prefer to have it on a

7  disk --

8          **THE COURT:**  It doesn't matter to me.  I am just

9  curious as to the process.  All right.  Why don't you go ahead

10 and see if you can get that fixed, and we'll return to it.

11         **MS. GARRETT:**  Thank you, Your Honor.

12         **THE COURT:**  You may call your next witness.

13         **MS. MEZA:**  Good afternoon, Your Honor.  The United

14 States calls Dr. Charles T. Clotfelter to the stand.

15 **CHARLES T. CLOTFELTER, PH.D.,** PLAINTIFFS' WITNESS, at 2:36

16 p.m., being first duly sworn, testified as follows:

17                     DIRECT EXAMINATION

18 **BY MS. MEZA**

19 Q    Good afternoon, Dr. Clotfelter.  Can you please introduce

20 yourself to the Court.

21 A    I am Charles T. Clotfelter.  I'm a professor of public

22 policy, economics and law at Duke University.

23 Q    And how long have you held that position?

24 A    I have been at Duke since 1979.  Before that, I taught at

25 the University of Maryland.

1  Q    And, Dr. Clotfelter, could you tell us about your

2  educational background?  What degrees do you hold?

3  A    I have an undergraduate bachelor of arts from Duke

4  University.  I majored in history, graduated in 1969.  I have a

5  master's and a Ph.D. in economics from Harvard University, and

6  I received a Ph.D. in 1974.

7  Q    And as a professor of public policy and economics, what is

8  the focus of your work or your area of expertise?

9  A    Most of my research has been in the economics of education

10  and in something we call public economics.

11  Q    And what parts of your previous academic research are most

12  relevant to the work you did in this case?

13  A    Probably the work I have done on school desegregation and

14  on education in North Carolina.  In my dissertation, I looked

15  at some of the effects of school desegregation, and then I

16  published some articles.  And then in 2004, I published a book

17  called *After Brown:  The Rise and Retreat of School*

18  *Desegregation*.  I was published by Princeton University Press.

19  And in addition, I, with two coauthors, Helen Ladd and Jacob

20  Vigdor, have done a number of studies looking at data from the

21  state of North Carolina.

22  Q    And approximately how many articles have you published in

23  scholarly reviewed journals?

24  A    A little over 60.

25  Q    And are you a member of any professional organizations in

1  your field?

2  A    I am a member of the American Economic Association, the

3  Southern Economic Association, and the Association for Public

4  Policy and Management.

5  Q    Have you received any awards or special recognition in

6  your field?

7  A    I was president of the Southern Economic Association.  I

8  received, along with one other winner, the Gladys Kammerer

9  award for the best study in political science on national

10 policy in 2004 for that book on school desegregation.

11 Q    What was that book again?

12 A    What was the --

13 Q    The book.

14 A    The book was *After Brown:  The Rise and Retreat of School*

15 *Desegregation.*

16         **MS. MEZA:**  Your Honor, based on these qualifications,

17 and as more fully set out in Dr. Clotfelter's expert

18 declaration in this matter, the United States offers Dr.

19 Charles Clotfelter as an expert in the economics and history of

20 education in North Carolina.

21         **THE COURT:**  Any objection?

22         **MR. STRACH:**  No objection, Your Honor.

23         **THE COURT:**  He can give his opinions.

24 **BY MS. MEZA**

25 Q    Dr. Clotfelter, what were you asked to do for this case?

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  A    I was asked to look at disparities in educational

2  resources in North Carolina between black and white students,

3  to look at both past and present, to look at gaps in

4  achievement and educational attainment between blacks and

5  whites, both past and present, and to see whether there was any

6  link between those.

7  Q    And were you asked to perform any analysis of voting or

8  voting behavior?

9  A    No, I was not.

10 Q    And were you asked to perform any analysis of House

11 Bill 589?

12 A    No, I wasn't.

13        **MS. MEZA:**  Your Honor, may I approach?

14        **THE COURT:**  Yes.

15        **MS. MEZA:**  I just handed Dr. Clotfelter a copy of

16 Plaintiffs' Exhibit 237 and 249.  They are Dr. Clotfelter's

17 expert declaration and surrebuttal declaration in this matter.

18 **BY MS. MEZA**

19 Q    Dr. Clotfelter, are the exhibits I just handed you your

20 expert report and surrebuttal report that you prepared for this

21 case?

22 A    Yes, they are.

23 Q    Do these reports describe the analysis you undertook in

24 this case and your conclusions?

25 A    They do.

 1              **MS. MEZA:**  The United States moves to admit into

 2     evidence Plaintiffs' Exhibit 237 and 249.

 3              **MR. STRACH:**  No objection, Your Honor.

 4              **THE COURT:**  Admitted.

 5     BY MS. MEZA

 6     Q    Could you briefly summarize your overall conclusions?

 7     A    In a capsule, I found that the past disparities and

 8     current disparities have had both direct and indirect effects

 9     on achievement and attainment among citizens of North Carolina

10     and that there are linkages that have the effect of

11     perpetuating some of these gaps.

12     Q    And could you describe the steps you took in preparing

13     your report?

14     A    I reviewed what I considered the relevant published

15     material.  This was reports and books.  I looked at government

16     statistics, and I reviewed the results of published work that

17     I've done along with coauthors.

18     Q    And what primary sources of data did you use for your work

19     in this case?

20     A    Most of the data are U.S. Government, such as census.  And

21     we actually utilized a data set in our research based on

22     individual records from North Carolina students.  The State of

23     North Carolina in the 1990s made an agreement with Duke

24     University and the University of North Carolina to allow access

25     to individual student records, as long as the identities were

          NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  removed.  All of us that worked on it signed confidentiality

2  agreements, and this allows the analysis of detailed records

3  with large numbers of data points.

4  Q    And was that the North Carolina Education Research data?

5  A    That's right.  The name of the center is the North

6  Carolina Education Research Data Center.

7  Q    And are the methods you used widely accepted in the fields

8  of public policy and educational research?

9  A    Yes, they are very conventional.

10  Q    Dr. Clotfelter, did you examine the intergenerational

11  links between parental education and children's educational

12  outcomes?

13  A    I did for this report.  I found that it appeared in a

14  number of studies that we have done and others, even studies

15  that we really were focusing on something else, like

16  achievement.  So the answer is, yes, we studied it and others

17  have studied it.

18  Q    Can you explain the distinction between educational

19  achievement and educational attainment?

20  A    As used by researchers, achievement refers to usually the

21  results of standardized scores.  They could study what

22  somebody -- the knowledge that somebody has or the aptitude or

23  skills they have.  That's achievement.  And attainment usually

24  refers to the number of years of schooling or degrees obtained.

25  Q    So just going back to the topic I asked you about, did you

1  come to any conclusions about intergenerational links between

2  parental education and children's educational outcomes?

3  A    What I concluded from looking at this is that there were

4  both direct and indirect effects on these gaps as a result of

5  the differences in resources provided for blacks and whites,

6  and that led to differences in schooling, achievement, and

7  ultimately in socioeconomic status.

8  Q    Okay.  Why don't we look at an example.  Can you turn to

9  page 7 of your report.  It actually will come up on your

10 screen.  We are going to look at paragraph 13.

11 A    Okay.

12 Q    Can you briefly summarize what you are reporting in this

13 paragraph?

14 A    I think the main message in this is that we find that the

15 children of more highly educated parents do better, as measured

16 here by the achievement, the scores and the end-of-grade tests

17 for fifth graders in the state.

18     And this is a finding -- a lot of researchers have

19 found -- in this case, we found that the children of parents

20 who had finished high school did better than the children of

21 parents who didn't, and we found that those who finished some

22 college did better than the high school graduate kids, and that

23 the children of college grads did better than them.

24     And so the real message -- and this is, again, a finding

25 that a number of researchers have discovered -- is that there

1  is a systematic relationship between the educational attainment

2  of the parents and the achievement of the children.

3      Would you like me to talk about the numbers?

4  Q    Sure.  So you explain your conclusions using standard

5  deviation.  Could you explain what standard deviation is?

6  A    So in that paragraph, the findings are -- the way we

7  talked about it in the article was the standard deviation

8  differences from the lowest group, that is, the group with the

9  parents that had the least education.  So every one of those

10  categories is using that difference.

11      What I think would be the helpful takeaway is that -- is

12  to look at the difference between those second two numbers,

13  between the .539 and the .345.  These are results for -- the

14  highest one is the children of college graduates.  And the .345

15  is the result for the children of high school graduates.  The

16  difference between those two is approximately three-tenths of a

17  standard deviation.

18      Why do social scientists like us use standard deviation?

19  So let me just take a detour and answer that question because

20  it does seem strange.

21      The reason that social scientists use standard deviations

22  is because often they are comparing outcomes that have

23  different scales.  Imagine -- ask the question whether a

24  one-point increase in a scale is important.  If the scale were

25  a grade point average, the difference between a 2.0 and 3.0 is

1  an enormous difference.  But in the SAT, where the scores go

2  from 200 to 800, a one-point increase is insignificant.

3      So what researchers do is to use something called the

4  standard deviation, which is really a measure of the spread.

5  So in the case of the GPA, the grade point average, it is very

6  tight.  In the case of the SAT, it is broad.

7      What does .3 of a standard deviation mean?  It means the

8  following:  Children of high school graduates -- and we compare

9  them to children of college graduates -- only about 38 percent

10 of children of high school graduates will be higher than the

11 average for children of college graduates; whereas, 50 percent,

12 by definition, of the children of college graduates would be.

13     Another way to think about .3 -- the question you would

14 want to ask is, is this a big deal.  .3 of a standard deviation

15 is approximately the average achievement that a fifth grader

16 makes in a whole year.  So the difference between these two

17 groups is something on the order of what a child might learn in

18 a whole year.

