**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, EMMANUEL BAPTIST CHURCH, COVENANT PRESBYTERIAN CHURCH, BARBEE'S CHAPEL MISSIONARY BAPTIST CHURCH, INC., ROSANELL EATON, ARMENTA EATON, CAROLYN COLEMAN, JOCELYN FERGUSON-KELLY, FAITH JACKSON, MARY PERRY, and MARIA TERESA UNGER PALMER,<br><br>Plaintiffs,<br><br>v.<br><br>PATRICK LLOYD MCCRORY, in his official capacity as the Governor of North Carolina, KIM WESTBROOK STRACH, in her official capacity as Executive Director of the North Carolina State Board of Elections, JOSHUA B. HOWARD, in his official capacity as Chairman of the North Carolina State Board of Elections, RHONDA K. AMOROSO, in her official capacity as Secretary of the North Carolina State Board of Elections, JOSHUA D. MALCOLM, in his official capacity as a member of the North Carolina State Board of Elections, JAMES BAKER, in his official capacity as a member of the North Carolina State Board of Elections and MAJA KRICKER, in her official capacity as a member of the North Carolina State Board of Elections,<br><br>Defendants. | **THIRD AMENDED AND SUPPLEMENTAL COMPLAINT**<br><br>**Case No.: 1:13-CV-658** |

## INTRODUCTION

1. This lawsuit seeks to protect and preserve the voting rights of North Carolina citizens—rights imperiled by the passage of new legislation that imposes unjustified and discriminatory electoral burdens on large segments of the state's population and will cause the

denial, dilution, and abridgement of African Americans' and Latinos' fundamental right to vote.

2. On June 25, 2013, the Supreme Court decided *Shelby County v. Holder*, No. 12-96, which invalidated Section 4(b) of the Voting Rights Act of 1965. Section 4(b) had included a formula for determining which state and local jurisdictions were considered "covered" jurisdictions under the Voting Rights Act based on a history of racial discrimination in voting. Section 5 required all covered jurisdictions, as defined by Section 4(b), to obtain approval (or "preclearance") from the U.S. Department of Justice before implementing changes to their voting procedures. The purpose of these provisions was to protect the electoral process from the vestiges of race discrimination.

3. Although *Shelby County* struck down Section 4(b), the Court made clear that its decision "in no way affects the permanent nationwide ban on racial discrimination in voting found in § 2" of the Voting Rights Act. The Court also reiterated that "[b]oth the Federal Government and individuals" can sue under Section 2 and that "injunctive relief is available in appropriate cases to block voting laws from going into effect."

4. Prior to *Shelby County*, 41 counties in North Carolina were covered jurisdictions under the Voting Rights Act and subject to federal preclearance requirements. Over the past 30 years, the Department of Justice has objected more than 60 times to changes in voting laws in North Carolina

5. One month after *Shelby County* effectively nullified the preclearance requirements in the Voting Rights Act, the North Carolina General Assembly moved to enact sweeping new limitations on the franchise. On July 26, 2013, the General Assembly passed North Carolina House Bill 589 (2013) ("H.B. 589"), which includes a number of substantial

restrictions on voting opportunities in local, state, and federal elections. Among other things, H.B. 589: (i) imposes strict voter-identification requirements; (ii) eliminates same-day voter registration and pre-registration; (iii) reduces early-voting opportunities by reducing the number of days of early-voting; (iv) prohibits the counting of provisional ballots cast by voters who go to the wrong precinct; and (v) expands the number of poll observers and the number of people who can challenge ballots. H.B. 589 was signed into law on August 12, 2013, and is designated as Session Law 2013-381.

6. In enacting H.B. 589, North Carolina became one of the first states to pass more restrictive voting laws following the Supreme Court's decision in *Shelby County*. The breadth of the new law is striking, targeting nearly every aspect of the voting process. One leading election-law scholar described H.B. 589 as "probably the most suppressive voting measure passed in the United States in decades."

7. The voter-identification requirements of H.B. 589 require registered voters to show one of a limited number of specific government-issued photo identification cards in order to cast a ballot and have it counted in a North Carolina election. This requirement will disproportionately injure African-American and Latino voters, who are less likely than other members of the electorate to possess the required forms of identification and also face disproportionately greater burdens in obtaining such identification. As a result, African-American and Latino voters are more likely than other North Carolina voters to have their votes denied, diluted, or abridged by H.B. 589.

8. The same-day registration and early-voting provisions of H.B. 589 eliminate the possibility of same-day registration of voters during the early-voting period and reduce the available days for early-voting. These provisions will disproportionately injure African-

American and Latino voters in North Carolina who use same-day registration and early-voting at higher rates than white voters. During the 2012 election cycle, ***70%*** of African-Americans who voted did so through early-voting opportunities. Latinos have significantly lower rates of voter registration than white voters in North Carolina, and disproportionately use same-day registration. Thus the elimination of previously available voter registration opportunities, like same-day registration and pre-registration, will have a disparate impact on Latinos. Same-day registration and early-voting have been highly successful programs utilized by large portions of the electorate. Yet nowhere in the legislative history or record did legislators offer a credible, non-discriminatory reason for eliminating these popular programs.

9. By providing that previously valid out-of-precinct provisional ballots will not be counted, H.B. 589 similarly has a disproportionate effect on African-American and Latino voters. African-American and Latino voters cast a disproportionate number of out-of-precinct provisional ballots, and upon information and belief, are more likely to cast out-of-precinct ballots in the future. The impact of the new restriction on out-of-precinct provisional ballots is further compounded by the elimination of same-day registration procedures previously available to update the registrations of those who have relocated to a different precinct. The North Carolina General Assembly nonetheless eliminated both out-of-precinct provisional ballots and the same-day registration practice without specifying any credible (much less compelling) non-discriminatory reason for its actions.

10. By expanding the number of poll observers and the numbers and qualifications of people who can challenge ballots, H.B. 589 increases the likelihood of voter harassment and imposes a substantial and unlawful burden on the right to vote. The state legislature passed these measures despite evidence of significant voter intimidation during the 2012 election

cycle. On information and belief, these changes will disproportionately impact African-American and Latino voters.

11. These provisions of H.B. 589—both independently and cumulatively—violate Section 2 of the Voting Rights Act, 42 U.S.C. § 1973. The limitations that H.B. 589 imposes on the right to vote have a disparate impact on African Americans and Latinos, and, in interaction with existing societal and economic conditions, result in denying African Americans and Latinos equal and meaningful access to the political process. The ultimate result of these provisions is the dilution of minority voting strength.

12. These provisions of H.B. 589 also violate the Fourteenth and Fifteenth Amendments of the United States Constitution. These provisions impose discriminatory and unlawful burdens on the right to vote that are not justified by any legitimate or compelling state interest. Although North Carolina legislators attempted to justify H.B. 589 by pointing to concerns of voter fraud, the facts before the legislature established that voter fraud is not a significant problem in North Carolina and, even if it were, that the provisions in H.B. 589 are not appropriately nor narrowly tailored to address that problem. Concerns of actual or perceived voter fraud also do not justify the substantial and unprecedented restrictions on voting opportunities disproportionately used by African Americans and Latinos—including early-voting, same-day-registration, and provisional ballots for out-of-precinct voters. H.B. 589 also draws irrational and unjustifiable distinctions among different classes of voters.

13. Plaintiffs request that the Court find the challenged provisions of H.B. 589 to be unlawful under Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the U.S. Constitution. Plaintiffs also request that the Court enter declaratory

and injunctive relief preventing defendants from implementing or enforcing the challenged provisions of H.B. 589.

## JURISDICTION & VENUE

14. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1357, and 42 U.S.C. §§ 1983, 1988, 1973, and 1973j.

15. This Court has personal jurisdiction over the defendants, all of whom are either elected officials in North Carolina or are board members, officers, or employees of the North Carolina State Board of Elections. All of the defendants work and reside in the State of North Carolina.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). Among other things, a substantial portion of the violations and harms complained of herein occurred, or will occur, in this District.