19 Q    Dr. Clotfelter, have those conclusions, the conclusions

20 reached in your study regarding intergenerational effects, have

21 they been replicated?

22 A    It turns out they have been.  Before we ever did it, there

23 were studies that looked at this.  A review of the literature

24 that I quoted in the report cites the large number of studies

25 that show that there is this connection, statistical connection

1  between a child's achievement and their parents' educational

2  attainment.

3      There is also a good deal of evidence that links the

4  socioeconomic status of the parents, of which education is a

5  big component, and the attainment of children.  For example, if

6  you did a table of the percentage of young people that go to

7  college, that would be related to the socioeconomic status.

8  Q    Dr. Clotfelter, did you also examine the history of

9  educational discrimination in North Carolina for this case?

10 A    I did.

11 Q    And did you reach any conclusions as a result of your

12 examination?

13 A    The State of North Carolina provided -- systematically

14 provided less in terms of school resources to black children

15 than white children throughout most of its history, not all,

16 and that would be the main conclusion having to do with the

17 disparity in resources in the past in North Carolina.

18 Q    Can you discuss some of these disparities more

19 specifically?  What specific resources were --

20 A    It could be -- the disparities in resources could be

21 measured in a number of ways.  After 1900, for at least the

22 first five decades of the 20th Century, there were expenditure

23 differences that were systematically in favor of white

24 children.  The per-child expenditures in white schools was just

25 much higher than for black schools.  North Carolina was not

1  only the state where that's the case.

2      For example, in 1915, in the state of North Carolina, when

3  black children constituted 33 percent of all students, only

4  13 percent of expenditures in the state were devoted to schools

5  for black children.

6  Q    Let me turn to Table G in your report.

7  A    Okay.

8  Q    Well, before we do that, did these disparities in

9  expenditures, facilities and such, did they correlate with the

10 educational attainment of students who were subject to these

11 racially disparate resources?

12 A    They did.  One thing I could have mentioned about

13 expenditures, that was not only the way you could tell there

14 was differences.  You could look at the facilities for black

15 schools versus white schools.  You could look at the property

16 values per child.  There were differences.  There were even

17 differences in the curricula offered in black schools and white

18 schools.

19     You asked me to look at past gaps in achievement and

20 attainment.  And, yes, there were clear correlations.  In terms

21 of achievement, in 1930, the U.S. Census found in North

22 Carolina 21 percent of the black population was illiterate

23 compared to 6 percent of the white population in 1930.

24 Q    Why don't we turn back to Table G.  Can you tell us what

25 is reflected on this table about past racial gaps in

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 135 of 193

1  attainment?

2  A    Well, these are data from the U.S. Census.  The question

3  the Census asked in every household:  Did you finish high

4  school?  Did you finish college?

5       And in the state of North Carolina, if you look at the

6  first line, for example, in 1940, the difference of -- between

7  the two racial groups in high school completion was fairly

8  large.  It was 23 and a half percent versus 6 percent for

9  blacks.  For college graduates, 5 percent of the white adult

10 population had finished college; whereas, only 1.6 percent of

11 blacks had.

12          **THE COURT:**  Does high school graduate include GED or

13 not?

14          **THE WITNESS:**  I think, Your Honor, that in 1940, GED

15 may have been so insignificant.  I will bet you anything that

16 it does in the later years.

17          **THE COURT:**  In your chart Table G?

18          **THE WITNESS:**  Yes.  I am just -- I am trying to guess

19 what the census would include, and I think that they would.

20          **THE COURT:**  I don't want you to guess.  But if you --

21          **THE WITNESS:**  I couldn't tell you for sure.

22 **BY MS. MEZA**

23 Q   Dr. Clotfelter, did you also examine current racial gaps

24 in attainment?

25 A    Yes.  In fact, in this same table, you can go to year 2010

1  and, as you can see, the percentage gap in high school

2  completion is quite a bit smaller, but there are still gaps.

3  Consider, for example, the gap in the percentage of the adult

4  population that has a college degree.  It's almost 30 percent

5  for white 25-year-olds or older versus 17 percent for black.

6  Q    Let's turn to achievement.  Could you please refer to

7  Table H from your report.  Could you tell us what is reflected

8  on this table, Dr. Clotfelter?

9  A    These are results of a national achievement test that's

10 given by the U.S. Government called the national assessment of

11 economic progress -- I'm sorry of educational progress.  It is

12 given in different grade levels, and there is a reading and a

13 math test.  This is the fourth grade test in math, and it is

14 describing results in the state of North Carolina.

15     The makers of the test create several thresholds called

16 basic, proficient, and advanced.  Higher grades -- higher

17 scores might have a chance of being advanced; whereas, lower

18 scores might only have the chance of passing a basic or

19 proficient.

20     If you look at the proficient rate, there is a gap, and

21 there are gaps in each of these.  In the proficient level, it

22 says that 60 percent of white fourth graders in North Carolina

23 are passing this test at the proficient level compared to only

24 22 percent of African-American children in the fourth grade.

25 Q    And this is under the mathematics proficiency?

1  A    That's right, in math.

2  Q    What about in reading?  What does it reflect about the

3  proficiency in reading?

4  A    The qualitative findings are similar.  The gap is a little

5  bit smaller at the proficient level and just about the same at

6  the advanced level.

7  Q    And are these gaps exclusive to fourth graders?

8  A    No.  They are observed at other levels.  One of the

9  studies that we did with North Carolina Education Research Data

10  Center data, we looked at the end-of-grade tests that are

11  administered in this state in reading and math for every grade

12  from third grade until eighth grade.  We measured these gaps,

13  and they are substantial over this grade span, and they don't

14  get any smaller from the third grade to the eighth grade.

15  Q    Do the racial disparities in the distribution of resources

16  to public schools still exist today?

17  A    They do.  They are not as extreme as they were.

18  Q    Can you provide some examples?

19  A    In our work, let me give a couple.  One of the things we

20  did was to utilize our administrative data to actually pair

21  each student with -- per teacher, and this is for seventh

22  grade.  So we took the seventh grade end-of-grade math test and

23  from that information we were able to identify the teacher and

24  the student.

25      And we asked the question:  What percentage of students

1  have a brand-new teacher, that is, a teacher with no previous

2  experience?  And we found that there is a racial gap that black

3  children in the seventh grade in North Carolina have about a

4  12 percent chance of a having a brand-new teacher and white

5  students have about an 8 percent chance.

6       We also broke up schools by their racial composition.  We

7  split all the schools in the state at each level into quartiles

8  by the percentage of minority students; and if I were to

9  compare the schools with the highest percentage minority with

10 the lowest percentage, there are systematic differences in the

11 kinds of teachers that they get.

12      The schools with high minority pupils have a higher

13 percentage of inexperienced teachers.  They have teachers that

14 scored lower on the test, the state test scores.  They have a

15 smaller percentage of teachers who are nationally board

16 certified, and they have a smaller percentage of teachers who

17 went to a school that's ranked by Barron's as a competitive

18 school.

19      So, systematically, the schools with a high percentage

20 minority have teachers with less impressive or weaker

21 credentials.

22 Q    And when you refer to racial imbalance in schools in your

23 report, you are speaking about this low minority/high minority

24 distinction?

25 A    Yes.  We actually have done studies specifically to look

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 139 of 193

1  at how racially balanced the schools are in each county or each

2  school district.  And the way we defined this was we used an

3  index that ranges from zero to one that shows how balanced the

4  schools are.  If every school had the same racial composition,

5  the index would be zero per zero, or segregation is another

6  term used.  If the schools were completely segregated by race,

7  there would be an index of one.  And so we looked at this index

8  over time.

9  Q    What is the relationship between racial imbalance in

10 school and the distribution of resources?

11 A    Well, it's important in the following sense:  Without

12 racial imbalance, it's almost impossible to have the kind of

13 disparities in terms of the teacher qualifications and their

14 relationship to race.  Having schools that are racially

15 imbalanced doesn't guarantee that there will be disparities,

16 but it allows that to happen.

17 Q    And has the State of North Carolina ever tried to

18 compensate for this imbalance in resources between high

19 minority and low minority schools?

20 A    Well, the State of North Carolina Department of Public

21 Instruction, like researchers in general, realize that these

22 disparities in teacher quality come about to a large extent

23 because there is a teacher labor market and teachers are

24 allowed to -- they are not required to stay at the school

25 forever.  They tend to want to teach in schools that have more

1  affluent populations and other characteristics.

2       In order to -- and so the State realizes that some of the

3  poorest schools in the state are served by a preponderance of

4  inexperienced teachers.  So in the year 2000, they instituted a

5  program that would pay $1,800 a year to any teacher in a

6  certain set of schools that had low income or low achievement

7  if these teachers were in one of three fields.  They were math,

8  science, or special Ed.  And so for three years, this bonus

9  program was in place.

10      We did a study to see whether that bonus program was

11  effective in keeping teachers identified to be highly important

12  in the schools; and we did find that as a result of the bonus

13  program, the attrition rate for these teachers was decreased.

14  Q    So it was fairly successful?

15  A    So by some measures, it was -- it certainly had a

16  statistical effect, and I think some people would say it was

17  successful, yes.

18  Q    Is the program still in place?

19  A    No, it was closed down after three years.

20          **MS. MEZA:**  Thank you, Dr. Clotfelter.  I have no

21  further questions.

22          **THE COURT:**  Any cross?

23          **MR. STRACH:**  Yes, Your Honor.  Thank you.

24                    CROSS-EXAMINATION

25

Case 1:13-cv-00658-TDS-JEP  Document 348  Filed 08/12/15  Page 141 of 193

1  **BY MR. STRACH**

2  Q    Good afternoon, Dr. Clotfelter.  Good to see you again.

3  A    Good to see you again.

4  Q    My name is Phil Strach.  As you recall, we took your

5  deposition in April, I believe, of this year?