17. This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

18. Plaintiff NORTH CAROLINA STATE CONFERENCE OF THE NAACP ("North Carolina NAACP") is a nonpartisan, nonprofit organization composed of over 100 branches and 20,000 individual members throughout the state of North Carolina. The North Carolina NAACP is led by Reverend Dr. William Barber, and has members who are citizens and registered voters in each of the state's 100 counties and in the 41 counties previously covered by the Voting Rights Act. Many of those members will be directly impacted and harmed by the unlawful provisions of H.B. 589. The fundamental mission of the North Carolina NAACP is the advancement and improvement of the political, educational, social, and

economic status of minority groups; the elimination of racial prejudice; the publicizing of adverse effects of racial and ethnic discrimination; and the initiation of lawful action to secure the elimination of racial bias. In furtherance of this mission, the North Carolina NAACP advocates to ensure that the interests of racial minorities are represented on the local, state, and national legislative bodies by representatives who share the community's interests, values and beliefs and who will be accountable to the community. The North Carolina NAACP encourages and facilitates nonpartisan voter registration drives by its chapters to promote civic participation. The North Carolina NAACP maintains its headquarters in Durham, North Carolina, within this judicial district.

19. The North Carolina NAACP has standing to challenge H.B. 589 on behalf of its members, who include African American and Latino voters in North Carolina. The North Carolina NAACP has members who will be directly impacted and harmed by the unlawful provisions of H.B. 589. Many of those members will be effectively denied the right to vote or otherwise deprived of meaningful access to the political process as a result of the challenged provisions of H.B. 589, or will have their voting strength diluted. The challenged provisions of H.B. 589 will also impose costs and substantial and undue burdens on the right to vote for those and other members.

20. The North Carolina NAACP also has standing to challenge H.B. 589 on its own behalf. By reducing early-voting opportunities and by eliminating same-day registration, H.B. 589 makes it substantially more difficult for the North Carolina NAACP to engage in get-out-the-vote and voter-registration activities, which they regularly perform in support of their civic-engagement mission. In light of those increased burdens, the North Carolina NAACP will be forced to divert time, money, and resources from their other activities in order to expend more

time and attention to assisting North Carolina citizens who are burdened by the new provisions of H.B. 589. H.B. 589 thus adversely impacts the North Carolina NAACP's overall operations.

21. Plaintiff Emmanuel Baptist Church is located in Winston-Salem's Columbia Heights Neighborhood. The Church is led by Dr. John Mendez and is committed to minister "to the social needs of the community," which includes ensuring its community members' participation in the political process and their right to vote. The Church's Social Action Committee organizes voter registration drives; provides transportation in vans owned and operated by the Church for members of the congregation and community to register and to vote; and conducts "Souls to the Polls" initiatives through which the Church transports to the polls hundreds of registered voters and other individuals seeking to register and vote.

22. Plaintiff Emmanuel Baptist Church has standing to sue on its own behalf. The reduction in early-voting days in H.B. 589 will place a strain on the Church's transportation services, will make it difficult for the Church to operate the programs as they have in the past, and will lead to a reduction in the number of voters and congregants that the Church is able to transport to the polls. Emmanuel Baptist Church must now divert substantial resources and attention away from other critical missions to assist members of its congregation, the residents of the surrounding community it serves, and other constituents who stand to have their right to vote burdened by the law.

23. Plaintiff Covenant Presbyterian Church serves a predominantly African American congregation in Durham, North Carolina. The Church is led by Pastor Jimmie Hawkins. Its congregation includes elderly registered voters, many of whom no longer drive and do not possess a driver's license as a result, and the Church remains a significant source of

support for these and other members of the community. The Church views voter engagement and civic participation as part of its mission, and has conducted "Souls to the Polls" programs through which it provided transportation from the Church to the polls after Sunday service during the first two weekends of early-voting. The Church plans to conduct a similar program for upcoming elections.

24. Plaintiff Covenant Presbyterian Church has standing to sue on its own behalf. Because of the reduced early-voting period, which now only permits one day of Sunday voting, the Church will have to divert resources away from its ministry in order to serve its "Souls to the Polls" program on the one remaining day of Sunday voting, and assist members of its congregation in obtaining the required identification to ensure that those members have transportation to the polls and are able to exercise their right to vote. Despite its best efforts, the Church fears that it does not have sufficient resources to accommodate all church and community members who need assistance during the shortened early-voting period.

25. Plaintiff Barbee's Chapel Missionary Baptist Church, Inc. serves a primarily African American congregation in Chapel Hill, North Carolina. The Church is led by Bishop Gene Hatley. As part of its mission, the Church participates in community outreach to foster better race relations in Chapel Hill, and to promote social justice. In prior elections, the Church organized multiple voter engagement programs through the Voter Participation Ministry, including voter registration drives, "Souls to the Polls" initiatives to provide members with transportation to the polls, and voter seminars to educate the congregation and community on the importance of voting. The Church plans to continue these programs for upcoming elections.

26. Plaintiff Barbee's Chapel Missionary Baptist Church, Inc. has standing to sue on its own behalf. The Church will have to divert additional resources from its other initiatives to the Voter Participation Ministry in order to assist members of the community in obtaining the identification required to vote; to register individuals by the appropriate deadline in light of the elimination of same-day registration; and to transport voters to the polls within the shorter period of time allocated for early-voting in H.B. 589.

27. Plaintiff ROSANELL EATON is a 94-year-old African-American woman who has lived in Louisburg, North Carolina her entire life, within seven miles of where she was born. The unlawful changes to North Carolina's election laws in H.B. 589 will directly harm her. Mrs. Eaton has been a member of the North Carolina NAACP for 63 years. She was one of the first African American's registered to vote in the 1940s in Franklin County, North Carolina and regularly votes in North Carolina elections. As a child, Mrs. Eaton was forced to attend Franklin County segregated schools from elementary school until her senior year of high school. She was valedictorian of her graduating class. Mrs. Eaton vividly remembers the degradations and injuries of the era of Jim Crow in North Carolina during this time, when she and other African Americans in her community experienced enforced separation in private and public places of accommodation. She remembers the injury of drinking from "colored" water fountains in Louisburg. As soon as she reached the age of eligibility, Mrs. Eaton traveled to the county courthouse to register to vote in Franklin County. As part of a prerequisite literacy test reserved for African Americans, three county registrars forced Mrs. Eaton to recite the preamble of the U.S. Constitution, which she did successfully. Since she became a registered voter, Mrs. Eaton has been active in assisting other African Americans in her community both to register and to vote. Due in part to her involvement in these efforts and her membership in

the NAACP, Mrs. Eaton remembers waking in her home some mornings to the sight of small crosses burned on her front lawn. Mrs. Eaton also experienced her home being shot at and the bullet hit just below her bedroom window. She is aware of other attempts to intimidate her African-American neighbors in Franklin County. Throughout her adult life, Mrs. Eaton has worked to expand access to the vote in her community and in Franklin County. She served for 40 years as an assistant poll worker in Franklin County. She was then appointed as a Judge at the East Youngsville precinct, and served as a Judge for more than 20 years. The new restrictive provisions of H.B. 589 enacted in 2013 will directly impact and harm Rosanell Eaton in several ways. Since the initiation of the early-voting period in Franklin County in 2000, Mrs. Eaton has frequently voted using early-voting during general elections. She was one of the first voters to use early-voting in Franklin County. The subtraction of the first seven days of early-voting under H.B. 589 eliminates her ability to vote during this period. Mrs. Eaton also continues to assist others to vote, including the elderly and disabled in her community. Her ability to provide this assistance will be hindered by anticipated longer lines and the increased education needs that will result from new restrictions, including fewer days of early-voting, voter-identification requirements, elimination of same-day registration, and restrictions on out-of-precinct provisional ballots. Mrs. Eaton will also be directly impacted and harmed by the voter-identification requirements of H.B. 589. Mrs. Eaton, who was born at home, has a current North Carolina driver's license, but the name on her certified birth certificate does not match the name on her driver's license or the name on her voter registration card. Mrs. Eaton will incur substantial time and expense to correct her identification documents to match her voter registration record in order to meet the new requirements under H.B. 589 to cast her ballot in North Carolina.