6  A    Yes, sir.

7  Q    And I represent the Defendants, and I have a few questions

8  to ask you about your testimony and your report.

9       I wanted to make sure it's clear.  You referenced this at

10 the very beginning of your testimony, Dr. Clotfelter.  You were

11 not asked by the Government to study the extent to which lower

12 education attainment by blacks affects their ability to

13 register and vote, were you?

14 A    Right.  As I testified, I was not asked to do that.  I was

15 asked to look at disparities in resources and gaps in

16 achievement.

17 Q    All right.  And as we discussed in your deposition, when I

18 use the term "Senate Factors," you don't -- do you know what I

19 am talking about?

20 A    I have heard them.

21 Q    All right.

22 A    I have heard of them.  I don't know what they are.

23 Q    And you certainly weren't giving an opinion in this report

24 on anything related to the Senate Factors; correct?

25 A    Unless I did it unknowingly, because I -- I was not asked

1  to do that.

2  Q    All right.  And you have not given any opinion in this

3  report on the ability of African-Americans to comply with the

4  existing 25-day rule for registering to vote; correct?

5  A    That is correct.

6  Q    And you have not given any opinion on the ability of

7  African-Americans to comply with voting in their correct

8  precinct; is that correct?

9  A    Right.

10 Q    Now, regarding the data that you used itself for the

11 conclusions that you gave in this case, I wanted to confirm

12 with you, your data consists of data from the public school

13 system; correct?

14 A    That is true.  These data are supplied by the Department

15 of Public Instruction, and so they have jurisdiction only on

16 the public schools of North Carolina.

17 Q    All right.  So the data does not contain data from private

18 school students?

19 A    Correct.

20 Q    Or homeschooled students?

21 A    Correct.

22 Q    And do you have any idea of what percentage of blacks

23 students are in private schools or homeschools?

24 A    I think you might have asked that before, and I didn't

25 know it and I still don't.  I think I might have said that in

1  the U.S., about 10 percent of students at the K-12 level go to

2  private schools, but I really don't know what it is.

3  Q    Okay.  And, of course, your report also does not account

4  for any learning or education that students of whatever race

5  may do or be provided on their own outside of the school

6  system?

7  A    Well, probably it does.  So these students are taking

8  achievement tests at the end of the year.  So usually taking

9  them in May, and they are presented with questions and if they

10  were read to home, if they did extra studies at home, if they

11  did their homework, all those things would be reflected in how

12  well they did.  Is that what you were getting at?

13  Q    Yes, thank you.  So the other concept I wanted to discuss

14  with you, just to be clear, is you have concluded that there is

15  a correlation between disparities in school resources and

16  racial gaps in educational attainment; is that correct?

17  A    Yes.

18  Q    Okay.  You have not concluded nor can you conclude that

19  there is any causal relationship; is that right?

20  A    This might bear a couple of minutes on my answer because

21  in social science, as actually in natural science, causation

22  depends -- really demands both correlation and then a theory

23  about why the correlation happens.  If I stuck my finger into

24  boiling water and it was burned, there would be a correlation

25  between that act and it having a burn on it, but whether it was

1  caused really is a function of what is our theory about the

2  molecules and their effect.

3        If other research is confirmatory that this is a cause,

4  then you'd have a stronger argument, but it's always an

5  argument.  So in the case of, let's say, the education of the

6  parents and the achievement of children, what I was reporting

7  is a correlation, and that's the only thing that is as firm as

8  this table.  But there is other research that -- used by

9  people, like ethnographic researches, who go into homes and

10 observe the difference between homes where the parents have

11 more education.  They observe the number of words that the

12 children have.

13       And so I would say that the statistics -- the only thing

14 that you can say for sure is that it's a correlation, but the

15 researchers in the body of social science research would tend

16 to say it looks like it's causation because we can't think of

17 other reasons why this might have happened.

18       If what -- I think the most common thing in economics

19 these days is to say there is a correlation, but there is

20 probably some kind of error.  There is something else going on

21 that explains that.  And in the case of the educated parents

22 and the high-achieving children, it is really hard to think of

23 what other things might be happening.

24       So, again, I think the answer would be we can say for sure

25 it's correlation because it's on the computer printout.

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  Whether it's causation is in the eye of the researcher; but I

2  think in this case, it's a pretty good argument that it's

3  causal.

4  Q    All right.  And you discussed a period of time, in fact, I

5  believe in the 1800s, when per capita education spending was

6  equitable and black voter participation was actually higher

7  than whites.  Did I get that right?

8  A    This was in the period, in fact, that was described in

9  earlier testimony today, in the late 19th Century.  The

10 statistics that I present show that the ratio of black to white

11 sometimes went over one, sometimes went under one.  So it did

12 vary.

13      It was when it got to 1900 when there was really a

14 consistent pattern of per capita spending in white schools of

15 being higher.

16 Q    Okay.  But there was a -- certainly a correlation between

17 per capita education spending and black voting participation in

18 that time period; correct?

19 A    There seemed to be.  I don't know how long it was, but

20 there did seem to be in some of those years.  I would have to

21 go back and look at precisely the years that you are referring

22 to, but I do remember that before -- this is based on the

23 Hartzband study of expenditures in North Carolina, I think.

24 And that before 1900 -- there were years going on both sides,

25 but beginning in 1900, it was all one way.

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  Q    All right.  And I think you would agree with me that in

2  the last 20 years in North Carolina, there haven't been any

3  actual spending disparities in terms of actual of expenditures

4  because schools have been integrated; correct?

5  A    Well, it's basically we don't know because the people that

6  ran the schools segregated them by race until 1954 and actually

7  kept statistics a little longer than that and that made it easy

8  to look at spending disparities, but now that's not the way

9  schools are set up.

10      So there may be some disparities, but we would never be

11 able to discover it.  So what you're left with is to look at

12 other measures like, you know, what kind of teacher people

13 have.

14 Q    Right.  But because the schools are integrated, you cannot

15 say that there's any actual spending expenditure disparities --

16 A    Yeah, there's no way; I agree.

17 Q    In fact, there are no -- unlike in the past, there are no

18 longer identifiable black schools and white schools as you

19 said; correct?  Is that right?

20 A    Thankfully, yes.

21 Q    All right.  So there has been a great deal of progress in

22 terms of integrating at least the public schools?

23 A    There have been, yes.

24 Q    And there's been a lot of progress in the level of

25 expenditures themselves for the public schools; correct?

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1  A    I don't look at that, but I think that's the case.  Even

2  when you hold inflation constant, I think it's gone up.

3  Q    In fact, in your report, as I recall, Dr. Clotfelter,

4  there was a chart that indicated that even earlier than 1959,

5  the salary of black teachers began to overtake that of white

6  teachers?

7  A    Right.  There was a table that looked at the average

8  salary for black teachers and white teachers.  And at some

9  point was it -- you have it in front of you.  Probably around

10 1950 --

11 Q    Right.

12 A    -- or something, the number for blacks went above the

13 number for whites.  Probably the way to think about that is

14 that in the black community, in the black labor market, the

15 number of occupations open to black individuals was really

16 limited.  It turned out to be the ministry, the law, medicine,

17 and education, and, whereas, opportunities for whites was much

18 more extensive.

19     So it was conceivable that once the State began to pay

20 comparable salaries based on qualifications and degrees, if

21 black teachers had more master's degrees, that would explain

22 it, or stayed in their jobs longer because the salaries are

23 usually based on experience and degrees.

24 Q    Okay.  And the numbers in your report bear that out given

25 the increases; correct?

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 148 of 193

1  A    They would certainly be consistent with that story, yeah.

2  Q    Right.  Okay.  And then sort of the other side of this, I

3  wanted to ask you about a question about the gap in college

4  graduates that you just testified about a moment ago.

5       Isn't it true that -- and I believe that was Table G.

6  A    G, uh-huh.

7  Q    It appeared to me in looking at Table G that the gap

8  between blacks and whites graduating from college has actually

9  gotten wider recently; correct?

10 A    Yeah, so it is always a question about how you measure

11 these gaps.  There's two ways to do it.  One would be to

12 subtract one from the other, and the gap would have gotten

13 bigger that way, but the other way is look at the proportional

14 difference.  And so you take the ratio of the white to the

15 black and -- and in that way, it's gotten smaller

16 proportionately.  So it is kind of how you want to look at it.

17      But, certainly, the rate of college completion has

18 increased for both blacks and whites.

19 Q    Right.  And so to the extent that you can measure it in a

20 way that shows that it's -- that the gap has widened, that

21 certainly can't be explained by any official discrimination by

22 the State; correct?

23 A    Well, again, it's -- whether it's widened or narrowed,

24 it's still there, and that comes up from subtracting but not

25 from dividing.  But the question has to do is that the result

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  of official discrimination?

2  Q    Right.

3  A    I think the role of official discrimination is probably

4  negligible.

5  Q    And, in fact, isn't it true, as we discussed in your

6  deposition, that with respect to this disparity anyway,

7  something other than State action is contributing to the

8  disparity?

9  A    I think in a lot of things.  Certainly, the State is not

10  the only actor.

11  Q    All right.  And isn't it also true that your report showed

12  that the Hispanic high school diploma rate is less than the

13  black high school diploma rate?

14  A    It could.  Could you point me in the direction of that?

15  Or is it in 41?

16  Q    Sure, let me find it.

17  A    Okay.

18  Q    Paragraph 40, I believe.

19  A    Okay.

20  Q    So the percentage for black adults was 79.9 percent, and

21  for Hispanics it was 53.9 percent.  Let me make sure I have

22  that.

23  A    I am just trying to figure out what this is a rate of.

24      Okay.  There is the percentage of adults 25 and older who

25  have a high school diploma or the equivalent.  And so for

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 150 of 193

1 whites, it was 88.1 percent, for blacks it was 79.9 percent,

2 and for Hispanics it was 53.9 percent, I think, in 2010.