28. Plaintiff ARMENTA EATON, age 66, is an African-American registered voter in Franklin County, North Carolina. For 30 years, Armenta Eaton has assisted elderly and disabled voters by driving them to the polls, and has also herself utilized early-voting in every presidential election since 2000, and she has frequently observed long lines at voting precincts, sometimes even during the early-voting periods. She now suffers from severe, chronic neck and back pain that make it difficult for her to stand for long periods of time, and require periodic doctor visits. Armenta Eaton prefers to vote in person because of its historical significance to African Americans and to ensure that her ballot is counted. The longer lines likely to result from reductions in early-voting days will cause significant hardship as she attempts to cast her ballot. The reduction in early-voting days also will make it difficult for her to coordinate schedules in assisting the elderly and disabled to get to the polls because she will have to transport more people on each remaining day.

29. Plaintiff CAROLYN COLEMAN, age 73, is an African-American elected commissioner who resides in Guilford County, North Carolina, and has been engaged in voter outreach and education for nearly 50 years. Ms. Coleman has spent time on college campuses encouraging students to vote and has worked to make voter registration more accessible to the public by setting up tables at shopping centers, football games, and other large events to register people to vote. Ms. Coleman plans to continue to be actively engaged in voter education, registration, and outreach. Also, in her elected office, Ms. Coleman represents a constituency (Greensboro) with a significant African-American population, and plans to run for reelection in 2014. Ms. Coleman will be forced to incur additional costs during her reelection campaign in order to assist members of the community to register to vote, and to educate the community on the additional restrictions on voting imposed by H.B. 589.

30. Plaintiff JOCELYN ANDREKA FERGUSON-KELLY, age 21, is an African-American student, majoring in clinical laboratory science at Winston-Salem State University, a historically black college in North Carolina. Ms. Ferguson-Kelly is registered to vote in North Carolina and voted in 2012 at the polling place on campus. Ms. Ferguson-Kelly does not have a North Carolina driver's license and does not possess any other form of accepted identification to vote under H.B. 589. Ms. Ferguson-Kelly plans to vote in the 2014 elections and will have to incur substantial time and expense to obtain the required identification. Ms. Ferguson-Kelly voted as a qualified voter in North Carolina during the 2012 general election; however, H.B. 589's voting restrictions will render her ineligible to vote unless she obtains the required identification.

31. Plaintiff FAITH JACKSON, age 22, is an African-American student, majoring in nursing at Winston-Salem State University, a historically black college in North Carolina. She is registered to vote in North Carolina and voted in 2012 at a precinct on campus. Ms. Jackson does not have any of the forms of accepted identification to vote under H.B. 589. Ms. Jackson plans to vote in the 2014 elections and will have to incur substantial time and expense to obtain the required identification. Ms. Jackson voted as a qualified voter in North Carolina during the 2012 general election; however, H.B. 589's voting restrictions will render her ineligible to vote unless she obtains the required identification.

32. Plaintiff MARY PERRY, age 86, is an African-American resident of Wendell, North Carolina and is registered to vote in North Carolina. Mrs. Perry has waited in long lines to vote during early-voting and has encountered difficulty in parking at the early-voting site in Raleigh during the early-voting period. This has resulted in her having to park long distances from the early-voting site. Mrs. Perry prefers to vote in person because of its historical

significance to African Americans and to ensure that her ballot is counted; however, due to her advancing age, Mrs. Perry is unable to stand for long periods of time or to walk long distances. Mrs. Perry believes that the reduction in early-voting days will result in greater concentrations of voters during remaining days and will result in longer lines, which will impose a substantial burden on Mrs. Perry's ability to vote.

33. Plaintiff MARIA TERESA UNGER PALMER, age 55, is a Latina councilwoman representing the Town of Chapel Hill, North Carolina. Ms. Palmer is also a registered voter in North Carolina. Ms. Palmer plans to run for re-election as councilwoman of Chapel Hill, and will be forced to incur additional time and expense to educate the Latino members of her constituency on the new voting laws and to ensure that they meet the new requirements to vote in the next election. Moreover, the name on Ms. Palmer's driver's license does not match the name on her social security card or her voter registration card. As a result, Ms. Unger will have to incur the time and expense required to obtain identification that is sufficient to vote under the new law.

34. Plaintiff JOHN DOE 1 is a citizen and resident of North Carolina who will be harmed by the unlawful changes to North Carolina's election laws included in the newly enacted H.B. 589.

35. Plaintiff JANE DOE 1 is a citizen and resident of North Carolina who will be harmed by the unlawful changes to North Carolina's election laws included in the newly enacted H.B. 589.

36. Plaintiff JOHN DOE 2 is a citizen and resident of North Carolina who will be harmed by the unlawful changes to North Carolina's election laws included in the newly enacted H.B. 589.

37. Plaintiff JANE DOE 2 is a citizen and resident of North Carolina who will be harmed by the unlawful changes to North Carolina's election laws included in the newly enacted H.B. 589.

38. Plaintiff JOHN DOE 3 is a citizen and resident of North Carolina who will be harmed by the unlawful changes to North Carolina's election laws included in the newly enacted H.B. 589.

39. Plaintiff JANE DOE 3 is a citizen and resident of North Carolina who will be harmed by the unlawful changes to North Carolina's election laws included in the newly enacted H.B. 589.

40. Collectively, plaintiffs ROSANELL EATON, ARMENTA EATON, CAROLYN COLEMAN, JOCELYN FERGUSON-KELLY, FAITH JACKSON, MARY PERRY, MARIA TERESA UNGER PALMER, JOHN DOEs 1-3, and JANE DOEs 1-3 are referred to in this complaint as the "Individual Plaintiffs." The Individual Plaintiffs have standing to challenge H.B. 589. Each of the plaintiffs will suffer an injury-in-fact that is caused by the challenged provisions of H.B. 589 and that would be addressed by an order from the Court directing the defendants not to implement or enforce the challenged provisions of H.B. 589. The injury-in-fact suffered by plaintiffs is the outright denial or dilution of their right to vote, or, at the very least, substantial and undue burdens on their right to vote that are not outweighed by a legitimate or compelling state interest. That denial and/or dilution, and those substantial burdens, are caused by the new limitations imposed on voting by the challenged provisions of H.B. 589.

41. Defendant PATRICK LLOYD MCCRORY, is the Governor of North Carolina. In that capacity, he is responsible for faithfully executing and enforcing the laws of North

Carolina, including H.B. 589. He is being sued in his official capacity as the Governor of North Carolina. Defendant MCCRORY is responsible for appointing the members of the North Carolina State Board of Elections and, in certain circumstances, has the power to remove certain members of the North Carolina State Board of Elections. Defendant MCCRORY also receives recommendations from the North Carolina State Board of Elections relative to the conduct and administration of the primaries and elections in North Carolina. Defendant MCCRORY also oversees the North Carolina Department of Transportation and other state agencies that are involved with the implementation and enforcement of H.B. 589. In light of his duties, there is a special relation between Defendant MCCRORY and H.B. 589.

42. Defendant KIM WESTBROOK STRACH is the Executive Director of the North Carolina State Board of Elections, which is charged with administering the election laws of the State of North Carolina. She is being sued in her official capacity as an officer of the North Carolina State Board of Elections. In light of her duties, there is a special relation between Defendant STRACH and H.B. 589.