3 Q    So the high school diploma rate for Hispanics was quite

4 significantly lower even than for blacks.

5 A    Yes, it was.

6 Q    Is that fair to say?

7 A    Yes, it was.

8 Q    And are you aware of any history of official

9 discrimination against Hispanics comparable to the history of

10 official discrimination against African-Americans?

11 A    I don't think anything comes up to the level of official

12 discrimination against blacks, but there was and has been a

13 significant discrimination against Hispanics.  There are, of

14 course, a ton of different circumstantial reasons why those

15 might be different.

16     But in answer to your question, nothing comes up to the

17 level of discrimination against black people.

18 Q    Right.  And so there may be a ton of other reasons to

19 explain that outside of official discrimination; correct?

20 A    Yes, indeed.

21 Q    In paragraph 41 of the report, you report the scores of

22 students on the NAEP, I believe, and the scores of Asian

23 students were higher than white students on the NAEP; is that

24 correct?

25 A    For the proficient level in math, they were.  They were 67

1  for Asian and 60 for white.  Advanced, it was 30 for Asian and

2  12 percent for white, yes.

3  Q    All right.  And there certainly hasn't been any history of

4  preferences for Asians over whites in North Carolina.  Would

5  you agree with that?

6  A    No history of preferences.

7  Q    In fact, there may be a history of official discrimination

8  against Asians; correct?

9  A    Well, in the United States there has been.  I am really

10 not sure if we would say the same about North Carolina.  I just

11 don't know, but certainly in the United States there has been.

12 Q    All right.  So the history of discrimination then cannot

13 fully explain the differences in these test scores; is that

14 correct?

15 A    That is abundantly correct.

16 Q    And, now, in the scores that you reported, Dr. Clotfelter,

17 in Table H, which I believe we were just talking about -- this

18 is the performance on the NAEP for fourth graders in 2013 --

19 isn't it true that what you were doing here through this table

20 is simply documenting the differences in the scores rather than

21 trying to provide an explanation for why the differences exist?

22 A    Correct.

23 Q    And I think we also talked about the issue of what

24 causes -- what might cause these differences in terms of race

25 versus poverty, and I think you would agree with me, wouldn't

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  you, that you have not attempted to tackle the answer to the

2  question of whether it's race or poverty that better explains

3  the differences in these test scores?

4  A    No, not in my report.

5  Q    All right.  To do that, you would have to do a fairly

6  sophisticated significant quantitative analysis; correct?

7  A    What you would have to do is to try to ferret out the

8  independent effects of racial identification versus income or

9  socioeconomic status; and because they are correlated, it's a

10 difficult statistical challenge, but I didn't try to do it.

11 Q    All right.  Do you think it could be done?

12 A    People have done -- you know, they've tried, but I think

13 it's ultimately, at the end of the day, you say there is some

14 contribution, but we have this thing called -- I'm afraid to

15 say it -- multicollinearity, and that is when two variables go

16 together so often, you don't know which one is responsible; and

17 that's the thing you run into.

18 Q    Okay.  All right.  I want to talk a little bit about some

19 of the testimony you have given on this notion of racial

20 imbalance in the schools.

21 A    Yes.

22 Q    I think you talked about it with respect to teachers,

23 et cetera, and I just want to focus on a couple of things.

24      One of the things that we talked about in your deposition,

25 as I recall, that I think may have been in your report was the

1  difference, say, for instance, in the Charlotte-Mecklenburg

2  schools.  They did not have a policy of assigning students

3  based on race to schools.  They let the -- they have more of a

4  neighborhood schools approach where they let the parents have

5  more say in terms of where the kids go to school.  Is that a

6  somewhat accurate description of how they do it in Charlotte?

7  A    My rudimentary understanding of law here is that around

8  1990, led by the Fourth Circuit and then the Supreme Court,

9  basically said there shall be no assignment of students by

10  race, even to the extent of saying we are going to try to keep

11  these schools within some bound.  So Charlotte does not assign

12  by race, nor does -- nor can any district that -- unless it is

13  under a previous Court order can do any assignment by race.

14  That would be I think -- so it would be accurate to say they

15  don't.

16  Q    Well, let me ask you this:  So there is no official

17  policy, state policy or otherwise, requiring students to be

18  assigned based on race in the Charlotte-Mecklenburg schools;

19  correct?

20  A    I think that would be correct.

21  Q    Okay.  And so to the extent that there's a racial

22  imbalance in where the students end up, that's not a product of

23  any action by the State; correct?

24  A    Well, I mean, yes and no.  So let's think about what the

25  State has its fingerprints on here.  I don't know if you are

1  counting Charlotte-Mecklenburg schools as part of the State,

2  but certainly the Government.  So one thing that the State is

3  doing is constraining the choices of individual parents.

4  Before, there was an assignment to a school.  Under the plan

5  that was adopted a few years ago in Charlotte-Mecklenburg,

6  parents are given a choice of schools within a quadrant, which

7  is kind of desegregation, a ruling that a number of places did,

8  including Winston-Salem at some point.

9      But the State is also allowing -- secondly, allowing

10  school districts to have supplements and so that the more

11  affluent districts, like my home county and my neighboring

12  county of Chapel Hill, has an additional amount.  So that

13  really encourages the more experienced teachers to seek jobs in

14  certain school districts.

15      And so -- and I guess that to the extent that the State

16  follows the usual norm of allowing teachers to go anywhere they

17  want and there is a place, again, there is the opportunity for

18  those disparities to arise.  So it's minimal, but it's there.

19  Q    Okay.  So is it -- in the case of the

20  Charlotte-Mecklenburg schools, for instance, in the school

21  system failing to constrain the private choices of the parents,

22  isn't it more accurate to say that that is State inaction, not

23  actual State action?

24  A    I guess there might be a semantic aspect to this.  It is

25  certainly not the same as writing a letter and saying you are

1 going to go to Myers Park school.  So it's just setting some

2 parameters within which you can operate.

3      If you think about -- something that you might think of as

4 real State action, we impose an income tax.  Well, the people

5 that have the tax imposed on them have the choice about whether

6 they are going to work or not and how much they are going to

7 work.  So there is certainly some private action involved.  So

8 I don't know if we call that State action or inaction when the

9 Government allows me to pay the amount of tax based on how much

10 I earn.

11 Q    Okay.  And similarly, with the example of the teachers, in

12 terms of the racial imbalance that you discussed in terms of

13 the degree to which white and black students are exposed to

14 ineffective or weaker teachers, is the way I think you put it

15 in your report, so the State could impose a policy, couldn't

16 they -- they could actually impose a rule that said that every

17 student had to rotate through every teacher's classroom?

18 A    Right.  That was the idea that you suggested in the

19 deposition.  Yes, and it's an inventive that would be a very

20 expensive and disruptive and probably unpopular thing, but --

21 policy, but that would effectuate what you're saying.

22      The other approach that would essentially have the same

23 effect is to mandate that the schools all be racially balanced,

24 because then it would be impossible for black children on

25 average to have teachers with systematically different

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  qualifications than the ones with whites.

2  Q    Okay.  So the disparities that currently exist are really

3  caused by the policy of allowing the teachers to choose

4  themselves what school to go to; correct?

5  A    That is largely, and that plus the differences in spending

6  that's allowed by the local additions.

7  Q    So the State action here or, as I put it, State inaction

8  is really simply the failure to constrain the private decisions

9  of teachers to -- in terms of where they want to teach?

10 A    Well, another way of saying it is the failure to provide

11 incentives for teachers to teach in these hard-to-staff

12 schools.  The experience of the State in the three years that

13 they had this 1,800-dollar bonus showed, A, that the

14 legislature was concerned about this problem and, second, that

15 the policy could be effective.  And so I think you could look

16 upon it and say that by taking this away, it's State inaction,

17 but it's got an asterisk to it because they knew that a certain

18 action would be effective.

19 Q    All right.  I want to ask you about that in just a second,

20 but before I get to that, let me just ask one more question

21 about the teachers.  Do you agree with me there's no evidence

22 that the public schools are intentionally assigning novice

23 teachers to classrooms with black students?

24 A    I think that's right.  One of the things that we did in

25 our study was to look at whether there were imbalances within

1  elementary schools, for example.  And to their credit, the

2  principals of the schools of North Carolina are pretty darn

3  fair in distributing within their schools -- I'm not sure

4  that's responsive, but I would agree with you.

5  Q    Okay.  And then with regard to this bonus program, using

6  bonuses to teachers -- to attract strong teachers to schools

7  with high proportions of minority students, you would agree

8  with me, wouldn't you, that the failure to have a bonus policy

9  like that in place is not a policy of discrimination but rather

10 the lack of a policy of affirmative action in terms of trying

11 to get the teachers in there?

12 A    Well, the first thing I would say -- I would amend what

13 you said.  It's a policy not only to attract and recruit, but

14 also to retain.  So that was what it was used.  So it was

15 applied to anybody that was already teaching.  And is the

16 question whether this is a failure of -- to be affirmative,

17 yes.

18 Q    Yeah.  Is it a policy of discrimination, or is it, rather,

19 a failure to engage in affirmative action to provide incentives

20 to the teachers --

21 A    I think it would be hard to argue that it's a policy of

22 discrimination.  It's a failure to do something that was proven

23 to be effective and which probably a lot of people thought

24 ought to be done, and I think there still are educators who

25 believe that the hard-to-staff schools is a continuing problem,

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  not just in North Carolina but in other places, and a couple of

2  school districts actually have tried their own ways to keep

3  those good teachers in the hard-to-staff schools.

4          MR. STRACH:  Thank you, Your Honor.  That's all the

5  questions I have.