43. Defendant JOSHUA B. HOWARD is the Chairman of the North Carolina State Board of Elections, which is charged with administering the election laws of the State of North Carolina. He is being sued in his official capacity as a member of the North Carolina State Board of Elections. In light of his duties, there is a special relation between Defendant HOWARD and H.B. 589.

44. Defendant RHONDA K. AMOROSO is being sued in her official capacity as a member of the North Carolina State Board of Elections, which is charged with administering the election laws of the State of North Carolina. In light of her duties, there is a special relation between Defendant AMOROSO and H.B. 589.

45. Defendant JOSHUA D. MALCOLM is being sued in his official capacity as a member of the North Carolina State Board of Elections, which is charged with administering the election laws of the State of North Carolina. In light of his duties, there is a special relation between Defendant MALCOLM and H.B. 589.

46. Defendant JAMES BAKER is being sued in his official capacity as a member of the North Carolina State Board of Elections, which is charged with administering the election laws of the State of North Carolina. In light of his duties, there is a special relation between Defendant BAKER and H.B. 589.

47. Defendant MAJA KRICKER is being sued in her official capacity as a member of the North Carolina State Board of Elections, which is charged with administering the election laws of the State of North Carolina. On information and belief, Defendant KRICKER resides within the Middle District of North Carolina. In light of her duties, there is a special relation between Defendant KRICKER and H.B. 589.

## FACTUAL BACKGROUND

### I. North Carolina's History of Discriminatory Voting Practices

48. Federal courts have repeatedly found a history of voting-related discrimination in North Carolina. The Department of Justice has also lodged over 60 objections to changes to voting laws in North Carolina under Section 5 of the Voting Rights Act.

49. In one of the Supreme Court's leading cases on the Voting Rights Act—*Thornburgh v. Gingles*, 478 U.S. 30 (1985)—the Court let stand a lower court's factual findings that a history of racial discrimination in North Carolina had resulted in a lower socioeconomic status for most African-Americans in the state; that North Carolina had a history of voting-related discrimination; that the state had used voting and electoral procedures

that lessened the opportunity of African-American voters to elect candidates of their choice; that political campaigns in North Carolina had used racial appeals; that African-Americans had rarely been elected to office in the state; and that voting was racially polarized in certain districts.

50. Numerous counties in North Carolina were, until recently, "covered" jurisdictions under Section 4(b) of the Voting Rights Act, 42 U.S.C. § 1973. In particular, 41 North Carolina counties were, based on a history of racial discrimination in voting, previously covered by Section 4(b)'s coverage formula, and thus those counties were required to obtain preclearance from the U.S. Department of Justice before making changes to their voting procedures. Under that system, those 41 North Carolina counties had sought preclearance for many voting-related changes.

51. The turnout rate among African-American voters in North Carolina, which has significantly lagged behind that of white voters as recently as the 2004 general election, surpassed that of white voters in the 2008 and 2012 general elections.

52. Voter registration and turnout rates among Latino voters in North Carolina both continue to lag significantly behind that of white voters in recent elections. It is estimated that only 53 percent of eligible Latino citizens in North Carolina are registered to vote.

53. From 1980 to 2013, the Attorney General interposed objections under Section 5 of the Voting Rights Act to at least 60 submissions consisting of some 155 discrete voting changes in North Carolina, finding that either the State or one of the covered political subdivisions within the State had failed to show that the proposed changes would not have the purpose or effect of denying or abridging the right to vote on account of race or color or membership in a language minority group.

54. Between 1982 and 2006, plaintiffs secured favorable outcomes in 55 lawsuits brought against governmental units in North Carolina under Section 2 of the Voting Rights Act. Ten of these lawsuits resulted in reported judicial decisions; 45 were settled favorably without a reported decision.

## II. <u>The Statutory History of H.B. 589</u>

55. On April 4, 2013, the North Carolina House introduced H.B. 589. The original bill was limited to requiring voter identification for in-person voting and introducing amendments to the absentee-ballot process. The bill passed the House with several minor amendments on April 24, and was referred to the Senate on April 25. But the Senate took no immediate action on the bill, and H.B. 589 languished for close to two months with little activity.

56. On June 25, 2013, the U.S. Supreme Court decided *Shelby County v. Holder*, striking down as unconstitutional Section 4 of the Voting Rights Act. Section 4 had provided a formula to identify state and local jurisdictions that had a history of racial discrimination in voting and thus were subject to preclearance requirements under the Voting Rights Act.

57. The North Carolina legislature quickly revived H.B. 589 after the Supreme Court decided *Shelby County*. The 41 North Carolina counties previously covered by the Voting Rights Act were now relieved of their obligation to seek federal clearance before changing their voting laws, and members of the North Carolina legislature moved to push forward new impediments to voting and to roll back voter protections. After *Shelby County* was handed down, Sen. Tom Apodaca—Chairman of the Senate Rules Committee—stated that "[n]ow we can go ahead with the full bill."

58. On July 23, 2013—less than one month after the Supreme Court issued its ruling in *Shelby County* and four days before the end of the legislative session—North Carolina lawmakers added an armada of amendments to H.B. 589, vastly expanding the bill's reach.

59. These amendments included, among others, reductions in early-voting; the elimination of same-day registration; a provision that explicitly prevented county boards of election from counting "out-of-precinct" provisional ballots; the elimination of discretion for county boards of elections to direct that polls remain open for an additional hour on Election Day; the elimination of pre-registration for 16- and 17-year olds; the elimination of flexibility for county boards of election to open early-voting sites at different hours within a county; the elimination of straight party ticket voting; the expansion of the number of poll observers and the numbers of people who can challenge ballots; and new regulations that make it more difficult to add satellite polling sites for the elderly or voters with disabilities.

60. The amendments were all added over the course of three days leading up to the close of the legislative session: July 23, 24, and 25. On July 25, the Senate passed this expanded version of H.B. 589. Hours later, the state House followed suit. And on July 26, during the waning hours of the last day of the legislative session, the House and Senate leaders signed the bill in preparation for its delivery to Governor Pat McCrory.

61. Although the North Carolina legislature moved rapidly to push H.B. 589 through, lawmakers had previously heard extensive commentary from the public about the disproportionate impact the proposed legislation would have on the voting rights of African-Americans.

62. At public hearings in March and April of 2013, numerous individuals and organizations detailed how a provision requiring voters to have photo identification would

disproportionately affect the voting ability of African Americans and other minorities. A representative of the North Carolina Justice Center testified that "African-Americans are more than three times as likely as whites to not have a government-issued ID." The ACLU of North Carolina told lawmakers that "while African-Americans make up 22 percent of the active registered voters in North Carolina, they are 31 percent of the registered voters identified as not having a valid state-issued government ID."

63. Proponents of H.B. 589, on the other hand, claimed that "[p]oor and minority voters do not lack photo ID because they cannot apply for government assistance without a photo ID." Other proponents of the bill—with no supporting information—warned that "illegals" would perpetrate fraud and "steal from us," and posited a "vast left-wing conspiracy … working to pad the voter rolls with as many non-citizens as possible."

64. At the public hearings on H.B. 589, opponents of the bill pointed out the dearth of evidence of voter fraud in North Carolina, noting that "the State Board of Elections reports that from 2000 to 2010, only two cases of voter fraud by impersonation were referred to the District Attorney for prosecution."

65. Lacking evidence of actual voter fraud, proponents of the bill resorted to their own suspicions, based largely on personal anecdotes, that fraud was rampant in the state. For example, one speaker in favor of H.B. 589 cited as evidence of potential voter fraud "a TV story of a blond woman in San Diego" who discovered that "an illegal had his photo made onto her credit card."

66. During the subsequent Senate Committee hearing, the Senate floor debate, and the House floor debate—all conducted within the last 96 hours of the legislative session—

members of the General Assembly were again made aware of the disparate negative impact that H.B. 589 would have on voters of color.