6          THE COURT:  Any redirect?

7          MS. MEZA:  I just have a couple more questions.

8                    REDIRECT EXAMINATION

9  BY MS. MEZA

10  Q    Dr. Clotfelter, given your conclusions about

11  intergenerational links between parental educational attainment

12  and children's achievement, the State's history of official

13  discrimination and State action has played a role in the

14  continuing gaps -- racial gaps -- has that played a role in the

15  continuing racial gaps in high school graduation rates and

16  college graduation rates?

17  A    I think it's hard to escape that conclusion.  Because of

18  this strong intergenerational link that happens within each

19  pair of parents and children, past disparities have a way of

20  living on.

21          MS. MEZA:  Thank you, Dr. Clotfelter.

22          THE COURT:  Hold on just a minute, please.

23          Can I refer you to paragraph 13 of your report, if

24  you have that?

25          THE WITNESS:  Yes.

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 159 of 193

1    **THE COURT:**  And you say in the math test, for

2  example, students with at least one parent who graduated from

3  high school.  Does that include students with -- in two-parent

4  households?

5           **THE WITNESS:**  The way --

6           **THE COURT:**  What does that mean?

7           **THE WITNESS:**  The way the State assessed the parental

8  attainment of parents was to ask about the more highly educated

9  of the parents.  So for children with one parent, they had an

10 answer.  For children of two parents, then they would take the

11 greater of those.  So that's the way the question was asked.

12          **THE COURT:**  Okay.  And then the next paragraph you

13 say that these various differences were controlled for based on

14 a number of factors.  Is marital status a factor that you

15 reviewed?

16          **THE WITNESS:**  I do not think so, and I think the

17 reason was is that I don't think that this information appears

18 in the student records that we were using.  But I -- I think

19 that's the answer, but I am not -- do I list it here?  It's --

20          **THE COURT:**  I didn't see it on the list.  That's why

21 I asked.

22          **THE WITNESS:**  I think it's not in there.  I could

23 look, but I'd have to look at one of my --

24          **THE COURT:**  Have you ever examined that?

25          **THE WITNESS:**  I don't think so, and I think the

1 | reason is because it's not in the North Carolina Education
2 | Research Data Center.  I will bet you somebody has -- again,
3 | I'm saying -- I would speculate --
4 |         **THE COURT:**  Okay.  I don't want you to speculate.
5 |         **THE WITNESS:**  -- that some people have done it, yeah.
6 |         **THE COURT:**  Now, if I understood you correctly, you
7 | said that some of the schools that had more African-American
8 | children -- I don't know if you said predominantly or what you
9 | said, but more African-American children tended to have newer
10 | teachers.  Was I right about that?
11 |         **THE WITNESS:**  Okay.  So there was two findings.  One
12 | didn't look at the schools.  It identified each child with his
13 | or her teacher; and in that study that was of seventh graders
14 | in 2001, we found that it was more likely for black children to
15 | have a math teacher who had never taught before that year.  And
16 | it was something like 12-point something versus 8.3.
17 |         And then the other study didn't look at the -- that
18 | connection between the student and the teacher but, rather,
19 | looked at entire schools and split up the schools in terms of
20 | racial composition, and then said let's look at the teachers in
21 | these schools.  So in that case, there wasn't the one-to-one
22 | connection.
23 |         **THE COURT:**  What is the racial makeup of the teaching
24 | pool in North Carolina?  Do you know?
25 |         **THE WITNESS:**  I think it is -- has a lower

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 161 of 193

1  African-American percentage than the students, but I couldn't

2  tell you.

3          THE COURT:  Okay.  I guess what I was confused by is

4  I thought you said that since 19 -- sometime in the 1950s, the

5  African-American average teacher salaries has exceeded that of

6  non-African-Americans.  Is that correct?

7          THE WITNESS:  We only know that through, I think,

8  about -- it might be the late '50s, and then that number has

9  not been published.  I guess it could be calculated, but I

10 haven't seen it.

11         THE COURT:  Okay.  So how long did that average

12 exceed that of non-African-Americans?

13         THE WITNESS:  I don't know.  Because in the data that

14 I present in some -- one of these tables, it begins about --

15 something like after World War II, and then it goes until the

16 end of segregated schools, and so I don't know how long it

17 lasted after that.  It is something that could be determined.

18         THE COURT:  Okay.  Does this data tell us anything

19 about whether African-American teachers are teaching in schools

20 that are not predominantly African-American, that they're for

21 some reason choosing other schools?

22         THE WITNESS:  I have forgotten exactly what we found.

23 My impression is that we found that these preferences were true

24 for all teachers, but less so for minority teachers.

25         THE COURT:  All right.  Thank you.

1          Does anybody have any questions in light of my

2    questions?

3              MS. MEZA:  No, Your Honor.

4              MR. STRACH:  No, Your Honor.

5              THE COURT:  All right.  Thank you, sir.  You may step

6    down.

7          We are going to take our afternoon break for

8    20 minutes, and then we'll get back at 4:00.

9        (The Court recessed at 3:42 p.m.)

10       (The Court was called back to order at 4:07 p.m.)

11             THE COURT:  Mr. Shapiro?

12             MR. SHAPIRO:  Good afternoon, Your Honor.  Your

13   Honor, the United States calls as its next witness Ms. Terrilin

14   Cunningham.

15   TERRILIN C. CUNNINGHAM, PLAINTIFFS' WITNESS, at 4:07 p.m.,

16   being first duly affirmed, testified as follows:

17                          DIRECT EXAMINATION

18   BY MR. SHAPIRO

19   Q    Good afternoon, Ms. Cunningham.

20   A    Good afternoon.

21   Q    Ms. Cunningham, can you state your full name, please.

22   A    My name is Terrilin Claiborne Cunningham.

23   Q    Ms. Cunningham, where do you live?

24   A    I live in Concord, North Carolina.

25   Q    And have you lived anywhere else?

1  A    Yes, I have.

2  Q    Can you tell us where?

3  A    I was born and raised in Missouri, St. Louis, Missouri.

4  I've lived in Pennsylvania, Pittsburgh Metropolitan Area.  And

5  I've lived in Maryland, Baltimore, and some of the other areas

6  in Maryland before moving here to North Carolina.

7  Q    Okay.  And when did you come to North Carolina?

8  A    I came here at the end of May, 2012.

9  Q    And why did you come to North Carolina in 2012?

10  A    I moved here because my daughter and my son-in-law lived

11  here, and I had lost my home and my business that I started

12  had -- was on its way out, and I lost all of my assets and so I

13  moved here to live with my daughter and my son-in-law to help

14  me get back on my feet.

15  Q    And are you still living with your son-in-law and your

16  daughter now?

17  A    No.  I moved out.

18  Q    When did you move out?

19  A    I moved out February 1 of 2013.

20  Q    And so now you have your own place?

21  A    Yes.

22  Q    And how do you support yourself?

23  A    Well, I have three jobs.  I'm an insurance agent, I'm also

24  a personal care attendant, and recently I started a business as

25  a Mary Kay consultant.

1   Q     And you are an insurance agent for what company?

2   A     For Optum Services, and that's a subsidiary of United

3   HealthCare.

4   Q     And you are providing personal care for what -- what

5   business?

6   A     For Elite Home Health Care.

7   Q     And what are the hours of those different jobs?

8   A     Well, Elite, I work from 8:00 until 11:00 Monday through

9   Friday.  And then I work --

10          **THE COURT:**  Is that 8:00 a.m. to 11:00 a.m.?

11          **THE WITNESS:**  Did I say 8:00 p.m.?

12          **THE COURT:**  No, you didn't say either.  I am asking.

13          **THE WITNESS:**  It is 8:00 a.m. until 11:00 a.m. Monday

14   through Friday.  And then I work Monday, Tuesday, and Wednesday

15   from 12:00 p.m. until 11:00 p.m. at Optum Services.  And also I

16   work Saturday evening from 12:00 p.m. until 11:00 p.m.  And

17   then my Mary Kay business, I do that on Thursday evenings,

18   Friday evenings, and an occasional Saturday morning.

19   **BY MR. SHAPIRO**

20   Q     So if I understood you correctly, your job for Optum

21   Services, which is the medical insurance job, is that a

22   40-hour-a-week job?

23   A     Yes, I work 10-hour days, four 10-hour days.

24   Q     Given that you have that full-time job, why is it that you

25   have the other two jobs?

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  A     So that I can afford to live.  So I can pay rent and

2  house -- I mean, rent and car and food.

3  Q     And how much does your full-time job with the medical

4  insurance company pay?

5  A     You mean hourly or per week?

6  Q     Per week.

7  A     Before or after taxes?

8  Q     Let's say before taxes.

9  A     $600.

10 Q     And what type of flexibility do you have in that job in

11 terms of if you are late to work or if you need to take time

12 off?  How does that work?

13 A     There is not room for error, not a lot of room for error

14 on that job when it comes to working your assigned hours.

15 Q     What happens if you are, let's say, late by four minutes?

16 How does that work?

17 A     That is half of an occurrence.

18 Q     And explain to us how these occurrences add up or how they

19 work.

20 A     Well, if you are late for four minutes, you get half of an

21 occurrence.  If you are late for 15 minutes, you get a full

22 occurrence.  Once you get three occurrences, you are put on

23 corrective action; and if you get another occurrence, you are

24 fired.

25 Q     Ms. Cunningham, before I move on, you were telling us

1  about your family.  Just to clarify, how many children do you

2  have?

3  A    I have four children.

4  Q    And are you married?

5  A    Not anymore.  I am divorced.

6  Q    Now, Ms. Cunningham, I would like to ask you a few

7  questions about your voting experiences.

8  A    All right.

9  Q    Ms. Cunningham, do you vote?

10 A    Yes, I do.

11 Q    How often do you vote?

12 A    As often as I possibly can.

13 Q    And why do you vote as often as you can?

14 A    I'm not always -- I can't always afford the time to go

15 vote because of the way that I work.

16 Q    Ms. Cunningham, you said you try to vote as often as you

17 can.  Why are you making that effort?