67. Not a single African-American member of the state House or Senate voted in favor of H.B. 589. The North Carolina Attorney General, Roy Cooper, sent a letter urging Gov. McCrory to veto the bill. "I write to state my strong opposition to the election reforms contained in House Bill 589 and ask that you veto this regressive legislation," Cooper wrote in a July 26 letter. "With a veto, you can encourage more people to be involved in the political process, stop this bad public policy, and prevent the confusion and cost of a legal battle."

68. Throughout the legislative process, lawmakers repeatedly tried to justify the restrictive new provisions in H.B. 589 by arguing that those provisions were necessary to combat voter fraud. The evidence before the General Assembly, however, showed very few allegations of voter fraud. According to the North Carolina Board of Elections, of the almost 7,000,000 votes that were cast in the 2012 election cycle, there were only 121 cases of alleged voter fraud reported to authorities. The great majority of those reported cases involved instances of individuals with felony convictions trying to vote or individuals attempting to vote more than once—problems that are not even addressed by the new provisions included in H.B. 589. The 2010 mid-term elections were also relatively free of voter fraud. Out of the 3,790,000 votes cast, the state referred only 28 cases of alleged voter fraud to authorities.

69. Since the year 2000, the State Board of Elections has reported only ***two*** instances of alleged voted impersonation. The General Assembly had that information before it when it enacted H.B. 589.

70. In its own study, the State Board of Elections stated that "[m]ost allegations [of voter fraud] prove to be unfounded, lack criminal intent, or cannot be substantiated." The General Assembly had that information before it when it enacted H.B. 589.

71. Indeed, even legislators in favor of H.B. 589 had to admit that voter fraud was not the major motivation behind the bill. "There is some voter fraud, but that's not the primary reason for doing this," said Thom Tillis, the House Speaker.

72. During the 2014 elections, pursuant to the "soft rollout" of the Photo ID requirement of H.B. 589, voters were instructed that, with very limited statutory exceptions, they would be required to present acceptable photo ID in order to vote beginning in 2016.

73. Employees and representatives took additional measures throughout 2014 and 2015 to instruct voters that they would be required to present acceptable photo ID in order to vote beginning in 2016. These included: (a) hiring "election specialists" to educate the public on the need for photo ID beginning in 2016; (b) developing a "stand-alone" voter ID website; (c) creating color posters used at every North Carolina voting precinct in 2014 that depicted photo IDs that would be accepted in 2016 and including the sentence, "In 2016, you will need a photo ID to vote."; (d) developing scripts, which were read by 2014 poll workers informing 2014 voters that they would need a photo ID to vote in North Carolina in 2016 and asking if they had such an ID; (e) requiring voters who did not possess an ID to execute an affidavit acknowledging that they did not possess such an ID; and (f) completing a mailing following the 2014 election to people who signed the affidavits and/or who appeared on the State's "no match" list reminding them of Photo ID requirement.

74. On June 18, 2015, almost two years after passage of H.B. 589—and just three weeks before trial of the Plaintiffs' challenge to the Photo ID requirement was scheduled to

begin—the General Assembly passed North Carolina House Bill 836 (2015) ("H.B. 836"), which makes certain amendments to the Photo ID requirement set forth in H.B. 589.

75. The amendments to the Photo ID requirement contained in H.B. 836 were the product of a conference committee on an unrelated bill and subsequently passed the General Assembly with limited discussion or debate. The bill was subsequently signed into law by Governor Patrick McCrory on June 22, 2015.

76. State officials have asserted that they do not intend to educate voters on the amendments to H.B. 589 contained in H.B. 836 until the conclusion of the 2015 municipal elections, just months prior to the March 2016 presidential primaries, the first elections where the Photo ID requirement is slated to be in effect.

77. State officials have also not publicized how county boards of elections or poll workers will be trained regarding the changes to the Photo ID requirement, nor have they conducted public hearings or published rules or regulations pertaining to the use of reasonable impediment declarations.

## III. The Challenged Provisions of H.B. 589

78. H.B. 589 includes a number of provisions that—independently and collectively—violate Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

### A. Voter Identification Requirements

79. Prior to the enactment of H.B. 589, any North Carolina voter who had provided a driver's license number or the last four digits of his or her social security number in a voter registration application was not required to provide a particular form of identification to cast a ballot for a statewide or federal election; the voter merely had to attest to his or her identity as listed on the registered voter list.

80. Despite the absence of any facts to indicate that this system was allowing significant voter fraud to occur, H.B. 589 burdens North Carolinians with voter ID requirements which disproportionately restrict the right to vote of African-Americans and Latinos.

81. H.B. 589 requires North Carolinians who cast their ballots in person to provide one of the following forms of unexpired ***photo*** identification: a North Carolina driver's license, learner's permit, or provisional license; a special identification card for non-operators; a United States passport; a tribal enrollment card issued by a federally recognized tribe; a tribal enrollment card issued by a tribe recognized in North Carolina; or a driver's license or non-operator's identification card issued by another state (provided that the voter registered within 90 days of the election). H.B. 589 also provides that voters who hold them can use expired military identification and veterans' identification cards, and that voters over 70 can use expired identification cards in certain circumstances.

82. The new voter ID requirements impose substantial burdens on those North Carolina voters who do not possess, and lack the means to obtain, the required identification. African-American and Latino voters are disproportionately represented among this group.

83. As of March 2013, African-Americans made up a disproportionate number of registered voters for whom the State Board of Elections could not identify as having a North Carolina driver's license or special non-operator's identification card. African-American voters were also less likely to use a DMV-issued photo ID than white voters when registering to vote in 2012, and were slightly more likely to show a paycheck or ID labeled as "other." Moreover, studies have shown that African-Americans and Latinos are less likely than

members of other demographic groups to possess the type of government issued photo ID required in H.B. 589 or the means to obtain it.

84. These Voter-ID provisions impose disproportionate burdens on African-Americans and Latinos. The history of racial discrimination in North Carolina has caused African-Americans and Latinos to have less access to transportation and health care, to be less well-educated, less well-housed, lower-paid, and more likely to live in poverty than their white counterparts. These vestiges of race discrimination make it more difficult for African-Americans and Latinos to comply with the Voter-ID provisions of H.B. 589.

85. African-Americans and Latinos, for example, find it more burdensome to find transportation to a location that can provide them with an approved identification, to interrupt the work day to go to such a location, and to afford the costs of traveling to such a location and obtaining approved identification. For example, North Carolina citizens who lack a proper form of identification will need to find transportation to the department of motor vehicles (or other appropriate state agency) to obtain the necessary identification. To obtain a driver's license, they will have to show multiple forms of underlying documentation to prove their name, date of birth, and other identifying information. If those individuals lack the necessary underlying documentation to obtain a driver's license, they will then have to find transportation to a social security office or another state or federal agency location, where they can then try to acquire such documentation. These state agencies (and even the local department of motor vehicles location) can be miles away from an individual's home and in an area with no public transportation.

86. The amendments to SL 2013-381 contained in H.B. 836 do not alleviate these burdens or the deterrence of minorities from voting that results from them, as H.B. 836 does

not alter SL 2013-381's requirement that voters present state issued photo ID in order to cast a regular ballot at the polls.

87. H.B. 836 does not eliminate the Photo ID requirement, but rather amends SL 2013-381 to provide a process for voters who cannot satisfy the requirement to either (a) complete a written request for an absentee ballot in accordance with G.S. 163-227.2(b1) until the deadline for submission of requests for absentee ballots provided in G.S. 163-230.1 (the "Absentee Ballot Option"), or (b) complete a "reasonable impediment declaration" and vote a provisional ballot, which will be counted in accordance with G.S. 163-182.1B (the "Reasonable Impediment Declaration Exception"), *see* G.S. § 166-166.13(c). Voters without photo ID in compliance with H.B. 589 cannot cast a regular ballot at the polls.