18 A    Because I believe in voting.  I believe that I have a

19 voice, and my voice counts.

20 Q    And how does that belief relate to your -- the way you

21 were raised and your family experiences?

22 A    My mother when I was a child -- my mother worked for the

23 polls in St. Louis.  On other years, she volunteered to pick

24 people up and take them to the polls.  I rode in the car all

25 day listening to people talk about voting and how important it

1   was to vote, and that just kind of got into me; and as I got to

2   be voting age, I made sure that I voted.

3       When my children got to be voting age, I took them for

4   their first vote, made sure that they understood the importance

5   of having a voice and expressing their voice.

6   Q    And, Ms. Cunningham, have you ever voted by mail?

7   A    No.

8   Q    And why not?

9   A    Because I want the experience to walk in, pull the lever,

10  see my ballot go into the ballot box and know that my vote is

11  being counted.

12  Q    Ms. Cunningham, you said that you came to North Carolina

13  in 2012.  Have you voted since you came to North Carolina?

14  A    Yes, I have.

15  Q    And when have you voted?

16  A    I voted in 2012, the national election, and then I voted

17  in 2014 in November, the November election.

18  Q    Okay.  When you refer to the November 2012 national

19  election, you are referring the Presidential election?

20  A    Yes.

21  Q    Let's take those one by one.  Can you tell us how you

22  voted in the 2012 election, how that played out?

23  A    You mean who I voted for?

24  Q    No, certainly not.  Tell us how you went about voting in

25  that election.

1  A    Well, at the time, I was living with my daughter and my

2  son-in-law.  My car had broken down that I had brought to North

3  Carolina, and then because I didn't have a job, I was hunting

4  for a job but didn't have a job, it got repossessed, so I

5  didn't even have a chance to fix it.

6  Q    You are referring to your car?

7  A    My car.  And so I was dependent on my daughter and my

8  son-in-law to take me everywhere that I needed to go.  They had

9  taken me to church.  We were sitting in church, and I really

10 didn't think I would have a chance to vote because they both

11 lead very busy lives.  While we were sitting there, I became

12 aware that North Carolina has Sunday voting, something I had

13 never heard of before.

14 Q    How did you become aware of that?

15 A    My pastor then -- he was my new pastor -- was explaining

16 that we needed to go vote.  People get out there and vote, and

17 he said, as a matter of fact, there is a polling site right

18 down the street from the church.  He said, go take your family

19 to go vote and then go out to eat.

20      So my son-in-law, who was sitting next to me, learned over

21 and he said, Mom, he said, I'll take you to vote, and then

22 we'll go get lunch.  So I took him up on it.

23 Q    Ms. Cunningham, what were the race of most of the

24 congregants in that church?

25 A    Our church is a predominantly African-American church.

1  Q    And what is the name of the church?

2  A    It's called The Park, or the official name is University

3  Park Baptist Church.

4  Q    If you could tell us, Ms. Cunningham, what did you do --

5  if you could describe what you did after you heard about the

6  possibility of voting down the road, if you could describe how

7  that played out.

8  A    Well, sure.  My son-in-law and I got in the car.  We went

9  down the road probably about five or six blocks.  We got out,

10 talked to a few of the people who were canvassing or

11 campaigning.  Then we got in line, and we talked to a few of

12 the people who were in line.  He saw some people that he knew

13 from church.  We talked and we went through the line and got in

14 and voted basically.

15 Q    And you mentioned the line when you were waiting to vote.

16 What was the race of most of the people in that line?

17 A    They were African-American.

18 Q    Now, when you look back at that experience of voting in

19 2012, how do you feel -- strike that.

20      What did you think after that experience in 2012?

21 A    Well, I'll put it this way:  When I came to North

22 Carolina, I was in a pretty bad way, and one of the things that

23 kind of helped to start to heal me was the fact that I was able

24 to go and vote, go and put the -- help put the person in office

25 that I wanted in office for President, and it was an empowering

1  move for me that day.

2      It was -- it started to make me feel a whole lot better

3  about coming south, when I had kind of avoided coming south

4  because of my experiences and -- the things that I've heard

5  about the South.  I really didn't think that I belonged in the

6  South with my thinking, I will put it that way.

7  Q    And so how did this -- so strike -- okay.  So could you

8  explain what you mean by that a little bit further?

9  A    Well, just the fact that I could vote on a Sunday.  When

10  Sunday is the time that I spend with my family, I could go and

11  do that with my son-in-law.  That was a bonding experience for

12  us.  Just those are the kind of values that I have, and Sunday

13  voting actually supported my values.

14  Q    I see.  And how easy would it have been for you to vote in

15  that election had you not been able to vote on a Sunday?

16  A    Not easy, because my children have busy lives of their

17  own.  I didn't come here to become a burden, take me here, take

18  me there; but since we were out, I was able to go vote, but I

19  would not have tried to get them after they work on their jobs

20  all day to take me to vote.

21  Q    And you indicated that you waited in line for some time.

22  How long did you wait?

23  A    Somewhere around 20 to 30 minutes or so.  You know, not

24  bad.  Not bad.

25  Q    And you've also indicated you are a busy person, you have

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 171 of 193

1  work.  How is it that you were able to take that time out of

2  your day to do voting on that Sunday?

3  A    Well, because I don't work on Sundays, for one thing.  I

4  go to church on Sunday, and I spend Sundays with my family.

5  That's what I traditionally do.  That's how my family works.

6  Q    How respectful have employers been, in your experience,

7  with allowing you to have that Sunday period?

8  A    I have never worked for an employer who required me --

9  after I told them that that was my day of prayer and of worship

10 and family, I have never had an employer to deny me and cause

11 me to work on Sunday.

12 Q    Is that something you raise with employers?

13 A    Yes.  Whenever I go in for an interview or anything, and

14 they ask me what days can you work, I distinctly tell them I

15 cannot work on Sunday.

16 Q    Thank you, Ms. Cunningham.  Let's now turn to 2014.  In

17 2014, were you still a member of that church?

18 A    Yes.

19 Q    And how did you go about voting in 2014?  Strike that.

20     Did you vote on Election Day, or did you vote during the

21 early voting period?

22 A    No.  I voted on Election Day.

23 Q    Why did you vote on Election Day and not during the early

24 voting period, given the great experience you had in 2012

25 voting on a Sunday?

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  A    Well, I did attempt to vote early, and it was my intention

2  to vote early; but during that time of year is called open

3  enrollment for Medicare, and that's what I do.  I work with

4  Medicare insurance, and I was working very long hours, and also

5  my health was failing.  So my doctor had me scheduled for

6  numerous -- I ended up having a procedure after all this, but

7  numerous tests.  And so in preparation for the tests, things

8  like that, so I could not -- while I was working and doing all

9  those tests, I couldn't fit that in, fit the voting in, even

10  though I tried before that.

11  Q    And you mentioned that you had some tests performed on

12  you.  If I may ask, what kind of medical conditions were you

13  suffering from?

14  A    Well, I have diabetes, high blood pressure, high

15  cholesterol, arthritis, and then finally found out that I had

16  polyps that had to be removed.

17  Q    So I think you explained to us why you were unable to vote

18  during the early voting period.  Did you try to vote on

19  Election Day?

20  A    Yes, I did.

21  Q    And what time of the day did you attempt to vote on

22  Election Day?

23  A    Well, I went to vote at approximately 12:30, right before

24  I went to work.

25  Q    Why did you vote at that time?

1  A    Because that morning I had an eye appointment, an

2  ophthalmology appointment, a diabetic appointment, and then I

3  went to go visit a -- one of my parishioners who was very sick

4  at home.  She had called for me to come, and I went to go visit

5  her, and I stopped to get some things for her before I went to

6  visit her.

7  Q    Where did you stop to get the provisions for her?

8  A    At Wal-Mart.

9  Q    Okay.  And when you say you stopped to -- did you say --

10 use the word "minister" for this individual?

11 A    I went to minister to her, yes.

12 Q    Could you explain what you mean by that?

13 A    In my faith, when a person is sick, they call for the

14 elders.  I am an elder.  I'm an ordained minister.  What we do

15 is we go and we anoint them and pray over them, and I counseled

16 her and worked with her to build up her faith so that she could

17 be healed.

18 Q    So you've explained to us that you went to your medical

19 appointment and you went to purchase some provisions at

20 Wal-Mart, and then you went to minister to this individual, and

21 then you went to vote, and then presumably to work?

22 A    Yes.

23 Q    Why in that order?

24 A    Well, I knew I had a lot to do that day, so I looked at

25 where my eye appointment was and where she was, and I just kind

1  of made a circuit to make sure that I didn't waste any of my

2  resources, my gas, and get everything done -- be able to get

3  everything done that I needed to do before I went to work.

4  Q    Would you have been able to accomplish all those things in

5  any other order, in your view?

6  A    I don't think it would have worked because I would have

7  been backtracking if I would have tried to do anything

8  different.

9  Q    And where did you go to vote?

10  A    The police substation down the street from where I work.

11  Q    And why did you choose that police substation as the place

12  to go vote?

13  A    Because it was the closest place to where I worked, and I

14  knew that I could -- I would pass it on my way to work.

15  Q    And how did the way you go about -- how did the way you

16  went about identifying this as your -- the place where you

17  would go to vote differ from what you had done when you resided

18  in, let's say, Missouri?

19  A    How did the way I went about --

20  Q    Deciding where you would go to vote.

21  A    Well, I knew that you had to vote inside of your county.

22  You had to register and vote inside of your county.

23          **THE COURT:**  Where?  Missouri or here?

24          **THE WITNESS:**  No, here in -- so I was registered in

25  Mecklenburg before, and I voted in Mecklenburg.  So once I was

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  registered in Cabarrus County, I knew I needed to vote in

2  Cabarrus County.

3  **BY MR. SHAPIRO**

4  Q    Did you think you could vote anywhere in the county?

5  A    Yes.

6  Q    Why is that?

7  A    Because when I voted before, we just -- I just voted down

8  the street from our church, which we didn't live anywhere near

9  the church.  We lived on the other side of Charlotte from the

10 church.