88. The law also allows any voter in the county to challenge the veracity of a voter's "Reasonable Impediment Declaration" and allows a county board of elections to reject a voter's provisional ballot cast thereupon if, in the view of the county board of elections, the declaration is factually false, denigrates the Photo ID requirement, or is obviously nonsensical; or if the voter has failed to provide underlying supporting identification.

89. The amendments to SL 2013-381 contained in H.B. 836 will disproportionately burden North Carolina's African-American and Latino voters, who, because they are disproportionately represented among the voting population who lack the forms of ID mandated by H.B. 589, will be more likely to have to execute a Reasonable Impediment Declaration and cast a provisional ballot, rather than a regular ballot.

90. Because African-American and Latino voters are disproportionately represented among those who lack the forms of ID mandated by H.B. 589, they are more likely to be relegated to separate lines to cast provisional ballots. Because the polling places with high

African-American and Latino populations will therefore have disproportionately more voters relegated to separate lines, those voters will also be subjected to longer lines and greater administrative hurdles, and deterred from voting.

91. The Reasonable Impediment Declaration process itself will impose greater burdens on African-American and Latino voters. The history of racial discrimination in educational access in North Carolina has caused African Americans and Latinos to have lower rates of literacy and English proficiency than whites. African Americans and Latinos have greater rates of low literacy, functional illiteracy and limited English proficiency and are more likely to face obstacles to executing a declaration, and more deterred from doing so in the first place.

92. Additionally, voters who do not possess qualifying photo identification—who are disproportionately African American and Latino—have already been discouraged from showing up to vote given the State's publications and pronouncements throughout 2014 and 2015 that photo ID would be required in the 2016 election. Voters who lack such an ID will be less likely to visit a polling place (and therefore take advantage of the Reasonable Impediment Declaration process) in light of the confusion that the State has caused through its publicity and "soft rollout" in 2014 and 2015.

93. The North Carolina legislature also created a distinction between absentee and in-person voters. A voter who casts an absentee ballot is not required to present photo identification at any point during the voting process, as long as he or she provided an accurate driver's license number or social security number during the registration process. Absentee voters are able to cast their ballots with nothing more than their own signature, and the signature of two witnesses. In past elections in North Carolina, African-American voters used

absentee ballots at lower rates than white voters. In 2012, African-American voters made up 22% of registered voters, but only 9% of the voters who cast their ballots through the absentee process; by contrast, White voters made up 71% of registered voters and roughly 86% of voters who cast absentee ballots.

94. Because African Americans use absentee ballots at lower rates than white voters, African Americans without ID mandated by H.B. 589 will be less likely than white voters to exercise the "Absentee Ballot Option" set forth in H.B. 836 and more likely to complete a "reasonable impediment declaration" and vote a provisional ballot, which can be subject to challenge.

**B. Registration**

95. Before H.B. 589 was passed, North Carolina voters had the opportunity to register to vote and cast a ballot all at once at one-stop early-voting sites. This was known as same-day registration. Same-day registration began in 2007.

96. Also, before H.B. 589 was passed, North Carolina residents between the ages of 16 and 18 also had the opportunity to pre-register at public high schools, drivers license offices, and certain public agencies. In fact, the law encouraged local boards of education to adopt policies to promote student voter pre-registration at high schools.

97. In the 2012 general election, African-Americans and Latinos took advantage of same-day registration at higher rates than White Americans. Statistics show that, in 2012, African-Americans accounted for around 41% of individuals who used the same-day registration process, even though they make up just 22% of the state's populations, and that Latinos also used same-day registration at a disproportionate rate in 2012. Additionally, in 2012, 100,000 first-time voters used same-day registration in North Carolina and nearly

150,000 used same-day registration to update their address or other information. Studies have shown that African-Americans and Latinos, traditionally, have been more likely to move (within the same state) than whites, and, as a result, are more likely to require updates to their voter registration application.

98. During the 2012 general election, about 3.1% percent of North Carolina's African-American voters who cast ballots used same-day registration, compared to about 1.6% of white registered voters.

99. Latinos, who have disproportionately lower rates of voter registration than white voters, also used same-day registration at a disproportionately higher rate to register for the first time.

100. H.B. 589's elimination of same-day registration and pre-registration opportunities for 16- and 17-year olds will have a disparate impact on African American and Latino voters, who have fewer opportunities to register to vote outside of this mechanism. The elimination of pre-registration will have a particularly disparate impact on Latinos, for whom youth comprise a larger proportion of the population than the proportion of young whites in North Carolina. The median age of Hispanics in North Carolina is 24, compared to a median age of 41 for non-Hispanic whites. Approximately 5 percent of the state's Latinos are 15-17, while 15-17-year olds make up 3 percent of the state's white population. Moreover, some 38% of North Carolina Hispanics are under the age of 18, and 89 percent are citizens. Finally, because voter registration of eligible Latino citizens in North Carolina lags far behind that of white voters and thus, elimination of access to voter registration opportunities will have a compounded disparate impact on Latinos.

101. H.B. 589 repealed same-day and pre-registration in their entirety. The repeal of same-day registration will have a disproportionate impact on African-Americans and Latinos.

**C. Early-voting**

102. Before H.B. 589, North Carolina allowed early-voting starting on the third Thursday before the election, and ending on the Saturday before Election Day. That period provides for a full 17 days of early-voting, including three Saturdays and two Sundays. Early-voting began in North Carolina in 2000.

103. In the 2012 general election, the first week of early-voting drew approximately 900,000 voters in North Carolina, and over 2,500,000 people cast ballots through the entire early-voting period. In total, 56% of North Carolina voters in the 2012 general election voted early.

104. African-Americans were disproportionately represented in the group of early voters. Indeed, a staggering ***70%*** of African-American voters who voted in the 2012 general election used early-voting. Even though they make up just 22% of the state's population, African-Americans accounted for 29% of all early voters, and 39% of the early voters on the last two Sundays of early-voting before Election Day. Moreover, it is estimated that over half of the Latinos who voted in 2012 used early-voting.

105. The North Carolina General Assembly removed the first week of early-voting and eliminated seven full days of early-voting, including one day of Saturday voting and one day of Sunday voting. In addition, H.B. 589 eliminates each county's option of offering four additional hours of early-voting, from 1 p.m. to 5 p.m., on the last Saturday before the election.

106. Sunday voting is particularly important in African-American communities in North Carolina. Many African-American churches in North Carolina conduct "Souls to the

Polls" voting drives. A disproportionate number of African-Americans vote on Sundays as compared to whites. The elimination of one day of Sunday voting will have a disparate impact on African-Americans.

107. A memorandum prepared by the executive director of the North Carolina State Board of Elections in May 2011, in response to a proposal in 2011 to cut early-voting in North Carolina, states that cutting early-voting would increase county election expenses because of the cost, among other things, of increasing the number of Election Day polling places, equipment, and staff.

**D. Other Measures Restricting The Right To Vote**

108. H.B. 589 includes several additional measures that have the effect of denying African-Americans and Latinos the right to vote, diluting minority voting strength, or imposing undue burdens on the right to vote.

109. Prior to the enactment of H.B. 589, voters who came to the wrong precinct were entitled to cast provisional ballots, which were then counted for non-precinct-specific elections. Out-of-precinct voting was authorized by law in 2004 and was revised and passed again in 2005. In passing the 2005 legislation, the General Assembly issued a legislative finding that a disproportionately high number of African Americans utilize out-of-precinct voting: "The General Assembly takes note of the fact that of those registered voters who happened to vote provisional ballots outside of their resident precincts on the day of the November 2004 General Election, a disproportionately high percentage were African-American." N.C. Session Law 2005-2 §1(9).

110. The General Assembly also explained in 2005: "It was then and is now the intent of the General Assembly in enacting G.S. 163-166.11 to expand the exercise of the franchise, not to limit it or to restrict it by the terms of earlier and narrower enactments."