11 Q    Okay.  So, in other words, because of the experience you

12 had in 2012 during the early voting period, you thought you

13 could do the same, vote anywhere in the county in 2014?  Did I

14 understand you correctly?

15 A    Yes.

16 Q    Okay.  So if you could tell us, what happened when you

17 went to the police station to vote?

18 A    I went in and gave my -- gave her my name, and she told me

19 I was in the wrong place, and the woman that had been talking

20 to me, she went and talked to another lady.  They came back and

21 said you can vote a provisional vote.

22 Q    Okay.

23 A    So --

24 Q    What happened then?

25 A    I filled out the paperwork, and I did my voting on the

1  provisional ballot.  I sealed it up and gave it back to her

2  to -- and watched to make sure that my ballot went into the

3  box, and then I scurried off to work.

4  Q    And how long did it take you to get to work?

5  A    About two or three minutes.  It's really just a couple of

6  blocks probably between the substation and where I work.

7  Q    Did you manage to get to work on time?

8  A    Yes, I did.

9  Q    And did the poll worker tell you at any time that your

10 vote may not count?

11         MR. MCKNIGHT:  Objection, Your Honor, on the hearsay

12 grounds that we've been raising.

13         MR. SHAPIRO:  This goes to state of mind, Your Honor.

14         THE COURT:  It's overruled.  I will consider it for

15 state of mind and to explain what she did next.

16         THE WITNESS:  So would you ask me that again?

17 BY MR. SHAPIRO

18 Q    Did a poll worker or anyone tell you that your vote would

19 not count?

20 A    No, no one told me that it wouldn't count.

21 Q    And what was your belief at the time about whether your

22 vote would be counted?

23 A    That the votes -- that the regular votes would be counted

24 first and then the provisional vote would be counted.

25 Q    And do you have any recollection of a poll worker telling

1   you the polling site you should go to?

2   A    Well, once they started pulling out all the paperwork and

3   everything, I have no recollection of them telling me where.  I

4   just -- I just -- my memory is just on getting that paperwork

5   done.

6           **MR. SHAPIRO:**  Your Honor, if I may approach?

7           **THE COURT:**  Yes.

8           **MR. SHAPIRO:**  I am going to show Plaintiffs'

9   Exhibit 309.

10  **BY MR. SHAPIRO**

11  Q    Ms. Cunningham, do you see an image on the monitor there?

12  A    Yes.

13  Q    And do you recognize that photograph?

14  A    Yes, I do.

15  Q    And who took that photograph?

16  A    I took it myself.

17  Q    As the official term, is that a selfie?

18  A    Selfie, yes.

19  Q    When did you take that photograph?

20  A    Right before I got ready to go into work after voting,

21  drove down the street.  Right before I got ready to go into

22  work, I snapped that picture.

23  Q    Okay.  And there is some text there as well.  Can you tell

24  us what that text is -- actually, strike that.

25      Can you read the text?

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 178 of 193

1  A    Thank you for making that bigger.

2      "I went to an ophthalmology appointment, shopped at

3  Wal-Mart, visited the sick, VOTED," in large letters, "and now

4  on my way to put in 8 to 9 hours at work #noexcusesvotepeople."

5  Q    And where did you write those words?

6  A    I put that on Facebook.

7  Q    And did you write -- that's what you wrote?

8  A    Yes, I wrote that.

9  Q    Why did you write that?

10 A    For some reason, I have a lot of young people who are my

11 followers.  My children's friends and even my children's

12 friends' children follow me on Facebook.  So I try to put

13 nothing but positive things so that -- and this was something

14 that I really want to -- just like it was taught to me, I want

15 to teach it to young people to vote and not to use any excuse,

16 but to vote.

17 Q    All right.  Thank you, Ms. Cunningham.  I am now going to

18 show you an excerpt of what's previously been moved into

19 evidence as Plaintiffs' Exhibit 305, a page from that exhibit.

20      **MR. SHAPIRO:**  Actually, before I do that, Your Honor,

21 I would ask to move into evidence Plaintiffs' Exhibit 309,

22 which is the photograph.

23      **THE COURT:**  Admitted.

24      **MR. SHAPIRO:**  Thank you, Your Honor.

25      **THE COURT:**  This is already in evidence; right?

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 179 of 193

1              MR. SHAPIRO:  Yes, it is, Your Honor.  That's just an

2   excerpt of the larger stipulation at page 7 of that

3   stipulation.

4   BY MR. SHAPIRO

5   Q    Ms. Cunningham, do you see that?

6   A    Yes, I do.

7   Q    And that is an extract from a State Board of Elections

8   database that has some information about your voting practices

9   and experiences in the past, including the 2014 election.

10        I want to direct your attention to the column with your

11  name and the portion of the column where it says "Vote

12  Counted."  And there is an N that's highlighted for no.  Do you

13  see that?

14  A    Yes, I do.

15  Q    And do you see there is a little note there that says,

16  "Assigned Precinct 12-05," indicating that you voted in the

17  wrong precinct?  Do you see that?

18  A    Yes.

19  Q    And so that indicates that your vote, in fact, was not

20  counted.  And how does that affect your view on the -- if you

21  will tell the Court, on the failures and the integrity of the

22  election system in this state?

23  A    It really causes me pain to feel like I did what I was

24  supposed to do to vote.  I did exactly -- not exactly, but I

25  did something similar to what I had done in 2012, and my vote

1  counted and the cause that I was voting for went over.  And

2  when I expected that to happen in 2014, for me to find out that

3  it didn't, I lost a lot of faith in North Carolina.

4      I am trying to understand, you know, why it's changed now.

5  When it was great in 2012, why did that have to change, and why

6  wasn't my vote counted?

7          **MR. SHAPIRO:**  Thank you, Ms. Cunningham.  No further

8  questions.

9          **THE COURT:**  Any cross?

10          **MR. MCKNIGHT:**  Yes, Your Honor.

11                      CROSS-EXAMINATION

12  **BY MR. MCKNIGHT**

13  Q    Good afternoon again, Ms. Cunningham.  We met last month

14  for your deposition in Concord.  Just a few questions for you

15  about your voting experiences in 2012 and 2014.  In 2012, I

16  believe you testified that you voted on a Sunday; correct?

17  A    Yes.

18  Q    And do you remember whether it was during the beginning of

19  the early voting period or at the end?

20  A    I am not sure.

21  Q    All right.  And then after you moved from Charlotte to

22  Cabarrus County, I believe you updated your driver's license at

23  the DMV; is that correct?

24  A    Yes.

25  Q    And at the same time, you also changed your voter

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 181 of 193

1  registration to Cabarrus County; is that right?

2  A    Yes.

3  Q    And you didn't have any difficulty in registering to vote

4  in Cabarrus County at the DMV, did you?

5  A    No.

6  Q    After you registered to vote in Cabarrus County through

7  the DMV, you received a voter registration card in the mail,

8  didn't you?

9  A    Yes.

10  Q    And before you moved to North Carolina, I know you talked

11  about living in three other states.  I believe in your

12  deposition we talked about the fact that you had voted in at

13  least two other states; is that right?

14  A    Yes.

15  Q    And those two other states are Missouri and Pennsylvania;

16  is that right?

17  A    That's right.

18  Q    And early voting wasn't an option for you when you lived

19  in either of those states, was it?

20  A    No.

21  Q    So if you voted in person in Missouri or Pennsylvania, you

22  had to do it on Election Day; correct?

23  A    Yes.

24  Q    And when you lived in Missouri and Pennsylvania, if you

25  voted in person on Election Day, you had to vote at your

1  assigned polling place; correct?

2  A    Yes.

3  Q    And when you voted in person on Election Day when you

4  lived in Missouri and Pennsylvania, you always voted at your

5  assigned polling place, didn't you?

6  A    Yes.

7  Q    And isn't it true that there were times when you lived in

8  Missouri and Pennsylvania that you were busy on Election Day?

9  A    Yes.

10 Q    And that required you to do some planning so that you

11 could make it to your assigned polling place, didn't it?

12 A    Yes.

13 Q    And in thinking about voting in North Carolina -- before

14 we sat down for your deposition last month, I think you

15 testified that perhaps the day before your deposition that you

16 were able to look up your voter information online; correct?

17 A    After I found out that I could look it up on online, yes.

18 Q    And how did you find out you could look it up online?

19 A    In talking with Attorney Shapiro, he told me that it was

20 available online.  I didn't know that my personal information

21 was online like that.

22 Q    And I believe you said you were able to find it using

23 Google; is that correct?

24 A    Yes.  I Googled where to look it up, and then I looked it

25 up.

1  Q    Among the information you were able to find online was

2  your assigned polling place, which is Cabarrus Senior Center,

3  isn't it?

4  A    Yes, I know it is the senior center.

5  Q    Were you able to find that information when you looked up

6  your voter information online?

7  A    Yes.

8  Q    If you had known that you had to vote in your assigned

9  polling place on Election Day November 2014, you could have

10 planned your day so that you could have voted before you went

11 to Wal-Mart or visited your friend, couldn't you have?

12 A    If I would have known that that was a stipulation, yes.

13 Q    If you had to, you could have gone to Wal-Mart and you

14 could have visited your friend on a different day, couldn't you

15 have?

16 A    I could not have visited her on a different day, no.

17 Q    Okay.  Why is that?

18 A    Because she had called for me as her elder.

19 Q    Okay.  All right.

20      **MR. MCKNIGHT:**  I don't think I have any further

21 questions for you, Ms. Cunningham.

22      **THE COURT:**  Any redirect?

23      **MR. SHAPIRO:**  Yes, Your Honor.