111. H.B. 589 ***eliminated*** out-of-precinct voting for state-wide or multi-precinct races by specifying that no out-of-precinct provisional ballots will be counted for any North Carolina or federal election. This means that for a registered voter who votes in the wrong precinct in their home county, their entire ballot will be thrown out, including votes for offices that are unrelated to the precinct, like President, US Senator, and Governor. That elimination will have a disproportionate impact on African-Americans and, upon information and belief, Latinos. In 2012, African-Americans, who make up approximately 22% of the state's population, cast roughly 30% of all out-of-precinct ballots.

112. H.B. 589 also expands the limits on the permissible number of poll observers and relaxes restrictions on the number and qualifications of people who can challenge ballots. The right to challenge ballots had previously been limited to those who were registered to vote in the same precinct as the challenged voter. However, H.B. 589 allows any registered voter to challenge another voter anywhere in the state before Election Day and any registered voter to challenge another voter from the same county on Election Day.

113. The North Carolina General Assembly passed these measures despite evidence of voter intimidation during the 2012 election cycle. For example, in October 2012 the Board of Elections explained that it had "received numerous reports of aggressive electioneering at one-stop absentee voting sites throughout the state," including campaign and party supporters "approaching voters within the buffer zone" around an election site and "using profanity and aggressive language to supporters of opposing candidates or political parties." In one instance,

a poll worker was "injured and required emergency medical attention when she attempted to protect the buffer zone from an overly aggressive electioneerer." The Board of Elections also stated that it had received "reports of voters purposefully being given misinformation about the 2012 General Election."

114. By expanding the limits on the number of permitted poll watchers and challengers, and by relaxing the restrictions on qualifications of poll watchers and challengers, H.B. 589 increases the likelihood of voter harassment and imposes an unlawful burden on the right to vote. On information and belief, such measures will disproportionately impact African-American and Latino voters.

### E. Cumulative Impact of Challenged Provisions

115. While each of the challenged provisions individually disproportionately impacts African-American and Latino voters, upon information and belief, the cumulative impact of the provisions will have an even greater disproportionate impact on African-American and Latino voters.

## CLAIMS FOR RELIEF

### Count I — Section 2 of the Voting Rights Act
### (42 U.S.C. § 1973)

116. Plaintiffs reallege and incorporate all prior paragraphs of this Complaint.

117. The provisions of H.B. 589 that impose voter-identification requirements, that eliminate same-day voter registration and pre-registration, that reduce the number of days for early-voting, and that prohibit out-of-precinct voting, as well as the State's implementation of those provisions, will, independently and collectively, have a disparate impact on African-American and Latino citizens of North Carolina.

118. On information and belief, the provisions of H.B. 589 that expand the number of poll observers and the numbers of people who can challenge ballots and that eliminate pre-registration, especially in combination with the elimination of same-day registration, will have a disparate impact on African-American and Latino citizens of North Carolina.

119. The provisions of H.B. 589 that impose voter-identification requirements, that eliminate same-day voter registration and pre-registration, that reduce the number of days for early-voting, that prohibit out-of-precinct voting, and that expand the number of poll observers and the numbers and qualifications of people who can challenge ballots, as well as the State's implementation of those provisions, will, independently and collectively, result in the denial or abridgement of the right to vote for African-American and Latino citizens of North Carolina, the Individual Plaintiffs, and members of the North Carolina NAACP on account of race or color in violation of Section 2 of the Voting Rights Act.

120. The provisions of H.B. 589 that impose voter-identification requirements, that eliminate same-day voter registration, that reduce the number of days for early-voting, that prohibit out-of-precinct voting, that eliminate pre-registration, and that expand the number of poll observers and the numbers of people who can challenge ballots, as well as the State's implementation of those provisions, will, independently and collectively, result in the dilution of voting strength of African-Americans and Latinos in North Carolina, including the Individual Plaintiffs and members of the North Carolina NAACP.

121. African-Americans and Latinos in North Carolina, as a group, disproportionately engage in early-voting, use same-day voter registration and pre-registration, and use out-of-precinct provisional voting. On information and belief, a disproportionate number of African-Americans and Latinos in North Carolina also currently lack the

identification required to vote by H.B. 589 and will be disproportionately burdened and deterred by the processes established in H.B. 836 for voters who lack the required forms of identification. On information and belief, a disproportionate number of African Americans will be adversely impacted by the provisions of H.B. 589 that eliminate pre-registration, and expand the number of poll observers and relax restrictions on the numbers and qualifications of people who can challenge ballots

122. At the time of H.B. 589's enactment, the General Assembly had before it evidence that African-Americans use early-voting, same-day voter registration, and out-of-precinct voting at higher rates than white voters, and that a disproportionate number of African-Americans lack the identification required to vote by H.B. 589. The General Assembly thus enacted a voter-identification requirement and eliminated or reduced early-voting, same-day voter registration, and out-of-precinct voting with knowledge that such actions would affect African-American and Latino voters disproportionately.

123. The provisions of H.B. 589 that impose voter-identification requirements, that eliminate same-day voter registration and pre-registration, that reduce the number of days for early-voting, that prohibit out-of-precinct voting, and that expand the number of poll observers and the number of people who can challenge ballots, as well as the State's implementation of those provisions, will, independently and collectively, have a causal connection to the discriminatory impact of North Carolina's voting laws.

124. The provisions of H.B. 589 that impose voter-identification requirements, that eliminate same-day voter registration and pre-registration, that reduce the number of days for early-voting, that prohibit out-of-precinct voting, and that expand the number of poll observers and the number of people who can challenge ballots, as well as the State's implementation of

those provisions, will, independently and collectively, interact with social and historical conditions in North Carolina—including racial disparities in areas such as housing, education, employment, income, health, and criminal justice—to deny African-Americans and Latinos meaningful access to the political process.

125. Under the totality of the circumstances, the provisions of H.B. 589 that impose voter-identification requirements, that eliminate same-day voter registration and pre-registration, that reduce the number of days for early-voting, that prohibit out-of-precinct voting, and that expand the number of poll observers and the number of people who can challenge ballots, as well as the State's implementation of those provisions, will result in the dilution of minority voting strength and will, independently and collectively, deny African-Americans and Latinos meaningful access to the political process.

126. North Carolina has an established—and judicially recognized—history of voting-related discrimination on the basis of race and ethnicity.

127. North Carolina has an established—and judicially recognized—history of racially polarized elections.

128. North Carolina has an established—and judicially recognized—history of using voting practices or procedures that tend to enhance the opportunity for discrimination against minority groups and to lessen the opportunity for minority groups to elect candidates of their choice.

129. North Carolina has an established—and judicially recognized—history of discrimination in education on the basis of race and ethnicity.

130. As numerous courts have recognized, racial minorities in North Carolina bear the effects of past discrimination—in areas such as education, employment, income, health,

and criminal justice—which hinder the ability of minorities to participate fully in the political processes. This history of discrimination causes North Carolina citizens who are members of racial minority groups to have less access to transportation and health care, and to be less well-educated, less well-housed, lower-paid, and more likely to have low literacy and to live in poverty than their white counterparts.

131. Political campaigns in North Carolina have, on occasion, used overt and subtle racial appeals in political ads issued during the campaign.

132. Some elected officials in North Carolina have historically demonstrated a lack of responsiveness to the particularized needs of minority communities. This lack of responsiveness is demonstrated by racial disparities in areas such as housing, education, employment, income, health, and criminal justice. Racial minorities in North Carolina also have insufficient political influence to ensure that their needs are considered and addressed by elected officials.

133. The alleged policy rationales underlying H.B. 589 are tenuous and are not supported by credible evidence. In addition, the challenged provisions of H.B. 589 are not necessary or appropriately tailored to the accomplishment of any legitimate or compelling state interest.