24                      REDIRECT EXAMINATION

25

1  BY MR. SHAPIRO

2  Q    Ms. Cunningham, you were asked a few questions about

3  voting in Missouri.  Did you ever miss any elections while you

4  were in Missouri that you would have liked to have voted in?

5  A    I believe there were some that I would have liked to have

6  voted in that I may have missed maybe.

7  Q    Have they -- to your knowledge, has Missouri changed its

8  election system in recent years in ways that may have made it

9  harder for you to vote?

10  A    I am not aware of any.

11  Q    I want to be very clear.  On the day that you voted in

12  2014, you had provided testimony on how busy that day was.

13  A    Right.

14  Q    Would you have been able to vote in any other way other

15  than the way that you did vote that day?

16  A    No.  I still would have to do the things that I had to do

17  for my own health and for my church member.

18        MR. SHAPIRO:  Thank you.  No further questions.

19                    RECROSS-EXAMINATION

20  BY MR. MCKNIGHT

21  Q    Ms. Cunningham, I think you just testified earlier, and

22  Mr. Shapiro just touched on this, you said you had to go visit

23  your church member that day.

24      If a church member calls you and it is a day that you are

25  working all day, you are working -- certainly, it sounds like

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  you're a busy lady.  You were working all day long and one or

2  two jobs in the same day.  What happens when somebody like that

3  calls?  Do you not have to tell them you ought to come see them

4  on a different day, or do you take off work?

5  A    I wouldn't take off work, but I would work them into my

6  schedule.

7          **MR. MCKNIGHT:**  No further questions, Ms. Cunningham.

8          **THE COURT:**  All right, ma'am, you may step down.

9          **MS. GARRETT:**  Hello, Your Honor.  We've resolved the

10  technical glitch and --

11          **THE COURT:**  My experience is that's usually followed

12  by the phrase "for now."

13          **MS. GARRETT:**  For now.  We would like to continue to

14  play the trial deposition testimony of Dr. Lynne

15  Vernon-Feagans, starting at page 37, line 1.

16          **THE COURT:**  All right.

17          **MS. GARRETT:**  Can we start?

18          **THE COURT:**  Yes, please.

19      (Designated portions of the deposition of Lynne

20      Vernon-Feagans continued to be played.)

21          **THE COURT:**  Stop.  Thank you.  I don't think we are

22  going to finish in a minute or so on this, and I have one issue

23  that I want to take up.  So if we could run the risk of the

24  technology maybe not working in the morning at the same spot,

25  but I'm going to hope it will, we'll pick up right there if we

NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1　can and then go from there.

2　　　　I wanted to ask you where you were, if you talked to

3　each other about any differences you still have on the issue of

4　the hearsay objection?  Has there been any progress, or have

5　you had time to address that?

6　　　　**MR. DONOVAN:**  We haven't really had time to address

7　it.

8　　　　**THE COURT:**  Okay.  Can you all address that tonight

9　between now and in the morning, and just let me know the nature

10　of the difference, if there is one, or whether you've come to

11　some conclusion?  And you have potentially a goose-gander issue

12　on late-blooming information.  So you all decide what you want

13　to do, if anything, about that, whether you are going to stick

14　to your motions or whether you've made some arrangement.  Just

15　advise me in the morning and then I will rule if I need to.  I

16　appreciate that.

17　　　　**MR. DONOVAN:**  What time tomorrow?

18　　　　**THE COURT:**  I would like to start at 9:00.  I may

19　have told you all earlier I was thinking 9:30; but I think if

20　we stay on schedule, we should be able to finish up within

21　three weeks, I hope.

22　　　　**MR. DONOVAN:**  I agree.

23　　　　**MR. FISHER:**  I mentioned the *Bolden* case earlier.  So

24　I wanted to just bring to the Court's attention we took a look

25　at that case, and what we see is cited statements from

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1 newspaper articles in that case.  We do see the Court relying

2 on those statements as it makes a finding of discriminatory

3 purpose.  I wanted to mention a couple of other cases.

4    **THE COURT:**  What kind of newspaper articles were

5 they?

6    **MR. FISHER:**  In this case, Your Honor, I don't have

7 the specific newspaper that it came from, but the Court does

8 have a block quote coming from a newspaper article and then

9 references that article again later in the opinion when it

10 makes a determination on discriminatory purpose.

11    **THE COURT:**  Do you know what page of the opinion that

12 comes from?

13    **MR. FISHER:**  Yes, it would be 1062.

14    **THE COURT:**  What is the full cite?

15    **MR. FISHER:**  542 F. Supp. 1050, and the pages that I

16 am referencing are 1062 and 1074.

17    **THE COURT:**  All right.

18    **MR. FISHER:**  In a similar light, we have the *Dillard*

19 case.  That's 640 F. Supp. 1347, and that's pages 1357 to 1359.

20 And also *United States Versus Brown*, and that's 494 F. Supp. 2d

21 440.  I don't have a pin cite on that one.

22    But, Your Honor, also if I could take a moment -- I

23 know we are breaking.  You mentioned, you know, resolving

24 issues with the Defendants.  I think at this point, you know,

25 where we are, just if I could frame real quickly -- we

  NAACP, et al. v. NC, et al. - Trial Day 2 - 7/14/15

1  haven't -- as far as I know, the Plaintiffs -- and we haven't

2  offered a specific newspaper article into evidence at this

3  point.  We haven't proffered anything.  I know there is the

4  issue of the stipulations, but we haven't proffered anything.

5        The way that we have kind of come to this point is

6  that we have experts, and ten experts, and the United States

7  has one in Dr. Lawson that we will be presenting towards the

8  end of the week that rely on newspaper articles to come to

9  their conclusions.  Again, we would say that with regard to

10 Dr. Lawson and the other intent experts that their reliance is

11 highly relevant to the issue of legislative purpose, and we

12 feel that those articles, you know, reflect their methodology,

13 and they're the best way that they can get at that purpose.

14       We would just reference the Court to those cases and

15 say that we believe the experts are entitled to rely on those

16 reports.  Again, when I have Dr. Lawson up here on the stand, I

17 can hit the wave tops of his report, and I can excise

18 referencing a newspaper article here in the court.  But as Your

19 Honor goes back and reads that report in chambers, you are

20 going to see references to newspaper articles throughout, and I

21 just want to caution that we don't think that those

22 references -- we think those should carry weight with the

23 Court.  We don't want those references to be disregarded at

24 all.

25       **THE COURT:**  I understand.  It all depends on what

Case 1:13-cv-00658-TDS-JEP   Document 348   Filed 08/12/15   Page 189 of 193

1 they are being offered for, in my view.  Again, my concern is

2 that if there is a piece of information that I would not rely

3 on, and ultimately I have to make the decision, but an expert

4 says but that's the kind of stuff I rely on when I write my

5 reports and come up with my decisions, it seems to me the

6 expert is trying to then use material that I would not find

7 reliable, but the expert says but it's good enough for me.

8 That's my concern.  I will take a look at the cases.

9         **MR. FISHER:**  Again, Your Honor, we can go into a

10 little bit more on the methodology with Dr. Lawson.  I think

11 that he will testify that in his practice his methodology is to

12 rely on newspaper articles to come to his conclusions and that

13 he has used those in this case to draw inferences and to draw

14 conclusions about discriminatory purpose.  Ultimately, you

15 know, the question that --

16         **THE COURT:**  I understand that, but the question is

17 whether in a court of law I can allow an expert to say, yes, I

18 think it was discriminatory and I relied on a bunch of

19 information that you, Judge, otherwise probably would not have

20 let into evidence.  That's my concern.  We don't need to debate

21 it.  I will take a look at the cases.  It depends on what the

22 information is.

23         For example, if the expert relies on the newspaper

24 article, as one of the experts today testified to, that

25 referred to an Attorney General opinion and then he went to go

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1  get the AG opinion, that's not the same situation of what I am

2  concerned about.  I am concerned about a double hearsay

3  statement because it's in a newspaper that quotes yet somebody

4  else, and that's being offered for the truth of the assertion

5  in the statement, that is, the intent of that person.

6          I have some hesitation about that.  Even if an expert

7  says it is good enough for me as an expert, that's why they

8  teach and that's their job and they are doing it for a

9  different purpose many times, it may be perfectly fine for

10 writing books and articles, but it is a little difficult if it

11 has to meet an evidentiary standard.

12         **MR. FISHER:**  Your Honor, we would never draw the

13 equivalence between judges and professors.

14         **THE COURT:**  Someday I am hoping to reach that status.

15         **MR. FISHER:**  But Dr. Lawson will come and he will

16 talk about his methodology, and he will talk about the

17 conclusions that he drew.

18         Again, the information you will see will be wave

19 tops, and I can certainly avoid talking about newspaper

20 articles during the testimony you see in this court.  However,

21 I did want to caution the Court, when you do read his report,

22 there will be references to newspaper articles there, and I

23 don't know -- I just wanted to frame that issue.

24         **THE COURT:**  Well, I can't determine which newspaper

25 articles are inappropriate unless there is some showing that

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1  it's an inappropriate article.  Otherwise, as a general matter,

2  I think I've already said, many of these experts, I would

3  think, could rely on press reports, depending on why they are

4  using them.  So I will leave it at that.

5          All right.  Anything else we need to address?  All

6  right.  Have a good evening.  We'll see you at 9:00.

7      (The Court recessed at 5:08 p.m.)

8

9                      END OF TRIAL DAY TWO

10

11                        * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I,  Briana L. Nesbit, Official Court Reporter,

7  certify that the foregoing transcript is a true and correct

8  transcript of the proceedings in the above-entitled matter.

9

10          Dated this 26th day July of 2015.

11

12

13                    _____

14                    Briana L. Nesbit, RPR
                       Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

NAACP, et al. v. NC, et al. – Trial Day 2 – 7/14/15