**Count II — Violation of the Fourteenth Amendment and 42 U.S.C. § 1983**

134. Plaintiffs reallege and incorporate all prior paragraphs of this Complaint.

135. The provisions of H.B. 589 that impose voter-identification requirements, that eliminate same-day voter registration and pre-registration, that reduce the number of days for early-voting, that prohibit out-of-precinct voting, and that expand the number of poll observers

and the number of people who can challenge ballots were enacted with the intention of suppressing the number of votes cast by African-Americans.

136. The historical background of H.B. 589, the sequence of events leading up to the enactment of H.B. 589, and the legislative history indicate that race was a motivating factor in the law's enactment.

137. At the time of H.B. 589's enactment, the General Assembly had before it evidence that African-Americans used early-voting, same-day voter registration, and out-of-precinct voting at higher rates than white voters. The General Assembly also had before it evidence that a disproportionate number of African-Americans lacked the identification required to vote by H.B. 589. The General Assembly enacted those provisions with knowledge and intent that such actions would affect African-American voters disproportionately.

138. The provisions of H.B. 589 that impose voter-identification requirements, that eliminate same-day voter registration and pre-registration, that reduce the number of days for early-voting, that prohibit out-of-precinct voting, and that expand the number of poll observers and the number of people who can challenge ballots are not supported by a legitimate or compelling state interest.

139. The provisions of H.B. 589 that impose voter-identification requirements, that eliminate same-day voter registration and pre-registration, that reduce the number of days for early-voting, that prohibit out-of-precinct voting, and that expand the number of poll observers and the number of people who can challenge ballots are not appropriately tailored to the accomplishment of any legitimate state interest.

140. The provisions of H.B. 589 that impose voter-identification requirements, that eliminate same-day voter registration and pre-registration, that reduce the number of days for

early-voting, that prohibit out-of-precinct voting, and that expand the number of poll observers and the number of people who can challenge ballots impose real and substantial burdens on the right to vote.

141. That burden will include, but will not be limited to, the fact that voters will encounter longer lines, limited times and opportunities to cast a ballot, undue delay; be prevented from voting a regular ballot; and, in many cases, be completely prevented from voting as a result of the enactment of the challenged provisions of H.B. 589.

142. Even if the challenged provisions of H.B. 589 did serve a legitimate or compelling state interest, that interest would be outweighed by the substantial burdens the challenged provisions of H.B. 589 impose on the right to vote.

143. In implementing and enforcing the provisions of H.B. 589, the Defendants will be acting under the color of state law.

144. Defendants' actions in implementing and enforcing the provisions of H.B. 589 will deprive Plaintiffs and other individuals in North Carolina of rights, privileges, or immunities granted under the Fourteenth Amendment of the U.S. Constitution.

145. In implementing and enforcing the provisions of H.B. 589, the Defendants will be discriminating against the Plaintiffs and other individuals in North Carolina due to their race, or the racial composition of their membership, in violation of the Fourteenth Amendment of the U.S. Constitution.

**Count III — Violation of the Fifteenth Amendment and 42 U.S.C. § 1983**

146. Plaintiffs reallege and incorporate all prior paragraphs of this Complaint.

147. The provisions of H.B. 589 that impose voter-identification requirements, that eliminate same-day voter registration and pre-registration, that reduce the number of days for

early-voting, that prohibit out-of-precinct voting, and that expand the number of poll observers and the number of people who can challenge ballots will, independently and collectively, result in the denial or abridgement of the right to vote of racial minorities in North Carolina, the Individual Plaintiffs, and members of the North Carolina NAACP on account of race or color in violation of the Fifteenth Amendment to the U.S. Constitution.

148. The provisions of H.B. 589 that impose voter-identification requirements, that eliminate same-day voter registration and pre-registration, that reduce the number of days for early-voting, that prohibit out-of-precinct voting, and that expand the number of poll observers and the number of people who can challenge ballots were enacted with the intention of suppressing the number of votes cast by African-Americans.

149. The historical background of H.B. 589, the sequence of events leading up to the enactment of H.B. 589, and the legislative history indicate that race was a motivating factor in the law's enactment.

150. At the time of H.B. 589's enactment, the General Assembly had before it evidence that African-Americans used early-voting, same-day voter registration, and out-of-precinct voting at higher rates than white voters. The General Assembly also had before it evidence that a disproportionate number of African-Americans lacked the identification required to vote by H.B. 589. The General Assembly enacted those provisions with knowledge and intent that such actions would affect African-American voters disproportionately.

151. The provisions of H.B. 589 that impose voter-identification requirements, that eliminate same-day voter registration and pre-registration, that reduce the number of days for early-voting, that prohibit out-of-precinct voting, and that expand the number of poll observers

and the number of people who can challenge ballots are not supported by a legitimate or compelling state interest.

152. The provisions of H.B. 589 that impose voter-identification requirements, that eliminate same-day voter registration and pre-registration, that reduce the number of days for early-voting, that prohibit out-of-precinct voting, and that expand the number of poll observers and the number of people who can challenge ballots are not appropriately tailored to the accomplishment of any legitimate state interest.

153. In implementing and enforcing the provisions of H.B. 589, the Defendants will be acting under the color of state law.

154. Defendants' actions in implementing and enforcing the provisions of H.B. 589 will deprive Plaintiffs and other individuals in North Carolina of rights, privileges, or immunities granted under the Fifteenth Amendment of the U.S. Constitution.

155. In implementing and enforcing the provisions of H.B. 589, the Defendants will be discriminating against the Plaintiffs due to their race, or the racial composition of their membership, in violation of the Fifteenth Amendment of the U.S. Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court:

1. Declare that the challenged provisions of H.B. 589 violate Section 2 of the Voting Rights Act and the Fourteenth, and Fifteenth Amendments to the United States Constitution;

2. Declare that Plaintiffs' rights will be irreparably harmed without injunctive or declaratory relief from this court;

3. Enjoin the Defendants, their agents, officers, and employees from implementing, enforcing, or giving any effect to the provisions of H.B. 589 that impose voter-identification requirements, that eliminate same-day voter registration and pre-registration, that reduce the number of days for early-voting, that prohibit out-of-precinct voting, and that expand the number of poll observers and the scope of individuals who may issue voter challenges.

4. Retain Jurisdiction under Section 3(c) of the Voting Rights Act for such a period as it deems appropriate and decree that, during such period, no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force at the time this proceeding was commenced shall be enforced unless and until the Court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 1973b(f)(2) of the Voting Rights Act.

5. Award Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988; and

6. Grant such other relief as the Court considers just and appropriate.

Dated: November 6, 2015

Respectfully submitted,

By: */s/ Daniel T. Donovan*

Adam Stein (N.C. State Bar # 4145)
Of Counsel
TIN FULTON WALKER & OWEN, PLLC
1526 E. Franklins St, Suite 102,
Chapel Hill, NC 27514
Phone: (919) 240-7089
astein@tinfulton.com

Daniel T. Donovan
Bridget O'Connor
Susan M. Davies
Michael A. Glick
K. Winn Allen
KIRKLAND & ELLIS LLP
655 Fifteenth St., N.W.
Washington, DC 20005
Phone: (202) 879-5000
tyannucci@kirkland.com

Penda D. Hair
Edward A. Hailes, Jr.
Denise D. Lieberman
Donita Judge
Caitlin Swain
ADVANCEMENT PROJECT
Suite 850
1220 L Street, N.W.
Washington, DC 20005
Phone: (202) 728-9557
phair@advancementproject.com

Irving Joyner (N.C. State Bar # 7830)
P.O. Box 374
Cary, NC 27512
Phone: (919) 319-8353
ijoyner@nccu.edu

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2015, I electronically filed the foregoing **THIRD AMENDED AND SUPPLEMENTAL COMPLAINT**, using the CM/ECF system in case number 1:13-cv-658, which will send notification of such filing to all counsel of record.

Respectfully submitted,

*/s/ Daniel T. Donovan*

Daniel T. Donovan

*Attorney for Plaintiffs in*
*North Carolina State Conference of the NAACP, et al. v. McCrory, et al.*